UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X

ADRIAN THOMAS,

                                                   Plaintiff,

                    -against-

CITY OF TROY, ADAM R. MASON, Individually, RONALD
FOUNTAIN, Individually, TIM COLANERI, Individually,
RENSSELAER COUNTY, and MICHAEL SIKIRICA,
Individually,

                                              Defendants.

-----------------------------------------------------------------------------------X

**COMPLAINT**

1:17-cv-626 (GTS/DJS)

<u>Jury Trial Demanded</u>

       Plaintiff Adrian Thomas, by his attorneys, Brett H. Klein, Esq., PLLC, complaining of

the defendants, respectfully alleges as follows:

<u>**Preliminary Statement**</u>

       1.     Plaintiff brings this action for compensatory damages, punitive damages and

attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of his civil rights, as such

rights are secured by said statutes and the Constitution of the United States.  Plaintiff's claims

accrued on June 12, 2017 when he was acquitted of all charges that were maliciously brought

against him arising from the City of Troy Police Department defendant officers' misconduct in

coercing a false confession out of Mr. Thomas, which was held to be unconstitutional by the

New York Court of Appeals.

<u>**JURISDICTION**</u>

       2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the

Fourteenth Amendment to the United States Constitution.

       3.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

**VENUE**

4.      Venue is properly laid in the Northern District of New York under 28 U.S.C. §
1391(b) in that this is the District in which the claims arose.

**JURY DEMAND**

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to
Fed. R. Civ. P. 38(b).

**PARTIES**

6.      Plaintiff Adrian Thomas is a thirty-four-year-old African American man who
presently resides in the State of Georgia.

7.      Defendant City of Troy was and is a municipal corporation duly organized and
existing under and by virtue of the laws of the State of New York.

8.      Defendant City of Troy is a municipal corporation existing by virtue of the laws
of the State of New York.  At all relevant times, defendant City of Troy maintained its own
police force, the City of Troy Police Department (TPD), whose principal function was to enforce
criminal and administrative laws and rules in and about the City of Troy.

9.      At all relevant times herein, defendant Adam R. Mason was a duly sworn police
officer/detective of the TPD and is being sued in his individual capacity.

10.     At all relevant times herein, defendant Ronald Fountain was a duly sworn police
officer/detective of the TPD and is being sued in his individual capacity.

11.     At all relevant times herein, defendant Tim Colaneri was a duly sworn police
officer/detective of the TPD and is being sued in his individual capacity.

12.     Defendant Rensselaer County was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

13.     Defendant Rensselaer County, as part of its Department of Health, employed, managed, and was otherwise responsible for the Rensselaer County Medical Examiner, which contracted with its employee and/or agent, defendant Michael Sikirica, to, *inter alia,* conduct forensic investigations and to prepare autopsy reports.

14.     Defendant Michael Sikirica, was and is a medical doctor who conducts autopsies for defendant Rensselaer County, in so doing, acts under color of law.  He is being sued in his individual capacity.

<u>**FACTS**</u>

15.     On October 23, 2009, following a jury trial in Rensselaer County Supreme Court, Thomas was convicted of murder in the second degree for a crime he did not commit:  allegedly killing his own four-month old son, Matthew.  Thomas was sentenced to a term of 25 years to life in prison.

16.     Thomas did not murder Matthew.  Nobody murdered Matthew.  Medical evidence confirms overwhelmingly that Matthew died of septic shock caused by a bacterial infection.

17.     The attending physician at Albany County Medical Center, Dr. Walter Edge, who had been on duty and had not slept for nearly two days when he examined Matthew, made a tragic misdiagnosis.  Despite the clear evidence of a bacterial infection and sepsis, Dr. Edge concluded falsely that Matthew had suffered a skull fracture and was the victim of child abuse.  Of course, Dr. Edge did not and could not say who caused the injuries that he misdiagnosed.

18.     Based solely on Dr. Edge's initial misdiagnosis, the defendant City of Troy detectives from the TPD falsely arrested Mr. Thomas, conceding that they when they first took

3

him into their custody, they did not have probable cause to arrest him.  They thereafter subjected him to a brutal interrogation that lasted nearly 10 hours – an initial two-hour session, followed by a second seven-plus-hour session.  In between, Thomas was involuntary hospitalized for approximately 15 hours for expressing suicidal thoughts.  Upon his discharge, he was met by defendant TPD detectives, who took him back to TPD headquarters to continue the interrogation. During this interrogation, the defendant detectives used a variety of techniques that the New York Court of Appeals held unconstitutional, including telling Thomas falsely that his already dead son was alive and that his survival could depend on Thomas's disclosures, threatening to arrest his wife if he did not confess, and repeatedly promising Thomas, falsely, that if he confessed to injuring Matthew, he would not be arrested and would be allowed to go home.  As a direct and proximate result of the detectives' unconstitutional actions, Thomas falsely confessed to throwing Matthew down on the bed.

19.     The Court of Appeals reversed Thomas's conviction in February 2014, concluding that his confession was coerced and false, and that it was unconstitutional to introduce it at his trial.  *See People v. Thomas*, 22 N.Y.3d 629 (2014).

20.     The People retried Thomas, again for murder in the second degree.  A jury acquitted him on June 12, 2014.

21.     Thomas spent nearly six years in jail and prison (September 22, 2008, through June 12, 2014) for a particularly heinous crime that he did not commit.  Prior to his wrongful conviction, Thomas had never been convicted of a crime and had no criminal record.  Following his wrongful conviction, he was falsely branded as the worst kind of villain:  a man who supposedly had murdered his infant son with his own hands.

22.     From his arrest through his sentencing on the underlying wrongful conviction,

Thomas was incarcerated at the Rensselaer County Jail.  From shortly after his wrongful

conviction in approximately November 2009 through his acquittal, Thomas was a New York

State DOCCS inmate, incarcerated initially at Downstate Correctional Facility, and then at

Auburn Correctional Facility, a maximum-security prison, until his acquittal.  Due to nature of

his conviction, Thomas received several death threats from other inmates, and was consequently

housed in protective custody through the majority of his time served at Auburn.  This status

prevented Thomas from availing himself of jail programs, and from pursuing his GED.

Moreover, Thomas was confined to a cell for about 22 hours per day.  Copious peer-reviewed

research studies demonstrate that prisoners who are subjected to prolonged isolation are prone to

suffering severe, lasting, and often permanent psychological damage.

23.     Worst of all, Thomas's wrongful conviction directly and proximately caused him

to lose his family.  He was, and to this day remains, completely cut off from his family, and was

deprived of the ability to grieve and mourn the tragic and untimely death of Matthew with his

family.

### FACTS

**Background**

24.     In September 2008, Thomas was 26 years old.

25.     He lived with his wife, Wilhemina Hicks, and their seven children (one of which

was Ms. Hicks' child from a prior relationship).

26.     The couple's two youngest children, Matthew and his twin brother ███████, were

four months old.  They had been born prematurely and, as such, were more vulnerable to illness

than full-term babies.

5

27.     Thomas had never been convicted of a crime, and had no criminal record.

28.     Thomas had been unemployed for several months.  He had recently obtained his trucker's license, and hoped to find work as a truck driver soon.

**Matthew's Illness**

29.     On the morning of September 21, 2008, Matthew was ill.  He was running a fever and had experienced diarrhea and vomiting for a few days.  Hicks did not think Matthew's symptoms were particularly severe, but at about 8:00 a.m., Matthew became limp and unresponsive.  Hicks called an ambulance.

30.     Matthew was transported to Samaritan Hospital in Troy, New York. There, he presented with a range of symptoms that strongly suggested a bacterial infection, including a low white blood cell count, irregular heartbeat, low blood pressure, severe dehydration, and respiratory failure.  The treating emergency room doctor noted the most likely differential diagnosis to be septic shock.  Blood tests to confirm sepsis were performed, but their results were not immediately available.  Meanwhile, Matthew was placed on massive doses of antibiotics.

31.     Later that day, Matthew was transferred to the Pediatric Intensive Care Unit at Albany Medical Center, where he was treated by Dr. Walter Edge.  On information and belief, Dr. Edge had been on duty and had not slept for nearly two days.

32.     While Matthew was being treated at Albany Medical Center, the evidence that he was suffering from septic shock caused by a massive bacterial infection continued to build.  His white blood cell count was very low, he had decreased clotting mechanisms, he failed to maintain oxygen saturation, among other signs.

33.     Dr. Edge nevertheless falsely concluded, based on no credible medical evidence, that Matthew had suffered a skull fracture and was the victim of a physical assault.

34.     Dr. Edge falsely informed a Troy Police Department detective that Matthew's skull had been fractured, that he was going to die, and that he had been "murdered."

35.     Dr. Edge was completely wrong.  The next day, more thorough testing confirmed that Matthew's skull had not been fractured after all.  A complete skeletal survey found no fractures, no contusions, no abrasions, and no deformities of any kind.

**The Interrogation and False Confession**

36.     Working from Dr. Edge's initial false diagnosis on September 21, but otherwise having no reason to believe Mr. Thomas had any involvement in causing Matthew's injuries, the TPD defendants took Mr. Thomas into police custody and set out to obtain a coerced false confession from him to justify his arrest and prosecution for a crime he did not commit.

37.     Later that day, officials from Rensselaer County Child Protective Services removed Thomas' other children from their home and placed them in emergency foster care.

38.     The defendant TPD officers took Mr. Thomas to an interrogation room at the Troy Central Police Station, where they interrogated Thomas, or stood by while he was interrogated without intervening in the illegal techniques employed, for a total of about 9 1/2 hours, broken into an initial two-hour and a subsequent 7 1/2-hour session.

39.     In between, Thomas, who had expressed suicidal thoughts during the first session, was involuntarily hospitalized pursuant to Mental Hygiene Law § 9.39 for approximately 15 hours in a secure psychiatric unit.

40.     Thomas was released from the psychological hospital to his interrogators, defendants Mason and Fountain, who immediately escorted him back to the police station where the interrogation resumed.  Thomas slept no more than an hour and a half between the two interrogation sessions.

41.     The premise of the interrogation was that an adult within the Thomas–Hicks household must have inflicted traumatic head injuries on Matthew.  Indeed, one of the interrogating officers told Thomas that he had been informed by Matthew's doctor that Matthew had been "slammed into something very hard.  It's like a high-speed impact in [a] vehicle.  This baby was murdered ...  [T]his baby is going to die and he was murdered."

42.     The defendant interrogators, led by defendant Mason, however, repeatedly reassured Thomas that they understood Matthew's injuries to have been accidental.  They said they were not investigating what they thought to be a crime and that once Thomas had told them what had happened, he could go home.  He would not, they reassured over and again, be arrested.

43.     Thomas steadfastly continued to deny that he had injured Matthew, even accidentally.  The officers then falsely represented to Thomas that his wife had blamed him for Matthew's injuries and then threatened that, if he did not take responsibility, they would "scoop" Ms. Hicks out from the hospital and bring her in, observing one of them must have injured the child.

44.     By the end of the initial two-hour interrogation, Thomas agreed to "take the fall" for his wife.  He said that he had not harmed the child and did not believe that his wife had either because "she is a good wife," but that he would take responsibility to keep her out of trouble.

45.     Before the interrogation recommenced on the evening of September 22, Matthew was pronounced brain dead.  Nonetheless, the defendant officers told Thomas that he was alive and that his survival could depend on Thomas's disclosure of how he had caused the child's injuries:

DEFENDANT MASON:  The doctors need to know this. Do you want to save your baby's life, all right?  Do you want to save your baby's life or do you want your baby to die tonight?

THOMAS:  No, I want to save his life.

DEFENDANT MASON:  Are you sure about that?  Because you don't seem like you want to save your baby's life right now.  You seem like you're beating around the bush with me.

THOMAS:  I'm not lying.

DEFENDANT MASON:  You better find that memory right now Adrian, you've got to find that memory.  This is important for your son's life man.  You know what happens when you find that memory?  Maybe if we get this information, okay, maybe he's able to save your son's life.  Maybe your wife forgives you for what happened.  Maybe your family lives happier ever after.  But you know what, if you can't find that memory and those doctors can't save your son's life, then what kind of future are you going to have?  Where's it going to go? What's going to happen if Matthew dies in that hospital tonight, man?

46.     About four hours into the second interrogation session, Thomas gave a statement. He said that, about 10 or 15 days before, he accidentally dropped Matthew five or six inches into his crib and Matthew hit his head "pretty hard."  He speculated that that impact may have caused Matthew's supposed brain injury.  He also recalled accidentally bumping Matthew's head with his head on the evening of September 20.  He noticed that Matthew's breathing became labored, but was afraid to tell his wife what happened.

47.     After defendant Mason coerced Thomas into giving the above-described false statements, defendant Colaneri entered the interrogation room.  He claimed to have had experience with head injuries during his military service in Operation Desert Storm, and he angrily accused Thomas of lying.  He said that Matthew's injuries could only have resulted from a far greater application of force than Thomas had described.  Matthew's doctors, he reported, had stated that the child's head injuries were comparable to those that would have been sustained by a passenger in a high-speed car collision.

9

48.     After Colaneri left, defendant Mason said that he felt betrayed by Thomas's untruthfulness and that he was doing all he could to stop his superior from having him arrested. Although he would later acknowledge in his hearing testimony that he did not then have probable cause for Thomas's arrest, he represented to Thomas that he was Thomas's last hope in forestalling criminal charges.  He said that he could not help Thomas unless Thomas told him how he had caused Matthew's injuries.  He proposed that Thomas had been depressed and emotionally overwhelmed after having been berated by his wife over his chronic unemployment and that, out of frustration, he had, without intending to harm the infant, responded to his crying by throwing him from above his head onto a low-lying mattress.

49.     He emphasized several times that, according to the doctor at the hospital, the child would have had to hit the mattress at a speed of 60 miles per hour to sustain the injuries from which he was suffering.  He had Thomas demonstrate with a clipboard how he threw the child down on the mattress, instructing:

> DEFENDANT MASON:  Move that chair out of the way.  Here hold that like you hold the baby.  Turn around, look at me.  Now here's the bed right here, all right. Now like I said, the doctor said that this injury is consistent with a 60 mile per hour vehicle crash, all right, all right.  That means it was a very severe acceleration.  It means he was going fast and stopped suddenly, all right, so think about that.  Don't try to downplay this and make like it's not as severe as it is. Because [we] both know now you are finally starting to be honest, okay, all right. Maybe this other stuff you said is the truth.
>
> THOMAS:  That is.
>
> DEFENDANT MASON:  For what the information that I need to know we both know now you are starting to finally be honest with that, all right.  Hold that like you hold that baby, okay and start thinking about them negative things that your wife said to you, all right, start thinking about them kids crying all day and all night in your ear, your mother-in-law nagging you and your wife calling you a loser, all right, and let that aggression build up and show me how you threw Matthew on you bed, all right.  Don't try to sugar coat it and make it like it wasn't that bad.  Show me how hard you threw him on that bed.

50.     The ensuing enactment conforming to defendant Mason's directions was captured on the interrogation video.  Thomas then enlarged upon his prior statement, now admitting that, under circumstances precisely resembling those specified by Mason, he threw Matthew down on his mattress on the Wednesday, Thursday, and Saturday preceding the child's hospitalization. Defendants Mason, Fountain, and Colaneri knew that the only purported evidence linking Mr. Thomas to Matthew's death was the coerced false confession that they extracted from him after he had for hours denied any wrongdoing.  They also knew that the coerced false confession ultimately made by Thomas was uttered by Thomas after they suggested what he should say, and was not consistent with the facts and medical evidence available to them.  They therefore knew that without the coerced false confession, probable cause was lacking.  They knew that this purported confession -- which was not legally sound or otherwise reliable -- was the only evidence linking Adrian Thomas to Matthew's death.

**The First Trial, the Appeal, and the Second Trial**

51.     Notwithstanding the overwhelming medical evidence that Matthew died of septic shock caused by a bacterial infection and the lack of evidence against Adrian Thomas other than his coerced false confession, Thomas was booked and incarcerated at the Rensselaer County Jail, and then arraigned on false criminal charges that he had murdered Matthew.  His criminal case proceeded to trial in October 2009 under Rensselaer County Case Number 08-1074.

52.     The prosecution built its case around the videotaped coerced false confession Thomas.  They showed the jury the taped demonstration of Thomas throwing an object on the floor to illustrate how he supposedly threw his son onto the bed.

53.     In his testimony to the jury, Thomas told the jurors that the admissions of guilt he made during the interrogation were all lies.  He denied hitting his son's head with his head,

hitting his son's head against the rail of the crib, and throwing his son on the bed three times.  He testified that during his interrogation, he eventually adopted the false story that the detectives had repeatedly and relentlessly fed to him over so many hours because the detectives repeatedly promised him that he would be released if he did, and he desperately wanted to get out of the interrogation so that he could go to the hospital and see his son and wife.

54.     The jury found Thomas guilty of second degree murder.   He was sentenced to 25 years to life in prison.

55.     In February 2014, the Court of Appeals reversed Thomas's conviction.  The Court found that the confession was coerced, involuntary, and therefore unconstitutional under the totality of the circumstances because the array of "highly coercive deceptions" used by the interrogating detectives.  *People v. Thomas*, 22 N.Y.3d 629, 642 (2014).

56.     In May 2014, Thomas was retried.

57.     Notably, Dr. Edge, the Albany Medical Center treating physician who had falsely concluded on the first day that Matthew had suffered a skull fracture caused by physical abuse, did not testify at trial, apparently because more thorough testing performed the next day had demonstrated to a medical certainty that there was no skull fracture, and that Matthew had no fractures, no contusions, no abrasions, and no deformities of any kind.  Upon information and belief, the defendant TPD detectives knew this before they started the second round of Thomas' interrogation, yet they deliberately disregarded this important exculpatory evidence in trying to frame Mr. Thomas for Matthew's death.

58.     Instead, the prosecution relied primarily on the Rensselaer County medical examiner, Dr. Michael Sikirica, who testified that Matthew had suffered subdural hematomas consistent with violent shaking.  Upon information and belief, Dr. Sikirica arrived at his

unsupported conclusions after meeting with defendant Mason before the autopsy was completed, and rendered his opinion in furtherance of defendant Mason's and the other TPD defendant officers' false accusations against Mr. Thomas based on Thomas' false coerced confession.  Dr. Sikirica's testimony was severely undercut, however, by the fact that his autopsy report failed even to acknowledge, much less to explain, the bacterial infection that he conceded Matthew was suffering.  Sikirica acknowledged the evidence of bacterial infection in his testimony, notwithstanding the absence of any mention of it in his report.

59.     Moreover, CT scans of Matthew's brain prove that he did not in fact suffer subdural hematomas.  The CT report itself does not mention subdural hematomas or even note the presence of blood.  The gap between the skull and brain clearly is mostly water, not blood.  And dura cross-section slides confirm the presence of small amounts of blood around Matthew's brain for weeks – a fact that is flatly inconsistent with the prosecution's theory that Thomas assaulted him on or shortly before September 21, 2008.

60.     The defense conclusively proved through the uncontroverted medical evidence and expert testimony that Matthew suffered no acute or even remote trauma, and that he died of septic shock caused by a bacterial infection, streptococcus pneumonia.

61.     The second jury acquitted Thomas on June 12, 2014.

62.     Defendants Adam Mason, Ronald Fountain, Tim Colaneri and Michael Sikirica either directly participated in the above illegal acts, failed to intervene in them despite a meaningful opportunity to do so, or supervised and approved of, oversaw, and otherwise conspired or participated in the aforementioned misconduct.

63.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of Troy and Rensselaer County, including, without limitation,

the inadequate screening, hiring, retaining, training and supervising its employees, and the City of Troy's *de facto* policy of engaging in unlawful interrogation tactics that resulted in or were likely to result in coerced false confessions.

64.     The aforesaid event is not an isolated incident.  Defendant City of Troy is aware from lawsuits, notices of claims, and complaints filed with the TPD that many TPD officers, including the defendants, engage in misconduct, and that they otherwise engage in unlawful interrogation techniques pursuant to TPD policy, custom or practice.

65.     Defendant City of Troy is further aware that such improper training has often resulted in a deprivation of civil rights.  Despite such notice, defendant City of Troy has failed to take corrective action.  This failure caused the officers in the present case to violate the plaintiff's civil rights.

66.     Moreover, upon information and belief, defendant City of Troy was aware, prior to the incident, that the individual defendants lacked the objectivity, temperament, maturity, discretion, and disposition to be employed as police officers.  Despite such notice, defendant City of Troy has retained these officers, and failed to adequately train and supervise them.

67.     Defendant Rensselaer County is likewise aware from lawsuits, notices of claims, complaints, and failed prosecutions that its medical examiner, Michael Sikirica, was overworked, overbooked, overextended, and otherwise lacked the objectivity, temperament, discretion, and disposition to be employed as County's medical examiner, and to otherwise competently provide evidence and testify against criminal defendants in homicide and other serious felony prosecutions.  Despite such notice, defendant Rensselaer County continued to retain Michael Sikirica and to proffer him as a witness in criminal prosecutions, and failed to adequately train and supervise him.

68.     All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of state law.

69.     All of the aforementioned acts deprived plaintiff Adrian Thomas of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

70.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto.

71.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

72.     As a result of the foregoing, plaintiff Adrian Thomas sustained, *inter alia*, physical injuries, emotional distress, embarrassment, and humiliation, and deprivation of his constitutional rights.

### AS AND FOR A FIRST CAUSE OF ACTION
(Malicious Prosecution under 42 U.S.C. § 1983 against Defendants Mason, Foutain and Colaneri)

73.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "72" with the same force and effect as if fully set forth herein.

74.     The individually named defendants initiated, commenced and continued a malicious prosecution against plaintiff Adrian Thomas.

75.     The individually named defendants were directly and actively involved in the initiation of criminal proceedings against plaintiff Adrian Thomas.

76.     The individually named defendants lacked probable cause to initiate criminal proceedings against plaintiff Adrian Thomas.

77.     The individually named defendants acted with malice in initiating criminal proceedings against plaintiff Adrian Thomas.

78.     The individually named defendants were directly and actively involved in the continuation of criminal proceedings against plaintiff Adrian Thomas.

79.     The individually named defendants lacked probable cause to continue criminal proceedings against plaintiff Adrian Thomas.

80.     The individually named defendants acted with malice in continuing criminal proceedings against plaintiff Adrian Thomas.

81.     The prosecution terminated in plaintiff Adrian Thomas's favor.

82.     As a result of the foregoing, plaintiff Adrian Thomas is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**AS AND FOR A SECOND CAUSE OF ACTION**
(Violation of Right to Fair Trial under 42 U.S.C. § 1983 against Defendants Mason, Fountain and Colaneri)

83.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "82" with the same force and effect as if fully set forth herein.

84.     Defendants Mason, Fountain and Colaneri created false evidence against plaintiff ADRIAN THOMAS and forwarded that false evidence to the Rensselaer County District Attorney's Office.

85.     Defendants Mason, Fountain and Colaneri used false evidence against plaintiff Adrian Thomas in legal proceedings.

86.     As a result of defendants Mason, Fountain and Colaneri's creation, forwarding to prosecutors, and use of false, fabricated evidence, plaintiff Adrian Thomas suffered a violation of his constitutional rights to a fair trial, as guaranteed by the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

87.     As a result of the foregoing, plaintiff Adrian Thomas is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Failure to Intervene under 42 U.S.C. § 1983 Against Defendants Mason, Fountain and Colaneri)

88.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "87" with the same force and effect as if fully set forth herein.

89.     Defendants had an affirmative duty to intervene on behalf of plaintiff Adrian Thomas, whose constitutional rights were being violated in their presence by other officers.

90.     The defendants failed to intervene to prevent the unlawful conduct described herein.

91.     As a result of the foregoing, plaintiff Adrian Thomas' liberty was maliciously prosecuted and subjected to deprivation of his right to a fair trial.

92.     As a result of the foregoing, plaintiff Adrian Thomas is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individual defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Conspiracy under 42 U.S.C. § 1983 and 1985
Against Defendant Michael Sikirica)

93.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "92" with the same force and effect as if fully set forth herein.

94.     Defendant Michael Sikirica conspired with the TPD defendants to undermine Adrian Thomas' rights to be free from malicious prosecution and fabrication of evidence and/or deprivation of his right to a fair trial.

95.     As a result of the foregoing, plaintiff Adrian Thomas was maliciously prosecuted and subjected to deprivation of his right to a fair trial.

96.     As a result of the foregoing, plaintiff Adrian Thomas is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individual defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Municipal Liability under 42 U.S.C. § 1983
against Defendant City of Troy)

97.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "96" with the same force and effect as if fully set forth herein.

98.     The foregoing violations of plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct chargeable to defendant City of Troy, amounting to deliberate indifference to the constitutional rights of persons, including plaintiff, who were investigated, arrested, or prosecuted for alleged criminal activities.

99.     Prior to plaintiff's arrest, policymaking officials of the City of Troy, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

a.      the determination of probable cause to make an arrest, and initiate and continue a prosecution, and the avoidance of arrests and prosecutions based upon falsely manufactured or unreliable or coerced and/or false "evidence";

b.      the duty to intervene to report misconduct committed by other officers; and

c.      unlawful interrogation techniques.

100.    The aforesaid deliberate or *defacto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the defendant City of Troy, including but not limited to, the TPD Chief of Police, who knew (or should have known):

a.      to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.      that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of

police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c. that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

101. Under the principles of municipal liability for federal civil rights violations, TPD's Chief of Police (or his/her authorized delegate) had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters and lawful interrogation techniques.

102. The TPD Chief of Police, personally and/or through his/her authorized delegates, at all relevant times had final authority, and constituted a policymaker for whom the TPD is liable, with respect to compliance by TPD employees with the above mentioned constitutional requirements.

103. During all times material to this Complaint, the TPD Chief of Police owed a duty to the public at large and to plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

104. The aforesaid policies, procedures, regulations, practices and/or customs of the TPD were collectively and individually a substantial factor in bringing about the aforesaid violations by defendants Mason, Fountain and Colaneri of plaintiff's rights under the Constitution and the laws of the United States.

105.     The foregoing customs, policies, usages, practices, procedures and rules of the TPD were the direct and proximate cause of the constitutional violations suffered by plaintiff Adrian Thomas as alleged herein.

106.     The foregoing customs, policies, usages, practices, procedures and rules of the TPD were the moving force behind the constitutional violations suffered by plaintiff Adrian Thomas as alleged herein.

107.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the TPD, plaintiff Adrian Thomas was deprived of his to be free from malicious prosecution and denial of his right to a fair trial and due process of law.

108.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating plaintiff Adrian Thomas's constitutional rights.

109.     As a result of the foregoing, plaintiff Adrian Thomas is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individual defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Municipal Liability under 42 U.S.C. § 1983 Against Defendant Rensselaer County)

110.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "109" with the same force and effect as if fully set forth herein.

111.     Defendant Michael Sikirica, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

112.     The aforementioned customs, policies, usages, practices, procedures and rules of Rensselaer County included, but were not limited to, inadequate screening, hiring, retaining, training and supervising its forensic pathologist, Michael Sikirica, that was the moving force behind the violation of plaintiff Adrian Thomas' rights as described herein.  As a result of the failure of Rensselaer County to properly recruit, screen, train, discipline, and supervise its medical examiners, including the individual defendant Michael Sikirica, defendant Rensselaer County has tacitly authorized, ratified, and has been deliberately indifferent to, the acts and conduct complained of herein.

113.     The foregoing customs, policies, usages, practices, procedures and rules of Rensselaer County constituted deliberate indifference to the safety, well-being and constitutional rights of plaintiff Adrian Thomas.

114.     The foregoing customs, policies, usages, practices, procedures and rules of Rensselaer County and its medical examiner's office were the direct and proximate cause of the constitutional violations suffered by plaintiff Adrian Thomas as alleged herein.

115.     The foregoing customs, policies, usages, practices, procedures and rules of Rensselaer County were the moving force behind the Constitutional violations suffered by plaintiff Adrian Thomas as alleged herein.

116.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of Rensselaer County, plaintiff Adrian Thomas was subjected to a conspiracy to maliciously prosecute him, and to deprive him of his right to fair trial.

117.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating plaintiff Adrian Thomas' constitutional rights.

118.    All of the foregoing acts by defendants deprived plaintiff Adrian Thomas of federally protected rights, including, but not limited to, the right:

        A.    To be free from malicious prosecution;

        B.    Not to be deprived of liberty without due process of law;

        C.    To be free from the failure to intervene; and

        D.    To be free from conspiracy to violate his rights.

119.    As a result of the foregoing, plaintiff Adrian Thomas is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individual defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**WHEREFORE**, plaintiff Adrian Thomas demands judgment and prays for the following relief, jointly and severally, against the defendants:

(A)    full and fair compensatory damages in an amount to be determined by a jury;

(B)    punitive damages against the individual defendants in an amount to be determined by a jury;

(C)    reasonable attorney's fees and the costs and disbursements of this action; and

(D)    such other and further relief as appears just and proper

Dated: New York, New York
June 11, 2017

                        BRETT H. KLEIN, ESQ., PLLC
                        Attorneys for Plaintiff ADRIAN THOMAS
                        305 Broadway, Suite 600
                        New York, New York 10007
                        (212) 335-0132

                        By:    __s/ Brett Klein_____
                                BRETT H. KLEIN (BK4744)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X

ADRIAN THOMAS,

                                                    Plaintiff,

                          -against-

CITY OF TROY, ADAM R. MASON, Individually, RONALD
FOUNTAIN, Individually, TIM COLANERI, Individually,
RENSSELAER COUNTY, and MICHAEL SIKIRICA,
Individually,

                                                    Defendants.

------------------------------------------------------------------------------------X


**COMPLAINT**


**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff Adrian Thomas
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132