# EXHIBIT "O"

1954

1    (Curriculum Vitae marked Defendant s Exhibit Q for

2    identification.)

3    (Slide marked Defendant's Exhibit R for identification.

4                (Whereupon, the jury entered the courtroom.

5           THE COURT:    Please be seated.  Good morning,

6    ladies and gentlemen.  We will now proceed with the trial.

7    The defense may call its next witness.

8                MS. EFFMAN:  We call Dr. Jerome Klein.

9    **JEROME O. KLEIN, M.D.,** after first having been duly sworn by

10   the Clerk of the Court, was examined and testified as follows:

11              The CLERK:  The sworn witness is Jerome O.

12       Klein, K-L-E-I-N

13   DIRECT EXAMINATION

14   BY MS. EFFMAN:

15       Q.   Good morning, Doctor

16       A.   Good morning.

17       Q.   Would you  please state your full name for the record?

18       A.   Jerome O. Klein.

19       Q.   And Dr. Klein, where do you live?

20       A.   I live in Boston, Massachusetts.

21       Q.   And what is your profession?

22       A.   I'm a pediatrician with a specialty in infectious

23   diseases.

24       Q.   Are you a duly licensed physician?

25       A.   I am.

Judy A. DelCogliano
Official Senior Court Reporter

1       Q.    Practicing physician?

2       A.    Yes.

3       Q.    And how long have you been licensed to be a doctor?

4       A.    I graduated medical school in 1956 and got my first

5   license, other than for being an intern in pediatrics, in New

6   York State in 1957.

7       Q.    And what state did you obtain that license in?

8       A.    Initially, New York.

9       Q.    And taking a step back, Doctor, are you currently

10  licensed to practice medicine in any states?

11      A.    I am.

12      Q.    In what states are you licensed currently to practi

13  medicine?

14      A.    Massachusetts.

15      Q.    And besides New York and Massachusetts, have you be

16  licensed to practice medicine in any other states?

17      A.    Yes.

18      Q.    And what states are those?

19      A.    California.

20      Q.    Would you tell us a little bit about your education

21  background starting with college?

22      A.    I'm a graduate of Union College in 1952, Yale Medica

23  School in 1956.  I had my first year of pediatric training at

24  University Hospital in Minneapolis, Minnesota, to 1957.  At th

25  time, it was a service commitment, and I was in the Public

1    Health Service and was in a group at the Centers For Disease

2    Control in Atlanta, Georgia, but stationed with the New York

3    State Health Department on Holland Avenue in Albany.

4        Q.   Stopping right there, Doctor.  Can you tell us a

5    little bit about that program that you were in?

6        A.   The program was called the Epidemic Intelligence

7    Service, and it was -- there was a movie made about what this

8    program was all about with Dustin Hoffman and Rene Russo.  So,

9    I like to feel like I'm a Dustin Hoffman type person.  But,

10   essentially, you looked at outbreaks that occurred, and my

11   province was New York State.  And of interest is that, at the

12   time, there was a major pandemic of influenza.  It was called

13   the Asian Flu, and it's very similar to what we are now

14   experiencing with the so-called swine flu.

15       Q.   Taking a step back to your graduation from Yale

16   University with a degree in medicine, did you do an internship

17   immediately following your completion of medical school?

18       A.   Yes.  That was the year in Minneapolis.

19       Q.   And in what particular area of medicine did you do

20   that internship in?

21       A.   That was in pediatrics.

22       Q.   After a year in Minneapolis, is that when you went to

23   the Public Health Service?

24       A.   Yes.

25       Q.   And how long were you in that position?

1          A.    Two years.

2          Q.    Following that position, what did you do next,

3    Doctor?

4          A.    I completed my pediatric training at Boston City

5    Hospital in Boston.

6          Q.    And how many years was that pediatric training?

7          A.    That was an additional two years.

8          Q.    Following completing that, did you participate in a

9    fellowships in the area of pediatrics?

10         A.    Yes.   I had a research fellowship in infectious

11   diseases on the Harvard Medical Service at Boston City

12   Hospital.   So, that was gaining a fellowship in infectious

13   diseases, and that was for three years.

14         Q.    And can you tell the jury some of the different kind

15   of infectious diseases you dealt with during that fellowship?

16         A.    The City Hospital at the time was a large urban

17   center hospital, 1100 beds.   And essentially, you saw

18   everything that occurred in the urban center in Boston.   So,

19   there was a lot of disease, an lot of pneumonias.   There was

20   still cases of polio.   There were secondary infections.

21   Hospital stays were longer at the time than they are now.   So,

22   it was a general spectrum of infectious diseases as would occu

23   in about 80,000 people.

24         Q.    And that fellowship was for three years, Doctor?

25         A.    Yes.

(*Klein - Defendant - Direct*)                    1958

1      Q.   Can you tell the jury, what is pediatrics?

2      A.   Pediatrics is the study of infants, children and

3   adolescents.  And in different hospitals, the age limit will

4   vary; at my hospital, it's to age 21.

5      Q.   And can you tell the jury what the term infectious

6   diseases means?

7      A.   The study of infectious diseases is those diseases

8   caused by microorganisms.  So, it may be bacteria, viruses,

9   parasites, fungi; anything that replicates and multiplies that

10   can cause harm to humans.

11      Q.   Immediately following your completion of your

12   fellowship, did you obtain any positions as a teacher in

13   pediatrics?

14      A.   Yes.  I became an assistant professor at Harvard

15   Medical School, then an associate professor at Harvard Medical

16   School.

17      Q.   Over the course of your career, have you taught

18   pediatrics and infectious diseases at any other schools besides

19   Harvard Medical School?

20      A.   In the mid 1970's, the hospital downsized, because

21   hospital stays were getting shorter, more efficient.  So, the

22   hospital went from 1100 beds to about 500 beds.  And instead of

23   having Harvard Medical School and Boston University and Tufts

24   all in the same hospital, the city administration decided to

25   give responsibility to Boston University.  So, I remained and

*(Klein - Defendant - Direct)*                                        1

1      became a professor of pediatrics at Boston University.

2          Q.   And how long did you serve as a professor of

3      pediatrics at Boston University?

4          A.   Until now.

5          Q.   You are still doing that, Doctor?

6          A.   I am.

7          Q.   And how long were you a professor at Harvard Medica

8      School?

9          A.   From -- well, first assistant, then associate

10     professor from 1962 to 1974, but I still have a faculty

11     appointment at Harvard Medical School.

12         Q.   Now, during the course of all these years, starting

13     with your completion of your fellowship up until the present

14     time, have you been actively and regularly engaged in the

15     practice of pediatrics?

16         A.   Yes.

17         Q.   And how long have you been a practicing doctor in t

18     field of pediatrics?

19         A.   Well, the practicing responsibilities have to do wi

20     hospitalized children.  So, my practice is hospital based, an

21     I will see children in the emergency room, as well as those i

22     the clinics and those who are hospitalized.  So, it's all

23     within the framework of the hospital.  And in addition to the

24     general practice of pediatrics, I would have consultations in

25     infectious diseases.  About three years ago, I stopped being

*(Klein - Defendant - Direct)*                               1960

1    attending physician; that is, being a physician on the wards
2    and seeing all patients, and narrowedmy  focus to only
3    consultations in infectious diseases.

4         Q.  Do  you still see patientson  a consultation basis in
5    Boston?

6         A.   Yes

7         Q.   And what hospital or hospitals do you practice out of
8    currently?

9         A.   It's almost all at what is now called Boston Medical
10   Center.  It used to be Boston City Hospital, but  I also have
11   clinical affiliations with Massachusetts General Hospital, a
12   rehabilitation hospital called Franciscan Children's Hospital,
13   another rehabilitation facility called Mass. General - I'm
14   sorry - Mass. Hospital School, and have had affiliation with
15   Children's Hospital.

16        Q.   Doctor, have you been seeing patients in the area of
17   pediatrics and infectious diseases for at least 45 years?

18        A.   Yes.

19        Q.   What hospitals have you been affiliated with over the
20   last 45 years?

21        A.   The hospitals that I mentioned; Massachusetts General
22   Hospital, Children's Hospital, the rehabilitation hospitals, as
23   well as my own, Boston Medical Center.

24        Q.   And Doctor, have you served as director of any
25   particular division of Boston City Hospital?

*(Klein - Defendant - Direct)*

1    A.   Yes.  From the mid-1960's until late 1990's, I was

2    head of the Division of Pediatric Infectious Diseases.

3    Q.   And that was at Boston City Hospital?

4    A.   Boston City Hospital, which then was privatized an

5    called Boston Medical Center.

6    Q.   Have you had occasion to serve as chief of infecti

7    diseases at the Franciscan Hospital For Children?

8    A.   Yes.  That's one of the rehabilitation hospitals t

9    I mentioned.

10    Q.   And currently, Doctor, you are still seeing patien

11    and you are still teaching medical students about pediatrics

12    and infectious diseases?

13    A.   Yes.

14    Q.   As to your current position, Doctor, in consultati

15    do you have a title, specific title for that position that yc

16    hold currently?

17    A.   I'm Professor of Pediatrics at Boston University

18    School of Medicine.

19    Q.   And you have been there for a couple of decades;

20    correct?

21    A.   Well, I came to Boston to finish my training in

22    pediatrics and stayed.

23    Q.   Early on in your career, Doctor, did you become boa

24    certified in pediatrics?

25    A.   I did.

*(Klein - Defendant - Direct)* 1962

1    Q. And could you tell the jury what it means to be board
2    certified?

3    A. There's a certification process by the specialty
4    groups, and in pediatrics, there's a written examination and an
5    oral examination, and I think I passed that in 1964.

6    Q. And since that time, have you maintained your
7    certification in the area of pediatrics?

8    A. During those decades, there was no need for
9    recertification, so I was grandfathered and have not had to
10    recertify.

11    Q. Do you hold any memberships, any professional
12    societies in the medical field?

13    A. Yes. Most of the societies are those that deal with
14    pediatrics, such as the American Academy of Pediatrics, and
15    infectious diseases, including the Infectious Diseases Society
16    of America, Pediatric Infectious Diseases Society, as well as
17    the Massachusetts associations that are affiliated with the
18    Academy of Pediatrics and the Infectious Disease Society.

19    Q. Have you held any positions in those professional
20    societies?

21    A. Yes. I have been a president of the Pediatric
22    Infectious Disease Society, the treasurer and a counsellor of
23    the Infectious Diseases Society of America, and I think those
24    are the major positions.

25    Q. Have you been a member of any professional

A000001833

*(Klein -- Defendant -- Direct)*

1    committees, Doctor?

2        A.   Yes.

3        Q.   Can you tell the jury about some of those committe

4    you have been a member of?

5        A.   I have been a member of committees for the Food an

6    Drug Administration that dealt with biologics and vaccines;

7    member of the National Vaccine Advisory Committee, which is

8    advisory to the secretary of Health and Human Services; a

9    member of the Board of Directors of the National Foundation

10   Infectious Diseases; and a member of various committees of t

11   American Academy of Pediatrics.

12       Q.   Over the course of your career, have you been a

13   consultant to any drug companies, Doctor?

14       A.   Yes.

15       Q.   Can you please tell the jury about some of those

16   companies?  First of all, can you tell us what it means to be

17   consultant to a drug company?

18       A.   The pharmaceutical and vaccine companies need advi

19   about products that they are developing, directions that they

20   should go, whether products are worthy of being evaluated.

21   And, so, they have advisory committees made up of people who

22   have specialties in the area that they are interested in, and

23   the two areas that I have been involved in are antibiotics an

24   vaccines.  And so during the, perhaps, the beginning of the

25   70's, I was on advisory committees for Eli Lilly,

*(Klein - Defendant - Direct)*  1964

1    Bristol-Myers, Hoffman-LaRoche, Pfizer; and the vaccine
2    manufacturers, Merck and Wyeth.

3        Q.   Are you still a member of any pediatric advisory
4    boards in terms of vaccines or antibiotics?

5        A.   Right now, I'm on a subcommittee of the National
6    Vaccine Advisory Committee dealing with vaccine finance and a
7    member of the technical support group for studies in the Far
8    East, in Bangladesh and Pakistan, that are financed by the
9    Gates Foundation and run by Save the Children, which try to
10   bring to developing countries the same level of management of
11   newborns with sepsis, bacteremias that we have.  So that, even
12   in conditions where access to medical care is very limited, we
13   can be more effective in saving babies who otherwise would not
14   survive because of overwhelming infection.

15       Q.   Doctor, have you authored any articles in the area of
16   pediatrics and infectious diseases?

17       A.   Yes.  Part of the goal of research is to report on
18   what your results are.  And, so, I have written a number of
19   research articles, review articles, textbooks dealing with
20   infectious diseases.  And over the years, if you are active
21   long enough, they start mounting up, and I think the last time
22   I looked, it was something in excess of 470 articles.

23       Q.   And have these articles been published in textbooks
24   in the area of pediatrics and infectious diseases?

25       A.   They have been published in journals, peer-reviewed

*(Klein ~ Defendant - Direct)*

1    journals, as well as in textbooks.

2        Q.    Doctor, can you tell us the names of some of the

3    textbooks you have had articles or chapters written by you

4    published in?

5        A.    Well, the two textbooks that I'm responsible for,

6    has to deal with ear infections.  It's called <u>Otitis Media in</u>

7    <u>Infants and Children</u>.  The second, I'm a co-editor of a large

8    textbook on infections of the fetus and newborn infant, and

9    that's now in the seventh edition.  The first edition was

10   published in the 70's.

11       Q.    Have you had articles published in a textbook called

12   <u>Textbook of Pediatrics and Infectious Diseases</u>?

13       A.    Yes.  There are a number of large general textbooks

14   of pediatrics infectious diseases, and I have had articles in

15   several of those textbooks.

16       Q.    Have you had articles published in a book called <u>The</u>

17   <u>Principles and Practices of Infectious Diseases</u>?

18       A.    I have.

19       Q.    As well as a book called <u>Principles and Practices of</u>

20   <u>Pediatric Infectious Diseases</u>?

21       A.    Yes.

22       Q.    And have you had any articles on the topic of

23   streptococcus pneumoniae published in any of those textbooks?

24       A.    Yes.  In the textbooks whose editor is a Dr. Long,

25   have the article on pneumococcal infections.

Judy A. DelCogliano
*Official Senior Court Reporter*

*(Klein - Defendant - Direct)* 1966

1     Q.   Now, you talked about your articles have been
2   published in  medical journals. Can you tell the jury some of
3   the names of some of the medical journals you have had your
4   articles published in?

5     A.   Well, some of them  are general medical journals, like
6   the New England Journal of Medicine. Others are specialty
7   journals, such as pediatrics, Journal of Pediatrics; others are
8   infectious disease journals, such as Clinical Infectious
9   Diseases, Infectious Diseases in Children, the Pediatric
10   Infectious Disease Journal.

11     Q.   Doctor, have you received any awards or honors in
12   recognition of your work in medicine?

13     A.   I have.

14     Q.   Can you please tell the jury about some of those
15   awards and honors you have received?

16     A.   Well, the two that I'm proudest of, the first is an
17   award from -- an annual award from the Infectious Diseases
18   Society of America, which has about 6,000 members, and it's for
19   lifetime achievement, and I received that award in 1995. The
20   second is an award from the National Foundation of Infectious
21   Diseases, which gives an annual award for scientific
22   achievement, and I received that award in 2002. I have also
23   received awards from the Massachusetts Infectious Diseases
24   Society, from the Pediatrics Infectious Disease Society.

25     Q.   Have you ever testified in a trial before, Doctor?

*(Klein ~ Defendant ~ Direct)*

1      A.   I have.

2      Q.   And what kinds of cases do you typically testify i

3 Doctor?

4      A.   There are two.  One is medical malpractice, and th

5 second is Vaccine Injury Compensation.  There's a program

6 that's funded by Congress where there's a tax on every vacci

7 and vaccines that are approved for universal immunization are

8 covered, and the monies from that tax go into a fund that, i

9 there should be a rare injury that is thought to be associate

10 with or due to the vaccine, there is compensation that is

11 available through that fund, and it's not a jury process.  It

12 a process where there's a special master, a judge, who hears

13 testimony and judges whether the claim is worthy or not, and

14 have testified in those proceedings.

15      Q.   How many times a year do you testify, Doctor?

16      A.   In a trial setting, none to two.

17      Q.   Have you ever testified in a criminal case before?

18      A.   No.

19      Q.   Are you being compensated for your testimony here

20 today?

21      A.   I am.

22      Q.   And what is your fee for your testimony here today?

23      A.   Well, the fee that was agreed on was $2500 for

24 preparation in anticipation of testimony and meetings with yo

25 and Attorney Frost and $5,000 for testimony today.

*(Klein - Defendant - Direct)*            1968

1      Q.   I show you what's been marked as Defendant's Q.   I'd

2      like to ask you if you recognize that document.

3          A.   I do.

4      Q.   What is Defendant's Q?

5          A.   It's a curriculum vitae and a list of publications

6      that was prepared by my secretary in July.

7      Q.   Does your curriculum vitae fairly and accurately

8      reflect your education, training, experience and achievements

9      in medicine, pediatrics and infectious diseases?

10         A.   It does.

11                  MS. EFFMAN:  At this time, I offer Defendant's Q

12         in evidence.

13                  MR. GLASS:  Your Honor, I object as being

14         unnecessary and cumulative.  The witness, Dr. Klein, has

15         just testified, and he can continue to testify to

16         everything contained therein, and I think it's unnecessary

17         to have an additional exhibit bolstering what the witness

18         has just testified to.

19                  THE COURT:  Defendant's Q will be received in

20         evidence over objection of the People.

21      (Defendant's Exhibit Q marked for identification received in

22      evidence and marked Defendant's Exhibit Q in evidence.)

23         Q.   Doctor, have you reviewed medical records concerning

24             and        Thomas?

25         A.   I have.

1           Q.   Can you tell the jury what records you have review

2           A.   I have reviewed the birth records of the twins, as

3    well as the records that are available for the events that t

4    place at Samaritan Hospital and Albany Medical Center, as we

5    as the transport records between the two institutions and fr

6    home to Samaritan Hospital.

7           Q.   Have you also reviewed the pathology report or the

8    autopsy report in this case?

9           A.   I have.

10          Q.   Besides those records, have you reviewed anything

11   else before testifying here today?

12          A.   Yes.  Last night, I was given a transcript of the

13   testimony of Dr. Jenny; and this morning, I was shown a

14   statement by the mother on 9/21 and 9/23.

15          Q.   Are these records and materials the kind of materia

16   ordinarily accepted by experts in the field of pediatrics and

17   infectious diseases?

18          A.   Yes, with the exception of the transcript.  They ar

19   contemporaneous medical records that were written at the time

20   by the physician and other people who were involved with

21          ████ 's care.

22          Q.   And with the exception of the transcript and the

23   statement, are those records and materials the kinds of

24   materials accepted in your profession as reliable in performir

25   professional opinions?

*(Klein - Defendant - Direct)* 1970

1       A.   Yes

2       Q.   Doctor, do you have an opinion, to a reasonable

3 degree of medical certainty, as to the cause of death of the

4 Thomas baby?

5       A.   I do.

6             MR. GLASS:   Objection, no foundation.

7             THE COURT:   Overruled.

8       Q.   You may answer the question, Doctor.

9       A.   I do.

10      Q.   And, Doctor, what is your opinion?

11      A.   The child died of overwhelming pneumococcal sepsis

12 and septic shock.

13      Q.   Can you explain to the jury the basis of your

14 opinion?

15      A.   The child had an acute infection due to this

16 organism, the pneumococcus, and the other term that you will

17 here is streptococcus pneumoniae, and it probably began with an

18 acquisition of the organisms from another human, presumably in

19 the household, that infected the upper respiratory tract; the

20 nose and throat. This is very common. If you went into a

21 day-care center for infants, you might find a third of them in

22 the winter would have the organism in the upper respiratory

23 tract. But in some infants, it will cause disease, and it can

24 cause disease in two ways.

25             One, it can spread directly. And, so, from the upper

A000001841

1    respiratory tract, it can go through the eustachian tube int

2    the ear and cause ear infections.  It can also be swallowed.

3    So, it gets into the lung and can cause pneumonia; or from tl

4    respiratory site, it can gain access to the bloodstream and

5    cause bacteremia, as happened in ███████.  In many cases, eve

6    when it causes bacteremia, it's relatively benign.  About a

7    third of the children, their host offenses, their immune

8    system, their spleen, will get the organism out of the

9    bloodstream and, even without antibiotics, the infection will

10   be contained.  But in a very small number, the infection will

11   multiply and progress with its -- the bacteria and its toxins

12   and result in sepsis, and sepsis is a term that implies a

13   systemic infection involving the whole body, and that can

14   result in consequences, including shock.  And once you get to

15   that point, death is -- there's a high probability of death,

16   and I believe that's what happened with ███████.

17        Q.   Can you tell the jury, what is pneumococcal sepsis?

18        A.   Pneumococcal sepsis is sepsis due to this organism,

19   the pneumococcus.  So, the implication is that it's not a

20   localized infection, like an ear infection or a pneumonia, but

21   it's gotten into the system through the bloodstream and is

22   giving generalized signs and symptoms.

23        Q.   Doctor, can you tell the jury what is septic shock?

24        A.   Septic shock is when the sepsis progresses to the

25   point where bodily functions are impaired, and it may be -- th

*(Klein - Defendant - Direct)*     1972

1    shock part is when there's cardiovascular collapse, and the
2    mortality rate is very high.

3        Q.  What causes sepsis, Dr. Klein?

4        A.  Well, sepsis in this case is due to this organism,
5    the pneumococcus, getting into the bloodstream and giving
6    general effects.

7        Q.  And how do you know he's got that organism?

8        A.  The blood culture taken at Good Samaritan grew this
9    organism.  So, we know that Matthew had it in his blood the
10   morning of the 21st when that blood specimen was taken.

11       Q.  And Doctor, when you say Good Samaritan, do you mean
12   Samaritan Hospital?

13       A.  I'm sorry.  I do.

14       Q.  Here in Troy.  Thank you.  What is the time frame for
15   sepsis to progress into septic shock?

16       A.  There are a number of bacteria, including the
17   pneumococcus, that are fulminant, that you can be entirely
18   well, and hours later, you can be on the cuspis of death.  And
19   for reasons that are unknown, there are cases like this, and
20   they often make the evening news; where a student, as an
21   example, went to a party on a Saturday afternoon, and that
22   evening, fell sick and was dead the next morning.
23   Meningococcus can do this, staphylococcus, the streptococcus
24   that causes sore throats, as well as the pneumococcus, this
25   organism, all have that uncommon manifestation of rapidly

A000001843

*(Klein - Defendant - Direct)*                                    1

 1   occurring fulminant disease that happen so quickly that, oft
 2   the patient does not get to a medical facility in time to
 3   prevent death.

 4       Q.    Is there a time frame in which it evolves from sep
 5   to septic shock, a minimum or maximum time frame?

 6       A.    Well, a minimum would be hours.  It can occur in th
 7   fashion that I mentioned, where someone could be well the nig
 8   before and dead the following morning.  And I have had
 9   experience with infants where the mom puts the baby to bed at
10   11:00 at night, there's some distress noted at 2:00 or 3:00 i
11   the morning; the baby is dead at 6:00 a.m.  So that this
12   manifestation of an infectious disease, in this case caused b
13   the pneumococcus, is like a truck running downhill without
14   brakes, and even intervention at some point, as the truck is
15   going down that hill, it's too late for the baby to survive.

16       Q.    Doctor, is it likely a child could take a bottle at
17   3:00 or 4:00 in the morning, and then at 8:30 or 9:00 in the
18   morning, be beyond help?

19       A.    Yes.

20       Q.    Would you please explain that to the jury?

21       A.    Well, it's this circumstance that I have been
22   describing; that the infection -- and I think in      ███      's
23   case, probably began on Friday, with the mom describing fever
24   and that probably involved the infection in the upper
25   respiratory tract.  And then during the next hours, when the

*(Klein - Defendant - Direct)*                    1974

1    organism probably gained access to the bloodstream, and in the

2    blood, it kept multiplying, toxin-producing, so that, still,

3    the baby was able to take a bottle at 4:00 a.m.; and then he

4    gets to the peak and all the bodily functions begin to

5    deteriorate.

6        Q.   Doctor, can you describe how this mechanism,

7    overwhelming sepsis, causes a baby's death, beginning with the

8    natural progression of pneumococcal sepsis?

9        A.   I think I have described it already, but the organism

10   is acquired from somebody else. For a four-month-old, it would

11   be in the household.

12       Q.   Doctor, would it assist you to draw this for the jury

13   on a flip chart?

14       A.   (Witness complying) So, Mom noted fever on Friday,

15   and that probably is the time when the child already has

16   acquired the organism in the nose and throat. So, we begin,

17   and this would be very common. So that, certainly, many

18   children would have that type of colonization in the upper

19   respiratory tract, and it may be accompanied by signs of a cold

20   at that time or a slight fever, and Mom described that the

21   child had a slight fever on Friday. From the nose and throat,

22   the organism might get, by direct extension, into the ears to

23   cause otitis; or be swallowed into the lung and cause

24   pneumonia.

25            Or uncommonly, it would get into the blood, and we

A000001845

1    call that bacteremia.  That's the organism in the bloodstrea

2    And we treat the otitis, the infection in the ears, with

3    antibiotics.  Most kids have at least one episode of ear

4    infections.  Some kids have a lot of ear infections.  Pneumo:

5    would be less common, but the pneumococcus is the most

6    important cause of bacterial pneumonia; and even less common

7    for the organism to get into the bloodstream to cause

8    bacteremia.

9           Even with bacteremia, the vast majority of childrer

10   do well and are either treated adequately with antibiotics or

11   clear it by the body's defense mechanisms, but in some

12   children, it will cause sepsis, with generalized symptoms and

13   signs of infection, and if that sepsis progresses, it will go

14   into a shock-like state called septic shock.

15          Now, as it applies to          , he probably acquired

16   the organism some time prior to Friday, because by Friday, he

17   already is showing some signs with fever.  He's looking okay

18   Saturday, but during that period of time, Friday to Saturday,

19   it gets into the bloodstream.  There's some evidence that he

20   has pneumonia, as well.  And from the bloodstream, he has

21   progression that goes to sepsis and then, finally, when he's

22   the emergency room at Samaritan Hospital, it evolves into

23   septic shock and very rapidly progresses, so that even with t

24   antibiotics given immediately, or very soon after his admissi

25   to Samaritan Hospital, he's beyond survival, and then the

*(Klein - Defendant - Direct)*     1976

1    progression to septic shock and death follows.

2         Q.    Thank you, Doctor. Can you demonstrate the pathway

3    on  the flip chart of the organism once it enters the body of

4    ▇▇▇▇▇?

5         A.    Well, I think it  happens in this sequence   This

6    would be the first entry point (indicating). We know that he

7    had some element of pneumonia and that, probably concurrently,

8    the organism is in the bloodstream and progresses to sepsis and

9    septic shock.

10        Q.    Can you have pneumonia and sepsis at the same time?

11        A.    Yes.  They could be parallel.  You can also have

12   pneumonia that will progress for the organism to enter the

13   bloodstream.  So, the organism can get in the bloodstream

14   directly from the nose or throat, or it might  spread to the

15   lungs and go from the lungs into the bloodstream.

16        Q.    Doctor, using the flip chart, can you demonstrate

17   what, if any, conditions you saw in the medical record of

18   Matthew Thomas that are consistent with a diagnosis of sepsis?

19        A.    May I consult my notes?

20        Q.    Yes, Doctor.

21        A.    The indications that this was sepsis and septic shock

22   are both laboratory tests, as well as the various findings on

23   physical examination that the baby had, and I would list the

24   following:  And this is the -- the reasons that I think that

25   this child had pneumococcal infection that progressed from

Judy A. DelCogliano
*Official Senior Court Reporter*

1     sepsis to septic shock.

2              Number one is his vital signs.  He wasn't able to

3     maintain his temperature.  In the medical records, the

4     temperature initially is normal, but then continues to drop t

5     the point where, at Good Samaritan, it is 95.6, but when he

6     gets to Albany Medical Center, it's 94.  So, one is his

7     temperature.

8          Q.   And Doctor, if the records reflect the baby's

9     temperature was 97.2 at 9:15 in the morning on Sunday, the

10    21st, would that be a temperature below normal for an infant?

11         A.   No.  That would probably be a normal temperature, b

12    what I think it indicates is that he may have had a higher

13    temperature than what the mother reported; that he had a

14    temperature on Friday.  He may have been febrile on Friday and

15    Saturday, but then as the sepsis progresses, he's not able to

16    maintain his temperature, and the temperature begins to fall.

17         Q.   A temperature of 94 degrees, would that be considere

18    hypothermic?

19         A.   It would be.  That's an abnormally low temperature.

20    Then, as the day progresses on the 21st, he's not able to

21    maintain his blood pressure.  And initially, where the systoli

22    high is 60, it progresses to 50, and then to 40.  So, it's a

23    further indication that he's progressing from sepsis to septic

24    shock.

25              Then the second is the laboratory tests.  For white

*(Klein - Defendant - Direct)*                    1978

1    blood cell count, the normal is five to$10,000$; and if you have

2    an infection, usually, white count gets higher. So, one of the

3    reasons we take white blood cell counts is, if it's abnormally

4    high, it suggests a bacterial infection and it would be a sign

5    to use antibiotics to fight that infection. But as the

6    infection becomes overwhelming, the bone marrow is suppressed

7    and is no longer able to fight the infection by putting out

8    white cells. White cells have a life of about 24 hours. When

9    the tests aredone at Samaritan Hospital, his white cells were

10   a thousand. So, instead of the normal five to 10,000, or as I

11   would expect with an infection, it would be 10 to 20,000, his

12   bone marrow is suppressed, and that probably has been going on

13   for 12 to 24 hours, and it's a thousand, and then it drops even

14   further to 500.

15        Q.   How does that number affect his ability to fight off

16   the pneumococcal organism?

17        A.   Well, one of the defenses for bacteria infection are

18   your white cells, and here his white cells are being

19   suppressed, so he loses that capability. The other is the most

20   important white cell following infection are called polys.

21   Polys are normally about 20 to 60 percent of your total white

22   cell count, and in infection, the number of polys would rise.

23   It could be 70 to 80 percent to 90 percent. His polys are five

24   percent.

25        Q.   And what is that a sign of, Doctor, if anything?

*Judy A. DelCogliano*
*Official Senior Court Reporter*

A000001849

1          A.    Again, it's a sign that the bone marrow is suppress

2     by the infection and toxins.  So, he probably had an elevated

3     white cell count early in the course, and now the sepsis is

4     overwhelming and it's suppressing the white cells.  So, he ha

5     this abnormally low count of a thousand.  He's producing very

6     few white cells and very few of the bacteria fighting white

7     cells.  So, that's an important indicator of this progression

8     from sepsis to septic shock.

9               In the -- among the hematologic factors that are

10    important, too, are platelets.  Platelets are part of your

11    clotting, but they are also an indicator of infection.  And

12    when you have overwhelming infection, the platelets are

13    suppressed, just as the white cells are suppressed.  So, when

14    he's at Samaritan Hospital, his first platelet count is low.

15    It's a 115,000.  The normal low would be 150,000.  So, it's

16    already low, and then it's getting lower.  It diminishes to

17    44,000 and then 29,000.

18          Q.    And what is the significance of the low of 44 and

19    29,000?

20          A.    Well, the most important indicator is of this

21    process; that it confirms sepsis to septic shock.  And, so,

22    your platelets are diminished, as well.  What we will talk

23    about in a few minutes is that his coagulation, his clotting

24    capability, is also being suppressed, and the platelets are

25    part of the clot, the way you are able to stop bleeding.  But

(Klein - Defendant - Direct)                            1980

1    here -- I'm just using it as an indicator of this progression.

2    May I take this off now?

3        Q.   Yes.

4        A.   Again, sepsis, leading to septic shock due to

5    pneumococcus, we are still in that reference frame.  The fourth

6    thing is he has problems with getting oxygen into his lungs.

7    His oxygen requirement is not being satisfied, and it's a test

8    that is termed oxygen saturation.  We want -- oxygen

9    saturation, normal, for any of us now would be 95 to a hundred

10   percent.  His decreased substantially to the 70's.  So, they

11   are unable to keep up with his oxygen requirement, and even

12   with ventilation, they are not able to maintain him.  So, you

13   don't have oxygen getting to the various tissues, and that

14   eventually will lead to inadequate oxygenation of the various

15   organisms, including the organs, including the heart.  So, the

16   failure to -- and it looks like he has a phenomena associated

17   with shock, called ARDS, acute respiratory distress syndrome.

18       Q.   Can you tell the jury what that is, please, Doctor?

19       A.   It's essentially stiff lungs; that you are not able

20   to -- it's not necessarily pneumonia, and the interesting thing

21   is the first x-ray, first chest film that's taken, doesn't show

22   anything; later on, some collapse of lung, some areas of

23   pneumonia, and there's some pneumonia in the autopsy report,

24   but the failure to be able to get oxygen into his lungs to

25   adequately ventilate, I think, is the cause.  He's going from

Judy A. DelCogliano
Official Senior Court Reporter

1    sepsis to septic shock.

2           The fifth is metabolic factors.  So, the sepsis is

3    causing derangement of many functions, and in terms of

4    metabolic factors, is identified by his pH.  pH establishes

5    between acidity and alkaline, and our pH normally is about 7.4,

6    and his pH indicates that he has acidosis, more acid, because

7    it drops to seven.

8           Q.   And what does that mean, Doctor?

9           A.   Well, that he's in this deranged metabolic state

10   where he's not able to maintain that -- what we call balance or

11   homeostasis, and then his glucose starts diminishing.  His

12   glucose should be 70 to over a hundred, and under stress, it

13   should be even higher.  His glucose is dropping.  So, his

14   metabolic functions are deranged now.

15          So, we have talked about vital signs, suppressed bone

16   marrow, difficulty in ventilation, difficulty in maintaining

17   his metabolic functions, and the last one is he gets into

18   problems with clotting.  So, he has a problem with coagulation

19   or clotting.

20          Q.   What does the term coagulation mean, Doctor, for the

21   jury?

22          A.   Coagulation is actually a mode of developing clot to

23   stop bleeding, and bleed progresses to a condition called

24   disseminated intravascular coagulopathy, if I can draw that.

25   So, this term, which is in the medical record - the diagnosis

1    is made based on the laboratory tests - is called DIC.  The D

2    stands for disseminated, meaning it's widespread.   The I is for

3    intravascular, meaning it's within blood vessels, and the C is

4    the coagulopathy.  And there are two laboratory tests, plus the

5    platelet count, that identifies that this is happening.  One is

6    called the prothrombin time.  The other is called the acute

7    platelet chromoplastic time.  Both of those are abnormally

8    high.  He's not able to get the best result in terms of those

9    clotting factors.

10          So, disseminated means it's widespread.

11   Intravascular means it's within the blood vessels, and the

12   coagulopathy means that the clotting is deranged.  So, what

13   happens is in blood vessels -- let's say this is a blood

14   vessel.  There's inflammation and deposition in the blood

15   vessel that increases to the point where blood can't get

16   through.  There's a thrombosis in those vessels, and it usually

17   leads to hemorrhage in the surrounding area and dead tissue,

18   and dead tissue is called an infarct.  So, there's usually

19   evidence that is in the autopsy of infarct plus hemorrhage.

20   And in the autopsy report, there is an identification of

21   infarct plus hemorrhage in the heart, the testes, and it may

22   contribute, also, to the retinal hemorrhage and the bleeding in

23   the head.

24          So, if you are not able to clot, then you could have

25   bleeding in any organ; and at the autopsy, they noted in the

1    microscopic examinations, heart and testes, but also could be,

2    where there was examination by the ophthalmologist, in the

3    retina, as well as the bleeding in the brain.

4         Q.   Doctor, is there, in fact, association between

5    coagulopathy or disseminated intravascular coagulopathy and

6    overwhelming sepsis?

7         A.   Yes.  This is usually a result of overwhelming

8    sepsis.  There may be other reasons.  I don't know them.  But

9    the vast majority of DIC will be due to an infection.

10        Q.   Do you have an opinion, to a reasonable degree of

11   medical certainty, as to what caused the coagulopathy problem

12   in this child?

13        A.   Yes.

14        Q.   And what is your opinion?

15        A.   It's the pneumococcal bacteremia, sepsis and septic

16   shock.

17        Q.   If there's bleeding in the heart and the testes due

18   to coagulopathy, is it possible to have bleeding in the brain

19   due to coagulopathy?

20        A.   You can have bleeding in any organ.  It can go

21   anywhere, because the same phenomena is occurring throughout

22   the body.  It can occur in the brain, the eye, heart and

23   testes, as was identified at autopsy.

24        Q.   And why was it occurring everywhere or anywhere?

25        A.   Because it's general.  All these clotting factors are

(Klein - Defendant - Direct)                    1984

1    in the blood.  So, wherever the blood would go, the possibility

2    of the blood vessel being involved, as in this case, could

3    result in the hemorrhage and infarct.

4         Q.   But if there's bleeding in the testes and the heart

5    due to coagulopathy, then it would also follow, Doctor, that

6    it's possible to have bleeding in the eyes due to coagulopathy?

7         A.   Yes; eyes, brain, anywhere in the body.

8         Q.   Based on the medical records you reviewed, Doctor,

9    when did the coagulopathy problems start, if you know?

10        A.   If we anticipate that the child's pneumococcal

11   infection began earlier than the first indication of fever -

12   that was on Friday evening - and that the bacteremia, the

13   organism in the blood, followed during the next hour or so, and

14   that the consequences leading to septic shock and his metabolic

15   vital sign changes occur when the child appeared on the morning

16   of the 21st, the DIC occurred during that progression.

17        Q.   If a child is kept alive -- strike that.  Before

18   testifying, Doctor, did you review the records from Albany

19   Medical Center?

20        A.   Yes.

21        Q.   And is there evidence that this child was on a

22   ventilator for several days prior to being pronounced dead?

23        A.   Yes.

24        Q.   And during the time -- if someone has a coagulopathy

25   problem, Doctor, and they are being kept alive on a ventilator,

Judy A. DelCogliano
Official Senior Court Reporter

A000001855

1    would that coagulopathy problem continue while they are on a

2    ventilator?

3        A.   Yes.  All the problems that I have identified with

4    the two charts - the vital signs, the lab tests, white blood

5    cells and platelets, difficulty in ventilation, the metabolic

6    factors and the coagulopathy factors - would continue during

7    this time, so that the DIC would also progress.  Now, he did

8    get transfusions, platelet transfusions that would mitigate

9    that to some extent, but it would not really have an impact on

10   the coagulopathy.

11       Q.   So, while the child is on the ventilator, there could

12   be additional fresh or new bleeding because of the coagulopathy

13   problem?

14       A.   Yes.

15       Q.   Once overwhelming sepsis sets in, how soon after that

16   would the coagulopathy problems start?

17       A.   Well, we only have tests at one point in time, upon

18   the admission to Albany Medical Center.  So, we know it

19   happened with those first lab tests on the 21st, but we don't

20   know how much in anticipation of them in time it would have

21   occurred, but probably hours.

22       Q.   Thank you.  You can return to the stand.  Thank you.

23   (Documents marked Defendant's Exhibits S and T for

24   identification.)

25       Q.   Doctor, can you explain for us, are certain age

(Klein - Defendant - Direct)                    1986

1     groups more prone to sepsis?

2          A.   Yes.

3          Q.   Can you tell the jury about what, if any, impact age

4     has on sepsis?

5          A.   Infants are at highest risk, and the first year of

6     life is the highest among that age group, and that's why

7     physicians are usually very alert for any signs that might

8     suggest sepsis, to begin antibiotics very early.

9          Q.   Why are infants more susceptible to the pneumococcal

10    organism?

11         A.   Well, it's not only pneumococcal.  The other bacteria

12    is important, too; the streptococcal, staphylococcal,

13    meningococcal infections, and it's probably because their

14    immune systems are not yet mature enough to develop protection

15    against those organisms.  That's why we begin immunizations at

16    two months of age, to try to bolster their immune protection.

17         Q.   Doctor, assuming -- you are aware from the records

18    that Matthew Thomas was born at 33 weeks.  Would you consider

19    that as premature?

20         A.   Yes.

21         Q.   And when a child is born premature, is there any

22    impact on the child's immune system or their ability to fight

23    off infection based on their being born premature?

24         A.   Well, there are two issues.  One is, during

25    pregnancy, the mother delivers antibodies to the baby that are

Judy A. DelCogliano
Official Senior Court Reporter

1    accentuated during the last weeks.  So, if you are born at

2    33 weeks, rather than 38 weeks, you are not getting the

3    mother's passively transmitted antibodies across the placenta

4    into the baby, into the fetus.  That's one element, that

5    prematures are more acceptable to infection.

6              The second is that the immunity system, immunologic

7    system, has to be prepped and built up, and the infant,

8    particularly the premature infant, has a relatively immature

9    immune system, and it's not until months later that they are

10   able to get an immune system that is more protective.  So, the

11   first year of life is really a vulnerable period in terms of

12   the pneumococcus and these other organisms.

13        Q.   What, if anything, do pediatricians do to help

14   protect a child against this?

15              MR. GLASS:  Objection, Your Honor, unless the

16        doctor knows what happened in this case.

17              THE COURT:  Sustained.

18        Q.   Doctor, did you examine the pediatrician records for

19   the Thomas baby?

20        A.   I did.

21        Q.   And are you aware of whether or not this child

22   received any shots to help protect him from infections?

23        A.   I did see that.

24        Q.   Tell the jury what you saw.

25        A.   In terms of the pneumococcus, we now have a very

1    effective vaccine that's cut down on problems such as Matthew

2    had by substantially, by about 80 percent, but you need vaccine

3    to be given at two, four, six months, and then a booster dose

4    at 12 months. That's the regular schedule. The reason we do

5    it at two, four, six months is because the first one has a

6    relatively modest effect, very little, but it has a so-called

7    memory, so that when you give the four-month dose, you get a

8    boost. The body remembers that you got the two-month dose.

9    Unfortunately, ▮▮▮▮ had the two-month dose, but had not yet

10   gotten the four-month dose. So, the protection afforded by the

11   vaccine was minimal.

12       Q.  Are there any factors that make recovery from

13   overwhelming sepsis difficult?

14       A.  In the sense that if it's -- if you reach the point

15   where the sepsis as progressed to septic shock, then the

16   attempt to manage the infection often fails. As we know in

17   this case, the baby is treated appropriately and aggressively

18   at both Samaritan Hospital and Albany Medical Center and

19   doesn't survive. So, this infection has overwhelmed the baby

20   at that time, when the baby is admitted to Samaritan Hospital;

21   and unfortunately, those cases will continue to occur, and we

22   will hope that we can get enough doses of the vaccine in to get

23   to the four-month and the six-month, where the baby will be

24   protected. But in this interval, the baby is still highly

25   vulnerable, and the vaccines will not yet be sufficiently

1    protective.

2         Q.   Doctor, are you familiar with -- what did Albany

3    Medical Center and Samaritan Hospital do to try to treat the

4    bacterial infection?

5         A.   Well, the mode of treating the bacterial infection is

6    with antimicrobial agents, and he got the right antibiotics at

7    Samaritan Hospital, and it was continued at Albany Medical

8    Center.  So, they gave him the right drugs.  It just was too

9    late.

10        Q.   What's the time frame for effective treatment with

11   these drugs, Doctor?

12        A.   Well, the time frame is that you give them early

13   enough before the sepsis is overwhelming.  And sometimes,

14   because the infections are so fulminant - they are so dynamic

15   in their course and overwhelming the patient - we are

16   unsuccessful.

17        Q.   Doctor, do you have an opinion, to a reasonable

18   degree of medical certainty, as to what was the prognosis for

19   Matthew when he was at Samaritan Hospital?

20        A.   Well, at the time, they didn't have all the facts

21   that we have now in terms of the progression and the various

22   laboratory tests.  The blood culture was taken, but they didn't

23   know the result until some 24 hours later.  So, they treated

24   the child for presumed sepsis appropriately, but they still

25   were uncertain about what the reasons for his illness were.

*(Klein - Defendant - Direct)*                    1990

1        Q.   Doctor, do you have an opinion as to whether --

2    strike that.  Do you have an opinion as to the state of health

3    of ▮▮▮▮▮ upon his arrival to Samaritan Hospital and during

4    his stay there?

5        A.   Well, we know that he wasn't survivable when he

6    arrives at Samaritan Hospital.

7        Q.   Doctor, do you have an opinion whether sepsis can be

8    caused by trauma?

9        A.   Yes.

10       Q.   What is your opinion?

11       A.   I know of no reason why trauma would cause sepsis.

12       Q.   And can you please explain your opinion for the jury?

13       A.   Well, we are dealing with an infectious organism and

14   its consequences, and if you get a bruise or a head trauma, it

15   has nothing to do with the immune system or the progression of

16   the infection from the throat to the lungs or the bloodstream.

17   So, any attempt to make a connection between head trauma and

18   the progression of the infection would be highly speculative.

19       Q.   Do you have an opinion as to whether streptococcus

20   pneumoniae can be caused by trauma, Doctor?

21       A.   Streptococcus pneumoniae is a microorganism.  It's

22   acquired via the respiratory tract by droplets from another

23   human and has nothing to do with trauma.

24       Q.   And how many years have you been studying,

25   researching, teaching and writing about streptococcus

*Judy A. DelCogliano*
*Official Senior Court Reporter*

1    pneumoniae?

2        A.   It would be since the early 60's.

3        Q.   Doctor, based on the autopsy report, was there any

4    evidence the child had acute and chronic pneumonia?

5        A.   The autopsy does identify acute and chronic

6    pneumonia.

7        Q.   Can you define the terms acute and chronic for the

8    jury?

9        A.   Acute is during the immediate period; in an autopsy,

10   prior to death.  The chronic is indeterminate.  I don't know

11   what the term meant, as the pathologist described it, but it

12   would mean it was more prolonged in time, but I don't see any

13   indication in the medical records that would support a

14   pneumonia that was over a prolonged period of time.

15       Q.   Do you have an opinion as to how the child developed

16   pneumonia?

17       A.   Yes.

18       Q.   And what is your opinion?

19       A.   It was by the methods that I outlined; acquired

20   through the respiratory tract, spread directly by swallowing

21   into the lung, and then causing some inflammation in the lung.

22       Q.   What does the term aspirate mean for the jury?

23       A.   Aspirate means that you have a foreign body or some

24   substance that you've aspirated inadvertently.  The gag reflex

25   usually is capable of preventing food from getting into your

(Klein - Defendant - Direct)                    1992

 1    lung.  So, as you swallow during a meal, the food -- there's a

 2    lid that goes over the trachea, and your food goes down the

 3    esophagus into your stomach.  So, that's your protective

 4    mechanism.  If you are inebriated and you vomited, for example,

 5    you might aspirate.  The vomit gets into your lung because your

 6    gag reflex would have been suppressed by your inebriation.  So,

 7    that would be aspiration.  If you drown, you can -- again, your

 8    gag reflex is less active, and water would get into your lungs.

 9    That would be aspiration of water.  So, it's usually an event

10    that occurs because the gag reflex is not operating

11    appropriately and stuff that should go into your stomach goes

12    into your lung.

13         Q.   Did you see any evidence in the records you reviewed

14    that this child had any problems gagging?

15         A.   I'm sorry?

16         Q.   Did you see any evidence in the records you reviewed

17    that the child had problems gagging?

18         A.   No.

19         Q.   From the records you reviewed, did it appear that the

20    gag reflex was intact?

21         A.   From what I understand, the child had a feeding at

22    4:00 a.m. that was entirely normal, and I understand from you

23    that the mother reports that the child had no problem with

24    prior feedings.  And what you would expect, if there was a

25    problem with aspiration, is the child's gag reflex would have

1     been suppressed in some fashion and that he would cough, choke,

2     show some signs that the food, instead of going into the

3     stomach, had gone into the lung.

4         Q.   Doctor, based on your 50 years of experience in

5     pediatrics and infectious diseases, is it likely that one can

6     develop pneumonia from aspirating as a result of head trauma?

7         A.   Yes.  One could imagine that, if the head trauma was

8     such that the child was comatose, was not responsive, and that

9     the gag reflex was suppressed and he had a feeding at the time,

10    so some material was in his mouth, that he could aspirate that

11    material into the lung because the gag reflex was suppressed.

12        Q.   And did you see any evidence of the child being

13    comatose before he arrived at the hospital?

14        A.   No.

15        Q.   Assuming the child had a normal feeding at 11:00 or

16    12:00 at night and then had another feeding at 3:00 or 4:00 in

17    the morning, and assuming there were no reports that the child

18    had any choking spells in the day before he went to Samaritan

19    Hospital, do you have an opinion as to whether or not this

20    child could have aspirated?

21        A.   I do.

22        Q.   And what is your opinion?

23        A.   There's no signal or evidence that the child

24    aspirated.

25        Q.   Doctor, do you have an opinion as to whether head

1    trauma can affect your immune system?

2         A.    I do.

3         Q.    And what is your opinion?

4         A.    There's no connection.

5         Q.    Doctor, in your opinion, did the alleged head trauma

6    have anything to do with the child developing pneumonia?

7         A.    I do.  I have an opinion.

8         Q.    What is your opinion?

9         A.    It had nothing to do with the pneumonia.

10        Q.    Can you explain your opinion for the jury?

11        A.    The pneumonia is an infectious process.  We have

12   talked about the acquisition of the organism, the

13   multiplication of the upper respiratory tract, the organism

14   then being swallowed into the lung causing the pneumonia.  The

15   only way that head trauma could be involved is if the child's

16   gag reflex was not operative and that he aspirated some glob of

17   stuff into his lung, but there's nothing in the autopsy or the

18   chest x-rays that indicates aspiration.

19        Q.    And which chest x-ray are you referring to, Doctor?

20        A.    Well, the initial one doesn't even show pneumonia.

21   Later on, there are several processes that are identified

22   including atelectasis.  Atelectasis means collapse of the lung.

23   It's not pneumonia.  It's just that the lung in a certain area

24   is collapsed, and then there is the possibility of pneumonia in

25   the x-rays.

1     Q.   If there had been aspiration due to alleged head

2    trauma, would you expect to see evidence of that in the first

3    x-ray done at Samaritan Hospital?

4        A.   Well, you might.  I'm not sure it's absolute, but if

5    there was significant aspiration, one would think it would show

6    up.

7        Q.   Doctor, did alleged head trauma have anything to do

8    with this child developing pneumococcal sepsis?

9        A.   No.

10       Q.   Can you explain that opinion for the jury?

11       A.   This child dies of an infectious disease.  He dies of

12   overwhelming pneumococcal sepsis and septic shock.  There's no

13   relationship with trauma and this infectious process.

14       Q.   Doctor, did alleged head trauma have anything to do

15   with this child developing septic shock?

16       A.   No.  The septic shock is a consequence of the

17   infection.  So, the issue is, the tragedy is that this child

18   developed an infection that progressed and was so overwhelming

19   that he couldn't survive.  He dies of pneumococcal septic

20   shock.

21       Q.   Doctor, assuming that CT scans taken at Albany

22   Medical Center on 9/21/08 report bilateral subdural fluid

23   collections, does that have any impact on your opinion as to

24   the cause of death of this baby?

25       A.   No.

A000001866

*(Klein - Defendant - Direct)*                                    1996

1      Q.   And why not?

2      A.   The sequence that I mentioned could include

3   bacteremia going to the brain and causing inflammation in the

4   brain, as well as subdural collections in the brain.  But the

5   autopsy doesn't show any substantial meningitis.  So, I think

6   that, although it's possible that there was a process beginning

7   by the time of death, it hasn't progressed to the point where

8   there's gross infection in the brain.  So, I think it remains

9   that the almost certain diagnosis and cause of death is the

10  overwhelming sepsis and septic shock, not a brain infection.

11     Q.   And Doctor, assuming that CAT scans from Albany

12  Medical Center reported bilateral subdural hematomas, does that

13  have any impact on your opinion as to cause of death?

14     A.   No.

15     Q.   Doctor, assuming that the autopsy findings include a

16  finding of a subgaleal hemorrhage, does that have any impact on

17  your opinion as to the cause of death?

18     A.   No.

19     Q.   And assuming that the autopsy report reported a

20  subarachnoid hemorrhage, does that have any impact on your

21  opinion as to cause of death of this baby?

22     A.   No.

23     Q.   Based on your review of the records and your

24  training, experience of 50 years, Doctor, can you determine,

25  with a reasonable degree of medical certainty, when the sepsis

*(Klein - Defendant - Direct)*                              199

1   || began to develop?

2   ||     A.   By history, we know that the baby had a clue as to

3   || when it developed on Friday with the minimum temperature

4   || elevation, so that there had to be some hours or even a day or

5   || so prior to that time that the infection was acquired and began

6   || to multiply to the point where the baby was febrile on Friday.

7   ||     Q.   What are the clinical signs of sepsis?

8   ||     A.   Sepsis is very nonspecific.  You can have fever,

9   || irritability, difficulty feeding, something that is not right,

10  || is usually a point that mothers know.  Mothers will come in and

11  || tell you, "The baby is not right."  And it may not be anything

12  || specific, but that's the challenge to pediatricians, to

13  || distinguish the many babies who have viral infections, flu-like

14  || illnesses, from the few that have sepsis, such as in Matthew's

15  || case.

16  ||     Q.   Is pneumococcal sepsis contagious, Doctor?

17  ||     A.   It's minimally contagious in the sense that there

18  || usually aren't epidemics of pneumococcal infection, but it is

19  || human to human transition.  This is a large household.  It's

20  || undoubtedly -- that this four-month-old, who remained in the

21  || household, acquired the infection from another member of that

22  || household.

23  ||     Q.   Doctor, assuming that this was a household of nine

24  || people, and this baby was the only one who had report of a

25  || fever, who presented a sign of illness, does that mean that no

Judy A. DelCogliano
*Official Senior Court Reporter*

1     one else in the household was carrying the infection or the

2     organism?

3          A.   No.  As I mentioned, if we went to a day-care center,

4     we took all the kids under a year and swabbed their throats, we

5     would probably find 30 percent would be carrying the organism.

6     So, it's very common, and the vast majority of people, vast

7     majority of infants never get to the point where it causes

8     disease.  But in a few, they will get either ear infections,

9     less commonly pneumonia, and even less commonly bacteremia, and

10    even a fraction of the bacteremia that will go on to sepsis and

11    septic shock.  So, it's a common organism, but it's like a

12    pyramid, where the base of the pyramid is the many infants who

13    are colonized, and then you go to a few who will have ear

14    infections, fewer who will have pneumonia, fewer who will have

15    bacteremia, and the very few at the peak of the pyramid who

16    will have sepsis and septic shock.

17         Q.   Doctor, fair to say that somebody could carry the

18    organism and not have any visible signs of illness?

19         A.   The vast majority of infants will be in that

20    category.

21         Q.   As well as any other young children or adults?

22         A.   Yes.

23         Q.   Doctor, are there other things that can cause bone

24    marrow suppression?

25         A.   Yes.

1        Q.   Can you tell the jury about that?

2        A.   If you have leukemia, a malignancy, it will cause

3    bone marrow suppression.  There are some chemicals, drugs that

4    will cause bone marrow suppression.  There are some poisons

5    that will cause bone marrow suppression.  But in the usual

6    events of an infant's life, it's almost always infection.

7        Q.   Did you see any evidence in the records of these

8    children from birth to September 21st and 22nd that would

9    indicate the cause of bone marrow suppression was anything

10   other than overwhelming sepsis?

11       A.   I saw nothing that would indicate, other than

12   infection, being the cause.

13       Q.   Doctor, in your opinion, to a reasonable degree of

14   medical certainty, based on your 50 years of experience in

15   pediatrics and infectious diseases, can you rule out head

16   trauma as a cause of this child's death?

17       A.   I think head trauma has nothing to do with his death;

18   that his death is caused by an overwhelming infection, and head

19   trauma is not a part of the cause of death.

20       Q.   And based on your work of 50 years in pediatrics and

21   infectious diseases, is overwhelming sepsis leading to septic

22   shock a well-recognized cause of infant death?

23       A.   It is, and often you hear it on the evening news,

24   because it's so dramatic; that a child or adolescent, or even

25   adult, who has been well, all of a sudden has an overwhelming

*(Klein - Defendant - Direct)*                          2000

```
 1    infection and dies within hours, and it is so dramatic that it
 2    makes the newspapers, television, and it's a well --
 3    fortunately, uncommon, but well-recognized consequence of
 4    overwhelming infection.
 5                 MS. EFFMAN:  One moment, please.  No further
 6         questions.
 7                 THE COURT:  Thank you.  Mr. Glass?
 8                 MR. GLASS:  Your Honor, could we take a break to
 9         go over all these notes before we start cross-examination?
10                 THE COURT:  Is ten minutes sufficient, 15?
11                 MR. GLASS:  Fifteen would be great.
12                 THE COURT:  Members of the jury, we will take a
13         15-minute break at this time.  Please do not discuss the
14         case among yourselves or with anyone else.  Do not read or
15         listen to any media accounts of this case.  Do not visit
16         any premises involved in this matter.  Do not conduct any
17         research regarding this matter.  Do not request or accept
18         any payment in return for supplying information regarding
19         this case.  Do not make any judgments regarding this
20         matter until you have heard all of the evidence and been
21         instructed as to the law.  If anyone attempts to
22         improperly influence you, please report it directly to me
23         without discussing it with anyone else first.  Thank you.
24                 (Jury excused.)
25                 THE COURT:  Doctor, as you remain a sworn
```

1          witness, I will ask you, please do not discuss this case

2          or your testimony with anyone until your testimony is

3          complete.  Thank you.

4                    (Brief recess taken.)

5                    COURT OFFICER:  Jury is entering.

6                    (Whereupon, the jury entered the courtroom.)

7                    THE COURT:  Please be seated.  The sworn witness

8          remains Dr. Klein.  Mr. Glass, whenever you are ready.

9                    MR. GLASS:  Thank you, Your Honor.

10    **CROSS-EXAMINATION**

11    **BY MR. GLASS:**

12          Q.   Good morning, Doctor.

13          A.   Good morning.

14          Q.   I have to say, I don't think I would have chosen

15    Dustin Hoffman for that movie role.  I think you are more the

16    Harrison Ford or Tom Cruise type myself.  I note this is your

17    first day here, but I have to get something out of the way that

18    has been going on with all of our medical witnesses.  You

19    testified in great detail on direct examination as to your

20    professional qualifications and board certifications and the

21    like, but I guess I have to get out some of the things that you

22    are not.  Okay?  First of all, you are not a board certified

23    forensic pathologist; correct?

24          A.   Correct.

25          Q.   Or any kind of a pathologist.  Would that be a fair

1      statement?

2          A.   It would.

3          Q.   And if you disagree with me, please let me know.   And

4      you are not a board certified ophthalmologist; correct?

5          A.   I am not.

6          Q.   Or a board certified radiologist?

7          A.   Correct.

8          Q.   Not a board certified neurosurgeon?

9          A.   Correct.

10         Q.   And you are not board certified in pediatric critical

11     care?

12         A.   I am not.

13         Q.   And that's a recognized subspecialty of pediatrics?

14         A.   It is now.

15         Q.   And you are not board certified in emergency

16     medicine, either; are you?

17         A.   I am not.

18         Q.   And have you ever been declared an expert in the area

19     of pathology?

20         A.   No.

21         Q.   And in your pediatric process, you have never

22     specialized in infant neurosurgery or infant neuropathology.

23     Is that correct?

24         A.   I have not.

25         Q.   Now, I gather from your direct testimony that what

1    you are doing these days is mostly consulting and teaching.

2    Would that be a fair statement?

3        A.    Not entirely, in the sense that the consultations are

4    in infectious diseases in the hospital.  So, we have a

5    consultant service that provides services to patients whenever

6    the physician wishes to have additional information about an

7    infectious process.  So, patient care is one aspect.  Teaching

8    is a second.  Research is a third, and writing, consultations

9    to industry, government, would be the fourth.

10       Q.    Okay.  But as far as having a, shall we say, a

11   patient caseload, that is something you don't have anymore?

12       A.    Well, it would in the times that I am on the

13   consultant service.

14       Q.    Okay.  But not as an attending, because you are not

15   doing --

16       A.    No.  I have given up the general pediatric portion.

17       Q.    Okay.  Now, I'm sure you can imagine why I asked you

18   those questions, because just a few moments ago, there was a

19   number of questions asked of you regarding your professional

20   medical opinion with reasonable medical certainty with respect

21   to head trauma versus some infectious disease.  And in this

22   case, I believe you are talking about sepsis and septic -- or

23   overwhelming septic shock; correct?

24       A.    Yes.

25       Q.    As far as head trauma goes, some of the specialties

1    that I mentioned deal specifically with head trauma?

2        A.   Yes.  I think the only questions that I felt were

3    within my areas of expertise were those that related head

4    trauma to infection.

5        Q.   Okay.  So, you are not sitting here diagnosing a lack

6    of head trauma in this case?  In other words, you are not

7    telling us there was no head trauma; are you?

8        A.   No.

9        Q.   In fact, there was head trauma.  You would agree with

10   that?

11       A.   The aspect that I related was that the coagulopathy

12   could cause bleeding anywhere, including the head; but other

13   than that general statement, I would not give an opinion about

14   head trauma.

15       Q.   Okay.  I guess, then, what you are saying, and

16   correct me if I'm wrong, is that you can't say whether or not

17   the bleeding in the brain was caused by coagulopathy or head

18   trauma; correct?

19       A.   That the coagulopathy could cause bleeding in any

20   organ, including the brain.

21       Q.   Spontaneous bleeding?

22       A.   It's not spontaneous in the sense that --

23       Q.   There has to be some force that resulted or causes

24   the bleeding; correct?

25       A.   Right.  And what I had described was that infection

1    could cause the coagulopathy, which could cause failure to

2    clot.

3          Q.   Okay.  There's a lot of coulds there, but, okay, I

4    understand where you are coming from.  And also, I can't help

5    but comment on the fact that, during the course of your direct

6    examination, we heard the word "probably" quite a few times;

7    correct?  This "probably" happened; that "probably" happened?

8          A.   Well, if you could be specific, I would review that.

9          Q.   It was early on in your direct.  I don't have the

10   notes specifically, but I will pass on that for right now.

11   Now, you testified that in your review of the records -- why

12   don't we back up for just a moment?  I just want to go over

13   with you the things that you did review on which you base the

14   opinions that you stated during your direct examination.  Okay?

15   I think you said you examined the autopsy report.

16          A.   Yes.

17          Q.   And the records of birth of both twins from Albany

18   Medical Center?

19          A.   I did.

20          Q.   And that included their stay in the Neonatal

21   Intensive Care Unit?

22          A.   Right.

23          Q.   And then they were transferred to another hospital,

24   and I don't want to confuse you, but this one was St. Mary's?

25          A.   Yes.

```
 1          Q.   You reviewed those?

 2          A.   I did.

 3          Q.   And did you review the records dealing with the

 4     well-baby checkups?

 5          A.   I did, and focused on the immunization series.

 6          Q.   Okay.  And did you review the records of the

 7     September 13, 2008, hospital visit to the Emergency Department

 8     at Samaritan Hospital?

 9          A.   I did.

10          Q.   And I'm pretty sure you looked at the September 21st

11     visit to Samaritan Hospital, to the emergency room, and the

12     subsequent -- and the transport there by the ambulance?

13          A.   Yes.

14          Q.   And then the transport from Samaritan to Albany

15     Medical Center, and then the Albany Medical Center records, as

16     well; correct?

17          A.   Yes.

18          Q.   Did you review the OB/GYN records of the mother?

19          A.   No.

20          Q.   And I think you testified that you reviewed a

21     statement of █████████ mother or a couple of statements of

22     Matthew's mother?

23          A.   Yes.

24          Q.   And did you review the statements of the Defendant?

25          A.   There was a statement.  I'm not sure --
```

1          Q.   Did you review a one-page statement or a ten-page

2     statement?

3          A.   It was a one-page statement.

4          Q.   So, if I told you that in evidence there's a ten-page

5     statement from the Defendant, you hadn't reviewed that?

6          A.   I did not.

7          Q.   And did you review a video on disc of an interview or

8     interviews with the Defendant and some police officers?

9          A.   No.

10          Q.   Didn't see those.  Okay.  In addition -- and no

11     police reports?

12          A.   I did not see the police reports.

13          Q.   And in addition to what I have just mentioned, did

14     you review the autopsy photographs?

15          A.   Yes.  At one point, Attorney Frost did send slides

16     that had been prepared from the autopsy.

17          Q.   We are talking about slides that you examine under a

18     microscope?

19          A.   No.  These were slides, Kodachromes.  They were

20     pictures.

21          Q.   Oh, pictures.  I'm sorry.  We don't hear about that

22     too much any more with digital stuff.  And were they the

23     autopsy photographs or some other?

24          A.   They were.

25          Q.   So, you did review the photographs taken at the

1    autopsy?

2         A.   I did, but it didn't help me in formulating my

3    opinions.

4         Q.   Okay.  And you are not a pathologist, so it really

5    was inconsequential?

6         A.   That's correct.

7         Q.   And I just asked you if there was some microscopic

8    slides.  You didn't review those; did you?

9         A.   No.

10        Q.   Now, I think you testified just a short while ago

11   that you didn't see, in your review of the records, any

12   evidence of Matthew having aspirated.  Do you recall that?

13        A.   I do.

14        Q.   What would -- where would that evidence be and what

15   would that evidence be?

16        A.   It would be in the parents' narrative in terms of did

17   the child, at any point in his feeding, choke, cough, have a

18   swallowing difficulty.  When you aspirate, you know it, and a

19   parent would know it; that a child, instead of taking a bottle

20   and swallowing it normally, was coughing, sneezing, choking,

21   spitting up.

22        Q.   Okay.  But food isn't the only thing you can

23   aspirate; is it?

24        A.   In terms -- if we distinguish aspiration from

25   swallowing.  Swallowing is the normal mechanism by which any

1   materials, secretions in the upper respiratory tract, go into

2   the stomach through the esophagus.  Aspiration is an abnormal

3   condition, where some foreign material or food is ingested and,

4   instead of going into the stomach, goes into the lung.

5        Q.   So, foreign material?

6        A.   Yes.

7        Q.   So, it doesn't have to be food?

8        A.   It could be anything.

9        Q.   Could be anything.  Okay.  And I think you said

10  sometimes -- or that the aspiration occurs when the gag reflex

11  is not acting appropriately?

12       A.   Correct.

13       Q.   And trauma can result in the gag reflex not acting

14  appropriately; can't it?

15       A.   If the trauma was sufficient that the child was

16  comatose, in a coma, or there was sufficient -- so the gag

17  reflex was not operating normally, then that could occur.

18       Q.   How about a temporary loss of consciousness?  Could

19  that occur during such an event?

20       A.   Well, if the loss of consciousness was accompanied by

21  something in the mouth.  So, let's say the child was feeding on

22  a hamburger and got hit in the head and the gag reflex was

23  aborted, then he could swallow the piece of hamburger into his

24  lung, but it's not a normal secretion that you would be

25  concerned about.

1      Q.         was only four months old, so I don't think he

2    was eating any hamburgers.  But say, for example, a

3    four-month-old prematurely born child was thrown forcefully

4    from the height of an approximately five-foot-nine man onto a

5    mattress that was about seven feet -- excuse me, 17 inches off

6    the floor.  Would you consider that somewhat of a traumatic

7    event?

8         A.   I would consider it a traumatic event.

9         Q.   Not something you would advise a parent to do; would

10   you?

11        A.   No.

12        Q.   And if it, in fact, happened three times over a

13   period of four days, it would be a series of traumatic events;

14   would it not?

15        A.   Yes.

16        Q.   And might not such conduct result in a temporary loss

17   of consciousness that could result in a compromise of the gag

18   reflex?

19             MS. EFFMAN:  Objection, speculation.

20             THE COURT:  Overruled.

21        A.   If the question is could it happen, the answer is

22   yes, it could happen.

23        Q.   And you are relying on no evidence of aspiration,

24   just based on the parents' history; correct?

25        A.   And the feedings; that the child was taking normally.

 1          Q.   And that came from the parents?

 2          A.   Yes.

 3          Q.   You didn't review the father's statement.  So, you

 4     don't know what he said about the feedings or the history; do

 5     you?

 6          A.   Not the ten-page statement that you refer to.

 7          Q.   Now, would it be something that you would consider

 8     important if, on the third occasion of that slamming down

 9     process I described a couple of minutes ago, if there were

10     reports that, once that ended, that the child was wheezing?  Is

11     that a significant event?  Would that enter into your opinion

12     or your evaluation of the processes here?

13          A.   I think you would consider it, but I'm not sure how I

14     would be able to interpret it in terms of his pneumococcal

15     sepsis.

16          Q.   Okay.  Pneumococcal sepsis would be an inflammation

17     of his lungs; correct?

18          A.   Caused by the -- no.  Sepsis is the general systemic

19     infection caused by the pneumococcus.

20          Q.   I see.  But I think it's your theory here that this

21     was a -- and I think the word is a fulminant?

22          A.   It's not theory.  It's based on fact.

23          Q.   What fact is it based on?

24          A.   The fact is the child has a positive blood culture;

25     that he has, as I noted, a half a dozen parameters of sepsis

 1  and septic shock.  So, those are in the medical record and are

 2  fact.

 3       Q.   They are.  I agree with you.  But I think you posited

 4  that this infection came on Friday night or Saturday morning?

 5       A.   Well, Mom indicated that there was fever on Friday,

 6  so it was something that would have been some time before

 7  Friday.

 8       Q.   Mom also indicated there was a fever a week before,

 9  too?

10       A.   Yes.  I think, in the way this sepsis and septic

11  shock evolved, that we are really dealing with those few days

12  prior to the 21st, and I don't see an association with the

13  events of the 13th.

14       Q.   Okay.  Well, what if the father said - and I believe

15  he did just yesterday - that the child was feverish all week

16  long?

17       A.   I didn't see any of that in the medical record.

18       Q.   Okay.  But you are relying on history, though;

19  correct?

20       A.   The medical contemporaneously-obtained history.

21       Q.   But if the father, and I'm positing this to you, if

22  the father said the child was feverish all week long, that

23  might change the equation; wouldn't it?

24       A.   No.  In the sense that it might indicate that the

25  child had this pneumococcal infection that had been simmering

*(Klein - Defendant - Cross)*                          201

1    for several days producing the fever, but then the progression

2    to the blood culture being positive and sepsis and septic shock

3    was encapsulated within that short period from Friday to

4    Sunday.

5         Q.   Notwithstanding that there might have been traumatic

6    events in the child's life on Wednesday and Thursday?

7         A.   Right.  I don't see where trauma has anything to do

8    with the demise of the child due to infection.

9         Q.   Now, would head trauma -- head trauma could affect

10   the brain; correct?

11        A.   Presumably, if there's damage to the brain, it would

12   affect it.

13        Q.   Does the brain play any role in the immune system of

14   a child?

15        A.   None.

16        Q.   None?

17        A.   None.

18        Q.   Brain doesn't even send out signals to the body?

19        A.   Brain sends out a lot of signals, but there are

20   multiple mechanisms disassociated from the brain that are

21   involved in immunologic protective factors.

22        Q.   Okay.  I think you said you read the testimony of Dr.

23   Jenny?

24        A.   I did.

25        Q.   Didn't she say something along the lines of what I'm

*(Klein - Defendant - Cross)*                          2014

1    talking to you about?

2        A.   She did, and I disagree.

3        Q.   So, what we have here is a professional disagreement

4    amongst --

5        A.   No.

6        Q.   No?

7        A.   We have somebody who's spent 50 years looking at

8    infection and immunologic phenomena and a woman physician who's

9    very competent in her area, which appears to be child abuse.

10   So, I would think that her area of expertise in immunology and

11   infectious diseases is far less than mine.

12       Q.   Okay.  And just as yours in head trauma would be far

13   less than hers?

14       A.   Agreed.

15       Q.   Okay.  Thank you.  Now, the bleeding in the brain --

16   just to go back to that for a second.  Would you agree with me,

17   Doctor, that subdural hematomas, in the absence of major trauma

18   or catastrophic trauma, like a car accident, subdural hematomas

19   are usually the result of, in an infant, are usually the result

20   of abuse?

21               MS. EFFMAN:  Objection, beyond the scope of his

22          expertise.

23               THE COURT:  Sustained.

24               MR. GLASS:  Your Honor, it appears to me that

25          the Doctor is ruling out head trauma.  I think I ought to

1        be able to inquire, to some extent, as to the basis for

2        his opinion.

3                MS. EFFMAN:  Your Honor, I object.  He's already

4        testified that he's not a neurologist.

5                THE COURT:  Yes.  I don't know that the Doctor

6        ruled out head trauma or not.  I think he stated his

7        opinion based on his background.  So, as of right now, I

8        don't think there's a sufficient foundation.  So, I'm

9        going to sustain the objection.  If a more detailed

10        foundation is laid, you can certainly reask it, and I will

11        consider it at that time.

12       Q.   Now, I think we all agree, Doctor, that based on your

13   review of the record, that when the child arrived at Samaritan

14   Hospital, the Emergency Department, he, at that time, was

15   already beyond the point of no return?

16       A.   We know that.

17       Q.   And I think your testimony was that the treatment he

18   received there and the subsequent treatment he received at

19   Albany Medical Center -- and I believe your words were

20   appropriate and aggressive?

21       A.   Yes.

22       Q.   So, you had no quarrel with the way he was treated?

23       A.   Correct.

24       Q.   And that the doctor, the emergency room doctor, Dr.

25   Kardos, engaged in - differential diagnosis - the first being

*(Klein ~ Defendant ~ Cross)*                          2016

1    sepsis, I think?

2         A.   Yes.

3         Q.   And the second being intracranial abnormality/

4    trauma?

5         A.   Yes.

6         Q.   And then the third being dehydration; correct?

7         A.   Yes.

8         Q.   As you recall.  And you understand or you know that

9    at Samaritan Hospital, there wasn't an opportunity to work up

10   the intracranial trauma or abnormality issue due to the

11   instability of the child?

12        A.   Yes.

13        Q.   But they did that at Albany Med?

14        A.   Yes.

15        Q.   And is -- was Dr. Jenny's testimony the only

16   testimony that you reviewed, or did you review the testimony of

17   the other physicians, as well?

18        A.   No.  It was the only one.

19        Q.   So, you didn't review the testimony of Dr. Edge, the

20   critical care pediatrician?

21        A.   I did not.

22        Q.   And you didn't review the testimony of Dr. Waldman,

23   the pediatric neurosurgeon?

24        A.   No.

25        Q.   Both of whom are board certified?

1        A.   I did not.

2        Q.   Would you be surprised to learn that they would

3    disagree with your assessment today?

4        A.   I wouldn't be surprised that a neurosurgeon would

5    disagree with an infectious disease expert in matters of

6    neurosurgery.  I would be surprised if he would disagree with

7    an infectious disease expert about infectious disease issues.

8        Q.   Sure.  But he agreed the sepsis was present and

9    there, as did Dr. Edge, and in fact, as did the medical

10   examiner, Dr. Sikirica.  They agreed it was there.  Their

11   feeling was it was all secondary to the head trauma.  Your

12   position is it is not?

13       A.   I'm not sure of the question.  The question is --

14   would you ask the question again?

15       Q.   You are right.  That was more of a statement than a

16   question.  Let me ask a question.  Ideally, if you were to

17   treat a patient, would you rather treat a patient in person or

18   from miles away just by looking at paper?  And that's a double

19   question.  You would much rather treat a patient in person;

20   wouldn't you?

21       A.   You mean contemporaneously, at the time?

22       Q.   Yes.

23       A.   Of course.

24       Q.   Dr. Edge, the critical care pediatrician, and Dr.

25   Waldman, the pediatric neurosurgeon, they had the opportunity

A000001888

1    to treat ▓▓▓▓▓ right in person, right there in the hospital,

2    and came to the conclusion that his death was neurological and

3    that sepsis was secondary.  And you, notwithstanding all of

4    your experience, which is certainly impressive, reviewed some

5    of the hospital records months later and came up with a

6    substantially different conclusion; correct?

7         A.   Yes.

8         Q.   And that's because you have a difference of opinion

9    with their findings?

10        A.   No, it's not.  It's because I have the advantage of

11   hearing and reading the whole story.  So, I have the advantage

12   that the physicians who are taking care of the child at the

13   time didn't have.  I know what the autopsy showed.  I know what

14   the blood culture showed.  I put together, in retrospect, now a

15   year later, all of the information that was available and can

16   give an opinion that this presentation and conclusion was due

17   to overwhelming sepsis, which the physicians at the time had to

18   deal with a minimum of information, only as the laboratory

19   tests became available, and certainly not before the autopsy

20   findings were available.

21        Q.   Okay, but they just testified last week.  All of that

22   stuff was available to them, too, yet there's still this

23   difference of opinion.

24             MS. EFFMAN:  Objection, speculation as to what

25        they testified to last week.  The Doctor testified he did

*Judy A. DelCogliano*
*Official Senior Court Reporter*

```
 1              not review the testimony of Waldman and Edge.
 2                      THE COURT:  Overruled.
 3          Q.   So, it's a difference of opinion?
 4          A.   I'm not sure of the question.
 5          Q.   So, this is a difference of opinion between
 6     yourself -- the treating critical care pediatrician, Dr. Edge,
 7     and the treating pediatric neurosurgeon, Dr. Waldman, and you
 8     all have differences of opinion as to the cause of death?
 9          A.   Well, I think that there's a factual basis for my
10     conclusion that includes --
11          Q.   Is there a factual basis for theirs?
12          A.   Can I finish my answer?
13          Q.   I'm sorry.  Go ahead.
14          A.   And the factual basis is that he did have a positive
15     blood culture for this organism.  He did go into sepsis and
16     septic shock.  He did have all the parameters that I identified
17     on the board, and the coagulopathy, the inability to maintain
18     his temperature, his shock, that leads to death.  So that, in
19     itself, is an important cause of death.  Any of the other
20     factors, including the head trauma, are apart from that and not
21     associated with the cause of death.  The cause of death was due
22     to overwhelming infection.
23          Q.   Okay.  And all those factors that you talked about
24     that you put up on the board there - inability to maintain
25     vital signs, low temperature, the low blood pressure, the
```

*(Klein - Defendant - Cross)*                    2020

1   abnormal platelet counts, the inability to get oxygen, clotting

2   issues and the glucose dropping - are all those signs exclusive

3   to sepsis?

4        A.   No, but they are in this framework of having an

5   identifiable bacteremia and sepsis, are almost certainly

6   associated with that process, rather than any other.

7        Q.   But they are -- can be associated with many other

8   conditions and diseases.  Is that correct?

9        A.   Not entirely, in the sense that we mentioned the DIC,

10  the disseminated intravascular coagulopathy, which is almost

11  always associated with infection.  It's not associated with

12  trauma.  Trauma can cause it, but the vast majority of infants

13  and children that we see are due to infection.  So, it doesn't

14  eliminate other possibilities, but the vast majority of cases

15  will be associated with sepsis, and we have documented

16  bacteremia in this case.

17       Q.   Did you just say trauma can cause coagulopathy?

18       A.   I believe that Dr. Jenny has a paper on that.

19       Q.   So, in that respect, you agree with her?

20       A.   No.  I agree with her that it's a factor, but that it

21  was not a cause of this child's death.

22       Q.   So, in that respect, you disagree with her?

23       A.   Well, if she said that trauma caused the death, then

24  I would disagree with her.

25       Q.   Well, she did say that.  Now, not being a

*(Klein - Defendant - Cross)*                                              202?

1    pathologist, you don't have to sign death certificates; do you?

2        A.   No.

3        Q.   Have you ever had to sign a death certificate?

4        A.   I have.

5        Q.   But it's something rare in your capacity as a

6    pediatrician; is it not?

7        A.   Well, as a consultant, it would probably be the

8    primary physician who would sign the death certificate.

9        Q.   Or, perhaps, the medical examiner?

10       A.   If that were the routine, yes.

11       Q.   Okay.  In fact, there was a medical examiner in this

12   case who did a full autopsy.  You reviewed the report; correct?

13       A.   I did.

14       Q.   Find any deficiencies there?

15       A.   No.  I took the report at face value.

16       Q.   And although it doesn't mention the word sepsis, the

17   medical examiner doesn't disagree that sepsis is there?

18       A.   No, and he identifies the positive blood culture.

19       Q.   Sure.  But he also -- also, you may recall the date

20   of the autopsy report was several months past the date of

21   death?

22       A.   I don't recall.

23       Q.   Well, it's in evidence.  Maybe we can take a look at

24   it.  Doctor, I'm going to show you what's been marked as

25   People's Exhibit 35, and I ask you to take a look at that,

1    please.  Do you recognize that exhibit, Doctor?

2        A.   I do.

3        Q.   And what do you recognize it to be?

4        A.   The final autopsy report.

5        Q.   And is that the same one that you reviewed?

6        A.   Yes.

7        Q.   Okay.  And when is it dated?

8        A.   The date of the autopsy is September 25, 2008.

9        Q.   When is the final report dated?

10       A.   Well, the cover letter indicates April 22, 2009.

11       Q.   Okay.  So, that would be five, six months or so after

12   the date of the autopsy?

13       A.   Yes.

14       Q.   And Dr. Sikirica is a board certified forensic

15   neuro -- forensic pathologist, neuropathologist, and a couple

16   others besides.  And he had several months to review all the

17   documents and all the records.  And would you agree he came up

18   with a different conclusion than you did?

19       A.   Well, he lists four anatomic diagnoses.

20       Q.   Right.

21       A.   I don't know whether that means they are in order of

22   priority.  The first is severe closed head injuries; second is

23   blood culture positive for streptococcus pneumoniae, spelled

24   wrong; third is severe anoxic type changes of the heart; and

25   the fourth is status post donation of multiple internal organs.

*(Klein - Defendant - Cross)*                                   202

1    Q.   But the first one is closed head injury?

2    A.   It is.

3    Q.   Head trauma?

4    A.   Yes.

5    Q.   And did you say organ donation, as well?

6    A.   The fourth.

7    Q.   And would it be common for someone with overwhelming

8    septic shock to have their organs harvested for donation?

9    A.   No.

10   Q.   Happened here?

11   A.   I don't know the consequences of anybody getting an

12   organ from this child.

13   Q.   I believe there was testimony that there was

14   successful transplantation?

15              MS. EFFMAN:   Objection.   This witness didn't

16        hear that testimony.

17              THE COURT:   Overruled.

18   Q.   Let me ask you this:   Would you be surprised if there

19   was successful transplantation of organs from this child?

20   A.   No.   The child had received, by the time of his

21   demise, enough antibiotics that the organisms probably were

22   dead, but I think it was not optimal.   You would not want to

23   transfer an organ from a child who is bacteriemic.

24   Q.   Okay.   I'm going to show you what's been marked as

25   People's Exhibit 34 which is in evidence and ask if you would

*(Klein - Defendant - Cross)*                    2024

```
 1      look at that.  Do you recognize that, Doctor?
 2           A.   I do.
 3           Q.   Did you have an opportunity to see that before?
 4           A.   Yes.
 5           Q.   And what is that?
 6           A.   It's a certificate of death.
 7           Q.   And that lists a cause of death; doesn't it?
 8           A.   It does.
 9           Q.   And what is the cause of death listed there?
10           A.   The immediate cause is severe closed head injuries
11      with cerebral edema due to blunt force trauma.
12           Q.   And you disagree with that?
13           A.   I do.
14           Q.   I'm going to show you what's been marked as People's
15      Exhibit 33 which is in evidence, Doctor, and ask you to look at
16      that.  Do you recall seeing that image before, Doctor?
17           A.   I think it may have been among the pictures that
18      Attorney Frost gave to me, but I had difficulty interpreting
19      it, so I felt I wasn't competent to make -- to provide an
20      opinion.
21           Q.   Okay.  Well, let me ask you this:  Do you know what
22      a -- and I don't mean to be condescending, but do you know what
23      a subgaleal hemorrhage is?
24           A.   Yes.
25           Q.   Do you recognize anything on there as a subgaleal
```

1   hemorrhage?

2       A.   I would leave that -- as a general pediatrician, I

3   do, but I don't have any expertise in that area.

4       Q.   Okay.  Thank you.  Just so I'm clear, and I don't

5   mean to beat this to death, but the subdural hematomas that

6   were found in the child's head, you saw the photographs of

7   that?

8       A.   I did.

9       Q.   And just so I'm clear, you are attributing that to

10  the coagulopathy problem?

11      A.   No.  What I said in the direct examination was that,

12  if you have a clotting problem - you can't clot - that you can

13  have bleeding in any organ, and the autopsy indicates there's

14  bleeding in the heart and in the testes, and that bleeding

15  could occur in any organ, the lungs or the brain or the retina;

16  so that I'm saying it may be a part of the bleeding that

17  occurred.

18      Q.   So, you can't say with any degree of certainty that

19  that subdural hematoma was not caused by trauma?

20              MS. EFFMAN:   I object.  This is beyond the scope

21      of this particular witness' expertise.

22              THE COURT:   Overruled.  The witness can answer

23      it, if he can.

24      A.   I can only answer that the clotting problem made for

25  a difficulty in stemming bleeding in any organ.

A000001896

*(Klein - Defendant - Cross)* 2026

1    Q.   Do you know when those subdural hematomas were

2    created?

3       A.   No.

4       Q.   So, it's conceivable they could have been created

5    before the coagulopathy problem surfaced.  You don't know?

6       A.   I don't know.

7       Q.   Now, you are testifying here today as an expert

8    witness, and you have done that before, although I think you

9    testified that this is the first criminal case you've testified

10   in?

11      A.   That's correct.

12      Q.   Well, welcome to criminal court.  Now, how much of

13   your income comes from case review and testifying?

14      A.   About 10 to 20 percent.

15      Q.   And how much did you make last year from consulting

16   on cases, either in anticipation of litigation or in litigation

17   itself?

18      A.   There are two parts of that question.  One is any

19   monies that are part of my working day go to the Department of

20   Pediatrics.  They have a Child Health Foundation.  So, the

21   monies that I have personally are either on vacation days, as

22   today, or evenings and weekends.  So, the money from -- that

23   goes to the Child Health Foundation last year would be, and I

24   would have to speculate, because I don't know exactly, about

25   $80,000.

*(Klein - Defendant - Cross)*                                    202

```
 1            Q.    Okay.  Now, this year, how many trials have you

 2       testified in this year?

 3            A.    One.

 4            Q.    Plus today?

 5            A.    Plus today.

 6            Q.    And none of those were criminal cases?

 7            A.    No.  The one -- actually, two.  They were both part

 8       of the Vaccine Injury Compensation Program that I mentioned,

 9       where an alleged injury due to a vaccine occurred and a Special

10       Master conducts a trial with expert witnesses that present for

11       the Government and for the Plaintiff.

12            Q.    And when you testify at those, you almost exclusively

13       testify for the Government.  Is that correct?

14            A.    Yes.

15            Q.    And I think you testified that you frequently testify

16       in medical malpractice cases?

17            A.    I do.

18            Q.    And you don't discriminate whether it's the Plaintiff

19       or the Defendant in that case?

20            A.    No.

21            Q.    But when you testify in those, you get compensated?

22            A.    I do.

23            Q.    And you get compensated for your preparation and for

24       your testimony, if it should occur, and for your expenses;

25       correct?
```

*(Klein - Defendant - Cross)*                2028

1          A.    That's correct.

2          Q.    And you charge more in private malpractice cases than

3    you are charging for us or for the defense here today; correct?

4          A.    I agreed to a stipend as Attorney Frost suggested.

5          Q.    I understand that; that today -- what was it; 7500

6    for testimony?

7          A.    No.

8          Q.    5,000 for testimony and 2500?

9          A.    That's correct.

10         Q.    And that is somewhat of a discount, though; correct?

11         A.    Depending on the number of hours, it probably is.

12         Q.    And if you were testifying at a medical malpractice

13   case for a plaintiff or maybe a defendant, a doctor, your fee

14   would probably be much higher; right?

15         A.    It would be by the hour.

16         Q.    And what would the hourly rate be?

17         A.    It would be $500 an hour.

18         Q.    And if -- strike that.  Now, in addition to the fee

19   that you got, your expenses are going to be reimbursed here

20   today, as well; correct?

21         A.    Correct.

22         Q.    Now, Doctor, I have to ask you:  Do you recall the

23   Leary litigation back in the early 1990's?

24         A.    No.

25         Q.    It was one of those Vaccine Injury Compensation

 1     cases?

 2          A.   I don't recall the name.

 3          Q.   That you testified as an expert witness in for the

 4     Government, for the Department of Health and Human Services.

 5     Are you aware that there was a Law Review article a few years

 6     ago that was critical of your testimony in that case?

 7          A.   No.

 8          Q.   You are not aware of that?

 9          A.   I am not.

10          Q.   Do you mind if I tell you about that?

11          A.   Please.

12          Q.   Now, maybe if I explain to you the Leary case a

13     little bit.  It was a child who had received a third DPT shot.

14     Can you explain for me what that is?

15          A.   It's one of the infant immunization series.  It's

16     diptheria, tetanus and pertussis or whooping cough.

17          Q.   That's a common vaccination?

18          A.   Not any more, in the sense that the pertussis vaccine

19     has been replaced by a so-called acellular pertussis.

20          Q.   In 1984, it was common?

21          A.   It was standard.

22          Q.   And two days after the Leary child got the third

23     shot, he died, and the parents filed a claim, as was common and

24     is common, and they filed it in the -- is it the Federal Court

25     of Claims?

1      A.    Well, the process that started about 1985 is that it

2   goes directly to this system of Vaccine Injury Compensation.

3   So, whether that's -- I'm not sure what the term is, whether

4   that's Federal Court or not, but it is Department of Justice.

5      Q.    And you testified in that trial on behalf of the

6   Department of Health and Human Services, and I believe your

7   testimony, your expert testimony, and I'm maybe paraphrasing

8   it, but essentially the -- your opinion at that time was that

9   the death of the child and the immunization two days previously

10   were merely coincidental and one had nothing to do with the

11   other.  Okay?  Trust me on that?

12      A.    I do.

13      Q.    And the Law Review article --

14      A.    Before you progress, which immunization was that?

15   Was it two-month or four-month or six-month?

16      Q.    It was the third immunization.

17      A.    So, it would have been six months.

18      Q.    The Law Review article is the Number 37 California

19   Western School of Law Law Review in the spring of 2001.  And

20   your testimony was criticized because, at the time that you

21   rendered that opinion regarding the vaccination and death being

22   coincidental but not connected, that you, in fact, were -- had

23   a relationship, a business relationship with Wyeth-Lederle - is

24   it - the laboratory or the drug manufacturer?

25      A.    Well, the vaccine manufacturer has gone through

1      multiple name changes.

2           Q.    Sure.

3           A.    But I would have been involved with their

4      pneumococcal vaccine, not their DPT vaccine.

5           Q.    But DPT at that time was the standard, and

6      Wyeth-Lederle was one of the biggest manufacturers of that

7      vaccine; weren't they?

8           A.    Yes, but I had no advisory relationship about DPT.

9           Q.    But you had a relationship with Wyeth-Lederle?

10          A.    Related to pneumococcal vaccine.

11          Q.    But they had an interest in DPT; didn't they?

12          A.    Well, you know, I don't recall any of the specifics

13     of the case as you related, but if they were the manufacturer

14     of DPT, that may have been, but I had no relationship to that

15     vaccine.

16          Q.    To the vaccine.  But you did through the company that

17     made that vaccine?

18          A.    Yes.

19          Q.    And in fact -- and at that time, you were the chief

20     editor of Pneumo.Com?

21          A.    Yes.

22          Q.    That doesn't exist anymore; right?

23          A.    No.  It was a Web site that was very effective in

24     talking about pneumococcal diseases, where both parents and

25     physicians could send in e-mail on that Web site and have their

1    answers be responded to.

2         Q.   And in fact, Wyeth-Lederle paid for that Web site?

3         A.   They did.

4         Q.   And you probably get where I'm going.  There appears

5    to be a clear conflict of interest there?

6         A.   It depends on how you determine conflict of interest.

7    I had nothing to do with DPT vaccine.  Everything that has been

8    related had to do with pneumococcal disease, which is the

9    subject of what we are talking about today.

10        Q.   But your ultimate opinion was that the child, given

11   your opinion that there was no relationship between the death

12   and the vaccine, that he should not be given any compensation;

13   correct?

14        A.   That they were unassociated, yes.

15        Q.   Yes.  But, in fact, the Court disagreed with you and

16   awarded compensation in that case?

17        A.   I don't recall that.

18        Q.   I will ask you to trust me, but that's what I read.

19        A.   I trust you.  So, what was the criticism from the Law

20   Review?

21        Q.   The criticism was there was a clear conflict of

22   interest, because you had an interest in Wyeth-Lederle, and

23   here you are testifying against Wyeth-Lederle at a contested

24   litigation?

25        A.   Usually in the court proceedings, if you've got a

1   good attorney for the plaintiff, they will bring that out, and

2   I would imagine that would have been developed during the

3   testimony.

4       Q.  Let me ask you this:  Did you disclose it on your own

5   voluntarily?

6       A.  If the question about conflict of interest with the

7   vaccine manufacturer was asked, I would have.

8       Q.  But as you sit here, you have no recollection of

9   that?

10      A.  I have no recollection of the case.

11      Q.  And we don't have to worry about any conflict of

12  interest here today; correct?

13      A.  Well, I have indicated my conflicts of interest; that

14  I have been involved in pneumococcal diseases, pneumococcal

15  vaccines, and have served on advisory committees to vaccine

16  manufacturers for pneumococcal vaccines.

17      Q.  But other than the compensation you talked about, you

18  are not receiving any other compensation here today or any

19  other considerations; are you?

20      A.  I think -- I don't understand the question.  You mean

21  is there a conflict of interest that's involved?

22      Q.  I'm asking you.

23      A.  Aside from being on advisory committees for

24  pneumococcal vaccines, which don't enter into the discussion

25  today, I don't see any conflict.

A000001904

1          Q.   Before you came here today, you have consulted with

2    members of the defense team.   How many times have you talked to

3    them?

4          A.   Attorney Effman and Attorney Frost came to Boston

5    twice.

6          Q.   And for how long did you meet; do you recall?

7          A.   Each time, it would have been a couple of hours.

8          Q.   And you spoke on the phone with them from time to

9    time?

10         A.   Yes.

11         Q.   And in addition to that, did you meet with them

12   before testifying today?

13         A.   Last night.

14         Q.   For approximately how long was that?

15         A.   Let's see.   Dinner would have been from 6:30 to 7:30,

16   and then 7:30 to 9:30.

17         Q.   And, then, you are aware they are advancing a theory

18   here of not head trauma causing death, but overwhelming septic

19   shock?

20         A.   I don't see it as they're advancing it.   I'm

21   advancing it, and not a theory.

22         Q.   Okay.   Well, I guess that's one of those opinion

23   things.   And you are doing that notwithstanding that █████████

24   death was, at least officially on the death certificate, ruled

25   a homicide; right?

*(Klein - Defendant - Cross)*                                    2035

1      A.   Yes.

2      Q.   So, you disagree with that?

3      A.   Yes.   ████████ death was due to overwhelming

4   pneumococcal sepsis.

5      Q.   Now, ordinarily -- frequently during consultations,

6   you write a report for the people who are consulting with you;

7   correct?

8      A.   You mean in the hospital?

9      Q.   Well, whether it's a hospital consultation or a

10  litigation consultation?

11     A.   Yes.

12     Q.   Do you write reports from time to time?

13     A.   Yes.

14     Q.   Did you write a report in this case?

15     A.   No.

16     Q.   Were you asked to?

17     A.   No.

18     Q.   And other than the notes that you provided here

19  today, did you have any other notes?

20     A.   No.

21     Q.   Now, do you know if, when you met with the defense

22  attorneys, they were taking notes?

23     A.   I assumed they were.

24     Q.   You don't have a specific recollection of them

25  jotting down notes as you were talking?

*(Klein - Defendant - Cross)*                    2036

1          A.   I think each time we discussed, they were taking

2      notes.

3                    MR. GLASS:  I would ask to be provided with

4          those, Your Honor.

5                    MS. EFFMAN:  May we approach, Judge?

6                    THE COURT:  Yes.

7                    (Sidebar discussion held at follows:)

8                    MS. EFFMAN:  Your Honor, my position is that

9          that is attorney work product, any notes that I took in

10         this case.  He has voluminous notes.  I have copied them

11         and provided them.  Any notes that he took and reviewed of

12         the file have been turned over.  I think anything I wrote

13         down is an attorney work product.

14                   MR. GLASS:  I don't think so.  I think if we had

15         made notes, we would have to turn them over as *Rosario*.  I

16         don't see the difference.  *Rosario* is reciprocal.

17                   THE COURT:  That's your only argument?

18                   MS. EFFMAN:  I think it's attorney work product.

19                   MS. BOOK:  You are summarizing what a witness is

20         telling you.  That's exactly what falls under *Rosario*.  We

21         are at a disadvantage here; that we didn't get them until

22         now.  This is a clear violation of *Rosario*.

23                   THE COURT:  I agree.

24                   MR. FROST:  First off, it's not *Rosario*.  It's

25         Section 240 -- I forget which of the CPL, but it is not

                    Judy A. DelCogliano
                  Official Senior Court Reporter

 1             *Rosario*.  *Rosario* pertains specifically to any written

 2             memoranda the defense would have of a witness or

 3             memorandum by a witness.  What we are talking about here

 4             is -- that's a witness for the prosecution.  There is no

 5             *Rosario* rule that applies to the defense.  There is a

 6             disclosure obligation under CPL 240 - I forget the

 7             specific section - but 240 whatever it is, 240.44, but it

 8             is not *Rosario* material.

 9                     THE COURT:  But do you contest that under that

10             section of the CPL --

11                     MR. FROST:  I think we would have to take a look

12             at the section, Judge.

13                     THE COURT:  Okay.

14                     MR. GLASS:  I apologize.  I think I used the

15             word *Rosario* generically.  I believe Mr. Frost is correct

16             about that.

17                     THE COURT:  What we are going to do is --

18                     MR. FROST:  There is nothing there other than --

19                     THE COURT:  Okay.  Do you have the section of

20             that, Ms. Book?

21                     MS. BOOK:  (Offering.)

22                     THE COURT:  Before we go any further, you are

23             objecting to turning these notes over.  Is that correct?

24                     MR. FROST:  We are saying they are not covered

25             by that section.

*(Klein - Defendant - Cross)*                    2038

1          THE COURT:  But are you consenting to disclose

2     them?  I mean, we can stop this.

3               MR. FROST:  Can I see the section?

4               THE COURT:  Of course.

5               (Discussion off the record between defense

6     counsel.)

7               MR. FROST:  They are referring to the witness

8     himself, Your Honor.  They are not referring to the

9     attorney.

10               MS. EFFMAN:  And I'm sure they met with Dr.

11     Jenny.  I wasn't supplied with any written notes from Dr.

12     Jenny.

13               MS. BOOK:  There were no notes.

14               MR. FROST:  It says made by the person.

15               THE COURT:  What's the People's response that

16     any written recorded statement made by a person, other

17     than the defendant, whom the defendant intends to call as

18     a witness, Subsection 2A?

19               MS. BOOK:  I know that there's case law that

20     says if you write down a statement of someone else -- just

21     as when we met with Wilhemina pretrial.  We handed that

22     over, because they were statements given to us.  Case law

23     definitely extrapolates it.

24               MR. FROST:  *Rosario* requirements are extremely

25     different.  This is specific, and it was before -- this is

Judy A. DelCogliano
Official Senior Court Reporter

1      a breach of the statute, *Rosario.*  It's very widely

2      developed over the years by the Court of Appeals, and it

3      includes literally everything.  This is not *Rosario,* as

4      Mr. Glass can see, and the statute says made by a person.

5                    THE COURT:  I agree.

6                    MR. FROST:  It has to be made by him.

7                    MS. BOOK:  It says made by a person, other than

8      the defendant, who the defendant intends to call as a

9      witness to the trial and relates to the subject matter of

10     the witness' testimony.  It depends on how you read the

11     commas.  A person could make a note pertaining to the

12     person they intend to call relating to the subject matter.

13                    THE COURT:  My reading of the statute, it is

14     clear that it would not allow for what you are seeking at

15     this point.  Now, if you think that there is case law

16     which supports your position, or you are requesting, we

17     can break for lunch now, and then I will give both sides

18     an opportunity.

19                    MR. FROST:  Can you give us a moment?

20                    THE COURT:  Sure.

21                    MR. FROST:  Let Ingrid take a look at her notes.

22                    THE COURT:  That would be my preference.  Go

23     ahead and take a moment.

24                    (Brief recess taken.)

25                    MS. EFFMAN:  May we approach, Judge?

1           THE COURT:  Yes.

2           (Sidebar discussion held as follows:)

3           MS. EFFMAN:  We feel that from reading the

4   section cited, that we are not required to turn over

5   our -- any handwritten notes we took ourselves.  We are

6   required to turn over his notes.  During the recess, we

7   can both research the point.  If we find any cases on the

8   relevant point --

9           MS. BOOK:  I already found one.  It applies to

10  District Attorneys, but considering that the rule is

11  identical when it comes to the defense --

12          MS. EFFMAN:  They have the burden of proof.

13          THE COURT:  Okay.  Let her go ahead.

14          MS. BOOK:  There's a Consolazio case that

15  encompasses a District Attorney's handwritten notes of a

16  person's --

17          MS. EFFMAN:  I don't see where there's any case

18  law that says an actual defense lawyer has to turn over

19  their note from a defense witness.

20          THE COURT:  If you are not going to consent,

21  which you don't have to do, we will break for lunch now.

22  I'm going to look into it myself.  We will break until

23  two o'clock.  You can give me any law you want, and I will

24  rule on it.

25          (Proceedings continue in open court as follows:)

```
 1                    THE COURT:  Okay.  Members of the jury, we are
 2          going to break for lunch at this point.  We are going to
 3          break until two o'clock.  So, that's about an hour and ten
 4          minutes, just about.  Please do not discuss the case among
 5          yourselves or with anyone else.  Do not read or listen to
 6          any media accounts of this case.  Do not visit any
 7          premises involved in this case.  Do not conduct any
 8          research regarding this case.  Do not request or accept
 9          any payment in return for supplying any information
10          regarding this case.  Do not make any judgments regarding
11          this case until you have heard all of the evidence and
12          been instructed as to the law.  And if anyone attempts to
13          improperly influence you, please report it directly to me
14          without discussing it with anyone else first.  Enjoy your
15          lunch.  We will see you back here at two o'clock.  Thanks.
16                    (Jury excused.)
17                    THE COURT:  Doctor, given that you are still a
18          sworn witness, I would ask you to please refrain from
19          discussing this case or your testimony with anyone until
20          your testimony is complete.
21                    THE WITNESS:  Understood.
22                    (A luncheon recess was taken.)
23                    (Proceedings continue outside the presence of
24          the jury as follows:)
25                    THE COURT:  Okay.  We are back on the record.
```

Judy A. DelCogliano
*Official Senior Court Reporter*

*(Klein - Defendant - Cross)*                    2042

1    When we broke, we had an issue as to whether the notes

2    taken by defense counsel in connection with their

3    interview with Dr. Klein were discoverable.  Do the People

4    want to be heard any further on that issue?

5              MS. BOOK:  Your Honor, I did a little research

6    on the break.  I again cite the People versus Consolazio,

7    Court of Appeals case from 1976, 40 NY2d 446.  Did the

8    Court find that case?

9              THE COURT:  No.

10             MS. EFFMAN:  Do you have a copy of that?

11             MS. BOOK:  I just have one copy.  In this case,

12   the -- basically, what the issue was was whether or not

13   the District Attorney's Office, taking handwritten notes

14   of something that their witness related to them, whether

15   or not that fell within the confines of *Rosario,* and the

16   Court held that it did; that any handwritten notes of the

17   District Attorney's Office fell within *Rosario* and had to

18   be turned over.

19             Additionally, in People versus Kozlowski, a

20   Court of Appeals case from 2008, it basically reaffirmed

21   that same rule with respect to prosecutors; that

22   handwritten notes of witness' testimony did constitute or

23   fall within what had to be turned over as *Rosario*

24   material.  I could not find a case that cited the converse

25   was true for the defense.

1            THE COURT:  I've got one for you.

2            MS. BOOK:  Great.

3            THE COURT:  We will let the defense be heard

4       first.

5            MR. FROST:  It is our position, Your Honor --

6       the Court has heard our position, Your Honor.

7            THE COURT:  The Court cites People versus

8       Charron, C-H-A-R-R-O-N, 198 AD2d 722, a 1993 Third

9       Department case, which quotes as follows:  "Defendant

10      initially contends that County Court committed error when

11      it required disclosure of a single page of notes made by

12      Defendant's counsel during the course of a pretrial

13      interview of a defense witness prior to direct testimony.

14      We disagree.  Under CPL 240.45(2)(a), the Defendant has an

15      obligation to turn over to the People any written or

16      recorded statement made by a person other than the

17      Defendant whom the Defendant intends to call as a witness

18      at the trial and which relates to the subject matter of

19      the witness' testimony.  This disclosure is required to be

20      made after presentation of the People's direct case and

21      before the presentation of the Defendant's direct case.

22      Because defense counsel took no pretrial statement from

23      the witness, the notes were properly considered as a

24      substitute.  We note that County Court redacted the notes

25      to delete the proposed questions which defense counsel

*(Klein - Defendant - Cross)* 2044

1          intended to ask and, thus, only required disclosure of

2          those portions that were deemed declarative.  We discern

3          no prejudice to Defendant in the Court's use of this

4          procedure."

5                    Based on that holding from the Third Department,

6          which is certainly controlling on this Court, I will order

7          that the notes be turned over.  However, if defense

8          counsel feels that there are portions of the notes which

9          should be redacted, I would be happy to conduct an in

10         camera review of them.

11                   MS. EFFMAN:  I copied the notes on lunch hour,

12         in the event the Court directed me to turn it over.  There

13         will be no redactions necessary.

14                   MS. BOOK:  We would ask for a couple of minutes

15         to review those, and the same thing is true of Dr. Leestma

16         or any other witnesses that may be testifying; if there

17         are any notes, we ask that they be turned over.

18                   THE COURT:  Again, based on the case that I just

19         cited, if there are any notes, the Court would order them

20         to be turned over, again, unless the defense contends that

21         there are portions which should be reviewed by the Court

22         in camera, I will do so.

23                   MS. EFFMAN:  I will copy any notes I have

24         regarding Dr. Leestma.  I will turn them over today to the

25         District Attorney's Office.  The other witness today, I

*(Klein - Defendant - Cross)*                                    2045

```
 1          have made no notes.

 2                    THE COURT:  You would like a few moments now to

 3          review those notes?

 4                    MR. GLASS:  It shouldn't take too long.

 5                    THE COURT:  Take your time.

 6                    (Brief recess taken.)

 7                    MR. GLASS:  We are ready, Your Honor.

 8                    THE COURT:  Ms. Effman?

 9                    MS. EFFMAN:  Defense is ready, Your Honor.

10                    THE COURT:  Doctor, I will ask you to resume the

11          witness stand, please.

12                    COURT OFFICER:  Jury is entering.

13                    (Whereupon, the jury entered the courtroom.)

14                    THE COURT:  Please be seated.  The sworn witness

15          remains Dr. Klein.  Mr. Glass, whenever you are ready, you

16          may proceed.

17                    MR. GLASS:  Thank you, Your Honor.

18     BY MR. GLASS:  (Continuing)

19          Q.  Good afternoon, Doctor.  I think I'm going to try to

20     wrap this up fairly quickly.  One of the things I wanted to

21     clear up, you made reference to the fact that there was retinal

22     hemorrhages present?

23          A.  Yes.

24          Q.  Do you recall that?

25          A.  I do.
```

*(Klein – Defendant – Cross)*                                        2046

1       Q.   And I think, and correct me if I'm wrong, you

2    contributed that to the coagulopathy issue?

3       A.   No.

4       Q.   You corrected me, then.

5       A.   What I said was that, as a result of the

6    coagulopathy, there could be bleeding into any organ.  It could

7    be a systemic event.  So, it could be into the foot.  It could

8    be into the intestinal.  We have evidence from the autopsy that

9    it was in the testes and the heart and that it could be in

10   the -- a contributor to the retinal hemorrhage and the bleeding

11   in the brain.

12      Q.   Okay.  And in fact, not only were the hemorrhages in

13   the retina itself, but they were in the optical nerve sheath,

14   and they were described as severe and acute.  Is that correct?

15      A.   That's in the province of an ophthalmologist.  I

16   would not comment on those distributions.

17      Q.   Okay.  Well, didn't you read that in the autopsy

18   report, what I just described?

19      A.   I don't recall.

20      Q.   But I think earlier you stated that, yes, there can

21   be bleeding in any organ when there is coagulopathy, but it's

22   not spontaneous bleeding; correct?

23      A.   No.  If you have the DIC, the disseminated

24   intravascular coagulopathy, which is due to the pneumococcal

25   sepsis in this case, it's not spontaneous.  It's caused by the

1    pneumococcus.

2        Q.   And the -- is that the only reason that there might

3    be retinal hemorrhaging?

4        A.   That's part of the progression of the pneumococcal

5    sepsis that led to death in this case.  So, there could be

6    bleeding into any organ, including the retina or the brain.

7        Q.   And there could be bleeding as a result of some other

8    cause unrelated to the coagulopathy; could there not?

9        A.   I would leave that to the experts in ophthalmology

10   and neuroanatomy or neuropathology.

11       Q.   But based upon your experience as a pediatrician of a

12   long tenure, isn't it a fact that trauma can cause retinal

13   hemorrhaging?

14       A.   Trauma can cause retinal hemorrhaging.

15              MR. GLASS:  Thank you, Doctor.  I have no

16        further questions at this time.

17              THE COURT:  Any redirect from the defense?

18              MS. EFFMAN:  Briefly, Judge.

19   REDIRECT EXAMINATION

20   BY MS. EFFMAN:

21       Q.   Doctor, in the records that you reviewed and the

22   mother's statement that you reviewed, is there any evidence of

23   loss of consciousness or abnormal feeding; in the records, or

24   from the mother, the records of Samaritan Hospital and Albany

25   Medical Center?

A000001918

*(Klein - Defendant - Redirect)*                    2048

1          A.   No.   There is no such indication.

2          Q.   And can you tell the jury whether the chest x-rays

3     taken at Samaritan Hospital and Albany Medical Center show any

4     evidence that this child aspirated?

5          A.   They do not.

6          Q.   And Doctor, finally, one last question.   Did alleged

7     head trauma have anything to do with this child's death?

8          A.   This child died of overwhelming infection.   Trauma

9     had nothing to do with overwhelming infection.

10              MS. EFFMAN:   No further questions.

11              MR. GLASS:   No questions, Your Honor.

12              THE COURT:   Doctor, thank you very much.   You

13         may step down.

14              MS. BOOK:   May we approach before the next

15         witness?

16              THE COURT:   Yes.

17              (Sidebar discussion held as follows:)

18              MS. BOOK:   Judge, Ms. Effman just gave me a

19         report, I think relating to the next witness, a Dr.

20         Ushkow.   The People would like an offer of proof before

21         this witness comes on.

22              MS. EFFMAN:   Dr. Ushkow is a relevant witness.

23         He saw the child on the 13th of September at Samaritan

24         Hospital.   The indictment alleges that the Defendant

25         committed crimes starting on the 10th of September, 2008.