EXHIBIT "P"

```
 1      (Curriculum Vitae marked Defendant's Exhibit U for
 2      identification.)
 3      (CD marked Defendant's Exhibit V for identification.)
 4                  THE COURT:  People ready to proceed?
 5                  MR. GLASS:  Yes, we are, Your Honor.
 6                  THE COURT:  Defense ready to proceed?
 7                  MS. EFFMAN:  Yes.
 8                  (Whereupon, the jury entered the courtroom.)
 9                  THE COURT:  Please be seated.  Members of the
10          jury, we had a few technical difficulties, and that was
11          the cause for the delay this morning.  So, I apologize for
12          that.  At this time, the defense may call their next
13          witness.
14                  MS. EFFMAN:  I call Dr. Jan Leestma.
15      JAN E. LEESTMA, M.D., after first having been duly sworn by the
16      Clerk of the Court, was examined and testified as follows:
17                  THE CLERK:  The sworn witness is Jan E. Leestma,
18          L-E-E-S-T-M-A.
19                  MS. EFFMAN:  Judge, as a preliminary matter, the
20          People are not going to have any objection based on
21          foundation for moving into evidence certain pieces of
22          evidence; Defendant's R, which are gram stain slides; a
23          CD, Defendant's V.
24                  THE COURT:  V, you said?
25                  MS. EFFMAN:  V, subject to certain redactions.
```

*(Leestma - Defendant - Direct)* 2064

1    And also will be moving in Defendant's P, which are the

2    obstetric records of Wilhemina Hicks.

3            THE COURT:  Do you want to offer those in

4    evidence at this time?

5            MS. EFFMAN:  Yes.

6            THE COURT:  People's position?

7            MS. BOOK:  That's correct, Your Honor.

8            MR. GLASS:  Was it P?

9            MS. EFFMAN:  P, R and V.

10           MS. BOOK:  No objection, Your Honor.

11           THE COURT:  Defendant's P, R and V are received

12   in evidence without objection.

13   (Defendant's Exhibits P, R and V marked for identification

14   received in evidence and marked Defendant's Exhibits P, R and V

15   in evidence.)

16   **DIRECT EXAMINATION**

17   **BY MS. EFFMAN:**

18       Q.   Good morning, Dr. Leestma.

19       A.   Good morning.

20       Q.   Would you please state your full name for the record?

21       A.   Jan Edward Leestma, L-E-E-S-T-M-A.

22       Q.   And where do you currently live?

23       A.   I live in Chicago, Illinois.

24       Q.   And what is your profession?

25       A.   I'm a medical doctor, a neuropathologist.

1      Q.   And can you tell the jury, what is a pathologist?

2      A.   A pathologist is a medical specialist usually.  It's

3   a recognized medical specialist, and the work that the

4   pathologist does is to understand the mechanisms of human

5   disease; that is, how a bug might kill you or affect tissues in

6   the body, how a cancer behaves, how it starts, how it plays

7   itself out, how it may bring the end of life.  Every form of

8   disease is fair game to the pathologist, and our job is to

9   understand how it works, basically.

10     Q.   Are you a licensed physician?

11     A.   Yes, I am.

12     Q.   In what states are you licensed in?

13     A.   Illinois and Michigan.

14     Q.   And how long have you been licensed to be a

15   physician?

16     A.   My Michigan license came first - I think it was

17   1965 - a year after I graduated from medical school, and I was

18   licensed in Illinois in 1971.

19     Q.   Can you tell us a little bit about your educational

20   background starting with college?

21     A.   Sure.  I attended Hope College in Holland, Michigan,

22   graduating after four years in 1960 with a Bachelor of Arts

23   degree in chemistry and biology, basically pre-med.  I then

24   went to the University of Michigan School of Medicine in Ann

25   Arbor for four years, graduated in 1964 with an M.D. degree.  I

1    then elected to pursue the study of pathology, and to that end,

2    went to the University of Colorado School of Medicine Medical

3    Center in Denver, where I began my training, which consisted of

4    two years of so-called anatomic pathology, or general

5    pathology.  That's where I learned how to do an autopsy, look

6    at surgical specimens that came from the operating room, and

7    beginning my research career, as well.  That program lasted two

8    years, and that's what I did.

9           At the end of that time, I decided to continue on,

10   but in neuropathology, or study of diseases - same deal - with

11   the nervous system, and I began that in Denver, also.  That was

12   a two-year program.  I took the first year in Denver and then

13   transferred to the Albert Einstein College of Medicine in the

14   Bronx, New York, where I completed training in 1968.

15        Q.   Can you tell the jury, what is anatomic pathology?

16        A.   Anatomic pathology is basically general pathology, as

17   I have indicated, study of diseases of every organ in the body.

18        Q.   Essentially, what is neuropathology?

19        A.   Same thing, only just honing down on the diseases of

20   the nervous system, the brain and spinal cord, things of that

21   sort.

22        Q.   Following your fellowship at the Albert Einstein

23   Hospital in Bronx, what did you do next, Doctor?

24        A.   We were in the midst of Vietnam conflict, and I was

25   obligated to serve in the military, but I beat them to it, I

```
 1    guess, and volunteered and was assigned to the United States
 2    Air Force Medical Corps and was allowed to continue finishing
 3    my training, and at the end of that, I would be obligated to go
 4    on active duty, which I did.  I came in as a captain of the Air
 5    Force Medical Corps and was detailed to the Armed Forces
 6    Institute of Pathology, and I joined the service organization
 7    on the campus of the Walter Reed Army Medical Center in
 8    Washington, and I was obligated for two years, but I served
 9    three.  The first was doing genitourinary pathology, needed
10    somebody there, so that's what you do.  At the end of that
11    time, I was able to transfer to the neuropathology section of
12    that institute, where I served two more years, and I was
13    honorably discharged with rank of major from the Air Force
14    Medical Corps in the summer of 1971.
15         Q.   Tell the jury --
16              THE COURT:  Can I interrupt you for one second?
17         Ma'am, do you want to take a break?
18              TRIAL JUROR:  I'm just having an asthma attack.
19              THE COURT:  Okay.  Do you wish us to take a
20         break?
21              TRIAL JUROR:  I'm sorry, but yes.
22              THE COURT:  That's okay.  Don't be sorry.  We
23         are going to take a break right now.  Please do not
24         discuss the case amongst yourselves or form any opinion
25         about the case.  We will take a break and come back
```

*(Leestma - Defendant - Direct)*                               2068

1          momentarily.

2                          (Brief recess taken.)

3                          (Whereupon, the jury entered the courtroom.)

4                          THE COURT:  Please be seated.  Okay now?  If you

5          or anyone else at any point needs a break, don't

6          apologize.  Just get my attention, and we will take a

7          break at any time.  You may continue, Ms. Effman.

8          Q.    Doctor, can you tell us what you did during your two

9          years at the Armed Forces Institute, the last two years you

10         were there?  Would you tell the jury what you did during the

11         last two years?

12         A.    The job at the Armed Forces Institute?

13         Q.    Yes.

14         A.    As I indicated before, this institute now,

15         unfortunately, has disbanded after 150 years.  It was the main

16         consultive agency for pathology issues for the Armed Forces;

17         Army, Navy, Air Force, Public Health Service.  That is, if

18         there were a death someplace, a soldier or retired person,

19         whatever, and there was some issues regarding the brain, and

20         the local facility wanted to refer that for further

21         consultation and diagnosis, it would come to the Armed Forces

22         Institute and might land on my desk, in which case it could be

23         an autopsy, trying to figure out what the process was,

24         diagnosis.  It could be a surgical specimen of a brain tumor or

25         some such thing, or in the case of the GU, it could be a

1    testicular tumor or a kidney tumor or something like that.  So,

2    my job and others in that branch were to offer those services.

3              They also expanded to the Veteran's Administration.

4    So, we had quite a huge amount of material coming in, also from

5    civilian hospitals all over the world desiring somebody to take

6    a second look or a third look or whatever.

7         Q.   And while you were stationed, so to speak, in the

8    D.C. area, were you affiliated with any hospitals there?

9         A.   Yes.  I had volunteered for doing work at -- I would

10   offer the similar services, teaching to the residents of the

11   Walter Reed Army Medical Center.  They had pathology residents

12   in training there, and I would be involved in teaching them;

13   went to the Bethesda Naval Hospital for the same purpose.

14   There were several medical schools in Washington at the time.

15   Most of them did not have a neuropathologist, so several of us

16   would volunteer to go over and teach medical students, do a

17   brain autopsy session, where we would demonstrate whatever was

18   the finding there, and I also did service at the -- it was in

19   transit at the time, but the Coroner's Office for the District

20   of Columbia while I was there, as well.

21        Q.   And what schools did you teach at in the Washington,

22   D.C., area?

23        A.   Howard University, George Washington University,

24   Georgetown University.

25        Q.   After completing your military service and being

*(Leestma - Defendant - Direct)*                              2070

1    honorably discharged, what did you do next, Doctor?

2         A.    Well, after being released from the Service, I set

3    about finding a job.  I wanted to work in the academic world,

4    and finally determined and was offered a position at

5    Northwestern University School of Medicine in Chicago, where I

6    live, as an Assistant Professor of Pathology and Neurology and

7    Chief of Neuropathology.

8         Q.    And can you tell us what the general job duties were

9    in that position?

10        A.    Well, basically, it falls into the service load,

11   which means working with the autopsy service to provide my

12   expertise; and to those kinds of cases, teaching residents on

13   how to read slides, how to learn how to do the work of a

14   pathologist, and then offering teaching to the residents in

15   neurosurgery, neurology, pathology, sometimes other fields,

16   even taught at the dental school and the nursing school

17   sometimes; and so that would be the service and teaching load.

18   And then I was expected to develop a research program, which I

19   did, and received some National Institute of Health grants to

20   pursue some of those studies.

21        Q.    And Doctor, how long were you employed through

22   Northwestern?

23        A.    Let's see.  I left Northwestern in 1985, after having

24   been there, like, about 14 years, and I, at that point,

25   switched to the University of Chicago, the Division of

Judy A. DelCogliano
*Official Senior Court Reporter*

1   Biological Sciences and their medical school, as a full

2   Professor of Pathology and Neurology and Associate Dean For

3   Student Affairs and some academic programs. .

4        Q.   And what did you do in that capacity?

5        A.   Primarily administrative.  I did some teaching, very

6   little, if any, service work.  I was always there if somebody

7   wanted to show me a case, but it was mostly administration

8   regarding the admission of people to the medical school and the

9   graduate programs in life science, like botany and biology and

10  so forth, and providing the administrative backup for the

11  students, financial aid and all that sort of business.

12       Q.   And how long were you at the University of Chicago?

13       A.   A couple of years.

14       Q.   Where did you go next?

15       A.   I went then to a neurosurgical hospital called the

16  Chicago Institute of Neurosurgery and Neuroresearch as their

17  Associate Medical Director and their neuropathologist, and I

18  was with that organization for 13 or so years or more, and

19  finally retired from that organization.

20       Q.   In that organization, did you have occasion to do

21  brain autopsies?

22       A.   Yes, all the way along.  I didn't do very much of

23  that while I was at the University of Chicago.  I had a

24  parallel appointment some years before with the Cook County

25  Medical Examiner's Office to act as their neuropathologist and

*(Leestma - Defendant - Direct)*                    2072

1   consultant, and I did that for 11 years, I think, but when I
2   was at the Chicago Institute of Neurosurgery, I did a lot of
3   administrative stuff, but also was probably in the operating
4   room every day rendering diagnoses for brain tumors or whatever
5   else happened; and if one of our patients should die, we had an
6   autopsy permit.  I would probably do the autopsy.  So, a full
7   service spectrum of things that I had always done, plus
8   administration.

9        Q.   Other than the hospitals you have mentioned in
10  Washington, D.C., can you tell the jury what hospitals you have
11  been affiliated with over the course of your career?

12       A.   Yes.  I don't know.  I think I had, at least with the
13  military -- I mean, there was no official affiliation, I don't
14  think; I just went there.  I was asked to be there.  The other
15  institutions were pretty much a voluntary situation, teaching
16  and so forth at the coroner's office.  I was paid for that
17  procedure, for those cases that I did there, so I had some
18  official appointment.

19       Q.   And when you worked at the Cook County Medical
20  Examiner's Office, that was in the capacity of coroner?

21       A.   Yes.  At the time, before I worked with them, it was
22  a coroner's system; that is, the coroner was sometimes a
23  physician, sometimes not, a political position, and that
24  switched over to a medical examiner system, where a board
25  certified forensic pathologist had to be at the office.  And

1    when that went in, I came in.

2        Q.   How long were you at that job for?

3        A.   I was there, I think, 11 years, 12 years, something

4    like that.

5        Q.   During the course of your career, have you been

6    affiliated with Children's Memorial Hospital in Chicago?

7        A.   Sure.  The last two or three years of my tenure at

8    Northwestern was spent as Chief of Neuropathology at the

9    Children's Memorial Hospital, where I did everything I did

10   every place else, only just restricted to the pediatric cases.

11       Q.   What does your current practice consist of?

12       A.   I'm retired from hospital practice, and I maintain my

13   own office, where I do consultations of forensic issues that

14   relate to the brain and nervous system, and that may involve

15   doing an autopsy from time to time.  It may involve, more often

16   than not, examining case materials, microscopic slides,

17   photographs, the body of cases and being prepared to offer

18   opinions and insights into whatever the issues are.

19       Q.   Are you board certified?

20       A.   Am I what?

21       Q.   Are you board certified?

22       A.   Oh, yes, sure.

23       Q.   And in what areas are you board certified?

24       A.   I have certifications in anatomic pathology and

25   neuropathology from the American Board of Pathology.

*(Leestma - Defendant - Direct)*                    2074

1      Q.   And what year did you obtain those certifications?

2      A.   1970.

3      Q.   Do you hold any memberships in any professional

4    societies?

5      A.   Yes.

6      Q.   Tell the jury about some of those, please.

7      A.   I'm a member of the American Association of

8    Neuropathologists, and have been for probably going on 40 years

9    now - that's the main one - and the international association

10   which flows from that.  I'm a member and fellow of the American

11   Academy of Forensic Sciences, and I have some other

12   memberships, but those are the main ones.

13     Q.   Have you held any editorial positions?

14     A.   Yes.

15     Q.   During the course of your career?

16     A.   Yes.

17     Q.   Tell the jury about some of those, please.

18     A.   Some of the early ones had to do with a

19   publication -- I don't think it exists anymore, but it's called

20   the Yearbook of Pathology, and it was one of these things that,

21   you know, what happened, what was published in the field of

22   pathology in the course of a year, and then the important

23   articles were abstracted, which I did, with respect to

24   neuropathology, eye, forensic, and there may have been one

25   other field; so, I did that for five or six years.  And then,

1    all the while, frequently being asked by, on an ad hoc basis,

2    by editors of other journals to review articles and

3    manuscripts, and I guess for five or six years now, I have been

4    on the Editorial Board of the American Journal of Forensic

5    Medicine and Pathology here in the United States.

6        Q.   Have you authored any articles in the area of

7    pathology, anatomic pathology or neuropathology?

8        A.   Yes.  I think we are approaching about 103 or 104 now

9    that represent articles in medical journals or book chapters or

10   books or anything that's publishable or, at least, out there

11   and available.

12       Q.   And can you name some of the journals you have been

13   published in?

14       A.   Well, let's see.  I was published in an article or

15   two in cancer, I guess, in a number of the neuropathology

16   journals.  Let me think.  They are published, and then they go

17   out there.  American Journal of Forensic Medicine is one,

18   Journal of Forensic Sciences; a spectrum of journals that

19   relate to the interests that I had at the time.

20       Q.   Have you published any books?

21       A.   Yes.

22       Q.   Can you tell the jury about that, please?

23       A.   When I was finishing my training and residency, I

24   published, co-authored a book that was called Histologic

25   Patterns in Tumor Diagnosis, meaning that there are certain

1    things under the microscope that sort of immediately click or

2    should for a diagnosis, and published that book as an aid to

3    young pathologists getting started, the craft, really, of how

4    to do surgical pathology. I did some book chapters for a

5    variety of textbooks, one of which is -- one of the classics,

6    Anderson's Textbook of Pathology, co-authored a couple of

7    chapters in there on the genitourinary system, and there have

8    been a number of other book chapters. The primary book that I

9    virtually wrote was called Forensic Neuropathology, and that

10   was published 20 years ago in 1988, and then there's been a new

11   version of it. I see some copies sitting here, of the recent

12   version of that book, a second edition that came out with a

13   publication date of 2009.

14        Q.   Is this the book, Doctor?

15        A.   That's the one you have in your hand. I have done a

16   number of chapters on a book that, again, is coming into a

17   second edition called Sudden Death and Epilepsy, and I did a

18   number of chapters in the first one 20 years ago, and now the

19   second one is coming out, and I will co-edit that volume, as

20   well.

21        Q.   Doctor, are you a member of any boards?

22        A.   Yes, a number of boards. I have been a member of the

23   Horizon Hospice Organization in Chicago, which is the first

24   hospice organization in the Chicago-land area. I'm no longer

25   active on that board but interested. I have been on the board

A000001947

1    of the Juvenile Protective Association of Chicago for probably

2    25 years or more now.

3        Q.    What are your duties on that board, Doctor?

4        A.    What is it?

5        Q.    What is it, generally?

6        A.    Well, the JPA, as it's called, is a direct service

7    organization to the families of abused and neglected children,

8    acting as a friend of the court and working with the Department

9    of Children and Family Services to try to keep families

10    together and to provide direct social services to those

11    families to help them with that, and I have been involved with

12    that organization for quite awhile.

13        Q.    Now, Doctor, have you been qualified as an expert in

14    pathology and neuropathology?

15        A.    Yes.

16        Q.    How many times have you testified in that subject

17    matter?

18        A.    Well, in giving -- testifying in court proceedings

19    such as this one, probably a couple of hundred times.  In

20    depositions and things that may or may not come into trial,

21    another couple of hundred.  So, it's probably been three or 400

22    times, something like that.

23        Q.    In how many states have you testified in?

24        A.    I think it's over 40 now.  Every now and again, I

25    have to go through it, but 40 to 42 states in the Union.

*(Leestma - Defendant - Direct)*                    2078

1    Q.   In all the states, were you qualified as an expert in

2    pathology or neuropathology?

3    A.   One way or another, depending on the issue of the

4    case, yes.

5    Q.   And have you testified before in New York State?

6    A.   Yes, I have.

7    Q.   Have you ever testified for the prosecution?

8    A.   Yes.

9    Q.   In what office have you testified for or offices?

10   A.   The most recent ones were the District Attorney's

11   Office or State's Attorney in San Diego, California.

12   Q.   And how many brain autopsies have you performed

13   during the course of your 40 plus year career?

14   A.   My calculation is about 20,000 brain examinations,

15   brain autopsies.  That's about as close as I can come.

16   Q.   And of those 20,000 brain autopsies that you

17   performed, do you have an estimate how many of those involved

18   children?

19   A.   It would be an estimate only, but I imagine a couple

20   of thousand, I suppose.

21   Q.   I'd like to show you what's been marked as

22   Defendant's U for identification.  I ask if you recognize that.

23   A.   Yes, I do.

24   Q.   And what is Defendant's U?

25   A.   That is my curriculum vitae and it is, as far as I

```
 1    know, up to date to about now.

 2        Q.   Does that curriculum vitae fairly and accurately

 3    represent your educational work and background in

 4    neuropathology and anatomical pathology?

 5        A.   It's all there, all the positions I have occupied.  I

 6    didn't include abstracts and speeches given or talks given.

 7    That would -- any publications that are there are those that

 8    are regular publications and not just, you know, press pieces

 9    or something like that.

10              MS. EFFMAN:  At this time, I move Defendant's U

11         into evidence.

12              MS. BOOK:  Your Honor, the People would object,

13         as this is bolstering and cumulative of what this witness

14         has already testified to.

15              THE COURT:  Defendant's U is received in

16         evidence over objection by the People.

17    (Defendant's Exhibit U marked for identification received in

18    evidence and marked Defendant's Exhibit U in evidence.)

19        Q.   Turning your attention to this case, Doctor, did you

20    have occasion to review medical records concerning ████ and

21    ████████ ████████

22        A.   Yes, I did.

23        Q.   Can you tell the jury what records you have reviewed?

24        A.   I have no idea if it's the complete medical records

25    or not.  I have no way of knowing, but I have some records
```

1    regarding the birth of both of these babies and some followup

2    in terms of well baby and pediatric visits.  I have medical

3    records that relate to the last -- the hospitalization for the

4    baby in question.  And as part of those medical records, I

5    received a disc that had images of a CT scan done on, if I'm

6    not incorrect, 9/21.  I think it's 2007.  I have autopsy

7    documents, reports related to the autopsy of the baby.  There

8    are photographs of -- some scene photographs that were

9    provided, as well as photographs of the baby before, during and

10   after the autopsy.  I have, then, autopsy tissue slides that

11   were prepared at the time of the autopsy and a couple of others

12   that I requested to be prepared, and I think that's it.

13        Q.   So we are clear, Doctor, Defendant's R in evidence,

14   does that reflect the microscopic slides that you requested to

15   review as part of this case?

16        A.   Yes.  It looks like it.  I would have to -- I made

17   images of these, if I could lay them out side-by-side to be

18   sure every slide is there, but it looks like it's my writing on

19   the bag that indicates the name of the case, and this was

20   returned to you not long ago.

21        Q.   And at some point, Doctor, did you take pictures of

22   these slides that you reviewed?

23        A.   Of some selected areas.  I have a digital camera on

24   my microscope that I could -- if there was some particular

25   finding I wanted to immortalize, I could take a picture of it

1    and then make prints or do whatever I wanted with them later.

2        Q.   Did you, in fact, take some photographs of some of

3    the slides that you reviewed?

4        A.   I did.

5        Q.   And, in fact, did you place them on a CD that's in

6    evidence now as Defendant's V, which is sitting in a laptop

7    over there?

8        A.   It's in my laptop in the form of a Power Point

9    presentation that has some very selected microphotographs and

10   so forth.

11       Q.   And apart from any picture of a CT scan, are the rest

12   of the slides pictured on the CD, are those all things that

13   came from the autopsy?

14       A.   That's right.  They are direct representations of

15   portions of the slides that are in that plastic bag.

16       Q.   Doctor, if I told you that the child went to the

17   hospital on September 21, 2008, and that's when the CAT scan

18   took place, would that be accurate?

19       A.   That's true.  I think it was done a few hours after

20   admission of the child.

21       Q.   Did you also have for your review the obstetrical

22   records of the mother?

23       A.   Correct.

24       Q.   And when we refer to hospitalizations, did you have

25   the opportunity to review records from two different hospitals

1    that saw this child on September 21, 2008?

2        A.    Yes.  I think that the child was brought first to a

3    local hospital and then brought -- transferred to a larger

4    institution, and I have records from both of those.

5        Q.    And do your records also include the birth records of

6    both babies?

7        A.    Yes.  There was -- I'm somewhat confused by it

8    because, apparently, the identity of the twins got mixed and

9    switched and, so, I don't know exactly who is who, and maybe

10   nobody does, but there were records regarding both of those

11   babies.

12       Q.    As part of your review, did you also receive a copy

13   of the pathologist's report in this case?

14       A.    Yes.

15       Q.    Are these records and materials the kind of materials

16   ordinarily relied upon by experts in your field of

17   neuropathology and anatomic pathology?

18       A.    These are the kinds of things that we examine all the

19   time, either with a contemporaneous case or one that we are

20   called on consultation.

21       Q.    And are the records and materials the kind of

22   materials that are accepted in your profession as reliable in

23   forming professional opinions?

24       A.    Yes.  There's a gradation of reliability, and that

25   has to do, by extension, with the objectivity.  In other words,

1      a good example of that is, if I had the actual brain sitting in

2      a crock full of formaldehyde, that's as objective as it gets.

3      I mean, whatever is there can't be messed with, and nobody can

4      do that.  The next best things are photographs of specimens and

5      so forth; that, of course, you're dependent upon the technical

6      quality, but more or less, those are things that can't be

7      fudged.  It's the straight information.  Microscopic tissue

8      slides are also very, very objective and reliable, to the

9      extent to which you can interpret what's there, and you are

10     limited somewhat by the sampling that the person ahead of you,

11     the pathologist who did the autopsy made; so if they didn't

12     take a slide of something, obviously, you can't examine it, but

13     whatever you do have is objective and the best kind of evidence

14     you can look at.

15             Another level would be radiologic studies, when you

16     have the actual disc or the films, whatever, to look at.  You

17     are limited only by the technique that's used and the method.

18     If it's 80 percent effective, then you probably can't do any

19     better than that, but that's subjective and can't be messed

20     with by anyone.

21             Then you get onto medical records and reports.

22     Autopsy reports are through the eyes of whoever did the

23     autopsy, and with -- it may be reliable or it may not be.  The

24     thing about the autopsy thing is that whatever is said in the

25     report, you can go back to the pictures, if they exist, or the

1    microscopic slides and have a check and balance there.  Medical

2    records may be reliable.  It's the only thing you have, but

3    there are sources of error and mistake and omissions and so

4    forth that can find their way into that.  Again, you do have

5    some opportunity, if you have better evidence, to compare and

6    see whether the things are corresponding or maybe they don't.

7         Then you get down the chain where you end up with

8    witness accounts and interviews and so forth and so on.  Those,

9    you have to take them for what they are, contemporaneous

10   accounts by somebody which may or may not be complete, truthful

11   correct or whatever.  And, so, there is kind of a pyramid, if

12   you will, of reliability, and I have tried to outline what that

13   is.

14        Q.   Doctor, fair to say that the records you were

15   provided with as part of this case, the slides, the autopsy

16   report, the microscopic sections, all the records you reviewed

17   are documents that people in your profession rely upon

18   regularly to form opinions?

19        A.   Absolutely, right.

20        Q.   And Doctor, based on your review of the records,

21   materials, along with your education and experience, do you

22   have an opinion, to a reasonable degree of medical certainty,

23   as to the cause -- strike that.  To the state of this child's

24   health upon arrival at Samaritan?

25        A.   I do.

1    Q.   And can you please tell us what your opinion is?

2    A.   In short, this was a sick child who, in all

3    likelihood, was suffering from a bacterial infection of the

4    respiratory tract and, perhaps, brain at that time.

5    Q.   Based on your review of the records and materials and

6    your educational experience, do you have an opinion, to a

7    reasonable degree of medical certainty, as to the prognosis for

8    this child upon his arrival at Samaritan?

9              MS. BOOK:  Your Honor, may I voir dire before

10   the witness answers?

11             THE COURT:  Yes, you may.

12   **VOIR DIRE EXAMINATION**

13   **BY MS. BOOK:**

14   Q.   Good morning, Dr. Leestma.

15   A.   Good morning.

16   Q.   My name is Christa Book.  I work for the DA's Office.

17   Now, Dr. Leestma, you are not a board certified forensic

18   pathologist; are you?

19   A.   I am not.

20   Q.   And what is the difference between a forensic

21   pathologist and a regular pathologist?

22   A.   Forensic pathologist would be one who classically

23   works in the context of a coroner's or medical examiner's

24   office, or in any case, is engaged in the generation of cause

25   and manner of death documents, death certificates, whatever the

*(Leestma - Defendant - Voir Dire)*                                    2086

1    local jurisdiction requires.  An ordinary or a hospital

2    pathologist could certainly do that work, and frequently they

3    do, if deputized for that purpose, but the focus is different;

4    cause and manner of death determination, forensic, diagnostic,

5    basically medical conditions by a hospital or general

6    pathologist.

7         Q.   And there's nothing that would have prevented you

8    from taking those boards; right?

9         A.   No, absolutely not, just my decision not to spend an

10   additional year of training to do it.

11        Q.   Okay.  And you are not a board certified forensic

12   neuropathologist, neither; are you?

13        A.   There is no such board.  I'm about as qualified, I

14   guess, as is possible, but forensic neuropathology is not --

15   the American Board does not have a board certification for

16   that.

17        Q.   Are you a board certified ophthalmologist?

18        A.   No.

19        Q.   So, you don't have the qualifications to look into

20   someone's eyes and diagnose them; correct?

21        A.   Probably with an ophthalmoscope, no; a microscopic

22   slide of the eye, probably, I am, yes.

23        Q.   Have you ever looked into someone's eyes and

24   diagnosed them?

25        A.   Excuse me?

  1         Q.    Have you ever looked into a live person's eyes and

  2    diagnosed them?

  3         A.    Sure.   When I was a medical student, I enjoyed

  4    ophthalmology a lot and took an extra rotation, actually, in

  5    doing that, but not since.

  6         Q.    Okay.   So, it would be fair to say that it's been

  7    45 years since you have done that, then?

  8         A.    No.    That's not my field of expertise.

  9         Q.    So, fair to say it's been 45 years since you have

 10    done that?

 11         A.    Yes.

 12         Q.    And you are not a board certified radiologist;

 13    correct?

 14         A.    What kind?

 15         Q.    A board certified radiologist?

 16         A.    No, no.

 17         Q.    And you are not a neurosurgeon?

 18         A.    No.

 19         Q.    And you are not a certified pediatrician?

 20         A.    No, I'm not.

 21         Q.    And have you ever been declared an expert in the area

 22    of pediatrics?

 23         A.    No.

 24         Q.    And did you know there's going to be a board

 25    certification for pediatric child abuse, the first test --

*(Leestma - Defendant - Voir Dire)*                    2088

1        A.    I'm aware that there is a certification, either in

2    progress or about to be done.  There is by -- I think the

3    American Academy of Pediatrics, but I'm not sure.

4        Q.    And the first test is going to be this November.  Did

5    you know that?

6        A.    It is what?

7        Q.    It is going to be this November.  Did you know that?

8        A.    I knew it was either on now or going to be.

9        Q.    You are not going to sit for that test?

10       A.    I certainly would not, no.

11       Q.    And you are not one who specializes in infant

12   neuropathology; are you?

13       A.    It's part of my training and experience.  I'm

14   certainly qualified to do that, and I have.

15       Q.    Okay.  Well, have you ever treated a live child for

16   infant neuropathology?

17       A.    That I would be involved in dealing with live

18   children?  In the context of going to the operating room while

19   they are alive, being operated on and giving diagnosis for

20   whatever the surgeon took out, sure.

21       Q.    When is the last time you did that?

22       A.    Probably about four years ago.

23       Q.    And have you ever had a live child as a patient?

24       A.    My kids.  That's about it.

25       Q.    So, other than your children, would it be fair to say

1    you have never treated a live child?

2        A.   No, no.  I have never done that, except as a student,

3    and haven't done so since.

4        Q.   And you graduated medical school in 1964; right?

5        A.   That's right.

6        Q.   So, it's been 45 years since you've treated a live

7    child, other than a member of your own family?

8        A.   That's fair to say, yes.

9        Q.   And you have never worked on a trauma unit, where

10   children come in after being in car accidents or with head

11   injuries; have you?

12       A.   I did as a student working in the pediatric emergency

13   room, or whatever they called it at the time.  There were

14   children that would come in from accidents and, presumably,

15   other causes that I saw.

16       Q.   And when was that?

17       A.   That would be probably 1964, the last year of my

18   medical school.

19       Q.   So, it would be fair to say that the last time you

20   worked on a trauma unit with children was 45 years ago?

21       A.   Yes.  That's fair.

22       Q.   And have you ever admitted a child into a hospital?

23       A.   No.

24       Q.   Have you ever admitted any patient into the hospital?

25       A.   Yes.

1      Q.   And when was the last time you have done that?

2      A.   When I was a pathology resident in Denver, for a

3   period of time, my paycheck came from the Veteran's

4   Administration, and I had to stand admitting officer duties

5   there once every few months.

6      Q.   What year was that?

7      A.   Oh, goodness.  That would be anywhere from 1964 to

8   1967, and there might be people that would come in on my watch

9   that I would admit to the hospital under those circumstances.

10   I wouldn't treat them.

11      Q.   So, taking 1967, it would be 42 years, then, since

12   you've done that?

13      A.   Right.

14      Q.   And would you agree with me that you are not a

15   treatment provider?

16      A.   I am not a treating physician, no, never have been.

17      Q.   It's not your job to treat children with existing

18   subdural hematomas; correct?

19      A.   No, it's not.

20      Q.   And, in fact, you have never treated an infant with

21   existing subdural hematoma; have you?

22      A.   I don't think that I have.

23      Q.   You consult on autopsies; correct?

24      A.   My interaction with pediatric disease would be by way

25   of surgical specimens and an autopsy circumstance.

1          Q.   So, that would be a consulting position; correct?

2          A.   I suppose so, although I would have full -- I would

3    generate an autopsy report and, in a sense, the buck would stop

4    with me, but I could be a consultant, sure.

5          Q.   Well, you would generate an autopsy report on that

6    one specific area you looked at; correct?

7          A.   That's correct.

8          Q.   Okay.  Not on the autopsy of the entire body?

9          A.   Oh, I could do it for the entire autopsy, sure.  I

10   have done that many times.

11         Q.   Okay.  When was the last time you did that?

12         A.   I don't know.  When I was at Children's Memorial

13   Hospital from, say, 1982 to '85, I frequently supervised the

14   autopsy service, and senior staff people, such as myself,

15   rarely do the autopsies.  We supervise the residents who do

16   them, and I don't know how many I was involved with.

17         Q.   Okay.  So, fair to say it's been about 24 years since

18   you performed an entire autopsy?

19         A.   No.  That's not true.  The last autopsy I was

20   involved with of a general character was probably five years

21   ago, and I happen to be in New Zealand, and a colleague of mine

22   was on call, and we did a case together.

23         Q.   Did you do the entire autopsy?

24         A.   Yes.  I was doing parts.  He did part and I did part.

25         Q.   Who signed the death certificate?

*(Leestma - Defendant - Voir Dire)*                2092

1          A.    Not me, the other -- the pathologist who was

2     deputized to do that, Dr. David Taylor.

3          Q.    So, not being a certified forensic pathologist, it's

4     not really in your job description to sign the death

5     certificate that determines the cause of death?

6          A.    Generally not.

7          Q.    And during the course of your career, how many full

8     autopsies, meaning from start to finish, head to toe, did you

9     do determining the cause and manner of death?

10         A.    Maybe half a dozen or so, where that was the issue,

11    and I was authorized, deputized to generate that death

12    certificate.

13         Q.    So, fair to say about six over the course of your

14    career?

15         A.    Something like that.

16         Q.    And one of those was someone who was executed;

17    correct?

18         A.    Yes.   There was a judicial execution in Colorado some

19    years back, and I was the pathologist of record for that.

20         Q.    So, not too much mystery about the cause of death

21    there; fair to say?

22         A.    No, there was not.

23         Q.    Okay.  Have you ever performed a full head to toe

24    autopsy on a child?

25         A.    Sure.

1        Q.   Okay.  And when was that?

2        A.   In the course of my 20, 30 some years as an academic

3    pathologist.  We did it in my residency.  Pediatric autopsies

4    were part of the work when I became a staff person in Chicago.

5    Most of the pediatric autopsies were done at the Children's

6    Hospital.  When I became the neuropathologist there, I did some

7    full autopsies myself there; more often than not, with a

8    resident or supervising them.

9        Q.   Have you ever signed a death certificate for a child?

10       A.   I doubt that I have.  I don't think so.

11       Q.   And in your 11 years as assistant medical examiner,

12   did you ever sign a death certificate during that period of

13   time?

14       A.   No.  I was the secondary pathologist under those

15   circumstances assisting the coroner's pathologist or M.E.'s

16   pathologist.

17       Q.   So, for 11 years, would it be fair to say that the

18   primary part of your duty was to come in one or two days a week

19   and look at slides of brains or portions of brains?

20       A.   In terms of the forensic service, I would come in

21   part of a day, a week, to do that at the Cook County Medical

22   Examiner's Office.  As a part of my other job, whatever the

23   caseload was; I might be in the autopsy room every day.  It

24   might be a week or more, would separate that.

25       Q.   Would it be fair to say you weren't doing head to toe

*(Leestma - Defendant - Voir Dire)*                    2094

1    autopsies in determining the cause of death and signing death

2    certificates?

3         A.    That's right.  I already indicated, functioning as

4    the coroner's physician or deputized, I didn't have occasion to

5    do that.  I'm perfectly qualified to do so, but the occasions

6    only arose about a half dozen times or so.

7         Q.    And when was the last time that you prepared or

8    conducted an autopsy as a clinician, not being related to being

9    retained as an expert on a particular case?

10        A.    While I was -- when I was still doing hospital

11   practice, which has been about four years or so ago; then there

12   would be no retention.  I would be the hospital pathologist,

13   and I would generate a report.  That was that.  Ever since

14   then, whenever autopsies would occur, most often, it would be

15   in a consultative role.

16        Q.    Okay.  So, when you say that your current job now,

17   since you retired from the hospital -- correct me if I'm wrong.

18   But I believe you said to Ms. Effman that your current job now

19   may involve an autopsy from time to time?

20        A.    Occasionally.

21        Q.    Has it involved one in your job as a consultant?

22        A.    Sure.

23        Q.    A full autopsy?

24        A.    Sure.

25        Q.    And when was the last time you did that as a

1    consultant?

2        A.   Oh, boy, that would be probably five or six years

3    ago.  There was a period of time where a number of exhumation

4    autopsies needed to be done, and I did them.  I think that

5    would be the most recent context.

6        Q.   So, since you have retired from your job and become a

7    consultant, it's fair to say you haven't done any full

8    autopsies; correct?

9        A.   No.  I have no facility to do them.  I could, but I

10   haven't.

11       Q.   Okay.  And even with the exhumation project that you

12   worked on, is it accurate to say you have only done about a

13   dozen full head to toe autopsies over the course of your

14   career?

15       A.   No.  I have done hundreds of autopsies, full,

16   complete autopsies and generated the reports.

17       Q.   And did you sign the death certificate?

18       A.   No.

19       Q.   Did you determine the cause and manner of death in

20   the head to toe autopsy?

21       A.   I determined the medical cause of death.  Usually,

22   under those circumstances in hospital, the physician of record

23   would be signing the death certificate.  The signing of the

24   death certificate by the hospital pathologist may occur, but it

25   usually doesn't.  Somebody else does that.

*(Leestma - Defendant - Voir Dire)*                    2096

1        Q.   Doctor, do you recall testifying in a case, the

2    People of the State of California versus Ronnie Morinda

3    (phonetic) in 2002?

4        A.   What's the last name of the case?

5        Q.   Morinda?

6        A.   I remember the name, but I don't remember the case.

7        Q.   The defense attorney would have been a John May?

8        A.   May was the defense attorney.  Okay.

9        Q.   And if I told you that, in that case, you were asked

10    by the prosecuting attorney, "I'm distinguishing between

11    looking at the slides and actually doing the full forensic

12    autopsy.  I understand your answer to be about five or six."

13    And you said, "That's probably true.  The entire -- doing the

14    body and everything and being responsible for the cause and

15    manner of death.  That's true."  Would you disagree with that?

16        A.   No.  That's what I thought I have been answering

17    before.

18        Q.   So, doing the full forensic autopsy, not looking at

19    slides, looking at the body and determining the cause of death,

20    you have done about five or six.  Is that correct?

21        A.   Where I was the guy who signed the death certificate,

22    yes.

23        Q.   Well, you weren't talking about death certificates

24    here; were you?  You were talking about -- he was

25    distinguishing between looking at slides and actually doing the

─────────────────────────────
*Judy A. DelCogliano*
*Official Senior Court Reporter*

A000001967

*(Leestma - Defendant - Voir Dire)*                    2097

1    full forensic autopsy, and your answer was five or six.  Is

2    that correct?

3         A.   Yes, to determine the cause and manner of death,

4    correct.

5         Q.   And for the most part now, Doctor, would it be fair

6    to say that the majority of your work is looking at slides of

7    brains or portions of cutting of brains?

8         A.   In current practice, yes.  I don't look at that many

9    brain specimens any more.  It would be slides, photographs,

10   documents and so forth.

11        Q.   And you are not there when the actual autopsy is

12   performed; correct?

13        A.   Most often not.

14        Q.   And you are not actually doing any of the cuttings

15   yourself.  Is that correct?

16        A.   That's correct.

17             MS. BOOK:  Thank you, Your Honor.

18             THE COURT:  Ms. Effman, you may proceed.

19             MS. EFFMAN:  Thank you, Judge.

20   **DIRECT EXAMINATION**

21   **BY MS. EFFMAN:  (Continuing)**

22        Q.   Doctor, based on your review of the records and

23   materials in this case, do you have an opinion, to a reasonabl

24   degree of medical certainty, as to the prognosis for this chil

25   when he arrived at Samaritan Hospital on the morning of

*(Leestma - Defendant - Direct)*                    2098

1   September 21, 2008?

2       A.   Yes.

3       Q.   And what is your prognosis?  What's your opinion as

4   to the prognosis for this child?

5       A.   Given what emerged from laboratory studies and other

6   studies, it would be grave.  It would be very, very serious.

7       Q.   And what do you base that opinion on?

8       A.   The opinion is based on a number of facts that

9   emerged.  The child was shown to have streptococcus bacteria in

10  his blood.  That's a very serious finding.  At autopsy, it

11  became evident that this child had meningitis, had pus

12  collections over an older fluid collection in the brain, had

13  abscesses or cellulitis - that's a technical term - of

14  bacterial infection in the soft tissues around the eye or eyes.

15  Those are -- and then, of course, pneumonia with -- most likely

16  due to the pneumococcal organism.  This is a disseminated

17  fulminant form of bacterial infection which has an extremely

18  high mortality rate once it's recognized.

19      Q.   Doctor, what, if any, health problems did the Thomas

20  baby or ▮▮▮▮▮▮▮ as the records are entitled, have at

21  Samaritan Hospital?

22      A.   Well, upon -- you know, this is like peeling an

23  onion.  You take the first layer off and you see what's there,

24  and as more studies come in, you get a fuller picture.  It was

25  quite clear that this child was in terrible shape coming into

Judy A. DelCogliano
*Official Senior Court Reporter*

1    the hospital, comatose, not breathing with, ultimately,

2    bacteria in the blood, shock, basically, low blood pressure, a

3    number of other findings.  And, so, this child was desperately

4    ill, and then it turns out that there's other things going on;

5    namely, this child has bilateral fluid collections over the

6    brain that are chronic and go back a very long time.  And,

7    eventually, the child was found to have hemorrhage in the

8    retina of the eye and other things, but it would be -- the

9    general state of shock, largely due to bacterial infection,

10   played over the fact that this child has pretty large fluid

11   collections of material over the brain, which is a stressful

12   situation at best.

13        Q.   Now, Doctor, what is the significance of a child

14   having a blood pressure in the 50's, dropping into the 40's at

15   Samaritan Hospital?

16        A.   It's shock.

17        Q.   And Doctor, what is the significance of having a

18   white blood cell count of a thousand that drops to 500 at

19   Albany Medical Center?

20        A.   That is -- in the context of this case, says,

21   basically, the body is being overwhelmed by an infection that

22   the bone marrow can't respond to any more.  The white blood

23   cells are being mobilized and being killed someplace.  They are

24   being consumed.  So, this is a very serious turn of events.

25        Q.   What is the significance of having a platelet count

*(Leestma - Defendant - Direct)*                    2100

1    at Samaritan Hospital of 115,000 that thereafter drops to

2    44,000 and 29,000 at Albany Medical Center?

3         A.    This is what I would call a consumptive coagulopathy.

4    In other words -- it's a lot of words, but it means that these

5    blood platelets are being consumed in making blood clots

6    someplace, and they are being taken out of the blood, and that

7    is a situation that is a prelude or a part of the general

8    picture of something called coagulopathy, meaning that there's

9    a teeter-totter, if I can be permitted to say, of clotting and

10   non-clotting in the blood - all of us - and when this

11   teeter-totter tips one way down, and clotting is occurring for

12   whatever reasons somewhere in the body, then what happens is

13   that this clotting process may consume the products that make

14   blood clots, rendering the blood then thin and able to bleed in

15   various places that it would not normally do that.

16        Q.    Would that be called coagulopathy, Doctor?

17        A.    Yes.    There's a number of terms for this.    Sometimes

18   the term disseminated intravascular coagulation, or DIC, is

19   used.    I prefer the broader term, coagulopathy, because it

20   isn't specific.    It just says this equilibrium is out of

21   equilibrium, and it can mean various things and have various

22   consequences.

23        Q.    And with coagulopathy, how serious of a problem is

24   that, if someone has problems with blood clotting?

25        A.    The consequences of a coagulopathy?    Is that what you

*Judy A. DelCogliano*
*Official Senior Court Reporter*

1    want to know?

2          Q.   Yes, Doctor.

3          A.   Well, many times, this process may be proceeding and,

4    outwardly, it's not evident.  It becomes evident sometimes when

5    you have bleeding around the intravenous sites, trivial wounds,

6    bruises appear on the body that have no traumatic basis for

7    them, apparently, bleeding in the gastrointestinal tract,

8    bleeding into various organs, sometimes bleeding in the brain,

9    bleeding in the eye, and this can become fulminant.

10              Another problem that can happen is that the

11   coagulation of this blood can occur in blood vessels, in which

12   case you clog them up.  In the case of the brain, if you have a

13   clot which is developing in veins that are supposed to be

14   draining blood away from the brain, then you have the situation

15   of blood coming into the brain but no way for it to get out, in

16   which case bleeding and the rupture of blood vessels into the

17   brain and its coverings can occur.  So, this can be something

18   that you don't suspect right away, and it can be like Niagara

19   Falls; that it becomes a cascade to ultimately bring about the

20   death of an individual.

21         Q.   And Doctor, what's the significance of a finding of a

22   temperature of 97.2 at Samaritan Hospital that drops down to

23   94 degrees?

24         A.   That's a grave finding if it's correct.  In other

25   words, you first have to ask the question how was that

1    measured, and if somebody just put a thermometer in the armpit,
2    well that's a notoriously inaccurate way to do it.  But if it's
3    a bona fide way of measuring the temperature, it may mean,
4    basically, you are witnessing a person in the process of dying.
5    Their regulatory mechanisms can't keep body temperature up, and
6    they are basically failing.

7        Q.    What is the significance of having a blood sugar of
8    50, Doctor, for a four-month-old infant?

9        A.    This, again, may be a measure of the failing body.
10   You always have to say did the child get some drug that is
11   depressing the glucose level, but again, it's probably one more
12   indicator that the systems are breaking down and death is
13   approaching.

14       Q.    Doctor, in the records of Albany Medical Center,
15   there's an indication that the child was suffering from a
16   condition called pancytopenia.  What is the significance of
17   that?

18       A.    Well, pancytopenia means all the blood cell elements
19   are depressed; while we know the white cells were, because the
20   count showed that.  Part of the platelet count might mean that
21   they are being consumed and/or the blood, the bone marrow, is
22   being stressed so much that it's not making the precursor cells
23   that make platelets.  So, it's a very dire situation that may
24   have many causes but, again, it's part of this -- you are
25   witnessing the decay and fragmentation of an organism here.

1          Q.    What's the significance of the finding of the

2    positive blood culture that was taken immediately upon this

3    child's arrival at the Samaritan Hospital and it came back

4    positive, Doctor, for streptococcus pneumoniae?

5          A.    Bad situation.  You have bugs in the blood or a

6    bacteria in the blood, and that is a very serious, potentially

7    life-threatening situation.

8          Q.    What about the significance of notations in records

9    at Samaritan Hospital and Albany Medical Center of symptoms of

10    acute respiratory distress syndrome?

11          A.    Again, this can be a symptom or an indicator of

12    shock, not enough blood perfusing the lungs.  The lungs don't

13    like it, and they begin to shut down.  So, respiratory distress

14    is part of the multiorgan failure kind of scenario that happens

15    when people are septic and in shock, and it's a dreaded

16    complication, because it's just one more thing that the

17    clinician might be trying to have to play catch-up to try to

18    save this baby's life.

19          Q.    Can you tell the jury, what is septic shock?

20          A.    Sure.  Basically, when you have bacteria in the

21    blood, bacteria are liberating toxins and cause death of

22    tissue.  The release of these -- I guess you could say it's a

23    little bit like smoke from a fire.  It's toxic.  It inhibits

24    various bodily functions, interferes with cardiovascular

25    activity and the maintenance of blood pressure, and it's a dir

*(Leestma - Defendant - Direct)*                    2104

1    situation.

2         Q.   Is there any association or connection between septic

3    shock and coagulopathy?

4         A.   Yes.

5         Q.   Would you please tell the jury about that?

6         A.   One of the things that can upset this teeter-totter

7    of clotting versus not clotting and this balance is the

8    presence of bacterial toxins, high temperature and the products

9    of bacterial infection, which is dead tissue and the fragments

10   of that that are being absorbed in the body.  That can produce

11   these problems.

12        Q.   What happens when coagulopathy takes place or occurs?

13        A.   Pardon me?

14        Q.   What happens when coagulopathy takes place?

15        A.   Well, then, as I say, you first consume the products

16   of coagulation, and that might end up with blood clots in blood

17   vessels where you don't want them, in the brain and elsewhere,

18   and then you end up with bleeding, and the bleeding can be a

19   little bit, a lot, everywhere, nowhere.

20        Q.   And when you have problems with coagulopathy, can

21   that bleeding be widespread throughout the body?

22        A.   Yes, it can.

23        Q.   In fact, can you bleed anywhere in your body when you

24   have a problem with coagulopathy?

25        A.   That's true.  Sometimes, in some cases, you end up

*Judy A. DelCogliano*
*Official Senior Court Reporter*

1   with somebody that basically turns purple.  Their skin is

2   blotchy and covered with lots of places where little blood

3   clots and bleeding have occurred in the skin.  Sometimes that

4   involves internal organs.  If it involves the heart and major

5   organs, then they shut down and that could kill you.

6       Q.   Did you find any evidence in the records, in the

7   autopsy report, of this child having problems with

8   coagulopathy?

9       A.   Yes.  It's documented in the medical chart.  The

10  child was treated for it, or attempted to be treated for it,

11  and it's in the autopsy, too.

12      Q.   And what treatment was rendered for this particular

13  problem?

14      A.   An attempt is made to try to provide the absent

15  coagulation proteins and things like that.  One way they do

16  that is to take plasma, blood plasma from a donor, get rid of

17  the red blood cells and give them all of the things that are in

18  the serum and plasma to redress that, and that was attempted.

19      Q.   What evidence did you find of this child -- where is

20  there evidence that this child had a problem with coagulopathy

21  based upon your review of the records and the autopsy report?

22      A.   Well, the laboratory studies clearly showed a number

23  of measures of it.  There are a half dozen laboratory studies

24  that can do this platelet count for one, something called the

25  prothrombin time, or PT or PTT.  There's another computer

1   variable called INR that is done, and then there are a bunch of

2   other studies that can measure the level of blood proteins that

3   provide coagulation, like fibrinogen.  You can also measure the

4   products of degradation of blood clots called fibrin split

5   products and other things, and I don't remember how many of

6   those were done, but the term coagulopathy was scattered

7   throughout the medical record, and the child was treated for

8   that.

9       Q.   Turning your attention the autopsy report, is there

10  any evidence of coagulopathy in the autopsy report?

11      A.   Sure.  I could see evidence of coagulopathy in some

12  slides of the brain, where some small blood vessels contained

13  clots inside the blood vessels and bleeding surrounding those

14  vessels.  The -- there was hemorrhage in the testicles of this

15  baby that was described by the autopsy pathologist.  There

16  would be no reason for it to be there, other than that.  So, I

17  think there's plenty of evidence for not only the clinical

18  diagnosis, in-life diagnosis of coagulopathy, but the

19  confirmation of it at autopsy.

20      Q.   Did the autopsy reveal whether or not there was any

21  hemorrhage in the heart or myocardium?

22      A.   Yes, there was.

23      Q.   Okay.  And would that also be consistent with

24  coagulopathy?

25      A.   Coagulopathy and/or sepsis.  There was actually death

1    of heart cells and some scarring there related to that and

2    reaction to that. So, it could be coagulopathy now and,

3    perhaps, some time in the past, as well as some products of the

4    bacteria in the blood.

5        Q.   And how does keeping someone alive, such as this baby

6    on a ventilator -- does coagulopathy continue to occur while

7    the child is on a ventilator?

8        A.   Sure. A life support would include ventilator and

9    other drugs to keep the blood pressure up, all of which the

10   child received, and this can have some effects, too. It

11   basically keeps, quote, the body alive. The brain may be

12   already considered dead by that point, but that will allow, if

13   a pneumonia is present, for it to continue; other life

14   processes to continue until those supports are stopped.

15       Q.   So, until the ventilator is turned off, if a child

16   has a coagulopathy problem, that could continue to occur; you

17   could have fresh bleeding because of coagulopathy until the

18   ventilator is turned off?

19       A.   Probably not. When the heart action stops, the

20   machines are pulled off and unplugged; life ceases and those

21   processes are stopped.

22       Q.   Do you have an opinion, to a reasonable degree of

23   medical certainty, as to the cause of recent bleeding in the

24   testes, myocardium, brain and retina?

25       A.   Yes.

*(Leestma - Defendant - Direct)*                    2108

1      Q.   What is your opinion, Doctor?

2      A.   Well, the testes and myocardia ones probably are

3  associated with coagulopathy.  The hemorrhages in the retina

4  have a better explanation.  I think they could have been added

5  to by the coagulopathy, but the better explanation is increased

6  intracranial pressure.

7      Q.   Now, these conditions we talked about previously, the

8  low blood pressure, the low body temperature, the low blood

9  sugar and pancytopenia and the low white blood cell count and

10  platelets, are those all conditions consistent with

11  overwhelming sepsis, septic shock?

12      A.   Yes.

13      Q.   Doctor, can leukopenia, the low white blood cell

14  count, pancytopenia and hypoglycemia, the low blood sugar -- do

15  those have anything to do with head trauma?

16      A.   I don't know how I could connect the two.  My answer

17  would be no.

18      Q.   Doctor, based on your review of the records,

19  materials, education and experience, having done over 20,000

20  brain autopsies, and your work at the Cook County Medical

21  Examiner's Office, among your work at other hospitals, do you

22  have an opinion to a reasonable degree of medical certainty as

23  to the cause of death of the ▆▆▆▆ baby?

24      A.   Yes.

25      Q.   And what is your opinion?

---

*Judy A. DelCogliano*
*Official Senior Court Reporter*

 1          A.    I would say the effects of bacterial infection due to

 2    strep pneumoniae, the streptococcal bacteria, in the form of

 3    sepsis, bacterial infection of the surfaces of the brain,

 4    abscesses and cellulitis within the orbital tissues around the

 5    eye, and the complications of coagulopathy on top of that.

 6          Q.    And would that sepsis be pneumococcal sepsis based on

 7    the bacteria that was found in the child's body?

 8          A.    They were found -- the organisms were recovered from

 9    the blood.  I examined tissue slides of all of the areas.  I

10    think I had five or six slides of brain, the subdural hematoma

11    membranes and tissues of the eye.  I found strep in all of

12    those by use of the gram stain.

13          Q.    Doctor, do you have an opinion, with a reasonable

14    degree of medical certainty, as to the nature of the subdural

15    hematoma described in the autopsy report?

16          A.    I do.

17          Q.    And what is your opinion, Doctor?

18          A.    These are -- perhaps one could use the term chronic

19    subdural hematoma.  There are other terms, chronic fluid

20    collections, subdural hygroma.  There are a bunch of terms that

21    describe the situation of these fluid collections over this

22    child's brain that had been chronic; and by chronic, I mean

23    present for weeks and months, possibly going back to birth.

24          Q.    Are you able to age the chronic subdural based on

25    microscopic sections, Doctor?

*(Leestma - Defendant - Direct)*                    2110

1          A.   Yes, we can.

2          Q.   And we have those microscopic sections here today on

3     action slide.  We also have them on a CD; correct?

4          A.   I do.

5          Q.   Would it be helpful to come down here and demonstrate

6     for the jury how you can age the microscopic sections?

7          A.   Sure, and the context in which we would do that.

8          Q.   Yes, Doctor.

9          A.   I can do that.

10         Q.   Come on down, please.

11         A.   I think what I will do, if it's permitted, is sort of

12    stand beside here, and then I can use my cursor to demonstrate.

13         Q.   Sure, Doctor.

14         A.   Shall I proceed?

15         Q.   Please, Doctor.

16         A.   What we have here on the screen are two pieces of

17    film, basically, from the CT scan done a few hours after

18    admission of this child to the hospital on 9/21, and the one on

19    the left is a -- basically a band saw section electronically

20    through the top of the child's head, down maybe an inch or so.

21    And what we have here are -- if my cursor works.  This is --

22    where my arrow is is the front, above the ears; would be here

23    and there.  The back of the head is back here (indicating).

24    What we see is something in between the two cerebral

25    hemispheres.  That's called falx, F-A-L-X.  That's part of the

1   dura that falls in between the two cerebral hemispheres.  It

2   has some white density on it, and that white density is either

3   blood that is in the falx itself or a very thin layer.  White

4   would be how blood would appear.  The skull has -- the skull is

5   white.  Because of the calcium that is in there, it absorbs the

6   x-ray.  You can't see the soft tissues of the head.  What we

7   see here, this is the right cerebral hemisphere.  It's

8   reversed; that's the way the radiologists read it.  This is the

9   right cerebral hemisphere.  This is the left cerebral

10   hemisphere, and you can see that it doesn't fill the skull

11   completely.  And what is over the brain is a collection of gray

12   material here, and a little darker material on the left side.

13   This particular side is watery fluid that may have a little bit

14   of blood pigment in it.  I would probably describe it as

15   straw-colored fluid, maybe it has a slight brownish tint if you

16   could have it in front of you.

17            On the right cerebral hemisphere, there's a little

18   more gray there, which means there's probably a little more

19   blood pigment that is mixed in with this fluid that is there.

20   The other thing that one can see, if I can get my cursor back,

21   is there are little strings and things that seem to traverse

22   these spaces, and this is the component that could either be

23   veins that are connecting this outer part of this fluid

24   collection to the surface of the brain or represents septa of

25   connective tissue in membranous components here.

1          If we go to the next panel, which is a cut farther

2    down in the brain - again, front of the brain up here, the rear

3    of the brain back here, the right side and then the left side

4    (indicating - we can still see the falx, and it's only that

5    much right now, a little bit of white color there.  We go to

6    the back part, and there's much more white color, and maybe a

7    little bit more of white material that's puddled back here in

8    the back part of the head in this fluid collection.  If you

9    want to see a comparison of what cerebrospinal fluid looks

10   like, which is clear water with a little sugar and salt in it,

11   that's how it should look, pretty dark black.  So, anything

12   less than that indicates that there's something distended in

13   this fluid.

14          So, just simply looking at the CT scans alone, you

15   can say these are fluid collections on both sides of the brain,

16   which there's really a rather minimal amount of recent blood.

17   The most evident would be back here, kind of puddling in the

18   occipital lobe on the right-hand-side; but if characterized,

19   these lesions, they -- acute bleeding is not a major part of

20   it.

21          Q.  Fair to say, Doctor, there's very little acute

22   bleeding that you noticed on the CT scan?

23          A.  There is recent bleeding.  I don't know how long it

24   had been there, at least back here (indicating).  This is

25   probably about the most acute bleeding there is.  You can see

A000001983

1    how comparatively little there is at that point.  So, this

2    would be a chronic fluid collection, subdural hematoma, if you

3    want to call it that, with some small amount of acute bleeding

4    in it.  Now, how long would it take for -- if you started out

5    with an acute subdural hematoma, where all this black space was

6    white, fresh blood, probably many weeks to get to this, and

7    then it tapers off.  Some of these fluid collections could be

8    present for years, and they all have a little element of blood

9    in them for some reason.

10        Q.   Can you tell the jury, what is your experience in

11    interpreting CT scans and how long you have been interpreting

12    them for, Doctor?

13        A.   Sure.  I'm privileged to be part of a generation

14    where lots of wondrous things happen, one of them the discovery

15    of the CT scanner and the MR scanner.  These happened while I

16    was in hospital practice, and Children's Memorial and the

17    Northwestern Memorial Hospital received -- I don't remember

18    what year it was that we got our first CT scanner, but the

19    radiologists who were charged with the responsibility of

20    reading these new images, basically, didn't know how to do it.

21    The appearance of the brain axis is how I cut the brain at

22    autopsy.  So, these radiologists came down to the autopsy room.

23    We would have a case.  They would bring their scans along with

24    them, and there would be the brain.  And they would say, "Well,

25    that's what it looks like in my film.  Let's see what it looks

*(Leestma - Defendant - Direct)*          2114

1    like in the brain."

2              So, it was a matter of immediate correlation between

3    what the pathology was and what they were seeing on their

4    images.  So, in a sense, the neuroradiologist and I learned to

5    read these things together, and that interplay between

6    radiology and pathology continued as long as I was at those

7    institutions.  So, consequently, I grew up with this, with

8    these techniques.

9              And later, when I was doing primarily surgical

10   neuropathology at the Chicago Institute of Neurosurgery, I

11   would go to the OR.  There are the films on the wall.  I can

12   see the patient right there.  There was hardly a day that went

13   by that I didn't look at some form of cranial imaging, along

14   with the surgeons or with the radiologists.  So, I have been

15   doing this as long as the technology has been around.

16        Q.   Thank you, Doctor.  Do you have an image on your disc

17   which would demonstrate or show the microscopic section of the

18   chronic subdural you described here today?

19        A.   Yes.  One of the things that one would want to do

20   when you do the autopsy, when you open the skull and take the

21   brain out, this fluid flows away.  So, you don't have that

22   image any more.  What you have left behind are elements of

23   membranous tissue back here, and you want to make sections of

24   that to make a microscopic slide, which is exactly what we did,

25   and here is a depiction of this.

1            Let's start down here.  This is some recent blood

2     that is red, and the red blood cells have different colors to

3     them, indicating that this is blood that's been in this

4     particular location up to, I don't know, five days, a week.

5          Q.   Can you use a pointer, please, to -- starting back to

6     your first description.

7          A.   This area right in here (indicating) --

8                TRIAL JUROR:  We can't see.

9                MS. EFFMAN:  Judge, do we have a pointer or any

10           kind of device?

11               THE COURT:  I don't know that we have -- maybe

12           just using a pen or something, Doctor, to actually show on

13           the screen.

14         A.   Okay.  This part here is a blood clot, and it has red

15    blood cells that are clumped, also some watery fluid.  Some of

16    those red blood cells are preserved, which means that they can

17    be about two to three days old.  Those undergoing color changes

18    are probably in the order of three, five, six days old from the

19    time of death, meaning that some of this blood could have been

20    still coming in there while this child was hospitalized.

21               Beneath that, we have another layer.  I don't know

22    how you want to define these things, but if you want to look at

23    it, we have probably one, two, three, four, five, six, maybe

24    seven or eight layers here.  Now, these layers are -- represent

25    the body's attempt to heal this subdural process.  The skull

1    would be up here not shown.  And what is in here?  We see lots

2    of brown things.  Those are blood vessels, new blood vessels

3    that are formed to try to carry away this debris and cells that

4    are there.  And the reasons we have layers like this is because

5    there have been multiple episodes of bleeding.  It would be

6    like a place that had six earthquakes in a row.  And the aging

7    and dating of each one of these membranes, there's a time

8    frame.  It probably takes several weeks to get one good layer

9    going.  And then, if there was another episode of bleeding on

10   top of that, then the process starts all over again.

11            So, this is -- represents morphology, I guess, if you

12   want; and if you add up all of these time frames of weeks and

13   months here, this process could easily go back to the time of

14   birth.

15            Now, one last thing that I want to mention is this

16   layer that's up here at the top (indicating) is filled with

17   dead cells, or another not very elegant term is pus, P-U-S,

18   dead white blood cells, organisms, debris and so forth.  So,

19   this child has what would be called a subdural or intradural

20   empyema.  That is the collection of pus and dead tissue under

21   the skull just on top of the dura where this was sampled.

22        Q.    And do you have an opinion, to a reasonable degree of

23   medical certainty, as to the cause of the pus?

24        A.    It probably got there by -- well, there's two

25   methods - hematogenous - in other words, there's bugs in the

1   blood that colonized this particular area because it's damaged

2   and set up housekeeping there, or there is a direct extension,

3   for example, from, say, a sinus near this. There's a sinus

4   infection, and it broke through and eroded through the bone

5   into the dural space and set up housekeeping there. I don't

6   know which one operated.

7        Q.   And does pus have any connection to trauma, Doctor?

8        A.   No.  The only circumstance in this kind of case would

9   be if there had been a skull fracture that had passed through

10   one of the sinuses at the base of the skull releasing

11   contaminated material.  We don't have any evidence of that.

12        Q.   Please proceed, Doctor.

13        A.   This is a microscopic slide taken in the brain.

14   These larger blue things are nerve cells.  This is a tangle of

15   capillaries that are in the cortex or in the surface of the

16   brain.  The white matter is down here.  There's lots of white

17   holes.  That's edema.  There's where water has come into the

18   brain.  And then we have these vessels which are distended with

19   red blood cells and contain blood flow and inflammation

20   surrounding them.

21        So, I think this is an example of intravascular

22   coagulation that happened before this baby died, and maybe

23   before his hospitalization, indicating the circumstances that

24   were going on in this kid.

25        Q.   And is that causally connected to overwhelming sepsis

*(Leestma - Defendant - Direct)*                          2118

1   and septic shock, Doctor?

2        A.   I believe that's the pathway that got us to this

3   place.  I should point out, also, if I moved this field up and

4   had taken a picture of the surface of the brain, I would have

5   found inflammatory cells there and with the gram stained

6   bacteria.

7        Q.   Doctor, can you explain to the jury what's depicted

8   on this particular slide?

9        A.   Okay.  On the left panel, what we have is a section

10  of tissue in the fat and muscle area surrounding the eye.  That

11  is -- the eye is, of course, enclosed in bone, and that's what

12  we call the orbit, and there's soft tissues surrounding the

13  eye, and that's where this section has been made.  There are

14  lots of blood vessels, which are normally present.  Many of

15  them are thrombosed, that is clotting, and have inflammation in

16  the wall.  We have this area of necrosis, where tissue has

17  died, and I had a gram stain, or had one made of this tissue.

18  And what I'm pointing out here, these dark big globs here, are

19  the nuclei of inflammatory cells.  All the little dark dots,

20  like grains of rice all over the place, are the streptococcal

21  bacteria, gram-positive bacteria that are in this dead and

22  dying tissue around the eye.

23       Q.   Did you request that certain slides from the autopsy

24  be gram stained for your review of this case?

25       A.   I did.

1        Q.   Doctor, can you tell the jury, what is gram staining?

2        A.   What you basically do -- and you can do it with a

3    smear; in other words, a cotton swab of some secretion

4    somewhere, put it out under a glass slide, and then stain it

5    with these reagents called the gram stain, and look at it under

6    a microscope, and they will -- these reagents will stain

7    certain bacteria dark like this.  Typical would be

8    streptococcus, staphylococcus and some others.  And then if it

9    didn't, they would have a pink color, like the bacteria that

10   inhabits the gut, like E. coli.  Those germs will have a pink

11   color, so they are gram negative.  And the form, or the way

12   these two dots are together, that's typical for streptococcus

13   and particularly strep pneumoniae.

14       Q.   Why is it important to gram stain a body slide?

15       A.   It tells you that there's bugs there.  I mean, if you

16   look at this, you say there has to be something there because

17   of the cellular reaction and the way the tissue is dead.

18   Although you have a positive culture, it's not the same as

19   saying, "There it is.  We have closed the loop on it."

20       Q.   And did you gram stain any other slides, besides the

21   slide of the orbital tissues, as we talked about here?

22       A.   Again, I wanted to be sure.  Are there bugs in the

23   subarachnoid space over the brain?  Yes.  Are there bugs in

24   this tissue around the eye?  Yes.  There should be no doubt as

25   to what the cause of death is.

*(Leestma - Defendant - Direct)*                    2120

1     Q.   Basically, all the gram staining you did showed that

2   the brain and the area behind the orbital tissues had evidence

3   of this bacteria, streptococcus pneumoniae?

4     A.   Right.

5     Q.   What is the significance of that?

6     A.   It just closes the loop on the reason.  Why is this

7   necrotic?  Why are the inflammatory cells there?  It's there

8   because there's bugs, and it tells you, when you have this kind

9   of perfusion and distribution of a serious infectious organism,

10  that's -- it's an advanced and disseminated disease.  That's

11  very, very, very serious.  There's the cause of death sitting

12  right there looking at you.

13    Q.   Doctor, going back to the previous slide, please, for

14  a moment.  You talked about there was evidence of clotting

15  problems.  Can you point for the jury with the pointer or the

16  pen where --

17    A.   These blood vessels are distended with blood clots,

18  and there's reaction in the wall of the blood vessel, and that

19  would be typical for coagulopathy and so forth.

20    Q.   And that's consistent with coagulopathy related to

21  sepsis or overwhelming sepsis?

22    A.   Sure.  You have sepsis here and you've got it right

23  next door.  You've got the whole story right there.

24    Q.   Can you go back a moment to the two prior slides with

25  the chronic subdural hematoma?  Thank you, Doctor.  Based on

1    the number of layers - you testified seven or eight layers - do

2    you have an opinion, to a reasonable degree of medical

3    certainty, as to the age of this chronic subdural?

4         A.   Yes.  In its totality -- I mean, we have to start

5    from the surface down here and move down, but the oldest

6    material probably goes back -- this child is only four months

7    old, and it certainly could go into that time frame; not all of

8    this.  Maybe we are looking at a four-month-old, a

9    three-month-old, a one-month-old, a two-week-old, that kind of

10   thing (indicating).

11        Q.   And Doctor, in terms of risk factors, did you review

12   the mother's obstetrical records in this case to determine

13   whether she had any risk factors during pregnancy and during

14   childbirth?

15        A.   Yes.  There were a number.  This child -- when we

16   take a look at children that have bleeding in the dura and

17   bleeding in the brain and then go back, there have been a

18   number of studies that have looked at that.  What factors are

19   around that could correlate with those things?  And there's a

20   bunch of them.  This child had at least a half dozen of these;

21   being early delivery, twins, the presence of toxemia during the

22   pregnancy in the mother.  The presence of premature rupture of

23   membranes is potential for bacterial infection.

24        Let me think.  They go on, but these would be all

25   things that could put stress upon the baby and produce bleeding

A000001992

*(Leestma - Defendant - Direct)*          2122

1   in the brain in conjunction with birth.

2       Q.  Would meconium stained membranes - that is, a baby

3   having a bowel movement in utero - would that be a pregnancy or

4   birth complication factor?

5       A.  It's an indicator of fetal distress, and I suppose

6   just any indicator of fetal distress would be another box that

7   you would check off on that risk profile.

8       Q.  Would preeclampsia be a risk factor?

9       A.  Yes.

10      Q.  High blood pressure, would that be a factor?

11      A.  Well, that's part of the preeclampsia complication,

12  high blood pressure in the mom.

13      Q.  What about obesity on the part of the mother?

14      A.  That's another one.  Overweight is something that

15  adds risk.  I'm not exactly sure where in the alphabet it

16  comes, but it's there.

17      Q.  And what about breach presentation for vaginal

18  delivery?

19      A.  That's another one.  If the presentation is anything

20  other than the usual head down situation, if there's any

21  problem with delivery, and there often is with twins, that's

22  another risk factor..

23      Q.  What about use of forceps during delivery?  Would

24  that be a birth complication factor?

25      A.  True, forceps, anything else that indicates that it

*Judy A. DelCogliano*
*Official Senior Court Reporter*

1    was difficult to get the babies out, or they just popped out.

2    There's good news and bad news. A precipitous delivery is also

3    connected with brain bleeding and so forth.

4        Q.    What about a bacterial diagnosis of a vaginal

5    infection of the mother at the time of delivery? Would that be

6    a risk factor?

7        A.    Absolutely.

8        Q.    What about the fact that one child, Twin A, was born

9    with pulmonary stenosis? Does that have any host in the risk

10   factors of the birth process?

11       A.    That departs a little bit. I'm not sure what role

12   that would particularly play.

13       Q.    What percentage of normal pregnancies experience

14   intracranial bleeding during childbirth?

15       A.    This has been studied. It used to be thought it was

16   quite rare, a few percent. Now it turns out that normal,

17   presumably normal vaginal deliveries, 25 to 40 percent or more

18   may have some evidence of bleeding in the brain.

19       Q.    And if you had any of these pregnancy or birth

20   complications, Doctor, that we talked about, how does that

21   impact, this 25 or 40 percent, the number you have given us

22   that have babies that experience intracranial bleeding?

23       A.    It would probably shift those babies further and

24   further into the 25 to 40 percent rate. I don't know what the

25   exact number correlations are, but that clearly increases the

*(Leestma - Defendant - Direct)* 2124

1  risk for bleeding.

2      Q.  Can you explain to the jury how bleeding can occur

3  during childbirth?

4      A.  Sure.  The head has to conform to the anatomy of the

5  birth canal; namely, it has to elongate.  It has to move and

6  twist and turn and so forth, although the -- birth is not for

7  sissies.  It's a traumatic process.  And in the course of that,

8  the intracranial structures have to be capable of moving and

9  being stretched and strained, as well.  And part of the problem

10  with that is, with molding of the head, that the dura,

11  especially near the back of the brain and the tentorium, it's

12  called, may be stretched and produce bleeding in those

13  locations.

14      Q.  So, in terms of areas that you can have bleeding

15  during childbirth, what would those areas be?

16      A.  Well, it can occur anywhere in the dura, but

17  classically, where all of the components of the dura come

18  together, more or less, near the base of the skull and the

19  cerebellum.  The dura there is very vascular, and it

20  experiences, from a mechanical point of view, more stresses

21  placed upon it during birth than other areas, and it's

22  reasonable, therefore, that blood does occur there, which it

23  does.

24      Q.  So, you can have bleeding anywhere in the dura as a

25  result of childbirth?

1        A.   You can, sure.

2        Q.   And if you have bleeding in the dura, can that flow

3    to the posterior fossa?

4        A.   Well, once you have bleeding that goes into the

5    subdural, quote, space, it's a potential space, but it can be

6    actualized very easily.  It can respond to gravity and can

7    redistribute itself in different parts inside the head.

8        Q.   And during your review of the autopsy report in this

9    case, was there evidence that there was blood in the posterior

10   fossa of this child?

11       A.   Well, we can see it on the CT scan.  There clearly

12   was this process, an old one, with some recent bleeding back

13   there, yes.

14       Q.   Doctor, before I stop you there, do you have

15   additional slides that you would like to demonstrate for the

16   jury, Doctor?

17       A.   Yes, this one.

18       Q.   Can you describe for the jury what is pictured on

19   this slide?

20       A.   This is lung, section from the lung which shows

21   virtually no air in it.  It's all completely collapsed.  And if

22   you look - you can't really see it with this section here -

23   there are acute inflammatory cells scattered through this and

24   evidence of pneumonia, but this is primarily collapse of lung

25   tissue, most likely because air didn't reach it through the

*(Leestma - Defendant - Direct)*                  2126

1    ventilator and the lungs didn't expand, at least where this

2    section was taken.

3        Q.   Can you describe for the jury what is depicted on

4    this photograph?

5        A.   This is the section of heart, some heart muscle more

6    or less normally scattered around the side of it.   In the

7    center is a scar, where muscle fibers have been killed, and I'm

8    not sure what did that.   It's not recent.   It's been repaired

9    with scar tissue.   It's like a little tiny heart attack, and

10   that is present in this child's heart.

11       Q.   Based on what's depicted there, Doctor, do you have

12   any idea how long this scarring had been there?

13       A.   Probably a month or months.   So, something has been

14   going on here.   I don't know what caused that.   It could be

15   coagulopathy.   It could be something else.   I have no idea.

16       Q.   Would that have any connection to pulmonary stenosis?

17       A.   Whatever pulmonary stenosis was caused by.   It could

18   have been an intrauterine infection or something going on that

19   caused that.   It might have been responsible here.   This is

20   scar tissue that's left.   I don't know what occurred before.

21       Q.   Okay.   Thank you, Doctor.   There was one of the heart

22   at the end?

23       A.   Yes.   It just shows that there's some areas of heart

24   muscle damage.   Muscle fibers that are dark and square indicate

25   that this heart has been having to work harder.   I don't know

1    how many of these scarred areas were there.  If there was some

2    element of pulmonary stenosis, the heart has to work harder to

3    pump blood, and that is reflected in a nonspecific way in

4    another section of the heart.  So, this child came into this

5    situation with a damaged heart for a variety of reasons, and

6    that's the load this child has to deal with.

7         Q.   You can take the stand again, Doctor, please.

8    Doctor, you just touched upon earlier that you have experience

9    in reading CAT scans and ultrasounds.  How many years have you

10   been interpreting these things?

11        A.   Oh, a long, long time.

12        Q.   Not to date your age, Doctor.

13        A.   I'm 70 years old.  But anyway, for 40 years or so.

14        Q.   And as part of this case, did you have a chance to

15   review an ultrasound from St. Mary's Hospital from May 14,

16   2008, approximately ten days after these children were born?  I

17   draw your attention to that, Doctor.  Can you rule out the

18   existence of a subdural hematoma based simply on that

19   ultrasound?

20        A.   No, I can't.

21        Q.   And can you explain that position to the jury?

22        A.   Ultrasound, it's a wonderful technology that seems to

23   be getting better and better and better all the time.  It's

24   noninvasive.  It doesn't produce radiation or damage anything,

25   as far as we know, and it's a good way if you have worries

*(Leestma - Defendant - Direct)*                    2128

 1    about bleeding or some process inside the head, especially with

 2    a baby, because the skull isn't very thick, you can do an

 3    ultrasound.  But like any other sort of screening test, it's

 4    not as sensitive as other methods, and you can get false

 5    negatives, and I would say the incidence of false negative

 6    exams - that is, when there's really nothing there but you pick

 7    it up - is probably higher with an ultrasound than false

 8    positives.  So, if you have a lesion that you can see with an

 9    ultrasound, it's probably there, and then you may want to do

10    some other studies to define further what it is.  So, a

11    negative study, you cannot necessarily go home with a

12    comfortable feeling that there's nothing there.  Probably more

13    likely than not, there's nothing there, but you can't be sure.

14         Q.   And might a small amount of a bleed not appear on an

15    ultrasound?

16         A.   Yes.  That happens.  I have encountered that

17    situation where, by extrapolating back, where there should have

18    been something there, and then reviewing the studies --

19    sometimes there's technical reasons; the study wasn't very good

20    or the technician didn't have the magic in the fingers to make

21    things come out right.  And by all rights, the study is

22    negative, but there had to be something there, but it was below

23    the level of detection of the instrument.

24         Q.   Might there be any lag time in the appearance of a

25    subdural hematoma such that it may not appear on an ultrasound

1        performed ten days after a premature birth of 33 weeks?

2            A.   Yes.   That doesn't mean the birth is the only thing

3        that's going on.   This child is trying to adapt to be a full

4        newborn.   Other things can occur.   And who knows?   A process

5        may have begun after the ultrasound was taken.   It's just --

6        you can certainly have processes that have a beginning but are

7        small and minimal, I guess, that do evolve into something like

8        what we see here in this child, and you see that all the time.

9            Q.   And what's the most diagnostic way to -- I guess --

10       strike that.   Is a CAT scan more -- a better way to take a look

11       at the -- that particular area of the body?

12           A.   Sure.   A CT scan is a good technology.   MR is better.

13       The trick with these things is you get radiation from a CT

14       scan, a lot more than you get from a chest film, and a

15       developing brain is something you don't necessarily want to

16       irradiate if you don't have to.   So, consequently, there's a

17       cost benefit.   There are risk benefit equations you have to

18       work on.

19               An MR, on the other hand, is much more expensive.

20       You probably have to sedate the child in order to do that, and

21       then you can really get information.   But, you know, how badly

22       do you need that information?   Do you have reason to go there?

23       Maybe not.

24           Q.   Which is the least expensive means of doing the

25       imaging?

*(Leestma - Defendant - Direct)*                    2130

1        A.    Well, you make a pass at an ultrasound.  It's

2    relatively cheap.  It's noninvasive.  Who knows?  It may show

3    you something or it may not.

4        Q.    Doctor, why might there be blood present subdurally

5    on a child that's not picked up on an ultrasound ten days after

6    birth?

7        A.    Well, it's either thin, below the level of detection

8    of the instrument, or the way the study was done, it didn't

9    point the ultrasound to where the bleeding was, and we know

10   that you don't get these membranes and reactions overnight.  It

11   takes time.  So, something had to be in this kid's brain and

12   dura at or about the time of birth, or shortly there

13   afterwards, that then built on itself and rebled and bled and

14   rebled again, and this rebleeding can be totally spontaneous,

15   having nothing to do with anything else that's going on, and

16   there you see the results of it.

17       Q.    Doctor, taking you a step back to the blood in the

18   posterior fossa we talked about earlier.  We were told by other

19   witnesses in this case that the ultrasound would not pick up

20   blood in the posterior fossa, and the autopsy report that's now

21   in evidence has evidence of blood in the posterior fossa.  Can

22   the subdural communicate to other areas of the dura?

23       A.    Sure.  I mean, it's not a space, but once you have

24   blood in the so-called subdural compartment someplace, it can

25   dissect and redistribute itself to other places.

1          Q.    Would it be helpful to draw that for the jury,

2     Doctor?

3          A.    Oh, I don't know that I need to.  I think that is

4     excessively complicated.

5          Q.    What happens to -- can you describe the healing

6     process of a chronic subdural?

7          A.    Okay.  Well, the first thing is that you end up with

8     blood in the subdural compartment, which shouldn't be there.

9     The blood releases chemicals and products of degradation that

10    call forth inflammatory cells that come out of the blood from

11    other places there to gobble this stuff up and make it go away.

12    Cells locally have chemical signals from the dying red blood

13    cells to the scar.  So, the whole idea is to wall off this bit

14    of blood and make it go away.  Well, the process of doing that

15    is inefficient, it appears, and little capillaries grow into

16    this evolving membrane, which is a few cell layers thick and

17    then gradually increases.  Those little capillaries will

18    rupture, and there you go.  You start the process over again.

19              So, there's incremental bleeding, so that you can

20    never, in a way, ever catch up, and we see a litany of that

21    right here in this picture.  Frankly, I have never seen one

22    with as many layers in it as that.  Actually, if you want to

23    take the cover of my book, you can see, in a sense, an example

24    of what a really chronic subdural fluid collection with

25    membranes looks like.  There's an archeology there.  And it's

*(Leestma - Defendant - Direct)*                    2132

1    the natural process of healing that goes awry that bleeds to

2    some of these things.

3        Q.   And Doctor, is rebleeding necessarily tied to a

4    particular event or incident?

5        A.   No.

6        Q.   And what can cause a rebleeding of a chronic subdural

7    hematoma?

8        A.   Nothing you know about, or let's say that somewhere

9    along the way the child became coagulopathic.  Obviously, this

10   is a site of injury and bleeding can occur and, therefore, you

11   have added something to it.  If the child became septic, you

12   get the same issues.  If there were an episode of head trauma,

13   of whatever kind, these are delicate structures and they could

14   bleed again.  So, there's a whole list of processes that can

15   lead to the rebleeding, but it's part of the natural disease

16   process in trying to heal up a subdural hematoma that involves

17   bleeding.  That's been known for more than a hundred years in

18   the literature.

19       Q.   And can you have rebleeding without any movement of

20   the body?

21       A.   Most of the time, you have no idea what is producing

22   the incremental rebleeding.

23       Q.   Fair to say, anything and nothing can cause

24   rebleeding?

25       A.   Anything and nothing, right.

_____

                          Judy A. DelCogliano
                        Official Senior Court Reporter

*(Leestma - Defendant - Direct)*                    2133

1        Q.   And, certainly, a chronic subdural hematoma could

2    rebleed without any trauma, Doctor; correct?

3        A.   Absolutely.

4        Q.   Can increased intracranial pressure from meningitis

5    cause rebleeding in a chronic subdural?

6        A.   That may be complicated.  I'm not quite sure how I

7    would draw the mechanism for doing that but, certainly,

8    infection in the region of membranes like that could facilitate

9    rebleeding.

10       Q.   And, certainly, the infection you saw in the brain

11   and eye of this child based on microscopic sections you gram

12   stained, could those be things that could be connected to the

13   rebleeding?

14       A.   Yes.

15       Q.   Can septic shock cause rebleeding?

16       A.   Sure.

17       Q.   Do you know if pulmonary stenosis can cause

18   rebleeding?

19       A.   I don't quite know how that would work.  I would want

20   to be conservative on that and say I don't know.

21       Q.   Doctor, have you seen studies which connect CPR to

22   rebleeding?

23       A.   This has been controversial.  There could be a

24   reasonable mechanism for doing so, and it probably has

25   occurred, but in terms of case reports that would tie

                        Judy A. DelCogliano
                     Official Senior Court Reporter

*(Leestma - Defendant - Direct)*                    2134

1    rebleeding in a subdural directly to CPR, I am unaware of one,

2    but there could be.

3         Q.   Doctor, based upon your 40 some years experience in

4    medicine, being certified as a neuropathologist and anatomical

5    pathologist since 1970, do you have an opinion, to a reasonable

6    degree of medical certainty, whether -- can a subdural hematoma

7    be caused by throwing a baby from shoulder height onto a

8    mattress 17 inches from the ground?

9         A.   My answer is probably not.

10        Q.   Can you explain that to the jury, please?

11        A.   Yes.  In order to understand or probe into this

12   issue, you've got to know what kind of forces are involved in a

13   scenario like what you have described, and those scenarios have

14   been modeled.  I have seen them done.  I have got copies of

15   some of these studies done by a biomechanical engineer using

16   dummies that are wired up to computers, in which drops and

17   throws onto bed mattresses of one kind or another have been

18   done.  And it looks like the highest acceleration threshold

19   might approach 40 times the force of gravity, more likely 20.

20        Q.   And that would be doing so manually; correct?

21        A.   Yes, 20 to 40 G's.  Now, that would be like being in

22   the elevator, or in a really fast car.  As you accelerate, you

23   experience some acceleration.  Those would be fairly small

24   ones.  If you plop into a couch at your house at the end of the

25   day exhausted, you will probably experience about ten times the

1   force of gravity as you get to your couch.  That, in that

2   general range, maybe twice of that or so, is what one could

3   experience if they dropped onto a mattress from these heights.

4   That's been measured.

5           Then we have to say, okay, what does 10 or 20 or 30

6   G's mean?  Well, when one looks at injury scenarios for adults

7   or children or other things, what are those numbers like?  It

8   looks like you have to start getting to a hundred times or more

9   the force of gravity before you start getting subdural

10  hematomas and brain injury and that sort of thing.  So, we are

11  not there.

12     Q.    And have there -- there have been studies on that;

13  correct, Doctor?

14     A.    There have been studies.  The notion that we know

15  nothing about the injury thresholds in babies and children is

16  not correct.  A number of studies have been -- have come out as

17  a result of design of the air bags.  The first air bags were --

18  killed people; babies and children, in particular, which

19  occasioned where do you put a kid in the car.  Do you want to

20  have an air bag in front of them or not?  And they do have some

21  threshold numbers.  They are not like a cold experiment, where

22  you take ten kids and do something horrible to them.  You can't

23  do that.  But nature's experiments, nature's accidents do give

24  us some insight as to what it is, and that is probably on the

25  order of a hundred times the force of gravity to produce

*(Leestma - Defendant - Direct)* 2136

1    subdurals, and actual brain injury, much more than that.

2         Q.   Doctor, what's your background in pattern

3    interpretation?

4         A.   My background in what?

5         Q.   In pattern interpretation or pattern recognition?

6         A.   It's part of the training in pathology, and certainly

7    around forensics, is that there are patterns of -- under the

8    microscope, you can tell the difference between a Scotch plaid

9    and a paisley, and then maybe even more sophisticated as you

10   grow better.  But on surface of the body, that's an important

11   thing.  For example, in injuries, if someone strikes a pattern

12   surface, you may see a reflection of that in the bruise or the

13   injuries that are on the skin, and these are -- you know, this

14   is written about in every forensic pathology textbook,

15   including my own, that some insights might be gained if you can

16   get patterns; and if you can't, well, then you have to move on

17   to something else.

18        Q.   Doctor, let me refer you to People's 33 in evidence

19   for this following question, Doctor.

20        A.   Yes.

21        Q.   Referring you to People's 33, do you see what's

22   depicted in this photograph?

23        A.   Well, this is a photograph of the back of the child's

24   head.  The scalp has been peeled downward and the scalp has

25   been peeled forward out of you, and what we have is a rounded

1    three-quarters of an inch in diameter area of blood on the soft

2    tissues overlying the skull, about where my finger is.

3        Q.   And referring to that picture, Doctor, People's 33, I

4    believe.  And based on your experience of 40 years, Doctor, can

5    you give us an opinion, to a reasonable degree of medical

6    certainty, as to if that subgaleal hemorrhage in that

7    photograph was caused by blunt force trauma?

8        A.   Don't know.  One of the things that you look for is

9    is there a pattern of some sort and is there anything in the

10   case history or the environment that might correlate with that.

11   This is -- if it's an impact, it would probably be a flat

12   surface, not a pointed one, not a linear one, not something

13   else.  Then I have to look at, well, where is the corresponding

14   area of bruising in the scalp that's immediately over that

15   area, and I don't see one.  So, it tells us we have some

16   bleeding on the surface of the skull without an apparent

17   confirmation of the surface phenomena.  It causes me to wonder,

18   is that really an impact, or is it due to something else,  .

19   coagulopathy being the main culprit.

20       Q.   And if that were to be connected with blunt force

21   trauma, would you expect to see some corresponding mark on the

22   scalp internally?

23       A.   I would not necessarily expect it on the surface, but

24   on the reflected scalp that's directly over this thing.

25   Actually, how do you get from here to there?  And, so, I'm

1    doubtful that this is a blunt force impact site.  It may have

2    another explanation, coagulopathy being one of them.

3        Q.   In terms of the photograph you reviewed, Doctor, is

4    there any corresponding bleeding through the scalp directly

5    opposite the subgaleal hemorrhage?

6        A.   No.

7        Q.   And do you have an opinion whether a subgaleal

8    hemorrhage could have been caused by throwing a baby from

9    shoulder height to a mattress 17 inches off the ground?

10       A.   This isn't where an impact would likely occur.  I

11   have already discussed that I don't think it is an impact site

12   at all.  Therefore, I don't how it could correlate to any

13   subdural.  First of all, we have a chronic subdural that is

14   months old with very, very little recent bleeding in it.  So, I

15   don't know what we are talking about here.

16       Q.   Doctor, do you have an opinion as to the cause of

17   this subgaleal hemorrhage?

18       A.   No.  I said it's possibly coagulation.

19       Q.   How serious is the subgaleal hemorrhage in connection

20   with the child's health?  Is it a serious thing?

21       A.   Is what?

22       Q.   How serious is the subgaleal hemorrhage in connection

23   with the child's health?

24       A.   Trivial.  I have nothing to attach it to.  It doesn't

25   seem to be connected with anything.  I don't know what to make

1   of it.

2       Q.   And in terms of the subarachnoid hemorrhage mentioned

3   in the autopsy report, how serious is that, Doctor?

4       A.   I think that is strictly incidental.  This child was

5   on a respirator, had virtually no circulation going to the

6   brain because of the vast intracranial pressure.  And in the

7   course of this brain sitting there without any blood pressure

8   in it for two days, basically -- all of these brains that come

9   to autopsy have subarachnoid hemorrhage.  So, it has no

10  particular meaning.

11      Q.   And do you have an opinion as to the cause of this

12  child's coagulopathy problems, Doctor?

13      A.   Sure, sepsis.

14      Q.   Doctor, perhaps the next question, if I could ask you

15  to come down.  We are going to need the easel, please.

16                (Discussion off the record at the bench.)

17                THE COURT:  Members of the jury, we are actually

18      going to break for lunch at this point.  We are going to

19      stop until quarter of two.  We will break until 1:45.  I

20      ask you, please do not discuss this case among yourselves

21      or with anyone else.  Do not read or listen to any

22      accounts of this case.  Do not visit any premises involved

23      in this matter.  Do not conduct any research involving

24      this case.  Do not request or accept any payment in return

25      for supplying any information regarding this trial.  Do

1        not make any judgment regarding this trial until you have

2        heard all of the evidence and been instructed on the law.

3        If anyone attempts to improperly influence you, please

4        report it directly to me without first discussing it with

5        anyone else.  Enjoy your lunch.  We will see you back here

6        at quarter of.

7                  (Jury excused.)

8                  THE COURT:  Doctor, I just want to caution you,

9        as you are still a sworn witness and your testimony is

10       continuing, please do not discuss your testimony in this

11       case with anyone.

12                 THE WITNESS:  Fine.

13                 THE COURT:  Thank you, Doctor.

14                 (A luncheon recess was taken.)

15                 (Proceedings continue outside the presence of

16       the jury as follows:)

17                 THE COURT:  Please be seated.  Before we bring

18       the jury out, on the break, the People submitted to the

19       Court an Order to Show Cause, which the Court signed, and

20       the Order pertained to precluding testimony from Dr.

21       Ofshe, if I'm pronouncing his name correctly.  The Court

22       made the Order returnable Monday morning at nine o'clock.

23       Mr. Frost, did you want to be heard on that?

24                 MR. FROST:  Yes, Your Honor.  I want it to be

25       made returnable at the close of testimony today, because

1          to bring Dr. Ofshe all the way back from Paris, only to

2          have to turn around and go back, would be an extreme

3          hardship for him, and also for the County.  It would be an

4          additional expense, and I might say, also, in reliance

5          upon the Court's ruling, we have already spent a good,

6          great deal of money purchasing tickets, airline tickets

7          from Paris and round trip to Los Angeles, where he was

8          next scheduled to go.  That can't be recovered.  So, I

9          think it's critical to resolve this issue today.  I don't

10         see anything new.  I think the whole idea of a *Frye*

11         Hearing is to decide the issues raised in the affidavit.

12         That's my position.

13                 THE COURT:  Does the defense object to the Court

14         making it returnable right now?

15                 MR. FROST:  Not at all, Your Honor.

16                 THE COURT:  People object to that?

17                 MS. BOOK:  Have you had an opportunity to review

18         everything?

19                 THE COURT:  I have reviewed everything that the

20         People submitted; the Order, the Affirmation in Support

21         and the exhibits, yes, I did.  And you can certainly be

22         heard further, if you'd like, but --

23                 MR. GLASS:  May we have one moment, Your Honor?

24                 THE COURT:  Sure.

25                 (Discussion off the record between counsel.)

2142

1          MR. GLASS:  We have no objection if the Court

2     rules right now.

3          THE COURT:  Okay.  Do you wish to be heard any

4     further?  I have reviewed the submissions.  Anything you

5     want to add?

6          MR. GLASS:  No, Your Honor.

7          THE COURT:  Mr. Frost, anything you want to add?

8          MR. FROST:  Your Honor, I think we have

9     satisfied all the *Frye* factors.  I think the big issue

10    here is is that within the ken, of course, within the ken

11    of the average juror.  Dr. Ofshe will tell you that

12    studies have been made that the average layperson has very

13    serious misconceptions about the importance -- on the

14    issue of confessions; namely, that innocent people

15    wouldn't confess to a crime, which has been demonstrated

16    to be false through DNA exoneration cases and other

17    exoneration cases and, also, that the average people

18    consider evidence of gold standard and -- the average

19    person considers a confession gold standard type of

20    evidence, right behind DNA, and I think Dr. Ofshe

21    indicated fingerprints, but it's apparent today -- we have

22    the report of, I think it was, the National Academy of

23    Science in 2007, that fingerprints have come under attack,

24    also, as being conclusively -- conclusive proof.

25          And thirdly, most importantly, the average juror

1    is unaware that police interrogation over the past 50 to

2    60 years has followed a set pattern involving three

3    factors of psychological influence, namely, the setting in

4    which the interrogations are held, evidence ploys that are

5    utilized to reduce the subject's confidence by saying,

6    "Well, we have medical proof - your wife said you did it,"

7    that type of thing, to reduce the subject's level of

8    confidence from a hundred percent down to near zero, and

9    then other psychologically motivating factors, such as,

10   "You are not going to be arrested.  This isn't a crime.

11   This is an accident.  I'm going to talk to the DA, get you

12   a good deal.  I'm going to talk to the judge.  I'm going

13   to talk to" -- whatever I have to do.

14              All these things are unknown, that jurors may

15   know something about from watching television, but they

16   are unaware that this is standard police investigation,

17   going back to Inbau-Reid in 1965.  This is what they do.

18   They have trained over 90,000 people in this technique or

19   pattern of interrogation, and these people, as good

20   apostles, go back to where they came from and spread the

21   gospel.

22              So, these are issues that really are going to

23   have to be decided at a Frye Hearing as to the

24   qualifications of Dr. Ofshe.  His qualifications are

25   impeccable.  As to whether this is an established field,

2144

1            the problem -- I have done my client a disservice in

2            referring to this as false confession as the topic of Dr.

3            Ofshe's expertise.  Correctly put, the topic is police

4            interrogation and the use of factors of influence to bring

5            about a confession, which may or may not be false.  False

6            confession is one of the phenomenon of the results of the

7            use of extreme influence.

8                    The cite -- the prosecution cites a couple

9            cases, including the Rosario case, which found Dr. Ofshe

10           to be eminently qualified.  He's testified 330 times.

11           He's testified, according to the e-mail, a copy of which I

12           furnished to the Court, eight times in New York State.

13           You don't read about the decisions in which he's permitted

14           to testify, because it usually comes up on appeal.

15                    If I may address it now, I think the touchstone

16           here is LeGrand, and I note that one of the cases cited by

17           the prosecution, the Koury case, the Appellate Division in

18           our department likened false confessions to eyewitness

19           identification testimony, which up until that time, the

20           Third Department ruled was inadmissible.  Well, the answer

21           to that is People versus LeGrand, where the Court of

22           Appeals said it was an abuse of discretion to preclude or

23           deny an expert from testifying on eyewitness

24           identification, where the eyewitness identification was

25           the, if not the only evidence in the case, almost the only

```
1        evidence in the case.  We have a precisely similar
2        situation here.
3              Further - I will finish with this -  the cases
4        they cite involve a different, wholly different subject.
5        This was -- Koury, I think it was the Defendant's mother
6        said he was highly susceptible.  And I think in the Lee
7        case, Dr. Camperlengo testified as to a mental condition
8        at the time to make it highly susceptible.  And the other
9        case, the Lee case, said the same thing.  That's a
10       different area, and we are talking there about particular
11       individuals.
12             Dr. Ofshe would not testify in this case that,
13       in his opinion, this is a false confession.  He will go
14       through the police interrogation, how it's done.  He will
15       diagram it, explain it on a flip chart, discuss the
16       setting, discuss the evidence ploys, discuss the other
17       motivational factors; and besides that, at the Frye
18       Hearing, he would testify as to studies that have been
19       made regarding exoneration, people who have been
20       exonerated by DNA and likely strong evidence of 20
21       percent to 50 -- in excess of 50 percent in the State of
22       Illinois, and he will testify to studies, three studies
23       that he will tell you just what I told you about, it
24       being -- that these are matters that are beyond the ken of
25       the average juror, and he will also tell you there's
```

2146

 1       developed literature in this field, as there is in all

 2       fields of specialized scientific knowledge.  There was a

 3       review in 1992 with over a thousand citations, a

 4       bibliography with citations in 2003 and 2002 for all of

 5       that.

 6               I respectfully submit that we are entitled to

 7       the *Frye* Hearing.  The issues that are raised are issues

 8       that are properly done in a *Frye* Hearing, and I might

 9       finish by saying this is, essentially, a motion to

10       reargue.  We haven't really come up with any law or the

11       Court hasn't overlooked any principle of law which is a

12       ground for reargument, if you want to construe it as an

13       argument for renewal with regard to the facts.

14               So, based upon that, I would request that you

15       deny the Order to Show Cause.

16               THE COURT:  Thank you.  Mr. Glass, anything you

17       want to add?

18               MR. GLASS:  Very briefly, Your Honor.  I don't

19       know how this can be a motion to reargue when there wasn't

20       a motion on the table in the first place.  This is our

21       motion to preclude.

22               Secondly, putting aside for a moment the Court's

23       considerable discretion in dealing with matters of

24       evidence, Mr. Frost makes very cogent arguments, but I

25       think he's in the wrong forum.  He should be at the

```
 1        Appellate Division or the Court of Appeals.  I think, as a

 2        trial level court, again putting aside matters of

 3        discretion, this Court is obligated to follow the law in

 4        this State as it exists in its decision of law, and I

 5        think it's pretty clear that false confession evidence has

 6        not gained acceptance in the community for which -- I

 7        guess the social psychological community, and the courts

 8        of this State generally have not accepted it, and the

 9        Court is bound to follow that law, and the application

10        ought to be granted.

11                 THE COURT:  Mr. Glass, isn't the question of

12        whether it's been generally accepted by the scientific

13        community, isn't that a question that can only be answered

14        after a hearing has been held?  I mean, perhaps in other

15        cases, courts have found that it isn't generally accepted,

16        but those are older cases.  Shouldn't a hearing at least

17        be held for the Court to consider the evidence and then

18        make its determination?

19                 MR. GLASS:  If the Court feels comfortable with

20        that result, I can't disagree with it, but we are relying

21        on precedent as it exists now.  I think that's fairly

22        clear in the cases that we provided to the Court.

23                 THE COURT:  Okay.  I understand both sides'

24        positions.  The People's motion to preclude, asking the

25        Court to, essentially, summarily preclude the testimony of
```

2148

1           Dr. Ofshe, is denied.  The Court, as I indicated before,

2           will conduct a *Frye* Hearing this Monday at nine o'clock

3           a.m., and that will be for, obviously, for the purpose of

4           determining the admissibility of Dr. Ofshe's testimony.

5                   Anything further from the People before we bring

6           the jury out?

7                   MS. BOOK:  Did you get our other Order to Show

8           Cause, Your Honor?

9                   THE COURT:  We received a second Order to Show

10          Cause from the People.  The Court signed it and returned

11          it to the DA's for service on the defense.  Service was

12          ordered to be made personally by the end of the day today.

13          The Court set a return date for this Monday at 9:00 a.m.

14                  MS. BOOK:  Thank you, Your Honor.

15                  MR. FROST:  Can we know the subject of that,

16          Your Honor?

17                  THE COURT:  The subject matter, the Court's

18          understanding, was allowing the People to call a CPS

19          worker in rebuttal, as part of a rebuttal case, for the

20          purpose of impeaching the Defendant's testimony to the

21          extent that he claimed the statements that he made to the

22          police were false.  That's the general --

23                  MR. FROST:  Thank you, Your Honor.

24                  THE COURT:  That Order to Show Cause -- and

25          incidentally, the People -- I don't know if it was set

```
 1              forth in the alternative, but it was in the last
 2              paragraph; either alternatively or outright consented to a
 3              Huntley Hearing, if it was determined appropriate.
 4                        MR. GLASS:  Outright consent to a Huntley.
 5                        THE COURT:  That Order to Show Cause will be
 6              returnable Monday at 9:00 a.m. for the defense to submit
 7              any written opposition, and then the Court will decide at
 8              that time whether a hearing is necessary or what other
 9              decision we will make.  Anything further from the People?
10                        MR. GLASS:  No, Your Honor.
11                        MS. EFFMAN:  I'm ready, Judge.
12                        THE COURT:  Doctor, I think we can have you
13              retake the stand, and we will bring the jury out, please.
14                        (Whereupon, the jury entered the courtroom.)
15   DIRECT EXAMINATION
16   BY MS. EFFMAN:  (Continuing)
17         Q.   Doctor, I ask you to step down to draw for the jury
18   the retinal area of the retinal hemorrhage.  Can you tell the
19   jury, what is a retinal hemorrhage?
20         A.   What do you want to know about them?
21         Q.   Please tell us what they are.
22         A.   Okay.  In the common parlance, retinal hemorrhages
23   would be bleeding that occurs in the sensory element of the
24   eye, the retina.  And without any further modification or
25   issues, that's a general term for that.
```

*(Leestma - Defendant - Direct)* 2150

1    Q.   And would any drawing be helpful to explain to the

2    jury?

3    A.   Sure.   There are many mechanisms for retinal

4    hemorrhages, but in the context of this particular case and

5    increased intracranial pressure, I think, perhaps, a diagram

6    might help that.

7    Q.   Can you please draw us a diagram, Doctor?

8    A.   Okay.   This is the eye.   The retina is right here.

9    The optic nerve, which connects the eye to the brain, is right

10   here (indicating).   And, actually, the dura of the brain is

11   this sheath here that blends with the back of the eye, and this

12   sheath is the optic nerve.   I think I will just label this "ON"

13   for optic nerve, and that is the retina.

14       The arterial circulation to the eye comes in through

15   the ophthalmic artery that comes off vessels at the base of the

16   brain and extends into the center of the optic nerve and

17   arborizes out to provide blood supply to the retina.   The

18   venous drainage more or less parallels that.   There is the vein

19   called the central retinal vein, and at some point, it

20   traverses the space around the optic nerve and goes for a ways

21   and then, eventually, finds its way into the jugular systems

22   and other systems of the venous drainage in the base of the

23   skull.

24       Now, let's do it this way.   And the optic nerve

25   joins -- let me just do it like -- it joins the brain.   The

1     point that I'm making here is this is the subarachnoid space,

2     and it contains cerebrospinal fluid that surrounds the brain

3     and also surrounds the optic nerve sheath.  The point of that

4     is that, whatever the pressure is inside the head, it's going

5     to be transmitted down the optic nerve sheath.  So, if you had

6     a gauge here that is measuring pressure and you had a gauge

7     here that's measuring pressure (indicating), they would be

8     pretty much the same.

9           Now, that pressure normally is -- I will say normally

10    is equal to something less than about 15 millimeters of

11    mercury.  That's the equivalent of venous pressure.  If I were

12    to put a needle in one of my veins and put a pressure monitor

13    on, that's about what it would be.  It would be between zero

14    and 15.  So, that's the normal situation.

15          If there is increased intracranial pressure,

16    obviously, this gauge is going to go up.  If it goes above

17    15 millimeters of mercury, it means that this venous blood is

18    squeezed.  It can't exit.  So, what you basically end up with

19    is a situation like -- imagine my hand to be the retina, my

20    wrist to be the optic nerve sheath.  And if I were to put a

21    blood pressure cuff or tourniquet on and cuff it up just to the

22    point where it included venous outflow, but arterial blood flow

23    is still going in there at a hundred millimeters of mercury or

24    thereabouts, I've got blood coming into the eye, but no way for

25    it to get out.  And then what happens is blood builds back up

*(Leestma - Defendant - Direct)*                    2152

1    and bursts out of little capillaries and, actually, may burst

2    into the optic nerve sheath and produce retinal hemorrhages.

3    And this has been a subject of study for 50, 60 years and has

4    been studied in animals, primates, humans; you name it.

5           Q.   If you have increased intracranial pressure, that can

6    cause a retinal hemorrhage?

7           A.   By this mechanism, it prevents venous drainage from

8    the eye and it builds back up and hemorrhages occur.

9           Q.   Given the existence of a chronic subdural collection

10   and septic shock in this child, what are the dynamics of

11   increased intracranial pressure, and what does it mean in this

12   child?

13          A.   One thing that may be -- I'd like to make another

14   drawing, if I could, since we have paper.  We can take a look

15   at something.  Let's just for a moment diagram in very

16   elementary fashion the nervous system.  We have the ventricles

17   of the brain here and so forth; the skull here.  This would be

18   the subarachnoid space, spinal cord.  So, what we essentially

19   have is a closed system.  So, what's inside of here?  What's

20   inside of the box?  We have the brain and the water that's

21   inside the brain that makes up the tissue.  We have blood that

22   is in the blood vessels of the brain, and then we have

23   cerebrospinal fluid, which is filling all this space around.

24   So, that's the stuff that's in there.

25               Now, if you happen to have something else, which

1   could be a subdural hematoma or a cyst or brain tumor, or any

2   mass or lesion, in order for that to exist in there, something

3   has got to leave.  If the room is filled to capacity and

4   somebody else wants to get in, somebody is going to have to

5   leave to make room for that new person, and the something that

6   leaves is this, the cerebrospinal fluid.  It is produced

7   constantly, every day; you and me, about a pint a day is made,

8   and a pint a day has to be absorbed.

9            Your pressure goes up a little bit because of this

10   new -- I will just call it X, whatever it happens to be, and

11   then an equal volume of cerebrospinal fluid is going to have to

12   be absorbed to make way for that.  And we have a situation

13   which -- maybe we can diagram with a little graph here; that we

14   can say this is pressure on this axis, from zero going up, and

15   this is volume on that axis.  Now, we already know that the

16   pressure that the brain likes to operate in is somewhere --

17   let's just say it's here at about 15 millimeters of mercury,

18   and this varies somewhat.  It goes up and down, and there's

19   always a balancing effect that cerebrospinal fluid will make

20   way for.

21            Well, when you get into a situation where the volume

22   exceeds the capacity of absorption, then what happens is

23   pressure goes up.  It turns out that the way -- how much

24   capacity do we have to control this is based largely on the

25   volume of cerebrospinal fluid that there is, because if you

*(Leestma - Defendant - Direct)*                    2154

1    haven't got any, you can't absorb any.  If it's trapped in some

2    way and you can't absorb it, then you are stuck.  So, in a

3    baby, it might be around 40 to 50 milliliters.

4            Let's assume that this is in a normal situation and

5    the pressure rises and falls and does that and let's -- we

6    might use it like a bank balance.  Say you have $100 in your

7    checking account.  I hope you have more than that, but let's

8    say you have a hundred, and you write a check for $20.  No

9    problem.  The bank will pay it off.  This pressure, the

10   pressure on you financially goes up a little bit, but then it

11   comes back down.  Everything is fine.  There are no symptoms,

12   no nothing.  Let's say you write a check for another 20 or $30,

13   still okay.  You can compensate for that.  The brain

14   compensates.  This mass is getting bigger.  What if you start

15   getting real close to the hundred mark over here?  Then we have

16   a situation where a very tiny amount of increased mass, whether

17   it's due to this subdural or cyst, or maybe there's some blood

18   or maybe there's some edema, that raises that volume.

19   Sometimes in a baby, it may be as little as one or

20   two milliliters, which is about the volume of the tip of your

21   little finger.  Then we go over.  If you write a check for

22   $101, or $100.01, then all sorts of nasty things happen from

23   the bank.  You bounce a check, you get charged.  They call you

24   up, all these sorts of things.  Those could be equivalent of

25   symptoms.

*(Leestma - Defendant - Direct)*                              2155

1        So, when a child reaches a place, or anyone reaches

2   the place of capacity where this thing is too big or increased

3   in size too much, then pressure goes up; and in the ranges that

4   go up from this, the brain doesn't like it.  You will develop

5   symptoms.  Respirations will cease, vomiting, unconsciousness,

6   seizures, all sorts of things.  And once you get up this curve

7   a ways, it's very hard to go back down.  Some irreversible

8   things happen.  Your reputation is damaged because you bounced

9   a check, if you want to use that analogy.

10       This is the whole dynamic of intracranial pressure.

11   We try to operate in this general zone of equilibrium, and when

12   things change, a small amount of hemorrhage, swelling in the

13   brain, inflammation around the brain, which would retard the

14   ability to absorb cerebrospinal fluid, what happens?  Increased

15   intracranial pressure.  And if that goes up significantly, then

16   you end up with complications, like retinal hemorrhages,

17   herniation of the brain stem, pressure on the brain stem,

18   decompensation and sometimes death.

19   Q.    Can retinal hemorrhage be caused without any trauma?

20   A.    Yes.  I mean trauma -- well, how does trauma work?

21   By making a subdural, by making edema in the brain or causing

22   the heart to stop or the chest not to allow the lungs to

23   expand, and then the brain doesn't get enough blood flow, and

24   that's how you do it.  There may be several steps between a

25   traumatic injury and why increased intracranial pressure goes

*Judy A. DelCogliano*
*Official Senior Court Reporter*

*(Leestma - Defendant - Direct)* 2156

1   up, but anything that plugs into messing up this nice

2   equilibrium here will get you there.

3       Q.   Certainly, Doctor, are you aware that there are a

4   number of nontraumatic causes of retinal hemorrhage; correct?

5       A.   There are some, if there is something wrong with the

6   blood.  For example, people with leukemia may develop

7   hemorrhages because leukemia infiltrates in the retina; and if

8   you have coagulopathy, bleeding, it can occur there.  If you

9   are taking Coumadin or Heparin or something for blood thinner

10  and you have too much, you can end up with bleeding in the eye.

11  If there's chest compressions, as in trauma or some other

12  circumstances, backup of venous pressure into the eye may

13  occur, and you may end up with retinal hemorrhage.  But

14  probably the major cause, however you get there, is increased

15  intracranial pressure.

16      Q.   And would that include increased intracranial

17  pressure from meningitis?

18      A.   Sure, and almost anybody who has meningitis will have

19  some disorder of the absorption of cerebrospinal fluid, plus

20  some edema on the brain, putting a load on this biometric

21  system here, and we can call this the pressure/volume

22  equilibrium.

23      Q.   Do you have an opinion, Doctor, as to the cause of

24  this baby's retinal hemorrhage?

25      A.   I think increased intracranial pressure.  The child

1    died with a respirator brain, meaning the pressure was probably

2    up here, a hundred millimeters of mercury or more.  There's no

3    subtlety to that.

4         Q.   Thank you, Doctor.  You previously showed us some

5    pictures.  Let's talk about infection briefly.  You previously

6    showed us some slides on the T.V. with evidence of pus on the

7    brain.  Do you recall that, Doctor?

8         A.   Yes.

9         Q.   In what portion of the brain did you find evidence of

10   infection or pus?

11        A.   Virtually every place where the subarachnoid space on

12   the surface of the brain was sampled.  It varied from place to

13   place, but it was everywhere.

14        Q.   And that was an infection consistent with the

15   bacterial infection streptococcus pneumoniae?

16        A.   I sampled, I think, three sections of the cerebral

17   cortex and had them gram stained, and there were bugs in every

18   one of those.

19        Q.   And that is the bag of slides that's now in evidence,

20   Defendant's R.  Is that correct?

21        A.   I believe the gram stains and everything are in

22   there.  There they are.  They are in that plastic container.

23        Q.   This is the evidence you looked at that showed

24   infection on the brain?

25        A.   Exactly.

*(Leestma - Defendant - Direct)*                    2158

1        Q.   Besides the microscopic slides, did you see any --

2   based on your review in this case, did you see any evidence of

3   any external problems within the child's eyes that indicated to

4   you an infection?

5        A.   Yes.  In the tissues of the orbit surrounding the

6   eye, that's primarily where the worst infection and abscess

7   formation was.

8        Q.   As part of your review of the autopsy report, was

9   there an examination done of the sinuses as part of the autopsy

10  report?

11       A.   No.  By that, I mean when the brain is taken out,

12  then you have the empty skull base, and there are a number of

13  paranasal sinuses that are reachable through bone of that skull

14  base, and none of those were opened or examined.

15       Q.   And what is the significance -- or what would you

16  look for, Doctor, if you are doing an examination, what would

17  you look for in doing an examination of the sinuses?

18       A.   Well, in the face of sepsis due to this particular

19  organism, sinus infection would be way high on the list for a

20  locus where this whole thing began, and it would be appropriate

21  to open those - it takes just a few minutes - to see what's in

22  there.  And if you find pus in one of the sinuses, by direct

23  extension, that's probably how it got into the brain.  And it's

24  incumbent upon you, if you are there to try to find out what

25  went on with the child like this, you've got to collect the

─────────────────────────────────────
*Judy A. DelCogliano*
*Official Senior Court Reporter*

1   evidence, and it wasn't.

2       Q.   The autopsy report refers to macrophages being on the

3   brain.  Is that the same thing as pus?

4       A.   Yes and no.  Macrophages are scavenger cells that

5   take a few days to reach a site of injury.  There are other

6   cells that get there first called polys.  They come from the

7   blood.  And, so, the pus is really the collective of dead

8   cells, whatever they are, inflammatory cells.  There might be

9   some blood.  There's necrotic or dead tissue, fluid and

10  organisms.  So, it's the gunk that builds up in the gutters, so

11  to speak.

12      Q.   In which eye did you find evidence of bacterial

13  infection?

14      A.   I think it's in both of them, actually; more on the

15  right, tissues around the right eye that I found that.

16      Q.   Doctor, can you tell us, what is bacterial

17  meningitis?  What is meningitis first?

18      A.   Well, meningitis is an inflammation of the coverings

19  of the brain.

20      Q.   And what is bacterial meningitis?

21      A.   If it's bacteria, that's the thing that caused it.

22      Q.   Can you please explain the natural progression of

23  bacterial meningitis?

24      A.   Sure.  The process -- bacteria don't just usually get

25  there unless there's an open head wound; sometimes with gunshot

1   wounds or fractures where the skull breaks and everything is

2   contaminated, that's where -- or a sinus fracture.  Then bugs

3   can get into the coverings of the brain.  More commonly, it is

4   thought to occur hematogenously.  In other words, you will have

5   an upper respiratory infection, maybe a pneumonia, possibly a

6   sinus infection, and that somehow allows bacteria to reach the

7   blood, which then goes to every place and settles somehow in

8   the brain.  That's the common mechanism.

9             Another is direct extension, because the sinuses are

10  very, very close to the intracranial environment, and if you

11  have an abscess in a sinus, bugs can penetrate the dura and get

12  into the meninges and get into the brain that way.

13       Q.   Can someone have meningitis and sepsis at the same

14  time?

15       A.   Oh, yes.  In point of fact, they are hand in glove.

16       Q.   Did you find any evidence of bacterial meningitis in

17  the case of █████████  ███████

18       A.   Ask me that again.  I missed it.

19       Q.   Did you find any evidence of bacterial meningitis in

20  this case?

21       A.   Bacterial meningitis?  Yes, of course, all over the

22  place.

23       Q.   Can you tell the jury what that evidence is?

24       A.   Well, that is the fact that even in the gross

25  examination of the brain specimen, it looked like there was pus

1    in the coverings of the brain.  It looked creamy and green, and

2    that's the first tip off.  It isn't the end of it.  Then you go

3    to the microscopic, and there it is.  And the further

4    explanation or nail down of that fact is the fact there is

5    organisms there.  So, it looks like it, smells like it, tastes

6    like it.  I mean, that's pretty gross, but never mind.  We have

7    at least three levels of proof of meningitis in this case.

8         Q.    And how serious is a bacterial meningitis infection

9    in a four-month-old premature baby?

10        A.    Very serious.  In real young ones -- well, babies of

11   this age that are not infected with pneumococcus, but a more

12   common organism called H flu -- H flu is a more benign form of

13   meningitis that not many kids die of because it gets diagnosed

14   and is easily treatable.  Pneumococcal meningitis, on the other

15   hand, is a worse actor, and the whole survivability depends on

16   discovery and treatment.

17        Q.    Doctor, do you have an opinion, to a reasonable

18   degree of medical certainty, if trauma caused sepsis,

19   overwhelming sepsis in the case of this baby?

20        A.    Is trauma related to the sepsis?  I would say not.

21        Q.    Can you explain your opinion, Doctor?

22        A.    Well, first of all, how would a traumatic episode,

23   whatever it is, to be defined, produce bacteria?  It can't

24   produce bacteria.  How does it help to introduce bacteria into

25   a system, the blood or the brain or whatever?  Now, if you had

*(Leestma - Defendant - Direct)* 2162

1    an open head injury, that's trauma, and there's contamination.

2    That's how it could get in there.  That's the easiest way.  In

3    terms of just some traumatic episode, blows and compression to

4    the bowel and the abdomen can open up bacteria into the

5    bloodstream from the gut.  But in terms of just -- or a

6    fracture going through a sinus.  Those are about the only ways

7    that I would imagine making sense.

8         Q.   And in this case, was there any evidence of any skull

9    or nasal fracture, Doctor?

10        A.   No, no.

11        Q.   Do you have an opinion, Doctor, as to whether

12   repeated bouts of head trauma could cause this baby to

13   aspirate, therefore causing pneumonia leading to sepsis?

14        A.   Many things are possible.  It just doesn't -- the

15   evidence isn't there to enable me to start going down that kind

16   of a scenario.  It doesn't make a lot of sense to me.

17        Q.   Was there any evidence in the records you reviewed

18   that this child had any evidence of aspiration; that he had

19   aspirated?

20        A.   I couldn't find anything, and I don't think it's

21   written in the autopsy.

22        Q.   Did you find any evidence in the case of this child

23   that supports the prosecution's theory that blunt force trauma

24   caused this baby's problems?

25             MS. BOOK:  Objection, Your Honor.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

1              THE COURT:  Basis?

2              MS. BOOK:  Your Honor, he's already given his

3         opinion many times.  This has been asked and answered.

4              THE COURT:  Overruled.

5         A.   Blunt force trauma is a notoriously fuzzy, gray

6    description, but we are basically talking about an impact of

7    some sort that's not sharp and cutting and that could be

8    inflicted or accidental.  The important part of an impact

9    injury scenario is where is the impact?  What are the effects

10   of it?  And in this particular case, I'm not at all convinced

11   that there is an impact site that is a good candidate on the

12   head.  The only one that might be is this right parietal thing

13   that doesn't have any associated deep scalp bleeding to it.

14             The other things are, if it's an impact injury to the

15   head, then where is the brain injury?  This child had chronic

16   fluid collections on both sides of the brain.  The amount of

17   acute bleeding in this process is minimal; mostly posterior.

18   So, if there's a great big subdural hematoma caused by trauma,

19   where is the acute bleeding?  I don't see it.  So, we have an

20   ongoing process.  Could trauma have occurred?  I suppose so,

21   but I can't find a great big headline here in the evidence to

22   help me take that path.

23        Q.   Doctor, can you rule out, to a reasonable degree of

24   medical certainty, that trauma caused this child's death?

25        A.   I could say yes, and on the other side of it, I don't

*(Lesstma - Defendant - Direct)*                2164

1    find any persuasive evidence that head trauma was important in

2    this child's demise.

3         Q.   And Doctor, what caused the death of this child?

4         A.   What does what?

5         Q.   What was the cause of death of this child?

6         A.   Sepsis and bacterial infection that led to meningitis

7    and abscess around the eyes and bacteremia.

8               MS. EFFMAN:  No further questions.

9    CROSS-EXAMINATION

10   BY MS. BOOK:

11        Q.   Hello again, Doctor.

12        A.   Good afternoon.

13        Q.   Let's talk about --

14              THE COURT:  Do you have an issue?

15              MR. FROST:  I'm sorry to interrupt, but Ms.

16        Effman asked if she could have a couple seconds to consult

17        with me.  We are consulting.

18              THE COURT:  I thought she said no more

19        questions.

20              MS. EFFMAN:  I apologize.  I may have one or two

21        more questions.

22   BY MS. EFFMAN:  (Continuing)

23        Q.   Doctor, do you have an opinion, to a reasonable

24   degree of medical certainty, as to what caused the increased

25   intracranial pressure that caused the retinal hemorrhages in

                        Judy A. DelCogliano
                        Official Senior Court Reporter


A000002035

1    this case?

2                    MS. BOOK:  Objection.  This has been asked and

3          answered, Your Honor.

4                    THE COURT:  Hasn't it been?

5                    MS. EFFMAN:  I don't believe so.

6                    MS. BOOK:  I believe it was, several times,

7          actually.

8                    THE COURT:  I will overrule the objection, but I

9          think we are starting to ask repeat questions here.  I

10         will let him answer this question.

11         A.    Okay.  There are a number of processes that --

12   against the dynamic volume/pressure arrangement that I was

13   talking about.  The child has fluid collections over the brain

14   that may or may not be absorbable by the route of the

15   cerebrospinal fluid.  They may be walled off.  So, they may be

16   the equivalent of a big X there, which puts the capacity for

17   compensation in a baby like this over to the right-hand-side,

18   close to an overdraft.  Then we have the bacterial infection,

19   which is going to impede the amount of normal cerebrospinal

20   fluid absorption by a variety of mechanisms that are more

21   complicated than probably need to be gone into.  But increased

22   intracranial pressure is almost always present with meningitis.

23   So, we have that load on top of the fluid collections.

24                    Then once you have a situation where a child is

25   decompensating, that adds a further load due to brain swelling

*(Leestma - Defendant - Direct)*                                2166

1   and cerebral edema from the fact that the kid isn't breathing

2   very well and maybe has lung infection that impedes gas

3   transfer.  So, you start ending up with four or five mechanisms

4   that worsen the intracranial pressure environment and lead to,

5   among other things, retinal hemorrhages.

6              MS. EFFMAN:  Thank you, Doctor.  One moment,

7        Judge.  No further questions.

8              THE COURT:  Ms. Book, whenever you are ready.

9   CROSS-EXAMINATION

10  BY MS. BOOK:

11       Q.   Doctor, let's talk about you testifying as an expert

12  witness in cases.

13       A.   Okay.

14       Q.   How much of your income comes from case review and

15  possibly ultimately testifying in a case?

16       A.   At the current time, it may vary.  I'm drawing some

17  investment and retirement income that has nothing to do with

18  anything except being there.  Over and above that, in terms of

19  earned income, it may vary anywhere from 50 percent to

20  25 percent.

21       Q.   And in the past, has it been as much as 80 percent?

22       A.   There have been times when that was true, before I

23  drew a retirement income, that it could be so, yes.

24       Q.   How much did you make last year from consulting on

25  cases?

 1          A.   Probably less than $50,000.

 2          Q.   Okay.  And how many trials have you testified in so

 3    far this year?

 4          A.   Let's see.  I think four.

 5          Q.   Okay.  And the four trials that you testified in, as

 6    well as the cases you have consulted on, approximately how much

 7    have you made so far this year?

 8          A.   Let me think.  Maybe -- probably a little more than

 9    50.  I haven't gone and run the tax things yet, but it may be

10    about 60,000.

11          Q.   And you said you testified in four trials so far this

12    year?

13          A.   Yes.

14          Q.   How many of those were for the prosecution?

15          A.   None.

16          Q.   And how many times did you testify for the

17    prosecution in 2008?

18          A.   None, no times.

19          Q.   How many times did you testify for the prosecution in

20    2007?

21          A.   Zero.  I haven't testified in a prosecution case

22    since the middle 90's.

23          Q.   Okay.  Not only do you principally testify for the

24    defense, but you testify assisting criminal defendants or

25    people whose children were to be taken because of allegations

(Leestma - Defendant - Cross)                    2168

1    of child abuse; correct?

2        A.    That is the common scenario of the cases I get

3    involved in, right.

4        Q.    Okay.  And how much do you charge an hour to prepare

5    for trial?

6        A.    My regular rate, which is always negotiable, is --

7    starts at 400 an hour for out-of-court work and 600 an hour

8    when I'm giving sworn testimony at deposition, hearing or

9    trial, and that may be subject to negotiation because of the

10   Public Defender's limits, and then I have to choose whether I'm

11   going to do the case at that level or not.

12       Q.    Did you enter into a negotiation for a reduced fee in

13   this case?

14       A.    Pardon me?  I'm sorry.

15       Q.    Did you enter into a negotiation for a reduced fee in

16   this case?

17       A.    Yes.  There's a reduced fee in this case because of

18   the limitations of funding.

19       Q.    And how much are you being paid an hour in this case?

20       A.    I think it will turn out to be $250 an hour for

21   whatever I do.

22       Q.    Okay.  So, as you sit here today, how much have you

23   made so far?

24       A.    I was paid a retainer against which I worked, and I

25   think that was $2500, and I have submitted a bill for some work

                              Judy A. DelCogliano
                          Official Senior Court Reporter

 1 │ in preparation for the trial, and then we will see what the
 2 │ time works out and expenses after that.
 3 │     Q.  So, how many hours before you got here today have you
 4 │ put into this case?
 5 │     A.  I don't remember what it worked out to be;
 6 │ probably -- I mean, I have billed about 4,000.  So, whatever
 7 │ that works out to be.  That's eight hours.  Isn't that eight
 8 │ hours?  I guess.
 9 │     Q.  So, as you sit here today, you have already made
10 │ 4,000, and that's before you have testified?
11 │     A.  I have billed for the additional 1500.  I haven't
12 │ received it.
13 │     Q.  Okay.  And are you also being compensated for the
14 │ time it took you to travel here?
15 │     A.  That, I usually bill separately at the rate of $100
16 │ per hour, and that will go into my final billing and accounting
17 │ for what I did in the case.
18 │     Q.  And when you can get them, you prefer first-class
19 │ tickets, don't you, in your cases?
20 │     A.  Oh, I would love them, but I can't always get them,
21 │ and I usually end up flying coach or use miles to upgrade.
22 │     Q.  How many prosecution offices currently have you on
23 │ retainer?
24 │     A.  That I have done cases for?
25 │     Q.  Currently, do you have a retainer with any

(Leestma - Defendant - Cross)                    2170

1    prosecution office?

2         A.   No, I do not.

3         Q.   As you sit here?

4         A.   No, I don't.

5         Q.   And you have also been hired by the media before to

6    give comments on cases; haven't you?

7         A.   I have never been paid by the media, other than

8    expenses to, several years ago, to go to New York to appear on

9    one of the programs, but I have not been paid for my time.

10   They reimburse my travel.

11        Q.   Well, didn't you give an opinion to the media in a

12   civil suit indicating that a cellular phone gave a woman brain

13   cancer?

14        A.   I might have.  I don't recall.

15        Q.   And you spoke with the defense prior to coming out

16   here today; right?

17        A.   I have spoken with the defense counsel, of course,

18   yes.

19        Q.   How many times?

20        A.   Well, I don't know how many times on the telephone

21   with Mr. Frost.  Usually, Ms. Effman was in listening.  I don't

22   know; maybe four or five times on the phone.  We met in person

23   on one occasion in my office in Chicago.

24        Q.   Did Ms. Effman and Mr. Frost fly out to Chicago to

25   meet with you?

*(Leestma - Defendant - Cross)*                              2171

1      A.   They did.  I assume they flew.  I don't know how they

2   got there, but they met with me, and we met again yesterday and

3   very briefly this morning.

4      Q.   Okay.  And they told you that their theme and theory

5   of this case is sepsis; correct?

6      A.   No.  That isn't how -- in fact, that did not come

7   from them.  That came from me.

8      Q.   Okay.

9      A.   When I was asked to look at the case and see what's

10  there, this became apparent; that that was an important issue,

11  and I informed counsel of that.

12     Q.   And you know that the medical examiner in this case

13  found that ████ ███ died from severe closed head injuries

14  with a cerebral edema due to blunt force trauma.  Isn't that

15  correct?

16     A.   Words to that effect.  I'm aware that that's his

17  opinion.

18     Q.   And he ruled ████ death a homicide?

19     A.   I know that.

20     Q.   And in medical school, you were trained to write

21  reports on cases that you were involved in; weren't you?

22     A.   Well, yes.  As a medical student, you write in the

23  chart the standard dialogue of chief complaint, history, your

24  examination and conclusions, of course.  You do that all the

25  time.

*(Leestma - Defendant - Cross)*                     2172

1      Q.   And where is your report in this case, Doctor?

2      A.   I did not write a report.  I was not asked to do so.

3      Q.   Did you ask the defense if they preferred you to not

4  write one?

5      A.   I always ask, "Would you like me to write a report?"

6      Q.   Did they indicate --

7      A.   They may say yes; they may say no.  And they said,

8  "We don't think we want one in this case."

9      Q.   And did you know that if you wrote a report, it would

10 have to be turned over to the prosecution in advance of the

11 trial?

12     A.   I have no knowledge of what the rules are.  I am

13 aware that that sometimes happens.  I don't know what the

14 motivation is, not my business.

15     Q.   And have you spoken to the attorneys in this case

16 about what the witnesses who have testified before you have

17 said?

18     A.   I have had a little bit of feedback about that.  I

19 have had the transcripts of some of them.

20     Q.   Who have you read the transcripts of?

21     A.   I have read a transcript of Dr. Jenny, Dr. - I will

22 get the name right, I hope - Waldman, a neurosurgeon, the

23 transcript of Dr. Sikirica.  I think that's it.

24     Q.   Did you read Dr. Edge's testimony?

25     A.   I don't believe I was provided with that, no.

*(Leestma - Defendant - Cross)* 2173

1    Q.   Did you read Dr. Ojukwu's testimony?

2    A.   I don't recall so.

3    Q.   Dr. Kardos?

4    A.   No.

5    Q.   And when you met with the defense prior to this case,

6    did you give them an indication of what type of questions they

7    should ask you?

8    A.   Inevitably, I suppose if we are dealing with an

9    issue, I might make a suggestion that this might be a question

10   or a way to get to the answer; perhaps it might be superior

11   than the one that they put out at first.  So, we do talk about

12   that a little bit.

13   Q.   Okay.  And prior to coming here today, you already

14   testified you reviewed the autopsy report; correct?

15   A.   Ask me that again.  I missed it.

16   Q.   Prior to coming here today, you reviewed the autopsy

17   report; correct?

18   A.   Of course, I looked at the autopsy report, sure.

19   Q.   And the OB/GYN records of the mother?

20   A.   Yes.

21   Q.   And records from the birth at Albany Medical Center?

22   A.   That's right.

23   Q.   Records from the subsequent transfer to St. Mary's

24   Hospital?

25   A.   The final admission.  I mean, the key admission, yes.

```
 1           Q.   No.  I'm talking about when the babies, after five
 2      days of birth, were doing well.  They got transferred to the
 3      other hospital for another 15 days or so.
 4           A.   I think I was provided with that, but I simply don't
 5      recall right now.
 6           Q.   Do you recall if you read it?
 7           A.   Well, I don't know if I was provided with the two
 8      hospitals.  And if asked that question, how many hospitals did
 9      the kids go to, I would have said I don't remember; I don't
10      know.
11           Q.   Okay.  So, you don't have a recollection as you sit
12      here today --
13           A.   I don't have a recollection, no.
14           Q.   -- of reading the St. Mary's records from the twins
15      transfer after May 9th?
16           A.   I don't remember.
17           Q.   Okay.  And did you review the well-baby checkups?
18           A.   There were a number of those.  I certainly couldn't
19      recite the dates and times of them, but that was part of my
20      packet.
21           Q.   And you testified that you have reviewed the medical
22      records from when          was admitted to the hospital on
23      September 21st?
24           A.   For sure, right.
25           Q.   Now, did you review a one-page statement given by the
```

1    Defendant, Adrian Thomas, the child's father?

2         A.   I'm trying to recall what I was provided.  There were

3    many recitations in hospital records and in various forms about

4    what happened proximate to the child's admission.

5                   MS. BOOK:  May I approach, Your Honor?

6                   THE COURT:  Of course.

7         A.   And I simply don't recall all of those.

8         Q.   Doctor, I'm going to hand you what's in evidence as

9    People's Exhibit 15.  This is a statement given by the

10   Defendant,            father, Adrian Thomas, on 9/22 of

11   '08. Can you tell me if you have read this before?

12        A.   I don't know if I have seen this.  I don't

13   recognize -- usually, I recognize -- and if I can read the

14   handwriting.  I don't know if that's part of my package or not.

15        Q.   Okay.  Fair enough.  I'm going to show you People's

16   Exhibit 17 in evidence.  This is a ten-page statement given by

17   the Defendant, Adrian Thomas, between 9/21 and 9/23/08.  Are

18   you familiar with that?

19        A.   This doesn't look familiar, the multi-page thing.

20   It's conceivable it was part of my packet, but I don't

21   remember.

22        Q.   Is it fair to say you don't have any recollection of

23   reading that?

24        A.   I do not.

25        Q.   So, is it fair to say that you don't have any

*(Leestma - Defendant - Cross)*                           2176

1    recollection of, in the Defendant's own words, him saying that

2    he hit his baby's head against the babies' crib?

3         A.   I am aware that that's immortalized in medical

4    records from somebody else's statement, but in his own words, I

5    can't say that I read that.

6         Q.   Okay.  And are you familiar with, out of this

7    statement, the Defendant saying that he picked his child up

8    over his head and threw him with considerable force onto a

9    mattress 17 inches off the ground three times in four days?

10        A.   In various ways in the medical chart, those facts or

11   something very similar to that were reported, and I saw that.

12        Q.   But you never read it in the Defendant's own words?

13        A.   I don't recall doing so, no.

14        Q.   Okay.  And are you familiar with -- the Defendant

15   says, on the morning ▇▇▇▇▇ got sick, that he threw him back

16   into the crib at least 15 inches.  Were you aware of that?

17        A.   I don't remember the number, but that was, again,

18   recited in the medical record.

19        Q.   And Doctor, I'm going to hand you People's 18, 19, 20

20   and 21 that are in evidence.  Are you familiar with nine hours

21   worth of video?

22        A.   No.

23        Q.   Of the police interviewing the Defendant?

24        A.   No.

25        Q.   Whereby he demonstrates the amount of force he used

1    when throwing this baby?

2         A.   I have not seen that material.  I am unfamiliar with

3    it.

4         Q.   So, is it fair to say you are not familiar with the

5    Defendant's interpretation of the amount of force he used on

6    throwing his baby on that mattress?

7         A.   I am not aware of his particular words in that

8    regard, no.

9         Q.   Thank you.  Okay.  And going back to the autopsy

10   report for a moment, are you familiar with the fact that Dr.

11   Sikirica is board certified in forensic pathology?

12        A.   Yes, I am.

13        Q.   And that he took that extra year of schooling and

14   training?

15        A.   Yes.  Usually, a year fellowship is required.  He

16   must have done that.

17        Q.   And that Dr. Sikirica inspected ███████ ████ in

18   person head to toe.  Are you familiar with that?

19        A.   I hope so.  He did the autopsy, yes.

20        Q.   And that he prepared the slides?

21        A.   He prepared the autopsy report and everything that

22   came with it.

23        Q.   Okay.  So, when you were showing the slides on the

24   video earlier, you said that we did that in this case; we took

25   these cuttings from slides.  Did you mean Dr. Sikirica did

*(Leestma - Defendant - Cross)*                     2178

1      that?

2           A.   I assume he did so.  Sometimes that's the job of the

3      helper in the morgue, but he's responsible for it, and I would

4      say -- there it is.

5           Q.   So, when you say "we," you didn't mean --

6           A.   Well, I didn't select them.  They were provided to me

7      by way of the Medical Examiner's Office through counsel and a

8      FedEx or something to me.

9           Q.   Okay.  And you are aware that Dr. Sikirica signed the

10     death certificate?

11          A.   I'm sure he did.

12          Q.   And are you aware that he performed this autopsy on

13     September 25th but didn't prepare his final report until the

14     end of April?

15          A.   There were some months that elapsed.  I'm aware of

16     that.

17          Q.   And did you know that, during that time, he was

18     waiting for cultures to come back from Samaritan Hospital?

19          A.   I don't know.  I recall that there was some question

20     about, maybe in the transcript, of why the delay, and I think

21     he said there were some delays in laboratory reports.  I have

22     no personal knowledge of that.

23          Q.   Okay.  And did you know that he was taking the time

24     to review all the medical records of the child?

25          A.   I don't know that.  I don't know what he was doing.

1          Q.   Did you know that Dr. Sikirica took the time to read

2     the ten-page statement and the one-page statement of the

3     Defendant?

4          A.   I don't know what he examined or what he took the

5     time to examine.

6          Q.   Okay.  Did you know that Dr. Sikirica examined the

7     statement given by the child's mother, Wilhemina Hicks?

8          A.   I have no idea what other materials, outside of the

9     objective examination, he examined.

10          Q.   Well, isn't that listed in the autopsy report,

11     Doctor, everything that he examined?

12          A.   No.  He didn't say, "I examined all these records

13     from birth to death."  I don't believe that those things are

14     immortalized there, but it does say what tissues he examined,

15     what parts of the body he examined, what he took for

16     microscopic preparations.  That's all in the report.

17          Q.   And did you read the statement given by Wilhemina

18     Hicks, the child's mother?

19          A.   I don't believe so.

20          Q.   And would you agree, Doctor, that if you had the

21     opportunity to assess ▮▮▮▮▮ in person, that would be the

22     preferred way to go about conducting an autopsy?

23          A.   Well, sure.  Then I could select what I wanted to

24     have sampled, photographed and all of that.  That's obviously

25     the best.

A000002050

1      Q.   Okay.  So, Dr. Sikirica had a bit of an advantage,
2    let's say?
3      A.   He had the advantage to do it and the responsibility
4    that went with it.
5      Q.   Now, let's talk about your testimony in some of these
6    prior cases for a moment.  It's common that you testify
7    regarding preexisting head injury; isn't it?
8      A.   When it's present, I testify to it, yes.
9      Q.   And in a large percentage of cases that you have
10   testified in in the last ten years that involved a subdural
11   hematoma, you found a preexisting one; have you not?
12     A.   It's surprising that maybe 75 to 80 percent of the
13   cases that I come to -- that find their way to me - I don't
14   know how they do that - that there may be a subdural, and
15   there's some element of chronicity in it.
16     Q.   So, 75 to 80 percent of the cases you testify in, you
17   find a preexisting subdural hematoma?
18     A.   Yes, ma'am, I did.
19     Q.   That none of the other medical examiners find?
20     A.   Not necessarily.
21            MS. EFFMAN:  Objection, repetitive.
22     A.   Not necessarily.
23            THE COURT:  Hold on.  There's an objection.  The
24        objection is sustained.
25     Q.   And you have testified in the nanny case in Boston;

 1    correct?

 2         A.   I did.

 3         Q.   Very high profile case?

 4         A.   It was a very notorious high profile case, yes.

 5         Q.   And Louise Woodward was on trial for the death of a

 6    child in her care; correct?

 7         A.   That's correct.

 8         Q.   ███████ █████

 9         A.   That's the name of the baby.

10         Q.   And in that case, you found a preexisting head

11    injury; correct?

12         A.   I did.

13         Q.   And then, Doctor, isn't it true that you turned

14    slides over, that you had received from the prosecution, over

15    to a woman by the name of Katie Leachman, who was a reporter

16    for *60 Minutes*?

17         A.   I don't know what her assignment was.  I did that.

18    She requested the materials, and with the consent of the

19    attorneys that were involved at the time, I -- they said they

20    had no objection to it and, therefore, I did.

21         Q.   And the case was over at that point; right?

22         A.   The case was over.

23         Q.   So, you weren't still being retained by the

24    attorneys; correct?

25         A.   Correct.

1          Q.   And you turned these slides -- essentially, you

2     turned a part of this dead baby over to the media.  Is that

3     correct?

4          A.   I don't know how to comment about that.  I mean,

5     slides are --

6          Q.   Did you, Doctor?  Is it a part of the baby?

7          A.   The slides are actual tissues of the individual,

8     however you wish to define it.  Those materials were, with the

9     consent of the attorneys who hired me, given to Ms. Leachman.

10         Q.   And, obviously, the parents in that case were pretty

11    outraged about that; weren't they?

12         A.   I don't --

13              MS. EFFMAN:  Objection, relevancy,

14         argumentative.

15              THE COURT:  Sustained.

16         Q.   And did you know that you were criticized by medical

17    ethicists about your decision to do that?

18              MS. EFFMAN:  Objection, argumentative.

19              THE COURT:  Overruled.

20         Q.   Is that a yes, Doctor?

21         A.   I don't know.  This was a very high profile case that

22    had many tempers running high, and there were a number of

23    people that were criticizing me essentially for being a defense

24    witness and the content of the material that the case involved,

25    and I don't know how many of them were ethicists or otherwise.

1        Q.   Would it surprise you if I told you that medical

2    ethicists criticized your decision to turn over slides to the

3    media?

4        A.   I don't know which medical ethicist this is, whether

5    that's an appropriate qualification or not.  I don't know.

6        Q.   And for that case, Doctor, after you turned the

7    slides over, would it be fair to say that you got more media

8    coverage; that you got interviewed on television?

9                   MS. EFFMAN:   Objection, relevance.

10                  THE COURT:   Overruled.

11       A.   There was a great deal of media coverage after and

12   during the trial.  Of course, during the trial, there was no

13   way that I could comment.  Afterwards, there were a number of

14   interviews and media of all sorts regarding that, and I gave

15   interviews and provided information.

16       Q.   And these interviews also continued to take place

17   after you turned over these slides to the media; correct?

18       A.   Certainly, yes.

19       Q.   And you were compensated between 60 and $70,000 for

20   that trial; weren't you?

21       A.   Lord, I don't know.

22       Q.   Would it surprise you if I told you you testified to

23   that before?

24       A.   I simply don't remember.  It could be.  I doubt that

25   it was 70, but there were two legal exercises, the criminal

A000002054

1    trial, and then there was a civil exercise that I never

2    testified to but did do an extensive deposition.  So, I guess

3    if you lumped all of the time and everything, it could reach

4    that.

5         Q.   And that was ten years ago; right?

6         A.   I guess it was now.

7         Q.   And you testified in a case where a John Pozefsky

8    (phonetic) was on trial for the aggravated murder of his infant

9    daughter, an Ellie Pozefsky.  Do you recall that?

10        A.   You got to give me a little more.  What city, what

11   state, where?

12        Q.   Sure.  You testified that Pozefsky, 30, who was on

13   trial in Cuyahoga County Common Police Court for an aggravated

14   murder of the March 29th death of his infant daughter -- and

15   this was written in 1999.  Do you recall that?

16        A.   This would have been -- in what county or

17   jurisdiction?

18        Q.   In Cuyahoga County?

19        A.   Cuyahoga County.

20        Q.   Ohio?

21        A.   Ohio, yes.  Okay.  I barely remember -- I remember

22   the name, and I remember being there, but not much else.

23        Q.   Well, do you recall that John Pozefsky, who was on

24   trial for the aggravated murder of his infant daughter, you

25   testified that she died from a birth complication, not from

1    blunt force trauma?

2         A.   I don't remember.

3         Q.   You don't remember?

4         A.   I do not remember the facts of the case.

5         Q.   If I showed you a newspaper article, would that help

6    you?

7         A.   This is a case that, like everything else, took hours

8    and hours of preparation.  I was on the stand probably several

9    hours.  This is more than ten years ago or about ten years ago.

10   A one-pager would not help me recover the substance of the

11   case.

12        Q.   All right.  Well, do you disagree with me that you

13   may have found a birth complication and not blunt force trauma?

14        A.   If you say so, that may be so.  I simply don't

15   remember.  When the cases are over, there are plenty of others

16   that come along.  There's lots of other work going on, and I

17   tend not to retain, unless it's an accident somehow, the

18   individual details, and I certainly wouldn't want to be held to

19   details on that one.

20        Q.   Okay.  Well, Doctor, as you sit here today, in the

21   last five years, in cases you testified in that have involved

22   the issue of a subdural hematoma, can you tell me the name of a

23   case where you did not find an existing subdural hematoma?

24        A.   No.  I can't remember.  I mean, I have said maybe 75,

25   80 percent do have some underlying aging on the lesion, but I

1       simply can't, with all those cases, recall the names and dates

2       and places like that.  My memory is not that good.

3            Q.   Thank you.  You answered my question.  Is it fair to

4       say your specialty is in the area of diseases of the central

5       nervous system?

6            A.   Correct.

7            Q.   And a lot of your work is looking at areas such as

8       tumors, viruses, epilepsy and the nervous system?

9            A.   That's fair.

10           Q.   Is that fair to say?

11           A.   Yes.

12           Q.   And you have not written many articles dealing with

13      the treatment of children who are the victims of abuse; have

14      you?

15           A.   The treatment?  Certainly not.

16           Q.   And, in fact, of the 105 articles that are listed on

17      your CV, only four of them have the word "children" in the

18      title.  Would that be fair to say?

19           A.   Lord, I don't know.  I have certainly written --

20           Q.   Would you like an opportunity to review?

21           A.   Let me look at it.  The titles of the articles?  I

22      don't know.

23           Q.   Actually, let me get the one that is in evidence.

24                MS. BOOK:  Judge, may I approach?

25                THE COURT:  Of course.

1      Q.   Doctor, if you could look over your 105 articles for

2    a moment and tell me how many of them have the word "children"

3    or "infant" or "baby" or "pediatric" in the title?

4          A.   There's an article, or Citation 99, 2006, talking

5    about the shaken baby syndrome, confessions and admissions.  It

6    says "baby" in there, but it doesn't say child.

7          Q.   So, that's two.

8          A.   Then there's 98, which is "Case analysis of brain

9    injured, admittedly shaken babies" -- Or "infant," and that

10   doesn't have the "child" in it, but it's a baby.

11         Q.   I'm asking about the ones in the title, Doctor.

12         A.   "Occult/asymptomatic cranial injury in infancy."

13   That's one.  Well, there's one that goes way back on renal cell

14   cancer in children.  That would be 1970.

15         Q.   So, did you find four, Doctor?

16         A.   I think that's probably it.

17         Q.   Okay.  So, four of 105 articles that you have written

18   have the word "children" in the title?

19         A.   Children, infant, babies in the title.  That does not

20   talk about the content.

21         Q.   And you have never written about recognizing and

22   treating children with head injuries; have you?

23         A.   No.  I'm not a treating physician.  That isn't what I

24   write about.

25         Q.   Right.  Because you never have treated a child during

1    your career; correct?

2         A.   With head injuries, I have no memory, beyond medical

3    school, of having done so.

4         Q.   ·Okay.  And when you come to work day in and day out

5    now since you have retired, you don't look at CT scans of a

6    child, unless they are dealing with a case you have been

7    retained in; correct?

8         A.   That's usually the circumstance.  I always request

9    imaging studies, and many times they are available, and I read

10   them.

11        Q.   All right.  And when was the last time you performed

12   a life saving effort on a child?

13        A.   A what?

14        Q.   Life saving efforts on a child?

15        A.   Never.  I have never done that.

16        Q.   And is it fair to say you never met ▬▬▬▬ ▬▬▬▬

17        A.   I never did.

18        Q.   You never treated him?

19        A.   I never saw him, didn't know him.

20        Q.   And you didn't make cuttings in ▬▬▬▬ brain?

21        A..  I did not.  He was not available.

22        Q.   Doctor, would you agree with me that you previously

23   wrote the following:  "It is sometimes an issue at trial, often

24   exploited by defense attorneys, that the apparent lack of

25   external evidence of an injury in connection with a massive

```
 1    intracranial trauma somehow correlates better with an

 2    accidental injury, rather than a willful one.  This

 3    interpretation is fallacious and should not be conceded."  Did

 4    you previously write that, Doctor?

 5         A.   If you would tell me where that appeared, I would

 6    agree with you.

 7         Q.   It appeared in your first edition of Forensic

 8    Neuropathology.

 9         A.   That doesn't surprise me.

10         Q.   At Page 338.

11         A.   Yes.  It's possible I wrote that, yes.

12         Q.   Okay.  Now, let's talk about the retinal hemorrhage

13    in this case.  You have never been declared an expert in

14    dealing with treatment of the eyes; correct?

15         A.   No.  I'm not an ophthalmologist.  I never did any of

16    that.

17         Q.   Never treated a patient for an eye disorder?

18         A.   As a medical student, but not in a normal

19    circumstance.

20         Q.   So, some 45 years ago, perhaps, but not subsequently?

21         A.   Probably.  I guess my kids had conjunctivitis.  I

22    maybe gave them some eye drops.  That's it.

23         Q.   Okay.  So, forty-five years ago or a member of your

24    family; correct?

25         A.   That's right.
```

1     Q.   Are retinal hemorrhages indicative of child abuse?

2     A.   No.

3     Q.   Well, have you previously testified that they are

4     highly correlative of child abuse?

5          A.   There is a strong correlation in abusive head injury

6     in children.  A large percentage of these babies will have

7     retinal hemorrhages.  I have written about it.  I may well have

8     testified about that.

9     Q.   So, in fact, when you have a child abuse case, you

10    are much more likely to find retinal hemorrhaging than when you

11    don't have a child abuse case.  Is that correct?

12         A.   I don't know that that's true.  Certainly, in the

13    known abuse cases, the instances of retinal hemorrhages in some

14    series is a hundred percent.  The issue comes of how do you

15    know it's an abusive injury.  Then you have other cases, again,

16    by the same token, how do you know what it really is; but the

17    fact is pediatric head injury is attended by a very high

18    percentage of infants that have retinal hemorrhages.

19    Q.   Doctor, do you previously recall, in the People v.

20    Morinda case in 2004, you were asked by the prosecutor:  "Okay.

21    So, in fact, when you have a child abuse case, you are much

22    more likely to find retinal hemorrhaging than when you don't

23    have a child abuse case?"  And you answered:  "Yes, with

24    cranial head injury in infancy, yes, that's true."

25         A.   Using the literature reports, that would probably be

```
 1    so, yes.

 2        Q.   And in this case, it would be fair to say that we

 3    have extensive retinal hemorrhaging; right?

 4        A.   I think that is so, yes.

 5        Q.   In both eyes?

 6        A.   I believe it, yes.

 7        Q.   Let's talk about how you age subdural hematomas for a

 8    moment.

 9        A.   Okay.

10        Q.   You age subdurals based on studies of adult brains.

11    Would you agree with that?

12        A.   The study that provides a microscopic road map to do

13    that was done on, I think, 151 adult subdural hematomas whose

14    age was known.

15        Q.   Okay.

16        A.   And no comparable study has ever been done in

17    children.

18        Q.   No comparable study has ever been done in children?

19        A.   Or published.  Now, that doesn't mean that those of

20    us who are looking at material like this aren't constantly

21    trying to find cases that there is a time frame to weigh the,

22    you know, the veracity of the method to see if it's way off

23    somewhere or if it's on the money, so to speak, and I haven't

24    found that it is.  I haven't found anything to throw that

25    method out the window.
```

*(Leestma - Defendant - Cross)*                              2192

1          Q.   Okay.   So, you haven't found anything to indicate

2     that a child's brain -- that you could age subdurals of a

3     child's brain the same way you could have in an adult's brain?

4          A.   I think it would be very, very close.

5          Q.   All right.  So, would you agree with me, Doctor, that

6     an adult's brain and a child's brain is not really similar?

7          A.   There are many, many differences, of course; whether

8     that translates down to how fast healing processes in the dura

9     work, I'm sure that has to be resolved yet.

10         Q.   And a child's brain is much more fragile.  Would you

11    agree with that?

12         A.   It depends what you mean.  In some respects, a

13    child's brain is more resilient to insults than an adult, and

14    we need more, you know, more definition of what you are talking

15    about.

16         Q.   Well, would you agree with me that a baby's skull is

17    not formed after birth?

18         A.   That's true.

19         Q.   Sutures are opened up?

20         A.   It's softer.  It's malleable.  The sutures can open;

21    adult's cannot.

22         Q.   So, that's a difference; right?

23         A.   Yes, it is.  There are many differences.

24         Q.   And there's no hard scientific data to suggest that a

25    baby's brain clots at the same rate as an adult brain, other

*(Leestma - Defendant - Cross)*                     2193

1    than your own anecdotal experience.  Is that correct?

2          A.   Ask me that question again.

3          Q.   Sure.  There's no hard scientific data to suggest

4    that a baby's brain clots at the same rate as an adult brain,

5    other than your own anecdotal experience; correct?

6          A.   That it clots, C-L-O-T-S?

7          Q.   Yes.

8          A.   Well, a brain doesn't clot.  I don't know what we are

9    talking about.  I'm confused by that.

10          Q.   All right.  Maybe I can clear this up a little bit.

11    Do you recall, in the People v. Morinda case, you were asked:

12    "And there's absolutely no good, hard scientific data to

13    suggest that a baby's brain clots in the same -- at the same

14    rate as adult brain, other than your own sort of anecdotal

15    experience?"  And you answered:  "I'm unaware of any studies

16    that have used baby's subdurals and approached it the same way,

17    to applying, dating and applying characteristics on it.  I

18    mean, people do it all the time, but it's not published in

19    quite the same way.  You are right."

20          A.   I see where you are getting to.  The question was

21    posed in a confusing way.  The things that produce subdural

22    hematomas in adults and older people tend to be of a different

23    character than we see in children, and the mechanisms are

24    probably quite different.  This is data that's emerging now,

25    new studies that are going on.  So, there are some important

*(Leestma - Defendant - Cross)*                    2194

1    differences.  In terms of the healing process, the aging and

2    dating process, there are certain limits that cells, regardless

3    of whether they are in adults or old people or young, can only

4    do things so quickly.  And how accurate, what the variation is

5    in the aging and dating for infantile subdurals and adults has

6    yet to be defined, but it is probably not going to be

7    unexpected.

8            In other words, if we say, "You see these things in

9    the slide," and it means that the clot is three to five days

10   old, to suddenly put it way out of that frame or way before it

11   in children, I have not seen any cases that would cause me to

12   say it's remarkably different.

13       Q.  But Doctor, with respect to a baby's brain, you are

14   working on an assumption.  Is that not correct?

15       A.  We have to extrapolate the data we have and do the

16   best we can, and I have no reason to say, "Throw all the data

17   out the window.  I don't know what to do."

18       Q.  But Doctor, you are working on an assumption;

19   correct?

20       A.  Yes.

21       Q.  Now, let's talk about your new book for a moment.  On

22   Page 273 of your new book, under "subdural hematoma and

23   subdural infusions," you have written, "neonatal subdural

24   hematoma is said to be uncommon to rare with only nine cases

25   reported as of 1978."  Is that published there?

1      A.   That's what I wrote, yes.

2      Q.   And you went on to say, "but others have indicated

3   that subdural hematomas, often in the posterior fossa, though

4   uncommon, are not rare"?

5      A.   That's right.

6      Q.   So, Doctor, is it fair to say that neonatal subdural

7   hematoma is, at best, uncommon?

8      A.   Yes, at best.  It turns out that there's been recent

9   publications that have studied that, and it appears it's a lot

10  more common than we thought, and some of that might supplant

11  that.  I don't know what the most recent --

12     Q.   This book was published in 2009; was it not?

13     A.   Yes.  It was published in 2009, but the writing of

14  this goes back a couple of years.  You can't always have

15  everything.

16     Q.   Okay.  Well, this was put out this year, though;

17  right?

18     A.   Yes.  It was available in November, but they say

19  2009.  So, that's it.

20     Q.   And it goes on to say that, "in most cases, most such

21  cases occur in connection with difficult deliveries involving

22  the use of forceps, vacuum extraction and cesarean sections

23  performed once the birthing process has begun"?

24     A.   Those were important risk factors that were known

25  then, and some additional ones have appeared since.

*(Lesstma - Defendant - Cross)*                                    2196

1          Q.   Did you know that ▮▮▮▮ ▮▮▮▮ mother, Wilhemina

2     Hicks, said he was born a vaginal delivery?

3          A.   That's correct.  That's what I understand.

4          Q.   And then it goes on to say, "a typical history is a

5     difficult delivery with the infant appearing intact at birth,

6     but then, in the course of hours or days, deteriorating."  Does

7     it say that?

8          A.   That's a common scenario, correct.

9          Q.   We don't have any evidence of ▮▮▮ in a matter of

10    hours or days, deteriorating; do we?

11         A.   No.

12         Q.   And you go on to say that, "surgical intervention may

13    be life saving."  ▮▮▮ didn't need to have any surgery here,

14    now; did he?

15         A.   No.

16         Q.   And you say, "subdural bleeding may be acute and

17    produce immediate symptoms, including seizure, coma,

18    respiratory distress and death."  We didn't have evidence of

19    any of these here; did we?

20         A.   No.  He didn't present that way in the neonatal

21    period, no, not at all.

22         Q.   And then you go on to say a few sentences down,

23    "episodes of bleeding evolve slowly and only eventually,

24    usually within a few weeks."

25         A.   That's right.

*(Leestma - Defendant - Cross)*                    2197

1       Q.   "Produce symptoms, which can include all of the

2   above, as well as paralysis, abnormal movements and reflexes,

3   nausea and projectile vomiting"?

4       A.   That's often how they present when they do.

5       Q.   Okay.  So, first of all, ▇▇▇▇▇▇ didn't present

6   anything within a few weeks; did he?

7       A.   Not until he was four months old, no.

8       Q.   And he never had symptoms of paralysis; did he?

9       A.   He didn't present that way.  He presented unconscious

10  and comatose and not breathing.

11      Q.   Fair to say he didn't exhibit any of these symptoms;

12  right?

13      A.   Well, he didn't present with paralysis or seizures.

14      Q.   And -- I mean, the way I heard it on your direct

15  case, it sounds like this was a pretty sick baby; right?

16      A.   A very sick baby.

17      Q.   Who had some unusual complications?

18      A.   A very sick baby on admission at the age of four

19  months.

20      Q.   Well, from what I hear, Doctor, it sounds like he was

21  a pretty sick baby since he was born?

22      A.   I don't have that.  He remained in the hospital for a

23  period of time, which is typical, and was treated for possible

24  sepsis, which apparently he didn't have.  I don't know how sick

25  a baby he was, enough that the hospital wanted to keep him for

*Judy A. DelCogliano*
*Official Senior Court Reporter*

*(Leestma - Defendant - Cross)*                    2198

1    a while.

2         Q.    You say he had layers upon layers upon layers of

3    these subdural hematomas.  They are not healthy; are they?

4         A.    That's right, that took months to develop, long after

5    this child was released from the hospital.

6         Q.    And if I heard it correctly on direct, you said that

7    ▆▆▆▆▆▆ had had a heart attack about a month before the

8    autopsy?

9         A.    Histologically and microscopically in the heart, yes,

10   I would say so.

11        Q.    So, this baby had a heart attack around three months.

12   Is that your testimony?

13        A.    At least that, yes, maybe before.

14        Q.    And you know on September 13, 2008, Wilhemina Hicks

15   took her baby to the emergency room because he had a slight

16   rash on his face; right?

17        A.    I don't remember that.  I don't know.

18        Q.    Okay.  Well, wouldn't it be fair to say, if this

19   child experienced a heart attack, someone was going to take him

20   somewhere?

21        A.    There's a lot of damage that occurs, and heart

22   attacks occur and nobody knows they occurred.

23        Q.    Do you agree that it is a fact that the vast majority

24   of seriously head injured infants and children, when automobile

25   and other major accidental trauma can be ruled out, acquired

1    their injuries as a result of abuse?

2         A.   I wrote that in the earlier edition of my book, and

3    similar statements have been revised to take a broader view of

4    those things.

5         Q.   Well, you've said that in the past; haven't you,

6    Doctor?

7         A.   Pardon me?

8         Q.   You have said that in the past, though; haven't you,

9    Doctor?

10        A.   I have, sure.

11        Q.   The vast majority of these children were abused.

12        A.   That is what I said.   I would not write that today,

13   and I haven't written it today.

14        Q.   Would you agree that, as a general rule, most

15   children don't die from intracranial bleeding associated with

16   vaginal birth?

17        A.   That's true.

18        Q.   And most children who do experience intracranial

19   bleeding are asymptomatic; correct?

20        A.   That's true.

21        Q.   And that means they don't exhibit any signs or

22   symptoms of this intracranial bleeding; correct?

23        A.   That's correct.

24        Q.   And most of these children, they clear up on their

25   own without any type of medical intervention; correct?

Judy A. DelCogliano
Official Senior Court Reporter

A000002070

*(Leestma - Defendant - Cross)*          2200

1       A.   They appear to solve their problems themselves

2    somehow.  Some don't, but most do.

3       Q.   And if they do rebleed, how often is it clinically

4    significant?

5       A.   Well, it's hard to -- it becomes clinically

6    significant when you've got somebody -- a baby coming in with

7    symptoms that then are worked up and are shown to be subdurals

8    and bleeding and so forth.  That's clinically significant.

9    They don't know that until they have actually been discovered.

10      Q.   All right.  Well, if 25 or 40 percent of children are

11   born with intracranial bleeding, is it a fact that most of

12   those are never clinically significant?

13      A.   Quite correct.

14      Q.   And normally, they wouldn't impact the child at all;

15   right?

16      A.   Well, as far as we know.  They seem to pass through

17   this period and -- the only way we know there's percentages

18   like that is studies where ultrasounds and CT scans and other

19   things have been done on a general population, to pick them up,

20   and that's how we would know that there are that many.  We

21   wouldn't know otherwise.

22      Q.   Here again, Doctor, is it fair to say you are sort of

23   working on an assumption?

24      A.   Right.

25      Q.   And you say that they can bleed with minor trauma or

1    no trauma; right?

2        A.   Say that again.  I'm sorry.

3        Q.   That intracranial bleeding or subdural hematomas,

4    they can rebleed with minor trauma or no trauma; correct?

5        A.   True.

6        Q.   And when an infant is first born, they have a very

7    wide anterior fontanelle; correct?

8        A.   Most do, yes.

9        Q.   And that's right up here (indicating)?

10       A.   Correct.

11       Q.   And it makes the top part of the brain pretty easy to

12   view on an ultrasound; does it not?

13       A.   Yes.  Quite frequently, that's where they will do

14   this.  The ultrasonic instrument will be put up there, and that

15   means, then, you are not having to look through bone to get a

16   look at the brain.

17       Q.   Okay.  And you even said on direct that that's

18   usually the method that people use when a newborn gets one

19   done; correct?

20       A.   Yes.  There's lots of variation in instrument and the

21   technology and the competence and all that.  These are not

22   uniform studies, by any means.

23       Q.   Okay.  And           had one of those done; right?

24       A.   He had one of these done - for whatever reason, I'm

25   not clear - but it was negative.

1        Q.   No intracranial bleeding?

2        A.   Pardon me?

3        Q.   No intracranial bleeding; correct?

4        A.   Well, that's what the report says.  They found

5   nothing wrong.

6        Q.   No subdural hematoma; correct?

7        A.   They didn't say that.  They just said this is a

8   normal study.

9        Q.   Well, wouldn't that imply, then, that there are no

10  subdural hematomas?

11       A.   That would be implied, but not necessarily so,

12  because we know there's an error rate.  They just say it's a

13  normal study.

14       Q.   Okay.  And this was done ten days after his birth;

15  right?

16       A.   That's about right, yes.

17       Q.   Okay.  And where were the majority of ███████

18  subdural hematomas located at his autopsy?

19       A.   Everywhere.  He had them all over the hemispheres of

20  the brain, the base of the skull, virtually everywhere.

21       Q.   Fair to say up here, as well, on his anterior

22  fontanelle?

23       A.   Everywhere, everywhere.

24       Q.   So, that would have been pretty easy to see on an

25  ultrasound; wouldn't it have?

1      A.    That would be -- you can see all of these on the CT.

2   And as I said, they are everywhere.

3      Q.    Doctor, did you plot out on a growth chart the growth

4   of             head from birth until his admission on

5   September 21st?

6      A.    I didn't have those numbers. I had the numbers

7   that -- it was 49 and something inches, which I think is kind

8   of big, for the autopsy.

9      Q.    Well, did you review in Dr. Jenny's testimony that

10   she did, in fact, plot out the infant's brain on a growth chart

11   from birth until September 21st, and that until that hospital

12   admission, his growth rate was appropriate and normal?

13      A.    That I would like to see. I don't recall seeing

14   that. That's something I often look for, because children with

15   problems like this often do have an increasing head

16   circumference, and I just don't remember.

17      Q.    I don't have Dr. Jenny's testimony, but I know you

18   did. Do you recall seeing that in there?

19      A.    I do not. I can't recall it.

20      Q.    Well, would you expect to see an increased growth

21   rate if there was, in fact, a growing subdural hematoma inside

22   the infant's brain?

23      A.    I would expect to see that. Some children somehow --

24   either the brain is shrunken, and somehow head enlargement is

25   not needed to compensate. I don't have a good explanation, but

*(Leestma - Defendant - Cross)* 2204

1    when you see children with CT scans that look like that,

2    usually their heads are in the 95th percentile of

3    circumference.

4        Q.   Oh, well, on the day that that was taken, certainly,

5    Dr. Jenny said his head was larger on that date, on

6    September 21st, but up until that event, it was growing at a

7    normal rate?

8        A.   I don't know that, and that is a piece of information

9    I would like to know.

10       Q.   So, that would be pretty unusual, if he had these

11   subdural hematomas since birth, that it would be growing at a

12   normal rate until September 21st; right?

13       A.   I don't know that you could say that.  I would say I

14   would, more likely than not, expect the head, wherever the kid

15   was born, on the 50th percentile or 30th or whatever happened,

16   you should ride that curve or stay pretty close to it.  And

17   most of the kids that have what this kid did would traverse

18   that; they would accelerate head circumference growth at the

19   expense of something else.

20       Q.   Okay.  You would agree he would have a bigger head?

21       A.   I would expect that.

22       Q.   And if someone did have an existing subdural

23   hematoma, you would agree that a greater intensity of trauma

24   could lead to a greater chance of a rebleed.  Is that correct?

25       A.   Children with these fluid collections appear to be

1     more vulnerable to head trauma than those who don't have them

2     and, therefore, the propensity for additional bleeding and the

3     symptoms that come from that.  There have been cases talked

4     about and reported like that.

5          Q.   So, your answer is yes?

6          A.   Yes.

7          Q.   Okay.  And is it common that people with significant

8     head trauma develop complications?

9          A.   Yes, always.

10         Q.   Okay.  And would you agree with me that the brain

11    sends messages through the central nervous system?

12         A.   Well, that's what it does.  The brain generates

13    nervous impulses and processes information coming in and sends

14    impulses going out, enabling you to move and do all of that.

15    Yes.  That's what the brain does.

16         Q.   So, the brain is probably very important in the

17    function of your body; correct?

18         A.   Yes.  You can't -- if you don't have one, you are not

19    alive.

20         Q.   Right, exactly.

21         A.   You are dead.

22         Q.   Exactly.  So, if you were to have trauma in your

23    brain, obviously, that's going to decrease your body's ability

24    to work.  Is that correct?

25         A.   It depends on what stresses you are talking about.

A000002076

(Leestma - Defendant - Cross)                           2206

1    If there's brain damage, quite clearly, the organisms' ability

2    to respond to stress would be diminished, but it can be in very

3    specific ways and not necessarily general ways.  So, we would

4    need more information to go further with that.

5         Q.   But generally, you would agree with that statement;

6    wouldn't you?

7         A.   Again, I can't be nonspecific.  I deal in the world

8    of specifics.  So, I'm saying, if the brain doesn't work, you

9    are diminished; obviously, you are, but in not always

10   predictable ways.

11        Q.   You agree diminished?

12        A.   Okay.

13        Q.   Okay.  And is it common that someone with a head

14   trauma might develop pneumonia?

15        A.   Yes.  If their level of consciousness and functioning

16   is impeded, they can, especially if they can't cough.

17        Q.   Right.  Because if you were --

18        A.   If they can't --

19        Q.   I'm sorry, Doctor.

20        A.   If they can't cough and protect their airway, they

21   would be vulnerable to pneumonia.

22        Q.   Okay.  And, again, if you do lose that period of

23   consciousness and you become more vulnerable, Doctor, isn't it

24   possible that you could aspirate?

25        A.   Of course.

                              Judy A. DelCogliano
                          Official Senior Court Reporter


                              A000002077

1        Q.   And if you aspirate, it's possible that you are not

2    going to be able to clear your airways.  Isn't that correct?

3        A.   That's possible.

4        Q.   And that you might be more susceptible to bacterial

5    diseases or anything else?

6        A.   That's true.

7        Q.   Okay.  And you agree with me that, if someone is on a

8    ventilator for two days, they're certainly most likely going to

9    develop pneumonia?

10        A.   Many individuals who are on artificial ventilation

11    will develop some element of pneumonia while on artificial

12    respiration.  They will.

13        Q.   And new trauma could potentially lead to fresh

14    bleeding around the edges of a subdural hematoma --

15        A.   Yes.

16        Q.   -- that wasn't damaged before?

17        A.   Yes.  That's true.

18        Q.   So, even if you did, let's say, have an existing

19    subdural hematoma, new trauma could cause new fresh bleeding?

20        A.   That's been demonstrated.

21        Q.   Okay.  And in an area where it wasn't damaged before;

22    correct?

23        A.   It's conceivable.

24        Q.   And it's medically possible to have both a fresh

25    bleed and a rebleed at the same time; correct?

A. I wouldn't disagree with that. That's okay.

Q. And you say a baby thrown onto a soft mattress, that's not enough force to cause a subdural?

A. It appears not. As I said before, these kinds of scenarios have been measured and peak G-forces have been measured and compared with injury threshold and appears below those.

Q. But you are not a biomechanical engineer, now; are you?

A. I am not, no.

Q. And you would agree with me that there's no studies of infants thrown onto a bed to test this theory; correct?

A. As living babies, no.

Q. So, again, Doctor, would you agree with me that, again, you are working on an assumption?

A. We are using the best knowledge and statistical information that we have, and I'm just saying that the thresholds or the peak G-forces that can be generated by scenarios you have talked about do not appear to be sufficient to produce a subdural hematoma.

Q. But again, Doctor, this was never tested on real infants, obviously?

MS. EFFMAN: Objection, asked and answered.

THE COURT: Overruled.

Q. Correct?

1          A.    One has to be careful about assumptions.  You just

2     say what evidence do we have to go one step further and make a

3     statement.  We can't.  We just say it doesn't appear that we

4     are reaching an injury threshold by a scenario such that you

5     have talked about.  Is it possible that there could be somebody

6     who would be injured by that?  Of course, it's possible.  We

7     just don't know.

8          Q.    My question is:  You don't have any studies about

9     infants being thrown onto a bed; correct?

10         A.    As far as I'm aware, there are none that have

11    reported incidents like this and then followed up by saying:

12    "Here, look what happened."

13         Q.    Now, Doctor, you said that this could not possibly

14    have caused this child's trauma; correct?

15         A.    I'm saying that this child, the evidence, the severe

16    head trauma that occurred in this child is very low.

17         Q.    Well, Doctor, would it be helpful for you to see the

18    Defendant demonstrating how he threw his child?

19         A.    No.  It wouldn't help at all.  I'm not -- I can't

20    calculate G-forces.  I cannot do those things here.  All that

21    has been done by other people, and demonstrations -- I'm

22    probably not qualified to properly evaluate that.  You would

23    need somebody other than me.

24         Q.    So, therefore, would you agree with me that you are

25    not properly qualified to give an opinion as to whether this

1   Defendant, throwing his baby onto a mattress three times in

2   four days from above his head, weighing almost 500 pounds, down

3   onto this mattress -- are you qualified to say that that would

4   not cause trauma?

5        A.   I don't know.  That would have to be absolutely

6   tested, and I'm saying scenarios like that have been measured,

7   and it appears that the peak G-forces that are capable of being

8   generated that way are not sufficient to produce subdural

9   hematomas, as far as we know.

10       Q.   So, you are not qualified to give that opinion; are

11  you, Doctor?

12       A.   I could not make a judgment, based on the Defendant's

13  statements, of whether that represents reality or not.

14       Q.   Well, is that conduct you would advise parents to

15  engage in?

16       A.   Excuse me again?

17       Q.   Is that conduct you would advise parents to engage

18  in?

19            MS. EFFMAN:   I object.  That's argumentative,

20       Judge.

21            THE COURT:   Overruled.

22       Q.   Would you advise parents to engage in that sort of

23  conduct?

24       A.   I don't advise parents to be stressing children in

25  manners like that.  I think that's risky behavior, and I

                    Judy A. DelCogliano
                  Official Senior Court Reporter

A000002081

1    certainly don't recommend doing that.

2         Q.    Risky of what?

3         A.    What's that?

4         Q.    Risky of what?

5         A.    I'm sorry?

6         Q.    What is that risky of, Doctor?  You said it's risky

7    behavior?

8         A.    Well, you are introducing accelerated forces into a

9    baby.  If you missed and hit the wall or knocked off the bed or

10   something, now you are into a whole different situation.  All I

11   can say is that is risky behavior, and I think that is common

12   sense.

13        Q.    And could lead to trauma?

14        A.    It may lead to trauma.

15             MS. BOOK:  Nothing further.

16             THE COURT:  Ms. Effman, before you -- do you

17        have some redirect?

18             MS. EFFMAN:  Very, very short.  Maybe we could

19        take a break to stretch our legs.  Would you like to take,

20        maybe, five minutes?

21             THE COURT:  Members of the jury, we will take a

22        break for about ten minutes.  Please do not discuss this

23        case among yourselves or with anyone else.  Do not read or

24        listen to any media accounts of this case.  Do not visit

25        any premises involved in this case.  Do not conduct any

*(Leestma – Defendant – Redirect)*                    2212

1      research regarding this case.  Do not request or accept

2      any payment in return for supplying any information

3      regarding this case.  Do not make any judgments regarding

4      this trial until you have heard all of the evidence and

5      been instructed as to the law.  And if anyone attempts to

6      improperly influence you, please report it directly to me

7      without discussing it with anyone else.  We will take a

8      break for ten minutes.  Thank you.

9              (Jury excused.)

10             THE COURT:  Before we break, Doctor, I want to

11     remind you again during the break, since you are a sworn

12     witness, please do not discuss your testimony.  Thank you,

13     Doctor.

14             (Brief recess taken.)

15             (Whereupon, the jury entered the courtroom.)

16             THE COURT:  Please be seated.

17  REDIRECT EXAMINATION

18  BY MS. EFFMAN:

19     Q.   Just a few questions on redirect briefly.  Referring

20  you to the autopsy report which is already in evidence in this

21  case, typically, when you do an autopsy report, Doctor, do you

22  list what documents that you reviewed as part of your review of

23  a case, if you are the one actually doing the autopsy?  Is that

24  standard procedure?

25     A.   Usually not.  Occasionally, in the preambles, so to

                    Judy A. DelCogliano
                 Official Senior Court Reporter

A000002083

1    speak, the autopsy pathologist may do that, but my experience

2    says, usually, they don't.  They will have something about an

3    investigator, if there's a scene investigation, or if there's a

4    little bit of hospital, they may give some preamble to their

5    report, but usually, they don't go into detail.

6         Q.   Now, Ms. Book asked you during cross-examination

7    whether or not you -- whether Dr. Sikirica indicated in his

8    report that he had reviewed a statement from a Wilhemina Hicks

9    as part of writing his report.  Are you aware of whether or not

10   his report lists that he reviewed Wilhemina Hicks' statement?

11        A.   I don't remember, no.

12        Q.   Doctor, would referring to the autopsy report refresh

13   your recollection?

14             MS. BOOK:  Your Honor, I'm going to object to

15        this question.  That was not my question.  The question I

16        asked was whether he knew if Dr. Sikirica reviewed these

17        things, not whether he elicited them in his report.

18             THE COURT:  What is the question pending right

19        now?

20             MS. EFFMAN:  The question pending is -- Ms. Book

21        seemed to indicate on cross-examination that Dr. Sikirica

22        indicated in his report that he read Wilhemina Hicks'

23        statement.  In fact, the report doesn't reflect that.  I

24        want to ask the Doctor to refer to the report, and does it

25        mention Wilhemina Hicks' statement as being one of the

*(Leestma - Defendant - Redirect)*          2214

1   things he reviewed in writing his report.

2          MS. BOOK:  I asked, Doctor, do you know that Dr.

3   Sikirica read the statement of the mother, Wilhemina

4   Hicks.

5          THE COURT:  I will allow the -- I will overrule

6   the objection and allow it.

7   Q.   Would referring to the autopsy report refresh your

8   recollection, Doctor?

9   A.   Yes, it would.

10  Q.   Reading on Page 5 of the record -- I would ask that

11  you review that, and when you have had a chance to look at

12  that, please look up, Doctor.

13  A.   Okay.  I've got that.

14  Q.   Isn't it true, Doctor, that report does not indicate

15  that he reviewed Wilhemina Hicks' statement as part of these

16  autopsy reports?

17  A.   It's not specific.  It says copies of medical records

18  were obtained, copies of the hospital --

19  Q.   Let me stop you right there, Doctor.  Does that

20  report state he reviewed Wilhemina Hicks' statement?

21  A.   No, it doesn't.

22  Q.   Thank you, Doctor.  In fact, in his report, Dr.

23  Sikirica notes that there is evidence of chronic subdural

24  hemorrhage; correct?

25  A.   Yes.

1          Q.    In fact, he notes that on a dura section -- which is

2    one of the things you reviewed as part of this case; correct?

3          A.    Correct.

4          Q.    Are you aware that in this case that Drs. Edge and

5    Waldman have testified that the subdural hematoma could be

6    weeks or months old.  Are you aware of that, Doctor?

7          A.    Yes.

8          Q.    And Doctor, as a neuropathologist, just like Dr.

9    Sikirica, neither one of you treat patients; correct?

10         A.    I certainly don't, and it appears that Dr. Sikirica

11   does not, either, but as my -- he could have a practice on the

12   side, and he probably would be legally able to do so in New

13   York.  I don't know if he does.  I think it would be unlikely.

14         Q.    Ms. Book asked you several things about a book you

15   had written, the first edition of your book, and you made

16   certain comments to Ms. Book; that you revised some of the

17   things in your second edition.  Can you explain why you change

18   certain comments from the first edition to the second edition,

19   Doctor?

20         A.    Sure.  In the 20 years that elapsed, my viewpoints on

21   many things have changed in response to literature and new

22   information, and it would be totally inappropriate in a new

23   writing exercise to ignore the wheels of progress and the

24   knowledge and facts that have emerged since the last one.  To

25   repeat the old stuff would be professionally ridiculous.  The

*(Leestma - Defendant - Redirect)* 2216

1    world is flat.  Why continue to write about that when you know

2    it's not true?  So, obviously, everybody goes on a learning

3    curve.  So do I.  And in writing a book, one must take

4    awareness of the movement of thought, knowledge, information

5    and deal with that, which I did.

6        Q.   And would that be because science, as many things,

7    evolves over time; correct?

8        A.   Absolutely.  More information has come in that spoke

9    to or impinged upon some important things in that old book and,

10   frankly, in view of new information, is wrong.

11       Q.   And how much time elapsed or spanned between the

12   first edition and the second edition?

13       A.   About 20 years.

14       Q.   And once you finish writing a book and you submit it

15   to publisher, what is the turnaround time in actually having

16   the book published, on the shelf, ready to be purchased or sold

17   to people or stores?

18       A.   In this one, modern publishing is amazing; got a

19   manuscript to the publishers, and I think it was about four

20   months later, we had a book.  This is with proofreading and

21   everything.  So, many times, they sit there and sit there and

22   sit there.  I have had that experience.  But this one was as

23   fast and expeditious as I know.

24       Q.   And Doctor, Ms. Book referred to Page 273 of your

25   book on the topic of subdural hematomas and subdural adhesions.

1   At least you have had two purchases of your book as a result of

2   this case, Doctor.  But she read to you a portion of the page,

3   but what she did not finish reading to you is -- under the

4   section, Doctor, do you state that, "In addition to birth

5   trauma and molding of the head, which can cause subdural

6   hematomas, bleeding disorders and sepsis and vascular anomalies

7   may also cause subdural bleeding."  Did you write that in your

8   book?

9        A.  Yes, right.  I should also point out that in the

10  book, there are a number of places through the book where

11  subdural hematomas are discussed, not just in one chapter, and

12  because it's a complicated subject, there are many aspects of

13  this process which were discussed and talked about that I hope

14  paint a fair picture of what this entity is about.

15       Q.  In the chest x-rays that you have been given to

16  review from one taken at Samaritan Hospital, one taken at

17  Albany Medical Center, isn't it true, in fact, there's no

18  evidence of aspiration in either of those x-rays?  Is that

19  correct, Doctor?

20                  MS. BOOK:  Objection, leading.

21                  THE COURT:  Sustained.

22       Q.  Doctor, are you aware of any evidence in any of the

23  x-rays in this case, of the chest, of any evidence of

24  aspiration?

25       A.  None was reported.

*(Leestma - Defendant - Redirect)*          2218

1      Q.   And is there any evidence in the autopsy report of

2   aspiration?

3      A.   I don't believe those words were used.  And in

4   looking at the evidence, the kind of lung changes that were

5   seen in this autopsy would not be typical for aspiration, which

6   means pulmonary hemorrhage from the acid that comes from the

7   stomach, and I didn't see any evidence of that.

8      Q.   Ms. Book asked you some questions about fresh

9   bleeding.  Can fresh bleeding be caused by problems with

10  coagulopathy?

11     A.   Fresh bleeding anywhere, subdural included.

12     Q.   And as discussed earlier, Doctor, did this child have

13  problems with coagulopathy?

14     A.   Of course, in spades, very much so.

15     Q.   Is that, in fact, documented in the records of Albany

16  Medical Center?

17     A.   Correct.

18     Q.   And, in fact, isn't it true, Doctor, that the CAT

19  scan you displayed here today shows very little evidence of

20  bleeding?

21     A.   Yes.  There is evidence of chronic bleeding and the

22  reactions and repair from that, but the amount of actual recent

23  bleeding - that is, within some days of death - is really only

24  in the right posterior, kind of puddled there, and that

25  wouldn't amount to very much.

1      Q.  And in terms of posterior fossa, Doctor, does an

2   ultrasound show bleeding in the posterior fossa at ten days of

3   life?

4      A.  None was reported.  The study was said to be within

5   normal limits.

6      Q.  In fact, would an ultrasound, at ten days of life,

7   would that equipment or that procedure cover the area of the

8   posterior fossa?

9      A.  Sometimes imaging down in that area is kind of at the

10   end of the food chain, so to speak.  It's not closest to the

11   sensor, and it's conceivable that things could be missed there.

12   I'm not an ultrasonographer.  So, I don't know the limits of

13   the technology, other than having heard people talk about it

14   and read about it and seen these studies.  As I indicated, it's

15   possible to have a so-called negative study but still have

16   something that proved to be there.

17      Q.  And certainly, Doctor, bleeding in the posterior

18   fossa, is that a kind of bleeding that accompanies some at

19   vaginal childbirth?

20      A.  Say that again.  I'm sorry.

21      Q.  In terms of bleeding during childbirth, is the

22   posterior fossa one of the places where you can find bleeding

23   in the brain or in the intracranial area during childbirth?

24      A.  That's correct because, apparently, the way the dura

25   folds around and forms the tentorium, the hole where the brain

*(Leestma - Defendant - Redirect)*                    2220

1    stem goes through, is an area that stresses of molding, and

2    deformation of the skull could impinge there, and that's where

3    bleeding seems to be when it is observed.

4         Q.   Can subdural bleeding due to gravity flow into the

5    posterior fossa?

6         A.   Sure.  It will get there.  The problem is you have

7    bleeding in the dura itself, which can go this way, leak out

8    that way or go in the other direction, ultimately dumping some

9    blood into the subdural compartment that can redistribute

10   itself in lots of places.

11        Q.   In terms of slides that you were shown, the

12   microscopic section you showed in this trial, in terms of the

13   layers of the chronic subdural hematoma --

14        A.   Right.

15        Q.   In terms of the age of that based on the number of

16   layers, Doctor, how old is that chronic subdural hematoma?

17        A.   Takes you back pretty close to birth.  The problem

18   is, we don't have a good way to say that's exactly

19   three months, four days, whatever it is.  The layers, though,

20   each one of those takes several weeks to reach that level of

21   maturity, and you add them up; you are there.  You are back in

22   the perinatal period.

23        Q.   Since we know we have a four-month-old child we are

24   dealing with, certainly, Doctor, several months takes us to the

25   time of birth; correct?

Judy A. DelCogliano
*Official Senior Court Reporter*

```
 1        A.   Yes.

 2                  MS. EFFMAN:  One moment, Judge.  Okay.  No

 3        further questions.

 4   RECROSS-EXAMINATION

 5   BY MS. BOOK:

 6        Q.   Just a couple questions.  Doctor, the autopsy report,

 7   it doesn't say the subdural hematoma went back to birth from

 8   Dr. Sikirica, now; does it?

 9        A.   I don't think that was -- he made any such statement.

10   He just simply mentioned there was chronicity, and that was it.

11        Q.   You read his testimony; correct?

12        A.   Yes.

13        Q.   Do you recall reading he said it went back two months

14   at most?

15        A.   I'm trying to remember the words, and I don't -- I

16   think he was asked a question like that and said it was

17   possible.

18        Q.   Okay.  And you said there was no aspiration reported.

19   Is that correct?

20        A.   Well, at least -- it's certainly not mentioned on the

21   radiology reports and, frankly, I don't recall it being

22   mentioned anywhere.

23        Q.   But you -- well, was it mentioned in Dr. Sikirica's

24   testimony?

25        A.   I know he was of the opinion that that may be
```

*(Leestma - Defendant - Recross)*                    2222

1   important, and I don't know the evidence for it.

2        Q.   And to be clear, part of that history comes from the

3   parents, correct, as to whether or not aspiration may have

4   occurred?

5        A.   Well, sometimes.  I mean, if there's been vomiting

6   and, you know, formulas coming out of nose and then there's

7   coughing and choking, I guess one could impute that aspiration

8   had occurred.  But more often, that's a clinical judgment and

9   can occur, certainly, in an acute life-threatening event, which

10  is what happened to this child, which is how you describe it.

11  Aspiration can occur there.  I just didn't see any evidence of

12  it.  That's all.

13       Q.   And, likely, it would have occurred at home prior to

14  coming to the hospital.  Is that correct?

15       A.   Yes.  I'm trying to -- ask me that again.  I want to

16  be sure.

17       Q.   Likely, the aspiration would have occurred at home

18  prior to coming to the hospital; correct?

19       A.   It certainly can.

20       Q.   Okay.  And just to be clear, you didn't read the

21  one-page statement of the father about the events of ▮▮▮▮

22  ▮▮▮▮  right?

23       A.   Right.

24       Q.   You didn't read the ten-page statement; right?

25       A.   You mean the emergency --

1        Q.   No.  I'm talking about the child's father's ten-page

2    version of what happened, to include that, after one of the

3    times he threw the baby down on the bed, the baby was wheezing

4    badly?

5        A.   Yes, I recall that.

6        Q.   You didn't read that; did you?

7        A.   I recall that being made but, again, I don't know

8    what that means, whether that means there's been some

9    aspiration or not.

10       Q.   So, you are not sure, fair to say, whether or not

11   aspiration occurred?

12       A.   Right.

13       Q.   And you said there was really not a lot of blood

14   noted in the baby's brain.  Is that what you said?

15       A.   There was what?  Say again.  I'm sorry.

16       Q.   Not -- there wasn't much blood noted in the baby's

17   brain?

18       A.   Yes, correct, correct.

19       Q.   So, would you agree with me that the autopsy report

20   says there was 60 milliliters of subdural blood that came out?

21       A.   That's the fluid and the bloody fluid; certainly, 60

22   ml's were collected, and that wouldn't be out of keeping with

23   what was in the fluid collections.  Now, whether that was all

24   blood, blood with fluid -- I mean, they say blood but --

25       Q.   Well, Dr. Sikirica, who was actually there and

*(Leestma - Defendant - Recross)*                    2224

1    suctioned the blood out, correct, he recorded it as blood, not

2    bloody fluid.  Is that right?

3        A.   Well, then, this is material that would have had to

4    have accumulated after the child was admitted to the hospital,

5    because it's not there within three hours of admission.

6        Q.   So that your testimony is that that's not blood in

7    the CAT scan?

8        A.   There is some small amount that I pointed out, would

9    be blood-tinged fluid.  I'm sure if one were to collect that,

10   and if there were 60 milliliters of blood in this child's head

11   at the time of autopsy, it had to have come after that CAT scan

12   was taken.

13       Q.   Well, you said you read Dr. Waldman's testimony;

14   right?

15       A.   I read his transcript, yes.

16       Q.   And were you familiar with the fact that Dr. Waldman,

17   a neurosurgeon, said that that was blood in that child's head

18   on the CAT scan, not a fluid?

19       A.   Well, I would certainly want to ask him a few

20   questions; point the blood out to me.  What would it look like

21   if it were a hundred percent blood or five percent?  And that

22   would be an issue that I think would need to be cleared up.  If

23   he said there was a lot of blood in this kid's head, I would

24   respectfully disagree.  It's not there.

25       Q.   So, your answer is yes; you are familiar with the

```
 1    fact that Dr. Waldman, a neurosurgeon, said that was blood?
 2         A.   If he made that statement and said that this kid's
 3    head had blood in it, I would beg to differ. .
 4              MS. BOOK:   Thank you.
 5    REDIRECT EXAMINATION
 6    BY MS. EFFMAN:
 7         Q.   Doctor, there's no history in the record -- strike
 8    that.  Doctor, there's no history from the mother, in the
 9    records of Samaritan Hospital or Albany Medical Center, that
10    she reported the child aspirated.  Is that correct?
11              MS. BOOK:   Objection, leading.
12              THE COURT:   Sustained.
13         Q.   Doctor, did you see any reports of the Samaritan
14    Hospital or Albany Medical Center records concerning the mother
15    making any reports about aspirating?
16         A.   No.
17         Q.   And in your review of the records from Samaritan
18    Hospital and Albany Medical Center, did you see any reports
19    whereby the mother reported or complained the child had been
20    wheezing?
21         A.   No.
22              MS. EFFMAN:   No further questions.
23    RECROSS EXAMINATION
24    BY MS. BOOK:
25         Q.   And Doctor, did you know that the Defendant was alone
```

*(Leestma - Defendant - Recross)*                    2226

1    with the baby at the time that he was throwing him around on

2    the bed?

3                   MS. EFFMAN:   I would object to the form of that

4          question, Judge.

5                   THE COURT:   Sustained.

6          Q.   Doctor, did you know that when Mr. Thomas admits that

7    he was throwing the baby down on the bed three times within

8    four days, that he was alone, and that the mother was not in

9    the room?

10                  MS. EFFMAN:   Same objection, Judge.

11                  THE COURT:   Overruled this time.

12         A.   I don't know what the details of that are.  I'm told

13   that he had admitted to throwing the baby down onto the

14   mattress a number of times.  Exactly how many times and all the

15   details, I don't know that and never took the time or effort to

16   look into that or try to evaluate it.  I was simply looking at

17   the scenarios that were presented and what we could know about

18   them and what is known about the science behind it.  That's all

19   I know.

20         Q.   Doctor, to say you are going to rule out trauma,

21   wouldn't it be important to read about the traumatic event?

22         A.   The perspective when I look at cases like this, and

23   this is no exception, are from the point of view of the

24   pathologist.  What is there?  What objective evidence is there?

25   And then someone may advance various scenarios or theories,

*(Leestma - Defendant - Recross)*                     2227

1    whatever, and that has to be weighed against the evidence that

2    is there.  And from my part of looking at this, I do not see

3    trauma of a significant degree in this baby.  I see sepsis,

4    bacterial infection, shock, coagulopathy.  That's what I see.

5    I don't see the trauma that is said to be so severe that it

6    killed this child.

7         Q.   And that's your opinion without having read anything

8    about the traumatic events from the father's own mouth; right?

9              MS. EFFMAN:  Objection, asked and answered.

10             THE COURT:  Overruled.

11        A.   I have to, again, look at -- the proof of the pudding

12   is in the tasting.  What is the traumatic event that is there?

13   If someone alleges various things, and I cannot see a

14   counterpart of that in the autopsy, what am I to do?  I can

15   only can view this scenario through the lens of my discipline,

16   my confidence and so forth.  Show me the trauma.  I do not have

17   a major traumatic evidence in the autopsy.  What I see is a

18   medical condition, an infectious disease process.  And is

19   trauma buried in there somewhere?  It could be, but it's

20   certainly not the primary event or the primary process.

21        Q.   Well, Doctor, you just testified that you weren't

22   really qualified to give an opinion on that trauma; right?

23   Didn't you just testify to that 20 minutes ago?

24        A.   Let's define the limits of that.

25        Q.   Doctor, I asked you a question.  Did you just say

1      that 20 minutes ago?

2          A.    To evaluate -- if somebody demonstrated something to

3      me, I would not wish to go there, because I cannot quantify

4      that.  I would leave that up to a biomechanics individual, who

5      could evaluate those things and probably has.

6          Q.    And you didn't go there; right?

7          A.    That's right.

8                MS. BOOK:  Nothing further.

9      **REDIRECT EXAMINATION**

10     **BY MS. EFFMAN:**

11         Q.    Doctor, demonstration or not, that doesn't change

12     your opinion about the cause of this child's death; correct?

13               MS. BOOK:  Objection, leading.

14               THE COURT:  Sustained.

15         Q.    Whether a demonstration is performed or not, Doctor,

16     does that have any impact on your opinion as to cause of death

17     in this case?

18         A.    As I indicated, no.

19         Q.    And you didn't go the route that Ms. Book is talking

20     about, because the objective medical evidence doesn't go that

21     direction; correct?

22               MS. BOOK:  Objection, leading.

23               THE COURT:  Sustained.

24         Q.    Doctor, you did not -- Ms. Book referred to

25     demonstrations.  Did you feel the need to go to demonstrations

*(Leestma - Defendant - Redirect)*                    2229

1   based on the other objective evidence you saw in the records,

2   the slides and the autopsy report?

3       A.   I could find no benefit in that, because it would be

4   playing on impressions, rather than science and method.

5   Biomechanics individuals would be able to evaluate those

6   things, demonstration, whether I know them to be true or not.

7   All I can say is against the testing that I'm aware of and

8   seen, got all the data on, it doesn't appear that those injury

9   scenarios reach an injury threshold.  And to look at a

10  demonstration or something like that, how could I -- how could

11  I impugn what G-forces are there.  I don't have instruments.

12  It would be a totally unprofessional exercise.

13      Q.   In fact, does the objective medical evidence in those

14  records support your opinion as to cause of death, Doctor?

15      A.   The objective evidence in the autopsy, which can't be

16  fudged.  I'm just saying, as I said before, the end point is,

17  if allegations -- and allegations are made that this was a

18  traumatic death.  Show me the trauma.  I don't see it.  I can't

19  see it through the overwhelming pathology due to infection.

20               MS. EFFMAN:  Thank you, Doctor.

21               MS. BOOK:  Nothing further.

22               THE COURT:  Doctor, you may step down.  Thank

23       you.  Okay.  Members of the jury, we are going to break

24       for the day at this time.  As I was telling you yesterday

25       or the day before, sometimes the need arises for the Court