EXHIBIT "R"

1              THE COURT:  Is that correct, Mr. Coffey?

2              MR. COFFEY:  Yes.

3              THE COURT:  Okay.  Members of the jury, that

4       fact has been so stipulated by the parties in this case.

5       The People may call their next witness now.

6              MS. EGAN:  Thank you, Your Honor.  The People

7       call Dr. John Waldman.

8    **JOHN WALDMAN**, after first having been duly sworn by the Clerk

9    of the Court, was examined and testified as follows:

10             THE CLERK:  The sworn witness is John B.

11      Waldman, W-A-L-D-M-A-N.

12             THE COURT:  You may proceed, Ms. Egan.

13             MS. EGAN:  Thank you, Your Honor.

14   **DIRECT EXAMINATION**

15   **BY MS. EGAN:**

16      Q.   Good afternoon, Dr. Waldman.

17      A.   Good afternoon.

18      Q.   Would you introduce yourself to the jurors?

19      A.   I'm Dr. John B. Waldman, retired pediatric

20   neurosurgeon.

21      Q.   When did you retire?

22      A.   Two years ago, almost two years ago.

23      Q.   Congratulations.

24      A.   Thank you.

25      Q.   How long did you practice pediatric neurosurgery?

*(Waldman - People - Direct)*                                     460

1          A.   Over 30 years.  I began at Albany Med and stayed

2     there my whole career.  I began in 1979.

3          Q.   So, you were practicing at Albany Med at the time of

4     your retirement?

5          A.   Yes.

6          Q.   And what was your position at Albany Medical Center?

7          A.   I was -- well, I was a professor of surgery, Division

8     of Neurosurgery, and I was an attending neurosurgeon on the

9     full-time faculty.

10         Q.   And what were your duties as a professor?

11         A.   As a professor, teaching, taught medical students,

12    both in the ward and in the classroom; and Albany Med also has

13    a neurosurgical training program, so it involved teaching

14    residents, as well, and full-time practice.

15         Q.   And what were your duties as a treating physician?

16         A.   Well, for most of the time, I took care of

17    predominately young children and took care of children with

18    neurological problems that were possibly in need of surgery.

19    It isn't always surgery, but medical management of patients, as

20    well.

21         Q.   Now, could you tell the jury about your formal

22    education?

23         A.   I graduated from Yale University.  I just returned

24    for my 45th reunion.  And then I went to Albany Medical College

25    and got an M.D. degree in 1973.  After that, I entered the

*(Waldman - People - Direct)*                                    461

1    residency training in neurosurgery.  That required, at the

2    time, five years of neurosurgery, one year of general surgery.

3    And after that, I spent some time in a pediatric nursery

4    fellowship or fellowships.  I did some time at the Children's

5    Hospital Medical Center in Boston and some time at The Hospital

6    For Sick Children in Toronto; and after, that I returned and

7    was on the full-time faculty at Albany Med.

8         Q.   And were you board certified?

9         A.   Well, board certification requires completing an

10   approved residency, which I did, passing a written examination,

11   which I did during my residency, and then you have to wait a

12   period of time and submit practice data that gets reviewed.

13   You then have to be accepted for sitting for an oral

14   examination, and I did that.  I finished my residency in 1979.

15   I think the first opportunity I had to sit for the Boards was

16   either in 1981 or '82.  I don't remember, but I passed my

17   Boards at that time.  At that point in time, there was no Board

18   certification in pediatric neurosurgery, but subsequently, much

19   later - I think in the early 90's maybe - there was -- American

20   Board of Pediatric Neurosurgery was formed, and I also passed

21   that entrance, also.  So, I'm Board certified in neurosurgery

22   and pediatric neurosurgery.

23        Q.   Did you have to recertify periodically for those

24   Boards?

25        A.   General neurosurgery, no.  At the time, they were for

1    life.  Currently, you have to recertify.  Pediatric

2    neurosurgery, you have to recertify, and I did just before I

3    retired.  I think I had to take a written Board examination,

4    which I passed.  So, I was recertified approximately two years

5    ago.

6         Q.   And did you maintain that certification throughout

7    your years of practice?

8         A.   Yes.

9         Q.   In what states were you licensed to practice medicine

10   in?

11        A.   New York State.

12        Q.   And have you written any books or professional

13   journal articles?

14        A.   Yes.

15        Q.   Can you estimate how many?

16        A.   No.  I don't know.

17        Q.   Is it more than ten?

18        A.   More than ten, fewer than 50, I would guess.

19        Q.   What types of articles have you written?

20        A.   All types.  Early on, some of it had to do with

21   science research; then later, mostly case reports.  I was

22   involved in writing a chapter for a book for general

23   practitioners on neurosurgical issues.  My chapter was, of

24   course, on pediatric neurosurgical issues that a pediatrician

25   or family practice doctor might see.  I guess that's most of

1    it.

2        Q.   Now, let's talk about September of 2008.  Were you

3    employed at Albany Medical Center at that time?

4        A.   Yes.

5        Q.   And did you come to know someone by the name of

6    ███████ ████?

7        A.   Yes.

8        Q.   How did you know ████████?

9        A.   Well, I don't have any direct recollection, but from

10   review of the medical records, he was admitted to the hospital

11   and a neurosurgical consultation was requested.  I probably was

12   not on call that night, so one of my partners saw ████████.  And

13   then I believe the next day, I saw him; and the day following,

14   I saw him in the hospital.

15       Q.   Do you recall the date you first began your

16   neurosurgery consult with ████████?

17       A.   That I personally did?

18       Q.   Yes.

19       A.   I believe it was either -- probably the 22nd of

20   September, and then I saw him on the 23rd.

21       Q.   Now, what is a consultation?

22       A.   Well, typically, when someone is admitted to the

23   hospital, there's a primary physician of one specialty or

24   another who has the primary responsibility for management of a

25   patient.  A patient like ████████, who is admitted to the

*(Waldman - People - Direct)*                              464

1    Pediatric Intensive Care Unit -- I apologize.  I thought I

2    turned my phone off.

3                    THE COURT:  That's okay.

4         A.    The question, again, was?

5         Q.    What is a consultation?

6         A.    So, in this case, it would have been a Pediatric

7    Intensive Care Unit doctor.  That's a pediatrician who has done

8    a fellowship in intensive care medicine, pediatric medicine.

9    And that person is primarily in charge of the overall care of

10   the patient; but as I'm sure everybody knows, medicine is very

11   specialized these days.  So, if a patient has a problem with

12   their eye, you would consult a pediatric ophthalmologist.  If

13   they have a problem with their brain, they would consult with a

14   pediatric neurosurgeon or a pediatric neurologist and likewise.

15   So, a consult is a -- someone who is asked to see a patient for

16   a specific purpose related to their area.

17        Q.    Why were you asked to get involved in ████████'s

18   treatment?

19        A.    Because ████████ had acute or subdural hematoma.

20        Q.    Now, did you review any of ████████'s records as part

21   of your consult?

22        A.    Yes.

23        Q.    Do you recall what records you reviewed?

24        A.    Whatever was available in the medical record.  Now,

25   to what degree I reviewed it, I don't have any direct

1    recollection, but I would have -- my practice was to see the

2    patient with one of the residents, possibly the resident who

3    had initially seen him in consultation.  So, it would be a

4    combination of getting information directly from other doctors

5    who are caring for him, including my own resident, and the

6    chart; but I have no direct recollection in this case of what I

7    actually reviewed.

8         Q.   Did you review any tests or scans of ▇▇▇▇?

9         A.   Yes, I did.

10        Q.   What did you review?

11        A.   I reviewed his CT scan.

12        Q.   And what is a CT scan?

13        A.   A CT scan is a specialized x-ray.  X-rays look at

14   different densities of tissue.  Regular x-ray can only

15   discriminate between very wide densities.  For example, if you

16   take a chest x-ray, you can see bone and you can see air and

17   you can see vague gray soft tissues, but a CT allows one to see

18   very small differences.  So, you can see much more detail.  And

19   it is -- but still, you are looking at densities; and the

20   format is such that you view a three-dimensional structure in

21   two dimensions.  It's like slicing a tomato and taking the top

22   slice off and looking at that slice, and then taking the next

23   slice off and looking at that slice.  So, you get a slice from

24   the bottom to top or top to bottom or whatever part of the body

25   you are scanning.

*(Waldman - People - Direct)*

1    Q.   Does a CAT scan typically only look at one slice?

2    A.   No, no.  There's always -- always covers multiple

3    slices, and the thickness of the slice also varies, and there

4    are other techniques, like injecting contrast agent, which you

5    can do to make certain tissues look different and help you

6    distinguish between one thing and another.

7    Q.   How do the differences in density appear visually on

8    the CAT scan?

9    A.   Well, the CAT scan is, in essence, a bunch of zeros

10   and ones.  It's digital information that then needs to be put

11   into a picture format, and that is done on a gray scale,

12   meaning from bright-bright white to black-black-black and

13   everything in between, and those -- the image can be

14   manipulated.  There is no -- for example, in the old days when

15   you took an x-ray, it came out on a piece of film.  That was

16   the original.  There is no original CAT scan that anyone can

17   look at.  It's just numbers that get manipulated.  Does that

18   make sense?

19   Q.   Yes, it does.  Thank you.  Do you actually perform

20   the CAT scans yourself?

21   A.   No.  The CAT scans are done by specially trained

22   x-ray technicians.

23   Q.   Are those technicians doctors?

24   A.   No, but they are supervised by doctors.

25   Q.   And then once the scan is complete, what is done with

*(Waldman - People - Direct)*

1    that data?  Who looks at it next?

2         A.   Well, it depends on what is being imaged.  But if

3    it's the brain, most institutions today, although not all,

4    would have a neuroradiologist - certainly, the Albany Medical

5    Center Hospital has Board certified neuroradiologists - who are

6    specially trained not just in radiology but in looking at

7    images of the nervous system; would review those films, dictate

8    a report, and that report would be printed out.  It would be

9    corrected by the neuroradiologist and then would become part of

10   the medical record.

11        Q.   Are you a neuroradiologist?

12        A.   No.

13        Q.   Can only radiologists read scans?

14        A.   Anybody can read a scan, but in terms of

15   competence -- well, part of neurosurgical training is -- a

16   large part of neurosurgical training is involved in reading

17   scans; CAT scans, MRI's.  Neurosurgeons make decisions on how

18   to treat patients, particularly surgical treatments, based on

19   imaging in large part.  So, we can't rely on someone else,

20   someone else's interpretation of a film, if we are going to be

21   the responsible surgeon to operate on someone's brain.  So, we

22   have to be -- we have to know how to read scans.

23            Now, are there times when we consult with

24   neuroradiologists about a difficult case, for example?

25   Absolutely.  We work together.  But many times for

*(Waldman - People - Direct)*

1    straightforward problems, although films are officially read,

2    we always look at them ourselves and make our own

3    determinations.

4    Q.  So, approximately how many scans have you read in

5    your career?

6    A.  Probably hundreds of thousands.  My career in

7    neurosurgery --

8            MR. COFFEY:  Objection.  He wasn't asked about

9        his career.  He was asked how many he read.

10         THE COURT:  Ask another question, Ms. Egan.

11         MS. EGAN:  Sure, Judge.

12    Q.  Now, did you review ▇▇▇▇▇▇'s CAT scan yourself?

13    A.  Yes.

14    Q.  And how is the information from a CAT scan stored?

15    A.  Um, well, I'm sure it's on-line for a time and then

16    it probably gets archived.  What that means at Albany Med, I

17    don't know, but I would venture to guess that it's stored on

18    tape.

19    Q.  Has neuroradiology always been its own specialty,

20    Doctor?

21    A.  No.  When I began practice, there was no specialty of

22    neuroradiology.  All of the studies that were done were done by

23    neurosurgery pretty much.  So, back before there was CT and

24    MRI, the available modalities were mostly x-ray and

25    angiography, where dye is injected into blood vessels and the

1  rapid sequence of x-rays were taken to outline the blood

2  vessels and a technique called pneumoencephalography.  So, when

3  I started my neurosurgical training, that's what the junior

4  neurosurgical residents did.  We did studies on thousands of

5  angiograms and pneumoencephalographs.  And then when CT's

6  started, eventually, neuroradiology became a separate

7  specialty.

8      Q.   And prior to neuroradiology becoming a separate

9  specialty, all neurosurgeons had to read their own scans?

10     A.   Yes.  I don't recall, but it's possible that they

11 were not even reviewed by radiology at all at that point.  I

12 don't recall.

13     Q.   Thank you.  Now, if I were to show you images of

14 ▇▇▇▇▇'s CAT scan here today, could you explain to the jury

15 what you saw on that scan?

16     A.   Yes.

17              MS. EGAN:  Then at this time, Judge, I would

18         move People's Exhibit Number 14 into evidence, which is, I

19         understand, going to be on stipulation.

20              MR. COFFEY:  Well, I want to get a foundation

21         for this, if I can, meaning -- can I ask him questions

22         first?  It's part of the record.

23              THE COURT:  Yes.  If you are objecting on

24         foundation, Ms. Egan can attempt to lay the foundation or

25         if you want, Mr. Coffey, to do it -- I'm not sure.  Is

*(Waldman - People - Direct)*                                                 470

1          there an objection?

2                    MR. COFFEY:  I don't know because --

3                    MS. EGAN:  I'm sorry.  I'm confused.  I thought

4          we had agreed that that would be stipulated in as the

5          other medical records were.

6                    MR. COFFEY:  That's fine.

7                    MS. EGAN:  I can get a certification for it if

8          needed.

9                    MR. COFFEY:  I don't object to it.

10                    THE COURT:  People's Exhibit 14 will be received

11         in evidence at this time on stipulation of the parties.

12         Ms. Egan, would you please, for the record, identify what

13         People's 14 is?

14                    MS. EGAN:  Certainly.  People's 14 is a compact

15         disk which contains the images derived from the CAT scan

16         of ███████    ████ which was conducted on September 21st of

17         2008.

18                    THE COURT:  Okay.  We will have it marked in on

19         stipulation of the parties.

20         (People's Exhibit 14 marked for identification received in

21         evidence and marked People's Exhibit 14 in evidence.)

22                    MS. EGAN:  If I could just have one moment, Your

23         Honor, to set up the audiovisual display.

24                    THE COURT:  Sure.

25                    (Brief pause in proceedings.)

*(Waldman - People - Direct)*                                471

1          MS. EGAN:  I apologize for the delay, Your

2     Honor.  I'm having a little better time with it this time

3     but technology is not my friend.

4          THE COURT:  Okay.

5          MS. EGAN:  Your Honor, may I ask the witness to

6     step down off the stand?

7          THE COURT:  That's fine.  Doctor, if I could

8     just ask that you keep your voice up nice and loud.  Thank

9     you.

10         THE WITNESS:  Yes, sir.

11         MS. EGAN:  And I will ask that you stand off to

12    the side.

13         THE WITNESS:  Maybe I will stand on that side.

14    Q.   Is this the scan that you previously reviewed in

15    connection with ████████ ████ ' case?

16    A.   Right.  This is from Albany --

17         MR. COFFEY:  Can I identify which picture he's

18    identifying, so we can specifically know exactly what --

19         THE WITNESS:  Yes.

20         MS. EGAN:  Certainly, Mr. Coffey.

21    Q.   I'm beginning with image number one of the scan.

22    A.   Here it says image one of 28.

23         THE COURT:  Hold on one second.  Can the jury

24    hear the Doctor?

25    A.   One of 28.  So, there are 28 slices.  This is the

*(Waldman - People - Direct)*                472

1   first slice.  We are looking -- we are going to be looking at a

2   series of slices starting at the base of the brain going up

3   toward the top.  The other thing I would like to point out is

4   that on CAT scans right is on the left and left is on the

5   right.  So that, hopefully, won't confuse you.

6       Q.   Thank you, Doctor.  So, image number one, what is

7   this slice portraying?

8       A.   Well, what we can see here, here you can see the eyes

9   and these bright spots -- first of all, as tissue gets denser

10  and denser, it gets whiter and whiter.  So, just for reference,

11  air - you see, for example, in the sinuses - would be black and

12  this, on these images, bone will be white, denser than air.

13  Gray is soft tissues.

14       So, what we are seeing here is actually a cervical

15  vertebrae.  This is lower than the brain, and this gray tissue

16  right here is the spinal cord.  We see the eyes.  The bright

17  white are the lenses of the eyes, and that is about all that's

18  worth mentioning on that slice.

19       THE COURT:  Ms. Egan, I'm not sure the way this

20  is positioned and the way the Doctor is positioned that

21  everybody can see the screen.  So, it's your witness.

22  It's your presentation, but I just bring that to your

23  attention.

24       MS. EGAN:  Certainly, Judge.  Would the Court

25  inquire as to whether the jurors are having difficulty

1    viewing the images?

2              THE COURT:  When the Doctor is leaning in to

3    explain, I believe he's blocking part of the screen so --

4              THE WITNESS:  I could go to the other side and

5    just block Mr. Coffey.

6              MS. EGAN:  Let me see if I can come up with a

7    suitable arrangement for all, Judge.  Would the Court

8    inquire -- can all of the jurors see the image now?

9              THE COURT:  The jurors are indicating that they

10   can.

11   A.    Again, I just want to emphasize that the brightness,

12   the whiteness, the darkness can be manipulated.  If you were

13   looking at density -- so, if the densest thing you can

14   imagine - let's say land - is here and air is down here, the

15   image could show just simply total black and totally white.  If

16   you divide that whole range into just two images, everything

17   from the middle down to the bottom is completely black and

18   everything -- but above that would be completely white.  That

19   wouldn't be very useful.  So, we divide it up into gradations

20   of white to black and everything in between, but you can also

21   change that level.  If you are interested, for example, just in

22   looking at bone, you could move the whole window up toward the

23   density that that bone is at and divide that up into more.  So,

24   we are going to be doing that a little bit as we go through.

25   Q.    Can I just clarify, Doctor?  When you say that the

*(Waldman - People - Direct)*                                    474

1    image and densities can be manipulated, do you mean you are

2    changing the data or you are changing the view of the data?

3         A.   You are not changing the data.  You are just changing

4    the presentation, the whiteness or blackness or grayness to try

5    to tweak it to get the detail that you want to.

6         Q.   Thank you.

7         A.   I could give an example.

8         Q.   Please do.

9         A.   It just shows you here the window level.  It's set to

10   look at the brain now, but if we set it to look at the bone,

11   you can see how it changes and you can see, where this was

12   completely bright white before, now you can see bone and you

13   can see marrow there.  Now I just have to get it back.  So, we

14   are going to window width and level and we are going to go to

15   brain.  I'm going back to where we were.

16        Q.   Are we ready to move on to image number two?

17        A.   We are.

18        Q.   Do you mind advancing the computer, Doctor?

19        A.   All right.  Okay.  This is image two of 28.  It

20   doesn't show a whole lot of difference.  This is spinal cord

21   still.  These are the lobes.  This is air, and then this is the

22   nose, pharynx.  You can see a little bit of the ears here.

23        Q.   Let's move on to image three.  What do you see in

24   this image?

25        A.   We are still seeing spinal cord.  We are getting near

1    the base of the skull.  We are seeing a little bit of the eyes.

2    This right here is a little bit of the gyrus rectus, which is

3    the underneath surface of the frontal lobe of the brain, and

4    this is a little bit of the temporal lobes which sit on the

5    sides of the brain; but nothing else to remark on there, no

6    abnormalities.

7         Q.   Let's move on to image four.  And what is portrayed

8    here, Doctor?

9         A.   Not a whole lot.  A little of the temporal lobes,

10   frontal lobes.  This is still within the orbit.  This very dark

11   stuff is periorbital fat, probably the spinal cord and lower

12   brain stem right here.  Now you can start to see a little

13   difference.  Now, one thing also to point out is that you can

14   see that this gray part here that we are seeing is larger than

15   this.  That's because the child -- and this doesn't look like

16   this because the child isn't quite straight in the machine.

17   He's a little bit tilted.  One side is a little lower than the

18   other side.  And here you can see some dark areas here.  We

19   will explore that at higher cuts.

20        Q.   Let's move on to image five.

21        A.   Here we can see some abnormalities.  This is image

22   five of 28.  And you can see here, this is brain, this gray,

23   and this is fluid of some nature between the brain and the

24   bone, and you can also see - remember, this is left side; this

25   is right side - that it is a little denser, a little whiter on

*(Waldman - People - Direct)*                        476

1    this side compared to this side.  You can also see more of this

2    dark around the temporal lobe on that side particularly.  That

3    is also some kind of fluid.

4        Q.    And approximately where in the head is this image

5    taken?

6        A.    Well, this would be inside here (indicating), just

7    inside the frontal areas, and these are more or less where your

8    ear is - and see, this is ear - so a little bit in front of the

9    ear.

10       Q.    Let's move on to image number six.

11       A.    Okay.  So, now we can see more of this fluid that is

12   surrounding the brain.  There is normal fluid around the brain.

13   It's called cerebrospinal fluid or CSF.  And although it's not

14   exactly like water, if you look at it in a glass, it would look

15   like water.  It's clear fluid, normal.  It has some proteins in

16   it and it has some electrolytes and various other things, but

17   it looks like water.  And, typically, water would be a little

18   darker than this.  So, there's something -- this is not normal

19   looking CSF.  It's got something that increases the density,

20   makes it a little grayer, a little whiter.  So, it has

21   something mixed in it.

22       Q.    So, what level would regular CSF read as?

23       A.    It would look blacker than this.  This is air.  It

24   wouldn't be that black, but it would be blacker than that

25   probably.

1        Q.   Let's move on to image seven.

2        A.   We can probably move a little quicker if you want to

3    skip some of these.

4        Q.   Certainly.

5        A.   Okay.

6        Q.   Just for the record, which image is this?

7        A.   This is image nine.  So, in this image, we can again

8    see that there is some kind of a collection surrounding the

9    brain.  This is a normal structure.  This is called a fourth

10   ventricle.  It's a normal cavity inside the brain where the

11   cerebrospinal fluid flows, and these are what are called the

12   temporal horns.  This is also part of the ventricular system

13   inside the brain where there is normal cerebrospinal fluid.

14   So, these are normal structures.  And there's also

15   cerebrospinal fluid outside the brain between the arachnoid and

16   pia.  So, there is --  the brain is floating, if you will.

17   That's probably not a good term, but surrounded by

18   cerebrospinal fluid in normal conditions.

19       Q.   Since you mentioned it, Doctor, I'm going to

20   interrupt.  What is the pia and what is the arachnoid?

21       A.   Well, if you look at them on the microscope, they are

22   similar.  There's no difference between the pia and the

23   arachnoid.  The pia is a very thin translucent membrane that

24   is -- it's right on the surface of the brain; in some cases,

25   adherent to the brain surface.  The arachnoid is separated from

1    the pia and there are little strands of pia-arachnoid that

2    extend between them, and arachnoid means spider-like,

3    basically.  So, those little fingers of stuff look like a

4    spider web.  So, that's why it's called the pia-arachnoid, and

5    it's between the pia and arachnoid that the cerebrospinal fluid

6    flows.

7         Q.   Does the arachnoid refer to another membrane?

8         A.   It is another membrane, but it's identical to the

9    arachnoid.  It's just the location that is different.  So, the

10   pia is right on the surface of the brain.  Then it is the

11   cerebrospinal fluid and the arachnoid that encompasses the

12   cerebrospinal fluid.  And then on top of that is the dura

13   mater, which is a thicker fibrous layer that sits right on top

14   of the arachnoid.  So, in normal circumstances, there's no

15   actual space, meaning they are together like this (indicating),

16   but if something happens, something gets injected into that

17   space, then it becomes a real space.  That's the subdural

18   space, and then the skull sits on stop of the dura.  And again,

19   there is no -- there is a potential space between the dura and

20   the skull, but under normal conditions, there's no real space

21   there.

22        Q.   Now, is there anything else of clinical significance

23   that you note in this image?

24        A.   Yeah.  I'm going to try -- it's probably difficult to

25   see from where you all are, but this fluid collection is a

1    little brighter, a little whiter than this side.  Can you

2    appreciate it?  There's also a -- maybe we can find it better

3    on another image.  This is a little better.  There is a --

4         Q.   Just for the record, Doctor, which image is this?

5         A.   This is image ten.

6         Q.   Thank you.

7         A.   Let me get rid of those.  Again, I apologize, because

8    it's difficult to see, but there is this collection here, and

9    then underneath it, there's a little dark.  There's a darker,

10   little bit of a darker -- is that visible at all from where you

11   are?  So, I would interpret this as showing that -- between

12   here and here is the subdural space and this is the

13   subarachnoid space.  That's what we see here, this darker.

14        Q.   And the shading, is there any significance to the

15   shades of gray on this image?

16        A.   Well, it means that this is denser than this side.  I

17   think it may be even more clear here.  You can see this darker

18   rim.  That's right on -- closer to the surface of the brain.

19   That, I believe, is the subarachnoid space and this is the

20   subdural space.  Now, here you can see ventricles, the normal

21   spaces, and you can see that the fluid is darker.  That's more

22   toward normal.  I can't say that it's completely normal, but

23   it's certainly darker than either one of these.  This is more

24   like what normal cerebrospinal fluid looks like.

25             And again, you can see that -- now this is the back

*(Waldman - People - Direct)*

1    of the head, the occipital lobe right here.  You can see here

2    this fluid space and it's brighter, significantly brighter and

3    larger than on the left side; and here, also, you can see it's

4    even brighter right there.  So, there are some gradations of

5    the density as we go from front to back, and that has to do

6    with -- what is causing that injury is density being affected

7    by gravity.  This is a child who has been unconscious and lying

8    on his back.

9         So, if, for example, there is blood or protein fluid,

10   that would settle out.  So, you know, if you put -- you know,

11   mix something in water, some - I don't know - orange juice or

12   something and let it sit there, all the pulp would go to the

13   bottom of the glass.  That's probably what is happening here.

14        Q.   Doctor, which image is this?

15        A.   This is image -- one of these days, I will remember

16   to say that first.  This is image 14.

17        Q.   What does the increased brightness in that area

18   indicate to you?

19        A.   Well, theoretically, it just means it's denser than

20   something that's darker.  It's more dense.

21        Q.   What could cause that increase in density?

22        A.   Blood.  More of the same, as you can see, again, the

23   difference, but this extends over the whole surface of the

24   brain.  And I would also point out -- this is image 20 of 28.

25        Q.   Thank you, Doctor.

*(Waldman - People - Direct)*

1    A.   If you leave the brain for a second and just look at

2    the bone.  A young infant's skull is not one giant bone.  There

3    are multiple bones.  There are two parietal bones, two frontal

4    bones, occipital bones, temporal bones and others.  Where bones

5    come together, flat bones come together are called sutures.

6    Usually, they interdigitate like a zipper; but in a very young

7    child, they are less zig-zaggy and they more abut each other.

8    When you have pressure inside the head by some accumulation of

9    fluid or swelling of the brain, it can push the sutures apart,

10   spread the sutures apart.  So, that is a sign of, probably,

11   abnormal pressure inside the head; and this area here, you

12   don't see the bright white bone.  This is the anterior

13   fontanelle, the soft spot babies have.

14        And this is the -- these are the two coronal sutures

15   that separate the frontal bones from the parietal bones, and

16   they are -- and these are the lambdoid sutures.  The names are

17   not important, but they are spread apart, indicating a problem

18   with pressure inside the head.  That is about -- everything

19   else would be redundant to talk about.  And there are no -- a

20   fracture would appear as a dark line in the bone.  You would

21   see those fractures.

22    Q.   Doctor, what color would fresh or old blood appear as

23   on the scan?

24    A.   Okay.  Acute blood, acute clotted blood typically is

25   bright white; and ferial blood can ultimately look the same as

*Judy A. DelCogliano*
*Official Senior Court Reporter*

P021116

1    cerebrospinal fluid.  So, it changes over time.  The cells are

2    metabolized.  The proteins and whatever leak out and the body

3    takes it away; and over time, it becomes more and more and more

4    and more like cerebrospinal fluid, looks on the scan more and

5    more like cerebrospinal fluid.

6          But in children particularly -- for example, if there

7    is an injury that causes subdural bleeding, that injury can

8    also sometimes tear the arachnoid membrane - remember, it's

9    very thin and transparent - in which case, cerebrospinal fluid

10   can mix with the blood and, if you will, dilute it and make it

11   look less bright.  So, that's why it's sometimes very difficult

12   to age very precisely subdural hematomas on the basis of a CT

13   scan.

14         Q.   And Doctor, based on your experience and review of

15   this scan, do you have an opinion as to whether hematomas are

16   present in ████████'s head?

17         A.   I do.

18         Q.   And what is that opinion?

19         A.   I believe that he has bilateral subdural hematomas

20   with more acute blood or fresh blood on the right side.

21         Q.   And what is it that you see in the scan that leads

22   you to that opinion?

23         A.   Well, I believe that --

24              MR. COFFEY:  Judge, can I have him identify what

25   we are looking at?

*(Waldman - People - Direct)*

1    A.   Yes.  I'm looking again -- this is image 24, and I'm

2    looking at the fluid surrounding the outside of the brain and

3    the inner hemisphere fissure around the brain on both sides.

4    This is not normal.  There is normally not that giant space

5    there, and I believe that -- this is subdural space on the

6    other side and this is brighter, so it's got more -- it's

7    denser, and I believe the explanation for that is blood.

8    Q.   Thank you, Doctor.

9    A.   More acute blood.

10   Q.   Thank you.  At this point, Doctor, I believe we are

11   done with the scan, so you can take your seat.

12          THE COURT:  Members of the jury, would you like

13   to take a break at this point in time?  I believe there's

14   some more time left with this witness.  Would you like to

15   take a break at this time?  Okay.  We will do that.

16          Members of the jury, we will take a 15-minute

17   break at this time.  Don't discuss the case.  Don't form

18   any judgments or opinions.  Don't read or listen to any

19   media accounts.  If anyone attempts to improperly

20   influence you, report that directly to me.

21          MR. COFFEY:  Judge, can you admonish --

22          THE COURT:  You are all set.

23          (Jury excused.)

24          THE COURT:  Be seated, please.  Doctor, because

25   you are still giving sworn testimony in this case, I will

*(Waldman - People - Direct)*

1          ask that during this break you please not discuss your

2          testimony or the case with anyone, including the attorneys

3          involved.

4                    THE WITNESS:  Yes, sir.  I understand.

5                    THE COURT:  You may step down.

6                    (Brief recess taken.)

7     (Albany Medical Center Report marked People's Exhibit 21 for

8     identification.)

9                    THE COURT:  Bring the jury back in, please.

10                   MS. BOOK:  Judge, if at some point it looks like

11         we are not going to get to Dr. Sikirica for some reason, I

12         would just ask if maybe we can talk about it so we can let

13         him go because he has other work to do but is, obviously,

14         willing to stay here and stay late if we are going to get

15         to him and finish his testimony.  But if it comes to a

16         point where it looks like we are not going to get to him,

17         maybe we can talk about it at that point.

18                   THE COURT:  Sure.  We have two hours left.  We

19         will see how we go, but that's fine.  Okay.  Bring the

20         jury in, please.

21                   COURT OFFICER:  All rise.  Jury entering.

22                   THE COURT:  Please be seated.  The sworn witness

23         remains John Waldman.  Doctor, I will remind you you are

24         still under oath.  Ms. Egan, you may continue.

25                   MS. EGAN:  Thank you, Your Honor.  And Judy, can

*(Waldman - People - Direct)*

485

1      I have the last question and answer read back?

2                  (The previous question and answer were read back

3      by the Reporter.)

4    **BY MS. EGAN:   (Continuing)**

5         Q.   Doctor, what is a subdural hematoma?

6         A.   A collection of blood on the subdural space.

7         Q.   Are these collections normally present?

8         A.   No.

9         Q.   How can they be caused?

10        A.   They are caused by trauma, varying degrees.

11        Q.   And what is it about the collections that indicates

12   that they are caused by trauma?

13        A.   I'm sorry.  Could you repeat the question?

14        Q.   I will rephrase the question.  Can they be caused by

15   accidents?

16        A.   Yes.

17        Q.   Is there a way to differentiate a hematoma caused by

18   accidents versus one caused by trauma?

19        A.   On a CT scan or by looking at an autopsy or overall?

20        Q.   We will start with on a CT scan.

21        A.   No.

22        Q.   Then looking at other clinical signs and symptoms of

23   the patient?

24        A.   Well, if there is bruising or evidence of impact and

25   no history of trauma, that certainly raises the issue of

1    inflicted injury.  If there's a history of an automobile --

2    high speed automobile accident, then that could explain

3    subdural hematoma; the child walking into someone swinging a

4    baseball bat.  I mean, there are many kinds of traumas that can

5    cause subdural hematomas, but you can't tell one from the other

6    by looking at a CAT scan.

7        Q.   Based on your review of ▮▮▮▮'s CAT scan and his

8    medical chart, do you have an opinion as to how these subdural

9    hematomas were caused?

10       A.   I do, yes.

11       Q.   And what is that opinion?

12       A.   I think he sustained a blunt force trauma that caused

13   the subdural hematomas and they caused his death, the child's

14   death.

15       Q.   Now, can you tell the age of the hematomas?

16       A.   On a CAT scan?

17       Q.   Yes.

18       A.   No, not precisely.  In some cases, you can, and --

19   for example, if that big space were filled with entirely very

20   bright signal, that would indicate an acute subdural hematoma

21   and you could estimate that it happened roughly within hours or

22   a day of the -- of presenting at the CAT scan.  Chronic

23   subdural hematomas that are over three weeks or so, typically,

24   in age develop membranes that are visible on pathological

25   evaluation.  These membranes get, if you will, thicker over

*(Waldman - People - Direct)*

1    time and are visible and can be seen, certainly, under

2    microscope.  So, that's the way of aging subdural hematomas.

3           But in a clinical situation, it's very difficult,

4    particularly, as I mentioned before, in young children, where

5    there can be a mixture of acute blood with cerebrospinal fluid

6    that dilutes it.  It makes it look, quote-unquote, more chronic

7    than it actually is.

8        Q.   So, were you able to age ▓▓▓▓▓'s subdural

9    hematomas?

10       A.   No.  There was -- appeared to be some fresh blood,

11   probably within a day or two, mixed with CSF.  So, I can't

12   precisely age it, no.

13       Q.   Now, did the radiologist who performed the scan

14   create a report?

15       A.   He did, yes.

16       Q.   Did you review that report?

17       A.   Yes, I did.

18       Q.   Do you recall the findings contained in that report?

19       A.   More or less, yes.  He described bilateral subdural

20   fluid collections.  He didn't characterize the fluid itself.

21   He didn't.  Although he subsequently suggested that the

22   collection on the right side, the denser whiter side, he used

23   the term subdural.  Now, I think most people reading that would

24   interpret that as subdural hematoma but he didn't actually say

25   hematoma.

1        Q.   So, as you recall, the word blood and hematoma are

2    not in that report.   Is that correct?

3        A.   Correct.   Radiologists are looking at densities.

4             MR. COFFEY:   I object.   There's no question.

5             THE COURT:   Sustained.

6        Q.   But is it your interpretation of that language in the

7    report, based on your years of experience, that it does, in

8    fact, refer to hematomas or collections of bloody fluid?

9             MR. COFFEY:   Object as leading.

10            THE COURT:   Sustained.

11       Q.   Do you have an opinion as to what the language in

12   that report refers to?

13       A.   Yes.

14       Q.   What is that opinion?

15       A.   Well, the opinion is not separate from my own opinion

16   of interpreting the scan.   I believe he was referring to - and

17   I am referring to - subdural hematoma.

18       Q.   Now, in your years of practice, have you treated or

19   evaluated babies who had brain bleeds caused by birth?

20       A.   I have definitely seen many children who have

21   bleeding from birth, yes.

22       Q.   Have you seen subdural hematomas like those on

23   █████'s scan in any of the children that were associated with

24   birth?

25       A.   Never.

*(Waldman - People - Direct)*                              489

1    Q.   Are there other types of disease that could cause

2    subdural hematomas like the one on ███████'s head?

3    A.   I think I mentioned before that there is always some

4    trauma.  The question is, in a normal child, it takes

5    considerable force to cause a subdural hematoma.  So, if

6    there's some underlying disorder that may predispose to

7    bleeding, then a lesser degree of trauma might lead to a

8    subdural hematoma.

9    Q.   Are there any empirical studies that have evaluated

10   accidental versus inflicted head trauma in children?

11   A.   There are hundreds of thousands of studies.  There

12   was a study that looked at normal birth.  I believe they did a

13   consecutive series of children who were delivered, I believe,

14   by all means; normal, spontaneous, vaginal deliveries.  I think

15   there might have even been some C-section children in the

16   study.  I don't remember the exact, but these were normal

17   children.  There was no suspicion -- they weren't preemies.

18   There was no suspicion of intracranial bleeding clinically, and

19   all these children went under MRI scans and there was a number

20   of patients - again, I don't remember the percentage; I believe

21   it was under 50 percent but it was not -- it wasn't point one

22   percent - who actually had extremely thin -- had evidence of

23   extremely thin subdural hematomas.  These were all nonclinical.

24   You wouldn't have known they were there, in other words, unless

25   you actually looked for them on the scan.  And they were

1   followed and rescanned, and 100 percent of them were completely

2   gone by a month and none of them ever developed into anything

3   clinically significant.  They were all just teensy little thin

4   rim of subdural blood.  We have known for a very long time that

5   subarachnoid blood, blood in that space between the arachnoid

6   and the pia where the spinal cord is, that's extremely common

7   after normal vaginal delivery.

8       Q.   And in those cases, does that subarachnoid blood

9   resolve on its own?

10      A.   Yes.

11      Q.   Are there any studies assessing accidental head

12  trauma in children from falls?

13      A.   From falls?

14      Q.   Yes.

15      A.   Are you referring to short falls?

16      Q.   Yes.

17      A.   The definition of a short fall -- it depends on the

18  article but, typically, we can say under four feet, falling off

19  a changing table, falling from a chair.

20           MR. COFFEY:  Objection as testifying outside his

21      expertise.

22           THE COURT:  Sustained.

23      Q.   Judge, have you reviewed -- I'm sorry.  Dr. Waldman,

24  have you reviewed such studies in your clinical practice and

25  relied upon them in formulating your own diagnoses of patients?

1        A.    Sure.   It's a part of the -- it appears in the

2    neurosurgical literature, many of these articles, and I read

3    the literature.

4        Q.    Then could you tell us what these studies of short

5    falls have found?

6        A.    Well, the predominant feeling is that short falls do

7    not lead to -- short falls can cause skull fractures.   This is

8    known.   Short falls can lead to death extremely rarely, one in

9    several million.   Those deaths, the patients who die from short

10   falls, the majority of the literature indicates that they die

11   from epidural hematomas, which is different from the subdural.

12   It's between the dura and the skull and it's more related to a

13   skull fracture that injures a specific blood vessel on the

14   outside of the dura.   So, in the epidural stages, it's arterial

15   blood.   It develops rapidly and can lead to death.   It's very

16   different from a subdural hematoma.

17        And the other rare cause of death in a short fall is

18   due to an injury to a carotid artery in the neck that leads to

19   thrombosis and, basically, a massive stroke.   There are very,

20   very few case reports of children also dying from massive

21   subdural hematoma, usually unilateral, after a short fall; but

22   the vast majority of children who die, where there was a

23   shortfall as an explanation for the injury, have a very

24   different pattern of injury that has been shown.   Except for a

25   few outlying physicians, the vast majority of physicians

1   attribute this to nonaccidental trauma.  So, extensive retinal

2   hemorrhages, acute subdural hematomas, significant alteration

3   of a neurological function, coma; that, together, without a

4   history of significant injury, like an automobile accident,

5   raises a high level of suspicion for inflicted or nonaccidental

6   injury.

7        Q.   Did ████ have any other signs or symptoms

8   consistent with inflicted head injury?

9        A.   He had, as was described by the ophthalmologist,

10  extensive retinal hemorrhages and, of course, he had, you know,

11  profoundly altered neurological condition.  He was near death,

12  if not clinically brain-dead, by the time he got to Albany

13  Medical Center.

14       Q.   Now, Doctor, are you familiar with a condition known

15  as sepsis?

16       A.   Yes.

17       Q.   And what is your understanding of sepsis?

18       A.   Well, sepsis means a biological organism in the

19  blood.

20       Q.   Are you familiar with the term coagulopathy?

21       A.   Yes.

22       Q.   And what is coagulopathy?

23       A.   Coagulopathy is a term used to describe a disorder of

24  clotting, blood clotting.

25       Q.   And how about DIC?  Are you familiar with that term?

*(Waldman - People - Direct)*                                     493

1     A.   Yes.

2     Q.   And what does that mean?

3     A.   DIC means disseminated intravascular coagulation or

4     coagulopathy.

5     Q.   And what condition does that refer to?

6     A.   Well, sometimes something can trigger the pathway

7     that leads to blood clots.  And if that process is widespread,

8     it can consume the proteins that circulate, that actually are

9     involved in the formation of blood clotting.  So, if you use

10    them all up, clotting blood, there's none left, and then you

11    can get abnormal bleeding, and that's what disseminated

12    intravascular coagulopathy means.

13    Q.   Could coagulopathy have led to the type of subdural

14    hematoma that ███████ had?

15              MR. COFFEY:  Object to that.  It's outside the

16         areas of his expertise.

17              THE COURT:  Sustained on foundation.

18    Q.   In your experience, have you treated pediatric

19    patients that have clotting disorders?  Have you treated them

20    for head injuries, as well?

21    A.   Yes.  Severe brain injury is one of the, I guess,

22    common causes of DIC.  The brain is a very rich source of

23    tissue thromboplastin, which is a protein that can initiate

24    clotting.  So, when the brain is injured and those proteins

25    then get into the bloodstream, they can initiate disseminated

1    intravascular coagulation.

2        Q.   So, could a head injury cause DIC?

3        A.   Yes.

4        Q.   Now, after you finished your consult with ████,

5    did you provide any additional services or treatment to him?

6        A.   No.  By the time I saw him, he had no salvageable --

7    he was not salvageable.  His neurological condition was as bad

8    as it could be, and it wasn't something that he could recover

9    from.

10       Q.   Would you describe him as clinically brain-dead?

11       A.   By the second time I saw him, I believe he was or

12   about to be declared clinically brain-dead.  When I say

13   brain-dead, I'm not talking about the legal definition in the

14   sense that you have to do a specific series of tests.  What I

15   mean to say is that he had no evidence of neurological

16   function.  He was in deep coma and his pupils were not reactive

17   to light.  He had no brain stem reflexes and no movement.  So,

18   neurologically, that is part of the brain death criteria, that

19   neurological -- those neurological findings.

20       Q.   Are there any other tests associated with the

21   determination of brain death?

22       A.   Yeah.  There's several others.  They are not all

23   required, but you have to do what's called an apnea test.  One

24   of the -- the very lowest functions of the brain stem is to

25   provide a stimulation for breathing.  So, when that is lost,

*(Waldman - People - Direct)*

1    there's no breathing, no spontaneous breathing.  That's another

2    criteria.  That's not something I did in my assessment.  So,

3    that is part of the legal determination of brain death.  You

4    have to take someone off of the ventilator if they are on it,

5    like ██████ was, and determine that, as the carbon dioxide in

6    the blood builds up, that there is no effort to breathe at all

7    and that, ultimately, happened.  But there are other tests.

8    You can do radionuclide or scans where you inject material that

9    goes into the blood vessels and the blood that can be traced as

10   it goes up toward the brain; and if the pressure in that brain

11   inside of the head is high enough, if it's higher than the

12   arterial pressure and the heart is able to push to send the

13   blood into the brain, that nuclear material stops at the base

14   of the skull, never gets into the head.  So, that is another

15   test that is sometimes done to determine brain death.

16       Q.   What tests did you perform on ██████ to assess his

17   neurological function?

18       A.   I would have to look at my notes to see for sure.

19       Q.   Doctor, which notes are you referring to?

20       A.   I wrote two notes in the chart; one, I believe, on

21   the 22nd and one on the 23rd.  I'm probably the only

22   handwriting in the chart that you can read.

23   (Physician Notes marked People's Exhibit 22 for

24   identification.)

25       Q.   I'm handing what has been marked People's Exhibit 22

*(Waldman - People - Direct)*

1    for identification to Dr. Waldman.  Can you look at that and

2    tell me if those are the notes to which you are referring?

3         A.   Yes.  I think there's a page two for this.

4         Q.   It's a double-sided document.  Is that the page two?

5         A.   Yes.  Those are the two notes.

6         Q.   Could you review them to yourself and then let me

7    know when your recollection has been refreshed.

8         A.   Okay.

9         Q.   Okay.  Thank you.  Let the record reflect I am taking

10   the exhibit from Dr. Waldman.  Now that your memory has been

11   refreshed, Dr. Waldman, what tests did you perform on ▆▆▆▆

12   to assess his neurological function?

13        A.   I did some basic parts of the neurological exam.  I

14   looked in his eyes and shown a light in his eyes.  His pupils

15   were fixed and unreactive.  I checked to see whether he had a

16   gag reflex, which is another brain stem reflex, and that was

17   absent.  And I touched his eye with a piece of cotton, touched

18   his cornea to see whether he blinked - that's another brain

19   stem reflex - and he did not; and he had no movement whatsoever

20   to painful stimuli.  I also mentioned that he had no

21   spontaneous respirations.  That was probably reported to me.  I

22   doubt that I checked that myself.  I don't have any direct

23   recollection of examining him.

24        Q.   And what was your opinion of ▆▆▆▆'s neurological

25   function?

1      A.    That he was -- they should consider a brain death

2   determination.

3      Q.    Now, based on your review of ▮▮▮▮'s records, were

4   you aware of the progress of his decline?

5      A.    From the records?

6      Q.    Or otherwise, from the records or your experience in

7   dealing with other doctors on the case.

8      A.    Well, it's a little difficult, because I don't have

9   any direct recollection of talking to anybody or -- and

10   whatever, and I have reviewed other records.  So, I'm not a

11   hundred percent sure how to answer that; but I believe that he

12   was ill for a day or two beforehand.  I know now that he did a

13   partial feeding early in the morning, and then some time later

14   in the morning, hours later, he was found unresponsive and 911

15   was called.

16      Q.    Were you aware of the time frame between when he was

17   found unresponsive and when the CAT scan was performed?

18      A.    I don't recall exactly the time.  I think it was that

19   he got to Albany Med and he had been at, I believe, Samaritan

20   Hospital before that.  So, I don't know exactly a time.  I

21   think it was something -- probably three hours or so, maybe a

22   little bit more.

23      Q.    Now, in your opinion, Doctor, could the -- could

24   ▮▮▮▮'s subdural hematomas have accounted for a rapid decline

25   in his condition?

*(Waldman - People - Direct)*

1      A.   Yes.

2      Q.   How could that be?

3      A.   Well, there's several factors that determine the time

4   frame.  An infant is a little bit different from an older child

5   and adult in that the intracranial volume can expand to a

6   degree because the sutures are open.  We saw this in ████'s

7   case; but there is a limit to that, as well.  I mean, the head

8   typically just doesn't get bigger and bigger and bigger

9   forever.  The head has no empty space.  The intracranial space

10  where the brain is has no empty space.  There's either brain,

11  there's blood, normally blood vessels, arteries, capillaries

12  and veins, and there is the cerebrospinal fluid.

13      There are mechanisms as -- for example, let's just

14  say a brain tumor is growing inside the head or a blood clot is

15  accumulating inside the head.  The intracranial pressure will

16  not go up initially because the brain has the ability to absorb

17  more cerebrospinal fluid than it produces.  So, as some amount

18  of blood is entering the head, into the subdural space, an

19  equal amount of cerebrospinal fluid is displaced, so there's no

20  change in pressure, and there are other mechanisms.

21      But, eventually, these mechanisms can be exhausted

22  where, now, every little bit extra of blood causes a -- I am

23  sorry.  Whereas the pressure, as you are putting volume in, has

24  stayed flat.  Initially, eventually, when those mechanisms are

25  exhausted, there is a precipitous rise in pressure, and that

1    pressure then kills the brain.  It can be high enough, as I

2    mentioned before, to prevent blood from going into the head.

3    The brain doesn't store oxygen or store nutrients.  It requires

4    them on a constant basis to maintain a life.  So, when that

5    happens, the brain dies.

6            So, in the case of ▮▮▮▮▮ or anyone, when you see

7    them initially when they are not yet brain-dead, you don't know

8    exactly where they are in that curve or how close.  If someone

9    is awake -- let's say ▮▮▮▮ was seen six or eight hours

10   earlier.  He might have been very cranky.  He might have been

11   sleepy, but he wouldn't have been in deep comma.  We know that

12   because he fed.  But we wouldn't know where along that line he

13   is.  It could be in the next minute that he shoots up.  It

14   could be in the next hour he shoots up.  So, that's how, even a

15   subdural hematoma that is not occurring instantaneously like

16   some do - not instantaneously, but very rapidly - can

17   eventually lead to brain death.

18           So, I believe that's what happened to ▮▮▮▮.  He

19   had subdural hematoma.  He had an additional injury that led to

20   this brighter signal in the subdural space that is more acute,

21   fresh blood that tipped him over to the -- sent him over the

22   balance.  He crossed that elbow, that curve, and developed

23   severe increased intracranial pressure that caused his demise.

24       Q.   So, in your opinion, is it possible for an infant to

25   function relatively normal for some period of time after

*(Waldman - People - Direct)*                    500

1      sustaining an inflicted subdural hematoma?

2             A.    Well, in this case --

3                    MR. COFFEY:  He was asked a general question.  I

4             object to anything further.

5                    THE COURT:  I don't understand the objection.

6                    MR. COFFEY:  The question is was it possible

7             that the patient can for a certain period of time.  I

8             don't object to the question, but unless he relates it to

9             that question, I object.

10                   THE COURT:  Well, I haven't heard an answer yet,

11            so -- Doctor, do you understand the question?

12                   THE WITNESS:  I would like it repeated, if

13            possible.

14                   THE COURT:  Can we have the question read back?

15                   (Whereupon, the pending question was read back

16            by the Reporter.)

17                   THE WITNESS:  Yes.

18                   THE COURT:  Mr. Coffey, you have no objection to

19            that.  Is that right?

20                   MR. COFFEY:  No, I don't.

21            Q.    And how is that possible?

22            A.    Well, as I mentioned, there are mechanisms initially

23      to compensate for the accumulation of this bloody fluid.  In an

24      individual case, you don't know, because you don't know the

25      rate at which it's happening.  There are a lot of unknowns, but

*(Waldman - People - Cross)*                                    .501

1   it is possible for someone to have the onset of a subdural

2   hematoma.  I mean, this is not an example that's relevant to

3   this case, but in elderly people -- from the time we are born,

4   we are losing brain cells.  Our brain is shrinking.  And by the

5   time you get to my age or older, your brain has shrunk

6   significantly.  You can see it on a CAT scan, and cerebrospinal

7   fluid takes up that space.

8          But without going into great detail, you can develop

9   subdural hematomas from a simple fall sometimes that you don't

10  even remember and yet -- some subdural developing.  Once it

11  becomes chronic, then you have these membranes and they can

12  leak blood, or there can be minor leaks and they can get bigger

13  and bigger and bigger very, very, very slowly.  So, by the time

14  someone becomes symptomatic, they don't even remember their

15  original injury; it happened maybe months before.  That's

16  obviously different from this case, but that's how it happens.

17  It depends on the rate and the size and the ability of the

18  brain to compensate how quickly someone becomes symptomatic.

19          MS. EGAN:  If I could just have one moment,

20       Judge?  I have no further questions at this time.

21          THE COURT:  Okay.  Mr. Coffey?

22  **CROSS-EXAMINATION**

23  **BY MR. COFFEY:**

24       Q.   Doctor, good afternoon.

25       A.   Good afternoon, Mr. Coffey.

1      Q.   Doctor, let me start off, do you consider yourself an

2    advocate?

3      A.   An advocate?

4      Q.   An advocate?

5      A.   I am here to give my truthful opinion.

6      Q.   Well, I don't think anyone is saying you are

7    untruthful, but that's not my question, and I'm sure you

8    understand it.  In this case, do you consider yourself an

9    advocate?

10               MS. EGAN:  Judge, I'm going to object to this

11          question.

12               THE COURT:  Sustained.

13     Q.   Well, are you a scientist?

14     A.   Yes.

15     Q.   Now, if you or anybody else were a true scientist,

16   would you agree that the facts would take you in whatever

17   direction you would go, regardless if it, quote, helps one side

18   or the next?  Would you agree or disagree with that?

19     A.   I would agree with that.

20     Q.   So, when I asked you that question initially -- let

21   me ask it another way.  Do you believe -- and I understand you

22   have an opinion.  We will deal with that.  But do you believe

23   that your role here is to help the District Attorney's Office

24   in a way that goes beyond science?

25               MS. EGAN:  Objection.

1          THE COURT:  The objection is overruled.  I

2     understand the point of the question now.  The objection

3     is overruled.

4     Q.   Do you understand my question?

5     A.   I guess it depends on your definition of science.

6     Q.   Well, you testified -- you looked at 28 images in

7     this case; correct?

8     A.   Yes.

9     Q.   And that, in a sense, is science; isn't it?  In other

10    words, there's objective and subjective things in medicine;

11    correct?

12    A.   Correct.

13    Q.   Now, what opinions may be may be subjective, but when

14    you looked at the brain, would I be correct that those are

15    objective views of the brain?  Would that be a correct

16    statement?

17    A.   They're objective determinations of various densities

18    within the brain.

19    Q.   And if I ask you your temperature and you take your

20    temperature at 98.6 - and we have asked this question before -

21    that's an objective reading of a person's temperature; correct?

22    A.   Correct.

23    Q.   If a person says I have a headache or a stomachache,

24    that's subjective; correct?

25    A.   Correct.

*(Waldman - People - Cross)*

1    Q.   May be caused by an objective problem.  But when

2    people describe pain and so forth, that's subjective; correct?

3    A.   Yes.

4    Q.   Now, Doctor, do you agree with me that you should not

5    testify beyond your expertise?

6    A.   Again, I think it's a matter of definition.

7    Q.   Well, you wouldn't testify as a gynecologist; would

8    you?

9    A.   Absolutely would not.

10   Q.   You wouldn't testify as an orthopedist; would you?

11   A.   No, but that doesn't mean I don't know anything about

12   it and it doesn't mean that I haven't taken care of patients

13   with fractures or whatever.  I wouldn't pass myself off as an

14   orthopedic surgeon.

15   Q.   Are you board certified in orthopedics?

16   A.   No.

17   Q.   Are you board certified in neuropathology?

18   A.   No.

19   Q.   Are you board certified in infectious diseases?

20   A.   No.

21   Q.   Are you board certified in pediatrics?

22   A.   No.

23   Q.   Are you board certified in pathology?

24   A.   No.

25   Q.   So, you are board certified in neurosurgery; correct?

*(Waldman - People - Cross)*

1      A.   I am, yes.

2      Q.   And when people come -- when this boy came to the

3  hospital, would I be correct that one of the reasons why you

4  saw this baby is because you were acting within your skill as a

5  neurosurgeon, pediatric neurosurgery; correct?

6      A.   Yes.

7      Q.   Now, let's talk about what you reviewed before you

8  testified here today.  You have given testimony previously;

9  correct?

10      A.   In this case?

11      Q.   Yes.

12      A.   Yes.

13      Q.   Would I be presumptuous that you -- when I ask if you

14  reviewed that testimony?

15      A.   My testimony?

16      Q.   Yes.

17      A.   My testimony, I did review, yes.

18      Q.   When did you review it?

19      A.   Days ago; last week, probably.

20      Q.   Were you with anyone when you reviewed it?

21      A.   No.

22      Q.   Had you met with members of the District Attorney's

23  Office?

24      A.   Yes.

25      Q.   And when was the last time you met with them?

1      A.   Three weeks ago?  Two weeks ago, something like that.

2      Q.   And where did you meet?

3      A.   At my home.

4      Q.   And who from the District Attorney's Office came to

5   your home?

6      A.   Ms. Egan and Ms. Book.

7      Q.   And how many times have they been to your home?

8      A.   Once.

9      Q.   How long did you meet with them?

10      A.   I would guess an hour to an hour and a half,

11   something like that.

12      Q.   Had you ever met with either one of them prior to

13   that date?

14      A.   Not to my recollection, no.

15      Q.   Now, did you make notes?

16      A.   No.

17      Q.   Did they make notes that you recall?  Do you recall

18   them writing in front of you?

19      A.   Possibly.  I don't recall.

20      Q.   Now, were you made aware of the fact that there are

21   other competent -- well, I will take out the word competent.

22   There are other people who have expressed an opinion contrary

23   to yours.  Did the District Attorneys tell you about that?

24      A.   Contrary to my -- what opinion of mine?

25      Q.   The opinion that this baby's death was caused by

1   subdural hematomas.  Have you been made aware that there were

2   other people, board certified physicians, who have expressed a

3   difference in opinion with you.  Have you been told that?

4        A.   Yes.

5        Q.   And in terms of your preparation in front of the jury

6   that, presumably, doesn't know much about neurosurgery and

7   these things, in preparation, did you ask to review the

8   testimony of these individuals?

9        A.   I didn't ask to review anything.

10       Q.   So, you didn't care what they had to say?

11       A.   No.  I was given stuff, but I didn't ask for it.

12       Q.   Okay.  Did you read it?

13       A.   Yes, I did.

14       Q.   And there's a Dr. Jan Leestma and a Dr. Jerome Klein.

15   Do those names sound familiar to you?

16       A.   Yes.  I had both of those.

17       Q.   Have you read their testimony?

18       A.   Yes.

19       Q.   And you acknowledge that they have come to a

20   different opinion than yours; correct?

21       A.   Correct.

22       Q.   Okay.  Now, do you take the position that because you

23   are Dr. Waldman, a professor of neurosurgery at Albany Medical

24   Center, that your opinion is the only opinion that is

25   important?

*(Waldman - People - Cross)*                                           508

1      A.   No.

2      Q.   You are aware of the fact that Dr. Leestma is a

3   nationally renowned neuropathologist; correct?

4      A.   I have no idea what his reputation is.

5      Q.   Well, if you read his testimony, he gave his

6   background in the field of neuropathology; didn't he?

7      A.   I think I probably skipped that.

8      Q.   And Dr. Klein, do you know what his specialty is, or

9   did you skip that, as well?

10      A.   I think he is an infectious disease doctor.

11           MS. EGAN:   Objection.  I don't see the relevance

12      of these questions.

13           THE COURT:   Sustained.

14      Q.   You are not an expert in sepsis; are you?

15      A.   I am not, no.

16      Q.   In fact, you have expressly under oath admitted that

17   you are not an expert in sepsis; correct?

18      A.   Yes.

19      Q.   And in that instance, you would defer, would you not,

20   to a person who is an expert in sepsis?

21      A.   Would I defer?

22      Q.   Yes, in terms of what sepsis is caused by, its

23   effects and so forth.  Would you defer to a person who is an

24   expert in sepsis?

25      A.   I think there are people who are board certified in a

1    variety of things who are -- it would depend on what their

2    opinion was.  I wouldn't -- just because they are experts in

3    infectious disease, I wouldn't necessarily take everything they

4    say to be truth, just like you are not taking everything that I

5    say about neurosurgery to be true.

6         Q.   Well, in this case, whether sepsis leads to bleeding

7    disorders -- and DIC is a bleeding disorder; isn't it?

8         A.   Yes.

9         Q.   And whether sepsis, which is an infection that

10   involves the -- a person's system; correct?

11        A.   Yes.

12        Q.   And what is septic shock?

13        A.   Septic shock is a condition where an infection

14   overwhelms the body's ability to function.  It may shut down

15   the kidneys.  It may shut down the liver.  It may cause

16   meningitis in the brain.  It may cause disseminated

17   intravascular coagulopathy.  It can do a lots of things that

18   can cause the body to shut down.  Shock means the blood

19   pressure is low and the patient is not adequately oxygenating

20   and getting nutrition.

21        Q.   Now, the sepsis which can cause meningitis -- which

22   is an inflammation of the meninges of the brain; correct?

23        A.   Yes.  Well, the infection is typically within the

24   cerebrospinal fluid and those membranes bound the -- bind the

25   boundaries of the cerebrospinal fluid.

*(Waldman - People - Cross)*

```
 1        Q.   Have you ever in your practice, Doctor, treated

 2   infants with septic shock?

 3        A.   I have been involved -- not that I was treating them,

 4   but I have been treating patients for neurosurgical issues who

 5   have had septic shock.

 6        Q.   And in that case, have you referred those patients to

 7   the patients -- or the physicians who are dealing with them to

 8   pediatric infectious disease experts?

 9        A.   Yes, I would.  If it were my patient who I thought

10   had septic shock, I would refer it to a pediatric infectious

11   disease doctor.

12        Q.   Which is what Dr. Klein is; correct?

13        A.   Yes.

14        Q.   Okay.  Now, on the question of whether sepsis can

15   lead to a bleeding disorder, you are not an expert on that;

16   correct?

17        A.   Well, I mean, there's certain things that any doctor

18   knows, and I do know that DIC can be caused by sepsis, if

19   that's what you are asking me.

20        Q.   Well, I'm talking about bleeding disorders.  Can

21   sepsis -- whether or not most cases of sepsis leads to bleeding

22   disorders, you are not an expert in that; correct?

23        A.   When you say most cases, yes, I wouldn't know how to

24   answer that question.

25        Q.   Okay.  And in this case with ████, he developed
```

1    meningitis, didn't he, or don't you know; or no, for that

2    matter?

3         A.   I'm not sure that he did develop meningitis.

4         Q.   Did he -- I will get to that.  The -- let's talk

5    about the -- this case in terms of ████████.  We looked at the

6    CAT scans which you reviewed.  And there was a report issued by

7    a Dr. Hoover.  Is that correct?

8         A.   Yes.  That's the official report.

9         Q.   That's the official report.  And that's the report by

10   the neuroradiologist; correct?

11        A.   That is the report of Dr. Eric Hoover, and I believe

12   he is a board certified neuroradiologist, but I'm not sure.

13        Q.   All right.  But anyway, you have worked with him in

14   the past; correct?

15        A.   Yes.

16        Q.   And have you ever talked to Dr. Hoover about this

17   matter?

18        A.   No.

19        Q.   Now, I understand that you can read -- and no one is

20   disputing the fact that you can read a CAT scan.  If you really

21   wanted to know more about certain brain tissue, an MRI would be

22   even more specific; wouldn't it?

23        A.   In certain circumstances, it would.  I think -- you

24   know, an MR is not looking at density; it's looking at the

25   different parameter.  So, certain kinds of fluid, for example,

*(Waldman - People - Cross)*

1    might look different; and, so, an MR could add something in

2    certain cases.

3         Q.   Well, in this case, Dr. Hoover certainly thought it

4    might add something; right?

5         A.   I don't know that he did.  I don't recall that part

6    of the statement.  Well, yes, he did.  I do remember.  Yes, he

7    did.

8         Q.   And you knew when you testified today that I was

9    going to ask you questions about your treatment and the

10   findings made, and you certainly had to know that I was going

11   to ask about Dr. Hoover's report; correct?

12        A.   Well, I presumed you probably would, yes.

13        Q.   Pretty good guess, right, or no?

14        A.   Yeah.  No.  Go ahead.

15        Q.   Now, Dr. Hoover, in his report, indicated that there

16   are large bilateral extraaxial fluid collections slightly

17   larger on the right.  I will show you.  Do you want me to?

18        A.   No.  That's fine.

19        Q.   Posteriorly - which is the back; right - on the right

20   side - and I understand they are reverse on the CAT scans - and

21   over the upper aspect of the right cerebral convexity.  The

22   fluid is distinctly denser than on the left, which probably

23   indicates it is a large subdural collection.  Correct?  That's

24   what he wrote?

25        A.   That's what he wrote.

*(Waldman - People - Cross)*

1    Q.   Do you agree or disagree with that?

2    A.   I agree with it.

3    Q.   On the right, it is unclear whether the fluid is

4    subdural or merely subarachnoid.  Do you agree or disagree with

5    that?

6    A.   I don't disagree with it.

7    Q.   Now, the distinction can easily be made - I'm going

8    to repeat that - the distinction can easily be made with MRI.

9    That's what he said.

10   A.   Yes.

11   Q.   Do you think he's wrong about that?

12   A.   No.  I don't think he's wrong about it.

13   Q.   Now, with regard to the fluid, he saw more fluid on

14   the right than on the left; correct?

15   A.   Yes.

16   Q.   And with regard to the right, you don't know how much

17   blood is in there; maybe two percent, one percent?  You don't

18   know how much blood is in there, right, or do you?

19   A.   No.

20   Q.   You don't?

21   A.   You mean blood versus a mixture of cerebrospinal

22   fluid?  Correct.

23   Q.   On a percentage basis; correct?

24   A.   Correct.

25   Q.   Now, if it's, say, one percent or five percent or

1    maybe less than ten percent of blood, that's not a lot of

2    blood; is it?

3         A.    Inside the head, it's still a lot of blood, but it's

4    relatively less blood than the overall size of the collection,

5    yes.

6         Q.    And that blood that may have existed at that point --

7    and he never, by the way, indicated in his report that the

8    fluid was in any way bloody; did he?

9         A.    Right.  He was a typical radiologist who went -- he's

10   looking at densities.  That's how he reported it.

11        Q.    So, he's typically insufficient in his reporting?

12        A.    No, not insufficient.

13        Q.    You need a neurosurgeon like you to fill it in for

14   him.  Is that what you are telling me?

15        A.    No.  Well, when he referred to subdural, I think he

16   may have been referring to a subdural hematoma.

17        Q.    He may have?

18        A.    Most of the time in discussing -- when people say

19   subdurals, most of the time we are talking about subdural

20   hematomas.  That's conjecture.  I don't know what he was

21   thinking.

22        Q.    So, now we have - and I appreciate this - conjecture

23   that he may have been, may have been referring to subdural

24   hematoma; correct?  Right?

25        A.    Yes.

1          Q.   You just told us.

2          A.   Yes.

3          Q.   He might not have been; right?

4          A.   He described an extraaxial fluid collection.  That's

5     how he described it.

6          Q.   And it's conjecture that he's referring to a subdural

7     hematoma; right?

8          A.   Right.  And then he referred to it as likely

9     subdural.  I'm not sure likely is the term.

10         Q.   He said probably subdural.

11         A.   Probably subdural.

12         Q.   In any event, you are speculating - and we are forced

13    to speculate - as to whether he meant a subdural hematoma;

14    right?

15         A.   Correct.  He might have been referring to the space

16    rather than -- subdural space versus -- or subarachnoid space.

17         Q.   And one way to find out would be, of course, if the

18    District Attorney's Office or you, for that matter, were to

19    call Dr. Hoover and say to Dr. Hoover, "By the way, Dr. Hoover,

20    what do you mean by this?"  That's an easy way to find out;

21    right?

22              MS. EGAN:  Objection.

23              THE COURT:  What basis?

24              MS. EGAN:  Relevance and basis of knowledge.

25              THE COURT:  Overruled.

*(Waldman - People - Cross)*                                                516

```
 1        Q.   Correct?

 2        A.   An easier way would be to talk to the pathologist.

 3        Q.   Oh, you think the pathologist would be --

 4        A.   Not --

 5        Q.   Doctor, please.  Are you telling me that you think it

 6   would be better to talk to the pathologist about what the

 7   radiologist thinks than talking to the radiologist himself?

 8   Are you telling me that?

 9        A.   Today, yes.

10        Q.   All right.  Now, let me go back, if I can.  We know

11   from your testimony -- I think we know.  If I'm wrong, Doctor,

12   you correct me.  I'm sure you know you can.  You have testified

13   before; correct?

14        A.   I have, yes.

15        Q.   Did you ever testify in behalf of an accused in a

16   criminal matter?

17        A.   Yes, I have.

18        Q.   How long ago?

19        A.   In a criminal trial?

20        Q.   Yes.

21        A.   I couldn't even tell you.  I did recently participate

22   in a 440 hearing.

23        Q.   Okay.  All right.  Let me go back.  Now, 440 hearing

24   is a person who is attempting to have his conviction

25   overturned; right?
```

1    A.   Yes.

2    Q.   Let me go back, if I can, though.  Let me walk

3    through this, if you don't mind.  You were nice enough to

4    explain and go through the images with us.  And the ventricles

5    are those two little horns that come out in your head?

6    A.   They are within the brain substance.  They look

7    like -- yeah.  I guess you could describe them as little horns.

8    Q.   I don't know if that's the right way to describe it.

9    But in any event --

10   A.   That's part of the ventricular system we were looking

11   at.

12   Q.   Now, these ventricles which are on the images -- when

13   ▮▮▮▮▮▮ was brought to Albany Med, do you know when the CAT

14   scan was performed on the 22nd, what time?

15   A.   I do not recall that, no.  I believe it was soon

16   after -- I believe he was brought directly -- bypassing the

17   Emergency Department, brought directly to the Intensive Care

18   Unit.  I would imagine there was some amount of time and then

19   he went down for a scan.

20   Q.   And there's only one CAT performed; correct?

21   A.   That's my understanding, yes.

22   Q.   Okay.  And would I be correct -- and I know you have

23   issued a report in this case, which we have.  In your report,

24   which is dated 9/22, that is your interpretation of the CAT

25   scan?

*(Waldman - People - Cross)*                                    518

1          A.   Well, again, I don't have any direct recollection.  I

2     can only go by what I read and what my usual practice is, but

3     it would be inconceivable that I didn't look at the CT myself

4     and that that would be my interpretation.

5          Q.   Okay.  So, as you sit here today, your best

6     recollection almost six years later is that that report that

7     you have in front of you --

8               MS. EGAN:  Objection to referring to the

9          document as a report.  I believe it's notes.

10         Q.   All right, notes.

11         A.   Yes.

12         Q.   I will withdraw that.  I apologize.  Your notes, that

13    constitutes your findings of what you believe you saw on the

14    CAT scan; correct?

15         A.   Yes.  That's my interpretation of the CAT scan.

16         Q.   Now, Doctor, at the time that you did that, would I

17    be correct that you believed at that moment that this boy's --

18    what you characterize as a subdural hematoma, was caused by

19    trauma.  Would that be a fair statement?

20         A.   Yes.

21         Q.   And you believed at that time that he, ████████, being

22    four months old, had suffered trauma at the hands of somebody

23    else whom you didn't know at the time; correct?

24         A.   Well, I had no history of a mechanism of injury.

25         Q.   I understand that.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

P021153

*(Waldman - People - Cross)*                                    519

1          A.   So, I made no assumptions about it.

2          Q.   Now, having said that, having -- and you know as a

3     neurosurgeon that that -- your notes and any report you may

4     have issued would necessarily go in the chart and would be

5     viewed by people subsequently, and they would be important in

6     terms of your findings; correct?

7          A.   Yes.

8          Q.   You don't start -- on a matter of this seriousness,

9     you don't --

10         A.   I mean it's any -- I try to be accurate and truthful

11    when I write notes no matter what the case.

12         Q.   And you are not going to guess about something?

13         A.   In other words, I don't change my notes because I

14    think maybe this will come to trial.

15         Q.   Okay.

16         A.   I'm not sure that's what you were suggesting, but no.

17    I understand the implications of what I'm doing and I try to be

18    honest and forthright when I write my notes.

19         Q.   And that's what I'm asking.  And I'm not suggesting

20    that.  You would write down what you believe to be the case;

21    correct?

22         A.   Yes.

23         Q.   And later, just because there's a criminal trial or

24    you talk to District Attorneys, whatever, if you held a view,

25    you are not going to necessarily change it or alter it to fit a

*(Waldman - People - Cross)*

1    theory of the prosecution; correct?  Would you agree with that?

2         A.    Oh, absolutely.

3         Q.    Now, there may be facts that you learn later which

4    may --

5         A.    Right.

6         Q.    Which you might with any expert.  In other words, you

7    could come to an opinion, talk to an expert, look at a CAT scan

8    or an MRI - I'm not going to call you by your first name - but

9    they might say, "Well," and you say, "Okay, maybe"?

10        A.    Yes, yes.

11        Q.    Now, you talked about the aging of the subdural;

12   right?  And there was, what, one subdural hematoma here, if you

13   can answer that?  Can you answer that yes or no?

14        A.    Well, I believe there were bilateral subdural

15   hematomas.  The subdural space actually is one space.

16        Q.    All right.

17        A.    But what I mean by bilateral, they were over both

18   hemispheres.

19        Q.    Well, Dr. Hoover does not note any density on the

20   left side.  He -- reading his report, he's not suggesting

21   there's any blood on the left side; is he?

22        A.    No.  What he's saying is that the fluid collection

23   could be, on the left side, either subarachnoid or subdural.

24        Q.    All right.

25        A.    But he -- on either side.  He never uses the term

 1     blood or hematoma.  He uses collection.

 2          Q.   Fair enough.  But the collection, really, that he's

 3     talking about, the density occurs on the right side; correct?

 4          A.   There's fluid on both sides that have density

 5     different from cerebrospinal fluid.  So, even if it's all

 6     subarachnoid on the left, it's not normal cerebrospinal fluid.

 7     It's not normal fluid.  It's abnormal.  The question is whether

 8     it's in the subdural space, the subarachnoid space, equally

 9     divided.  He doesn't -- he's hedging his bets on that one.

10          Q.   And, so, when you talk about the brain, it's like a

11     container, nothing separating it.  So, there's some fluid

12     washing around and mixing in the brain; correct?  So, there's a

13     little more -- I know that's kind of basic, but what I'm

14     getting at is this:   �alto▊▊▊   has a subdural hematoma, and

15     there's evidence, according to your testimony, more dense, more

16     fluid on the right, more blood on the right than on the left;

17     correct?

18          A.   I would interpret it that way, yes.

19          Q.   All right.  Now, let's assume I take a four-month-old

20     baby - all right - and I take a four-month-old baby and I lift

21     him - I'm six feet tall; well, 5-11 and three-quarters - and I

22     take that baby and I throw that baby on the floor, hits his

23     head.  Good chance that baby is going to get a subdural

24     hematoma; right?

25          A.   It certainly is a possibility, yes.  That kind of a

 1    trauma can cause a subdural hematoma.

 2         Q.   Now, if I go less than 17 inches and do that, the

 3    very good likelihood is that it's not going to cause a subdural

 4    hematoma; right?

 5         A.   What exactly are you doing?

 6         Q.   I'm dropping the baby on the floor less than --

 7         A.   Just dropping?

 8         Q.   Dropping.

 9         A.   Not --

10         Q.   Not --

11         A.   Not slamming.

12         Q.   And the baby falls.

13         A.   That would be unlikely.

14         Q.   Now, let me talk about throwing it from above.  And

15    you have used the word in the past that, in your opinion, that

16    this baby suffered a serious application of force; correct?

17         A.   I don't recall the terms.

18         Q.   Do you want me to read it to you?

19         A.   I think you just did.  I would not dispute that's

20    what I said.

21         Q.   So, we are talking about a serious application of

22    force.  We are talking about an application of force that is

23    going to cause a subdural hematoma; right?

24         A.   Yes.

25         Q.   Now, if you get a concussion -- since you have used

*(Waldman - People - Cross)*

1    the example of older people.  Now we know there are all kinds
2    of lawsuits by the NFL and all those people.  And you get a
3    professional boxer, for example, and he gets hit and gets
4    knocked out.  He has a concussion; right?
5        A.   Yes.
6        Q.   Or you get some of these football players, which are
7    now worried about getting hit in the head and walking around
8    half cockeyed, they have had a concussion; right?
9        A.   Meaning they are not unconscious but they have been
10   hit in the head?
11       Q.   Yeah.  And they don't know what day of the week it
12   is?
13       A.   Yes.  That would be a concussion, yes.
14       Q.   Right?
15       A.   Yes.
16       Q.   And that's an alteration of mental consciousness;
17   isn't it?
18       A.   Yes.
19       Q.   Right?
20       A.   Yes.
21       Q.   And what happens is that brain has suffered a severe
22   insult; right?
23       A.   It's -- well, it depends on what you mean by severe,
24   but enough to produce a concussion, yes.
25       Q.   And when you played football at Yale -- you are very

1    familiar with concussions; right?

2         A.   Yes, I am.

3         Q.   Now, it's no different for a child who is four months

4    or a gentleman, man or woman who is 80 years.  You take that

5    kind of force, and you deliver that to that person enough to

6    cause a severe application, a serious application of force

7    using your terminology, you are going to see some physical

8    manifestations of that; aren't you?

9         A.   It depends on what you mean by physical

10   manifestations.  You mean on the skin?

11        Q.   No, either on the skin or the child may have -- the

12   person will have -- either the eyes will open up; they will

13   have twitching.  You take that kind of force in a person, isn't

14   it true that that person, with a reasonable degree of medical

15   certainty, is going to display some outward signs of having

16   suffered a severe head injury?  Isn't that true?

17        A.   You mean immediately or for some period of time?

18   Yeah.  I would agree, yes.

19        Q.   You would agree?

20        A.   Yes.

21        Q.   Now, tell me something.  Do you have children?

22        A.   Grown children.  They are still my children.

23        Q.   Fair enough.  What I was getting at is this:  I don't

24   know.  When you were younger, you and your wife -- but in your

25   practice, generally speaking, when people bring kids into the

1   hospital, it's the mom who generally does it, right, or no?

2       A.   No.   I would say certainly more than 50 percent of

3   the time but --

4       Q.   And would you agree with me that moms -- and I'm

5   using moms.   It could be any parent.   But mothers, they are

6   very good historians.   They are not always perfect but --

7       A.   Well, yes.

8       Q.   I understand there's qualifications.

9       A.   Yes, yes.

10      Q.   Let me do another one.

11      A.   The other way is when the mother tells me there's

12  something wrong, I believe the mother.

13      Q.   And when you take -- in your position as a pediatric

14  neurosurgeon -- I understand all the x-rays and CAT scans and

15  everything else.   But even with all the new advances in

16  medicine, history, history is still a critical component of any

17  clinical picture; isn't it?

18      A.   Yes, it is.

19      Q.   Doctors can say all they want.   Doctors who don't

20  care about patients - I know you do - but who don't want to

21  deal with patients -- but you want to know what is going on

22  with a patient, especially a newborn, a four-month-old; talk to

23  mom to find out from mom what's been going on with him; "How

24  has he been" and all that.   Correct?

25      A.   If you have the opportunity, yes.

1    Q.   If you have the opportunity.  Now, do you know, as

2  you sit here today, whether mom ever reported to anyone to this

3  very moment that her son, ███████, ever displayed an altered

4  state of consciousness before the weekend of September 21st?

5  Do you know that?

6    A.   I believe I do know that.

7    Q.   The answer is she never did; correct?

8    A.   No, she did.

9    Q.   She did?

10   A.   I don't know who she told or exactly what she told.

11   Q.   Before that weekend, it is your understanding that --

12  by the way, the mother has testified in this case?

13   A.   Yes.  I have no idea what she testified to.  So, I

14  guess it's vague enough in my mind that I don't know for sure.

15   Q.   If I were to tell you that the mother, prior to that

16  weekend, has never reported -- not to doctors, not to nurses,

17  not to us, not to this jury today or this week; that she has

18  testified that prior to the weekend of the 21st, her son never

19  displayed any altered state of consciousness.  Would that have

20  an effect upon your analysis; yes or no?

21   A.   It would have an effect on my analysis, yes.  I'm not

22  going to put my fingers in my ear and not hear it.  I would

23  listen.

24   Q.   Okay.  Now, I want to ask you something else, if I

25  can.  I want to go back to this subdural hematoma.  I think you

*(Waldman - People - Cross)*

1    told us -- and you know that there's -- that I disagree with

2    your analysis.  But nonetheless, I'm going to accept your

3    analysis for the moment; that        suffered a subdural

4    hematoma at some point in time in his life.  All right?

5        A.   Yes.

6        Q.   That subdural hematoma that you have aged, and you

7    have seen it on the CAT scan, was more than three weeks old,

8    wasn't it, because it was chronic?

9        A.   No.  I don't agree with that.

10        Q.   Well, you don't know how old it was; correct?

11        A.   Yes.  What I did say, I believe today, is that that

12    bright fluid is bright enough.  It's brighter than the density

13    of the brain.  So, that is very suggestive to me that that's

14    acute blood.  So, I would -- and I think I said that in my

15    testimony earlier; that it was probably a day or two.  I could

16    time that to a day or two.

17        Q.   Did this subdural -- was that enclosed by a

18    neovascular membrane?  It was; wasn't it?

19        A.   To my knowledge, no.

20        Q.   It was not?

21        A.   No, it was not.

22        Q.   Now, you have been asked this opinion and given this

23    opinion that, aging the subdural, that you are not able to age

24    it.  Do you agree or disagree with that?

25        A.   Well, I just qualified it.  I can't give, you know,

1        an hour or a day, but my opinion is that there was enough fresh

2        blood in that -- or the scan showed hyperdense - by that, I

3        mean denser than the brain - fluid that is consistent with

4        fresh blood, and that is probably within a day or two.

5            Q.   Doctor, I'm going to ask you if you recall being

6        asked this question and giving this answer.  All right?

7            A.   Yes, sir.

8            Q.   At a prior time.  "Doctor, based upon your experience

9        and training, are you able to determine the age of those

10       collections of bloody fluids?

11               "Answer:  In circumstances where there is a bleed,

12       for example, into the brain itself, or even into the subdural

13       space, other than in infants or, I will say, when there is an

14       acute hemorrhage into the subdural space, without mixing with

15       cerebrospinal fluid, the blood that is up to a week old will

16       appear bright, brighter than the brain.  So, it will appear

17       white.  Over time, that blood undergoes -- it breaks down and

18       becomes more and more borderline over time.  From about a week

19       to three weeks, the density of that will be almost like brain

20       tissue.  It will be gray.  So, it will go from bright white to

21       gray; and after that period of time, it will appear dark.  So,

22       you could say, if you knew that there was no mixture of fluids

23       in there, that this was chronic.  However, when you -- and in

24       particular, the instance of infant subdural hematomas, there's

25       so much cerebrospinal fluid that mixes with the blood, unless

*(Waldman - People - Cross)*                        529

1    you see bright white - in which case, it has to be less than a

2    week old - you can't age it.  This could have happened an hour

3    before.  It could have happened weeks before."

4            Do you recall being asked those questions and giving

5    those answers?

6        A.   I don't recall it, but I did review my testimony and

7    that's my testimony.  The only thing different about that --

8        Q.   Before we get to what's different, I want to ask you

9    what you said.

10            MS. EGAN:  Judge, objection.  Can we let the

11            witness answer the question?

12            MR. COFFEY:  I haven't asked a question.

13            THE COURT:  The objection is overruled.

14       Q.   Your last testimony in this case was that this

15   subdural could have been weeks before; right?

16       A.   No.  That's not what I said.  You misinterpreted what

17   I said.

18       Q.   Well, you said --

19       A.   I said there was hyperdense blood.  It could have

20   been a week old.  The difference between what I said then and

21   today is the number of days, couple of days difference.

22       Q.   You don't think I have misread your testimony from

23   before; do you?

24       A.   That's how I interpreted what I said.

25       Q.   Well, I interpreted it as saying this could have been

1    three weeks before; it could have happened weeks before,

2    actually?

3         A.   No.  I said under certain circumstance.  If it were

4    dark, it could have been three weeks before, is what I said.

5         Q.   Now, the -- on the question of -- let me ask you

6    something about that.  Assuming -- you said there was some

7    fresh blood.  Now, I want to ask you about this.  Assuming

8    there was fresh blood, in your opinion, there certainly was

9    blood that was not fresh; correct?

10         A.   I don't know that.

11         Q.   You don't know that?

12         A.   No.  It could be because it was a mixture of CSF.  It

13    could have been all fresh blood mixed with CSF, or there could

14    have been a chronic component, too.  I don't know.  You can't

15    tell that.

16         Q.   Okay.  So, if you did, you would be guessing?

17         A.   I would be guessing.

18         Q.   Okay.  Now, having said that, with regard to -- let

19    me talk about sepsis for the moment.  With regard to the

20    process that occurs when bacteremia gets in the bloodstream,

21    starts to spread throughout the bloodstream and that process

22    that occurs, you are not qualified to testify to that.  I'm not

23    saying you are not a good doctor.  You understand that?  But

24    that is not within your realm of expertise; is it?

25         A.   It is not, no.

1          Q.   So, if you were to take the issue of a bacteremia

2     getting in the system, going through the bloodstream,

3     developing sepsis and septic shock, whether septic shock then

4     caused the coagulopathy, you are not prepared in your expertise

5     to say that; correct?  Do you understand my question?

6          A.   I'm not a hundred percent.  Are you asking me about

7     the coagulopathy, or are you just saying in general?  I'm not

8     an expert in septic shock.

9          Q.   Right.  And whether septic shock can cause a

10    coagulopathy, which is excessive bleeding; correct?

11         A.   I have testified that I know that it can.

12         Q.   Right.  We are on the same page there.  But my point

13    is that whether septic shock can cause coagulopathy, you can't

14    agree or disagree with that; correct?

15         A.   No.  I agree that it can cause --

16         Q.   Did this boy have coagulopathy?

17         A.   Yes.

18         Q.   Clinically or radiologically?

19              MS. EGAN:  Objection, Judge.  I think the Doctor

20         has already stated this isn't within his field of

21         expertise.

22              THE COURT:  Overruled.

23         A.   I think you said radiologically.  You didn't mean

24    that.  You meant laboratory.

25         Q.   Yes.

1          A.    The laboratory findings were consistent with a

2     coagulopathy.  Clinically, I don't believe he had a

3     coagulopathy.  He didn't have -- he wasn't bleeding from his IV

4     puncture sites.  He didn't have bruises over his body that you

5     see typically with DIC.

6          Q.    But he did have DIC as it turns out?

7          A.    Well, he had -- yes.  He had low coagulation factors

8     consistent with disseminated intravascular coagulopathy, which

9     we know can happen in severe head injuries, and it can happen

10    in other things, including septic shock.

11         Q.    Okay.  And when a coagulopathy happens, a person gets

12    that, he's going to be bleeding all throughout his body,

13    correct; his brain, his heart, everywhere.  Right?  Or if you

14    don't know, tell me.

15         A.    I can tell you in my experience what I have seen.  I

16    have seen, for example, in multiple trauma cases, people

17    develop DIC.  They can have bleeding into the skin, into the

18    abdomen, into the chest, all places.  I have not seen this kind

19    of intracranial bleeding related to -- ever related to DIC,

20    never seen.

21         Q.    You are not an expert in that.  But you agree you are

22    not an expert; correct?

23         A.    I agree, but I have taken care of patients with head

24    injuries and septic shock, and I have never seen subdural

25    hematomas like this occur in septic shock personally.  I don't

1   know if it's ever been reported, but I have not seen it.

2        Q.   Well, do you think that a person who is an expert in

3   the field of pediatric infectious disease may know more than

4   you in this area?

5        A.   I have no idea.

6             MS. EGAN:   Objection.

7             THE COURT:   Overruled.

8        Q.   You have no idea?

9        A.   Depending on their experience.

10       Q.   Well, would you agree that a person may know more

11  than you in this area?

12       A.   Yes, absolutely.

13       Q.   Okay.  So, you can find a radiologist, for example,

14  or a neurologist who says, "In my experience, I have never seen

15  something," and you as a neurosurgeon --

16       A.   I have seen it.

17       Q.   Yes.  You would say, as a neurosurgeon, he may not

18  have, but I'm a neurosurgeon; correct?

19       A.   Yes, absolutely.

20       Q.   Now, if you know -- and if you don't, you can tell me

21  if it's a guess.  If you had trauma - and you say he had

22  trauma, this boy had trauma - you have indicated there could be

23  a delayed effect; correct?

24       A.   Delayed?

25       Q.   In other words, he has -- I apologize.  He has trauma

1   and, somehow, there's a bleed, and that bleed, what, just

2   begins to get worse?

3       A.   Yes, even enlarges over time.

4       Q.   And as that bleed is enlarging over time, how much

5   time is that going to take?

6       A.   Well, that's not something I can say.  It depends

7   on --

8       Q.   So, the answer is you can't say?

9       A.   Yes.  The answer is you can't know for sure.  That's

10  what I was talking about on the curve.

11      Q.   I understand.

12      A.   How close they are to the elbow, you don't

13  necessarily know.

14      Q.   But if you have trauma which causes a bleed, at some

15  point in time, that bleed will start to cause significant

16  problems for a person; correct?

17      A.   No.

18      Q.   If it keeps bleeding?

19      A.   Not necessarily.

20      Q.   All right.  So, when this baby started to bleed to a

21  point -- or when this subdural hematoma was caused, if it were

22  caused by trauma, you don't know; do you?

23      A.   Again, I would say I don't know precisely when but --

24      Q.   What is your range?

25      A.   Probably a few days.

*(Waldman - People - Cross)*                                                    535

1    Q.   A few days?

2    A.   Yes.

3    Q.   All right.  Now, Doctor, let's take those few days.

4    In order for this to occur with a serious application of force,

5    using your words -- these are your words; aren't they?

6    A.   Uh-huh.

7    Q.   A couple of days means a couple of days from Sunday,

8    because Sunday is when this baby crashes and gets brought to

9    Samaritan, gets transferred to Albany Med.  So, that couple of

10   days, your opinion is on Friday is when that trauma occurs;

11   right?

12   A.   Friday or Saturday, I guess.

13   Q.   Friday or Saturday?

14   A.   It could extend it a little bit probably; but yeah,

15   within that range.

16   Q.   Friday or Saturday; correct?

17   A.   Okay.

18   Q.   And you agree with me that on that Friday or

19   Saturday, because we have already agreed -- you have already

20   told us this.  That if you have this serious application of

21   force, this child is going to display outward signs of having

22   suffered a serious head trauma; correct?

23   A.   Those were your words.  I didn't say that.

24   Q.   Well, I thought you told me that if you had a serious

25   application of force to a person's head such as this, that that

*(Waldman - People - Cross)*

1  person, this child, would display some physical manifestations

2  of that force.  Didn't you tell me that?

3      A.   I didn't, but I will tell you that now if you are

4  asking me.

5      Q.   Do you agree with me?

6      A.   Yes, but the symptoms may be transient.  They may

7  resolve.  In other words, the concussive part of it may

8  resolve.

9      Q.   Well, how long would it take to resolve?

10     A.   It may take minutes to hours.

11     Q.   Okay.

12     A.   So, if I smack a kid because he's crying and doesn't

13 want to go to bed, and then after I smack him, he stops crying;

14 he goes to bed and wakes up, you know, eight or nine hours

15 later, he may not have physical signs of having that.

16     Q.   But using your testimony, Doctor -- and I'm asking

17 you now in your opinion, not what -- you might want -- I will

18 withdraw that.  You would expect - in fact, you can state with

19 almost absolute certainty - that if you had this child

20 severely -- with a severe head blow, this child, within

21 minutes, if not continuing for hours, is going to display a

22 physical manifestation of that blow; isn't he?

23     A.   Not necessarily physical in the sense of a bruising,

24 but I would expect the child would cry and be irritable at a

25 minimum.

1     Q.   Well, he would also cry and be irritable and, also,

2    his eyes would begin, possibly, to glaze over and he would show

3    some shaking; wouldn't he?

4     A.   No.

5     Q.   He wouldn't?

6     A.   Shaking means a seizure and many children who have

7    severe injuries don't have seizures.

8     Q.   Let's talk about in terms of your accuracy here,

9    Doctor.  And you try to be accurate.  You testified here at

10   length.  You testified another time at length, and you read

11   your testimony; correct?

12     A.   Yes.

13     Q.   So, let's not fill in the blanks when I ask you this

14   question.  You have never said, have you, that this boy had any

15   bruising on his scalp; have you?

16     A.   I have never said that.

17     Q.   And --

18     A.   Well --

19     Q.   Oh, I'm sorry.  I guess you may have said it.

20     A.   You mean on the outside of his scalp?

21     Q.   I don't care where it is.  I don't care where it is.

22   Doctor, let's use the word bruising.

23     A.   No.  I'm not disputing the bruising.  He showed no

24   external signs of trauma.  That is true.  I have said that.

25     Q.   And you have never testified, ever, that this baby

1   had a subgaleal hemorrhage; have you?

2        A.   I don't know.

3        Q.   You don't what?

4        A.   I don't know whether I testified to that or not.

5        Q.   Come on, Doctor.  You don't know whether you have?

6        A.   No.  I don't remember.

7        Q.   Really?

8        A.   Because I know it now, but I'm not sure when --

9        Q.   You know it now?

10       A.   Yes.

11       Q.   Well, let me look at your -- Doctor, you testified

12  you weren't going to testify on behalf, solely, of the People.

13  I'm going to look now at your notes.  And you tell this jury

14  whether you say you saw a subgaleal hemorrhage in your notes,

15  Doctor?

16       A.   No.  I did not see it.

17       Q.   And on your direct examination with Ms. Egan, did you

18  ever utter those words, subgaleal hemorrhage?

19       A.   I will take your word for it that I never did.

20       Q.   Don't take my word for it.  You have been in the

21  courtroom.

22       A.   I don't remember that specific statement.  I

23  don't recall.  There was no external --

24       Q.   Doctor, you really don't remember as you sit here?

25       A.   I don't remember.  I would not dispute what you are

1    saying, but I don't actually remember.

2        Q.   If you saw a subgaleal hemorrhage, you would have

3    noted it; wouldn't you?

4        A.   If I saw it when I examined him, I would have noted

5    it.

6        Q.   He didn't have a subgaleal hemorrhage; did he?

7        A.   I think he did ultimately.  On autopsy, he had a

8    subgaleal hemorrhage, but I did not know that at the time; and

9    when I testified, I don't know what I knew about the autopsy.

10   I don't recall.

11                MR. COFFEY:  May I take a minute?

12                THE COURT:  Yes.

13                MS. BOOK:  When Mr. Coffey is finished, may we

14       approach off the record one moment?

15                THE COURT:  Yes.  Attorneys approach, please,

16       off the record.

17                (Discussion off the record.)

18       Q.   Doctor, why is there a specialty of neuroradiology?

19       A.   Well, two reasons.  One is neuroradiology --

20   initially, when it was formed, it was formed because there were

21   specialized techniques, CT scan, initially, that required new

22   training to understand it and be able to interpret it.  Plus, I

23   think probably more importantly, there were a lot of procedures

24   that were done, for example, angiography, and the techniques of

25   angiography changed significantly more or less coinciding with

1    the time of the CT scan also that led -- those kind of studies

2    previously had been done by neurosurgeons who really didn't

3    want to do them any more.  They wanted to be in the operating

4    room taking out brain tumors and such.  And, so, we sort of

5    passed that along to the radiologist, and they required special

6    training to learn how to do those.

7         Q.   Special training?

8         A.   Special training to do the angiography and other

9    procedures and also, eventually, interpreting the scans.

10        Q.   Do you ever refer cases to neuropathologists?

11        A.   Um, I mean, I guess, yes.  You know, when we do --

12   when we are in surgery and we remove tissue, that tissue goes

13   to the Department of Pathology; and if it's appropriate, the

14   neuropathologist would review both that material and offer an

15   opinion about it.  So, in that sense, yes.

16        Q.   Doctor, I'm going to go back to your sworn testimony

17   and ask you if you recall being asked this question and giving

18   this answer:  "Question:" --

19             MS. EGAN:  Object.  Reading the question and the

20        answer is improper.

21             THE COURT:  That objection is overruled.

22        Q.   "Question:  In this report that was read and reviewed

23   by Eric Hoover, M.D., his impression indicates:  'Large

24   bilateral extraaxial fluid collections, probably subdural on

25   the right.'  Correct?

1           "Answer:  Yes.

2           "Question:  And in fact, his impressions and findings

3    do not make any reference to the words hemorrhage, hematoma or

4    blood; correct, Doctor?

5           "Answer:  Yes.  Well, I would like to review that

6    again, if you don't mind.

7           "Question:  Sure.

8           "Answer:  Yes.  He refers to the subdural as a fluid

9    collection.

10          "Question:  And that collection could have been there

11   for weeks, Doctor?

12          "Answer:  Possibly.

13          "Question:  Possibly months, too; correct, Doctor?

14          "Possibly months, but I would not expect to see the

15   density in the right side after months."

16          MS. EGAN:  Objection, Judge.  I don't believe

17       this is proper impeachment.

18          THE COURT:  Why?

19          MS. EGAN:  To read multiple questions and

20       multiple answers in a row.

21          THE COURT:  That's precisely how you do it.

22       That objection is overruled.

23   Q.   So, I'm going to go back to this.  These are your

24   words, Doctor.  And if you want to look at that, you tell me.

25   A.   Go ahead.

*(Waldman - People - Cross)*

1     Q.  "Answer:  This was possibly months, but I would not

2    expect to see the density in the right side after months unless

3    there were fresh hemorrhage.

4          "Question:  Certainly, Doctor, you cannot rule out

5    the possibility that blood fluid collection had been there for

6    months; correct?

7              "It's possible that some of it was there for months.

8          "Question:  And in terms of the subdural hematoma

9    that you talked about here today, certainly, Doctor, you can't

10   tell this jury -- you can't tell how long this had been there;

11   correct?

12         "Answer:  Sitting here today and looking at those

13   scans, I cannot age the subdural."

14       Do you want to take a look at this and see if that's

15   what you said before?

16     A.  No.  It's not inconsistent with what I have said

17   today, frankly.

18     Q.  Well, I thought you told us today you could age it;

19   it was within a couple days?

20     A.  No.  I said the bright signal in that subdural was a

21   few days; let's say a week.

22     Q.  So, you could age it?

23     A.  That component.  But could there have been a chronic

24   component there for months before the acute blood entered the

25   subdural space?  Yes.

 1        Q.   That's your answer today?

 2        A.   That's pretty much what I said then, too.

 3        Q.   So, when you say "I cannot age the subdural," that's

 4   what you meant?

 5        A.   In another question, I did age the subdural.  You

 6   told me I aged it a week.

 7        Q.   Well, I will tell you what.  On one answer, you said

 8   you can age it; in one answer, you say you can't age it.

 9        A.   It depends on the interpretation.  The entire amount

10   of subdural fluid, some of it may have been old, but some of it

11   was definitely fresh blood.

12             MR. COFFEY:  That's all I have, Judge.

13             THE COURT:  Ms. Egan, any redirect?

14             MS. EGAN:  Yes, Judge, if I may just have a

15        minute.

16             THE COURT:  Sure.  Take your time.

17   **REDIRECT EXAMINATION**

18   **BY MS. EGAN:**

19        Q.   Doctor, Mr. Coffey just asked you several questions

20   about the age of the subdural hematomas in ██████'s head.

21        A.   Right.

22        Q.   Would you please explain your opinion on the age of

23   the subdurals?

24        A.   Okay.  Traditionally, if you look at the density of

25   blood on CT scans, it undergoes a change over time.  This is

1    sort of vaguely defined as acute, subacute and chronic.  Acute

2    blood on a CT scan appears brighter or whiter than the average

3    density of the brainy substance.  We relate densities to the

4    brain, what the brain looks like.  If the brain looks like

5    gray -- and acute blood is brighter.  It looks whiter than that

6    gray brain.  So, that's acute.

7            Subacute, the density of the blood is more or less --

8    looks the same gray as the brain, and then chronic is when it

9    looks dark.  It's darker than brain.  Okay?  So, that's the

10   typical way we used to characterize that.

11           But what we know now is that in some cases,

12   particularly in children, acute blood can also mix with

13   cerebrospinal fluid, and that dilutes the density of it.  So,

14   an acute subdural that occurred one hour before a scan can look

15   just like ███████ 's scan.  So, it makes it more difficult.  The

16   traditional acute, subacute, chronic designation doesn't hold

17   up in every case.  It's much more complicated than that.  What

18   determines -- what is a better determinate of age sometimes, of

19   a subdural, is an MRI; not always.  The signal changes you see

20   with blood over time in an MRI is very, very, very complicated

21   and there are lots of exceptions.  So, even then, subdurals are

22   very difficult to age, but the best indicator is --

23               MR. COFFEY:  I object.  This is nonresponsive.

24               THE COURT:  Overruled.

25           A.   What the best indicator is is the pathology.  And by

1    that, I mean that, when you do an autopsy and look at the

2    subdural fluid, you can visually look at it and you can look at

3    it through a microscope and you can age it and --

4                    MR. COFFEY:  Objection.  He's testifying as a

5         pathologist now.

6                    THE COURT:  Now the answer is becoming

7         unresponsive.  I will sustain the objection.  Ms. Egan,

8         you can ask another question.

9         Q.    Is it possible to age a subdural hematoma to the

10   hour?

11        A.    No.

12        Q.    Is it possible to age a subdural hematoma to the day?

13        A.    Based on just the CT scan?

14        Q.    Yes.

15        A.    No.

16        Q.    What other information could give a more accurate age

17   to a subdural hematoma?

18        A.    The history of when a trauma occurred, like in a car

19   accident, and you see an acute subdural on a scan.  That would

20   be it.  There are other things that are not specific but give

21   some credence to, more or less, when, for example.  In this

22   child, we saw that the sutures were widely separated, and that

23   translates into the circumference of a measurement around the

24   head that is way out of the normal range.  There are well

25   established ranges of head size in children and there are

*(Waldman - People - Redirect)*

1    graphs; and when you bring your child to the pediatrician for

2    the regular visits, he typically will measure the head

3    circumference and he will plot it on a graph.  When you see

4    subdural hematomas that are slowly developing, they may not

5    cause symptoms.  The first sign of a subdural might be a child

6    whose head circumference which had been at the 25th percentile

7    now suddenly is at the 98th percentile.  Something happened

8    that caused that very rapid change in the head size.  And, so,

9    a pediatrician, if he saw that, even though the child may

10   appear completely normal or maybe no history of anything, that

11   pediatrician would or should order some tests, either an

12   ultrasound --

13              MR. COFFEY:  I object to this, Your Honor.  It's

14        totally nonresponsive.

15              THE COURT:  Sustained.

16   A.   Well --

17              THE COURT:  There's no question.

18              THE WITNESS:  Sorry.

19   Q.   Did you have an opportunity to review any records

20   pertaining to ████'s head growth?

21   A.   Yes.

22   Q.   Was there anything indicative of intracranial

23   abnormality in those records?

24   A.   Yes and no.  The initial -- I believe at

25   approximately two months of age, he had a head circumference

*(Waldman - People - Redirect)*

1    measurement done by the pediatrician that placed him, I

2    believe, just under the 25th percentile, something in that

3    range; in other words, within normal range.  It wasn't big.

4    When he came into the hospital, Albany Medical Center, you

5    know, during the admission that he died, his head circumference

6    was way above the 98th percentile.  So, some time between --

7    the inference is that some time between two months and when he

8    came into Albany Med this event happened and progressed from

9    that point.

10        Q.   Can the age of a subdural hematoma be determined more

11   accurately upon autopsy?

12        A.   I would say it's my understanding that, yes, it can.

13        Q.   Doctor, would you defer to an infectious disease

14   doctor's opinion of whether or not a child sustained an

15   inflicted brain injury?

16        A.   No.

17        Q.   Was an MRI ever performed on ███████?

18        A.   No.

19        Q.   Do you know why that was?

20        A.   Yes, two reasons.

21             MR. COFFEY:  I object as irrelevant.  It wasn't.

22             MS. EGAN:  Judge, this was covered on

23   cross-examination.

24             THE COURT:  The objection is overruled.

25        A.   There were two reasons.  One is he was basically

1   brain-dead.  So, it served no purpose in terms of treating

2   ████.  And secondly, he was very unstable, meaning his blood

3   pressure was very unstable, and an MRI requires moving a

4   patient and all - he was on a ventilator - all the equipment

5   down to the MRI facility.  MR, as you may or may not know, is

6   an extremely powerful magnet, so there couldn't be any metal.

7   It's very complicated; plus the test itself takes some time.

8   So, he wasn't in a condition to have an MRI, and there was no

9   useful purpose in it in terms of treating Michael -- or

10  ████, I'm sorry.  So, it was not done.

11       Q.   Thank you, Doctor.  May I ask what exhibit is up

12  there at the witness stand with you?

13       A.   This is my note.  This is Exhibit 22.

14            MS. EGAN:  Mr. Coffey, do you have the

15       radiologist report?

16            MR. COFFEY:  Yes.

17       Q.   Do you know what time the CAT scan was performed on

18  ████?

19       A.   I don't recall.

20       Q.   Would the date that the radiologist printed give you

21  an idea?

22       A.   It would be on the, actually, on the scan, would be

23  the most accurate time.

24            MS. EGAN:  If I could have a moment, Judge.  I'm

25       just going to turn the scan back on.  Judge, may I ask the

1    witness to step off the witness stand?

2              THE COURT:  Sure.

3        Q.   Dr. Waldman, could you take a look at that image from

4    the CAT scan CD in evidence?  And can you tell me if you can

5    determine the date when the CAT scan was performed?

6        A.   1220:48.

7        Q.   What date?

8        A.   9/21.  So, 20 to one in the afternoon.

9        Q.   Thank you, Doctor.  Dr. Hoover's report refers to

10   large bilateral extraaxial fluid collections, probably

11   subdural.  Is this language commonly used to refer to hematomas

12   among neurosurgeons and neuroradiologists?

13       A.   I would say more neuroradiologists than

14   neurosurgeons.

15       Q.   Have you heard of --

16       A.   I mean, I use --

17             MR. COFFEY:  I object.  He keeps doing this.  He

18       wasn't asked a question.

19             THE WITNESS:  I'm continuing the --

20             MR. COFFEY:  Excuse me, Doctor.

21             THE COURT:  I understand the objection.  Doctor,

22       had you finished your answer?

23             THE WITNESS:  I had not.

24             THE COURT:  You may continue.

25       A.   I use fluid collections in other circumstances.  I

1    didn't use them in this circumstance, because I believe these

2    to be subdural hematomas.

3        Q.   Have you heard neuroradiologists use these type of

4    terms referring to hematomas or bloody fluid collections?

5                 MR. COFFEY:  Object as leading.

6                 THE COURT:  Sustained.

7        Q.   Now, did you interpret ███████ 's CAT scan yourself?

8        A.   Yes.

9        Q.   And what is your opinion as to the fluid collections?

10                 MR. COFFEY:  Judge, he testified to this at

11            length on direct examination.  This is just a

12            recapitulation of his direct.

13                 THE COURT:  Haven't we covered this?

14                 MS. EGAN:  Judge, I just wanted to clarify it.

15            It was covered on cross at length.

16                 MR. COFFEY:  I had to ask questions from the

17            direct.

18                 THE COURT:  The purpose of redirect is to

19            clarify any areas you believe require clarification.  It's

20            not just to go through direct all over again and get the

21            opinions all over again.  I'm going to sustain the

22            objection.

23                 MS. EGAN:  Certainly, Judge.

24        Q.   Now, you were asked questions about serious

25    application of force.  Does force have a greater effect on an

1    infant's brain than on an adult's brain?

2        A.   Well, there are definitely differences between the

3    anatomy and the physiology of an infant's brain and an older

4    person's brain or an adult brain.  And, so, the response to

5    trauma also can differ.  So, the answer is -- I think the

6    answer is yes.  There are differences.

7        Q.   Can an infant sustain a greater level of trauma from

8    the same application of force as an adult?

9        A.   Well, it's known that infants are more susceptible to

10   diffuse -- an injury called diffuse axonal injury.  There are

11   probably differences, but it's not an extremely well studied

12   area to give precise answers, but there are known differences

13   in the patterns of injuries sometimes, and an infant also has a

14   larger head relative to body mass and weaker neck muscles, so

15   that it makes acceleration-deceleration kinds of injuries more

16   important in young children compared to an older child or

17   adult.  So, yes.  There are differences.  In terms of the

18   actual forces, I think that that is not exactly, no.

19       Q.   Can an infant sustain serious brain injury without

20   external signs of injury?

21       A.   Yes.

22       Q.   Can an infant sustain a subdural hematoma without

23   external signs of injury?

24       A.   Yes.

25       Q.   Now, how would an altered state of consciousness

*(Waldman - People - Redirect)*                    552

1    manifest itself in an infant?  What signs would the infant

2    show?

3         A.   The infant might be irritable, possibly inconsolable,

4    crying, could be sleepy and, you know, progressing to

5    unresponsive.

6         Q.   And what's --

7         A.   Could feed poorly, vomit.

8         Q.   Would a layperson always be able to recognize these

9    symptoms as an altered state of consciousness?

10                   MR. COFFEY:  I object to this.

11                   THE COURT:  Sustained.

12        Q.   Is it possible for those signs to resolve quickly?

13        A.   Yes.

14        Q.   Now, you were asked about bleeding and coagulopathy.

15   Was ▮▮▮▮▮▮ bleeding everywhere?

16        A.   No.

17        Q.   Was ▮▮▮▮▮▮ bleeding everywhere in his brain?

18        A.   No.

19        Q.   You were also asked about subgaleal hemorrhage.  What

20   is a subgaleal hemorrhage?

21        A.   The scalp has layers.  The galea is a fibrous layer

22   on the inside of the scalp.  And sometimes with injuries, you

23   know, blunt force trauma of some nature or another, you can get

24   tearing of some blood vessels that leads to a collection of

25   blood in the space between the galea and the skull.  Sometimes

*(Waldman - People - Redirect)*

1    you can get bleeding on the outside of the galea and into the

2    scalp, as well.

3    Q.  Are subgaleal -- how are subgaleal hemorrhages

4    typically detected?

5    A.  Well, if they are large enough and you examine for

6    it, you can sometimes feel them.  For example, after a normal

7    vaginal delivery, sometimes kids have a big -- (indicating);

8    sometimes that is subgaleal.  Sometimes it is in another space,

9    subperiosteal; but you can sometimes see them and feel them.

10    They will feel sometimes boggy, is the term.

11    Q.  I'm sorry.  Are they visible in CAT scans?

12    A.  They may be, yes.  They may be.

13    Q.  Are they always visible in CAT scans?

14    MR. COFFEY:  Object as leading.

15    THE COURT:  Overruled.

16    A.  No.  They are not always.

17    Q.  Why would you not always be able to visualize a

18    subgaleal hemorrhage on a CAT scan?

19    A.  It may not be big enough to see.

20    Q.  Doctor, how many years were you reading your own

21    scans before neuroradiology became a specialty?

22    A.  Well, I don't remember exactly when neuroradiology

23    became a specialty; but when I was a resident, there were - at

24    least at Albany Med - there were no neuroradiologists until I

25    was in my, I think, my third year following graduation from

*(Waldman - People - Recross)*                                                554

medical school, is when Albany Med got their first MR.  I could

be off by a year but, definitely, there was no neuroradiologist

when I was doing my first year of neurosurgery.  And so,

technically, once I finished my residency, there has always

been a specialty, neuroradiology specialty.

Q.  Do neuroradiologists receive training above and

beyond the training a neurosurgeon receives?

A.  It's not above or beyond.  It's different.  You know,

they focus on imaging, reading images, doing the procedures

they do, angiography.  There's some overlap.  For example --

MR. COFFEY:  I object to that.  We are not

asking about overlap.  He was asked about above and

beyond.  It's different.

THE COURT:  I think the witness has answered the

question.

MS. EGAN:  If I could just have one minute,

Judge?  I have nothing further.

THE COURT:  Mr. Coffey, any recross?

MR. COFFEY:  Thank you.

**RECROSS-EXAMINATION**

**BY MR. COFFEY:**

Q.  Doctor, the trauma you are talking about, even if

there is trauma, can be accidental -- could be accidental;

couldn't it?

A.  I can't tell from looking at scans or the patients

1    what the intent of an injury was.  That is correct.  I wasn't

2    there to witness it.

3         Q.   Doctor, let me -- why don't you answer the question

4    specifically if you can?  It can be accidental.  Is that

5    correct, incorrect, or you are not prepared to answer it?

6    There's three choices.  Which one would you choose?

7         A.   I would choose it could be accidental.

8              MS. EGAN:  Objection.  The witness has already

9         answered the question, Judge.

10             THE COURT:  Mr. Coffey, ask the question.  The

11        witness can answer as he sees fit.  If you feel it's

12        unresponsive, you can make an application, but the answer

13        will stand.

14        A.   I can be responsive.  The answer would be accidental.

15        Q.   Now, did you tell us on your redirect examination

16   that a pathologist would be able to date the age of a subdural

17   hematoma better than you?

18        A.   Better than from a CT scan, yes.

19        Q.   And you indicated that a baby that suffered trauma,

20   you would expect him to have a diffuse axonal injury; correct?

21        A.   No.  I didn't say I expected they would have.  I said

22   it's possible.  I didn't even say that.  I just threw it out

23   there as a different -- a difference between an adult brain and

24   a child's brain and the kinds of injuries that they can have.

25        Q.   Rather than just throw things out, I assume you are

     1   testifying as you are right, the purpose; correct?

     2        A.   I was trying to answer the question that was asked of

     3   me.

     4        Q.   ███████ did not have a diffuse axonal injury; did he?

     5        A.   I don't think we know the answer to that.  First of

     6   all, it's a pathological --

     7        Q.   The answer is you don't know?

     8             MS. EGAN:  Objection.  Can he allow the witness

     9   to answer the question?

    10             MR. COFFEY:  He answers and then he --

    11             THE COURT:  Just ask the question and allow the

    12   witness to answer the question before you ask the next

    13   question.

    14        Q.   Do you know if ███████ had a diffuse axonal injury?

    15        A.   No, I don't.

    16             MR. COFFEY:  Okay.  That's it.

    17             THE COURT:  Ms. Egan, any redirect?

    18             MS. EGAN:  No, Your Honor.

    19             THE COURT:  Doctor, you may step down.  Thank

    20   you.  All right.  Members of the jury, we are going to

    21   break for the day at this point in time.  I will ask that

    22   you please report back here tomorrow at 9:30.  We will

    23   attempt to get started at 9:30 tomorrow.

    24             During the course of this break, please do not

    25   discuss the case among yourselves or with anyone else.  Do