EXHIBIT "S"

1          THE COURT:  Sure.

2          (Discussion off the record.)

3          THE COURT:  The People may call their next

4     witness.

5          MS. BOOK:  Thank you, Your Honor.  The People

6     call Dr. Carole Jenny to the stand.

7     **CAROLE JENNY**, after first having been duly sworn by the Clerk

8     of the Court, was examined and testified as follows:

9          THE CLERK:  The sworn witness is Carole Jenny,

10    J-E-N-N-Y.

11         THE COURT:  You may proceed, Ms. Book.

12         MS. BOOK:  Thank you, Your Honor.

13    **DIRECT EXAMINATION**

14    **BY MS. BOOK:**

15    Q.   Good morning.

16    A.   Good morning.

17    Q.   Could you introduce yourself to the jury, please?

18    A.   I'm Carole Jenny.

19    Q.   And how are you employed?

20    A.   I'm a professor of pediatrics at the University of

21    Washington in Seattle, and I work with the Child Protection

22    Unit at the Seattle Children's Hospital.

23    Q.   What, exactly, does that entail?

24    A.   We get consulted on all the possible abuse or neglect

25    cases that come into the hospital.  We do consults from the

1    community, from social service workers or police if they have

2    questions about medical aspects and, you know, is this abuse;

3    is this not abuse.  I also do clinics at a hospital called

4    Harborview Medical Center, which is the county hospital in

5    Seattle.  I see outpatients.  Most of the outpatients that we

6    see are sexually abused kids or kids where there's concern of

7    sexual abuse.

8           We do research.  We have something just established,

9    a fellowship training program.  We do a lot of teaching of

10   medical students, residents, interns, community docs, other

11   people in the community.

12          Q.   How long have you been at the Seattle Hospital?

13          A.   Since February.

14          Q.   Okay.  And why the recent move?

15          A.   Well, we originally thought we were going to retire,

16   but then when we got to Seattle, my husband and I were both

17   offered really interesting jobs, so we didn't.  So, we moved to

18   Seattle, because that's my husband's home.

19          Q.   Okay.  Now, I'd like to turn to your educational

20   background for a moment.  Could you tell us where you went to

21   college?

22          A.   I went to the University of Missouri in Columbia,

23   Missouri.

24          Q.   And what year did you graduate?

25          A.   In 1968.

1       Q.   What degree did you obtain there?

2       A.   A Bachelor's, a BA degree in zoology.

3       Q.   Okay.  And can you tell us about your postgraduate

4  degrees?

5       A.   I have a Bachelor's in medical science from Dartmouth

6  Medical School and an M.D. degree from the University of

7  Washington.  And then after residency, during fellowship, I did

8  an MBA at the Wharton School of the University of Pennsylvania.

9       Q.   Can you tell us about any postgraduate training or

10  fellowships that you participated in?

11       A.   I was an intern in pediatrics at the University of

12  Colorado and then a resident in pediatrics at Philadelphia

13  Children's Hospital, and then I did a fellowship at the

14  University of Pennsylvania.  It was the Robert Wood Johnson

15  Clinical Scholar.

16       Q.   What does that mean?

17       A.   Well, it's the Johnson Foundation, as in Johnson &

18  Johnson Company, and the foundation has a program where they

19  train or they give fellowship opportunities to physicians after

20  they completely finish their medical training in related

21  fields.  I did mine in health services administration, health

22  management.

23       Q.   What certifications or licenses do you hold?

24       A.   I'm licensed to practice in Rhode Island and in the

25  State of Washington.  I'm board certified by the American Board

1       of Pediatrics in general pediatrics and in child abuse

2       pediatrics.

3            Q.   Can you tell us about the subspecialty of child abuse

4       pediatrics?

5            A.   Child abuse pediatrics was a subspecialty

6       established -- well, actually, the first exam was given in

7       2009, although people have been doing this work for quite

8       awhile; but the Board of Pediatrics recognized it as a

9       subspecialty of pediatrics in 2009.

10           Q.   Did you have anything to do with that test?

11           A.   Well, I wrote the first application to the Board of

12       Pediatrics on behalf of the American Academy of Pediatrics

13       asking that it be made a full subspecialty, justifying the need

14       for a subspecialty.

15           Q.   Would you like some water?

16           A.   Yes.  That would be helpful.  Thank you.  And I was

17       on the board of their group for exams for the subspecialty.

18           Q.   So, you actually wrote the exam in the subspecialty

19       of child abuse pediatrics?

20           A.   Yes.

21           Q.   And are you current in both of those subspecialties

22       that you are certified in?

23           A.   Yes.  I'm certified in both until -- well, actually,

24       I'm certified in general pediatrics for life, but I have been

25       taking the exams every seven years just to -- you know, I like

1    being up to date, and I'm also board certified currently in

2    child abuse pediatrics.

3        Q.   Okay.  What do you mean that you are board certified

4    for life but you take the exams anyway?

5        A.   Well, until about 1985, if you passed your pediatric

6    boards once, you weren't required to maintain certification;

7    but then in about '90, they said, well -- in '85, they said

8    from now on, everybody has to take an exam every six to seven

9    years to show that they have maintained their qualifications.

10   I took my last exam in 2010.

11       Q.   And you do that voluntarily?

12       A.   Yes.

13       Q.   And have you passed all your exams?

14       A.   Yes.

15       Q.   Okay.  You mentioned that you serve as a member of a

16   faculty currently?

17       A.   Yes.

18       Q.   Can you tell us about that?

19       A.   Well, the University of Washington is a very large

20   medical school, the only one, actually, in about a five-state

21   area on the Northwest part of the country, and I'm on the

22   Department of Pediatrics.  I'm a full professor.

23       Q.   Can you briefly describe for us your employment

24   history and any administrative positions you have held?

25       A.   Well, I started out as -- at the University of

*(Jenny - People - Direct)*

1    Washington after a fellowship with joint appointments in the

2    department -- in the public health school and then in the

3    medical school.  And then when my children arrived, I quit and

4    didn't work for seven years.  I was a full-time mom, and then I

5    went back to work after they were in school.  At that point, I

6    took a job at Harborview Medical Center in Seattle doing child

7    abuse work, and I have been doing it ever since.

8              After I left Harborview, I did spend one year in

9    private practice and then went to the University of Colorado

10   and had a faculty appointment, and I was a medical director of

11   a research group there.  And then in 1990, I was recruited by

12   Brown and I stayed at Brown until this past spring, this past

13   winter.

14        Q.   And what did you do at Brown?

15        A.   I was a professor of pediatrics and I was the

16   director of the Child Protection Program at the hospital, the

17   affiliated children's hospital called Hasbro Children's

18   Hospital named after the toy company.

19        Q.   What hospitals have you had or do you currently have

20   privileges at?

21        A.    Currently, I have privileges at the -- at Harborview

22   Medical Center and Seattle Children's in Seattle.  Previously,

23   I was at Hasbro Children's, and I also had privileges at Women

24   and Infants Hospital in Seattle, which is where they deliver

25   all the babies.  And then before that, I was on the staff of

*(Jenny - People - Direct)*                                      574

1   the Denver Children's Hospital; and before that, I was in

2   Seattle.

3          Q.   Can you briefly tell us some of your professional

4   memberships?

5          A.   Um, I'm a member of the American Academy of

6   Pediatrics, the American Professional Society on Abuse of

7   Children, the Forensic Science -- Academy of Forensic Sciences,

8   the International Society of Prevention of Child Abuse.  I

9   guess those are the main ones.

10         Q.   Okay.  And have you been appointed to any national

11  committees?

12         A.   Yes.

13         Q.   Can you tell us about those?

14         A.   Um, I was, for several years, the chair of the

15  Committee on Child Abuse for the American Academy of

16  Pediatrics, which is sort of the body that represents 60,000

17  American pediatricians.  I have been on the board of directors

18  of the American Professional Society of the Abuse of Children,

19  and I have been the -- a district vice chairman for District

20  One in the Academy of Pediatrics, which is all of New England

21  and part of Canada.

22         Q.   Have you been on any state and local committees?

23         A.   Yes.

24         Q.   Can you tell us about those?

25         A.   Oh, gosh, a lot.  I have been on -- I founded Death

1    Review in the State of Rhode Island, where we review every

2    child's death, and I was the chair of that for five years.  I

3    have been on advisory committees to the Legislature.  I worked

4    with the Attorney General's Office on a committee that defines

5    standards for sex offender categorization, when they first had

6    sex offender notification legislation.  I have done -- been an

7    advisor to the State Child Advocate.

8         I have worked with the Centers for Disease Control,

9    the CDC, in Atlanta on devising protocols for the evaluation of

10   children and for defining head injuries in children.  I have

11   been on study groups with the National Institutes of Health

12   that analyze grant proposals; lots of things.

13        Q.   Okay.  Now, just for a moment, I want to talk about

14   the Death Review team that you did.  Can you tell us about that

15   and what exactly that was?

16        A.   Well, over the last 20 years, most states have begun

17   to look very carefully at child deaths, and the whole point of

18   doing it is to look for areas of prevention.  So, we organized

19   the team in Rhode Island - I'm not sure what year - maybe '98,

20   maybe, because they had not had a child death review team, and

21   this included the medical examiner, law enforcement people,

22   social services people, people from family organizations, the

23   SIDS organization, sudden infant death syndrome support group.

24   And we would, as a group, we would review difficult cases; but

25   as a panel -- there were three of us that reviewed every death

*(Jenny - People - Direct)*                                        576

1       in the State of Rhode Island in any child under 18, and the

2       idea was to look for patterns so we could deal with prevention,

3       and we did -- we did a lot of drowning safety promotion.  We

4       have done safe sleep promotions for infants, helmet programs,

5       bicycle safety and so on.

6               So, as a group, the death review panel would identify

7       how and why are kids dying, why are we losing our babies and

8       our youngsters, and then try to think up good ways to make that

9       better and make the environment safer.  I also was on death

10      review at -- I was on the committee.  I didn't run it, but I

11      was on it in Colorado.  That's why I started it in Rhode

12      Island.

13          Q.  Can you approximate how many children's deaths you

14      have reviewed?

15          A.  Well, in Rhode Island, we had, I think, 170 a year.

16      That's from birth to 18.  So, obviously, I did that for five

17      years.  And then, of course, I'm involved in a lot of child

18      death cases in my other role as a child abuse pediatrician.

19          Q.  So, would it be fair to say you have reviewed

20      thousands of child death cases?

21          A.  Well, let's see.  Well, at least a thousand, I would

22      say.  I have been doing this for 30 years.

23          Q.  Now, when you review a child death case, what do you

24      look at?

25          A.  Everything, everything I can get my hands on; police

*(Jenny - People - Direct)*

1    records, social service records, all the medical records, birth

2    records, prenatal records, well-child care records; you know, a

3    lot of times kids are involved with other agencies, like WIC,

4    the supplemental feeding program, and they keep records of a

5    child's growth and development.  If it's relevant, we look at

6    school records, you know, depending upon what the nature of the

7    case is.  So, it's an extensive process.

8         Q.   Have you been elected to any positions?

9         A.   Um, I have been the president of the American Academy

10   of Pediatrics in Rhode Island.  I have been elected to the

11   Board of the American Professional Society For Abuse of

12   Children.  I was elected to serve on the section -- and then I

13   was the chair of the Section on Child Abuse For the American

14   Academy, which does all the educational materials and plans for

15   continuing medical education.

16        Q.   Have you had the opportunity to consult in your

17   field?

18        A.   Yes.

19        Q.   In what ways?

20        A.   Well, I have consulted with hospitals that are -- you

21   know, they are either having problems with their Child

22   Protection Program or they want to, you know, to get it

23   reviewed and kind of get a grade card.  I have, again,

24   consulted with CDC and NIH.  I have done consultation, you

25   know, for -- in lots of legal cases.  I have done, you know,

*(Jenny - People - Direct)*

1    legal consultation, medical legal consultations in England,

2    Wales, New Zealand, Canada and in several states in the U.S.

3        Q.   Have you been published?

4        A.   Yes.

5        Q.   How many times?

6        A.   I haven't counted recently.  I have eight books that

7    I have edited or co-edited, and I have had about 40 book

8    chapters and way over a hundred scientific publications in

9    medical journals.

10       Q.   Those eight books that you have written, what are

11   they and what are they about?  You don't have to say all of

12   them, but generally?

13       A.   Most recent was a large textbook for physicians on

14   child abuse, great big thing, and child abuse and neglect; and

15   then I have also recently published a book called *Medical Child*

16   *Abuse*.  That is about kids that get excessive unnecessary

17   medical care, how it can hurt them; and the others have been on

18   physical abuse, sexual abuse of children.

19       Q.   What other topics have you published on?

20       A.   Well, my main -- early on, I published a few basic

21   science papers when I was in medical school.  And since I have

22   been in this field, I have published on sexual abuse, on

23   sexually transmitted diseases, on failure to thrive and

24   neglect; and most recently, in the last ten years, most of my

25   work has been in the field of head trauma and child death.

*(Jenny - People - Direct)*

1    Q.   What, specifically, do you publish on with respect to

2    head trauma and child death?

3    A.   Epidemiology, meaning you know where and when it

4    happens, how to recognize it, biomechanics.  I worked for five

5    years in a biomechanics laboratory with a head injury research

6    group in Japan and just, you know, lots of different aspects of

7    head trauma.  I did one study on coagulation problems in babies

8    with head trauma; you know, many different studies.

9    Q.   Can you briefly tell us about your work in Japan?

10   A.   Well, the crash test dummies that people use to

11   analyze infant injuries in the U.S. are very -- they are not

12   very well engineered, and a private lab, actually, in Japan,

13   built their own set of dummies that are very, I guess you would

14   say, advanced, very biofidelic.  And, so, I happened to meet

15   these people at a pediatric meeting, a scientific meeting, and

16   they then hired me to work with their team in designing infant

17   head trauma studies using their particular amazing laboratory,

18   which was just a wonderful experience.

19   Q.   What, exactly, did you look for during that?

20   A.   We studied all kinds of things.  We looked at car

21   crashes.  We studied accidental injuries, lots of different

22   kinds of falls and things that occur to infants in accidents,

23   just look at the biomechanics of what their head experienced,

24   and then we also looked at abusive injuries that were modeled

25   by these dummies or on these dummies.

*(Jenny - People - Direct)*                                          580

1          Q.   Have you lectured in your field?

2          A.   Yes.

3          Q.   Approximately how many times?

4          A.   Oh, hundreds, in lots of different countries.  I

5     often give lectures.  Most recently, I have been in Sweden and

6     Israel and France within the last year, and then I have

7     lectured medical meetings all over the U.S.

8          Q.   Have you testified in court before?

9          A.   Yes.

10         Q.   Approximately how many times?

11         A.   Um, about once or twice a month.  Most of the cases

12    are cases where I actually --

13              MR. COFFEY:  Objection.  She wasn't asked why.

14         She was asked how many times.

15              THE COURT:  Overruled.

16         Q.   You can continue.

17         A.   Most of the cases that I do are kids -- are my

18    patients, kids that I see and then they are going to Family

19    Court to decide where the child should live, and I also do

20    other cases, you know, get hired by other jurisdictions to look

21    at child death cases and child abuse cases.

22         Q.   Have you been qualified as an expert witness in court

23    before?

24         A.   Yes.

25         Q.   In what courts have you been qualified?

*(Jenny - People - Direct)*

1    A.   In County Courts, State Courts in the U.S., in courts

2    in, again, New Zealand and Wales and England and Canada, and I

3    also testified before the -- the Courts of Appeal in England,

4    which is kind of like their Supreme Court.  And, so, I have

5    been -- and in court-martials -- courts-martial in military

6    cases and in Family Court.  I'm sorry.

7    Q.   That's okay.  Have you received any honors or awards

8    in your field?

9    A.   Yes, I have.

10   Q.   Can you briefly tell us about some of those honors

11   and awards?

12   A.   I was the recipient of the Outstanding Contribution

13   to Child Abuse and Neglect Award given by the American Academy

14   of Pediatrics.  I was given a nice award by the National

15   Association of Children's Trust Funds, again on the issue of

16   preventing child abuse.  I was given an award by the American

17   Professional Society on Abuse of Children for my work, for

18   outstanding professional in child abuse.  I have been given two

19   awards by the Federal Government for my work in child abuse.

20   Q.   Did there come a time that you were contacted by the

21   Rensselaer County District Attorney's Office to consult on a

22   case involving the death of ███████  ██████?

23   A.   Yes.

24   Q.   And are you being compensated by the District

25   Attorney's Office for your time and consultation on this case?

*(Jenny - People - Direct)* 582

```
1    A.   I am.

2    Q.   How much are you being compensated?

3    A.   $300 an hour for record review and for testimony.

4    Q.   Do you testify for both the prosecution and defense?

5    A.   Yes.

6    Q.   Do you testify for the prosecution more than you do

7  the defense?

8    A.   I do.

9    Q.   Why is that?

10   A.   Well, I never refuse -- I rarely refuse to review

11 cases, unless I'm just way far behind and don't have enough

12 time.  If I review a case for the defense and I say, "Gee, I

13 think this is abuse," they are obviously not going to call me

14 to testify.  And I have done that with prosecution cases.  I

15 say, "I don't feel comfortable testifying in this case because

16 I don't think this is, you know, the right thing," and then

17 they don't call me, either.  What usually happens in those

18 cases, though, is the case gets dropped.

19             MR. COFFEY:  I object to this as nonresponsive.

20 She wasn't asked whether they get dropped.

21             THE COURT:  Overruled.

22   A.   Not always.  Some cases, they go ahead and proceed

23 with the case, and that's their choice.

24   Q.   Okay.  And specifically, have you testified in other

25 cases for the Rensselaer County District Attorney's Office
```

*(Jenny - People - Direct)*

1    before?

2        A.   I think this is like the fourth time I have testified

3    here.

4        Q.   Okay.  Did you review any records prior to coming

5    here today?

6        A.   Yes.

7        Q.   Can you tell me what records you reviewed?

8        A.   Um, the prenatal care records for ███████  ██████ '

9    mother, his birth records, his postnatal records, his

10   well-child care records and records of a hospital visit,

11   emergency visit on September 13th of -- 2009?  No.  I forgot

12   what year.  September 13th.  And then also a prolonged hospital

13   record beginning in September of -- 21st.  I forget what year

14   it was.

15       Q.   That's okay.

16       A.   I'm sorry.  And then I reviewed the autopsy report,

17   police records, social service records.

18       Q.   Now, let's start at the beginning and talk about the

19   prenatal history of Wilhemina Hicks.  You just testified that

20   you reviewed the prenatal history and OB-GYN records of

21   ██████ 's mother.  Did she have any prenatal or pregnancy

22   problems?

23       A.   She had pregnancy induced hypertension.

24       Q.   What does that mean?

25       A.   It used to be called toxemia, but it's a problem that

1    develops in some pregnancies, where the mother gets very high

2    blood pressure and oftentimes will have some kidney problems,

3    as well, and it can be fatal to mothers.  Obviously, it's

4    something people watch for very closely.  This was a twin

5    pregnancy, which always is more complicated than a non-twin

6    pregnancy.  Mother had some difficulties with her blood sugar

7    and, you know -- and she went into premature labor, had

8    premature rupture of her membranes, early rupture of her

9    membranes and then went in and delivered the babies vaginally.

10        Q.   Okay.  Now, when we say premature rupture of the

11   membranes, does that just mean your water broke earlier than 40

12   weeks or what does that mean?

13        A.   Well, it broke before delivery, too early, and it's

14   just, you know, something that they watch.  Once the water

15   breaks, they would rather get the baby out within 24 hours or

16   12 hours, even better, because that just increases the risks to

17   the baby.

18        Q.   Okay.  Do you know whether or not there was any

19   meconium involved in this case?

20        A.   Meconium?  There was staining of the fluid, of the

21   amniotic fluid that came from the uterus.  There wasn't, to my

22   understanding, frank meconium, which is essentially fetal poop;

23   but when one of the babies has released meconium, the fluid

24   takes on kind of a greenish tint.

25        Q.   And what is the risk of that?

*(Jenny - People - Direct)*

1        A.    Well, if you aspirate -- if the baby is born and when

2   they take their first breath -- they actually have meconium in

3   their mouth and they aspirate it into their lungs.  It causes

4   very severe pneumonia.  So, when you are at a delivery and you

5   are delivering, as the pediatrician, you get the baby and

6   there's meconium present, generally before the OB delivers the

7   baby, he will try to suck it out with suction; and then when

8   the baby is delivered to the pediatrician, you intubate the

9   baby to look beyond the cords to see if there's meconium down,

10  you know, beyond the vocal cords that can get then into the

11  lungs.  If there is, you wash it out with saline.  You don't

12  want that stuff to get into the lungs.  That's very critical.

13       Q.    Now, in this case, there's been some mention of the

14  meconium.  Was it to that extent at all?

15       A.    No.  There was some staining of the fluid.

16       Q.    What does that mean?

17       A.    There was some meconium -- some babies are born just

18  with frank sticky black meconium around their mouth and around

19  their body.  If they at some point during the delivery process

20  have -- excrete some meconium, it can make the fluid a

21  different color.  It's just a sign that the babies are in

22  distress and we want to get them out.

23       Q.    Was there a concern for anyone aspirating meconium in

24  this case?

25       A.    Neither of these babies aspirated.

*(Jenny - People - Direct)*                                586

1    Q.   Was ███████  ███████ born premature?

2    A.   Yes.

3    Q.   At how many weeks gestation?

4    A.   I believe 33 weeks.

5    Q.   Is there a degree of prematurity and a degree of full

6    term?

7    A.   Yes.

8    Q.   Could you tell us about that?

9    A.   Well, ideal is around 38 to 40 weeks; and generally,

10   37 to 35 is considered mildly premature, and those kids have

11   different problems, other than real premature babies.  From 35

12   weeks down to 29 weeks or to 30 weeks, they are considered

13   premature; and less than 30 weeks, they are exceedingly

14   premature.  Now they are delivering babies at 24, 25 and 26

15   weeks and resuscitating them and keeping them alive and,

16   obviously, they are very high risk babies.

17   Q.   So, being that ██████ was born at 33 weeks

18   gestation, where did that place him on the prematurity scale

19   and what risks are associated with that?

20   A.   Well, he's midrange.  The problems that can happen

21   are lung disease, chronic lung disease, low blood sugar, low

22   body temperature, difficulty feeding.  Those are -- that age

23   range of kids, those are things you look for.

24   Q.   Is there anything that can be done to improve the

25   lungs?

*(Jenny - People - Direct)*                                    587

1      A.   Well, are you talking about this individual case or

2   any case?

3      Q.   Well, in any case, is there anything that can be done

4   to help improve the lungs?

5      A.   Yes.

6      Q.   What is that?

7      A.   Well, depending on the nature and degree of the lung

8   disease, you put kids on ventilators and give them support

9   until their lungs mature.  You can give them -- give the mother

10  steroids before delivery to decrease the likelihood of lung

11  disease.

12     Q.   Why do you give steroids?

13     A.   Because it decreases the amount of inflammation and

14  there's less chance the baby will develop severe lung problems.

15     Q.   Do you know if Wilhemina received that steroid shot?

16     A.   Yes, she did.

17     Q.   And is that helpful towards the babies when they are

18  delivered?

19     A.   Yes.

20     Q.   Now, was there any birth complications with ████?

21     A.   ████ did require some oxygen.  His initial -- when

22  babies are born, you give them a score called an Apgar score.

23  That kind of is a score of how well they are adapting to

24  neonatal life, their life outside the uterus, and you do it at

25  one minute and five minutes.  His first was low.  He was

*(Jenny - People - Direct)*

1    stimulated and given oxygen; and his second was nine, which is

2    fabulous.  So, he very quickly came around.  He did require

3    some oxygen in the nursery.  He never was on a ventilator.  He

4    never required, you know, serious respiratory support.  He

5    had -- he was hypothermic, which means kind of had a hard time

6    maintaining his body temperature, which is normal for these

7    kids, but it's something you really watch; and he did receive a

8    workup for a possible infection, but that was negative.

9        Q.   Okay.  Now, the Apgar's that you were talking about,

10   what do they assess?

11       A.   Breathing, color, movement, strength of baby's cry.

12   It's kind of a rapid assessment to see whether the baby is

13   going to be in bad trouble or whether they can make that

14   adaptation to extrauterine life on their own.

15       Q.   Now, is one of the scores predictive of how you are

16   going to do?

17       A.   Well, I think certainly, by five minutes, you want

18   the kid to have a normal Apgar; and if they don't at one

19   minute, you are certainly going to give them oxygen and do what

20   you have to do to make sure that they have a good start.

21       Q.   So, the fact that ████████'s Apgar was a nine at five

22   minutes, what did that indicate to you?

23       A.   That's good.  That means he made an adaptation.  He

24   responded to the therapy.  He did well.  For a 33-week-old

25   baby, he really had a fairly uncomplicated course.

1      Q.   When ▮▮▮▮▮ was born, other than what you have

2  already described, were there any other health concerns?

3      A.   Um, he had some difficulty gaining weight and had the

4  normal preemie feeding issues, but he did well and didn't have

5  any -- when he left the hospital, he was a normal baby.

6      Q.   What is a trivalvular pulmonary stenosis?

7      A.   That's when the pulmonary valve, the valve between

8  the atrium and the ventricle, is a little constricted, is

9  constricted.

10     Q.   Was that present at all in ▮▮▮▮▮?

11     A.   You know, they said it was.  They heard a murmur.

12 They did an ultrasound and said it was, but four months later

13 on autopsy, and also on ultrasound or on Doppler study of his

14 heart, echocardiogram, he had perfectly normal valves.  So, if

15 it was there, it wasn't ever -- it didn't ever affect him in

16 terms of his ability of his heart to function; and at the time

17 of his death, he had very normal cardiac function by the

18 ultrasound.

19     Q.   How was ▮▮▮▮▮ during his stay at Albany Medical

20 Center?

21     A.   At Albany?

22     Q.   Yes.

23     A.   The first time or the second time?

24     Q.   The first time after he was born.

25     A.   He did well.  He, again, needed oxygen.  He did get a

*(Jenny - People - Direct)*                                    590

1    short course of antibiotics, but his cultures were negative and

2    he required help with feeding and staying warm, the typical

3    kind of preemie problems.

4         Q.   At some point, was he transferred to another

5    hospital?

6         A.   Yes.

7         Q.   Where was he transferred to?

8         A.   They sent him home to St. Mary's.

9         Q.   And why would they send a premature newborn to

10   another hospital?

11        A.   Well, depending on the level of the intensity of care

12   he needed.  If they don't need intensive care, it's certainly

13   much more convenient for the family if he's at a local

14   hospital, rather than a hospital that's farther away.  It's

15   mostly for the convenience of the family, but it's common to

16   have people step down from a high level to a midlevel to a

17   regular nursery.

18        Q.   Okay.  And did you review his records at St. Mary's

19   Hospital?

20        A.   Yes.

21        Q.   How was he during his stay at St. Mary's?

22        A.   He did well.  He grew, and he basically just matured

23   to the point where he was perfectly safe to go home.

24        Q.   Was there any indication to you that ▓▓▓▓  ▓▓▓▓

25   had intracranial bleeding or was born with any type of subdural

*(Jenny - People - Direct)*

1    hematomas?

2         A.   Well, he didn't have any seizures or neurologic

3    issues as a newborn.  He did have, I think at about 10 days,

4    ultrasound, and that is a study that looks at just the part of

5    the brain that's underneath the soft spot on top of the head.

6    So, you only see, you know, this kind of region of brain, but

7    it was perfectly normal.  They didn't see any excess fluid.

8         Q.   In your experience, is an ultrasound an accepted

9    method of checking premature babies for intracranial bleeds?

10        A.   Well, certainly, they do it.

11             MR. COFFEY:  She didn't ask what they do.  She

12        asked whether it's acceptable and I object.

13             THE COURT:  The objection is sustained.

14        A.   I'm sorry?

15        Q.   That's okay.  In your experience, is an ultrasound an

16   accepted method of checking premature babies for an

17   intracranial bleed?

18        A.   Yes.

19             MR. COFFEY:  I object to this as outside of her

20        expertise.

21             THE COURT:  The objection is sustained on

22        foundation.

23        Q.   Dr. Jenny, during your 30 plus years in practice

24   being a pediatrician, have you had the opportunity to review

25   the results from ultrasounds of premature babies?

*(Jenny - People - Direct)*

1     A.   Yes.

2     Q.   How many times?

3     A.   Many.

4     Q.   Have you ever yourself ordered that an ultrasound be

5 done on a premature baby?

6     A.   Yes.

7     Q.   Why is that?

8     A.   Because there's no bad side effects.  It's not like a

9 CAT scan that radiates the baby's head.  It's not like an MRI

10 that, until recently, required deep sedation and had some kind

11 of risk.  So, it's kind of an easy -- it's an easy, fast,

12 nonintrusive way to look at babies, the front part of their

13 heads, which is where they often get bleeds if they are

14 premature.

15     Q.   So, in your experience, is this an accepted method of

16 checking babies for intracranial bleeds?

17     A.   It's standard for all babies that are premature.

18     Q.   And was there any indication that ████████ had an

19 intracranial bleed or was born with a subdural hematoma?

20     A.   It certainly didn't happen around the top of his

21 head.  He also didn't have any what we call germinal matrix

22 hemorrhages - which is really why people do the study - which

23 are deep bleeds in the brain that preemies can get that can

24 lead to neurologic problems.

25     Q.   Are you familiar with any studies or statistics with

*(Jenny - People - Direct)*

1    studying newborn babies and whether or not they have bleeds?

2        A.    In the head?

3        Q.    Yes.

4        A.    Yes.

5        Q.    Can you tell me about those?

6        A.    Well, for many years, people only got imaging studies

7    on kids that were in big trouble or something was obviously

8    wrong with them, either a very complicated delivery or had

9    abnormal neurologic exams.  It started about ten years ago, I

10    think, but most recently, those studies have been done in the

11    last ten years.  People have done studies on normal newborns

12    where they do rapid sequence MRI's that don't require sedation

13    and, surprisingly, found that 25 to 46 percent of normal

14    newborns that are perfectly healthy will have small amounts of

15    bleeding in the backs of their heads, down low in what's called

16    the posterior fossa, or just in this part of the brain

17    (indicating).

18        And the studies that have been done, where they

19    followed the normal children that have those small bleeds, they

20    find that they are gone in a month to six weeks and kids don't

21    have any long-term ill effects that we know of.

22        Q.    Are those children symptomatic?

23        A.    No.

24        Q.    And what does that mean?

25        A.    Well, that means that they -- this was the first time

1   anybody started doing those kinds of studies on normal children

2   that didn't look like they had bad brain disease.  And, so,

3   that was -- it was surprising because nobody has ever looked at

4   normal newborns before.

5       Q.   What type of bleeding are we talking about that these

6   children had in these studies?

7       A.   Subdural or small amounts of subarachnoid bleeds or

8   sometimes even small bleeds within the brain substance itself.

9       Q.   Does it rise to the level of a subdural hematoma?

10      A.   Yes.

11      Q.   Okay.  And would you expect to find a subdural

12  hematoma that was present since birth on an ultrasound of an

13  infant's brain?

14      A.   Well, it depends on where it's located.  If you have

15  subdurals right, you know, in this part of the head, you can

16  see them very well on ultrasound, because they really don't

17  look like regular subarachnoid fluid.  If they are in the back,

18  you can't see that with an ultrasound.  You can only look at

19  the parts where there's a nice soft spot that you can put your

20  transducer in to do the measurements.

21      Q.   Going back to the St. Mary's stay for a moment, were

22  there any health concerns for ▮▮▮▮▮ during his stay at St.

23  Mary's?

24      A.   Not that I recall, other than normal growing and

25  gaining.

*(Jenny - People - Direct)*

1    Q.   Was he growing and feeding appropriately?

2    A.   By the time he left, he was doing well.

3    Q.   Was ▉▉▉▉ eventually sent home from St. Mary's?

4    A.   Yes.

5    Q.   Do you remember about how old he was when he was sent

6    home?

7    A.   He was about five weeks, I think, ten weeks?  I can't

8    remember.  I'm sorry.

9              MS. BOOK:  If I may have a moment.  May I

10        approach, Your Honor?

11             THE COURT:  You may.

12   Q.   Dr. Jenny, I'm going to show you what's in evidence

13   as People's Exhibit Number 11.  If you could take a look

14   through this and see if you can refresh your memory as to when

15   he went home.

16   A.   Looks like 5/22 and he was born 5/9.  Is that right?

17   Let me find the discharge.  5/22.

18   Q.   He was sent home?

19   A.   Uh-huh.

20   Q.   Thank you.  Were there any specific instructions

21   given to Wilhemina Hicks for addressing any health concerns?

22   A.   I think the main issue was frequent feeding.  Babies

23   that age, you need to feed more frequently than you do a normal

24   baby or a full-term baby.

25   Q.   Now, in those records, some say ▉▉▉▉ Hicks; some

*(Jenny - People - Direct)*                                    596

1        say ███████ ██████. Are they referring to the same person?

2        A.   I think Hicks was the mother's name before she was

3        married.

4        Q.   Okay.  So, why might it have ██████ Hicks on some of

5        the records?

6        A.   That's generally -- when you have a newborn baby, you

7        admit them under the name of the parent that delivered them so

8        you can kind of keep track of them, and then I guess when

9        people fill out the birth certificate, they have the option of

10       using the father's name or the mother's name.

11       Q.   Okay.  Did ██████ receive all of his recommended

12       follow-up care with his pediatrician?

13       A.   He did.

14       Q.   Was he up-to-date with his immunizations as of

15       September of 2008?

16       A.   Yes.

17       Q.   As of September of 2008, how many shots did ██████

18       have for streptococcus pneumonia?

19       A.   One at two months of age.

20       Q.   Out of how many shots?

21       A.   You have them at two, four, six months and a year, a

22       series of four.

23       Q.   And in your experience evaluating thousands of child

24       deaths over the course of your career, can you tell us, do a

25       significant number of children die from streptococcus pneumonia

*(Jenny - People - Direct)*

1   before they are able to get all four shots because they are not

2   fully immunized?

3       A.   Um, I haven't -- well, certainly in the five years --

4               MR. COFFEY:   I object to this, the fact she's

5       asking an opinion.   I think it's outside her field, unless

6       she's qualified to do this.

7               THE COURT:   Overruled.

8       A.   When we did death review, the five years that I ran

9   that, we had none at the Children's Hospital.

10              MR. COFFEY:   I object to that as an incomplete

11      statistical survey, just because her hospital found none.

12              THE COURT:   You can cross-examine her on that

13      topic.   The objection is overruled.

14      A.   Now that we have the immunizations, it's rare.

15  Before we had immunizations, it was a very common problem.

16  Kids would come in with meningitis or pneumonia from strep

17  pneumonia and be very, very ill.

18      Q.   How long ago was that?

19      A.   When did they start immunizing?   Oh, I think about --

20  I can't even remember, some time within the last 20 years;

21  probably ten years ago maybe.

22      Q.   Okay.   Did ██████ have any health concerns the

23  entirety of the summer of 2008?

24      A.   Other than his mother using -- it was still in the

25  summer.   His mother used a cleaning chemical by mistake on his

1    cheek and he got some dermatitis on his cheek that he was

2    treated for on the 13th.  Otherwise, he had normal well-baby

3    care.

4         Q.   On the 13th of what?

5         A.   September.

6         Q.   Doctor, were you able to review ███████'s head growth

7    from the time of birth until his admission at Albany Medical

8    Center?

9         A.   Yes.

10        Q.   Could you tell us about that?

11        A.   It was perfectly normal until his last admission,

12   when he came in with subdurals.

13        Q.   Why is head growth measured?

14        A.   It's very important because it reflects brain growth

15   and, of course, you want to make sure -- babies' heads double

16   in size in the first year of life; and if the head is not

17   growing, you get very worried because that means the brain is

18   not expanding the head.  And if the head grows too much, you

19   know, like if the child comes in for their two-month check and

20   their head has gotten quite large, you are going to be very

21   concerned that there may be something wrong.  There may be

22   fluid in the brain, for instance, or they may have a condition

23   called hydrocephalus, which is a congenital condition where too

24   much water on the brain occurs.

25        Q.   And do you recall, at ███████'s two-month visit,

*(Jenny - People - Direct)*

1    where his head fell in the head circumference growth chart?

2         A.   He was growing at a normal rate.  It was consistent

3    with his birth and early records.

4         Q.   Now, in your experience, do you have any knowledge

5    with respect to whether or not subdural hematomas would cause

6    your head to grow?

7         A.   Well, you always look at head growth as a measure of

8    the age of the subdural.  If the child started off at birth and

9    the head gradually expanded beyond what it should, you need to

10   be very concerned that there was a chronic problem.  But if

11   it's growing normally and then suddenly jumps, you know, we use

12   that to kind of -- as a proxy measure for timing of injury.

13        Q.   What do you mean by that?

14        A.   Well, you know, if the head is growing normally,

15   there's not -- the brain is normal and the baby is

16   neurologically normal, they are not likely to have extra fluid

17   in their head.

18             MR. COFFEY:  Objection.  This is outside her

19        area.

20             MS. BOOK:  Your Honor, I asked if this was in

21        her experience.

22             THE COURT:  The objection is overruled.

23        A.   What was I saying?  And then when you see that sudden

24   jump in the head circumference, you go, "Oh, there must be

25   something going on" that started between this visit and that

*(Jenny - People - Direct)*                              600

1    visit.

2         Q.    Okay.  Now, do you recall, based on your review of

3    the records, where ████████'s head fell in the growth chart

4    after going to the hospital on September 21st?

5         A.    He had to have had a large jump in his head

6    circumference.

7         Q.    Okay.  How large of a jump; do you recall?

8         A.    I don't know.

9         Q.    Okay.  Well, based upon your review of the records,

10   the jump in the head circumference from his two-month check to

11   the Albany Med admission on September 21st, what, if anything,

12   did that indicate to you?

13        A.    That he had had abnormal head growth in that time

14   period.

15        Q.    Doctor, are you familiar with the term called sepsis?

16        A.    Yes.

17        Q.    Okay.  So, we have heard a lot of words during the

18   course of this trial.  We have heard bacteremia, sepsis, septic

19   shock.  Are they all related?  Can you tell us what they are

20   and what the differences between them are?

21        A.    Sepsis means you have microorganisms in your blood,

22   and that could be viruses, bacteria or fungus.  So, sepsis just

23   is a term meaning you have an infected bloodstream.  Bacteremia

24   means you have bacteria in your bloodstream, and septic shock

25   is a complication, usually, of bacterial sepsis, where the

*(Jenny - People - Direct)*

1    bacteria releases toxins that cause the blood pressure to

2    become very low and clotting abnormalities to happen.

3         Q.   Okay.  So, people who get bacteremia, does it always

4    necessarily turn to sepsis?

5         A.   Well, they are one and the same.  I mean, if you have

6    bacteremia, you are, quote, septic.

7         Q.   Okay.

8         A.   But there are other things that can cause sepsis

9    besides bacteria.

10        Q.   Okay.  And is there varying degrees of this?

11        A.   Yes.

12        Q.   Can you tell me about that?

13        A.   Well, you know, sometimes patients will actually, you

14   know, get complete physical collapse from having sepsis in

15   their bloodstream.  In other kids - you know, it's a finding -

16   they have a fever and you take blood cultures just to make

17   sure, and you are surprised because they don't look that sick.

18   So, it really depends on how much, how bad and what the

19   organism is.

20        Q.   What are some of the signs and symptoms of sepsis?

21        A.   Well, one of the things that we see is that kids come

22   in with these horrible rashes.  They have big blue blotches on

23   their skin from bleeding problems and they kind of look bruised

24   all over; low blood pressure, trouble keeping your temperature

25   up, dropping your white count, abnormal blood clotting.

1    Q.   Now, the rash that you just described that you will

2    see on children who get sepsis, is that the same kind of rash

3    that ███████ presented with on September 13, 2008, at the

4    Samaritan Hospital?

5              MR. COFFEY:  Objection, unless she can testify

6         that she read the record and can identify it.

7              THE COURT:  I'm sorry?

8              MR. COFFEY:  She never identified that she even

9         saw that record.

10             MS. BOOK:  Your Honor, she did review --

11        indicated that she had seen the record.

12             THE COURT:  That objection is overruled.

13   Q.   I'm sorry.  I lost my train of thought.  The type of

14   rash that you were talking about that is associated with

15   sepsis, is that the same type of rash that was present on

16   ███████ at the September 13th visit at Samaritan Hospital?

17   A.   No.

18   Q.   Why not?

19   A.   This rash is very distinctive.  You get these blue

20   blotches, basically, and they are under the skin.  They are not

21   raised, and it's just -- it's different.  It's not like a

22   blistery thing on the cheek.

23   Q.   Okay.  Now, at ███████'s appointment on September

24   13th at the Samaritan Hospital Emergency Room, what happened on

25   that date?

1     A.    Um, they told her to stop using wipes.  I don't think

2    they gave her any medication.  Nobody was particularly

3    concerned about it.  It would heal itself once the toxin or the

4    chemical that was irritating him was no longer present.

5     Q.    Was ▮▮▮▮▮ exhibiting any signs or symptoms of

6    sepsis on September 13, 2008?

7     A.    No.

8     Q.    Was he exhibiting any signs or symptoms of any type

9    of a bacterial disease on September 13, 2008?

10     A.    No.

11     Q.    And is there any indication that that rash on his

12    face ever became infected or inflamed in any way?

13     A.    There was never any indication that it was infected.

14     Q.    Now, I want to talk to you about the morning of

15    Sunday, September 21, 2008.

16          THE COURT:  Before you do that, Ms. Book,

17          members of the jury, at this point in time, we are going

18          to take a ten-minute break.  During the course of this

19          break, please do not discuss the case among yourselves or

20          with anyone else.  Do not read or listen to any media

21          accounts of this case.  Do not form any judgments or

22          opinions about this case.  Do not request or accept any

23          payment in return for supplying any information.

24          Members of the jury, just so you understand

25          today's schedule - because I haven't talked to you about

*(Jenny - People - Direct)*

1   this yet - but it is going to be slightly different than

2   our typical schedule.  We are going to take a ten-minute

3   break now, as I indicated.  We are then going to work

4   right up until noon.  At noon, we will break for lunch for

5   one hour until one o'clock; and at one o'clock, we will

6   resume only until 2:30 today.  We can't go all the way

7   until 4:30 today, but we will go till 2:30.  So, I just

8   want you to be aware of how today is anticipated to

9   progress.  With that said, we will break for ten minutes

10   at this time.

11          (Jury excused.)

12          THE COURT:  Doctor, because you are still giving

13   sworn testimony, I will ask that during this break, please

14   don't discuss this case or your testimony with anyone.

15   That includes the attorneys involved in this case.  Okay?

16          THE WITNESS:  Yes.

17          THE COURT:  Thank you.  See you in ten minutes.

18          (Brief recess taken.)

19          (Proceedings continue outside the presence of

20   the jury as follows:)

21          THE COURT:  Do you want to put something on the

22   record, Ms. Book?

23          MS. BOOK:  Yes.  We spoke with Dr. Sikirica's

24   secretary.  He can be here at one o'clock today.  The way

25   that we are progressing with testimony today, I don't

*(Jenny - People - Direct)*

1    think it's likely that we are going to get to Dr. Sikirica

2    in all reality.  I think I'm going to take until probably

3    the lunch break to finish up Dr. Jenny's direct, if not

4    pretty close to the lunch break, and then we are going to

5    have an hour and a half, if I'm doing my math correctly.

6              THE COURT:  Correct.

7              MS. BOOK:  When we are done.  So, I just wanted

8    to see how the Court wanted me to proceed with Dr.

9    Sikirica to be here first thing in the morning for a full

10   day of testimony, or he can be here at 1:00; but he would

11   request, really, to finish today, because he was here for

12   four hours yesterday, and I guess there's a really big

13   backup of bodies at this point.  And if he doesn't come

14   here, he's going to go to Kingston to do a bunch of

15   autopsies this afternoon.

16             THE COURT:  Okay.  So, what are you asking?  We

17   can't go past 2:30 today.

18             MS. BOOK:  No, I know.  Can we -- do we want Dr.

19   Sikirica here at 1:00, anyway, or can we send him to

20   Kingston and tell him tomorrow morning because, in all

21   likelihood, we will not get to him at all?

22             THE COURT:  Mr. Coffey?

23             MR. COFFEY:  If I might.  I really don't care,

24   except my whole schedule gets tossed away significantly

25   tomorrow.  Sikirica is not going to be five minutes.  So,

1    if he goes the entire morning, that creates a real problem

2    for me.  I would ask, if you are going to do that, that we

3    start early with him.

4              THE COURT:  Well --

5              MR. COFFEY:  We are accommodating his schedule

6    beyond everybody else's schedule.

7              THE COURT:  I understand.  All right.  You have

8    some amount of time with Dr. Jenny; correct?

9              MR. COFFEY:  Uh-huh.

10             THE COURT:  So, if you start at one o'clock, you

11   don't anticipate you would be finished in time to then put

12   another witness on before 2:30?

13             MR. COFFEY:  I'm not going to mislead you.  I

14   don't know.  I can't say.  In all honesty, I can't tell

15   you that.

16             THE COURT:  What I would say is you can contact

17   Dr. Sikirica on lunch break when we see where we are with

18   this witness.

19             MS. BOOK:  Okay.

20             THE COURT:  Anything else?

21             MS. BOOK:  No.

22             MS. EGAN:  Yes.

23             MS. BOOK:  Go ahead.

24             MS. EGAN:  There's just been an issue with --

25   Dr. Leestma has published a new book which is not out in

1    print yet but is going to come out within, I think, a few

2    weeks.  We have requested a copy through defense counsel

3    several times in the past few weeks.

4         THE COURT:  Let me just interrupt.  Does this

5    person have anything to do with Dr. Jenny's testimony?

6         MS. EGAN:  It does not, but I just wanted to

7    make a record of it at this point in time.

8         THE COURT:  Well, we are under certain time

9    constraints.  So, if it doesn't pertain to this witness --

10   I'm certainly going to give you a chance to make a record,

11   but I would prefer not to do that right now because we

12   have the jury waiting, and I want to see to it that we at

13   least finish Dr. Jenny's testimony today if possible.  So,

14   I will let you make a record at another point in time.

15        MS. EGAN:  Thank you.

16        THE COURT:  We will bring the jury in, please.

17        COURT OFFICER:  All rise.  Jury entering.

18        THE COURT:  Okay.  Please be seated.  The sworn

19   witness remains Carole Jenny.  Doctor, I will remind you

20   that you are still under oath.  Ms. Book, you may proceed.

21        MS. BOOK:  Thank you, Your Honor.

22   **BY MS. BOOK:  (Continuing)**

23        Q.  Now, Dr. Jenny, I would like to talk to you about the

24   morning of Sunday, September 21, 2008.  Can you tell us what

25   happened to ███ that morning?

1    A.   Um, well, he fed, I think, around 4:00 in the morning

2    and was apparently normal; and then at around 9:00, his mother

3    went in and found him barely breathing, not responsive,

4    unconscious, in grave distress.

5    Q.   Okay.  And what happened after that?

6    A.   They called 911.  He was taken to Good (sic)

7    Samaritan Hospital, where he was resuscitated and put on a

8    ventilator, and then he was transferred to Albany because he

9    needed a higher level of care.

10   Q.   Are you familiar with a differential diagnosis?

11   A.   Yes.

12   Q.   What does that mean, to make a differential

13   diagnosis?

14   A.   That's a list of all the things you consider when you

15   are trying to make a plan for diagnosis and treatment of any

16   patient in any situation.  So, you know, in your mind, you

17   would make a list of, you know, what possibly presents looking

18   like this, what are the most likely things, what should be

19   treated first and how should we proceed with a diagnostic

20   workup.

21   Q.   Are you familiar with what Dr. Kardos' differential

22   diagnosis was on the morning of September 21st at Samaritan

23   Hospital?

24   A.   Top on her list was overwhelming sepsis, and she also

25   considered a head injury as a possibility and hypothermia, low

*(Jenny - People - Direct)*

1    temperature.

2         Q.   Okay.  And do you know if dehydration was on there?

3         A.   Yes, it was.

4         Q.   What was done to attempt to treat each one?

5         A.   Well -- in Samaritan Hospital?

6         Q.   Yes.

7         A.   He was given oxygen initially.  He was ventilated

8    with a mask and a bag, where they squeeze the bag to help him

9    breathe.  He received drugs to keep his blood pressure up and

10   his heart rate up.  He received antibiotics, because that's

11   normal when a child comes in that's that age and they are not

12   responsive and they are very ill.  They routinely get started

13   on antibiotics because you can't wait for cultures to come

14   back.  He was too unstable to do a blood workup.  So, they

15   basically resuscitated him, gave him fluids, gave him

16   antibiotics, gave him pressors, which are drugs to keep his

17   blood pressure going, gave him oxygen and put him in an

18   ambulance and sent him to Albany.

19        Q.   Why would a baby be too unstable to get a head injury

20   workup?

21        A.   Well, it takes awhile to get the baby to CT, put him

22   in a scanner.  You don't have access to him while he is in a

23   scanner and then bring him back.  You can't do that unless

24   their basic level is stable enough, if you don't think you are

25   going to need to do immediate resuscitation.  You wait until

1    you are sure they don't need to be resuscitated immediately

2    before you send them out of the ED or the Intensive Care Unit.

3         Q.   And why was ███████ not stable enough to go to the

4    CAT scanner at Samaritan Hospital?

5         A.   His temperature was low.  His blood pressure was low.

6    He was very ill.  He was unresponsive.

7         Q.   At this time, was ██████ exhibiting any signs or

8    symptoms of sepsis?

9         A.   Yes.

10        Q.   What was he showing?

11        A.   He had low blood pressure, a low white blood cell

12   count.  He had a low platelet count, not critically low but

13   lower than normal, and he had low blood pressure and he had

14   trouble maintaining his body temperature.

15        Q.   Now, could these signs and symptoms be associated

16   with anything else?

17        A.   Well, anything that causes shock and DIC, severe

18   trauma, loss of blood.

19        Q.   Could these symptoms be consistent with a head

20   injury?

21        A.   In and of itself alone, the low blood count was not

22   something we would normally see.  You can certainly see kids

23   with cardiovascular instability, trouble with their blood

24   pressure and their breathing.  Unconsciousness is not uncommon

25   and --

1          MR. COFFEY:  I object to this.  She wasn't asked

2     what wasn't.  She was asked if something was consistent.

3     I object as nonresponsive.

4          THE COURT:  The objection is sustained.  Ms.

5     Book, you can ask a follow-up question.

6     Q.   The signs and symptoms that ▓▓▓▓▓ was exhibiting,

7     were any of those symptoms consistent with a head trauma?

8     A.   Some of them were.

9     Q.   Can you tell me which ones?

10    A.   The low blood pressure, the loss of consciousness,

11    the cardiovascular instability, trouble breathing.

12    Q.   What symptoms were not associated with a head injury?

13    A.   The low white blood cell count is something we don't

14    generally see in head injury.

15    Q.   At Samaritan Hospital, was ▓▓▓▓▓ showing any signs

16    of a clotting problem?

17    A.   Well, they didn't get clotting studies.  They didn't

18    get blood tests for clotting while he was there.  He didn't

19    bleed excessively when they put in lines, when they put in IV

20    lines.  He didn't have any bruising on his skin or obvious

21    bleeding on his skin.

22    Q.   Okay.  Now, when you say that he didn't bleed

23    excessively when they put in IV lines or that he didn't have

24    excessive bruising to his skin, what does that have to do with

25    clotting?

*(Jenny - People - Direct)*                                     612

1    A.   Obviously, if you can't clot your blood and you try

2    to start, you poke needles in children's arms and they don't

3    have clotting ability, then they will just keep losing blood;

4    and if their clotting system is reasonably effective, they will

5    not keep losing blood.

6    Q.   So, the fact that ███████ was not bleeding

7    excessively when hooked up at different IV sites and the fact

8    that he lacked those bruises to his body, did that indicate

9    anything to you about his ability to clot at the time that he

10   was at Samaritan Hospital?

11   A.   Well, functionally, he was clotting reasonably.  I

12   don't know if he had abnormal coagulation studies.  His

13   platelet count was, I think, 155,000, which is low, but we

14   don't start worrying about kids bleeding out until they get to

15   ten to 15,000.

16   Q.   Okay.  Do you know if it was actually 115,000?

17   A.   Oh, I'm not sure.  It was over a hundred.

18   Q.   And if someone's platelet count is over 100,000, what

19   does that indicate?

20   A.   Well, they don't have bleeding from blood platelets

21   until it gets much lower.  It's lower than usual, but they are

22   not symptomatic at that point, but it's something you watch,

23   obviously.

24   Q.   Okay.  And where did ██████ go from Samaritan

25   Hospital?

*(Jenny - People - Direct)* 613

1      A.   To Albany Medical Center.

2      Q.   Why did he go there?

3      A.   Because they had an Intensive Care Unit and a

4  neurosurgeon and more -- could offer more intensive care.

5      Q.   Are you aware of whether or not a CAT scan was able

6  to be done at Albany Medical Center?

7      A.   They did.

8      Q.   And are you aware of the results of the CAT scan?

9      A.   Yes.

10      Q.   What were those results?

11      A.   He had old and new subdural hemorrhages.

12           MR. COFFEY:  I object to that, unless she can

13      qualify how she came to that conclusion.  There's no

14      evidence in this record that that was a diagnosis at

15      Albany Medical Center and I object to this.

16           THE COURT:  I understand, Mr. Coffey.

17           MR. COFFEY:  I'm sorry.

18           THE COURT:  That's okay.  Your objection is

19      sustained.

20      Q.   Are you aware of whether or not ████████ was suffering

21  from any subdural hematomas at the time that he entered Albany

22  Medical Center?

23      A.   The doctors recorded that in their records.

24           MR. COFFEY:  I object to this.  There's no

25      evidence of this.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

P021248

*(Jenny - People - Direct)*                                    614

1          THE COURT:  Well --

2          MR. COFFEY:  May I approach on this or not?

3          THE COURT:  Do you want to approach?

4          MR. COFFEY:  If I can.

5          THE COURT:  You may.

6          (Sidebar discussion held on the record as

7     follows:)

8          MR. COFFEY:  Judge, there is nothing in this

9     record that any doctor at the Medical Center said that he

10    had a subdural.  It is an interpretation, and Waldman went

11    through three hours yesterday talking about his

12    interpretation of that word.  Subdural hematoma does not

13    appear in any radiological report; and for her to say that

14    is misleading and it's dishonest on her part.

15         MS. BOOK:  I don't agree with that, Your Honor.

16    Dr. Waldman testified how he would interpret a

17    radiologist's reading of the record.  Dr. Waldman did

18    testify that it was, in fact, a subdural hematoma, and Dr.

19    Jenny is aware of the result of the autopsy report which

20    indicated this.  So, I feel she is qualified to answer

21    this, and Dr. Waldman's notes from Albany Medical Center

22    say CT bilateral hemispherical --

23         MR. COFFEY:  In that case, it's cumulative.  Dr.

24    Waldman already testified to it.

25         THE COURT:  The objections are overruled.  The

1       Court finds it's not unduly cumulative or unduly

2       prejudicial for that reason.  Second of all, this witness

3       can testify as to what the records and her review of the

4       records indicated.  So, I'm going to overrule the

5       objections, but I'm going to have you ask a new question.

6       You can ask her what her review of the records indicated

7       was the case but -- and as long as you do that, I feel

8       that it's proper.  Mr. Coffey, you can certainly

9       cross-examine this witness on that issue regarding your

10      belief that there's no support in the records for what her

11      testimony is going to indicate there is support in the

12      records for.  That's the Court's ruling.

13              MR. FROST:  Can I add one thing?  I think this

14      is what you were getting at, Judge.  I think one of our

15      objections will be or is that this witness shouldn't be

16      allowed to interpret what Dr. Hoover said in his report.

17      Dr. Waldman is different.  He can read, but there's no

18      foundation that this witness can read scans herself, as

19      opposed to reading reports.  I don't think it's fair to

20      speculate that Dr. Hoover meant X if he said Y.

21              THE COURT:  I understand that point.  I don't

22      think we have gotten to that point yet, where that

23      objection would lie, but if we do get to that point and

24      you believe that objection is proper, you can reserve your

25      right to make it and I will consider it.

*(Jenny - People - Direct)*                                                616

```
 1                   (Proceedings continue in open court as follows:)

 2                   THE COURT:  Ms. Book, you may continue.

 3                   MS. BOOK:  Thank you.

 4         Q.   Dr. Jenny, are you aware of what the results were of

 5   the CT scan of Albany Medical Center?

 6         A.   Yes.

 7         Q.   Could you tell us what the results were?

 8         A.   The results were that he had excess fluid in his

 9   head.  They thought it was probably subdural fluid.  They

10   hadn't ruled out an enlarged subarachnoid space.

11         Q.   Okay.  And was there a hematology consult?

12         A.   There was.

13         Q.   What is a hematologist?

14         A.   That's a doctor that studies blood disorders.

15         Q.   Can you tell us what the results of the hematology

16   consult was?

17         A.   Um, he had clotting abnormalities and a very low

18   white blood cell count, and he was also not making good red

19   blood cells.

20         Q.   Okay.

21         A.   And a low platelet count -- or a dropping platelet

22   count.  Sorry.

23         Q.   What is DIC?

24         A.   It's disseminated intravascular coagulation.

25         Q.   What does that mean?
```

*(Jenny - People - Direct)*

1      A.   That means that something happens that causes the

2   blood to be extra clottable.  The blood is stimulated to clot,

3   and when it starts doing that in several different areas, it

4   uses up clotting factors.  So, secondarily, you have bleeding

5   problems.  So, it's a combination of too much clotting and too

6   much bleeding.

7      Q.   Doctor, are you aware of whether or not DIC can come

8   as a result of head trauma?

9      A.   Yes.

10      Q.   And what is your opinion on that?

11      A.   It's very common.  Most of the kids we see with head

12   trauma have DIC in the first couple of days after the event.

13      Q.   And can you explain to us why that is?

14      A.   There's a -- when a child gets a brain injury, there

15   are various chemical substances released into the bloodstream,

16   and one of those is called tissue factor; and tissue factor

17   acts as a trigger to clot, basically, and it can set off a DIC

18   pattern.  I mean, there's lots of things that cause DIC;

19   automobile accidents, infections, cancer, head trauma.  In our

20   head trauma babies when we studied them, almost all of them had

21   evidence of DIC.

22      Q.   And are you aware of whether or not an

23   ophthalmologist consulted on █████ ?

24      A.   Yes.

25      Q.   What is an ophthalmologist?

1          A.   A doctor that studies eyes.

2          Q.   And are you aware of what the results were from the

3     ophthalmology study?

4          A.   He had extensive hemorrhaging around the inside of

5     his eyeball, the lining on the inside of the eyeball, called

6     retinal hemorrhages, in multiple layers.

7          Q.   What, if anything, does that indicate to you in your

8     experience?

9          A.   It's a sign of severe problems.  In kids, those kinds

10    of hemorrhages are generally only seen in bad head trauma and

11    in severe clotting problems.  You can get it in things like

12    sickle cell disease, if it's really bad.  You can get it with a

13    direct blow to the eye.  That can cause it, as well.  But it's

14    unusual in kids to get that extensive of hemorrhaging.

15         Q.   Okay.  And can you tell us about -- have any studies

16    been done with respect to inflicted trauma and retinal

17    hemorrhaging?

18         A.   Yes.

19         Q.   Can you tell us about those?

20         A.   Well, there's been lots of studies done, and what

21    they find is that retinal hemorrhaging is very common; severe

22    retinal hemorrhaging is very common in inflicted trauma.  A

23    recent study, actually, a nice study was published at Great

24    Ormond Street Hospital, which is a --

25                   MR. COFFEY:  Objection, unless it's more than a

*(Jenny - People - Direct)*

1    recent study.  I think it's self-serving.

2            MS. BOOK:  Judge, I think she's trying to

3    identify the study.

4            THE COURT:  The objection is overruled.

5        A.    There was a study at Great Ormond Street Hospital

6    where they looked at all the eyes of kids in Intensive Care,

7    and they didn't look at kids who had trauma, who had abusive

8    trauma, and they found those types of retinal hemorrhages in

9    leukemics, in children with very severe clotting problems.  Two

10   children had been in really bad accidents, automobile and so

11   on.

12       Q.    What medical intervention was done at Albany Med on

13   ███████?

14       A.    Well, he was kept on a ventilator.  He was kept on

15   pressors, which are drugs to keep the blood pressure up.  He

16   was essentially brain-dead at the time he arrived.  They had

17   said he had -- he had no neurologic function at that point.  He

18   was given -- his clotting problems were treated.  He was given

19   transfusions.  He was transfused with plasma, just plain old

20   plasma that helped his clotting problems.  He received

21   platelets.  He received red blood cells.  He was on routine

22   anti-seizure meds.  He was continued on his antibiotics;

23   essentially supportive care until they actually did formal

24   brain death testing and determined that he was not viable.

25       Q.    How is brain death testing performed?

*(Jenny - People - Direct)*

1    A.  Well, there's several different ways.  You can do --

2  in a child that's stable enough, you can do what they call flow

3  studies to see if there's blood circulating through the head.

4  In this case, they did a clinical study, where they take the

5  child off the ventilator and see if his carbon dioxide level

6  goes up in his blood because he's not breathing well.  That

7  generally would stimulate somebody to start breathing, and if

8  they see no response, then that's a very bad sign that there

9  isn't any central nervous system function going on.

10    We also do other things, a neurologic exam, something

11  called calorics, which is putting cold water in the ear to see

12  if the eyes respond.  Generally, the eyes will deviate if you

13  put cold water in comatose patient's ears; and then just

14  looking at the reflexes and the general state of neurologic

15  functioning, looking at the EEG's to see if they have any brain

16  waves.

17    Q.  Do you know what the results of the cultures taken at

18  Samaritan Hospital turned out to be?

19    A.  He had one blood culture that was positive for

20  streptococcus pneumoniae.

21    Q.  What is streptococcus pneumoniae?

22    A.  It's a common bacteria that causes -- in kids, it

23  usually causes ear infections.  It can cause meningitis.  It

24  can cause sepsis.  It can cause pneumonia, more commonly

25  pneumonia than meningitis.

*(Jenny - People - Direct)*

1    Q.   How is it that a child can get streptococcus

2    pneumoniae?

3    A.   Well, it's a bacteria that lots of people carry, lots

4    of young children carry.  Somehow it gets into their lungs and

5    then into their bloodstream and into their central nervous

6    system.

7    Q.   Now, based on your review of all of the records in

8    this case, as well as all of your years of experience dealing

9    with pediatric patients, do you have an opinion as to how

10   ████████ could have contracted this streptococcus pneumoniae?

11   A.   You know, sometimes we don't know.  Sometimes, it

12   just happens; other times, we assume it comes from --

13            MR. COFFEY:  Object to what she assumes.  She

14        already said she doesn't know.  I object to anything

15        beyond that as speculation.

16            THE COURT:  Sustained.  You can ask a different

17        question, Ms. Book, but the answer can't be based on

18        assumption.

19            MS. BOOK:  I understand, Your Honor.  Thank you.

20   Q.   Dr. Jenny, do you have any opinion, specifically as

21   to ████████ ████████, as to how he could have contracted

22   streptococcus pneumonia that went into his bloodstream?

23   A.   Well, he had pneumonia in his lungs.  I assume that

24   was the original place that it was seeded abnormally; and as it

25   grew, it got into his bloodstream.

1    Q.   Okay.  When was ▮▮▮▮▮ pronounced dead?

2    A.   I think it was one o'clock or 11:00 on the 23rd of

3    September.

4    Q.   Was there anything further that could have been done

5    for ▮▮▮▮▮?

6    A.   No.

7    Q.   What did the Albany Medical Center doctors feel had

8    caused this baby's death?

9    A.   A head trauma.

10   Q.   Are you familiar, Dr. Jenny, with the brain and its

11   layers?

12   A.   Yes.

13   Q.   Could you step down for us and draw the brain and its

14   layers and explain to us where ▮▮▮▮▮'s head injuries were

15   located?

16   A.   Okay.

17              MS. BOOK:  Your Honor, may I have the witness

18        step down?

19              THE COURT:  Okay.

20   A.   (Drawing) I like to think of the head as an onion

21   because it's in layers.  If you look at the head, you have a

22   plane right here, and you are going to look at half the head.

23   You have an outside layer.  That's the scalp.  It has the hair

24   on it.  And under that, you have a skull, which is the brain, a

25   box, such as the bony brain box, and then -- so, here's the

1    scalp.  Here's the skull.  And between the brain and the

2    scalp -- I mean the skull and the scalp, you have an area of

3    kind of connective tissue.  That's called the -- it's the

4    subgaleal space or below the galea, another word for scalp.

5    So, that's subgaleal.  And then right on the very outside of

6    the brain, you have a thin layer of tissue that's a membrane on

7    the -- not a membrane, a thin layer of tissue outside of the

8    skull that kind of feeds the skull and takes care of it, and

9    there's blood cells, blood vessels in that tissue, and that's

10   called a periosteum.  Peri, meaning around; and osteum, meaning

11   bone, around the bone.  So, it's the layer attached to the bony

12   layer.

13        And then inside the skull, you have another layer of

14   tissue.  In babies, it is very adherent to the skull.  It

15   sticks to the skull, and that layer is called the dura, and

16   it's kind of a protective, thick, almost plastic looking

17   membrane that covers the brain.  And then inside the dura,

18   there's another layer of tissue, and that is called -- and this

19   is like thin membranes.  It almost looks like tissue paper, and

20   that tissue paper layer is called the arachnoid membrane.

21        And then below the arachnoid, there's another space;

22   and inside that space is the brain.  And so -- and there's

23   another tiny little thin layer of tissue that sticks to the

24   brain that kind of we don't -- not really important in terms of

25   making a diagnosis.

1          So, here's the brain itself; and inside the brain,

2     you have ventricles.  Fluid flows through the ventricles, and

3     that fluid goes down to the base of the brain and then

4     circulates within the subarachnoid space.  This is the

5     subarachnoid space, meaning it's -- yes.  Here's the brain

6     tissue.  Here's the arachnoid, the subarachnoid space.  And in

7     that space, you have cerebrospinal fluid, which is a clear

8     fluid with sugar and salt in it that floats around and kind of

9     feeds the brain, and it goes inside the brain into these

10    ventricles, into the holes in the middle of the brain and

11    circulates down, goes all the way down to the bottom of the

12    spinal cord.  When they do a spinal tap, they are collecting

13    samples of that subarachnoid fluid that's in that particular

14    area.

15         The other thing that is important in this particular

16    situation is bleeding between the dura and the arachnoid, and

17    that's called subdural bleeding or below the dura, and that's

18    not normal.  Kids don't have -- generally, the dura and the

19    arachnoid are right together.  There's no space between them.

20    But if something happens - the vessels get broken - then blood

21    can get collected in there.  You can also get pus collected in

22    there or other kinds of fluids.  But in a healthy, normal

23    state, there's nothing in the subdural space, where there's

24    always fluid flowing along in the subarachnoid space.

25         Q.   Okay.  Now, on this diagram, can you show us where

1        ████████'s subdural hematomas were located?

2        A.   Well, it's hard to show on this.

3                 MR. COFFEY:  Objection.  She hasn't given a

4        foundation on this as to what the basis of this is.

5                 THE COURT:  Ms. Book?

6                 MS. BOOK:  Your Honor, she testified that she

7        reviewed all the documents in this case, including the

8        autopsy, the results of the CT scan, as well as the Albany

9        Medical records.

10                THE COURT:  The objection is overruled.

11       Q.   Let me do it in a different color, so we can see it.

12       A.   Can I get a new piece of paper?

13       Q.   Sure.

14       A.   (Drawing) So, this would be -- I'm going to draw kind

15       of a cutting through the midline, rather than cutting in this

16       direction.  So, here's the nose, the mouth and the face - I'm a

17       terrible artist; I really apologize - and the back of the head

18       and so on.  And the brain is -- here's the bottom of the brain

19       box, the bottom of the skull, and it's divided into three

20       compartments.  There's a posterior compartment, and then

21       there's a right side, and then there's a membrane down the

22       middle that divides it into a right side and a left side.  You

23       basically have right, left and back.

24                And he had hemorrhaging on the right, up front, up

25       top.  On the left, up front, up top, he had some posteriorly

1    and he had a little bit in this posterior fossa area, and those

2    were subdurals.  So, this is just where they were located, not

3    what depth, obviously.  So, they were in that subdural space.

4         He also had -- I think I can show better on the first

5    diagram.  He also had some areas of hemorrhage on this

6    periosteal layer.  So, he had periosteal bleeds and subgaleal

7    bleeding, which is between the scalp and the skull.  So, he had

8    some areas of impact bleeds between the scalp and the skull.

9    Q.   Thank you.  Is there anything else that you would

10   like to show on this diagram?

11   A.   No.

12   Q.   You can have a seat.  Okay.  With respect to what you

13   demonstrated for us, based on your review of the records and

14   ██████'s autopsy report, which of what you demonstrated for us

15   was acute?

16            MR. COFFEY:  I object to that as leading.

17            THE COURT:  Overruled.

18   A.   Acutely, he had some acute blood in the subdural

19   space.  There was most likely acute bleeding under the scalp

20   outside the skull.

21   Q.   Okay.

22   A.   And also had acute brain swelling, bad brain swelling

23   that developed.

24   Q.   What does acute mean?

25   A.   Means within a day or two; it's right then.

1      Q.   Okay.  And where he had the acute subdural hematomas

2    that you described, are they in a place that would have been

3    discovered on that initial ultrasound if they were present

4    then?

5      A.   I think most of the acute blood was posterior.  What

6    was present under this part of the head was old blood.

7      Q.   Okay.  And where that old blood was, was that at a

8    place that would have been discovered upon that initial

9    ultrasound if it was the result of birth?

10     A.   In my experience, you can see it very well on

11   ultrasound.

12                MR. COFFEY:  I object to that.  Her experience

13             doesn't make a difference.  It's a question of whether

14             it's reasonable medical certainty.

15                THE COURT:  Overruled.

16     Q.   Okay.  So, in your experience, that is the type of

17   injury you would have seen on the ultrasound that was performed

18   on ███ on 5/14/08 had it been present then?

19     A.   Yes.  We do a lot of ultrasounds on babies whose

20   heads are too big, and the point of that is to see whether

21   there's blood or that cerebrospinal fluid layer is a little

22   extra thick.  If there's too much cerebrospinal fluid, that

23   makes the head grow big, which is kind of a common condition

24   that doesn't hurt kids, basically, or whether there's subdural

25   blood on top of that that is, in fact, pressing on the brain

*(Jenny - People - Direct)*                                       628

1    and making the skull expand.  So, we get consulted maybe once

2    every two weeks when a child comes in for an ultrasound because

3    of some abnormal head growth, and most of them have just

4    accumulated CSF, the cerebrospinal fluid, and you don't treat

5    it.  You don't do anything with it.  You say he's going to be

6    fine.  His head will be a little bigger than the other kids'

7    heads until he gets to be about two and then -- but the kids

8    that have subdural bleeding, it's much more of a concern.

9         Q.   The subgaleal hemorrhage that you mentioned, can you

10   tell us about that and whether or not that would be something

11   you could see on the outside of ████'s head?

12        A.   Sometimes you can; sometimes you can't.  A lot of

13   kids who get blunt trauma to the head will end up with

14   bruising, essentially, on that outside skull membrane in

15   between the scalp and the skull, but they will have nothing

16   externally.  They will have no swelling, and we wouldn't even

17   know it was there, unless we pulled back the scalp at autopsy

18   and find the bleeding.

19        Q.   Now, do you know if ████ had any external

20   injuries?

21        A.   He did not have any obvious external injury on his

22   skin.

23        Q.   Is that inconsistent with inflicted trauma?

24        A.   No.  It happens frequently.  The skull is relatively

25   soft and it kind of bends and, so, it doesn't offer a lot of

1    resistance when a child that age gets an impact injury.  And

2    then if you have -- you know, if after the injury, you have

3    very low blood pressure, you are not going to get swelling,

4    because it ain't going to happen because you don't have enough

5    blood pressure to push fluids through your tissues.

6           Q.   In your experience, what are subgaleal bruising?

7    What is that consistent with?

8           A.   Impact injuries.

9           Q.   What do you mean by that?

10          A.   Some object applied to the head or the head hitting

11   an object.

12          Q.   Okay.  Are there sutures in the skull?

13          A.   Yes.

14          Q.   What does that mean?

15          A.   Well, babies are born not with a solid brain box.

16   They have plates of bone that are isolated and then held

17   together by cartilage and that's so -- the baby's brain doubles

18   in size during the first year of life.  You have to allow for

19   rapid brain growth.  If they were born with a fixed skull like

20   an adult has, they wouldn't be able to expand their head to fit

21   that nice growing brain.

22          And then toward the end of the second year, the head

23   becomes very -- completely calcified but, again, it expands

24   with brain growth.  That's normal and that's -- those are

25   called sutures, those cartilaginous pieces.  In fact, that soft

1    spot you feel on a baby's head is where those plates of bone

2    come together, and they don't completely form until maybe

3    seven, eight months of life.

4         Q.   What is cerebral edema?

5         A.   Cerebral edema is swelling, swelling of the brain.

6         Q.   And was that present in ███████?

7         A.   Yes, very severely.

8         Q.   Now, you mentioned you also reviewed the autopsy

9    report?

10        A.   Yes.

11        Q.   What findings were listed on the autopsy report?

12             MR. COFFEY:   Objection.   We are going to have

13        the pathologist testify.

14             THE COURT:   Overruled.

15        A.   Bleeding between the scalp and the skull, old

16   subdural hemorrhages, new subdural hemorrhages, very swollen

17   brain.   He had some, what they call -- what Dr. Sikirica called

18   an infarction or an area of dead tissue in his heart, where

19   from -- that resulted from not getting blood circulated through

20   his heart.   He also had some similar lesions in his testicles.

21        Q.   Was there evidence of organ donation?

22        A.   Yes.

23        Q.   What organs were missing?

24        A.   They took part of the liver.   They took the --

25   actually, they took the pancreas.   They took the kidneys.

*(Jenny - People - Direct)*                                    631

Q.   Now, if a baby died from overwhelming septic shock,

in your opinion, would these organs have been able to be

harvested?

     MR. COFFEY:   Object to this.   There's no

    foundation.

     THE COURT:   Sustained.

Q.   Dr. Jenny, do you have any experience with children

after their death and reviewing the cause of death and whether

or not they were, in fact, an organ donor or not?

A.   Yes.

Q.   And do you have that experience in your thousand or

so cases of child fatalities that you have reviewed?

A.   Yes.   It often comes up.

     MR. COFFEY:   Object to this as irrelevant.

     THE COURT:   Overruled.   She's attempting to lay

    the foundation.

A.   Um, in the clinical setting, we are involved in cases

where the question is is this -- this child, obviously, is

going to die; is this a child that's suitable for transplant.

And either -- we often have to communicate with the medical

examiner to get their permission, and then we also have to

communicate with the transplant team about whether they want

the organs or not and whether we should press for donation.

Q.   So, have you personally been involved in cases where

the determination is being made as to whether or not organs are

*(Jenny - People - Direct)* 632

1    going to be donated?

2        A.   Yes.

3        Q.   How many times, do you think?

4        A.   Maybe 30.

5        Q.   And of the thousand or so cases that you have

6    reviewed as a part of the death team, do you know whether or

7    not those children were organ donors?

8        A.   Pretty rarely in Rhode Island.  It wasn't something

9    that was really emphasized.  They did a much better job in

10   Colorado when I worked there in terms of -- one of the District

11   Attorney's kids needed a heart, and they were very liberal

12   about letting us do transplants in medical-legal cases.

13       Q.   Okay.  Now, in your experience through what you just

14   described to us, if a baby died from overwhelming septic shock,

15   would you expect that a kidney and a liver could have been

16   harvested to other individuals?

17          MR. COFFEY:  I object to this, foundation.  I

18       would like to voir dire on this, at the very least.  I

19       object, first of all, without necessity for that.

20          THE COURT:  The objection as to foundation is

21       sustained.  At this point in time, we have to break for

22       lunch, in any event.  Members of the jury, we will break

23       for one hour at this point in time.  We will resume at one

24       o'clock.

25          During the break, please don't discuss the case.

P021267

1    Do not read or listen to any media accounts of the case.

2    Do not visit any premises mentioned during this trial.  Do

3    not conduct any research about this case.  Do not request

4    or accept any payment in return for supplying information

5    about this trial.  Do not form any judgments or opinions

6    about this case.  If anyone attempts to improperly

7    influence you, you must report that directly to me.  We

8    will break for one hour for lunch.  We will see you back

9    here at one o'clock.  Thank you.

10                (Jury excused.)

11                THE COURT:  Dr. Jenny, I will give you the same

12   admonition that I gave you before, and that is that, given

13   you are giving sworn testimony, please, during this break,

14   don't discuss this case or your testimony with anybody,

15   including the attorneys involved in this case.  Thank you.

16   We will see you back here at one o'clock.

17                MS. BOOK:  Your Honor, could we maybe have the

18   Court Officer tell her where she could grab lunch?

19                THE COURT:  Of course.

20                MS. BOOK:  Also, her purse is located in our

21   office.

22                THE COURT:  That's okay.  Thank you.

23                MS. BOOK:  Dr. Sikirica, Your Honor, are we okay

24   letting him --

25                THE COURT:  Yes.

1        MR. COFFEY:  Are we going to have Dr. Sikirica

2    here tomorrow morning, or is he going to be somewhere

3    else, like Kingston or some place else?

4        THE COURT:  Do you expect me to be able to

5    answer that?

6        MR. COFFEY:  No, but I would like to find out

7    from the People what his personal schedule is, if he can

8    accommodate us.

9        THE COURT:  We are going to start at ten o'clock

10   tomorrow morning.  If Dr. Jenny is finished, then Dr.

11   Sikirica will be the first witness.  If Dr. Jenny is not

12   finished, unless you make some arrangements to take a

13   witness out of order, she will finish up in the morning,

14   and I presume Dr. Sikirica would be the People's next and

15   last witness.

16       MS. BOOK:  Correct.

17       MR. COFFEY:  Now, let me ask you this in terms

18   of scheduling.  If that's the case, I'm going to ask you

19   to at least potentially consider going a little later

20   tomorrow because now -- I understand your schedule.  You

21   can't begin until 10:00, but if Sikirica goes till noon,

22   then I'm pushed over into the afternoon, obviously, and

23   that's a potential problem for me.

24       THE COURT:  Well, I will consider any requests.

25   I can tell you that from OCA's point of view, they won't

*(Jenny - People - Direct)*

1    even consider a request until four o'clock, so we can

2    advise them exactly where we stand.

3              MR. COFFEY:  Okay.

4              THE COURT:  So, if tomorrow you want to make a

5    request -- I don't represent I will grant it.  I represent

6    I will consider it, and we can see --

7              MR. COFFEY:  I'm not blaming you; just,

8    obviously, we are starting to get pushed back here.

9              THE COURT:  We can go off the record and break

10   for lunch.

11             (Whereupon, a luncheon recess was taken.)

12             (Proceedings continue outside the presence of

13   the jury as follows:)

14             THE COURT:  Please be seated.  Parties ready to

15   proceed?

16             MS. BOOK:  No, Your Honor.  May we approach on

17   the record, please?

18             THE COURT:  We are outside the presence of the

19   jury.  You can go ahead.

20             MS. EGAN:  With respect to scheduling, Judge, as

21   you know, Dr. Jenny has flown in from Seattle, Washington,

22   to testify today.  She is not able to stay overnight and

23   continue her testimony tomorrow morning.  She has a

24   caseload of patients waiting for her in Seattle.  She

25   needs to fly out tonight if her testimony cannot be

1       completed today.

2               That being said, perhaps we could get through

3       the remainder of her testimony, as we have until 2:30.  If

4       she cannot complete her testimony, the People are making

5       an application that the remainder of her testimony be

6       permitted via two-way Skype.  We are relying on the same

7       cases as the defense has placed in their Order to Show

8       Cause seeking similar relief for -- seeking a similar

9       provision for Patrick Barnes to testify via two-way Skype.

10              I have not had an opportunity to find out if

11      they are going to oppose this, and Dr. Jenny, because of

12      the time change, would be available to testify starting at

13      10:00 a.m. until 1:00 p.m. tomorrow via Skype.

14              THE COURT:  All right.  Well, first of all, if

15      the Court grants any applications to allow any witnesses

16      to testify via closed circuit T.V., there's no

17      restrictions placed on them.  Either the witness is

18      available at that point until completion or the witness

19      isn't.  That's the first thing I will say.  That applies

20      to the People's witnesses; that applies to the Defendant's

21      witnesses, as well.  With that said, Mr. Coffey, what is

22      your position?

23              MR. COFFEY:  I would like to get her going and

24      see where we can end up with this.  I certainly don't

25      want -- she's sitting here and -- nonetheless, my

1    preference, of course, is not to have her end at 2:30 on

2    direct and then I'm forced to now Skype her; but I just as

3    soon we start with her now and see where that takes us.

4           THE COURT:  Let me take a brief recess and see

5    if I can make any changes in my schedule which would allow

6    me to stay past 2:30.  Let me do that.

7           MS. BOOK:  Just so you are aware, I have only

8    maybe ten minutes, if that, left on direct.

9           THE COURT:  Mr. Coffey, do you think you have

10   more than an hour?  If you do, you do.

11          MR. COFFEY:  Listen, you have been very fair.

12   I'm not just saying that.  Let me have you check first, if

13   I can.

14          THE COURT:  All right.

15          (Brief recess taken.)

16          THE COURT:  We will go on the record.  I was

17   able to adjust my schedule such that I can stay here to

18   allow Dr. Jenny to finish her testimony.  So, that's what

19   we will do.  As soon as her testimony is completed today,

20   I will need to stop for the day, however.

21          Based upon the application that the People had

22   made, are the People consenting to allowing the defense

23   doctor to testify via Skype or closed circuit T.V.?

24          MS. EGAN:  We are not taking any position on the

25   application at this time, Judge.  We only received it last

*(Jenny - People - Direct)*

1      night.  We need to review it in terms of other factors, as

2      well.

3                  THE COURT:  Okay.  I will allow you to do that

4      but -- I will allow you to do that.  Ready to proceed with

5      the jury?

6                  MR. COFFEY:  Yes, we are, Your Honor.

7                  MS. BOOK:  Yes, Your Honor.

8                  THE COURT:  Bring the jury back in, please.

9                  COURT OFFICER:  All rise.  Jury entering.

10                 THE COURT:  Please be seated.  All right.

11     Members of the jury, before we continue, as you will

12     recall, I had advised you we would be stopping by 2:30

13     today.  That still may happen, but we are going to stay

14     until we finish this witness' testimony.  If that takes us

15     a little past 2:30, contrary to what I said earlier, we

16     will stay at least for as long as it takes to finish this

17     witness' testimony today.  So, I just wanted you to be

18     aware of that.  The sworn witness does remain Carole

19     Jenny.  Doctor, I remind you that you are still under

20     oath.  Ms. Book, you may continue whenever you are ready.

21                 MS. BOOK:  Thank you, Your Honor.

22     **BY MS. BOOK:  (Continuing)**

23          Q.  Dr. Jenny, in your experience, have you ever seen a

24     child who died from septic shock organs being donated?

25                 MR. COFFEY:  Object to the relevance.

*(Jenny - People - Direct)*

1           THE COURT:  Overruled.

2       A.   Um, you know, I think it varies by institution; but

3   at the institutions I have worked in, that has never been --

4   that's one of the things; they would not allow it.

5           MR. COFFEY:  I object to this.

6           THE COURT:  Hold on.  I have reconsidered the

7       Defendant's objection.  As to that question, the objection

8       as to relevance is sustained.  Members of the jury, the

9       last question and answer is stricken from the record and

10      is to be disregarded by you.

11      Q.   Now, you mentioned that you reviewed the medical

12  examiner's report.  What was the medical examiner's opinion

13  about what caused ████████'s death?

14      A.   Trauma to the head.

15      Q.   Okay.  And the retinal hemorrhages that you mentioned

16  earlier, are they significant in light of the cause of death?

17      A.   Um, well, certainly, we do see those kind of

18  hemorrhages very frequently in abusive head trauma.  You can

19  also see it with severe coagulation disorders.

20      Q.   Okay.  The older subdural hematomas, do you have an

21  opinion as to whether or not they were the result of inflicted

22  trauma?

23      A.   Um, given the dating of the subdurals and the fact

24  that the child had normal head growth up until two months of

25  age, I think they occurred after two months of age.

1      Q.   Based on your review of all of the records in this

2    case, based upon your 30 plus years experience in the field of

3    child abuse pediatrics and all of the experience that you have

4    testified to us about with regard to child death and child

5    abuse, do you agree with Dr. Sikirica's finding?

6      A.   Yes.

7              MR. COFFEY:  I object to that.

8              THE COURT:  What basis?

9              MR. COFFEY:  It's cumulative, leading,

10   self-serving, bolstering.

11             THE COURT:  That is an improper question.  The

12   objection is sustained.

13     Q.   Dr. Jenny, based upon everything that we have just

14   discussed and your training and experience, do you have an

15   opinion as to what caused █████████'s death?

16     A.   Yes.

17     Q.   And what is that?

18     A.   It was abusive head trauma complicated by bacterial

19   sepsis.

20     Q.   And knowing what you know about the mother's

21   condition during pregnancy and her pregnancy complications,

22   does that in any way change your opinion?

23     A.   No.  Babies -- well, this baby did very well after

24   birth and in the first four months of life.

25     Q.   Knowing how this child presented at Samaritan

*(Jenny - People - Direct)*

1    Hospital, all the factors that we talked about earlier as far

2    as the low white blood cell count, the platelets, the blood

3    pressure, everything that we talked about that he presented

4    with at Samaritan Hospital on the 21st, does that change your

5    opinion at all?

6        A.    No.

7        Q.    Why not?

8        A.    Um, well, the types of findings that were found on

9    autopsy are, you know, clearly related to trauma, multiple

10   episodes of trauma, and the acute nature of his decompensating,

11   you know, going from -- is also concerning for trauma; and his

12   blood work, much of it is very consistent with trauma, and his

13   low white count, his positive blood culture, are consistent

14   with an infection.

15       Q.    Do you have an opinion about how this child could

16   have gotten the infection in light of the head trauma?

17       A.    Um, kids with chronic head trauma do -- are more

18   susceptible to lots of medical illnesses in terms of, you know,

19   the -- but I can't say that the head trauma caused the sepsis,

20   no.

21       Q.    Okay.  What do you mean that kids with head trauma

22   are more susceptible?

23            MR. COFFEY:  Objection.  If she can't give an

24       opinion, she can't give an opinion.  So, anything else, I

25       think, is outside the realm of her expertise.

*(Jenny - People - Direct)*

```
 1              THE COURT:  Ms. Book?

 2              MS. BOOK:  Your Honor, she said that she

 3       couldn't say specifically with ███████, but she did say

 4       that, based on her experience, that children with trauma

 5       are more susceptible to other types of diseases, and I

 6       would like to explore that with her.

 7              THE COURT:  Well, if she indicated that she

 8       couldn't say with respect to this particular person,

 9       that's all that is relevant here.  So, I'm going to

10       sustain the objection.

11       Q.   Dr. Jenny, what is aspiration?

12       A.   It is when foreign material gets into the airways and

13   moves down into the lungs and causes inflammation in the lungs.

14       Q.   How can aspiration happen?

15       A.   Um -- well, some babies are born with it.  Others,

16   you know, do fine, and then they have some kind of bad illness

17   or they get paralyzed muscles or they get a bad head injury and

18   then their swallowing mechanism becomes inefficient and

19   material gets into the lungs.

20       Q.   Now, with respect to aspiration, is that something

21   that would have to occur during a feed?

22       A.   No.  It can occur during a feed.  It can occur if the

23   baby burps.  It can occur -- we can aspirate secretions from

24   the mouth at any time.

25       Q.   So, can you aspirate on your own spit or on your own
```

1    spit-up?

2         A.   Yes.

3         Q.   When you -- say I swallowed something down the wrong

4    pipe.  Is that kind of akin to aspiration?

5         A.   Yes.

6         Q.   Knowing what you know about ▮▮▮▮▮ likely also

7    having sepsis present at Samaritan Hospital, at Albany Medical

8    Center and upon findings on autopsy, does that in any way

9    change your opinion that ▮▮▮▮▮ died as a result of head

10   trauma?

11        A.   No.

12        Q.   Why not?

13        A.   Well, because he had acute head trauma at autopsy,

14   and he had all the signs and symptoms of acute head trauma.

15        Q.   Is it likely that a child who is beyond the point of

16   medical intervention at 9:00 a.m. due to overwhelming septic

17   shock would have taken a bottle at 3:00 or 4:00 in the morning?

18             MR. COFFEY:  Object to this, unless she's

19        qualified to testify.

20             THE COURT:  Sustained.

21        Q.   Dr. Jenny, do you know, based on your training and

22   experience and your experience with sepsis, whether a child who

23   is beyond the point of medical intervention at 9:00 a.m. due to

24   overwhelming septic shock would have taken a bottle at 3:00 or

25   4:00 in the morning?

*(Jenny - People - Direct)*                               644

1      A.   Yes.

2      Q.   And what is that answer?

3      A.   Well, I think it would depend on the organism.  If

4  it's pneumococcus, the kids are generally sick for a couple

5  days before they collapse.  If it's another bug called

6  meningococcus, they can die very quickly.

7           MR. COFFEY:  Objection, unless she can relate it

8      to this case.

9           MS. BOOK:  That's fine, Your Honor.  I will move

10     on.

11          THE COURT:  Okay.  The objection is sustained.

12     Q.   Would a head injury ravage an infant in a matter of

13  hours to the point of no return?

14     A.   Yes.

15     Q.   How so?

16     A.   Well, it would depend on the nature and severity of

17  the injury or if it's a repetitive injury, because we know that

18  the response to a second or third or fourth injury is much more

19  dramatic and much more devastating than the response to the

20  first injury, when the kids are injured more than one time.

21     Q.   Can you relate this to ▮▮▮▮▮▮'s case at all?

22     A.   Well, he had old trauma and obvious signs of new

23  trauma.  He had old bruises under his scalp and new bruising

24  under his scalp, old subdurals and new subdurals.  So, he

25  clearly had more than one episode of impact to his head.

*(Jenny - People - Direct)*                                    645

1      Q.   Do you have an expert medical opinion to a reasonable

2      degree of medical certainty as to whether or not the subdural

3      hematomas found on autopsy were present at birth?

4      A.   In my opinion, they were not.

5      Q.   Why is that?

6      A.   Because when we see kids that have continually

7      growing subdurals from birth, their heads start growing

8      immediately and they expand fairly dramatically, and this child

9      had normal head growth.  So, there really wasn't any room for

10     extra fluid at two months of age.

11              MS. BOOK:  May I have one moment, Your Honor?

12              THE COURT:  You may.

13     Q.   Doctor, if I told you that there's been testimony in

14     this trial that the Defendant, Mr. ████, had a fight with his

15     wife, was angry; ████ was crying and that he bounced the

16     baby onto the bed.  He didn't stop crying, so he bounced the

17     baby onto the bed harder and the baby fell onto the floor; and

18     I gave you further information that this bed was a king size

19     bed on just two box springs, only 17 inches up off of the

20     ground, not on any sort of a bed frame or headboard type

21     elevation.  And seeing the Defendant here in court, do you have

22     an opinion, to a reasonable degree of medical certainty,

23     whether or not ████'s injuries could have occurred from

24     this?

25              MR. COFFEY:  I object to this as lack of

1      foundation.

2              THE COURT:  Sustained.

3              MS. BOOK:  Your Honor, may I ask from the Court

4      what foundation you would like me to --

5              THE COURT:  Well, I don't think any foundation

6      has been laid that this witness has any expertise in

7      determining the mechanism of injuries and what type of

8      actions or trauma, if that's the case, would cause what

9      type of injuries.

10             MS. BOOK:  Your Honor, the witness did testify -

11     and I can expand on this if Your Honor would like - that

12     she worked with a lab in Japan for five years.  The sole

13     purpose of their studies was to look at mechanisms of

14     injuries with test dummies and babies to look at inflicted

15     traumas, to look at falls, to look at automobile crashes

16     and to watch those -- to see how those types of injuries

17     occurred.

18             THE COURT:  I do recall that testimony, but I'm

19     not certain it rises to the level of setting the

20     appropriate foundation.  If you want to attempt to lay a

21     further foundation, you may do so at this time; but at

22     least for the present purpose or for the present time, I

23     should say, the objection as to lack of foundation is

24     sustained.

25     Q.   Dr. Jenny, do you have any experience throughout your

1    30 years in child abuse pediatrics with taking a history and

2    then being able to see corresponding trauma to the child?

3         A.   Yes.

4         Q.   Can you tell us about that?

5         A.   Well, that's part of the workup.  That's what --

6    that's what we do in my field, because the big question is

7    always does the injury match the history that's given; and, so,

8    that's a very important part of thousands of cases that I have

9    done.

10        Q.   You also mentioned that you did work in Japan with

11   respect to trauma on -- as well as automobile accidents, etc.,

12   on crash test dummies, children and babies.  Can you tell us

13   more about that work and your findings?

14        A.   Well, again, we acted out many injury scenarios in

15   the laboratory with the babies very -- completely wired with

16   accelerometers, string gauges, and all of this was videotaped

17   on high speed video; and then we analyzed that data with

18   respect to the kinds of injury, events that happened, both

19   accidentally and inflicted injuries.

20        Q.   And do you have experience with

21   acceleration/deceleration type injuries in your years of

22   experience?

23        A.   Yes.

24        Q.   What is an acceleration/deceleration type injury?

25        A.   Well, there's different types.  There's what we call

1    linear acceleration, where the head just moves very rapidly in

2    one direction; and then there's annular acceleration, where the

3    head flops and flips back and forth once, twice, however many

4    times.  So, most injuries have a component of both, because

5    when the kids -- if you hit something and you rebound, your

6    head swings.  When you hit a hard surface, the head swings.

7    So, you get linear acceleration when you hit the hard surface

8    and annular acceleration when you go back.

9        Q.   And what exactly goes on inside of the head when

10   there is an acceleration/deceleration type injury?

11       A.   Well, you get strain on the brain tissue.  You

12   essentially get displacement and strain of the brain tissue

13   itself, and you get -- the brain moves in the head and you get

14   tearing of the little delicate vessels that run through that

15   subdural space around the brain.

16       Q.   So, does that have to come from a shaking?

17            MR. COFFEY:  May I voir dire before -- if she's

18       being qualified?  Let me do this before -- let me withhold

19       that objection for a minute.

20            THE COURT:  Okay.

21       Q.   Does that have to come from a shaking?

22       A.   No.  It can come from either an impact or a shaking

23   injury.

24       Q.   What about an impact on a soft surface?

25       A.   Well, it depends on how much rotation the child has,

1    how firm the impact was, how firm the surface is.  It varies.

2        Q.   What about the distance that the child would have

3    traveled in the air into that surface?  Would that matter?

4        A.   Well, the further the distance, the worse the impact

5    is going to be.

6        Q.   Would the age, size and vulnerability of the child

7    come into play?

8        A.   Yes.

9        Q.   Why is that?

10       A.   Infants respond to head trauma very differently than

11   adults.  They have more complicating factors.  They have --

12   they are more likely, with an episode of head trauma, to have

13   trouble breathing afterwards because their ability to regulate

14   their heart rate and respiratory rate is very immature.  They

15   often have a period of profound low blood pressure in their

16   heads after an impact or a rotation injury because, again, the

17   mechanisms of regulation are not mature, so they can't respond

18   quickly.  After they have an injury, the amount of damage that

19   is done is much more extreme than an adult or an older child.

20   And I can tell you why that is if that would be helpful.

21       Q.   Yes.  Please tell us why that is.

22'      A.   When infants are born --

23                MR. COFFEY:  I object.  This is not relevant,

24            the issue of the biomechanics of this.

25                THE COURT:  The objection is overruled.

*(Jenny - People - Direct)*

650

1        A.    When infants are born, they have many extra brain

2   cells - or axons, actually - protuberances from brain cells

3   they don't need.   These are just the things that go from the

4   brain cell to another brain cell to make connections, and they

5   are born with a lot of them, and then they -- the ones they

6   don't use die.   So, strangely enough, even though their brains

7   are growing, the number of cells actually decreases in the

8   first year of life, and that's a normal process.   You know,

9   they were designed that way, I guess, to get rid of the excess

10  noise and make the brain more efficient.

11        But all of the machinery that you need inside the

12  brain cell to destroy the brain cell is already there and

13  working, because it's going through this process.   So, you have

14  these energy packets that have enzymes in them and they are

15  very ramped up in the first year of life.   So, when the brain

16  suffers an insult and starts to die, the response is much more

17  dramatic.

18        So, we measure that in a couple of different ways.

19  One is we measure chemicals that get released from a damaged

20  brain that are toxic in the bloodstream; and after an injury,

21  infants' levels go sky high compared to adults and older

22  children.   And, so, that's an indication of the brain

23  essentially injuring itself after the initial injury.

24        So, you have normal healthy cells next to one that

25  just got damaged; and as that cell dies, it releases substances

*(Jenny - People - Direct)*

1    that kill the cell next door, that kill the cell next door,

2    that kill the cell next door, and that process is really ramped

3    up and active because of the way their brains are constructed

4    to get rid of unnecessary neurons.

5        Q.   Now, based upon everything that you just told us, do

6    you have an expert medical opinion, based upon the scenario I

7    gave you of the Defendant bouncing a baby onto a mattress 17

8    inches off of the ground, bouncing him again harder, the baby

9    falling onto the ground, as to whether or not this could have

10   caused ████████'s injuries?

11               MR. COFFEY:  May I voir dire now?

12               THE COURT:  Yes, you may.

13   **VOIR DIRE EXAMINATION**

14   **BY MR. COFFEY:**

15       Q.   Doctor, good afternoon.

16       A.   Good afternoon.

17       Q.   Didn't you tell us before that, with regard to that

18   hypothetical, there's a number of variables that you would have

19   to know; correct?

20       A.   Um, yeah.  You would have to know --

21       Q.   The question is:  Did you tell us that?  I'm not

22   asking for anything else, Doctor.

23       A.   Yes.

24       Q.   You testified -- I'm sorry.  You don't know the

25   surface; do you?

*(Jenny - People - Voir Dire)*

1    A.   No.

2    Q.   You don't know where the baby was dropped; do you?

3    A.   He was dropped vertically in the description that was

4    given.

5    Q.   Really?  You don't know if he was -- he could have

6    been dropped horizontally.  You don't know that; do you?

7            THE COURT:  Mr. Coffey, this doesn't go to the

8         issue of foundation.  You can save these questions for

9         cross-examination.

10    Q.   Sorry.  Doctor, you have testified -- you are not a

11    biomechanical engineer; are you?

12    A.   I'm not.

13    Q.   And you have testified, in fact, previously as a

14    result of this matter that you can't give an opinion on the

15    amount of forces that would interact upon a child in terms of

16    trauma; that you are not able to give that opinion?  Isn't that

17    true?

18    A.   Well, there is no --

19    Q.   Isn't that true, Doctor, or is it not true?

20            MS. BOOK:  Your Honor, I object and ask that the

21         witness be allowed to answer the question.

22            THE COURT:  You have asked your question.  The

23         witness can answer as she sees fit.

24    A.   We don't know the injury thresholds in terms of the

25    amount of G-forces or rotational forces it takes to cause

1    injury.  That's never been established for infants.  We do have

2    a lot of experience with accidental and nonaccidental injuries

3    that tell us -- that give us some parameters for how much is

4    too much.

5              MR. COFFEY:  I object to her testimony.  There's

6         no foundation based upon her concession.

7              THE COURT:  Ms. Book?

8              MS. BOOK:  Your Honor, I believe that everything

9         Dr. Jenny has laid out, her extensive studying of trauma

10        and forces in Japan, as well as her extensive experience

11        with head trauma, taking histories of patients, being able

12        to look at that, look at corresponding injuries, that Dr.

13        Jenny is qualified to give an opinion on this.

14             THE COURT:  I haven't heard -- I have heard all

15        of that testimony, but I haven't heard any foundation laid

16        as to whether this witness has any experience concerning

17        the mechanisms of certain types of injuries and the

18        resulting injuries.  So, the objection as to foundation is

19        still sustained at this point in time.

20   **DIRECT EXAMINATION**

21   **BY MS. BOOK:  (Continuing)**

22        Q.   Doctor, have you tested different types of events and

23   the occurrences that come of it?  Does that make sense?

24        A.   Yes.

25        Q.   And in what respects?

1      A.   Well, I mean, in two ways.  One is by looking at

2   thousands of head injuries and other injuries and looking at

3   the histories that are given and, you know, making conclusions

4   on the reasonableness, you know, compared to all the other

5   injuries we see, many of which are witnessed; and you reach

6   conclusions about types of injuries that result from those

7   types of events.

8           And then we studied, you know, the biomechanical

9   parameters in a laboratory, but the problem is that was a crash

10   test dummy.  That wasn't a baby that would die or not die or

11   get comatose.  So, that research is different than experiential

12   observations in the clinical setting.

13      Q.   Okay.  And have you been able to make correlations

14   between the mechanism of injury and the end result?

15      A.   Yes.

16      Q.   What types of conclusions have you been able to

17   reach?

18      A.   Um, with impact injuries, you see things like

19   subgaleal hemorrhages, for instance.  You can see subdurals

20   with both the impact and rotational injuries.  Coma results

21   from -- mostly from rotation of the head, and that's well

22   established in the laboratory in many, many settings.  So, you

23   can look at injuries and make a reasonable analysis as to the

24   severity in terms of what the clinical outcome will be.

25      Q.   And have you practiced this in your experience over

*(Jenny - People - Direct)*                                           655

1        the last 30 years?

2            A.   Yes.

3            Q.   In what ways have you practiced this?

4            A.   Well, we get lots and lots of histories, and we often

5        also see -- I see every accidental head injury in a child under

6        two and many of them over two at our hospital.  So, if we know

7        a child has been in an automobile accident or had a particular

8        type of fall, we can then look at the types of injuries that

9        they get.  So, I have had a lot of experience with accidental

10       injuries and inflicted injuries and particularly this age

11       group, particularly in the under ones.

12           Q.   Okay.  Now, in your expert medical opinion, if the

13       Defendant bounced ████████  ████████, as you knew him to be, at

14       four months old onto a bed; he didn't stop crying, so he

15       bounced him harder, fell onto the floor, stopped crying at that

16       point, do you have an opinion, to a reasonable degree of

17       medical certainty, if that could have been the cause of ████████

18       ████████' injuries?

19                     MR. COFFEY:  I object to this.

20                     THE COURT:  Okay.  The proper foundation has now

21                been laid for this witness to testify.  However, the form

22                of that question is improper.  So, the Court will sustain

23                the objection as to the form of that question.

24           Q.   Do you have an opinion, to a reasonable degree of

25       medical certainty, whether or not ████████  ████████' injuries

*(Jenny - People - Direct)*

1    could have been as a result of what I just described to you?

2        A.   The acute but not the chronic, obviously.

3        Q.   Okay.  And how could the acute have been the result

4    of that?

5        A.   The acute bruises on the scalp, the acute bleeding in

6    his head.

7        Q.   How is it that that type of action would cause that

8    type of injury?

9        A.   Both impact and rotation.

10       Q.   How would that involve both impact and rotation?

11       A.   Well, again, you would have impact on a softer

12   surface with a bounce.  You would have multiple episodes in a

13   row, and you have had impact on a hard surface, again, and you

14   usually get rotation with impact on a hard surface.  You always

15   get rotation with impact on a hard surface.

16       Q.   The fact that he didn't have any corresponding

17   outside head trauma, is that consistent or not consistent with

18   the history I just gave to you?

19       A.   That's something we see very commonly.  It's very

20   consistent; that you see the bleeding and the bruising under

21   the scalp, not outside the scalp.

22       Q.   Is there any particular reason in this case why it

23   would be consistent?

24       A.   Well, again, you know, him being so hypotensive,

25   having such low blood pressure, he wouldn't be perfusing his

*(Jenny - People - Direct)*

```
 1    tissues well.  To get that swelling, you have to have blood

 2    flowing through the vessels.

 3         Q.   Dr. Jenny, can you tell us, to a reasonable degree of

 4    medical certainty, whether or not you believe that ██████

 5    ██████' injuries came from an inflicted trauma?

 6              MR. COFFEY:  She's testified to this four times

 7         now.  I object.  I may be off one more or one less, but

 8         nonetheless, I object.

 9              THE COURT:  This has been asked and answered.

10         The objection is sustained.

11              MS. BOOK:  May I have one moment?

12              THE COURT:  You may.

13              MS. BOOK:  I have nothing further.  Thank you.

14              THE COURT:  Mr. Coffey?

15              MR. COFFEY:  Thank you.
```

**CROSS-EXAMINATION**

**BY MR. COFFEY:**

```
18         Q.   Tell me, Doctor, do you care about history?

19         A.   Do I care about history?

20         Q.   Yes.  You repeated my question.  Do you care about

21    history?

22         A.   History in a patient setting, history in a historical

23    setting?

24         Q.   Doctor, we are not talking about a historical

25    setting.  We are talking about this case.
```

1      A.   Yes, okay.  In all cases, yes, I care about history.

2      Q.   You do?

3      A.   Yes.

4      Q.   And you have testified, I think, on four occasions

5  for this office; correct?

6      A.   Yes, I think so.

7      Q.   Well, your recollection is better than mine.  Could

8  it be more than four?

9      A.   I don't think so.

10      Q.   And on how many different cases have you testified?

11      A.   Three.

12      Q.   And how much money did you make from this office?

13      A.   I don't know.

14      Q.   Come on, Doctor.  You can add it up.  You know

15  what --

16      A.   I don't keep records.  I mean, I don't keep the

17  records.  My husband does.  This was years ago.  I don't know

18  how much I made.

19      Q.   With all your experience, all the things you told us

20  about, when it comes to money, you don't keep track.  Is that

21  what you are telling me?

22      A.   I don't handle it.

23      Q.   That's not my question.  I didn't ask if you handled

24  it.

25      A.   My husband, I would assume, handled it.

1          Q.   I don't handle it, either, but my wife knows -- I

2    know what's going on, so --

3          A.   I don't remember the specific amounts that I charged

4    in these trials.

5          Q.   Now, let me go back to history for a moment.  If you

6    had a choice, Doctor, just generally speaking - let's talk

7    about generalities - between taking a history given by a

8    mother, who is, by the way, not claimed to have done anything

9    wrong, or a person who was been convicted of four felonies and

10   14 misdemeanors, on balance, who would you tend to support?

11         A.   Most of the time, if the mother has not been the

12   abuser, their history is accurate.

13         Q.   The answer, then, is the mother; right?

14         A.   Yes.

15         Q.   Correct?

16         A.   Yes.

17         Q.   So, Wilhemina Hicks -- you know who she is; right?

18         A.   The mother of this child.

19         Q.   And I assume you have spoken to her?

20         A.   No.  Have I spoken to her?  No, I haven't.

21         Q.   Well, isn't it important to talk to the parent about

22   a child?  You have done that; right?

23         A.   I have read all the interviews and I have read the

24   material in the medical record.  I haven't directly spoken with

25   her.

1  Q.   I know what you haven't done.  I'm more interested in

2  what you have done.  Have you talked to the mother?

3  A.   No.

4  Q.   And the mother would be a valid historian; correct?

5  A.   I assume.

6  Q.   Well, it's interesting, because a number of facts

7  that you have been given today were submitted by the mother.

8  You are aware of that; correct?

9  A.   I have submitted facts that were in the medical

10  history and in the interviews that were recorded

11  contemporaneously.

12  Q.   From the mother?

13  A.   Yes.  She was one of the people that gave

14  information.

15  Q.   Now, in terms of this -- tell me something.  You

16  travel around the country testifying for District Attorneys;

17  don't you?

18  A.   Um, I do this once every month or two.

19  Q.   Okay.  Well, that makes anywhere from six to 12 a

20  year; right?

21  A.   Not 12.  I would say I probably testify more like

22  four or five.

23  Q.   Four or five?

24  A.   Yes.

25  Q.   Well, we have gone from once or twice a month to four

*(Jenny - People - Cross)*                                    661

1    or five a year.  Somehow, that doesn't add up to me.  Once or

2    twice a month goes 12 to 20 -- is six to 12?

3         A.   I'm sorry.  I was mistaken about once or twice a

4    month.  I testify once or twice a month, but most of my

5    testimony is local.

6         Q.   I'm sorry.  You testify once or twice a month.  And

7    you testify all over the country; right?

8         A.   I have testified in different jurisdictions, yes.

9         Q.   Is the answer to that yes?

10        A.   Yes.  I don't know what all over the country means.

11   I have testified in several different states.

12        Q.   Let me take the geographic area.  Let's take the West

13   Coast of the United States.  You've testified in the West

14   Coast; right?

15        A.   Yes.  I live on the West Coast.

16        Q.   I didn't ask where you lived.  I asked where you

17   testified.

18        A.   I have testified.  That's home base.

19        Q.   You have testified in the South; right?

20        A.   Once or twice.

21        Q.   The answer is yes?

22        A.   Yes.

23        Q.   You have testified in the Midwest?

24        A.   Chicago, yes.

25        Q.   Well, maybe that's on the West Coast but --

*(Jenny - People - Cross)*                                          662

1        A.   No, in Chicago, I testified.

2        Q.   You testified in the East?

3        A.   Well, I lived there for 17 years, yes.

4        Q.   Okay.  You have testified all over the country;

5    right?

6        A.   Yeah.  I haven't testified in every state in the

7    country.

8        Q.   Okay.

9        A.   It depends on how you define --

10       Q.   If I don't ask you the exact question, then we are

11   going to have a little argument; aren't we?  In other words,

12   when I asked you if you testified all over the country and you

13   said you don't know what that means --

14       A.   I would define that as the entire country.  That's

15   the way I define it.  Maybe I'm defining it differently.

16       Q.   In how many states do you think you have testified in

17   the country on behalf of the District Attorneys or Federal

18   prosecutors?  What's your best --

19       A.   I think 17.

20       Q.   Seventeen?

21       A.   Yes.

22       Q.   And Doctor, in terms of your testimony, you have

23   claimed you have written a book that you say is the most

24   authoritative in the field; right?

25       A.   I didn't say that.  I think it's a very good book.  I

1    didn't say that.

2        Q.   Now, in terms of what you do, you were in the

3    American Professional Society on the Abuse of Children; right?

4        A.   Yes.

5        Q.   That very term indicates that the professionals there

6    are concerned about the abuse of children; right?

7        A.   That's right, yes.

8        Q.   You are a member of the International Professional

9    Society on the Prevention of Abuse For Children; correct?

10       A.   Yes.

11       Q.   You have spoken -- and I'm going to use the word 50.

12   You have spoken over 50 times around the country to various

13   prosecutorial authorities with regard to suspected child abuse;

14   haven't you?

15       A.   I have testified or lectured?

16       Q.   Lectured.  I apologize.

17       A.   No.

18       Q.   Twenty-five?

19       A.   I don't know.  I would have to look at my CV.

20       Q.   Does your husband take care of that, as well?

21       A.   No.  I --

22            MS. BOOK:  Objection.

23            THE COURT:  Sustained.  You don't have to answer

24   that question.

25       Q.   So, with regard to the money and with regard to the

1  number of times you have lectured, you can't tell this jury;

2  correct?

3       A.   I can't without looking at the count and say that

4  it's accurate.

5       Q.   Did you think I was going to ask you these questions?

6       A.   I didn't know what you were going to ask me.

7       Q.   You had no idea what I was going to ask you?

8            MS. BOOK:   I object to the relevancy, Your

9       Honor.

10           THE COURT:   Sustained.

11      Q.   Now, Doctor, with regard to the District Attorneys,

12  how much money did you make last year testifying for

13  prosecutors?

14      A.   About $70,000.

15      Q.   Seven or 70?

16      A.   Seventy.

17      Q.   Seventy?

18      A.   Yes.

19      Q.   And you were paid at that time as a professor at

20  Brown?

21      A.   Yes.

22      Q.   And how much have you made so far this year?

23      A.   I don't know.  I don't know.  I didn't work from

24  August to February.  I took -- that's when I was retired.  So,

25  I did more court work than usual.  So, I don't know.  I haven't

1    counted it up.

2         Q.   How much do you charge to testify today?

3         A.   $3,000 if it's a whole day.

4         Q.   This is a whole day, I assume?

5         A.   Yes.  I assume, yes.  It will be by the time I get

6    home.

7         Q.   And how much did you charge to review the records?

8         A.   I think I have done about eight hours.

9         Q.   All right.  And how much do you charge an hour?

10        A.   $300 an hour.

11        Q.   That's 5400 on this case alone?

12        A.   Eight times three is 24.

13        Q.   Well --

14        A.   Plus three.

15        Q.   Let's not forget the three grand we are getting paid,

16   Doctor; right?

17        A.   That's right, yes.

18        Q.   Now, how many times have you testified in the last

19   year?

20        A.   I don't know.

21        Q.   Now, in terms of your -- and you made a point of

22   being -- testifying on both sides, prosecution and defense.  In

23   fact, your practice is overwhelmingly testifying on behalf of

24   prosecutors, such as in this case; correct?

25        A.   Of the cases that I review, I'm more often asked to

*(Jenny - People - Cross)* 666

1    testify by prosecutors.

2         Q.   It is overwhelming the percentage.  In fact, it's 90

3    percent or more; isn't it?

4         A.   Yeah.  That's fair, yes.

5         Q.   Those are your words, 90 percent.  I didn't come up

6    with that.  You said that; right?

7         A.   I don't remember.

8         Q.   Did you read your -- you have given testimony in this

9    matter.  Have you read your testimony?

10        A.   No.

11        Q.   Have you talked to the prosecutors in this case?

12        A.   Yes.

13        Q.   When was the last time you talked to them?

14        A.   We had dinner last night.

15        Q.   They have must have gone over your testimony with

16   you?

17        A.   In my -- my previous testimony or this testimony?

18        Q.   Whatever.

19        A.   We talked about what this case, this most recent --

20   you know, what's coming up tomorrow is what we talked about.

21        Q.   Yeah.  And didn't you ask to see what have I

22   testified to previously?  Didn't you ask to see that?

23        A.   Um, I think they sent it to me.  I don't think I had

24   time to go over it.

25        Q.   When were you first told about this trial?

1          A.    Well, I was expecting it was going to be in a couple

2     of weeks.

3          Q.    When were you first told about the trial?

4          A.    Oh, not too long ago, actually.  I can't remember.

5          Q.    Well, that's another thing you can't remember?

6          A.    That's right.  I don't know the date.

7          Q.    Well, was it within the last two months?

8          A.    Probably, yes.

9          Q.    Well, you had ample time in the last two months to

10    read any testimony you have given; correct?

11         A.    Well, I had a lot of things to do in the last two

12    months.  So, no, I haven't read it.

13         Q.    Now, you told us, I think, that you were at Brown

14    University, and you now moved from Brown back to Seattle.

15    That's your hometown, Seattle?

16         A.    Yes.

17         Q.    Initially, you were in Colorado; correct?

18         A.    Yes.

19         Q.    And you left Colorado under rather unpleasant

20    circumstances; didn't you?

21         A.    Well, I got offered a job that paid twice as much

22    money at Brown.  I was offered the first tenured professorship

23    at Brown, or in my field at Brown, and my husband got offered a

24    fabulous job, too.  So, I thought it was actually a wonderful

25    move.

*(Jenny - People - Cross)*

1    Q.   Well, actually, when you have left Colorado, you were

2    in the middle of a lawsuit; weren't you?

3    A.   I don't think so.  I don't remember.  No.

4    Q.   You weren't involved, you and members of your staff

5    involved in a malpractice suit when you were in Colorado?

6    A.   I have been sued five times, but nobody has ever won.

7    Q.   Okay.  Now, let me talk about what you reviewed here

8    in this case.  I think you told us you reviewed the medical

9    records; correct?

10   A.   Yes.

11   Q.   You reviewed the -- well, the medical records at

12   Samaritan, Seton Health, Albany Medical Center; right?

13   A.   Yes.

14   Q.   And you read the autopsy report; correct?

15   A.   Yes.

16   Q.   Now, we haven't heard about your connection with Dr.

17   Sikirica, which is somewhat closer than -- and I'm not saying

18   it's elicit, but your relationship with Dr. Sikirica is not

19   distant; is it?  You know him very well?

20   A.   Well, he used to work in Rhode Island.  He worked

21   there for several years before he came here.

22   Q.   Well, Rhode Island is a big state.  When he worked in

23   Rhode Island, he worked for you; didn't he?

24   A.   He didn't work for me, no.  He worked for the Medical

25   Examiner's Office.

1      Q.   Well, you knew him; right?

2      A.   Yes.  I did cases with him.  I didn't socialize with

3   him.

4      Q.   I didn't ask if you socialized with him.  I asked if

5   you knew him.

6      A.   Yes.  I know him.

7      Q.   And you know him on a first name basis?

8      A.   What is his first -- I always just called him Dr.

9   Sikirica.  I honestly don't know his first name.

10      Q.   Have you talked to Dr. Sikirica about this case?

11      A.   I did several years ago.

12      Q.   So, the answer is yes?

13      A.   Yes.

14      Q.   And you talked to Dr. Sikirica, I presume, because

15   you wanted to find out his opinion and his thoughts; correct?

16      A.   Yes.  We did talk about the case, yes.

17      Q.   Correct?

18      A.   Yes.

19      Q.   Now, let's talk about some of the people that would

20   be important to talk to.  Do you know Dr. Waldman?

21      A.   No.

22      Q.   Do you know who he is?

23      A.   No.

24      Q.   Dr. Waldman testified yesterday.  He is a

25   neurosurgeon.  Now, have you ever read anything that Dr.

*(Jenny - People - Cross)*

1    Waldman has said about this case?

2         A.   I read the medical records.  I didn't memorize them.

3    I don't know the names of all the doctors that were involved.

4         Q.   Well, do you know who the primary doctor for ████

5    at Albany Medical Center was?

6         A.   I think it was Dr. Edge.

7         Q.   Dr. Edge.  And who is Dr. Edge?

8         A.   He's an intensivist.

9         Q.   And Dr. Edge, as you go through those records, Dr.

10   Edge, he is the treating physician.  His name appears all

11   throughout those records; correct?

12        A.   Right.

13        Q.   He is the person who would have been on the front

14   lines of this case; correct?

15        A.   Yes.

16        Q.   He's the person that, if you wanted to know what was

17   going on with this child when the child came to the hospital,

18   Dr. Edge would be in the best position to tell us; wouldn't he?

19        A.   Well, I certainly reviewed all of his notes very

20   carefully.

21        Q.   I didn't ask you that.  I asked you if he would be in

22   the best position to know what was going on with that child.

23   Would he?

24        A.   I actually think that you are better off looking at

25   the entire summary of the medical chart, not just focusing on

1    one doctor.

2        Q.   Wouldn't he be in the best position, even with all of

3    those records?

4        A.   Probably the --

5             MS. BOOK:  Asked and answered, Your Honor.

6        A.   Probably the --

7             THE COURT:  Overruled.

8        Q.   Wouldn't he?

9        A.   Probably the resident or intern who was with the kid,

10   you know, 24/7 would have a better knowledge of what happened

11   minute to minute and hour to hour, especially this many years

12   later.  Without the medical record, I think most physicians

13   wouldn't remember much about a case.

14       Q.   You don't know -- in other words, you don't even know

15   what connection Dr. Edge had with this baby; right?

16       A.   He would make attending notes.  The resident would

17   write up a note and then he would make an attending note.

18       Q.   Right.  He would sign off on it; right?

19       A.   Once a day, yes.

20       Q.   So, let's not start putting everything off on the

21   resident.  The fact of the matter is, Doctor - and you told us

22   how you are board certified - when you are an attending

23   physician in a hospital and the baby comes in, that is your

24   responsibility; isn't it?

25       A.   Yes, it is.

*(Jenny - People - Cross)*

1    Q.   I don't care what the resident does.   That resident

2    could be good or bad, whatever.   You sign off on something in a

3    hospital record, your name is on it, you are responsible for

4    it; correct?

5    A.   That's right.

6    Q.   You are telling the world and other medical

7    professionals, "This is what I see.   This is what I have heard.

8    This is my diagnosis," and so forth; correct?

9    A.   Right.

10   Q.   And that is exactly what Edge did in this case;

11   right?

12   A.   Yes, he did.

13   Q.   He would be the person where the buck would stop;

14   right?

15   A.   He was responsible as the attending physician, yes.

16   Q.   Did you talk to Dr. Edge?

17   A.   No, I didn't.

18   Q.   Doctor, with regard to aging a hematoma, you are not

19   qualified to do that; are you?

20   A.   No, I'm not.   Our imaging studies are done by

21   neuropathology.

22   Q.   And in fact, if you want to age a hematoma, you

23   wouldn't go to a gynecologist; would you?

24   A.   No.

25   Q.   You wouldn't go to an obstetrician; right?

*(Jenny - People - Cross)*

1    A.   No.

2    Q.   You wouldn't go to a -- you wouldn't even go -- in

3    terms of that, even a pathologist would not be the person that

4    you would necessarily go to; right?

5    A.   That's something that they do, but the

6    neuropathologist is usually the final word on that.

7    Q.   Right.  So, I assume, then, that you would have, in

8    terms of your opinion, gone to talk to Dr. Hoover, who, as you

9    know, issued a report in this case; right?  Let me show you.

10   A.   I'm not sure I saw the report.

11   Q.   You don't think you saw the report?

12   A.   I don't remember the name.  I'm sorry.

13   Q.   Let me show you what is called People's Exhibit 15.

14   That is a neuroradiological report issued by a board certified

15   neuroradiologist at Albany Medical Center Hospital.

16   A.   Well, it's an ultrasound.  That would be surprising,

17   I guess, because they usually don't do ultrasounds.

18   Q.   Did I give you the wrong -- I apologize.  I'm sorry,

19   Doctor.  I apologize for that.

20   (Albany Medical Records marked Defendant's Exhibit D for

21   identification.)

22           MR. COFFEY:  Judge, I'm going to offer the

23       certified records of the Albany Medical Center Hospital.

24           THE COURT:  Can I have a date?

25           MR. COFFEY:  Yes, who came into the care and

1        treatment of ▮▮▮▮ on September of 2008.

2                    THE COURT:  Ms. Book?

3                    MS. BOOK:  No objection.

4                    THE COURT:  Defendant's D will be received in

5        evidence at this time without objection.

6        (Defendant's Exhibit D marked for identification received in

7        evidence and marked Defendant's Exhibit D in evidence.)

8            Q.   Doctor, I'm going to move on.  When I find what I'm

9        looking for, I will talk to you about that.  Now, you have

10       previously expressed the opinion that on aging a subdural,

11       assuming there is a subdural, that you would defer to a

12       radiologist; correct?

13           A.   In terms of -- if I had a CT or an MRI, I would ask a

14       radiologist to tell me what they see.

15           Q.   Okay.  Now, so, if I were to say to you -- or ask

16       you, rather - I'm sorry - the age of a subdural, if it were a

17       week or two weeks or a month, your answer would be, and has

18       been in the past, I would defer to the radiologist?

19           A.   Well, I -- what I generally do in all cases is

20       consult with radiology.  If it's my kids, I have seen them in

21       the hospital and I -- it would depend on radiologic reports and

22       medical records that I review.

23           Q.   Is the answer that you would defer to the radiologist

24       or no?

25           A.   I wouldn't do it on my own.

1    Q.   And in fact, dating a subdural is a very complex

2    science; isn't it?

3    A.   It's complex, yes; and by radiology, it's rather

4    inexact.

5    Q.   Well, it's very complex.  You used the phrase very

6    complex; haven't you?

7    A.   Well, it's complex because it's inexact.  We don't

8    have very good baseline data on aging subdurals in infants.

9    All the data comes from old people.

10   Q.   So, if it's complex for radiologists, it's even more

11   complex dating it for a pathologist; isn't it?

12   A.   Well, they have an advantage, I think, because they

13   have the material right in front of them.

14   Q.   Except -- I'm sorry.  Go ahead.

15   A.   A pathologist can look at it under the microscope.

16   He can look at well-defined changes.  Again, there's not been

17   many studies done on the aging of subdurals in babies.  But

18   according to some people, it shouldn't be much different than

19   the aging of subdurals in older people.

20   Q.   Doctor, let's go back to my question.  You have

21   testified probably hundreds of times; correct?

22   A.   Yes.

23   Q.   My question to you is:  In dating a subdural, you

24   would rely upon a radiologist more so than a pathologist;

25   correct?

1       A.   No.  I would think that the pathologist, if the

2  patient died, would have a better handle on what they are

3  actually seeing.

4       Q.   Do you recall testifying in the case of Jennifer

5  Delbreck (phonetic) versus Melody Hewitt in Chicago in a

6  federal court in 2013?

7       A.   Yes.

8       Q.   Do you recall that testimony?

9       A.   I don't recall it but -- I mean I recall testifying.

10  I haven't read the testimony.

11       Q.   Were you criticized by the federal judge in that

12  case?

13       A.   He disagreed with me.

14       Q.   Well, maybe he didn't criticize you.  He disagreed

15  with you?

16       A.   I was told that it wasn't critical.  It was just a

17  disagreement.

18       Q.   This is Page 1155.  "Question" -- this is, by the

19  way, this is January of 2013, about a year and a half ago.  So,

20  I'm going to ask if you recall being asked this question:

21           "Question:  Would you agree with -- do you agree with

22  him that the chronic subdural hematoma was two weeks or greater

23  in age at the time she was admitted to the hospital on 12/28?

24           "I would leave that to the radiologist.  Dating

25  subdurals is a very complex science and that's -- pediatricians

*(Jenny - People - Cross)*                                    677

1     depend on what the radiologists tell them, so I would leave

2     that for him to decide."

3          A.   But your question was pathologist versus radiologist.

4          Q.   Doctor, stop for a minute.  Do you remember being

5     asked that question and giving --

6                    MS. BOOK:  Objection, Your Honor.

7                    THE COURT:  Mr. Coffey?

8                    MR. COFFEY:  I'm sorry, Judge.  But she --

9                    THE COURT:  Hold on a minute.

10                   MR. COFFEY:  Sorry, sorry.

11                   THE COURT:  Don't speak that way to the witness.

12         Ask her a question, allow her to answer.

13         Q.   My question is:  Do you recall being asked those

14    questions and giving those answers?

15         A.   I don't recall it, but that's an answer I would give.

16         Q.   You didn't say anything about a pathologist there;

17    did you?

18         A.   No, you did.  You asked me a question, would I depend

19    more on the pathologist or the radiologist, and I said I would

20    depend more on the pathologist.  That's what the question was

21    that was asked.

22         Q.   Doctor, in Chicago in 2013, when asked of aging

23    subdurals, you told the Court, under oath in a federal case,

24    that you would rely upon radiologists.  That's what you said?

25         A.   More than pediatricians in dating subdurals.

1     Q.   I'm sorry.  What?

2     A.   More than pediatricians in dating subdurals.  Your

3     question was do you rely more on the pathologist or the

4     radiologist, and I would say, in that order, pathologist would

5     have the best data, the radiologist the next, and the

6     pediatricians depend on the data that is interpreted by those

7     other two specialties.  But, certainly, somebody who actually

8     opens up a head and looks at the material has the best estimate

9     of the age of the material.

10               MR. COFFEY:  I move to strike that.  None of

11          that was asked about pathologists in that last question.

12               THE COURT:  Overruled.

13     Q.   You didn't mention pathologist in your answer; did

14     you?

15     A.   No.  You asked me a question about pathologists.

16     Q.   Doctor, in that question and answer, you never

17     mentioned the word pathologist under oath; did you?

18     A.   I have no idea what you are talking about.  You asked

19     me a question and I answered it.

20     Q.   Yes.  And when you were asked that question in

21     Chicago, you said --

22     A.   Right, in Chicago.  I thought you meant this

23     interchange.  In Chicago, they asked me if I, as a

24     pediatrician, would be more -- would be better at aging a

25     subdural than a radiologist, and I said a radiologist would

1    have more expertise in dating a subdural than a pediatrician.

2            Q.    The baby died in that case; didn't he?

3            A.    Yes, eventually, yes.

4            Q.    Now, I want to ask you now -- I'm going to show you a

5    part of the record from -- I would like you to look at this,

6    dated 9/21/2008.  And that's a report signed by a Dr. Hoover;

7    correct?

8            A.    Yes.

9            Q.    He's a neuroradiologist; correct?

10           A.    Yes.

11                 THE COURT:  Mr. Coffey, is this document in

12   evidence?

13                 MR. COFFEY:  Yes.  It's part of the medical

14   records.  If you want me to mark it separately, I will do

15   that.

16                 THE COURT:  What's it a part of?

17                 MR. COFFEY:   Part of the Albany Medical Center

18   records.

19                 THE COURT:  Defendant's D that you just moved

20   in?

21                 MR. COFFEY:   Right.

22                 THE COURT:  That's fine.

23           Q.    Have you ever seen that report before?

24           A.    Yes.

25           Q.    He's more qualified than you, isn't he, in dating?

*(Jenny - People - Cross)*                                    680

1      A.   To date radiological studies, yes.

2      Q.   You must have talked to Dr. Hoover?

3      A.   I did not.

4      Q.   Well, if I wanted to find out with regard to whether

5   there was a subdural hematoma, I would want to know from the

6   neuroradiologist; wouldn't I?

7      A.   I read his report.

8      Q.   I would want to know from the neuroradiologist

9   personally; wouldn't I?

10     A.   If it's a patient that I'm actually seeing, yes.  I

11  would sit down and go over the films with the neuroradiologist;

12  but if it's a patient I'm reviewing records of, that,

13  historically, I don't have access to all the doctors that have

14  taken care of this child.

15     Q.   Doctor, you could have asked the District Attorney's

16  Office for Dr. Hoover's phone number, who is local, and asked

17  to speak to him; correct?

18     A.   I read his report.

19     Q.   You could have.

20          MR. COFFEY:  Judge, I move to strike that

21     answer.  I asked if she could have, not what she did.

22          THE COURT:  Overruled.

23     Q.   You could have asked the District Attorney to speak

24  to him; correct?

25          THE WITNESS:  What was overruled?  I'm sorry.  I

*(Jenny - People - Cross)* 681

```
 1          don't understand.

 2                    THE COURT:  You can answer this next question.

 3                    THE WITNESS:  I can't?

 4                    THE COURT:  You can.

 5                    THE WITNESS:  I can.

 6          A.   I could have, yes.  I could have called up and asked

 7     to speak to anybody I want.  I don't know if they would have

 8     spoken to me.

 9          Q.   And Dr. Hoover would be the person who would be in

10     the best position, would you agree with me, as to what is on

11     those -- that CAT scan.  Would you agree or disagree with that?

12          A.   What's on the CAT scan?  Yes.  I agree that he would

13     be in the best position.

14          Q.   And Doctor, Dr. Hoover never indicated at all that

15     there was a subdural hematoma; did he?

16          A.   He said there probably was.

17          Q.   Really?  Would you read that to the jury?

18          A.   It says, "Large bilateral extraaxial fluid

19     collections, probably subdural on the right, and possibly the

20     same on the left.  MRI is recommended to distinguish between

21     subdural collections and enlargement of the subarachnoid

22     spaces."

23          Q.   He didn't call it a subdural hematoma, though; did

24     he?

25          A.   No.  He didn't use the term hematoma.
```

1     Q.   So, now we have got two critical people, which you

2     would agree, Dr. Edge and Dr. Hoover, who are involved in this

3     baby's care and treatment when he comes to the hospital, and

4     what their opinion is or not, you have no idea; correct?

5         A.   I just read the record.  So, that's all I know.

6         Q.   Now, when -- you indicated, I think in your direct

7     testimony, that in your opinion, there was acute subdural

8     hematoma; correct?

9         A.   Yes.

10        Q.   Is that what your opinion is?

11        A.   Well, that was what the treating physician said.

12    That's what the neurosurgeon said, and that's what the autopsy

13    report showed.

14        Q.   What treating physician said that?

15        A.   The intensive care doctors put that in their notes.

16        Q.   Who was that?

17        A.   It was one -- it was in the standard notes.  Several

18    times, they said acute and chronic or subdurals of different

19    ages, and I think, actually, the neurosurgery notes said acute

20    and chronic.

21        Q.   What did the intensivist base his opinion on, if you

22    know?

23        A.   I assume --

24        Q.   I'm not asking you to assume.  Do you know?

25        A.   The only way they would know would be to look at

1      imaging studies.

2          Q.   Well, intensivists can't read a CAT scan as well as a

3      radiologist; can he?

4          A.   No.

5          Q.   So, let's -- so, on assumption, you are assuming that

6      he read this; correct?  You are assuming that; correct?

7          A.   Well, somehow, he got information on the case that

8      there was subdurals of different ages, as well as the

9      neurosurgeon, who reads CAT scans all the time.

10         Q.   Well, that may be.  But in terms of the intensivist,

11     where he got it or whatever, you don't know; correct?

12         A.   I assume he got it from the radiologist.  I don't

13     know directly.

14         Q.   Now, let's not talk about assumptions for the moment.

15     Let's talk about what's in the record.  When ██████ --

16     withdraw that.  When you indicate that that baby had an acute

17     subdural, you have not read the CAT scan; have you?

18         A.   I have not.

19         Q.   You are not qualified to read CAT scans; are you?

20         A.   I do it all the time with radiologists.  I wouldn't

21     do it on my own.

22         Q.   Okay.  And the slides in this case, you have not read

23     them, either; correct?

24         A.   I did not.

25         Q.   So, therefore, your testimony today is based upon

1    opinions and assumptions made by others; correct?

2         A.   It was based on the report of the autopsy and review

3    of the medical records.

4         Q.   Others?

5         A.   Yes.

6         Q.   You have no hands-on experience in this case;

7    correct?

8         A.   I was not in Albany at the time of this case.

9         Q.   I guess the answer to that is yes?

10        A.   September of 2008, I was not involved in this case.

11        Q.   So, the answer is you have no hands-on experience;

12   correct?

13        A.   On this case, yes.

14        Q.   Well, I don't care -- do you think we are talking

15   about some other case here?

16        A.   In this case, I have had no hands-on experience.

17        Q.   Now, █████, you have testified -- and, in fact,

18   it's been your opinion for 30 years, if not more, isn't it,

19   that if you have a severe head injury, a baby is going to show

20   immediate signs of distress consistent with that severe head

21   injury; correct?

22        A.   Um, in the literature --

23        Q.   Is that correct or is that incorrect?

24        A.   That's not quite the full story.  In the

25   literature --

*(Jenny - People - Cross)*

1          MR. COFFEY:  Move to strike.

2     A.   -- the onset of symptoms.

3          MR. COFFEY:  I move to strike anything further,

4     Judge.

5          MS. BOOK:  Objection, Your Honor.

6          MR. COFFEY:  I'm not asking for an explanation.

7          THE COURT:  Let the witness answer the question.

8     You can follow up on redirect.  I will let you ask a new

9     question, Mr. Coffey.

10    A.   Not necessarily.  It depends on the nature of the

11    injury and the nature of the damage.

12    Q.   A severe head injury such as this baby suffered, it

13    has been your opinion consistent in the past that a baby would

14    experience visible signs consistent with having a severe head

15    injury; correct?

16    A.   Um, yes.  When babies get severe head injuries, they

17    don't act normal.

18    Q.   Okay.  Now, having said that, now I want to ask you

19    some questions, if I might.  We had -- I'm going to withdraw

20    that.  This acute subdural which you claim -- which somebody

21    else has told you about, how old is that?

22    A.   I didn't read that anybody gave it a specific age.

23    Most people in the field, in radiology and pathology, or in

24    radiology would say acute is one to three days.

25    Q.   One to three days?

*(Jenny - People - Cross)*

1    A.   Or from zero to three days.

2    Q.   All right.  Now, ▮▮▮▮ was brought into

3   Samaritan -- and you can assume this for the moment, the days.

4   He was brought in on a Sunday morning.  Okay?

5    A.   Yes.

6    Q.   Is that consistent with what your recollection is?

7    A.   Yes.

8    Q.   So, he gets brought into Samaritan Hospital.  And

9   from Samaritan Hospital, he's then transported to Albany

10   Medical Center; correct?

11    A.   That's right.

12    Q.   And at Samaritan Hospital, he at that time is,

13   unfortunately, on the road to his death; isn't he?

14    A.   Yes.

15    Q.   He has -- he's hypotensive; right?

16    A.   Yes.

17    Q.   Meaning low blood pressure?

18    A.   Yes.

19    Q.   His white blood count is perilously low; right?

20    A.   That's right.

21    Q.   He is nonresponsive; right?

22    A.   When he arrived at the medical center, yes.

23    Q.   Well, was he responsive at Samaritan, if you know?

24    A.   Well, on the EMT call, they said that he was

25   responsive to stimulation; but by the time he got to Samaritan,

*(Jenny - People - Cross)*

1  they didn't have that finding.

2      Q.   So, he's got a low blood count, low platelets,

3  hypotensive.  If he's responsive, he's barely responsive at

4  Samaritan Hospital.  They know at that time they've got a

5  problem taking care of this little baby.  So, they immediately

6  ship him over to Albany Med; correct?

7      A.   Yes.

8      Q.   I say "immediately," maybe within a half-hour or an

9  hour?

10      A.   Within a short time, yes.

11      Q.   And the doctor who sees him, the emergency room

12  physician, she diagnoses, in fact, has testified that, in her

13  opinion, the diagnosis was and is sepsis.  Are you aware of

14  that?

15      A.   I didn't know what her testimony was.

16      Q.   Do you care?

17      A.   I know that on her differential diagnosis, she had

18  sepsis and head injury, but she didn't have any imaging studies

19  to make a diagnosis.

20      Q.   I'm sorry.  I didn't ask you that.  I asked if her

21  opinion was sepsis.  I didn't ask about a head injury.

22      A.   She had that on the list of differential diagnosis.

23      Q.   She testified here in court a couple days ago that,

24  in her opinion, that baby had sepsis.  Are you aware of that?

25      A.   I didn't hear that testimony.

1          Q.   In any event, she comes to the conclusion, board

2    certified, that ███████ had sepsis.  Now, you are not an expert

3    in infectious diseases; are you?

4          A.   No.

5          Q.   And in fact, there are experts on -- pediatric

6    infectious disease experts; aren't there?

7          A.   Yes.

8          Q.   And these are experts in the field in various

9    hospitals around the country, such as small hospitals that may

10   be manned by a school at Harvard?

11         A.   I'm sorry.  I didn't understand.

12         Q.   You have heard of Harvard; correct?

13         A.   Harvard, yes.

14         Q.   One of the leading medical schools in the world;

15   right?

16         A.   Yes.

17         Q.   And there are infectious disease experts associated,

18   if you know, with institutions such as Harvard or Stanford or

19   Texas, whatever; correct?

20         A.   Yes.

21         Q.   And doctors oftentimes will defer or go to those

22   kinds of doctors and ask a doctor, "You got to tell me some

23   information with regard to this infection," right?

24         A.   Right.

25         Q.   It doesn't make a doctor bad or stupid or

1    incompetent.  It simply means one doctor is willing to defer to

2    the expertise of another; correct?

3         A.   That's right.

4         Q.   Have you ever heard the name of Dr. Jerome Klein?

5         A.   Yes.

6         Q.   And Jerome Klein is one of the leading authorities in

7    the country on pediatric infectious diseases; isn't he?

8         A.   He's a distinguished academician, yes.

9         Q.   Is that a criticism?

10        A.   No.

11        Q.   He's a clinician, as well; isn't he?

12        A.   I'm sorry?

13        Q.   He's a clinician, as well?

14        A.   He's done a lot of research.  He's a very highly

15   respected doctor.

16        Q.   Okay.  And when you met with the District Attorney's

17   Office, did they talk to you about Dr. Klein?

18        A.   They said that Dr. Klein had said that the child had

19   pneumococcal sepsis.

20        Q.   Did they tell you that they had -- Dr. Klein's

21   opinion was that it was severe sepsis when he went into that

22   hospital?

23        A.   I think I read that, yes.

24        Q.   You --

25        A.   I read the testimony from a previous event.

*(Jenny - People - Cross)*

1  Q.  Do you disagree with that?

2  A.  No.  He was critically ill.

3  Q.  Do you disagree that he had severe sepsis?

4  A.  No.  He had sepsis.  He had severe sepsis.

5  Q.  Fair enough.  So, now the baby develops severe

6  sepsis.  And with sepsis, you mentioned -- you were kind enough

7  to tell us what happens.  This bacteria, it's actually in your

8  throat; correct?

9  A.  When you are septic, it's in your bloodstream.

10  Q.  Well, pneumococcal pneumoniae -- or staphylococcal

11  pneumoniae, that bacteria, do we all have that?

12  A.  A lot of people carry it.

13  Q.  A lot of kids have it?

14  A.  In their throats, yes.

15  Q.  And the process that occurs is it gets in the throat.

16  It can migrate into the lungs; right?

17  A.  Yes.

18  Q.  And from the lungs, it can go into the bloodstream;

19  correct?

20  A.  Yes.

21  Q.  And that's bacteremia; correct?

22  A.  Yes.

23  Q.  We don't want bacteremia in the blood; do we?

24  A.  No.

25  Q.  That's bad; right?  And if bacteremia begins to

1    colonize the blood, it can begin to spread throughout the

2    bloodstream and, of course, the blood is being pumped by the

3    heart.  The blood is going all over, to the organs, the brain.

4    And if it becomes infected, septic, it can hit every organ;

5    right?

6        A.   Yes.

7        Q.   And if that happens, the sepsis can overwhelm a

8    baby's ability to fight off the infection; correct?

9        A.   Right.

10       Q.   And kill him; right?

11       A.   It can, yes.

12       Q.   Now, you have a situation where the baby comes in on

13   Sunday, and I think you told us that the acute subdural would

14   be from day zero to day three; correct?

15       A.   Based on the imaging studies, yes.

16       Q.   Based on what you have been told, anyway?

17       A.   Right.

18       Q.   Just so we know, in medicine, I'm going to take day

19   zero as Friday, or day one if you want.  Saturday is day two,

20   and Sunday is day three.  Would you accept that, or would you

21   go to day zero as Thursday?

22       A.   Just based on the radiology, again, I would say

23   that's reasonable.

24       Q.   Friday, Saturday, Sunday; correct?

25       A.   Yes.

*(Jenny - People - Cross)*                                                   692

1        Q.   Now, let's stay away from -- I will withdraw that.

2   If the baby had suffered a severe -- to cause this kind of

3   damage, we are talking about a severe head injury; aren't we?

4        A.   Yes.

5        Q.   And if he suffered a severe head injury, you are

6   talking about taking a baby -- a four-month-old baby, two

7   months premature.  You know that; right?

8        A.   Yes.

9        Q.   Or six weeks premature?

10        A.   Seven weeks.

11        Q.   Seven weeks.  Okay.  Six to eight, seven.  Okay.  And

12   you are talking about applying a lot of force to that baby's

13   head; aren't you?

14        A.   Yes.

15        Q.   Okay.  And when you apply that kind of force to that

16   baby's head, whether you throw it or drop it or drop kick him -

17   and I'm not being facetious - you are applying tremendous

18   forces to that little baby's -- I'm not talking about any part

19   of his body.  To his head; correct?

20        A.   Depending on the nature of the injury, yes.

21        Q.   We are talking about this injury.  Tremendous force;

22   correct?

23        A.   Right.

24        Q.   Dr. Waldman called it a serious application of force.

25   Okay?  You would accept that; wouldn't you?         P021327

Judy A. DelCogliano

*(Jenny - People - Cross)*

1      A.   Yes.

2      Q.   That baby -- you would never recommend that,

3    obviously; right?

4      A.   No.

5      Q.   And the mother, who is with that baby, who has not

6    been criticized and will not be criticized and is not being

7    criticized, that mom would be able to pick up, something has

8    happened to my son; wouldn't she?

9      A.   Well, it depends, because sometimes kids can take a

10   hit, get symptomatic and then start to recover until they take

11   another hit.  So, if you see them in that recovery period, it

12   may be very difficult to diagnose.

13     Q.   I thought you told us you would have visible signs

14   immediately?

15     A.   You do, but kids can get better and bounce back.

16     Q.   How much longer?

17     A.   It depends on the case.  I have done multiple cases

18   where people say -- they tell us they abused the kid multiple

19   times, and each time the kid gets acutely -- you know, stops

20   breathing or has trouble breathing or gets very sleepy and

21   then, over time, they go back to normal.

22     Q.   Fair enough.

23     A.   And then after multiple events, they finally get

24   pushed over the edge.

25     Q.   I'm talking about this weekend.  That's all I'm

*(Jenny - People - Cross)*

1    talking about, Doctor.  Stay with me here.  This baby has a

2    serious application of force.  I don't care what happened in

3    August.  I don't care what happened in June.  When that

4    happens -- and mom is with him the entire weekend.  Are you

5    aware of that, except for --

6         A.   Not the entire weekend.  She said there were times

7    when she was in the home when she wasn't supervising.

8         Q.   Who told you that?

9         A.   She said that in her statement.  She said that in the

10   hospital records.

11        Q.   Well, mom testified that she was out maybe for about

12   an hour or so?

13        A.   She wasn't there continually, is what she said in the

14   hospital records.

15        Q.   Well, her daughter was there.  Okay?  She's testified

16   in this case.  Are you aware of that?

17        A.   No.

18        Q.   So, now you've got two responsible -- well, at the

19   time, this child was nine.  She's now 15, or 14, I think.  So,

20   now you've got two people there, and this force that's being

21   applied, are you aware of the fact that mom never sees the loss

22   of consciousness in the entire weekend?  Are you aware of that?

23        A.   On Sunday morning, she did.

24        Q.   Day three?

25        A.   Yes.  That's right.

1      Q.   And that's at eight o'clock when she goes in to wake

2    the baby up; right?

3      A.   Correct.

4      Q.   Are you aware of the fact that from Friday, day one,

5    to day three, the baby is feeding well.  Are you aware of that?

6      A.   I was told that.  Well, she was feeding Pedialyte®,

7    which is not formula.  She wasn't feeding formula.

8      Q.   Is it your understanding he didn't have formula?

9      A.   Say again?

10     Q.   Your understanding is he did not get formula this

11   weekend?

12     A.   Well, certainly, the last few feedings, they were

13   feeding him Pedialyte® because he had difficulty with diarrhea.

14     Q.   Do you know if he had formula?

15     A.   I just remember her saying that at 4:00 a.m.,

16   somebody gave him Pedialyte®.

17     Q.   What kind of a history were you getting, if that's

18   all you know?

19             MS. BOOK:  Objection.

20     Q.   I will withdraw that.  Do you know -- Doctor, as you

21   sit here today testifying in a case involving a man who is

22   accused of murdering his child, do you know what the mother has

23   testified to the baby's condition Friday night, day one; do you

24   know?

25     A.   All I know is what I have read in the record.

*(Jenny - People - Cross)*

1    Q.   Do you know, as you sit here today - tell this jury -

2    what the mother testified to regarding his condition Friday

3    night?

4    A.   No.  I wasn't allowed in the courtroom.  I wasn't

5    here.

6    Q.   Did you ever ask anybody?

7    A.   I just read what was in the records.

8    Q.   Do you know what the mother testified to the baby's

9    condition all during the day Saturday?  Do you know?

10   A.   In the medical records, she said that he had a period

11   of irritability on Saturday night.

12   Q.   This is after 11:00.  Is that correct?

13   A.   I don't remember the timing.

14   Q.   You don't even know the history, then; do you,

15   Doctor?

16   A.   I have read the record.  I haven't memorized it.

17   Q.   Did you think I was going to ask you questions today

18   about the history that weekend?

19   A.   I didn't know what you were going to ask me.

20   Q.   Really?

21   A.   Really.

22   Q.   Now, if I were to tell you that Mrs. Hicks said that

23   that baby was happy and healthy the entire weekend, the entire

24   weekend up to Sunday morning, had some problems at night, a

25   little bit of -- 100.4 fever.  But that's not a big fever; is

*(Jenny - People - Cross)*

1   it?

2        A.   No.   That's actually a normal temperature for a child

3   this age.

4        Q.   Babies go to 104?

5        A.   That's within the normal range.   You don't start

6   calling it a fever at that range, especially if it's a rectal

7   temperature.

8        Q.   From her testimony, except for maybe one hour in

9   which her daughter was with Matthew, this baby, the entire

10  weekend, except for maybe the little bit of problem with the

11  temperature, the entire weekend, she said she saw no physical

12  signs of any distress of that child.   Are you aware of that?

13            MS. BOOK:   I'm going to object to that, Your

14       Honor.   I think it's a mischaracterization of Wilhemina

15       Hicks' testimony.

16            THE COURT:   Mr. Coffey?

17            MR. COFFEY:   I don't believe it's a

18       mischaracterization at all.   I think that's exactly what

19       she said.

20            MS. BOOK:   She called her mother to come look at

21       the child.   He had a fever on Friday night.   She went and

22       got Pedialyte®.   She gave a history of diarrhea.   She knew

23       he didn't feel right.   She woke him up and she made a

24       determination if he wasn't better by Sunday morning, she

25       was going to take him to the hospital.   So, to sit here

1      and say that she was with him all weekend and had no

2      problems and put that out to the doctor as facts in this

3      case is just wholly inappropriate and misleading.

4                  THE COURT:  The record speaks for itself.  I

5      understand both parties' position.  I'm going to overrule

6      the objection.  The People can follow up in that regard if

7      they see fit.

8           Q.   Let me ask you this, Doctor.  I'm going to take

9      you through exactly what Ms. Book -- you just heard what she

10     said; right?

11          A.   Yes.

12          Q.   Well, what she hasn't told you is this:  That during

13     the day Friday, up to the time on Friday night, ▇▇▇▇ was

14     okay.  He was happy.  Saturday, the fever from the night before

15     broke.  All right?  He had some diarrhea.  She gave him some

16     Pedialyte®.  He was okay Saturday.  Saturday night, he had

17     another fever, a little cranky, but she thought, I will see

18     what happens in the morning, wasn't taking him to the hospital.

19     No problems during the day Saturday.  No problems during the

20     day Friday.  Are you with me so far?

21          A.   Yes.

22          Q.   Saturday morning, she fed him -- Sunday morning, I

23     apologize.

24          A.   Yes.

25          Q.   Sunday morning at eight o'clock, the baby was

1    nonresponsive.  I want you to assume those facts.  There's

2    nothing in that that is in any way consistent with a baby

3    suffering acute injury; is there?

4         A.   Well, I mean, she did say to the hospital social

5    worker that --

6         Q.   Doctor, please take the facts that I have given you.

7    I'm not asking about a social worker.

8         A.   The case as I read it was different than that.

9         Q.   Let me take what she told the jury, because they are

10   the ones that are going to decide this.  So, why don't you take

11   the facts -- and you testified many times, Doctor.  So, I'm

12   asking you to assume the facts that I have just told you.  And

13   assuming those facts, there is nothing that's consistent with a

14   head trauma; is there?

15             MS. BOOK:  Your Honor, I'm going to object and

16        ask that Dr. Jenny be allowed to answer fully.  It's been

17        asked about, it's now questioned on.  Dr. Jenny should be

18        allowed to fully explain herself.

19             THE COURT:  Mr. Coffey can present a

20        hypothetical, and he's allowed to do that.  You can follow

21        up on redirect.

22             MS. BOOK:  I understand he's allowed to present

23        a hypothetical, but he's presenting the facts of this case

24        as if --

25             THE COURT:  He presented what you just

1    represented the testimony is, if I'm not mistaken.  So, I

2    don't think there's anything inappropriate about that.  As

3    I said, if you want to follow up on redirect, you are

4    certainly free to do so, but I'm going to allow the

5    question.

6    Q.   There's nothing in this case at all from the mother

7    that this child suffered any abuse; correct?

8    A.   Well, I mean, he was irritable, and that's a sign of

9    a head injury.  That can be the sign of a head injury.

10   Q.   When he had -- at 11:00 at night, I think she said,

11   it's my recollection, slightly cranky, but he was not irritable

12   during the day Saturday.  He was not irritable during the day

13   Friday.

14   A.   He was irritable -- her description in the hospital

15   social work note said he was irritable Saturday night.

16   Q.   Let's take the testimony as I have given you, Doctor,

17   and I'm going to keep bringing it back to what I'm asking you

18   in this case.  All right?  I don't care what she told -- I care

19   what she told the jury.  On the facts that I have supplied to

20   you that she's testified here today, having met multiple times

21   with the District Attorney, that she does not give anything

22   that's descriptive and associated with head trauma.  Isn't that

23   true?

24   A.   Irritability can be -- and I don't know the extent of

25   the irritability that the baby showed, but that can be a sign

*(Jenny - People - Cross)*

1    of head trauma.

2         Q.   Even if it's for five seconds?  Is that what you are

3    telling us?

4         A.   I would doubt it would be five seconds.

5         Q.   You don't know?

6         A.   I don't know how long the child was irritable.

7         Q.   So, you are coming before a jury and you are now

8    speculation on irritability, how long it took; right?

9         A.   I'm saying, in general, irritability is a sign of

10   head trauma.

11        Q.   In general.  But you have to know how much time and

12   so forth?

13        A.   It wasn't reflected in the record.

14        Q.   Now, this child didn't have any sleeplessness, wasn't

15   unconscious or didn't sleep -- wasn't unconscious or sleepy,

16   didn't have any marks on his body.  Are you aware of that?

17        A.   Yes.

18        Q.   And I know you said that it's not always the case

19   that a child who has severe head injury that he would show

20   marks.  But tell me:  If I slam a little baby on whatever I'm

21   slamming him on, chances are, at some point in time, that baby

22   is going to exhibit some marks on his face or head; isn't he?

23        A.   It depends.  It really depends.

24        Q.   Well, isn't it likely?

25        A.   Because their skulls are soft, and their skulls do

*(Jenny - People - Cross)*

1    bend when they have impact; and it's very common to not see any

2    external trauma and, at autopsy, to find bruising or bleeding

3    underneath the scalp.

4        Q.   But we are talking about repeated acts of trauma.  Is

5    that what you are telling us?

6        A.   I would think, in any one event, you may or may not

7    see external lesions.

8        Q.   But my question to you is on repeat -- you said there

9    were repeated events of trauma.  Didn't you say that?

10       A.   Yes.

11       Q.   If I had repeated events of trauma where I'm slamming

12   the baby down, not just his skull, but his neck, his

13   collarbone, his stomach, his legs, the more you do it, the

14   better chance you are going to start having marks on that baby;

15   right?

16       A.   It depends on what you do.  It depends upon the

17   nature of the forces that are applied to the body and how

18   frequently, how often and the severity of the forces.

19       Q.   You told us that he had multiple acts of severe

20   trauma.  Didn't you tell us that?

21       A.   Yes, because he had old and new subdural hematomas.

22       Q.   I understand that.  My question, then, to you,

23   Doctor, is specific, and you can tell me no, if you'd like.

24   Wouldn't you agree that, if you actually did have multiple acts

25   of trauma, that at some point in time, that baby, some part of

*(Jenny - People - Cross)* 703

1   his body, would exhibit signs of having been hit or hurt?

2   Wouldn't you agree with me?

3       A.   Not necessarily.

4       Q.   Now, the -- let's talk about September the 13th.

5   September the 13th, this baby had a rash on him.  He had a

6   rash; didn't he?

7       A.   Yes.

8       Q.   Now, a rash is not a black and blue; right?

9       A.   No.

10      Q.   That was an open portal; right?  In other words, the

11  rash had some skin opening; right?

12      A.   Well, they described it as a blister.

13      Q.   Well, blister.  If it broke or whatever, would have

14  an open wound; correct?

15      A.   Well, it may be covered with skin.  I don't know.

16  They didn't specifically say that.

17      Q.   All right.  Now, the baby appeared to be -- okay.

18  Well, maybe he didn't.  How was that baby?  How was ███████?

19      A.   They said he was normal.

20      Q.   Let me go now to the hospital, when you get to Albany

21  Med.

22      A.   To Albany?

23      Q.   Albany Med on September the 21st, I believe, Sunday.

24  When he got to the hospital, at that time, he had -- as it

25  turned out, he had brain swelling; correct?

*(Jenny - People - Cross)*                                    704

1          A.   Yes.

2          Q.   Consistent with sepsis; correct?

3          A.   Consistent with many things, consistent with an

4     insult to his body.

5          Q.   I'm sorry, Doctor.  I didn't ask about many things.

6     Please, Doctor.  Stay with the question I'm asking you.  It's

7     consistent with sepsis; correct?

8          A.   It can be.

9          Q.   Can be.  Hypotension can be consistent with sepsis;

10    correct?

11         A.   Yes.

12         Q.   Meningitis, did he have meningitis?

13         A.   Um, according to the autopsy report, they didn't talk

14    about meningitis on the autopsy.  So, I don't know.  Nobody did

15    a spinal tap.

16         Q.   Okay.  He had -- his blood count crashed, where he's

17    down to, like, one; wasn't it?

18         A.   Yes.

19         Q.   Consistent with sepsis; correct?

20         A.   Yes.

21         Q.   He had platelets.  His platelets were not clotting.

22    Consistent with sepsis; correct?

23         A.   He had a low, but not dangerously low, platelet

24    count.

25         Q.   Well, it actually got much worse when he was in the

1    Medical Center; correct?

2           A.   It did, yes.

3           Q.   And the DIC -- which is disseminated, meaning it goes

4    all through your body; correct?

5           A.   Yes.

6           Q.   Intravascular means it gets into the vessels of your

7    body; correct?

8           A.   Yes.

9           Q.   Into everything; correct?

10          A.   Well, on autopsy, he had normal liver, kidneys and

11   spleen.

12          Q.   Well, it was in his heart and his testes?

13          A.   I'm sorry?

14          Q.   It was in his heart and testes?

15          A.   Yes.

16          Q.   When he came into the hospital -- when you have a

17   DIC, you are, in effect, bleeding out; aren't you?

18          A.   Say it again.

19          Q.   When you have a DIC, you are, in effect, bleeding

20   out.  In other words, you have uncontrollable bleeding;

21   correct?

22          A.   Yeah, if it's very severe.

23          Q.   Well, this baby had severe DIC; didn't he?

24          A.   He didn't have uncontrollable bleeding on his skin or

25   at the IV marks.  He was functionally not bleeding externally.

*(Jenny - People - Cross)*                                        706

1          Q.   He had classic signs of DIC; didn't he?

2          A.   Well, he had hematologic signs.  He has blood signs

3     of DIC.  He had no evidence of bleeding in his kidneys, no

4     evidence of bleeding in his gut, no evidence of bleeding in

5     other organs where we usually see it.

6          Q.   Well, he had a lot of blood in his brain; didn't he?

7          A.   He did have blood in his brain.

8          Q.   Now, DIC, if not controlled, will continue to bleed;

9     correct?

10         A.   Yes.

11         Q.   They were trying to stop it, but they were

12    unsuccessful; weren't they?

13         A.   Yes.  The DIC -- actually, yes.  He was dead at that

14    point.

15         Q.   So, when he comes in Samaritan in the morning and

16    goes over to Albany Med in the afternoon, that DIC is

17    continuing to work its evil ways; isn't it?  It's continuing?

18         A.   Until he was treated, yes.  Then he got better.

19         Q.   Okay.  Now, DIC is -- can be consistent with sepsis.

20    I know it can be consistent with a lot of other things.

21    Consistent with sepsis; correct?

22         A.   Yes.

23         Q.   So, he's got low blood count, heart failure.  He had

24    heart failure.  Didn't he have a heart attack?

25         A.   When he first came in, he had a very low heart rate.

1    I don't think that there is was any evidence that he had acute

2    heart failure.  He was bradycardic, meaning slow heart.

3        Q.  He was actually tachycardic and bradycardic?

4        A.  Well, he was first bradycardic, and then they gave

5    him pressors, which makes your heart rate go faster.

6        Q.  So, this baby, every system in his body was shutting

7    down; wasn't it?

8        A.  No.  His kidneys were normal.  His liver was okay.

9        Q.  Okay, except for those.  He had some multiple organ

10   failure here; didn't he?

11       A.  No, I don't think so.  I wouldn't call this multiple

12   organ failure.  You can't have normal kidneys and have multiple

13   organ failure.

14       Q.  Well, in any event, he had a bleed consistent with

15   sepsis and that was a DIC; correct?

16       A.  He had a bleed -- are you talking about his head?

17       Q.  I'm talking about the bleed he had.

18       A.  In his head, you mean?

19       Q.  Correct.

20       A.  Well, you know, it depends.  I have seen a lot of

21   kids with DIC from other things, and the head is not usually

22   where they bleed.  They usually bleed first in their kidneys

23   and their livers and their guts.

24       Q.  That's a matter that an infectious disease expert

25   would be more qualified?

 1          A.   I'm just telling you what I have observed in many

 2     cases.

 3          Q.   Stay with my question, Doctor.  Wouldn't you agree

 4     with me that an infectious disease, pediatric infectious

 5     disease expert would be more qualified than you to give an

 6     opinion in that regard?  Would you agree or disagree?

 7          A.   I would disagree, because the people that deal with

 8     this most are the intensivists and the trauma doctors, not ID

 9     doctors.

10          Q.   But the intensivist is Dr. Edge?

11          A.   That's right.

12          Q.   Do you know if he's coming in to testify?

13          A.   I don't know.

14          Q.   He would be the person to talk to, wouldn't he,

15     according to you?

16          A.   I think --

17          Q.   That's what you just told us; right?

18          A.   Lots of us deal with DIC.  It's a common problem that

19     lots of pediatricians who take care of hospitalized critically

20     ill patients deal with.  So, you could say a hematologist would

21     be better off doing it or the traumatologist.  Most of --

22     trauma is the most recent cause of DIC that we see.

23          Q.   Are you done?

24          A.   I'm finished.

25          Q.   I thought you just told us that the intensivist would

*(Jenny - People - Cross)*

1    be the person who knows this?

2        A.   Well, the people who deal with these kids are in

3    intensive care.  So, most of the people who see the trauma are

4    the ICU docs; and those of us who work in Intensive Care Unit

5    deal with it all the time.

6        Q.   Isn't it true the retinal hemorrhages that you talked

7    about -- I will withdraw that.  Retinal hemorrhages are caused

8    by pressure; right?

9        A.   Increased intracranial pressure, you get a very

10   specific type of retinal hemorrhage, which isn't the type this

11   baby had.

12       Q.   Well, isn't it true that retinal hemorrhages can be

13   caused by things that have nothing to do with trauma?

14       A.   Lots of things cause retinal hemorrhages.  It's a

15   question of where they are located and what the patterns are.

16       Q.   And if you were to be told that an infectious disease

17   expert were to say that this baby's problems were caused by

18   sepsis and not trauma, you would disagree with him; wouldn't

19   you?

20       A.   You can get those extensive retinal hemorrhages in

21   septic babies and you can get them with trauma, and you can get

22   them in bleeding disorders, severe; like kids that have

23   hemophilia or severe bleeding disorders or kids who have

24   Vitamin K deficiency.  There's many different things that can

25   cause it.  There's four or five things that can cause severe

*(Jenny - People - Cross)*

1       retinal hemorrhages.  There's hundreds that can cause little

2       tiny retinal hemorrhages behind the eye.

3                    THE COURT:  Ladies and gentlemen of the jury, we

4               are going to take a break at this point in time.  During

5               this break, please don't discuss the case.  Don't read or

6               listen to any media accounts.  Don't form any judgments or

7               opinions.  Don't request or accept any payments in return

8               for supplying any information.  If anyone attempts to

9               improperly influence you, please report that directly to

10              me.  We will break for 15 minutes at this time.  Okay.

11                   (Jury excused.)

12                   THE COURT:  Doctor, as I told you before, please

13              don't discuss your testimony with anyone, including the

14              attorneys.  See you back here in 15 minutes.

15                   (Brief recess taken.)

16                   THE COURT:  Please be seated.

17      (Samaritan Hospital Records marked Defendant's Exhibit E for

18      identification.)

19                   THE COURT:  We are outside the presence of the

20              jury.  I will place on the record that as I was leaving

21              the bench and walking back to chambers, one of the members

22              of the jury had inquired of me if she could ask me a

23              question.  I told her that I could not speak with her;

24              that if, when I brought them back into court, if she had a

25              question to ask, I will allow her to do so in the presence

*(Jenny - People - Cross)*                                                711

1       of the parties.  It would, therefore, be my intention at

2       this time, when the jury comes back into court, to inquire

3       whether this particular juror had a question.  Is that

4       okay with the People?

5                     MS. BOOK:  Yes, Judge.  Thank you.

6                     THE COURT:  Is that okay with the defense?

7                     MR. COFFEY:  Yes, Judge.

8                     COURT OFFICER:  All rise.  Jury entering.

9                     THE COURT:  Please be seated.  Before we resume

10      with the trial testimony, I would note that one of the

11      jurors had inquired of me when we were on a break whether

12      she could ask a question.  I advised that juror that I

13      couldn't speak to the jury outside the presence of the

14      parties.  Ma'am, is there a question from either you

15      and/or the jury at this time?

16                    TRIAL JUROR:  I won't ask my question at this

17      time.  I will choose not to ask it.

18                    THE COURT:  Okay.  Are you sure?  Because if you

19      have a question that you feel pertains to this case or

20      pertains to your role as a juror, I would be happy to

21      entertain that question.  I'm not telling you you have to

22      ask it, but I just want to acknowledge that you attempted

23      to ask me a question in the back.  I told you I couldn't

24      speak to you outside the presence of the parties, and I

25      want to afford you the opportunity at this time to ask a

1    question if you feel it's appropriate or you need to; and

2    if you want to ask a question, you may do so.  If you are

3    asking to speak to me privately, you may do that, as well.

4    By privately, I mean on the record but not in front of

5    everyone else in the courtroom.  Or if you believe that

6    the question is unnecessary, you may forego asking it.  Do

7    you understand that?

8              TRIAL JUROR:  I do, Your Honor.  Thank you.  I

9    will forego asking it at this time.

10             THE COURT:  Thank you.  People satisfied and

11   prepared to proceed?

12             MS. BOOK:  Yes.

13             THE COURT:  Defense satisfied and prepared to

14   proceed?

15             MR. COFFEY:  I have no questions.  I'm good.

16   Thanks.

17             THE COURT:  Okay.  The sworn witness remains

18   Carole Jenny.  Doctor, I will remind you you are still

19   under oath.  Mr. Coffey, you may proceed when you are

20   ready.

21   **BY MR. COFFEY:  (Continuing)**

22        Q.   You know, Doctor, does it strike you that there's a

23   lot of coincidental things that occurred in this case?

24        A.   I'm sorry?

25        Q.   Let me see if I can follow here.  You claim that

1    there was an acute event from day zero -- or from Friday to

2    Sunday which caused trauma; correct?

3         A.   Yes.

4         Q.   Yet, ironically, at the very same time this occurs,

5    this baby develops a massive sepsis, shock; right?

6         A.   That's right.

7         Q.   Same weekend; right?

8         A.   Yes.

9         Q.   And you talked about aspiration before; correct?

10        A.   Yes.

11        Q.   There's no aspirations anywhere in this record; is

12   there?

13        A.   Well, you can't tell that, because lots of kids that

14   get head injuries have what we call silent aspirations.  They

15   don't cough.  They don't choke.  Stuff goes down their throats.

16        Q.   I'm sorry, Doctor.  I didn't ask about other kids.  I

17   asked about the record.  There's nothing in this record that

18   indicates this child aspirated; is there?

19        A.   There's nothing that indicates it and you can't rule

20   it out.

21        Q.   We can't rule out what -- well, let's see.  Actually,

22   when you can't rule out things, you now think, well, maybe the

23   baby aspirated, right, maybe?

24        A.   It's possible.

25        Q.   Possible.  And he has sepsis, which is a -- he has

1    objective signs of sepsis; doesn't he?

2        A.   Yes.

3        Q.   We don't have to go to anybody and wonder about that.

4    He's got sepsis.  It's septic shock.  And by the way, he was

5    bleeding in his eyes; wasn't he?

6        A.   Yes.

7        Q.   So, we know he has sepsis.  And sepsis, when that

8    gets in your bloodstream, that goes right through it; doesn't

9    it?

10       A.   It depends.  It depends on the nature of the host or

11   the person's immune system.  It depends on how toxic that

12   particular species of bacteria is.

13       Q.   Well, the staphylococcal pneumonia here goes right

14   through your bloodstream once it gets in there; doesn't it?

15       A.   Well, I don't know how long it took.

16       Q.   So, it goes -- well, are you aware of the fact that

17   Dr. Klein opines that on Friday, this sepsis gets in this boy's

18   bloodstream and hits it; and by Sunday, it's killed him?  Are

19   you aware that's his opinion?

20       A.   No.

21       Q.   Wouldn't you want to know the opinion of someone who

22   may disagree with you, or you don't care?

23       A.   I guess it important for the jury, certainly.  It's

24   important to the judge and jury.  I can't have access to people

25   I don't have access to.

*(Jenny - People - Cross)*                                    715

1      Q.   You can read their testimony.

2      A.   I did from the last one.

3      Q.   Yes.

4      A.   I don't remember the Friday to Sunday testimony.

5      Q.   Do you have a filtered memory?  Do you remember

6    things you want to remember?

7      A.   I read a stack of stuff that high.  I didn't remember

8    every single word.

9      Q.   Now, so, if he developed sepsis that's unrelated to

10   the trauma, you don't know whether that's true or not; correct?

11     A.   If it's unrelated to trauma?

12     Q.   Right.

13     A.   I don't know that.

14     Q.   Now, when you talk about trauma, it can be accidental

15   or intentional; correct?

16     A.   Yes.

17     Q.   And I want to ask you something about this, about the

18   hypothetical you were given before.  Remember the sequence of

19   the questions you were asked about the baby bouncing on the

20   bed?

21     A.   Yes.

22     Q.   Okay.  Well, let's assume this jury bar is a bed.

23   Okay?  (Indicating)  And I'm doing something here, bouncing a

24   little four-month-old; right?  Okay?

25     A.   Okay.

*(Jenny - People - Cross)*                                    716

1          Q.   Now, let's go to, say, 17 inches, okay, which is --

2     tell me where you think 17 inches is.

3          A.   Well, a little more than a foot, a foot and a half.

4          Q.   Okay.  So, I'm bouncing a little baby on a bed;

5     right?

6          A.   Yes.

7          Q.   And the baby bounces and falls off the bed.  Is that

8     severe trauma to you?

9          A.   It depends on the distance of the baby.

10         Q.   No.  I'm talking -- Doctor, stay with my example,

11    please.

12         A.   From that distance, if the head were supported, it

13    wouldn't cause any problems.

14         Q.   So, if I'm bouncing the baby on the bed and the baby

15    falls off, that wouldn't cause severe trauma; would it?

16         A.   Not necessarily.

17         Q.   And whether the baby is at 17 inches or 18 inches --

18    oh, do you know how far the bed that we are talking about, the

19    top of the bed was from the floor in this case?

20         A.   Seventeen inches.

21         Q.   Okay.  So, we don't have to speculate.  We know we

22    are talking about 17 inches; right?

23         A.   Well, that's how high the surface was.  I don't know

24    how high the person was that was throwing the baby onto the

25    bed.

*(Jenny - People - Cross)*

1    Q.   I'm sorry.  Would you repeat that answer?

2    A.   I don't know how high the person was who was bouncing

3    the kid off the bed.

4    Q.   Well, actually, you didn't say bouncing.  You just

5    used the word throwing; didn't you?

6    A.   Yes.

7    Q.   You don't have any evidence that he was throwing that

8    baby; do you?

9    A.   Um --

10   Q.   Do you?

11   A.   In this case, no; in this particular version of the

12   case, no.

13   Q.   Why would you use that word throwing?  Didn't you

14   think that we would listen to that word, and tell this jury

15   that you are using the word throwing, when you know very well

16   that throwing means something?  Why did you use that word?

17   A.   Well, my understanding was he was standing and was

18   not letting the baby -- was not pushing, holding the baby right

19   over the bed and dropping him; that, in fact, he dropped him

20   from some distance.

21   Q.   Why did you use the word throwing?

22   A.   It just seemed relevant.

23          MR. COFFEY:  Well, I guess we are going to find

24      out in a couple of days.  That's all I have.

25          THE COURT:  Ms. Book, any redirect?

718

1              MR. COFFEY:  May we approach?

2              (Sidebar discussion held on the record as

3         follows:)

4              MR. COFFEY:  Judge, we would move for a mistrial

5         based upon Dr. Jenny's statement, her opinion based upon

6         this version of facts.

7              THE COURT:  Ms. Book?

8              MS. BOOK:  Your Honor, I don't think this rises

9         to the level of a mistrial.  I, obviously, told Dr. Jenny

10        what she could and could not say at this trial.  I told

11        her not to mention -- I don't want to get into it, but I

12        told her not to mention anything from before, and I don't

13        think that she meant it as a prejudicial statement.  I

14        think it just came out that way, and it's harder for

15        doctors to live in the legal --

16             MS. EGAN:  Judge, can I add something?  Mr.

17        Coffey was also discussing several different

18        hypotheticals, one being -- he actually said slamming the

19        child on the floor and then bouncing the baby on the bed

20        at 17 inches; and she, in fact, corrected her statement

21        and said bouncing the child.  So, I think that there's --

22        I don't think it rises to the level of a mistrial because

23        we have been discussing -- Mr. Coffey was discussing

24        certain hypothetical versions of facts with the witness.

25             MS. BOOK:  Different versions of events.

1          THE COURT:  The Court will reserve on the

2     Defendant's application.  We will continue and then I will

3     issue a decision at the appropriate time.

4          (Proceedings continue in open court as follows:)

5          MS. BOOK:  May I have one moment, Your Honor?

6          THE COURT:  Yes, you may.

7     **REDIRECT EXAMINATION**

8     **BY MS. BOOK:**

9     Q.   Dr. Jenny, did you review the records in this case?

10    A.   Yes.

11    Q.   Did you speak to every doctor involved and all of the

12    witnesses in this case?

13    A.   No.

14    Q.   Why not?

15    A.   First, it would take an enormous amount of time.  It

16    would cost you guys a lot of money.  And second, I rely on the

17    medical record as recorded.  That's what medical records are

18    for.

19    Q.   If you felt that you did not have a full picture of

20    what happened from the medical records, would you be able to

21    give an opinion here today?

22    A.   I feel very comfortable with the opinion I'm giving.

23    Yes.  The question was, if I didn't have a full understanding

24    of the record, would I give an opinion?

25    Q.   Yes.

1      A.   I would not if I did not have a full understanding of

2    the record.

3      Q.   Okay.  So, whether it was Dr. Edge or Dr. Hoover that

4    performed a particular test or whether it happened at 8:00 in

5    the morning or 10:00 in the morning, does all of that -- does

6    any of that change your opinion today?

7      A.   It does not.

8      Q.   If a person is suffering from DIC, would you expect,

9    in your medical experience, for them to have a normal liver and

10   spleen?

11     A.   Liver and kidneys, you mean?

12     Q.   Liver and kidneys?

13     A.   That's unusual.  Those are usually organs that take a

14   hit.

15     Q.   Why is that?

16     A.   Because they have very high blood flow through them.

17     Q.   So, can you explain to us why it is that they would

18   take a hit?

19     A.   Well, because they get a lot of blood going through,

20   so they get a lot of exposure to the bacteria.

21     Q.   Would you expect to see clotting in those organs?

22     A.   Yes.

23     Q.   Now, Mr. Coffey asked you the difference between

24   subjective and objective signs here.  Was there objective signs

25   of head trauma to ███████ ████ ?

1      A.   Yes.

2      Q.   And what were those objective signs?

3      A.   The subdural hemorrhages that were healing and

4    brand-new.

5      Q.   Anything else?

6      A.   Well, I mean, there's other things that we see

7    commonly, like we see DIC in infant head trauma.  We see

8    hypotension.  We see low body temperature.  We see

9    cardiovascular or cardiorespiratory arrests.  Those are common

10   findings.

11     Q.   And did ████████ present with those findings?

12     A.   Yes.

13     Q.   Now, as a consultant in a case, as you are in this

14   case, are you limited to the records that you have?

15     A.   Yes.

16     Q.   And is it true that in any case, a person would be

17   limited to what is reported?

18               MR. COFFEY:  I object to that.  It's leading.

19               THE COURT:  Sustained.

20     Q.   In cases of head trauma, do you feel that all of the

21   aftermath, in your experience, is always reported?

22               MR. COFFEY:  I object to this as leading also.

23               THE COURT:  Sustained.

24     Q.   What is your experience with head trauma with respect

25   to reporting of it?

*(Jenny - People - Redirect)* 722

1      A.   Well, generally, people who see it recognize it and

2  report it.  If it happens and they don't see it, they don't

3  recognize it and they don't report it; and if the person who

4  was involved with the head trauma tells you accurately and

5  completely what happened, that's -- that's very helpful; but in

6  many of the cases I do, there's no history.

7      Q.   Now, Mr. Coffey asked you examples from the weekend

8  leading up to ███████'s death, and you were asked about signs

9  of potential head trauma based on how ███████ was acting that

10 weekend.  If I told you there was testimony from the mother in

11 this case - that she testified in court - that the baby was

12 crying in the bedroom on Saturday night while she was in the

13 kitchen making dinner, she couldn't see into the bedroom

14 because the door was closed, the baby was crying much louder

15 than normal, so much so she went into the bedroom to check on

16 him, and the baby was alone in the room with the Defendant,

17 would that crying -- could that be a sign of head trauma?

18     A.   It certainly could be.

19     Q.   Why is that?

20     A.   Well, I mean, it depended on when the trauma event

21 occurs.  It's often precipitated by crying and the crying can

22 be the baby's response to pain and fear.

23          MS. BOOK:  I have nothing further.

24          THE COURT:  Mr. Coffey, anything else?

25 **RECROSS-EXAMINATION**

1      **BY MR. COFFEY:**

2         Q.   Doctor, let's talk about something nonspecific.

3      You've got children; right?

4         A.   Yes.

5         Q.   How many children do you have?

6         A.   Two.

7         Q.   So, every time your child cried and was with your

8      husband, did you go running in and ask your husband if he was

9      beating your child?

10        A.   No.

11        Q.   A child cries for a lot of reasons; right?

12        A.   It was a question of a very loud unusual cry that I

13     answered.

14        Q.   Oh.  So, what constitutes loud and unusual -- you

15     have no clue really, as you sit here, what loud and unusual

16     means; do you?

17        A.   I think as a mother, you are used to listening to how

18     your baby cries and how your baby reacts; and if they react out

19     of the normal range, you might be concerned.

20        Q.   And when she went into the room, do you know where

21     the baby was?

22        A.   No.

23        Q.   Oh, that's not important?

24        A.   I don't know.  She didn't report it.

25        Q.   Actually, the mother did report it.  She reported it

*(Jenny - People - Recross)*                                     724

1    to the jury.

2           A.    I wasn't here for that.

3           Q.    I understand that.  This was Saturday night; right?

4           A.    Yes.

5           Q.    So, now, maybe the trauma occurs on Saturday night at

6    11:00?

7           A.    I think it's hard to pin down the exact timing of it.

8    We just know that the baby had acute and old head injuries.

9           Q.    So, if it occurs at nine o'clock on Saturday night,

10   theoretically, then this baby -- and if this baby is developing

11   sepsis, he's now developing sepsis before he gets injured;

12   right?

13          A.    I would assume so.

14          Q.    You got a lot of assumptions here; don't you?

15          A.    I think it's hard to know the exact --

16          Q.    You have a lot of assumptions; don't you?

17          A.    It's difficult to know the exact timing, yes.  I have

18   to make some assumptions.

19          Q.    And crying is very nonspecific; isn't it?

20          A.    It is.

21          Q.    Okay.  And by the way, I want to ask you one other

22   thing.  Leukopenia, what is that?

23          A.    That's a low white count.

24          Q.    And leukopenia is consistent with sepsis; isn't it?

25          A.    It is.

1      Q.   No question about that; right?

2      A.   Yes.

3      Q.   It is not consistent with head trauma; is it?

4      A.   It's not.

5                MR. COFFEY:  That's all I have.

6                MS. BOOK:  Very briefly, Your Honor.

7      **REDIRECT EXAMINATION**

8      **BY MS. BOOK:**

9      Q.   As Mr. Coffey pointed out, do you agree that mothers

10     are the best historians of their children?

11     A.   Are the best?

12     Q.   Yes.

13     A.   Yes.  I think so.  I don't know.  My husband was very

14     sensitive to my kids when they were little, to their needs.  He

15     could have reported it very well, too.

16     Q.   Do you think that if a cry is different than usual, a

17     mother would be the one to know that?

18     A.   I would think that that's something that moms do.

19               MS. BOOK:  Thank you.  Nothing further.

20               THE COURT:  Mr. Coffey, anything else?

21               MR. COFFEY:  Thank you, Doctor.  That's all I

22     have.

23               THE COURT:  Doctor, you may step down.  Thank

24     you.  Can I ask the attorneys to approach on the record?

25               (Sidebar discussion held on the record as