EXHIBIT "T"

1              THE CLERK:  The sworn witness is Katrina Kardos,

2        K-A-R-D-O-S.

3    (Samaritan Hospital Emergency Room Report marked People's

4    Exhibit 7 for identification.)

5              MS. EGAN:  May I inquire, Your Honor?

6              THE COURT:  Yes, you may.

7    **DIRECT EXAMINATION**

8    **BY MS. EGAN:**

9        Q.   Good morning, Dr. Kardos.

10       A.   Good morning.

11       Q.   Would you introduce yourself for the jury?

12       A.   I am Dr. Katrina Kardos.  I am an emergency medicine

13   physician at Samaritan Hospital in Troy.

14       Q.   And how long have you practiced emergency medicine?

15       A.   I finished medical school in 2003, and I have been

16   working at Samaritan Hospital in the emergency room since 2006.

17       Q.   And can you tell us --

18              THE COURT:  I'm sorry; if I could interrupt for

19        one moment.  We are going to take a brief break at this

20        time.  Members of the jury, please don't discuss the case.

21        Don't form any judgments or opinions.  If I could ask you

22        to step into the jury room for just one moment.  Thank

23        you.

24              (Jury excused.)

25              THE COURT:  Please be seated.  Dr. Kardos, if I

1          could ask that you please, during the course of this -

2          what I believe will be a short break - please don't

3          discuss your testimony or this case with anybody,

4          including the attorneys involved in this case.  If I could

5          ask you to step out of the courtroom for just one moment.

6          Thank you.

7                    (Witness excused.)

8                    THE COURT:  Okay.  We are outside the presence

9          of the jury.  Juror Number Eight has just indicated to the

10         Court through the Court Officer that she is familiar with

11         this witness from Samaritan Hospital.  I have no further

12         information other than that, but it would be the Court's

13         intention at this time to bring Juror Number Eight out and

14         inquire regarding what she's indicated to the Court.  Are

15         the People okay with that?

16                    MS. BOOK:  Yes, Your Honor.

17                    THE COURT:  Defense okay with that?

18                    MR. COFFEY:  Yes.

19                    THE COURT:  We will bring Juror Number Eight

20         out, please.

21                    (Juror Number Eight present in courtroom.)

22                    THE COURT:  Good morning, ma'am.  How are you?

23                    TRIAL JUROR:  I'm well.  Thank you.

24                    THE COURT:  For the record, you are Jeanine

25         Grinage, the juror in Seat Eight, Juror Number 381.  Is

1      that correct?

2                  TRIAL JUROR:  That's correct.

3                  THE COURT:  Ma'am, I believe you, through the

4      Court Officer, have indicated to the Court that you are

5      familiar with Dr. Kardos.  Is that correct?

6                  TRIAL JUROR:  Yes.

7                  THE COURT:  How are you familiar with her?

8                  TRIAL JUROR:  She's treated family members at

9      the emergency room.

10                 THE COURT:  Treated your family members?

11                 TRIAL JUROR:  Yes.

12                 THE COURT:  Has she ever treated you personally?

13                 TRIAL JUROR:  I don't know.  I don't think so.

14                 THE COURT:  Okay.  And when you say she's

15     treated family members, do you know which family members

16     in particular she's treated?

17                 TRIAL JUROR:  Yes, my niece and my nephew.

18                 THE COURT:  And were you present during any of

19     those times that your niece or nephew were treated by Dr.

20     Kardos?

21                 TRIAL JUROR:  Yes.

22                 THE COURT:  Do you know Dr. Kardos in any

23     fashion, other than what you have just described?

24                 TRIAL JUROR:  No.

25                 THE COURT:  And on those occasions when your

1    niece or nephew were treated by her and you were present,

2    did you have any direct interaction with her?

3              TRIAL JUROR:  Other than being in the room?  No.

4              THE COURT:  Okay.  Based upon the situation that

5    you have just described, essentially being present while

6    Dr. Kardos treated on various occasions your niece or your

7    nephew, based upon that, does that have any impact on your

8    ability to assess Dr. Kardos' testimony and her

9    credibility?

10             TRIAL JUROR:  No.

11             THE COURT:  Based upon that, do you -- does Dr.

12   Kardos have either a leg up or a leg down or would you

13   view her testimony any differently than you would any

14   other witness?

15             TRIAL JUROR:  No.  I really don't remember what

16   she did, so no.

17             THE COURT:  Okay.  Based upon what you have

18   explained to me here now, does that have any impact at all

19   on your ability to be fair and impartial in this case?

20             TRIAL JUROR:  No.

21             THE COURT:  Okay.  Ms. Book, any questions for

22   this juror?

23             MS. BOOK:  Just briefly.  Was Dr. Kardos able to

24   resolve whatever it was that they were being seen for?

25             TRIAL JUROR:  I don't really remember.  I just

1    recognized her when she came in and thought I was supposed

2    to let the Judge know.  But I don't remember what went on

3    in the emergency room.

4              MS. BOOK:  Okay.  After seeing Dr. Kardos, were

5    they ever again seen for that same issue?

6              TRIAL JUROR:  Because I don't remember what it

7    was, I really don't recall.

8              MS. BOOK:  Okay.  So, you didn't have a negative

9    experience, in that you felt like she didn't treat

10    whatever it was that they were there for that you recall?

11              TRIAL JUROR:  No.  It's neither positive nor

12    negative.  I really don't remember.  I just recognized her

13    when she came in.

14              MS. BOOK:  Okay.  Thank you.

15              THE COURT:  Mr. Coffey, any questions?

16              MR. COFFEY:  No.

17              THE COURT:  Ma'am, if I could ask you to just

18    step over in that room for one moment with the Court

19    Officer.  Thank you.

20              (Juror excused.)

21              THE COURT:  People satisfied?

22              MS. BOOK:  Yes, on that issue.

23              THE COURT:  Defense satisfied?

24              MR. COFFEY:  Yes.

25              THE COURT:  Both parties consent to this juror

*(Kardos - People - Direct)*

1    remaining on this jury.  Therefore, with the parties'

2    consent, and because this juror indicated that she only

3    came in contact with Dr. Kardos on a couple of isolated

4    incidents, only in a professional manner at that, and

5    during those interactions, she did not directly interact

6    with Dr. Kardos, along with the fact that this juror

7    indicated unequivocally that she could be and would be

8    fair and impartial and that the situation she explained to

9    the Court would have no impact on her ability to assess

10   Dr. Kardos' testimony or credibility, for all those

11   reasons and, again, the parties' consent, the Court will

12   leave this juror on the jury.  Bring her back out, please.

13              (Juror Number Eight present in courtroom.)

14              THE COURT:  Ma'am, I want to thank you for

15   bringing that to my attention.  I am going to leave you on

16   the jury.  I will ask that you return to the jury room at

17   this time, but I will ask you, please don't discuss with

18   any other jurors anything that you and I have talked

19   about.  Okay?

20              TRIAL JUROR:  Yes, Your Honor.

21              THE COURT:  Thank you, ma'am.

22              (Juror excused.)

23              THE COURT:  Do you have something to add, Ms.

24   Book?

25              MS. BOOK:  I do not.  I have a question.  Do you

1      think we could have one minute to use the restroom?

2                   THE COURT:  Yes, sure.  Go ahead.

3                   (Brief recess taken.)

4                   (Proceedings continue outside the jury with

5      Attorneys John Turi and Carmelo Laquidera present.)

6                   THE COURT:  We will go on the record.

7      Mr. Laquidara is present on behalf of the People, as are

8      Ms. Book and Ms. Egan.  Mr. Turi is present on behalf of

9      the Defendant.  Mr. Coffey and Mr. Frost are not in the

10     courtroom at this time.  It's my understanding that the

11     parties wish to place something on the record.

12                   Mr. Thomas, do you consent to -- well, I guess I

13     don't need to ask you.  Here's Mr. Coffey and Mr. Frost.

14     I will note that all attorneys are now present in the

15     courtroom.

16                   Mr. Turi and/or Mr. Laquidara, do you wish to be

17     heard at this time?

18                   MR. LAQUIDARA:  Your Honor, it's my

19     understanding that the Court signed a subpoena that our

20     office asked to have signed on Friday afternoon regarding

21     any records in possession of the Rensselaer County Public

22     Defender's Office pertaining to the representation of

23     William Terry by the Rensselaer County Public Defender's

24     Office.

25                   First, Judge, I would think we would have any of

1    those files that the Public Defender's Office represented

2    him on.  We would have those files as the prosecuting

3    agency in this county.  Also, my understanding in my

4    conversations with Mr. Turi this morning is that they are

5    in possession of one file where they represented

6    Mr. Terry, and that's the same file that we are currently

7    in possession of.  I believe it was a burglary file.  Mr.

8    Turi has assured me here this morning in our conversations

9    that the Public Defender's Office does not have any other

10   files pertaining to Mr. Terry, whether it's based on their

11   representation or representation of Mr. Terry by other

12   Public Defender's Offices or other private attorneys, and

13   we take Mr. Turi at his word for that.

14           And based on that, Judge, we see no need to go

15   forward with the subpoena.

16           THE COURT:  Okay.  Are you withdrawing the

17   subpoena at this time?

18           MR. LAQUIDARA:  We are, Judge.

19           THE COURT:  Mr. Turi, anything you want to add?

20           MR. TURI:  Nothing to add, Your Honor, other

21   than thank you, Carmelo.  I appreciate it.

22           THE COURT:  Thank you, Mr. Turi.  If I could ask

23   you to notify the County Attorney that the return time and

24   date of two o'clock today is now off the calendar.

25           MR. TURI:  Thank you, Judge.  I appreciate you

1          taking the time so we could be heard.

2                    THE COURT:  Okay.  We will bring the jury back

3          in, please.

4                    COURT OFFICER:  Jury entering.

5                    THE COURT:  Okay.  Please be seated.  The sworn

6          witness remains Katrina Kardos.  I will remind you that

7          you are still under oath.  Ms. Egan, you may continue

8          whenever you are ready.

9                    MS. EGAN:  Thank you, Your Honor.

10    **BY MS. EGAN:   (Continuing)**

11         Q.   Dr. Kardos, would you tell us a little bit about your

12    formal education?  Where did you complete your undergraduate

13    work?

14         A.   I went to Siena College for four years and received a

15    Bachelor of Science.  I then became a paramedic for a year, and

16    I went to Albany Medical College for medical school for four

17    years and then completed my residency at Albany Medical Center.

18         Q.   And what's a residency?

19         A.   It's a training program that's specifically designed

20    to your field of expertise.

21         Q.   And what was your specialty during your residency?

22         A.   Emergency medicine.

23         Q.   And how long is a residency?

24         A.   They range from three years and up, depending on the

25    field.

 1      Q.   How long was yours?

 2      A.   Three years.

 3      Q.   What did you do after you completed your residency?

 4      A.   I became an attending physician at Samaritan Hospital

 5  in Troy.

 6      Q.   Now, are you board certified?

 7      A.   Yes.

 8      Q.   And what are you board certified in?

 9      A.   Board certified in emergency medicine.

10      Q.   And what, specifically, do emergency room physicians

11  do?

12      A.   They see patients that arrive to the Emergency

13  Department and try to address and identify any life-threatening

14  conditions and treat them.

15      Q.   What is the goal of the emergency room treatment?

16      A.   To stabilize the patient and to get them to the level

17  of care that they need.

18      Q.   Is part of that goal an ultimate diagnosis?

19      A.   No.

20      Q.   Is part of that goal long-term treatment?

21      A.   No.

22      Q.   What states are you licensed to practice medicine in?

23      A.   New York State.

24      Q.   And when did you receive your license?

25      A.   2006, I believe.  I would have to look back.

*(Kardos - People - Direct)*                                           183

1     Q.   Have you been practicing since you received your

2  license?

3     A.   Yes.

4     Q.   And have you always practiced emergency medicine?

5     A.   Yes.

6     Q.   How many patients would you estimate you have treated

7  to date?

8     A.   Between 40 and 45,000.

9     Q.   And in September of 2008, approximately how many

10  patients had you treated up until that point?

11     A.   Approximately 20,000.

12     Q.   Have you taught or lectured in your field?

13     A.   Yes.

14     Q.   Where?

15     A.   I lecture for various EMS agencies, fire departments,

16  and I have done some lectures for larger EMS fields.

17     Q.   Approximately how many lectures have you delivered?

18     A.   Fifty.

19     Q.   Now, I want to talk about September 21, 2008, at

20  around nine o'clock in the morning.  Were you working then?

21     A.   Yes.

22     Q.   Where were you working?

23     A.   At Samaritan Hospital in the emergency room.

24     Q.   And do you know someone by the name of M█████

25  T█████

1        A.    Yes.

2        Q.    How do you know M████?

3        A.    He was a patient I treated on that date.

4        Q.    When did you first see M████?

5        A.    When he arrived by ambulance that morning.

6        Q.    What condition was he in when he arrived?

7        A.    Critical.

8        Q.    And can you describe what you mean by critical

9   condition?

10       A.    His life was being supported by the paramedics at the

11  time.

12       Q.    What do you do when you typically first encounter a

13  critical patient in the ER?

14       A.    We first address what we call the ABC's, which is the

15  airway, the breathing and the circulation of the patients.

16       Q.    Let's go one by one.  How do you assess the airway?

17       A.    We look to see if a patient can maintain their own

18  airway, if they can keep their tongue at the back of their

19  mouth, if there's anything in the airway that's obstructing it;

20  and then we go on to B, or breathing.  And first we assess to

21  see if they are breathing or not, and if they are not

22  breathing, we address it.  If they are breathing, then we

23  determine if it's adequate for them; are they breathing deep

24  enough and enough time is permitted, and we address that.

25       Q.    And did you assess M████ for the ABC's?

1    A.   Yes.

2    Q.   Could M███████ maintain his own airway?

3    A.   No.

4    Q.   What does that indicate?

5    A.   That indicates that he either has an obstruction in

6    the airway or that he's not able to keep his airway open

7    because of an inability to move the tongue from the back of the

8    airway or an inability to keep the muscles from having the

9    airway closed.

10   Q.   Was M███████ conscious at the time you saw him?

11   A.   No.

12   Q.   Does the inability to maintain an airway increase the

13   risk of aspiration?

14   A.   Yes.

15   Q.   Can you tell us, what is aspiration?

16   A.   Aspiration is when you have saliva or fluid or

17   material that's in your mouth that goes into your trachea,

18   which leads to your lungs, rather than going into your

19   esophagus, which leads to your stomach.

20   Q.   Is the term swallowing down the wrong pipe referring

21   to aspiration?

22   A.   Yes.

23   Q.   Is aspiration a common concern with emergency room

24   patients?

25   A.   Yes.

 1      Q.   Why?

 2      A.   Many people that come to the emergency room come to

 3   the ER because of problems with their airway or their

 4   breathing.   Patients that have these problems are at risk for

 5   aspiration.

 6      Q.   And what problems can be caused by aspiration?

 7            MR. COFFEY:   Object to this unless it's

 8   relevant.

 9            THE COURT:   Ms. Egan?

10            MS. EGAN:   Judge, I believe that it is relevant

11   in terms of her ultimate assessment of M█████'s

12   condition.

13            THE COURT:   The objection is overruled.

14      A.   Answer?   Can you repeat the question?

15      Q.   Sure.   What problems can be caused by aspiration?

16      A.   Aspiration can result in aspiration pneumonia or

17   aspiration pneumonitis, which is inflammation in the lungs.

18      Q.   What causes the pneumonia or the inflammation?

19      A.   It can be the material that was -- that went down

20   into the trachea that shouldn't have been in the trachea.

21      Q.   Can an infection enter the body because of

22   aspiration?

23      A.   Yes.

24      Q.   What are some common strains of bacteria that are

25   associated with aspiration?

*(Kardos - People - Direct)*

1    A.   Strep pneumo, staph aureus, haemophilus influenzae

2  are some of the most common ones.

3    Q.   Does being unconscious increase your risk of

4  aspiration?

5    A.   Yes.

6    Q.   And can a person aspirate without showing any outward

7  signs that they just did so?

8    A.   Yes.

9    Q.   Now, you said M█████ could not maintain his own

10  airway.  Did you do anything to assist him with that?

11    A.   Yes.  We placed an endotracheal tube, which is a

12  plastic tube that is inserted into the trachea through the

13  vocal cords, and that allows us to keep his airway open and

14  provide him with oxygen through the tube.

15    Q.   Did you note anything unusual when you intubated

16  M████?

17    A.   When we looked -- when I looked in the back of the

18  airway prior to intubation, there were secretions that had

19  pooled in the back of his airway.

20    Q.   Let's move on to breathing.  How was M████'s

21  breathing upon arrival?

22    A.   It was inadequate.  His respiratory was too low for

23  his age group.

24    Q.   So, was he able to breathe on his own?

25    A.   Minimally.

1      Q.   And what did you do to assist him with that?

2      A.    Initially, we used a bag valve mask, which is a

3    plastic mask that you put over the patient's face, and there's

4    a bag on it that you squeeze that pushes air into their lungs,

5    and then we placed the tube into his trachea, and then that

6    particular bag attaches to that tube and that allows us to

7    ventilate him.

8      Q.   And did that work for M████?

9      A.   Yes.

10     Q.   Now, let's talk about his circulation.  Do you recall

11   what M████'s pulse was?

12     A.   I know it was markedly elevated.  I don't know the

13   exact number.

14     Q.   Is there anything that I could show you that would

15   refresh your recollection?

16     A.   Either my chart or a list of his vital signs as a

17   part of the chart.

18              MS. EGAN:  Can I have one minute, Judge?

19              THE COURT:  Sure.

20   (Medical Records marked People's Exhibit 8 for identification.)

21              MS. EGAN:  Let the record reflect I'm showing

22    People's Exhibit 8 to defense counsel.  May I approach the

23    witness, Judge?

24              THE COURT:  You may.

25     Q.   Dr. Kardos, I'm showing you what's been marked as

1    People's Exhibit 8 for identification.  I'm just going to ask

2    you to take a look at that, see if that refreshes your

3    recollection as to M████'s pulse rate and then hand me the

4    exhibit before you answer the question.  Are you refreshed?

5         A.   Yes.

6         Q.   I'm taking People's 8 for ID from the witness.  Now,

7    do you recall, what was M████'s pulse rate?

8         A.   182.

9         Q.   And is that a normal pulse for a four-month-old

10   infant?

11        A.   No.  It's elevated, too high.

12        Q.   And do you recall what M████'s blood pressure was?

13        A.   No.  I know it was low.  I would have to look at the

14   exhibit again.

15             MS. EGAN:  Is there any objection to offering

16        People's 8 at this time?

17             MR. COFFEY:  No objection.

18             THE COURT:  People's Exhibit 8 will be received

19        in evidence at this time without objection.

20   (People's Exhibit 8 marked for identification received in

21   evidence and marked People's Exhibit 8 in evidence.)

22        Q.   Dr. Kardos, I'm handing you now what's in evidence as

23   People's Exhibit 8.  Can you take a look at that and tell us:

24   What was M████'s blood pressure?

25        A.   His initial blood pressure was documented at 117 over

1    62.

2         Q.   And is that a normal blood pressure for a baby his

3    age?

4         A.   The initial blood pressure is, yes, slightly

5    elevated.

6         Q.   Did you take any of M█████'s other vital signs upon

7    arrival?

8         A.   Yes, his temperature.

9         Q.   What was his temperature?

10        A.   97.2 rectally.

11        Q.   And is that a normal temperature for a baby?

12        A.   It's slightly low.

13        Q.   Is there anything about a patient's vital signs that

14   can indicate an increase in intracranial pressure?

15        A.   Yes.

16        Q.   What are those signs?

17        A.   Typically an elevation in blood pressure, a low or

18   high pulse and erratic respirations.

19        Q.   During the time you were with him, did M█████

20   exhibit those signs at any point?

21        A.   Yes.

22        Q.   Now, did you get any history about M█████ when he

23   came in?

24        A.   Yes.

25        Q.   What was that?

1     A.   The history was obtained from his mother and from the

2     paramedics that took care of him, and the mother had told me

3     that M█████ had had diarrhea and vomiting for a couple of

4     days; and on the morning that he came to the Emergency

5     Department, his temperature at home was 100.4.

6     Q.   Now, would you tell us what a differential diagnosis

7     is?

8     A.   A differential diagnosis is a list of potential

9     diagnoses that we as physicians develop when we first see a

10    patient come into the Emergency Department.  It's a list of

11    things that we progressively work through to try to determine

12    what's wrong with a patient.

13    Q.   And why do you make a differential diagnosis?

14    A.   As an emergency room physician, we are designed to

15    look for and treat the acute life-threatening emergencies

16    first.  So, when someone comes in, we try to immediately think

17    of what are the worse things that could be wrong with this

18    patient and then try to rule those out first.  So, we make that

19    list so that we have something to kind of go through in our

20    heads to try to rule out or rule in.

21    Q.   Is this list made quickly?

22    A.   Yes.

23    Q.   Are the potential diagnoses listed in any particular

24    order?

25    A.   No.

1        Q.    Did you make a list of differential diagnoses for

2    M█████?

3        A.    Yes.

4        Q.    What was that list?

5        A.    Recalling by memory, the list was sepsis or septic

6    shock, intracranial abnormality and dehydration.

7        Q.    And when you say "intracranial abnormality," what do

8    you mean by that?

9        A.    Intracranial bleeding or a rise in intracranial

10   pressure.

11       Q.    How would that be caused?

12       A.    There's a variety of things that can cause this;

13   anything from trauma, infection.

14       Q.    Would that encompass a head injury?

15       A.    Yes.

16       Q.    Now, what signs did M█████ exhibit that made you

17   concerned about septic shock?

18       A.    The fact that his -- so, when M█████ arrived, his

19   reported temperature at home was 100.4, which is slightly

20   elevated; the fact that he had been ill for a couple of days

21   with vomiting and diarrhea, and there was no reported history

22   of trauma from the parent that was in the Emergency Department.

23   All of those things make you concerned for sepsis.

24       Q.    What signs made you concerned about intracranial

25   abnormality or injury?

1      A.   Any time a child arrives in the Emergency Department

2   with a change in their mental status, as emergency room

3   providers, we always have to think about a head injury or

4   trauma or abuse to a child.

5      Q.   And what signs made you concerned about dehydration?

6      A.   The fact that it was reported that he had had

7   diarrhea and vomiting prior to coming.

8      Q.   And going one by one, what did you do to treat or

9   rule out each of these differential diagnoses?

10      A.   For dehydration, which is easiest - so I will explain

11   that first - we gave him intravenous fluid or fluid that goes

12   into his vein through an IV.  For sepsis, we did a variety of

13   blood work, including blood cultures, and we provided

14   antibiotics through the IV.  And for intracranial abnormality,

15   the next step would have been for us to do a CAT scan of his

16   brain, but at Samaritan Hospital, he was too unstable for us to

17   move him from the room he was in to the CAT scanner.

18         In addition, at Samaritan Hospital, we don't have

19   neurosurgeons.  So, if we were to do the CAT scan and it showed

20   bleeding or a mass or it showed an abnormality, we wouldn't

21   have been able to act on it quickly.  So, again, from the point

22   of an emergency room doctor, our goal is to get the patient to

23   where they can get the best level of care for their age and

24   their illness.  And so, for him, it was to get him to a

25   facility that has a Pediatric Intensive Care Unit, where they

1    have other physicians that can deal with those things. So, we

2    chose to try to stabilize him in our Emergency Department and

3    get him to the facility where he needed to go.

4        Q.  So, were you able to perform any scans or tests to

5    rule out intracranial injury?

6        A.  No.

7        Q.  Now, you stated you had done blood cultures. What

8    did those test for?

9        A.  Blood cultures check for the presence of bacteria in

10   the bloodstream.

11       Q.  Was a Gram stain done?

12       A.  Yes.

13       Q.  Did you receive the results of the blood cultures

14   and/or Gram stain while you were treating M███████?

15       A.  No.  It takes one to five days for those results to

16   come back.

17       Q.  So, why did you start antibiotics?

18       A.  Again, my time with every patient in the Emergency

19   Department is limited, and I have to think of every

20   life-threatening condition that they could have. He

21   potentially had sepsis, so we treated him with antibiotics.

22   And if his condition -- or excuse me. Once his cultures come

23   back, it can be determined if they need to be continued or not.

24   So, we start them right away to prevent a situation from

25   getting worse.

*(Kardos - People - Direct)*                                    195

1        Q.   Did you perform any other tests on M███████?

2        A.   We did a chest x-ray, blood work.  I believe that's

3    all.

4        Q.   Did the blood work show his white blood cell count?

5        A.   Yes.

6        Q.   Do you recall what that was?

7        A.   Yes.  It was 1.0.

8        Q.   Now, is that a normal white blood cell level for his

9    age?

10       A.   No, it's low.

11       Q.   Did the blood work show his platelet count?

12       A.   Yes.

13       Q.   And what was that?

14       A.   115,000.

15       Q.   Is that a normal level for his age?

16       A.   It's slightly low.

17       Q.   Now, what is DIC?

18       A.   DIC is a condition -- the letters stands for

19   disseminated intravascular coagulation.  It's a condition in

20   which the proteins in your body that help to control clotting

21   get used up rapidly.  As a result, you can get small clots that

22   can form in various parts of your body.  And as it progresses,

23   when the proteins that cause clotting get used up, you can

24   actually then bleed more excessively.

25       Q.   What are signs of DIC?  Let me rephrase that.  What

1   are external signs of DIC?

2       A.   External signs would be easy bruising, easy bleeding

3   or excessive bleeding.

4       Q.   Now, what is coagulopathy?

5       A.   Coagulopathy is a broad term which stands for a

6   problem with the clotting system in general.

7       Q.   And what are external signs of coagulopathy?

8       A.   They can be the same; bleeding, excessive bleeding,

9   easy bruising.

10      Q.   What's the function of platelets in your blood?

11      A.   Platelets help your blood to clot.  If you

12  essentially envision them of being sticky cells; they stick

13  together when there's a wound to help it stop bleeding.

14      Q.   Did M██████'s platelet level cause you concern of a

15  risk of either DIC or coagulopathy?

16      A.   No.

17      Q.   Why is that?

18      A.   Because it was so slightly low that it wasn't at a

19  level that concerned me.

20      Q.   What types of levels do raise your concern?

21      A.   Levels less than 20 to 30,000.

22      Q.   Now, did M█████ show any signs of bleeding?

23      A.   No.

24      Q.   Did you observe any bruises on M██████'s body?

25      A.   No.

*(Kardos - People - Direct)*

1    Q.   Now, did ███████ have an IV in place?

2    A.   Yes.

3    Q.   Did he have more than one?

4    A.   I don't recall how many he had.

5    Q.   Did you attempt to place a central line in M██████?

6    A.   Yes.

7    Q.   And what is a central line?

8    A.   A central line is when we place a larger IV.  We use

9  a needle to access one of the larger central veins in the body,

10  and the three most common spots for those are the groin, in

11  your femoral vein; beneath your clavicle in your subclavian

12  vein; or in your neck, in the internal jugular vein.  It allows

13  us better access in a larger vein in the body.

14    Q.   Where did you try to put in a central line on

15  M██████?

16    A.   In his groin, in the femoral vein.

17    Q.   Was it successful?

18    A.   No.

19    Q.   Why wasn't it successful?

20    A.   In a child so small, it can be difficult to access

21  the vein.  When you see how small a four-month-old is, you can

22  imagine their vein is very small, and it was difficult to

23  access.  He was also in shock at the time.

24    Q.   Did you puncture his skin with a needle?

25    A.   Yes.

*(Kardos - People - Direct)*                                198

1     Q.   Did you observe any unusual bleeding?

2     A.   No.

3     Q.   Did you observe any unusual bruising?

4     A.   No.

5     Q.   Did you observe any unusual bleeding at his IV site?

6     A.   No.

7     Q.   Any bruising at his IV site?

8     A.   No.

9     Q.   Now, you stated you performed a chest x-ray on

10   M███████, as well?

11    A.   Yes.

12    Q.   And did you get the results of that while M███████ was

13  in your care?

14    A.   Yes.

15    Q.   And did you review that x-ray?

16    A.   Yes.

17    Q.   And what were the results on that x-ray?

18    A.   The endotracheal tube was in good position and there

19  was no other acute abnormality identified.

20    Q.   Were there any signs of pneumonia on the x-ray?

21    A.   No.

22    Q.   Did you monitor M██████'s temperature?

23    A.   Yes.

24    Q.   What was it?

25    A.   When he arrived, it was 97.2 rectally, and it

1    progressively dropped throughout his stay in our Emergency

2    Department.  Ultimately, it was 94.7 rectally before he left

3    our Emergency Department.

4        Q.   Were any family members at the hospital with M████?

5        A.   Yes, his mother.

6        Q.   What was her demeanor when she was there?

7             MR. COFFEY:  Object as irrelevant.

8             THE COURT:  Ms. Egan?

9             MS. EGAN:  Judge, I do believe it's relevant,

10   given the People's theory of this case.

11            THE COURT:  Overruled.

12       A.   Answer?

13       Q.   Yes.  You may answer.

14       A.   She was very upset, clearly worried.

15       Q.   And did you advise her of M████'s condition?

16       A.   Yes.

17       Q.   Were there any other family members there?

18            MR. COFFEY:  It's irrelevant.

19            THE COURT:  It's been asked and answered.

20   Sustained.

21       Q.   Did you at some point speak to M████'s father?

22       A.   Yes.

23       Q.   When was that?

24            MR. COFFEY:  I object, unless she can identify

25   his voice; then I don't object.  If she can't, I want an

1    offer of proof as to how she can identify that it was his

2    voice.

3                    THE COURT:  Ms. Egan?

4                    MS. EGAN:  May we approach, Judge?

5                    THE COURT:  Sure.

6                    (Sidebar discussion held at the bench as

7    follows:)

8                    MS. EGAN:  I anticipate that she's going to

9    testify that the mother asked her to contact the father,

10   provided contact information.  She called and asked to

11   speak to either M██████'s father or Adrian Thomas and

12   advised him of the child's medical condition.  Certainly,

13   if Mr. Coffey wants to cross-examine her as to her

14   certainty, that that was Mr. Thomas she was speaking to,

15   he can; but again, given the People's theory of this case,

16   given that the Defendant's level of indifference to the

17   child's condition is something we need to prove, I

18   certainly think this is relevant, material information.

19   Mr. Coffey can cross-examine her, as I said, as to whether

20   she is certain that she spoke to Mr. Thomas, but I don't

21   believe we need to prove an identification procedure.

22                    THE COURT:  So, you are not offering any

23   statements from Mr. Thomas, rather you are offering

24   testimony that -- as to statements that this witness made

25   to Mr. Thomas?

1    MS. EGAN:  I'm offering one brief statement from

2 Mr. Thomas in which he replied "okay" in response to the

3 child's condition.

4    THE COURT:  Mr. Coffey?

5    MR. COFFEY:  Judge, it's not up to me to

6 cross-examine to find out if it's his voice.  It's up to

7 them.  *People v. Ely* establishes that if you are going to

8 identify somebody's voice, then they have to establish

9 that it was his voice.  I don't deny the fact that she

10 called and spoke to somebody, but she can't -- but who

11 knows who it is?

12    THE COURT:  How do you attempt to establish that

13 it was the Defendant this witness was speaking to?

14    MS. EGAN:  That she was asked by the child's

15 mother to call the Defendant.  The child's mother provided

16 the contact information; and that when she called, she

17 asked to speak to Adrian Thomas, M████ T████' father,

18 and the person on the phone identified himself as such.

19    THE COURT:  If you are able to lay that

20 foundation, then I will allow the testimony.  Certainly,

21 the defense can cross-examine the witness as he sees fit,

22 but it will require a foundation such as the one that you

23 just made an offer of proof on.  So, that's the Court's

24 ruling.

25    MR. COFFEY:  I would also -- this is a *Molineux*

1          issue which we have not addressed.  In other words, if the

2          offer of proof now -- is now being established to show he

3          was indifferent when he was on the phone and didn't seem

4          to care, that's *Molineux*.

5                    MS. EGAN:  Judge, that is not *Molineux*.

6          *Molineux* encompasses bad acts.  The Defendant's response

7          of "okay" is certainly not a bad act.

8                    THE COURT:  Let me back up for a minute here.

9          What is the relevance of this doctor calling the

10         Defendant, advising him - assuming that she was speaking

11         to him - advising him of what was going on and him saying

12         "okay"?  Under what theory is that in any way relevant to

13         indifference?  You tell me how that's relevant to this

14         case.

15                    MS. EGAN:  Certainly, Judge.  I anticipate that

16         she will state that she informed Mr. Thomas that the child

17         was most likely not going to make it and that Mr. Thomas'

18         response to that was simply to state "okay".  That is

19         relevant to his level of indifference to the child's

20         plight, and he hung up the phone after that without asking

21         any follow-up questions.  *People v. Barboni* indicates that

22         the People must show the Defendant's level of indifference

23         was depraved and I think, literally, did not care whether

24         the child lived or died.

25                    THE COURT:  At the time he committed the acts.

1              MS. EGAN:  Even in the hours afterwards.

2    *Barboni* specifically talks about the acts encompassing two

3    hours following when the Defendant abused the child.

4              THE COURT:  When the child is still in the

5    Defendant's care, when the Defendant is still -- has

6    control over what's happening, not once the child is out

7    of the Defendant's control and in the hospital.  At that

8    point in time -- what it sounds like to me you are arguing

9    is that it goes to consciousness of guilt.  His state of

10   mind after the baby has been removed from the home and

11   taken to the hospital is completely irrelevant with

12   respect to depraved indifference.  Depraved indifference

13   pertains to the time that he allegedly committed the acts

14   or in the immediate aftermath when the baby was still in

15   his control.  So, now that I understand that, I don't see

16   any relevance to this, other than, perhaps, consciousness

17   of guilt, which, as the parties I'm sure are aware, is

18   weak evidence to begin with.  There's many interpretations

19   to what "okay" means.  So, having understood now more

20   fully what is being presented, I'm going to sustain the

21   objection and not allow that.  It's only relevant to

22   consciousness of guilt, which is weak to begin with.  The

23   objection is sustained.

24              (Proceedings continue in open court as follows:)

25              THE COURT:  The objection is sustained, Ms.

1     Egan.  You may continue.

2         Q.   Dr. Kardos, how long was M███████in your care?

3         A.   Approximately two hours.

4         Q.   And did he leave Samaritan Hospital at some point?

5         A.   Yes.

6         Q.   How was that arranged?

7         A.   I called Albany Medical Center and spoke to the

8     pediatric intensivist and we arranged for M██████ to be

9     transferred from our facility to Albany Med's Pediatric ICU by

10    ambulance.

11        Q.   What is a provisional diagnosis?

12        A.   It's a diagnosis that we document before we have all

13    of the data back.

14        Q.   How does this differ from a differential diagnosis?

15        A.   A differential diagnosis is a list of possibilities

16    that we go through and try to rule out.  A provisional

17    diagnosis is things that we found, given the amount of time and

18    data that we have in our short time that we see a patient in

19    the ER.

20        Q.   And did you make a provisional diagnosis of M██████?

21        A.   Yes.

22        Q.   Do you recall what that was?

23        A.   I would have to see the list to be accurate.

24        Q.   Certainly.

25             MS. EGAN:  May I approach the witness, Judge?

*(Kardos - People - Direct)*

1              THE COURT:  Yes, you may.

2              MS. EGAN:  I'm showing the witness what's been

3      marked as People's 7 for ID.

4      Q.   If you could just take a look at that and let me know

5      when your recollection has been refreshed.

6      A.   Can I read off of it or no?

7              MS. EGAN:  Is there any objection by defense

8      counsel?

9              MR. COFFEY:  No.

10     A.   I can?

11     Q.   Yes, you may.

12     A.   Number one was respiratory failure.

13             MR. COFFEY:  I don't know if it's offered in

14     evidence.

15             MS. EGAN:  It's not in evidence.  It's marked

16     solely for ID.  Do you want it offered into evidence?

17             MR. COFFEY:  Subject to possible redaction, I

18     have no objection.

19             THE COURT:  What exhibit number is it?

20             MS. EGAN:  People's Exhibit 7, Judge.

21             THE COURT:  The People are offering it at this

22     time?

23             MS. EGAN:  We are offering it at this time.

24             THE COURT:  Defendant has no objection, with the

25     exception of possible redaction; correct?

1              MR. COFFEY:  Correct.

2              THE COURT:  Okay.  People's 7 will be received

3         in evidence at this time without objection.

4    (People's Exhibit 7 marked for identification received in

5    evidence and marked People's Exhibit 7 in evidence.)

6         Q.    And Dr. Kardos, would you go ahead and tell us:  What

7    was the provisional diagnosis?

8         A.    Number one, respiratory failure; number two,

9    leukopenia, low white blood cell count; number three,

10   hypotension, which is low blood pressure; and number four was

11   tachycardia and brachycardia, which is fast and slow heart

12   rates respectively.

13        Q.    Did you include septic shock on your provisional

14   diagnosis?

15        A.    No.

16        Q.    Now, what was M█████'s condition at the time he was

17   transferred to Albany Medical Center?

18        A.    He was critical.

19              MS. EGAN:  I have nothing further at this time.

20              THE COURT:  Mr. Coffey?

21              MR. COFFEY:  Thank you.

22   **CROSS-EXAMINATION**

23   **BY MR. COFFEY:**

24        Q.    Doctor, do you have both of those exhibits up there,

25   7 and 8?

1        A.   Yes.

2        Q.   Doctor, good morning.  My name is Steve Coffey.  And

3   as you know, I represent Adrian Thomas, who is on trial today

4   for murdering his son.  You are aware of that; correct?

5        A.   Correct.

6        Q.   Knowing that, I want to ask you a question as a

7   doctor.  Are you here as an advocate for the District

8   Attorney's Office?

9        A.   No.

10       Q.   Would I be correct that, in your role as an emergency

11  room physician, you would be testifying to what your expertise

12  and skill is.  Would that be a fair statement?

13       A.   Yes.

14       Q.   So, whether the information that you provide helps or

15  hurts Mr. Thomas or the District Attorney's Office, that is not

16  a decision that you would make.  Is that a fair statement?

17       A.   Yes.

18       Q.   Okay.  And you have previously given testimony in

19  this case; correct?

20       A.   Yes.

21       Q.   Now, let me ask you, if I can, this question:  Have

22  you met with members of the District Attorney's Office before

23  today?

24       A.   Yes.

25       Q.   When was that?

*(Kardos - People - Cross)*                                      208

1     A.   Last week.

2     Q.   And where did you meet?

3     A.   In this building.

4     Q.   All right.  In their office?

5     A.   I believe, yes.

6     Q.   Okay.  And how long did you meet with them?

7     A.   Like 30 minutes.

8     Q.   And who was present at that meeting?

9     A.   Christa Book and Kelly Egan.

10    Q.   And yourself?

11    A.   And myself.

12    Q.   Anyone else?

13    A.   No.

14    Q.   Now, you have never met with me; correct?

15    A.   Correct.

16    Q.   And Mr. Frost, you never met with him; correct?

17    A.   Correct.

18    Q.   And you never met with anybody involved at all with

19    the defense of this case.  Would that be a fair statement?

20    A.   Yes.

21    Q.   You never refused to meet.  You just haven't met with

22    us; correct?

23    A.   Correct.  I wasn't asked.

24    Q.   Pardon?

25    A.   I wasn't asked to meet with you.

*(Kardos - People - Cross)* 209

1     Q.   Had you been asked to meet, would you have met?

2     A.   Yes.

3     Q.   Now, at the time that you met with members of the

4   District Attorney's Office, did you go through the medical

5   records and the testimony that you gave previously?

6     A.   I was given a copy of what I had done previously.

7     Q.   Did you read it?

8     A.   Small parts of it.

9     Q.   Okay.  And why only small parts of it?

10    A.   Parts that I was -- parts that we had discussed, I

11  looked at.

12    Q.   Okay.  Well, I have your testimony, but you didn't

13  read all of it or you think --

14    A.   No.  I did not read all of it.

15    Q.   Can you tell me why you didn't read all of it?

16    A.   I had no reason to read it.

17    Q.   Okay.  Now, did you make notes of your conversations?

18    A.   I made notes of things I needed to look up to get

19  appropriate definitions.

20    Q.   Where are those notes?

21    A.   In my bag.

22    Q.   Where is your bag?

23    A.   Upstairs.

24    Q.   In the District Attorney's Office?

25    A.   I left it there because my computer was in there.

1        Q.   I understand.  I just --

2        A.   Oh, yes.

3        Q.   So, the District Attorney's Office is now holding

4    your bag; correct?

5        A.   Correct.

6        Q.   Now, let me go back to this, if I can.  You have

7    indicated that you have treated over 20,000 patients?

8        A.   Yes.

9        Q.   Coming in through the emergency room at Samaritan?

10       A.   Throughout my training and at Samaritan, Albany

11   Medical Center and Samaritan Hospital.

12       Q.   How many years have you been at Samaritan Hospital?

13       A.   It will be eight in July.

14       Q.   And you were board certified when?

15       A.   I have to look back at the exact year.  I believe it

16   was 2006.

17       Q.   So, by 2008, when M████w came into the emergency

18   room, you were board certified then.  Is that a fair statement?

19       A.   Yes.

20       Q.   Now, when M██████ was brought in, he was -- how did

21   he arrive; do you know?

22       A.   By ambulance.

23       Q.   Okay.  And do you recall, did you see him when he was

24   taken out of the ambulance?  Did they bring him into you?  Do

25   you recall that?

1    A.   They brought him in.  I was in the room waiting.

2    Q.   You were in the room?

3    A.   I was in Room 3.  The ambulance arrives and wheels

4    him into the room on the stretcher.

5    Q.   Now, the -- when he came into the hospital, the EMT's

6    brought him in or the paramedics, and then was his mother with

7    them at that time, if you know?

8    A.   I don't recall.

9    Q.   There came a time when you talk to her; correct?

10   A.   Yes.

11   Q.   She identified herself as M███████'s mother?

12   A.   Yes.

13   Q.   Now, tell me something in terms -- tell the jury.  Is

14   history important when you are treating a patient?

15   A.   Yes.

16   Q.   And if you were to take a history from the mother

17   about the child, you would want to know all the significant

18   information about what's happened to the child; correct?

19   A.   Correct.

20   Q.   Now, you indicated that you were in a hurry, but I

21   want to be clear about this.  You weren't in any hurry to the

22   point where this child's care and treatment would be in any way

23   compromised; right?

24   A.   Correct.

25   Q.   You weren't saying, "Come on, Mrs. Thomas.  I'm in a

1    big hurry.  It's Sunday morning.  I have a lot of things to do.

2    Move it along."  You didn't say that; correct?

3         A.   Correct.

4         Q.   Are you hesitating or am I going in a different

5    direction than you are going?

6         A.   No.  I'm not hesitating.

7         Q.   So, you asked the mother what happened to the child,

8    and she told you that he had been sick for two or three days;

9    correct?

10        A.   Yes.

11        Q.   Had not been sick before that; correct?

12        A.   Not that she stated, no.

13        Q.   Well, you asked the question, didn't you, Doctor?

14   "Tell me about your child."  And you are there at that point as

15   kind of a medical investigator; aren't you?  You want to know

16   what is going on with the baby; right?

17        A.   Right.

18        Q.   So, you said to her, the mother, "Tell me what

19   happened."  And she said he's been sick, diarrhea, some

20   vomiting last two or three days; correct?

21        A.   Yes.

22        Q.   No problems before that; right?

23        A.   Yes.

24        Q.   Now, at that point in time, or at least up to that

25   point in time, you made, what, a physical examination grossly

1    of the baby?

2         A.   Yes.

3         Q.   And when you looked at the baby -- I will show you

4    the records, if you'd like.  What time was it that you first

5    came into contact with M███████?  Would the record show this?

6         A.   Yes.

7         Q.   I'm going to show you now 8 and 9.  I don't know

8    which one.

9              THE COURT:  7 and 8, Mr. Coffey.

10             MR. COFFEY:  I apologize.

11        Q.   Can I stand next to you?

12        A.   Yes.

13        Q.   Thanks, Doctor.  Tell me if it's 7 or 8.

14        A.   Exhibit 8.

15        Q.   8.  Okay.  What time did you first see him?

16        A.   9:12 a.m.

17        Q.   All right.  So, at 9:12 a.m., you saw M██████.  And

18   you knew at that time that he was in trouble; right?

19        A.   Yes.

20        Q.   I know those aren't medical terms, but in distress or

21   he's having difficulty; correct?

22        A.   Yes.

23        Q.   And at that point, you immediately ordered his blood;

24   correct?

25        A.   After I did the airway and breathing, yes.

1        Q.  The ABC's; airway, breathing, circulation.  Correct?

2        A.  Yes.

3        Q.  And the blood was taken at about what time, 9:20,

4  9:25?

5        A.  I would have to look at the nurse's notes.

6        Q.  Take a look at that, if you would.

7        A.  It looks like 9:13.

8        Q.  9:13.  So, would I be correct, then, in trying to

9  determine what's going on, M███ comes to the hospital at

10  9:12.  You run the test at 9:13; correct?

11        A.  Yes.

12        Q.  You don't do any other blood test; correct?

13        A.  Correct.

14        Q.  Now, if I'm wrong -- I'm not trying to trick you.

15  I'm really not.

16        A.  I don't recall how many times it took to get all the

17  blood we needed.  That's not -- I put the order in.  As long as

18  the blood is collected, I don't count how many times it takes

19  to get it.  I believe they collected all the blood on the first

20  time.  I just don't know for sure.

21        Q.  Well, let me say this, so we don't -- you don't know

22  for sure, but unless the record indicates otherwise, we are

23  going to take the idea that blood was taken once.  Would that

24  be a fair --

25        A.  Yes.

1    Q.   Agreed.  So, when you take the blood at 9:13 or the

2    blood is taken, whatever testing of that blood is done at 9:13,

3    M███████ remained in the hospital for about two hours after

4    that; right?

5    A.   Yes.

6    Q.   So, anything that's going on in his blood that may

7    surface after 9:13 or 9:15, it's not going to be picked up

8    unless there's another blood test; correct?

9    A.   Yes.

10    Q.   Do you agree with me?

11    A.   Yes.

12    Q.   Again, are you hesitant about this or not?

13    A.   No.  I'm just trying to make sure I understand your

14    question.

15    Q.   Well, if you take my blood right now, it will take

16    whatever cells, whatever disease or bacteria I have; right?

17    A.   Yes.

18    Q.   But if at 12 o'clock, if there's a process going on

19    and something happened between 11:30 and 12:00, it won't pick

20    that up; correct?

21    A.   Correct.

22    Q.   So, therefore, if this baby were bleeding out after

23    9:15, this blood test would not pick that up; would it?

24    A.   No, it would not.

25    Q.   So, if this baby -- by the way, you learned later,

1    didn't you, that he developed a disseminated intravascular

2    coagulopathy.  You learned that; didn't you?

3         A.   That I did not learn, no.

4         Q.   If I were to tell you that the Albany Medical Center

5    records reflect that, would you agree?  You wouldn't have any

6    reason to dispute that; would you?

7         A.   No.

8         Q.   And with regard to DIC -- disseminated means

9    throughout his body; correct?

10        A.   Correct.

11        Q.   And when a child or a person gets disseminated

12   intravascular coagulopathy, that bleeding occurs all through

13   the body; doesn't it?

14        A.   Typically.

15        Q.   It goes in the heart, the brain, the testes for a

16   boy?  Everywhere that that blood can't clot, that's where it's

17   bleeding; correct?

18        A.   I believe so.

19        Q.   Well, you told us before --

20        A.   I gave you the definition of DIC.  I actually don't

21   see that in the Emergency Department record because it's a

22   later finding.

23        Q.   Fair enough.  In any event, generally speaking, DIC

24   is when the blood doesn't clot and a person -- and I'm not

25   being demeaning to anyone.  The person is actually bleeding

*(Kardos - People - Cross)*

1    out; correct?

2        A.   First they clot too much.  Once those proteins are

3    used up, they have the inability to clot because they no longer

4    have the protein.

5        Q.   When they infarct too much -- do you know what

6    infarct is?

7        A.   Yes.

8        Q.   Can that create infarct?

9        A.   Yes.

10       Q.   And that's -- that can be a blockage of tissue;

11   correct?

12       A.   An infarct is when an area of tissue doesn't have

13   enough blood supply and the cells begin to die.

14       Q.   DIC is a very, very serious complication; isn't it?

15       A.   Yes.

16       Q.   And that blood, if it's bleeding, to your knowledge,

17   the person can bleed in the brain, correct, because it's not

18   clotting properly; right?

19       A.   Correct.

20       Q.   So, when you say that he did not have DIC, all you

21   are saying is that the 9:13 blood test didn't pick it up at

22   that point; correct?

23       A.   Yes.

24       Q.   But the 9:13 test that you did take did show a series

25   of very serious problems with him; correct?

*(Kardos - People - Cross)*

1     A.   Yes.

2     Q.   And before we get to those, let me ask you this:

3  When you looked at the little baby, he had no bruising;

4  correct?

5     A.   Correct.

6     Q.   No contusions; right?

7     A.   Correct.

8     Q.   No damage to his head, no openings to his head;

9  correct?

10     A.   Correct.

11     Q.   Did you give him antibiotics?

12     A.   Yes.

13     Q.   What was that?

14     A.   What were the antibiotics?

15     Q.   Yes.

16     A.   I would have to look at the chart.

17     Q.   Sure.

18     A.   Exhibit 7.  He got Ceftriaxone and Vancomycin.

19     Q.   Vancomycin?

20     A.   Yes.

21     Q.   What was the reason why those were given?

22     A.   They are broad spectrum antibiotics, meaning they

23  cover a very broad variety of bacteria, and we give them when

24  someone is very ill until, if they have an infection, until the

25  source of the infection can be narrowed down and then the

1    antibiotics get changed accordingly.

2         Q.   Now, when you saw M███████ at nine o'clock and you

3    started following him, he was getting progressively worse.   Is

4    that correct?

5         A.   Yes.

6         Q.   He was crashing?

7         A.   Yes.

8         Q.   Right?  His blood pressure was dropping; correct?

9         A.   Yes.

10        Q.   What did that indicate?

11        A.   It indicated to me that he was becoming more ill.

12        Q.   His temperature, his temperature was dropping;

13   correct?

14        A.   Correct.

15        Q.   What was that dropping down to?

16        A.   94.7 rectally.

17        Q.   And a temperature of a baby that age of 94 plus is a

18   serious condition; correct?

19        A.   Yes.

20        Q.   And what does that indicate to you?

21        A.   Again, that he was becoming more ill.

22        Q.   And what is leukopenia?

23        A.   Low white blood count.

24        Q.   And did you test to see his blood counts?

25        A.   Yes.

*(Kardos - People - Cross)*

1          Q.    Now, Doctor, when we get sick or we have an

2    infection, generally speaking, your white blood counts, the

3    white blood cells, rather, will go up; won't they?

4          A.    Yes.

5          Q.    Because your body is generating these white blood

6    `cells to fight the infection; correct?

7          A.    Yes.

8          Q.    But if your white blood cells are going down, that's

9    consistent with a problem with your body being able to produce

10   white blood cells; correct?

11         A.    Yes.

12         Q.    It means you have an infection that's going through

13   your body.  It's literally taking over your body; correct?

14         A.    Yes, it can.

15         Q.    What part of your body produces white blood cells?

16         A.    The bone marrow.

17         Q.    Now, his white blood cell count had dropped to what

18   when you saw him?

19         A.    1.0.

20         Q.    And what is a normal white blood cell count?

21         A.    Five to ten.

22         Q.    So, he's about maybe 10 to 20 percent -- 80 to 90

23   percent below where he should be; correct?

24         A.    Yes.

25         Q.    Indicating that his bone marrow is not able to

1    produce enough white blood cells to fight this infection;

2    correct?

3        A.   Correct, can't make them quickly enough or can't

4    produce them.

5        Q.   It became clear to you during this morning that he

6    was in a battle for his life and was losing it; right?

7        A.   Yes.

8        Q.   He also had something called aureus.  Is that right?

9        A.   I did not identify that at Samaritan.  That was done

10   at --

11       Q.   That was done later?  Were there blankets put on him?

12       A.   I don't recall.  I do remember we did put a warmer

13   over him.

14       Q.   Put him in a warmer?

15       A.   We brought a warmer down from our labor and delivery

16   to help with his body temperature.

17       Q.   What is hypothermia?

18       A.   A low body temperature.

19       Q.   And was he treated for that as best you could?

20       A.   Yes.

21       Q.   Now, what other parts of his blood did you get the

22   results of?  We know the white blood cells were perilously low.

23   What else?

24       A.   We checked his hemoglobin and hematocrit, which

25   measure the red blood cells.  We checked his platelets.

1    Q.   Platelets were low?

2    A.   Slightly low.

3    Q.   Slightly low.  That's at 9:15; correct?

4    A.   Yes.

5    Q.   If those platelets were severely low -- let me

6    withdraw that.  His condition -- and I know you did everything

7    you could do.  No one is disputing that.

8    A.   Right.

9    Q.   But his condition from the time he came in at 9:15 to

10   the time that he was transported to Albany Med had actually

11   worsened at Samaritan; correct?

12   A.   Absolutely, yes.

13   Q.   So much so that you thought you couldn't treat him;

14   correct?

15   A.   Correct.

16   Q.   So, it would be reasonable to assume, would it not,

17   that his platelets and other things may very well have been

18   decreasing in that two-hour period; correct?

19   A.   Yes.

20   Q.   His body, his entire body systems - his heart, his

21   lungs and so forth, blood - were getting progressively worse;

22   correct?

23   A.   Correct.

24   Q.   And can you tell us whether he was responsive when

25   you first saw him at 9:15?

1     A.   I believe, from my memory, that the only response I

2  saw from him was he moved his legs slightly at one point.

3     Q.   Now, his platelet count was what, 175?

4     A.   115,000.

5     Q.   150,000?

6     A.   115,000.

7     Q.   The average range of a platelet count is about -- can

8  be up to 400,000; correct?

9     A.   150 to 400,000, yes.

10    Q.   All right.  The white blood cell count was what?

11    A.   1.0.

12    Q.   Okay.  And the normal would be about 3,000 to 10,000?

13    A.   Yes.

14    Q.   Why is a white blood cell count important?

15    A.   A white blood cell count can help to support your

16  diagnosis.  Your white blood cell count can change for a

17  variety reasons.  It can change due to infection, stress, pain,

18  but it can help support a diagnosis that you have.

19    Q.   Okay.  Now, was a blood culture taken?

20    A.   Yes.

21    Q.   What's that called, just a blood culture?

22    A.   A blood culture, yes.

23    Q.   Why did you take a blood culture?

24    A.   When looking at my differential diagnosis, sepsis or

25  infection was on my differential.  So, it was in my thoughts.

*(Kardos - People - Cross)* 224

1   And part of evaluating somebody for an infection includes

2   taking a blood culture.

3       Q.   Now, let's talk about your differential diagnosis.

4   When a person comes into the hospital, an adult or child, every

5   doctor, such as yourself, a board certified physician, will

6   kind of process in their own mind what is it that is causing

7   this?  A person has chest pain.  It could be a hard attack,

8   indigestion.  It could be a number of things; correct?

9       A.   Yes.

10      Q.   Okay.  And you have done this.  In fact, you still do

11  it every day of your life; correct?

12      A.   Yes.

13      Q.   So, when he came in and you talked to the mom and you

14  looked at him and you did all your tests, your differential

15  diagnosis had three, but the one that you really came to the

16  conclusion of was it was sepsis; correct?

17      A.   I didn't come to a conclusion.

18      Q.   Well, you actually have come to a conclusion at some

19  point in time; haven't you?

20      A.   No.

21      Q.   Well, I'm going to read you your testimony from

22  before, Doctor.  You may not have read this.  You actually had

23  been asked a question previously as to what do you think was

24  the cause of what happened to this baby, and you gave an

25  opinion.  Do you recall being asked that question and giving

1    that answer?

2         A.   Yes.

3         Q.   Okay.  But what is sepsis?

4         A.   Sepsis is a probable or documented infection in the

5    body that produces a systemic response.

6         Q.   Systemic meaning what?

7         A.   Like a whole body response.  It typically starts with

8    inflammation and then progresses from there.

9         Q.   Okay.  And in your differential diagnosis, you listed

10   sepsis or septic shock as part of your differential diagnosis;

11   correct?

12        A.   Yes.

13        Q.   And why was that?

14        A.   Because when the child came in, he had abnormal vital

15   signs.  He had a reported history of having vomiting and

16   diarrhea, reported history of having an elevated temperature.

17   During his stay in the ER, his temperature was going down.  So,

18   I included a source of infection as a possible diagnosis.

19        Q.   Well, septic shock is not just a source.  Septic

20   shock is taking over the system; correct?

21        A.   Sepsis is the probable or documented infection.

22   Septic shock is when you have low blood pressure associated

23   with that.

24        Q.   Rapid heart rate, low blood pressure, hypothermia,

25   leukopenia.  All consistent with sepsis; correct?

1      A.   Yes.

2      Q.   Now, what happens when your body gets septic shock?

3      A.   You have many inflammatory mediators released, toxins

4  get released and they start to infect all different organs in

5  your body.

6      Q.   And you came up with a provisional diagnosis;

7  correct?

8      A.   Yes.

9      Q.   And tell us again what a provisional diagnosis is?

10     A.   It's a diagnosis that we come up with in the

11  Emergency Department when we have only limited time and limited

12  data to work with.

13     Q.   All right.  Now, your provisional diagnosis for this

14  baby was respiratory failure, leukopenia, hypotension,

15  tachycardia and brachycardia; correct?

16     A.   Yes.

17     Q.   And these conditions, are they caused by sepsis?

18     A.   Yes.

19     Q.   You found no evidence whatsoever, from your analysis

20  or your review - and I understand you were preliminary - of any

21  trauma to this baby; correct?

22     A.   Correct.

23     Q.   And Doctor, is it true that the likely cause of this

24  baby's problems was sepsis?

25     A.   Yes.

*(Kardos - People - Cross)*

1    Q.   So, as you sit here today, you would agree that the

2    likely cause of his problems was sepsis; correct?

3    A.   With the information that I had that day, yes,

4    absolutely.

5    Q.   Well, as you sit here today, you agree that the

6    likely cause was sepsis; correct?

7    A.   Yes.

8    Q.   Now, do you know what Gram staining is?

9    A.   Yes.

10   Q.   What does it mean to Gram stain something?

11   A.   It's when you take, in this case, the patient's blood

12   and you use different kinds of dye to see if you can identify

13   the presence or absence of bacteria in different cells.

14   Q.   And what is bacteremia?

15   A.   Bacteremia?  The presence of bacteria in the blood.

16   Q.   And how does bacteria get in the blood?

17   A.   Through a break in the skin or the mucosal surface of

18   the body.

19   Q.   So -- and bacteria -- let me ask you a little bit

20   about this in terms of -- I use the word pyramid.  You take

21   kids in a day care center or, say, a class of 20 kids.  A bunch

22   of those kids will have some kind of a staphylococcal

23   pneumonia; right?

24   A.   Staphylococcal is a common pneumonia.

25   Q.   That's a common bacteria; correct?

1      A.   Correct.

2      Q.   Now, a lot of kids will get that and it won't be a

3  problem; correct?

4      A.   Correct.

5      Q.   A few more may get that and it may -- they may get

6  sick or they may get a fever; right?

7      A.   Yes.

8      Q.   And some others may get it and they get pneumonia,

9  because it gets in the lungs; correct?

10     A.   Correct.

11     Q.   And of course, there's less and less as we go up the

12  ladder.  And then you can get some where it will get more

13  serious, where bacteremia gets in the blood.  And that's not

14  good; is it?

15     A.   No.

16     Q.   That has to be treated with antibiotics; correct?

17     A.   Correct.

18     Q.   Because if bacteremia gets in the blood and it starts

19  spreading throughout the blood, it can ultimately cause sepsis,

20  infection in the blood, and then it can go racing through the

21  body; correct?

22     A.   Correct.

23     Q.   And the way it gets in the blood, from your

24  experience, is an open wound; correct?

25     A.   That's one way, yes.

1       Q.   I mean, if a child, for example, has an opening on

2   the cheek and a break in the skin, it could get in through

3   there possibly; right?

4       A.   Yes.

5       Q.   And through the lungs; correct?

6       A.   Yes.  Sometimes we don't know, yes.

7       Q.   Have you ever treated children with bacteremia

8   before?

9       A.   Yes.

10              MR. COFFEY:  May I have one minute?

11              THE COURT:  Yes, you may.

12              (Brief pause in proceedings.)

13      Q.   Doctor, let me ask you -- I asked you some questions

14  before about DIC.  You are not an expert on DIC; correct?

15      A.   Not at all.

16      Q.   Not at all?

17      A.   Not at all.

18      Q.   I want to ask you about aspiration.  There's no

19  evidence whatsoever that this child ever aspirated anything.

20  Is that correct?

21      A.   Not while he was in my care, no.

22      Q.   Well, you have no evidence of any history of him

23  having aspirated anything; correct?

24      A.   Correct.

25      Q.   You did a lung -- x-rayed the lungs?

*(Kardos - People - Cross)*

1    A.   Chest x-ray, correct.

2    Q.   Chest x-ray.  And that shows the lungs; correct?

3    A.   Correct.

4    Q.   No evidence of any particles or anything in his

5  lungs; correct?

6    A.   Correct.

7    Q.   All right.  Now, the reason why he got transferred to

8  Albany Med is why, because Albany Med's CAT scans are more --

9  did they have CAT scans at Samaritan?

10   A.   Yes.

11   Q.   But Albany Med had more specific CAT scans or MRI's,

12  something like that?

13   A.   No.  If I may answer, the reason he got transferred

14  is because we don't have a Pediatric Intensive Care Unit at

15  Samaritan Hospital.  We don't have the ability to care for a

16  child this ill.

17   Q.   All right.  Now, the antibiotics was appropriate for

18  treating someone with sepsis; correct?

19   A.   Yes.

20   Q.   And that is what you were working under; correct?

21   A.   That was one of the differential diagnoses, yes.  I

22  didn't have all my data back, so I was treating all the

23  differentials.

24   Q.   Well, now you have all the data back?

25   A.   We were unable to get a CAT scan at our hospital.  I

1    was treating the dehydration.  I was treating potential sepsis.

2    Unfortunately, he was too unstable to go to our CAT scanner.

3    So, we got him to the facility where he needed to be where they

4    were able to do everything else.

5          Q.   When you looked at him, you looked all through his --

6    externally, you looked at his head, his body and so forth;

7    correct?

8          A.   Yes.

9          Q.   There were no external injuries at all; correct?

10         A.   Correct.

11         Q.   No bruising to his head, his ribs, arms or legs;

12   correct?

13         A.   Correct.

14         Q.   You saw no fractures; correct?

15         A.   Correct.

16         Q.   There were no -- tell the jury the difference between

17   objective and subjective signs or objective and subjective

18   parts of medicine?

19         A.   Subjective is like -- maybe more interpretative,

20   something we have to interpret; whereas objective is something

21   that is black or white or can be proved.

22         Q.   So, my temperature, whatever it is, 98.6, that's

23   subjective?

24         A.   Yes.

25         Q.   If you were to say you were getting a headache

*(Kardos - People - Cross)*                                    232

1        talking to me, that would be subjective; correct?

2              A.   Subjective, correct.

3              Q.   Now, there were no objective signs at all that you

4        found of any trauma to this baby; correct?

5              A.   Correct.

6              Q.   The history of the diarrhea that you received from

7        Mom was within the last two or three days; correct?

8              A.   Correct.

9              Q.   In fact, in your report or in the medical report,

10       it's specific, two or three days; correct?

11             A.   Correct.

12             Q.   You wouldn't have guessed at that.  That's what she

13       told you; correct?

14             A.   If I could look at it again.  I documented what she

15       told me.

16             Q.   Sure.

17             A.   I have that the mom states the patient has been

18       having diarrhea for, quote, a few days.

19             Q.   All right.  Let me -- I'm going to show you what's

20       part of Exhibit Number 8, "diarrhea for two or three days."

21       See the "two or three days"?

22             A.   That's the nursing documentation.

23             Q.   That's not the history provided to you?

24             A.   No.  That is what the nurse received.  This is what I

25       received.

1      Q.   Okay.  You list a provisional diagnosis of

2   respiratory failure, leukopenia, hypotension, tachycardia and

3   bradycardia; correct?

4      A.   Yes.

5      Q.   Now, is a provisional diagnosis more defined than a

6   differential diagnosis?

7      A.   Yes.

8      Q.   It is; correct?

9      A.   Correct.

10      Q.   You have more information at that point?

11      A.   It's based on the data that I have at that point.

12      Q.   So, when M█████ left the hospital, that was your

13   diagnosis at that point; correct?

14      A.   Correct.

15      Q.   And all of those things were consistent with septic

16   shock; right?

17      A.   Correct.

18           MR. COFFEY:  One minute, if I might.  That's all

19      I have, Judge.  I have something I want to address with

20      you later, but that's all I have at this point.

21           THE COURT:  Ms. Egan, any redirect?

22           MS. EGAN:  Yes, Your Honor.

23   **REDIRECT EXAMINATION**

24   **BY MS. EGAN:**

25      Q.   I'm just going to grab Exhibit 7 and 8.  Dr. Kardos,

1    do you always take an in-depth medical history of patients in

2    the ER?

3         A.   No.

4         Q.   Why is that?

5         A.   We take the best history we can based on how ill the

6    patient is.

7         Q.   Now, did M█████ require constant care while he was

8    at Samaritan?

9         A.   Yes.

10        Q.   Did you see any signs of open wounds on M██████?

11        A.   No.

12        Q.   Did you see any signs of infection externally on

13   M████?

14        A.   No.

15        Q.   Now, what are external signs of bleeding out?

16             MR. COFFEY:   Objection.  I didn't ask that

17        question.  I believe she was asked that on direct.

18             MS. EGAN:   Judge, I believe Mr. Coffey did talk

19        about a patient bleeding out.

20             THE COURT:   The objection is overruled.

21        Q.   Thank you.  What external signs would you expect to

22   see if a patient is bleeding out?

23        A.   You would expect to see easy bruising, excessive

24   bleeding from any break in the skin, a patient becoming pale.

25        Q.   Did you see any of those external signs in M██████

*(Kardos - People - Redirect)*

1   while he was in your care?

2       A.   No.

3       Q.   Would you expect to see bleeding at an IV site if the

4   patient were experiencing internal bleeding?

5       A.   If it was severe enough, yes.

6       Q.   Now, did the mother report to you that M█████ had

7   also been vomiting the past few days?

8       A.   Yes.

9       Q.   Can an infant aspirate after he vomits?

10      A.   Yes.

11      Q.   Do you see signs of an aspiration pneumonia

12  immediately after someone aspirates?

13              MR. COFFEY:   Object to this as far beyond her

14       direct and cross.

15              MS. EGAN:   Judge, I believe this is well within

16       cross.   He discussed aspiration and whether M█████ had

17       aspirated.

18              THE COURT:   The objection is overruled.

19      A.   Can you repeat the question?

20      Q.   Do you see signs of aspiration pneumonia immediately

21  after someone has aspirated?

22      A.   No.

23      Q.   About how long would it take to develop?

24      A.   It can take one to several days.

25              MS. EGAN:   If I could just have one moment,

1     Judge.

2              THE COURT:  Sure.

3     Q.   Was M██████'s urine output being monitored?

4     A.   Yes.

5     Q.   Was any blood noted in his urine?

6     A.   There was no gross blood.  I would have to look at

7     the urinalysis to see if there was any microscopic blood.

8     Q.   Would that be in People's Exhibit 8?  I can hand you

9     the exhibit and you can let me know.

10             MS. EGAN:  May I approach?

11             THE COURT:  You may.

12    A.   It would actually be -- yes.  I believe it is in

13    here.  There was no gross blood, meaning that you couldn't see

14    it in the bag it was collected in, and there was trace blood in

15    the -- trace microscopic blood, which is not uncommon when you

16    put a catheter in somebody.

17    Q.   Is that consistent with a patient experiencing severe

18    internal bleeding, to see trace blood?  Let me rephrase that.

19    Let me withdraw that question.  Would you expect to see blood

20    in the urine if a patient were experiencing severe internal

21    bleeding?

22    A.   Yes.

23    Q.   The items listed in your provisional diagnosis, are

24    any of those consistent with head injury?  And I can hand you

25    the exhibit if you wanted to refer to that again.

1      A.    Head injury encompasses such a broad --

2                  MR. COFFEY:  I object.  She was asked a simple

3      question.  It's either yes or no.

4                  THE COURT:  The objection is overruled.

5      A.    What does that mean?

6      Q.    You can answer that.

7                  THE COURT:  Doctor, do you understand the

8      question?

9                  THE WITNESS:  Not really.  I mean --

10     Q.    I will withdraw the question and I will rephrase.  Do

11     you see respiratory failure in patients with head injury?

12     A.    With severe head injury, yes, you can.

13     Q.    Can you see hypotension in patients with severe head

14     injury?

15     A.    Yes.

16     Q.    Can you see tachycardia and bradycardia in patients

17     with severe head injury?

18     A.    Yes.

19     Q.    Can you see leukopenia in patients with severe head

20     injury?

21     A.    Yes.

22     Q.    And at the time you discharged M███████, did you have

23     the benefit of a CAT scan in making your provisional diagnosis?

24     A.    No.

25     Q.    And was your opinion regarding sepsis being a source

1    of M█████'s problems given with the benefit of any sort of CAT

2    scan?

3                     MR. COFFEY:  Object as leading.

4         A.   I did not have a --

5                     THE COURT:  Hold on one second.  I'm just

6         considering the objection.  The objection is sustained.

7                     MS. EGAN:  Can I have one minute, Judge?

8                     THE COURT:  Sure.

9                     (Brief pause in proceedings.)

10                    MS. EGAN:  I have nothing further, Your Honor.

11                    THE COURT:  Mr. Coffey, anything else?

12                    MR. COFFEY:  Yes.

13   **RECROSS-EXAMINATION**

14   **BY MR. COFFEY:**

15        Q.   Doctor, you have examined 20,000 patients; correct?

16                    MS. EGAN:  Objection.  Withdrawn.

17        Q.   Is that correct?

18        A.   At the time of this case, yes.  It's been more since

19   then.

20        Q.   Maybe 40,000 by now.  Is that correct?

21        A.   Yes.

22        Q.   You know what the signs and symptoms of head trauma

23   are; don't you?

24        A.   Yes.

25        Q.   And Doctor, other than the fact of your provisional -

1    actually, your differential diagnosis - you never, ever, ever

2    come to the conclusion that this baby suffered injury as a

3    result of trauma.  You never expressed that opinion; have you?

4         A.   No.  I have never expressed that opinion.

5         Q.   Your opinion is that the baby's injuries were

6    consistent and caused by septic shock; correct?

7         A.   With the information I had at that time, correct,

8    yes.

9         Q.   Well, 40,000 patients is a lot of experience; isn't

10   it, Doctor?

11        A.   It is.  I didn't have all of my data; but at that

12   point, absolutely, yes.

13        Q.   And you are not an expert in DIC; are you?

14        A.   No.

15        Q.   And at the time that the IV was placed and the

16   catheter in this little baby's -- in his penis, I assume;

17   correct?

18        A.   Yes.

19        Q.   If he developed DIC during the time he was in the

20   hospital, you are not prepared to say he didn't have DIC when

21   he left; are you?

22        A.   No.

23        Q.   And let me ask you about this aspiration.  I want you

24   to assume that the mother has testified in this case and was

25   specifically asked if there was any vomiting over --

1          MS. EGAN:  I'm going to object to discussion of

2     another witness' testimony.

3          THE COURT:  The objection is overruled.

4     Q.   She said she never -- she never testified about any

5     vomiting.  And in the report by the EMT's, the mother never

6     said anything about vomiting.  You say you have a history of

7     some vomiting that weekend?

8     A.   Yes.

9     Q.   Would I be correct that, when you take a history, you

10    are pretty careful?

11    A.   Yes.

12    Q.   When you are taking a history from me as a parent and

13    you have a child there, you don't stand there with your back to

14    the mother mumbling.  You look in their eyes and say, "Tell me

15    what happened to your baby."  Right?

16    A.   Yes.

17    Q.   Because a four-month-old, even healthy, can't give a

18    history; right?

19    A.   Yes.

20    Q.   And she told you that the only history that was

21    significant was that over the weekend - this is a Sunday - the

22    past couple of days, he had some vomiting and some diarrhea;

23    correct?

24    A.   Correct.

25    Q.   Nothing before that date; correct?

1          A.    Correct.

2          Q.    And you asked:  "Tell me what was going on with your

3     baby."  Right?

4          A.    Yes.

5          Q.    And that's what she told you; correct?

6          A.    Yes.

7                     MR. COFFEY:  That's all I have.

8                     THE COURT:  Ms. Egan, anything else?

9                     MS. EGAN:  Can I just have one moment, Judge?

10                    THE COURT:  Yes.

11    **REDIRECT EXAMINATION**

12    **BY MS. EGAN:**

13         Q.    Dr. Kardos, have you ever seen signs of intracranial

14    head injury in an infant?

15                    MR. COFFEY:  Object to this as outside the scope

16             of my recross.

17                    MS. EGAN:  Judge, he asked specifically about

18             head trauma.

19                    MR. COFFEY:  I asked because she asked on

20             direct.  I'm sorry, Judge.

21                    THE COURT:  The objection is overruled.  I will

22             allow the question; and you can, of course, follow up on

23             recross if you'd like.

24         Q.    In your experience, have you ever treated an infant

25    with intracranial head injury without any corresponding

1    external signs?

2         A.   Yes.

3                   MS. EGAN:   I have nothing further.

4    **RECROSS-EXAMINATION**

5    **BY MR. COFFEY:**

6         Q.   So, having treated children with intracranial head

7    injuries -- and you have treated those; correct?

8         A.   Correct.

9         Q.   And even with all that, today, as you sit here, based

10   upon the information that you knew, you are still adhering to

11   your diagnosis that this baby had sepsis and that was the cause

12   of his problems; correct?

13        A.   When he left the ER, with my knowledge, yes.

14                  MR. COFFEY:   That's all I have.

15                  THE COURT:   You may step down.

16                  MR. COFFEY:   May we approach the bench?

17                  THE COURT:   Yes.   On the record?

18                  MR. COFFEY:   No.

19                  (Discussion off the record.)

20                  THE COURT:   Members of the jury, we are going to

21             break for lunch at this point in time.   It's about five

22             after 12, so we will break until 1:05.   During the course

23             of this lunch break, please do not discuss the case among

24             yourselves or with anyone else.   Do not read or listen to

25             any media accounts of this case.   Do not visit or view any

1       premises mentioned here.  Do not conduct any research

2       about this trial.  Do not accept or request any payment in

3       return for supplying any information about this case.  Do

4       not form any judgments or opinions about this case.  If

5       anyone attempts to improperly influence you, please report

6       that directly to me.  Enjoy your lunch.  We will see

7       everyone back here at 1:05.  Thank you.

8               (Jury excused.)

9               THE COURT:  Please be seated.  Doctor, I believe

10      your testimony is completed.  I'm not completely certain

11      of that yet, though, because during this break, the

12      defense is going to review your notes and make a

13      determination as to whether they have any additional

14      questions for you.  The attorneys will let you know during

15      the lunch break whether that is, in fact, the case or not.

16      If they determine that there's no further questions, you

17      will be excused at this time, at that time.  If the

18      defense determines that they do have additional questions,

19      then you will be expected to -- you will be advised of

20      that and you will be expected to be back here at 1:05 to

21      complete your testimony.  Okay.  Do you understand that?

22              THE WITNESS:  Yes.

23              THE COURT:  And because there is still a chance

24      that you may be giving further testimony, I will direct

25      that during the break, until such time as you are advised

1    that your testimony is completed, that you please don't

2    discuss this case or your testimony with anyone, including

3    the attorneys.  To the extent that you need to communicate

4    with the DA's Office to show them where your notes are,

5    you may do that, but don't have any additional discussions

6    about this case or your testimony.  Okay?

7                 THE WITNESS:  Where do I wait?

8                 THE COURT:  Well, off the record.

9                 (Discussion off the record.)

10                (Whereupon, a luncheon recess was taken.)

11                (Proceedings continue outside the presence of

12   the jury as follows:)

13                THE COURT:  Please be seated.  Thank you.  We

14   will go on the record.  Before we proceed with the jury,

15   Mr. Coffey, did you have a chance during the lunch break

16   to review Dr. Kardos' notes?

17                MR. COFFEY:  Thank you, Judge.  I did, and we

18   told the District Attorney's Office that we had no need to

19   bring her back.  We are fine.

20                THE COURT:  Thank you.  Are the People ready to

21   proceed with the jury?

22                MS. BOOK:  Yes, Your Honor.  I just briefly

23   wanted to mark three things that I believe we are going to

24   stipulate in.  I'm sorry, four things.  That would be the

25   St. Mary's Hospital certified records of M████ and