EXHIBIT "U"

1    a witness on behalf of the Defendant at this time.  Just

2    so you are aware, I'm mindful that it's quarter of four.

3    We typically stop at 4:30 or are required to stop at 4:30.

4    I have requested permission to allow us to work until 5:30

5    today.  I don't know if that permission is going to be

6    granted yet.  So, that's word I'm waiting on and we likely

7    will proceed depending upon what I'm told, but it is

8    possible that we may be staying until 5:30 today, although

9    that's not for sure.  With that said, Mr. Coffey, the

10    defense may call its first witness.

11         MR. COFFEY:  Yes, call Dr. Klein.

12   **JEROME O. KLEIN**, after first having been duly sworn by the

13   Clerk of the Court, was examined and testified as follows:

14         THE CLERK:  The sworn witness is Jerome O.

15   Klein, K-L-E-I-N.

16         THE COURT:  You may proceed, Mr. Coffey.

17   **DIRECT EXAMINATION**

18   **BY MR. COFFEY:**

19   Q.   Hi, Doctor.  Would you give us your name and your

20   occupation for the record, please?

21   A.   Jerome O. Klein.  I'm a pediatrician with experience

22   in pediatric infectious diseases.  I'm a professor of

23   pediatrics at Boston University School of Medicine and

24   attending physician at Boston Medical Center.

25   Q.   Okay.  Now, Doctor, would you tell us where you

*(Klein - Defendant - Direct)*                                    912

1    graduated from medical school?

2        A.   Yeah.  I graduated from Yale Medical School.

3        Q.   Okay.  And after that, just give us a general

4    overview of your work history.

5        A.   I went into pediatrics.  I had my internship at the

6    University Hospital in Minneapolis.  And following that, there

7    was obligatory military service, and I was in the public health

8    service in a group called the Epidemic Intelligence Service.

9    This is a group that investigated epidemics, and I had -- we

10   were stationed at different locales.  I happened to be

11   stationed at the New York State Health Department on Holland

12   Avenue.  That was a two-year experience.

         And subsequent to that, I completed my pediatric

14   residency at Boston City Hospital and then had a fellowship in

15   infectious diseases on Harvard Medical Service and remained as

16   a Harvard Medical faculty until 1974, when the hospital

17   downsized and it went from three medical schools to one, Boston

18   University, and I chose to stay at the hospital, and I have

19   been there ever since as professor at Boston University.

20       Q.   Okay.  And what do you teach?

21       A.   I'm sorry?

22       Q.   What do you teach?

23       A.   I teach all aspects of infectious diseases, beginning

24   with medical students, residents, fellows and postgraduate

25   courses.

1     Q.   Okay.  Now, Doctor, I'm going to come back a little

2   bit later in terms of your experience.  But would it be fair to

3   say that there came an occasion some years ago when you were

4   contacted with regard to the death of ███████  ███████?

5     A.   Yes.

6     Q.   Okay.  And Doctor, that period of time several years

7   ago in another proceeding, did you have occasion to testify?

8     A.   Yes.

9     Q.   Since that time and in the last month or so, have you

10   and I had occasion to meet?

11     A.   Yes.  You came to Boston and we spent an hour or two

12   reviewing what had been present before.

13     Q.   Okay.  And Doctor, have you read the medical records

14   in this case?  Let me just go through these.  There's the Seton

15   Health records, birth records?

16     A.   Yes.

17     Q.   The Samaritan Hospital records, Albany Medical Center

18   records and the autopsy which has been performed by Dr.

19   Sikirica, along with the death certificate.  Have you read

20   those records?

21     A.   I have.

22     Q.   Now, Doctor, are you familiar with babies - first of

23   all, with human beings - who suffer from what's called sepsis?

24     A.   Yes.  That's an important part of what I do.

25     Q.   Okay.  And what does it mean to be a pediatric

1    infectious disease specialist?

2         A.   You deal with all the common infections, such as ear

3    infections, influenza, and all the serious infections, such as

4    sepsis, invasive diseases, meningitis, pneumonias and, in this

5    case, septic shock.

6         Q.   And Doctor, in terms of -- what's the difference

7    between a bacteria and a virus?

8         A.   What's the difference between --

9         Q.   A bacteria and a virus?

10         A.   Well, they are different microorganisms.  Bacteria

11    are able to live on their own.  Viruses need some protein or

12    other substrate to multiply.

13         Q.   Okay.  And Doctor, in the course of your experience -

14    I guess in the past 40 years - have you had occasion to treat

15    patients with sepsis?

16         A.   Yes.

17         Q.   Do doctors refer patients to you?

18         A.   Yes.

19         Q.   And talk about that a little bit if you would.

20         A.   Essentially, I have been mostly doing consultive

21    work.  That's my responsibility in both teaching and clinical

22    care; so that physicians who are faced with a serious pediatric

23    infectious disease problem put in a consultation.  I or one of

24    my colleagues reviews the case, goes over the specifics,

25    examines the patient, recommends the proper therapies and stays

*(Klein - Defendant - Direct)*

1    in contact until the patient is completely cured, as they would

2    go home.  So, it's a consultant service.

3        Q.   Doctor, with regard to the children or babies, have

4    you had experience in the past to treat babies for infections?

5        A.   You mean young infants or --

6        Q.   Young infants, babies, say up to five years of age?

7        A.   Yes.

8        Q.   And how many would you estimate that you have

9    treated?

10        A.   Well, that's the bread and butter.  Most of the

11    infectious diseases of importance occur in children under five.

12    Once you get to school age, you are pretty much home free.

13    Very few serious events occur after age five.

14        Q.   Now, what about vaccines?  Are you aware of the fact

15    that in this case ███████ was born at 33 weeks gestation?

16    Doctor, we have had testimony that the child -- he was

17    premature.  Would you agree or disagree with that?

18        A.   Yes.

19        Q.   Now, what happens in the last cycle of life for a

20    child for the last, say, seven weeks of gestation with regard

21    to his immune system?

22        A.   Well, during the last few weeks is when the major

23    portion of the protective antibodies from the mother is

24    transported across the placenta to the infant.  So, babies that

25    are born at four or five or more weeks preterm doesn't have

*(Klein - Defendant - Direct)*                                      916

1    this availability, the protective antibodies that the mother

2    could give him.  So, he's -- and then when he's born

3    prematurely, he's not able to respond to infections as would be

4    a term infant.

5        Q.   And why is that important?

6        A.   Well, it makes those infants more susceptible to

7    infection than it would be a term infant.

8        Q.   Now, Doctor, in the baby's first year of life, is

9    there a series of shots that the baby gets to help his immune

10   system?

11       A.   To help provide protection.

12       Q.   Okay.  Would you talk about that?

13       A.   Pardon me?

14       Q.   Would you talk about that?

15       A.   Well, we have been very fortunate.  We have an array

16   of vaccines now that have reduced the burden of infectious

17   diseases in infants and young children.  So relevant to this

18   particular case, there's a very effective pneumococcal vaccine

19   that is routine now for all infants, and it's administered at

20   two, four, six and 12 months.  ███████  was four months, but he

21   had only received one of the vaccines at age two months, and

22   that gives only a beginning to the protective level.  So, he

23   essentially had very little, if any, protection against

24   pneumococcus.

25       Q.   Now, what was the second shot supposed to do?

*(Klein - Defendant - Direct)*

1    A.   The second shot -- this is a very interesting

2    vaccine.   With each dose that's given - the first, the second,

3    two months of age, then four, six - each one amplifies and

4    exaggerates the previous one.   So, let's say you have a little

5    antibody from the two month, then the four month, you get a

6    boost; the six, month, even more; and by 12 months, you get a

7    sufficient level that it continues for three or four years.

8    So, this schedule of two, four, six, 12 has been very

9    effective.   In fact, most of the serious invasive pulmonary and

10   pneumococcal diseases are significantly down.

11   Q.   Now, Doctor, when you go to a day-care center, do

12   kids become more susceptible, for example, to infections?

13   A.   Well, not only more susceptible but more exposure.

14   Every child that comes into the day-care center brings their

15   own infectious organisms and their social being, so they mix

16   and match organisms; and that's why children in day care have,

17   in the winter months, a bug a month.   They may have one

18   respiratory event every month from October through May, and

19   that's continuous for two or three years.

20   Q.   Now, what does respiratory mean?

21   A.   Respiratory is going from the oral pharynx, the

22   mouth, into the lungs.

23   Q.   Okay.   Now, Doctor, is that generally the way

24   infections enter the body for young children?

25   A.   Well, the respiratory viruses; so, influenza.   There

*(Klein - Defendant - Direct)*

1    are a bunch of different respiratory viruses and bacterial

2    organisms, such as the pneumococcus, streptococcus.

3        Q.   Doctor, what is peer review?

4        A.   Peer review is usually used for publications or

5    grants, where a manuscript is presented by some investigators

6    and it's reviewed by those who are in a similar field to

7    whether it's worthy of being either published or granted in

8    terms of, if that's the case, funding.

9        Q.   When doctors write articles, are they -- are they

10   expected to be read by other experts in the field?

11       A.   That's the method of communication, the way you get

12   information related to your colleagues, is by publishing and,

13   so, that's available and now it's freely available on line.

14   You can get most publications within a few months after they

15   are produced in print.

16       Q.   So, that's actually much better than it used to be?

17       A.   It's certainly ease of communication.

18       Q.   Okay.  And Doctor, tell us:  Have you ever published

19   any articles in the field of pediatric infectious diseases?

20       A.   I have.

21       Q.   And how many?

22       A.   The last time I looked, there was like 485.

23       Q.   485?

24       A.   Yes.

25       Q.   I'm not going to go through all of those, but are

1   those articles widely read by other doctors in the field?

2       A.   Well, if they are in an area where there's interest,

3   they would be.

4       Q.   And do any of those articles refer to sepsis?

5       A.   A lot, a number of articles because, essentially, I

6   work at an urban center hospital, and that's part of the burden

7   the children living in urban centers have.

8       Q.   Okay.  And lectures -- I mean, I suppose, at times,

9   you would -- maybe you wouldn't.  But have you ever lectured in

10  the past?

11      A.   Often.

12      Q.   How many times do you think you have lectured with

13  regard to infectious diseases?

14      A.   Well, during the times when I was more active, it

15  would be once or twice a month.

16      Q.   Okay.  Now, have you ever had occasion when a

17  radiologist or neurosurgeons have referred babies to you for

18  your opinion in regard to the infectious disease process?

19      A.   Yes.

20      Q.   Okay.  Is that relatively frequent or infrequent?

21      A.   Well, it's collaborative.  So, for radiologists, for

22  example, if we have a child that we are concerned about and

23  they have taken the proper x-rays, we would sit down with them

24  and review those x-rays and get their expertise, as well as

25  contribute our framework for reviewing those areas.

*(Klein - Defendant - Direct)* 920

1    Q.   And in terms of giving, say, or prescribing medicine

2    or drugs for children who have infections, are you able to do

3    that?

4    A.   That's the bread and butter part, antibiotics,

5    antiviral and other remedies.

6    Q.   Okay.  And those drugs that can be available for

7    little babies, have they gotten more sophisticated and, for

8    lack of a better word, better over the years in fighting

9    infections?

10   A.   You mean have the new antibiotics --

11   Q.   Yes.

12   A.   Yes, they are.

13   Q.   Now, Doctor, if I wanted to talk to a doctor, any

14   doctor, about a pediatric patient -- withdrawn.  If I wanted to

15   talk to a doctor about a baby who had sepsis or septic shock in

16   a hospital, what kind of a doctor would I talk to?

17   A.   An infectious disease doctor.

18   Q.   Now, we have heard this issue before about being

19   board certified.  Are you board certified?

20   A.   In pediatrics.

21   Q.   Okay.  Now, I won't ask you the year, but I'm sure

22   it's been some time ago.  Is that a fair statement?

23   A.   Yes.

24   Q.   Now, I want to go, if I can, to this case in

25   particular,  ███    ███ .  And having reviewed everything --

*(Klein - Defendant - Direct)*

1    let me do this, if I can.  Are you aware of the -- █████ and

2    what happened in Samaritan Hospital before Albany Medical

3    Center?

4         A.   I am.

5         Q.   And have you reviewed the records?

6         A.   Yes.

7         Q.   And you were present today when Dr. Sikirica

8    testified?

9         A.   I was.

10        Q.   Doctor, talk to us, if you would, about whether

11   █████ had septic shock?

12        A.   █████ had septic shock.  He had an overwhelming

13   bacterial infection that led to shock; that is, blood pressure

14   diminished, but there were also other elements in the severity

15   of his illness.  So, when he comes to Samaritan Hospital, it's

16   very important to identify that his white count, which usually,

17   normally, is five to ten thousand, was 1,000.  And that

18   indicated, in the context of his other signs, that the bone

19   marrow had been suppressed.  White cells turn over, so that you

20   have new white cells produced every 12 to 24 hours.  Now, if

21   you have them suppressed and no new cells are being formed,

22   then the white count starts dropping off, because they only

23   have old cells that are present, and that's a reflection of

24   sepsis, and it usually indicates that that process has been

25   going on for, perhaps, 12 to 24 hours and the initiator of that

1    sepsis element, suppressing bone marrow, has been present for

2    several days.

3              So then ███████ comes to the morning of the 21st, and

4    he is in severe distress with other elements of overwhelming

5    sepsis.  As an example, he's not able to maintain his oxygen

6    saturation, so his ability to have oxygen is measured and drops

7    steadily.  He's not able to maintain his temperature.  He

8    drops, and when he gets to Albany, it's 94.  He's not able to

9    maintain his blood pressure and, most important, his blood

10   pressure, including his white cells, which I mentioned are so

11   low, but he also starts to have a drift down of his platelets.

12   They are 115,000 in the Samaritan Hospital, but when he gets to

13   Albany, they get down as low as 25,000, and that means that

14   this picture of suppression from the overwhelming sepsis is

15   having its effect on the bone marrow.

16             He's also not able to maintain metabolic functions,

17   such as a decreased glucose.  His pH is down, and he is

18   overwhelmed by this infection and there's very little in that

19   picture of where survival is likely.  So, he is overwhelmed by

20   the infection, and the physicians do what they can to maintain

21   him, but it's inadequate because he's so overwhelmed by

22   infection, and he dies within two days.

23        Q.   Well, now, let's go back if we can.  First of all,

24   you have treated patients, little babies before who have gone

25   into septic shock?

*(Klein - Defendant - Direct)*                                    923

1      A.   Yes.

2      Q.   Can you give me a number or range?

3      A.   Well, every year, there would be a half dozen such

4   babies.

5      Q.   And you are in a major Boston hospital?

6      A.   Yes.

7      Q.   And in the hospital, you are there.  Do you have

8   doctors from all the major medical schools in the city?

9      A.   Well, the residency is popular, so it would have

10  young residents from throughout the country.

11     Q.   Okay.  And do you teach them?

12     A.   Yes.

13     Q.   Now, let's talk about the septic shock.  Have you

14  also had occasion to, and I assume you have, read articles and

15  textbooks of other well-known, renowned doctors in the field?

16     A.   Yes.

17     Q.   In terms of the sepsis, how does a baby develop

18  sepsis?

19     A.   Particularly with this organism, the pneumococcus,

20  it's a respiratory organism.  So, it enters through the

21  respiratory tract.  And in a very small number of infants, it

22  gains access to the bloodstream; and in the bloodstream, it

23  multiplies, and it also produces toxins or poisons, and they

24  produce all the results that we find in ███████.  So, he's

25  overwhelmed by not only the multiplication of the organisms,

1    but also these toxins, and that's a deadly combination and it

2    was in this case.

3         Q.   Now, does it take awhile for this sepsis to develop?

4         A.   What happens is that the organisms multiply.  The

5    toxins are produced; but for perhaps days, it's not

6    recognizable.  The baby may continue to feed, and I have been

7    impressed with cases that I have managed where the babies

8    continue to apparently be okay and, all of a sudden, it's like

9    falling off a cliff and they then are in dire straits.  So, a

10   baby who looked well and is feeding, as this baby was at four

11   o'clock in the morning, and is unresponsive at 6:00, that is

12   not unexpected.  I have seen many cases like that, and it's a

13   question of the buildup of the organism to the point where then

14   this phenomena of overwhelming sepsis occurs and the baby who

15   is not recognizable as being very sick all of a sudden is in

16   dire straits.

17        Q.   And do you have an opinion, based upon a reasonable

18   degree of medical certainty, as to how long this sepsis was in

19   this baby's body before that Sunday morning?

20        A.   Well, the organism was in the baby's body probably

21   for several days, perhaps three or four days, and all the time

22   was building up to get to this point, where between four

23   o'clock in the morning and six o'clock in the morning, he goes

24   from a baby whose mother thinks is taking a bottle well to a

25   baby who is unresponsive.

*(Klein - Defendant - Direct)* 925

1          Q.   So, you would estimate, with a reasonable degree of

2     medical certainty, that the sepsis began to enter his

3     bloodstream some time on the 17th, possibly, in that area?

4          A.   The organism gained access to the bloodstream.

5          Q.   Now, Doctor let's talk, if we can, about DIC.  You

6     would not be the first person to talk about this.  So, we have

7     an idea of that.  But tell us about that, if you would.

8          A.   Well, DIC is a problem with bacteriolysis.  It's not

9     only the pneumococcus, but it also can develop with

10    meningococcus and other bacteria.  What happens is in a

11    suppression of the various elements of clotting, the organisms

12    irritate the lining of vessels and the platelets gather in

13    those areas.  So, they use up the platelets, which are

14    important in stopping bleeding, and there's deposition along

15    the lines of a blood vessel, then the platelets and fibrin or

16    particles, and you get either a clot -- what's called a

17    thrombosis.  Blood can't flow through, and the blood backs up

18    and may rupture the vessel because of the pressure on that

19    vessel and bleeding occurs; or there may be damage to the

20    vessel from the platelets and the fibrin products that lead to

21    ruptured vessels at that site.

22          So, you will see infants who have bleeding in various

23    organs.  And one of the major organs, which apparently was not

24    available for autopsy, is the adrenal gland, which is important

25    to maintaining the stability of metabolic functions, is

1    hemorrhagic because of this phenomena.

2         Q.   How about the brain?  Is the brain affected by DIC?

3         A.   The DIC, the failure to clot, can occur anywhere; and

4    here we saw that there was bleeding in the testes, in the

5    heart, behind the retina, in terms of retinal hemorrhage, and

6    throughout the brain.  And the fact that this can be -- the way

7    we manage it is we try to replenish platelets, give

8    fresh-frozen plasma, but that's like putting your finger in a

9    dike.  The process continues to flood the system and may cause

10   continued bleeding.

11        Q.   Can DIC -- withdrawn.  Do you have an opinion in this

12   case -- and all of the opinions that I'm going to ask you are

13   based upon a reasonable degree of medical certainty.  Do you

14   have an opinion as to whether the sepsis caused DIC in this

15   case?

16        A.   Yes.

17        Q.   And do you have an opinion as to whether the DIC

18   caused swelling in the brain?

19        A.   Well, that's not quite right.

20        Q.   Okay.

21        A.   The DIC is different from the swelling in the brain.

22   Swelling in the brain is caused by the infection, and that

23   causes cerebral edema or swelling, and that can be pressure.

24   Now, in a four-month-old, the fontanelle is open, so the head

25   may be enlarged.  But in autopsy, it was noted that that

1    fontanelle, that little soft spot, was bulging.  So, that's an

2    indicator of the increased pressure in the brain.

3         Q.   Caused by infection?

4         A.   Caused by this infection.

5         Q.   And this infection was sepsis?

6         A.   This infection was the pneumococcus.  The

7    pneumococcus caused the sepsis.

8         Q.   Okay.  Now, the pneumococcus causing the pressure on

9    the brain, what effect did that have upon the eyes?

10        A.   Upon the eyes?

11        Q.   Yes, the retina?

12        A.   Well, there's swelling.  So, the swelling can cause

13   pressure on different organisms.  Pressure can press blood

14   vessels or cause rupture of others.

15        Q.   Okay.  Did you see some photographs of the autopsy?

16        A.   I saw some of Dr. Leestma's photographs, and I did

17   see the medical examiner's pictures.

18        Q.   And did you see the eyes of the young baby?

19        A.   I don't recall.

20        Q.   Okay.  Now, Doctor, this process of sepsis, does --

21   and as the pressure builds and the infection, can that cause

22   hemorrhaging around the eyes?

23        A.   I would think it would cause pressure on all the

24   blood vessels, including those in the brain and behind the eye.

25        Q.   Now, we know in this case from the autopsy that there

1    were retinal hemorrhages.  Would that be consistent with this

2    infection, swelling and so forth?

3         A.   Yes, it could.

4         Q.   And do you know if there was pus inside the skull of

5    ██████?

6         A.   There was, and Dr. Leestma's pictures are very

7    illustrative of those collections.  And pus is white cells

8    gathering together into an abscess.  An abscess is just a

9    contained area of pus.

10        Q.   And you observed -- was there pus in this area?

11        A.   There was.

12        Q.   Doctor, what is meningitis?

13        A.   Meningitis is inflammation of the covering of the

14   brain.  The brain is enclosed in a -- like a cap.  And where

15   there's infection of the brain, often the covering is inflamed,

16   and the itis part is inflammation.  So, meninges that are

17   inflamed are meningitis.

18        Q.   And you have reviewed the records in this case?

19        A.   Yes.

20        Q.   And you talked about Dr. Leestma.  Do you know what

21   his particular specialty is?

22        A.   He's a, I think, a very well-known forensic

23   neuropathologist.

24        Q.   And have you looked at the photographs of the autopsy

25   of Dr. Sikirica?

1       A.   Yes.

2       Q.   Okay.  Now, Doctor, I'm going to show you what's been

3   marked as People's Exhibit 16.  All right?  And that's been

4   identified as a photograph of ███████.  What can you tell us

5   about that photograph?

6       A.   The photograph is of a baby that has many tubes in

7   place and obviously is getting intravenous fluids.  It looks

8   like there's respiratory support.  He's got tubes in a lot of

9   places.

10      Q.   What about his eyes?

11      A.   His eyes are somewhat swollen.

12      Q.   Okay.  Consistent with an infection?

13      A.   Well --

14      Q.   Or pressure?

15      A.   It depends.  If he's overloaded with fluids, he could

16  have the same swollen eyes.

17      Q.   All right.  Now, Doctor, with regard to that, with

18  ███████, you described some of the process as this sepsis

19  begins to grow.  I want to ask you about trauma.  All right?

20  Oh, I know what I want to ask you.  In your opinion, based upon

21  your view of the medical evidence - we have heard Dr. Sikirica

22  indicate today that he did not believe he had meningitis - do

23  you have an opinion as to whether you think he did?

24      A.   That he did have meningitis?

25      Q.   Did he or did he not?

*(Klein - Defendant - Direct)*

1    A.   Well, that's in the materials examined by Dr.

2    Leestma, and not only did he have meningitis or this

3    inflammation of the covering of the brain, but he had areas

4    where there were collections of white cells.  So, there was

5    pus, and the organism was represented in those areas.  So, the

6    pneumococcus has a very characteristic formation.  They are

7    called lancet shaped.

8              MS. BOOK:  I'm going to object to this, Your

9         Honor.

10             THE COURT:  What basis?

11             MS. BOOK:  The doctor is testifying as to

12        something that Dr. Leestma did.

13             MR. COFFEY:  I don't think so.  He's saying

14        based on his review.

15             THE COURT:  Well, that was my understanding of

16        the testimony.  So, I'm going to sustain the objection.

17             MR. COFFEY:  He's referring to another doctor.

18        So, I believe as long as he indicates what his basis is, I

19        would ask that he be allowed to continue.

20             THE COURT:  Well, if he's offering testimony or

21        an opinion and then providing a basis for that by

22        referring to something in the medical records or that

23        another doctor referred to, that's fine.  If he's sitting

24        here now merely testifying as to what he expects Dr.

25        Leestma to testify to, that's not okay.  So, I'm not, to

*(Klein - Defendant - Direct)*

1    be perfectly clear, sure which is happening.  So, I will

2    let you ask a new question.

3        Q.   Dr. Leestma will come on and we will deal with him at

4    the appropriate time.  Based upon your review of the evidence,

5    if you would give us your opinion.

6        A.   Well, my review of the photographs and the slide

7    photographs that were taken is that he had meningitis, and he

8    had abscesses in the brain with this organism that was

9    characteristically diplocoxide.  That's two pairs or pairs of

10   two, and they were part of those abscesses.  So, the organism,

11   the pneumococcus that had been in the blood culture taken in

12   Samaritan, was also found in those areas of the brain.

13       Q.   Now, what are macrophages?

14       A.   Macrophages are the types of cells that mop up

15   debris.

16       Q.   And did you see any evidence of that in this case?

17       A.   I don't recall.

18       Q.   Okay.  Now, Doctor, let me talk about trauma now, if

19   I can.  You know that there's been testimony that -- from the

20   People's witnesses that there was trauma in this case and the

21   trauma caused sepsis.  Do you agree with that?

22       A.   I don't know where that concept would come from.  A

23   trauma doesn't cause sepsis.  Bacteria causes sepsis.

24       Q.   Now, in order -- well, we have heard the Civil War

25   analogy.  If you have an open wound, can you develop sepsis?

*(Klein - Defendant - Direct)*

1   A.   Well, if you have an open wound - so you if have a

2   disruption of the integrity of the skin - then organisms can

3   find their way into that wound and then can cause sepsis, but

4   the sepsis is caused by bugs, not caused by trauma.

5   Q.   Now, Doctor, assume there's no evidence that on the

6   weekend before ███████ died or even a few days before that of

7   any open wounds, no open head wound, no open wound to his body

8   in his feet or any place.  Do you have an opinion, to a

9   reasonable degree of medical certainty, as to whether the

10  pneumococcal could have gotten into that -- how it could have

11  gotten into his body?

12  A.   The pneumococcus is a respiratory organism.  You put

13  it into your mouth, essentially, having had contact with

14  somebody who had the organism.  So, it's spread by droplets and

15  you inhale the droplets.  And in the vast majority of cases --

16  we all have had that experience.  We have all had experience

17  with pneumococcus, but there have been either no consequences

18  or there's been something mild, like a cold or otitis or

19  sinusitis.  In a very few instances, though, that respiratory

20  acquisition leads to the organism getting into the bloodstream;

21  and even then, the defense mechanisms are such that it's clear.

22  But this baby, at four months of age, it wasn't clear.  The

23  organisms multiplied, and he had the unfortunate consequences

24  of overwhelming sepsis causing death.

25  Q.   We have heard testimony that the sepsis was secondary

*(Klein - Defendant - Direct)*

1    to an aspiration which was secondary to the trauma.  Doctor,

2    what is aspiration?

3         A.   Aspiration is when you choke, essentially, and food

4    particles or other things that are present in your mouth go

5    down to your windpipe.  And in infants, there's a lot of

6    problems where they may take a small toy or another material

7    and swallow it, and it will go down into their windpipe and

8    they could choke.

9         Q.   Okay.  But in this instance, do you see any evidence

10   of aspiration?

11        A.   No.  There's no evidence in terms of clinical

12   history.  Often, these kids start coughing, choking.  They are

13   immediately evident to the parent, who brings the child to the

14   emergency room.  There's no evidence to that.  That's number

15   one.  Number two, there's no evidence on the x-ray.  Number

16   three, there's no evidence in the autopsy.

17        Q.   So, for anybody to say that there's aspiration here,

18   do you have an opinion, based upon a reasonable degree of

19   medical certainty, whether that is shear speculation?

20        A.   It is speculation.

21        Q.   There is objective and subjective elements in

22   medicine; correct?

23        A.   Yes.

24        Q.   We have used this example before.  Your temperature

25   is objective?

*(Klein - Defendant - Direct)*                                    934

1    A.   It is.

2    Q.   If I say I'm in pain, that's subjective?

3    A.   Yes.

4    Q.   Did this baby have objective or subjective signs of

5    sepsis?

6    A.   He did.

7    Q.   Objective?

8    A.   Objective.  Well, you know, this is a four-month-old.

9    So, he's not going to have symptoms.  He's not going to tell

10   you that he had a headache.  So, everything is signs or

11   laboratory values.

12   Q.   And do you have an opinion, based upon a reasonable

13   degree of medical certainty, of the cause of death of this

14   baby?

15   A.   I do.

16   Q.   And what is it?

17   A.   He died of overwhelming bacterial sepsis due to the

18   pneumococcus.

19   Q.   And Doctor, based upon your experience, in the 485

20   articles that you have written, the hundreds of lectures that

21   you have delivered, the thousands of babies in Boston that you

22   have -- you are a clinician, as well; correct?

23   A.   Yes.

24   Q.   That you have treated and consulted on, the 40, over

25   40 years of vast experience that you have accumulated, do you

1    have an opinion, based upon your field of pediatric infectious

2    diseases, whether trauma played any part in the death of this

3    poor baby?

4        A.   No, it didn't.  This baby died, and the sequence of

5    events, where the baby is apparently well and that, soon after,

6    is critically ill, and then follows a deteriorating pathway to

7    death, is completely consistent with overwhelming pneumococcal

8    sepsis.

9             MR. COFFEY:  One minute, if I might, Judge.

10       That's all I have, Your Honor.

11            THE COURT:  Ms. Book?

12            MS. BOOK:  Thank you, Your Honor.

13   **CROSS-EXAMINATION**

14   **BY MS. BOOK:**

15       Q.   Hi, Dr. Klein.  I'm Christa Book.  I'm an Assistant

16   District Attorney here.  How are you?

17       A.   I'm good.  Thank you.

18       Q.   Good.  Okay.  Now, I'm going to ask you a bunch of

19   questions.  If you don't understand, just ask me to repeat.

20   Sometimes I talk too fast.  If I am, just tell me.  Okay?

21       A.   I will.

22       Q.   Is there a subspecialty for infectious disease, in

23   that is there a board certification for it?

24       A.   There is.

25       Q.   Okay.  So, you are not board certified in infectious

1    disease.  Is that correct?

2         A.    That is correct.

3         Q.    Okay.  And you are not a board certified forensic

4    pathologist; correct?

5         A.    Correct.

6         Q.    Or a pathologist at all, for that matter.  Is that

7    correct?

8         A.    It is.

9         Q.    And it's not part of your job to sign death

10   certificates; is it?

11        A.    It's not my job.  I think I have signed some.

12        Q.    Like a few in the hospital over the years?

13        A.    Yes.

14        Q.    Okay.  But it's not your job to determine the cause

15   of someone's death, now, is it?

16        A.    Only during -- we have conferences where -- they are

17   called clinical pathologic conferences, and the circumstances

18   of death is discussed, and I would participate in those.

19        Q.    Okay.  But you are not the final person to make that

20   determination.  Is that correct?

21        A.    I'm sorry.  Determination of what?

22        Q.    Of the cause of someone's death?

23        A.    I am in those conferences.

24        Q.    Okay.  So, it's your determination, not the

25   pathologist, that rules?

*(Klein - Defendant - Cross)*                                937

1          A.   Well, it's collaborative.   The pathologist gives you

2     clues.   The clinical course gives you clues, and the infectious

3     elements are present and you each give an opinion.

4          Q.   Okay.   And you are not a board certified

5     ophthalmologist; are you?

6          A.   No.

7          Q.   Or a board certified radiologist?

8          A.   No.

9          Q.   Neurosurgeon?

10         A.   No.

11         Q.   Okay.   And you are not board certified in child abuse

12    pediatrics?

13         A.   No.   Is there a board in that?

14         Q.   There is.   It just started a few years ago.   Dr.

15    Jenny, who testified here, she is the one that started that or

16    started in that area.   Now, you have never been declared an

17    expert in the area of pathology; have you?

18         A.   No.

19         Q.   And you have never specialized in infant

20    neurosurgery; correct?

21         A.   No.

22         Q.   Okay.   Or infant neuropathology?

23         A.   No.

24         Q.   Have you ever treated a patient with head trauma for

25    that head trauma?

1          A.    Only if there's infection associated.

2          Q.    Okay.  So, if there's infection associated, you might

3     treat the infection, but you don't treat the head trauma.  Is

4     that correct?

5          A.    It is.

6          Q.    Okay.  And in fact, you are not really qualified to

7     treat head trauma.  Is that correct?

8          A.    Well, it wouldn't be my responsibility.

9          Q.    Okay.  And some of these specialties that I just laid

10    out, they deal directly with head trauma.  Is that correct?

11         A.    Well, I'm not sure all of those that you mentioned,

12    but certainly most of them.

13         Q.    Okay.  And am I also correct in saying that your

14    specialty has nothing to do with head trauma.  Is that correct?

15         A.    Correct.

16         Q.    And infectious disease and head trauma, other than

17    what you just said, that you might treat someone that has an

18    infectious disease that also has a head trauma, it's not really

19    overlapping in your experience; correct?

20         A.    Could you repeat that?  I'm not sure I understand.

21         Q.    Yes.  So, other than what you just described, that

22    you might treat someone with an infectious disease that also

23    has a head trauma, in your experience, they are not really

24    overlapping; correct?

25         A.    No.

*(Klein - Defendant - Cross)*                                    939

1    Q.   Okay.  Now, in ████ ████' case, do you agree

2    with me that there is, in fact, head trauma?

3    A.   I would leave that to experts that you just

4    mentioned.  In other words, I would not opine about head

5    trauma.

6    Q.   Okay.  So, do you agree that there is head trauma?

7    A.   No.  I just said I would not opine about that.

8    Q.   Okay.  Well, in a previous proceeding, did you agree

9    that there was head trauma present?

10   A.   I don't recall.

11   Q.   Okay.  Well, you are not disagreeing that there was

12   no head trauma; correct?

13   A.   That's a double negative.  I'm not sure what the

14   direct question is.

15   Q.   Okay.  You are not sitting here diagnosing a lack of

16   head trauma.  Would you agree with that?

17   A.   I am not opining about head trauma.

18   Q.   Okay.  And you can't say if the bleeding in the brain

19   was from head trauma or coagulopathy; can you?

20   A.   No.  I can only say that coagulopathy existed and is

21   capable of causing bleeding.

22   Q.   Okay.  But in this particular case, you can't say

23   that coagulopathy caused the bleeding in ████'s brain; can

24   you?

25   A.   Well, I can say that it was an element that is likely

1     to cause bleeding and that it was present.

2          Q.   Okay.  But you cannot say that it was coagulopathy,

3     not head trauma, that caused the bleeding in ████████'s brain;

4     can you?

5          A.   I'm a little confused by the question.

6          Q.   Okay.

7          A.   Can I just see --

8          Q.   Go ahead.

9          A.   To see if it fits to your question.

10         Q.   Sure.

11         A.   The baby had a problem with clotting caused by the

12    infection.  The clotting can cause failure to assist the body

13    in reducing bleeding.  So, this baby, without that potential to

14    reduce the clotting, had the potential to cause bleeding in any

15    organ; brain, behind the retina, the testes, the heart.  So, it

16    was there.

17         Q.   Okay.

18         A.   And caused by infection.

19         Q.   Now, you said it was there, but would you agree with

20    me that the only areas of ████████'s body where he was bleeding

21    was his head, his testes, his heart and in his eyes?

22         A.   Well, as we heard this morning from Dr. Sikirica,

23    there was some organs that were taken for transplant.

24         Q.   Okay.

25         A.   That were not pathologically available to him.

1    Q.   Okay.  Well, I'm glad you brought that up.  As a

2    specialist in infectious diseases, would you expect a kidney

3    that was bleeding to be successfully transplanted into another

4    person?

5    A.   Well, it would depend on the extent of the bleeding

6    and the availability of the organ.  So, let's say that there

7    was bleeding in five percent of a kidney.  I would think that

8    would be available for transplantation, but that's a specialty

9    area that I'm not involved in.

10                MS. BOOK:  Okay.  May I get this marked, please?

11   (Organ Transplant Documentation marked People's Exhibit 24 for

12   identification.)

13                MS. BOOK:  Your Honor, at this time, the People

14        have a certified document of the organ transplant records

15        in this case.  The People would move to enter them into

16        evidence.  It's People's 24 for identification.

17                MR. COFFEY:  I object.

18                THE COURT:  What basis?

19                MR. COFFEY:  On the basis of relevancy, and I

20        believe you have already made a ruling on this.  If you

21        have not, I apologize.  In any event, I object as to

22        relevancy.

23                THE COURT:  That's your only objection?

24                MR. COFFEY:  Well, I --

25                THE COURT:  May I see it, please?

1          MS. BOOK:  Yes, Your Honor.

2          MR. COFFEY:  And as to foundation.

3          THE COURT:  Attorneys approach, please.

4          (Sidebar discussion held on the record as

5     follows:)

6          THE COURT:  What's the argument as to relevance?

7          MR. COFFEY:  I don't know why it's being

8     offered.  I mean, I don't know the purpose.  I think if

9     you rule specifically on this -- I know you looked at me.

10    I'm going to object to anything going in about the

11    transplant.  Before I have objected to things and it has

12    been sustained.

13         THE COURT:  I haven't ruled on this.  This

14    hasn't been presented to me.  There may have been

15    questions of other witnesses pertaining to organ

16    transplantation where objections were sustained, but I

17    can't recall why that would have been, but that's

18    unrelated to the proffer at this point in time.  It could

19    be that the witness, I believe, didn't have the proper

20    foundation to speak on that topic.  I can't recall, but

21    this is the first time it's being presented to the Court.

22         MR. COFFEY:  I agree with that.  When you say

23    "this," you are saying this exhibit?

24         THE COURT:  This exhibit, yes.  Ms. Book, the

25    Defendant has objected indicating that these documents are

1    not relevant.  What do you say to that?

2              MS. BOOK:  Your Honor, the People believe that

3    they are relevant.  Obviously, the cause of death is at

4    issue here.  The defense is asserting that ████████

5    suffered and died from septic shock.  The People are

6    arguing that they would not have been able to donate

7    organs if he died from septic shock.  The defense has also

8    argued that DIC is present here.  The People are not

9    contesting that DIC was starting to become present.  We

10   have argued that because the kidney and liver are organs,

11   it would make transplant difficult.  I think that these

12   records are relevant to the case here.  They are

13   certified.  They are records of the transplant.

14             THE COURT:  I'm not asking you about foundation

15   at this time.  But there's been no dispute that certain

16   organs were transplanted?

17             MS. BOOK:  Yes.

18             THE COURT:  So, what are these records going to

19   add?  What are these records going to show that is in

20   dispute in this case?

21             MS. BOOK:  It's going to show the condition of

22   the organs.  They did an assessment of the organs.

23             THE COURT:  Well, these are voluminous records

24   which were just provided to me for the first time.

25   There's certainly nothing wrong with that.  I am just

*(Klein - Defendant - Cross)*

1    acknowledging I haven't had a chance to review them.  But

2    when you say they did an assessment -- that's what I'm

3    asking you.  How are these relevant?  What are these

4    records going to show which is relevant to your case?  We

5    have already established that certain organs were donated.

6    That's not in dispute.  We have had testimony from

7    witnesses regarding whether the organs would have been

8    affected or not affected and whether that would have

9    impacted their ability to be donated.  So, what are these

10   records going to add?

11              MS. EGAN:  Can I answer that?

12              MS. BOOK:  Go ahead.

13              MS. EGAN:  Because the organs that were donated

14   weren't evaluated during autopsy.  There hasn't been any

15   evidence as to the quality and the condition of those

16   organs, which is relevant.  Dr. Klein had mentioned that

17   the decision whether to transplant an organ is dependent

18   upon the need, essentially, whether you are willing to

19   compromise and take, perhaps, an organ not in the best

20   condition if the donor recipient need is great.  These

21   records show the condition specifically of the kidneys and

22   liver.  There are no areas of infarction which are

23   commonly caused by DIC, which Dr. Sikirica testified to.

24   Given these records were absent from ███████'s autopsy,

25   the condition of them which was determined by the

1    transplant center is highly relevant given the cause of

2    death.

3            THE COURT:  These records are going to show,

4    it's your position, that there was no infection in these

5    organs or that there was infection; there was no bleed or

6    there was bleeding?

7            MS. EGAN:  I said infarction, which is a

8    condition caused by bleeding.  They specifically said

9    there was infarction in those organs which is caused by

10   DIC.  Defense counsel has also had these records in their

11   possession.

12           THE COURT:  Okay.  Well, these records are quite

13   voluminous.  So, I am going to hand them back to the

14   People.  You show me specifically where there's a relevant

15   section in these reports.

16           MS. EGAN:  These are the two relevant pages,

17   Judge.

18           THE COURT:  Show me specifically what you are

19   relying on or what you deem is relevant.

20           MS. EGAN:  This is referring to the analysis or

21   condition of both kidneys.  It indicates infarct areas --

22   it indicates there are no infarcted areas; that,

23   basically, there are no problems with the kidney, either

24   kidney.  Dr. Sikirica has testified that the kidneys were

25   particularly susceptible to the damage caused by DIC,

*(Klein - Defendant - Cross)*                                    946

1    which is the organ vessel that leads to infarction in the

2    organ.  This shows the condition in the liver.  There are

3    no anatomical abnormalities, no hematomas in the liver,

4    which would be relevant to determine if the liver is

5    bleeding.

6              THE COURT:  Okay.  It is the People's position

7    and theory that DIC was not present in this case?

8              MS. EGAN:  Not that it was not present, but it

9    wasn't present to the degree that it would have caused

10   ▮▮▮▮▮'s death.

11             MS. BOOK:  It would not have caused the bleeding

12   in the brain, would not have caused the subdural

13   hematomas.

14             THE COURT:  And how is the fact that it may not

15   have impacted the liver and the kidneys relevant to show

16   that it didn't cause the bleeding in the brain?

17             MS. BOOK:  Because the kidneys are hollow organs

18   and they would have been, as Dr. Sikirica testified, one

19   of the first organs impacted by DIC.

20             MS. EGAN:  Which is a disseminated condition.

21             THE COURT:  But you have already conceded that

22   DIC was present.

23             MS. BOOK:  Conceding that it was present, not

24   conceding that it caused the subdural hematoma.

25             THE COURT:  I understand.  But if you are

*(Klein - Defendant - Cross)*

1   conceding DIC was present in this baby --

2          MS. BOOK:  It's different depending on what

3   stage it's at.

4          THE COURT:  My question to you is:  How is the

5   fact that the liver and kidneys may not have been impacted

6   relevant to show the impact or lack of impact that it had

7   on the brain?

8          MS. BOOK:  Because it would have affected them

9   before the brain.

10          THE COURT:  Says who?

11          MS. BOOK:  Says Dr. Sikirica, because they are

12   hollow organs.

13          MS. EGAN:  Judge, DIC is a disseminated

14   condition.  Defense has argued that ████████ was bleeding

15   out everywhere in his body and that's what resulted in the

16   bleeding in the brain, the testes and the heart, and this

17   is evidence that he was not bleeding out; in fact, not

18   bleeding out in the two organs that are most susceptible

19   to that condition.

20          THE COURT:  Okay.  What does the rest of the

21   record show?  You have referred me to two pages of I don't

22   know how many.

23          MS. EGAN:  Some of it is duplicative.  Some of

24   it has to do with organs they didn't use, like --

25          THE COURT:  Do we have to do this now?

1          MR. COFFEY:  Dr. Klein has said I'm not prepared

2     to testify about this; I don't know anything about

3     kidneys.

4          THE COURT:  Do you need them in evidence at this

5     point in time to cross-examine him on them or to attempt

6     to cross-examine him?

7          MS. BOOK:  I guess not, as long as I can use

8     them.

9          THE COURT:  Mr. Coffey, what is your position?

10     I know your position is that this witness is going to

11     indicate that he can't testify to this topic; and if he

12     says that, that will end it.  But what's your position

13     with respect to the People, if I reserve on this decision,

14     relying on these records for the purpose of

15     cross-examination?

16          MR. COFFEY:  First of all, the DIC is not an

17     issue.  Sepsis is not an issue, either, and they could

18     have come in through Dr. Sikirica and they haven't, and

19     now they are coming in after the event, two pages about

20     kidneys and something that really are not relevant here.

21     All their witnesses have testified here.

22          MS. EGAN:  I would like to note that Mr. Coffey

23     objected to questions being asked of Dr. Sikirica.

24          MS. BOOK:  And Dr. Jenny.

25          THE COURT:  Why didn't you offer these records

1          on your direct case?

2                    MS. BOOK:  We could have, but everything was

3          objected to when we tried to talk about organs.

4                    THE COURT:  As I said to Mr. Coffey, you are

5          talking about two different things.  I don't recall the

6          specific questions that were asked, the specific

7          objections that were made or the reason why I ruled why I

8          did, but it may be that you were asking questions to

9          qualify witnesses about this topic.  That may be why there

10         were objections made and sustained.  This is separate and

11         apart.  You are now indicating that, separate and apart

12         from those opinions, you want to offer these records

13         because they are relevant for the purposes that you

14         stated.  So, my question to you now is:  Why didn't you

15         offer these on your direct case?  What has happened with

16         the testimony so far of Dr. Klein that now makes these

17         relevant?

18                    MS. BOOK:  He's saying that this baby died from

19         sepsis and DIC.  DIC would be present throughout the body.

20         He said ████████ was bleeding throughout his body.  I'm

21         trying to prove the only places ███████ was bleeding was

22         his brain, his eyes, his testes and heart.  In fact, he

23         wasn't bleeding throughout his body.  He wasn't bleeding

24         in his kidneys, liver, abdomen, a bunch of other places

25         you would expect to see blood.  He said he doesn't know,

*(Klein - Defendant - Cross)*

1        because they weren't available at the time of inspection,

2        and I can ask him to take a look at these at the time they

3        were harvested and ask him about that.

4                    THE COURT:  Are you seeking to use it for that

5        purpose only, or are you seeking to introduce them into

6        evidence?

7                    MS. BOOK:  I am seeking to introduce them

8        through his testimony, as well.  It is the defense's

9        contention that this is what he died from.

10                   MR. COFFEY:  Our contention is he died from

11       sepsis, not DIC.

12                   MS. BOOK:  And that DIC caused the bleeding of

13       the brain and that bleeding of the brain --

14                   MS. EGAN:  His testimony was the sepsis caused

15       the DIC.

16                   THE COURT:  All right.  With respect to the

17       Defendant's objection as to -- can I have the records

18       back, please?  With respect to the Defendant's objection

19       as to foundation, that objection is overruled.  This

20       document contains a certification which indicates that

21       these records were created and/or received in the regular

22       course of business and it was the regular course of

23       business to make and/or receive the records and that they

24       were done so at or near the time of the events or the

25       transactions recorded therein.  So, the appropriate

1          business records exception has been satisfied through this

2          certification.  So, that objection is overruled.

3                      With respect to the objection as to relevance,

4          that objection is overruled, as well.  There's been ample

5          testimony in this case from both sides, disputed

6          testimony, I should say, disputed evidence regarding cause

7          of death, regarding sepsis, the degree of sepsis,

8          regarding DIC, the degree of that, regarding the effects

9          of those conditions on the different organs in the body.

10         So, the People have met their burden of demonstrating that

11         these records are relevant.

12                      Evidence that has even the most minimal

13         relevance, unless it's outweighed by prejudicial impact,

14         which the Court finds in this case it is not, should be

15         allowed in and the jury can give the evidence the weight

16         that it sees fit, if any.

17                      Again, to be clear, although there's been no

18         argument - and I can't foresee how there could be such an

19         argument - that these records are unduly prejudicial to

20         the Defendant, just so the record is clear, the Court has

21         weighed the probative value versus the potential for undue

22         prejudice and finds the probative value outweighs that

23         potential.  Again, that's for the reasons stated

24         previously by the Court as to why these documents are

25         relevant; and weighing against that is the fact that the

P021586

1          Court doesn't discern any undue prejudice and, in fact,

2          none has been argued.

3                     So, with all that said, People's 24 will be

4          received into the record at this time.  To the extent that

5          the parties believe there should be redactions made in

6          there, those must be made, of course, before the documents

7          are shown to the jury.

8                     (Proceedings continue in open court as follows:)

9                     THE COURT:  People's 24 will be received into

10         the record at this time.

11    (People's Exhibit 24 marked for identification received in

12    evidence and marked People's Exhibit 24 in evidence.)

13         Q.   Okay, going back for just a moment.  Dr. Klein, would

14    you agree that you cannot say that the bleeding in the brain

15    did not come from trauma?  Would you agree with that?

16         A.   There are two negatives in there.  Could you give me

17    a direct question?

18         Q.   Yes.  The bleeding in ███████'s brain could have come

19    from trauma; correct?

20         A.   Well, as I mentioned, I have no expertise, and you

21    pointed that out, in head trauma.  So, I would not give a

22    statement about that.

23         Q.   So, it could have come from trauma?

24         A.   I said --

25                     MR. COFFEY:  I object.  This is the fourth time

1          she's asked this question.  I object.

2                    THE COURT:  Overruled.

3     A.   I would not opine on that.

4     Q.   So, you don't know?

5                    MR. COFFEY:  That's the fifth time.  I object.

6     A.   I won't give an opinion.

7                    THE COURT:  Overruled.

8     Q.   So, you don't know?

9                    MR. COFFEY:  That's the sixth time.  I object.

10                   THE COURT:  Hold on, Doctor.  No.  The topic has

11    been covered.  The objection is sustained.

12    Q.   And Doctor, would you agree that, even if the

13    bleeding in the brain came from coagulopathy, there has to be

14    some force to that particular area that resulted in or caused

15    the bleeding?

16    A.   No.

17    Q.   You would not agree with that?

18    A.   No.  The coagulopathy is part of inflammation in the

19    vessels caused by the infection and the inflammation leads to

20    either obstruction, in which case there may be death in the

21    tissues around it, or it can lead to a rupture of the vessels.

22    So, it doesn't need a precipitating factor.  The infection is

23    the precipitating factor.

24    Q.   Now, the bleeding in ████'s heart, that could be

25    explained by anoxia; correct?

*(Klein - Defendant - Cross)*

1      A.   All I know is there was bleeding.  I don't know the

2  various pathologic elements that cause bleeding and whether

3  anoxia is one.  So, I don't know.

4      Q.   So, you can't say whether or not the anoxia could

5  have caused the bleeding in the heart?

6      A.   All I can say is that there was bleeding in several

7  organs; and whether the heart had a special additional factor,

8  I wouldn't be able to say.

9      Q.   Therefore, you cannot say that DIC caused the

10  bleeding in the heart.  Is that correct?

11      A.   No.  There was bleeding in the heart.

12      Q.   So, you cannot say that DIC caused it?

13      A.   It was consistent with DIC.

14      Q.   But you can't say that DIC caused it.  Is that

15  correct?

16      A.   Well, if you have DIC and you have bleeding, then

17  it's reasonable, to a medical degree of certainty, that they

18  are associated.

19      Q.   But you can't say whether or not anoxia could have

20  caused it?

21      A.   I think it's more likely, having had the DIC and you

22  have bleeding, that the DIC caused it.

23      Q.   Did you look at slides of the heart?

24      A.   No.

25      Q.   Do you know that it's a common agonal event of people

1   that have anoxia to get that bleeding to the heart?

2        A.   I'm not a pathologist, so I would not know that.

3        Q.   Okay.  So, not being a pathologist, you really don't

4   know if that bleeding in the heart could have been caused by

5   anoxia as a common agonal event.  Is that correct?

6        A.   All I know is that there was bleeding in the heart

7   and he had clotting problems.

8        Q.   So, would you agree with my statement that, not being

9   a pathologist and not being familiar with that event, you can't

10  say whether or not anoxia could have caused that bleeding in

11  the heart.  Is that correct?

12       A.   All I can say is there was an infectious element and

13  there was bleeding.

14       Q.   Okay.  If you could just answer what I asked you,

15  which is --

16            MS. BOOK:  Could you read that back, Judy,

17       please?

18            (Whereupon, the pending question was read back

19       by the Reporter.)

20       A.   I can only answer to the infectious disease issues.

21       Q.   So, no, you can't say whether or not anoxia caused

22  the bleeding in the heart?

23       A.   I would not opine on other than infectious disease

24  issues.

25       Q.   Okay.  Now, Dr. Klein, are you being compensated for

*(Klein - Defendant - Cross)*

1    your time here today?

2         A.   For the last couple of days, yes.

3         Q.   Okay.  And how much are you being compensated?

4         A.   In toto, for review of the medical records, for

5    discussions with the attorneys, for travel, for yesterday and

6    today, $7500.

7         Q.   Okay.  And have you made any notes?

8         A.   I have.

9         Q.   And have all of those notes been turned over to me?

10        A.   They have.

11        Q.   How many times have you met with the defense in this

12   case?

13        A.   Once in Boston and once this morning.

14        Q.   And have you had any telephone conversations?

15        A.   No.

16        Q.   And do you keep current on your board certification,

17   or were you grandfathered in?

18        A.   I'm grandfathered.

19        Q.   Okay.  Do you voluntarily sit for any new boards to

20   prove that you are still current?

21        A.   No.

22        Q.   Doctor, you are quite active in the world of

23   vaccines.  Is that correct?

24        A.   Yes, it is.

25        Q.   Okay.  With the power of vaccines now, would you

1   agree with me that we really aren't seeing babies die of strep

2   pneumo any more?

3        A.   Well, we are not seeing babies die if they have had

4   adequate immunizations.

5        Q.   Okay.

6        A.   And one immunization is just not enough.

7        Q.   So, how many deaths did you see this year of babies

8   that only had their first vaccine of strep pneumo?

9        A.   None.

10       Q.   How many did you see last year?

11       A.   I would have to go back and look.  We keep track.

12       Q.   Do you remember any offhand?

13       A.   Yes.  There were deaths and they were -- if we go

14   back to, say, 2010, when the new vaccine was introduced, there

15   were deaths due to types of pneumococcus that were not in the

16   vaccine.

17       Q.   So, types that were not in the vaccine.  But what I'm

18   asking about is:  How many babies do you see dying from strep

19   pneumo because they only got one shot at two months and they

20   hadn't had the next three yet?

21       A.   I can't give you an answer to that.

22       Q.   Okay.  Now, you stated that you would know of no

23   reason why trauma would cause sepsis?

24       A.   Correct.

25       Q.   Okay.  And you stand by that statement?

*(Klein - Defendant - Cross)*                                    958

1          A.   Of course.

2          Q.   Now, is surgery trauma to the body?

3          A.   Not if you are a good surgeon.

4          Q.   So, your statement as a medical professional that a

5    person going through a surgery - let's say an open heart

6    surgery - if you have a good surgeon, that's not trauma to the

7    body?

8          A.   Not if he's really good.

9          Q.   Doctor, are you really sitting on the stand

10   testifying that open heart surgery is not trauma to the body?

11         A.   Well, you know, the term trauma to me assumes that

12   there's an element of force involved.  I think a good surgeon

13   can be without that element of force.

14         Q.   So, you want us all to believe that if someone lays

15   on a table and I cut their chest open - not me, but a good

16   doctor - cuts their chest open, you know, goes in and does

17   something to their heart, their body has suffered no trauma.

18   That's your testimony?

19         A.   Yes.

20         Q.   You want to stick by that?

21         A.   Yes.

22         Q.   Okay.  So, why is it that they give you antibiotics

23   after surgery?

24         A.   If they are good surgeons, they give you antibiotics

25   only during the surgery.  They don't follow up with

1    antibiotics.

2         Q.   Okay.  Why do they give you antibiotics during the

3    surgery?

4         A.   It's just to assure that there's no bugs that gain

5    access.

6         Q.   Why would a bug gain access?

7         A.   Well, it might float through the air.

8         Q.   So, a bug might just float through the air in the

9    sterile surgery room?

10        A.   Remember, the room isn't sterile.  The surgeon is

11   sterile.

12        Q.   The surgeon is sterile, gowned up, masked up,

13   scrubbed for the appropriate amount of time, wearing masks and

14   gloves and all that, but the only reason they give you

15   antibiotics is because a bug might float through the air in the

16   surgery room?

17        A.   Surgeons do not like to have infections.  So, they go

18   overboard.  My opinion is they don't need it.

19        Q.   Okay.  Your opinion is if someone has open heart

20   surgery, they don't need antibiotics?

21        A.   Correct.

22        Q.   Okay.  So, the conscientious surgeons that give the

23   antibiotics, the reason they give it is because they want to

24   prevent a wound infection; correct?

25        A.   They don't want it on their list.  When you say

1    conscientious, I'm not sure what that means.  But the fact is

2    that a good surgeon has no infectious disease complications and

3    didn't need antibiotics.

4        Q.   Okay.  Well, the reason that a person is given

5    antibiotics is to prevent a wound infection.  Is that true?

6        A.   You mean in surgery?

7        Q.   In surgery or after the fact?

8              MR. COFFEY:  I'm going to object to the

9        relevance because we are not dealing with open heart

10       surgery here.

11             THE COURT:  Overruled.

12       A.   Would you say that again?

13       Q.   Sure.  You are giving antibiotics because you want

14   the person to not get a wound infection.  Is that correct?

15       A.   In cardiac surgery?

16       Q.   In any kind of surgery.

17       A.   Well, you don't need it in most kinds of surgery, if

18   you have clean areas that you are going into.  The heart is

19   clean.  The bowel is not.  But heart surgery, they don't need

20   antibiotics.  They probably use them for belt suspenders.

21       Q.   What would be a serious consequence of a wound

22   infection?

23       A.   Where?

24       Q.   On a person's body.

25       A.   Anywhere?

1    Q.   Yes.

2    A.   So, give me an idea of what kind of a wound you are

3    talking about.

4    Q.   If someone had a wound to their leg that got severely

5    infected, what could be a consequence of that?

6    A.   So, this is a wound that already has got infected?

7    Q.   Yes.

8    A.   Well, it would depend on the bug.  There's some bugs

9    that produce toxins.  It could be very serious.

10   Q.   Could it result in sepsis?

11   A.   It could.

12   Q.   Okay.  So, if I got a gunshot wound to my leg that

13   got infected and resulted in sepsis, is it your testimony that

14   the trauma of the gunshot wound did not result in sepsis?

15   A.   Well, you said the gunshot wound already got

16   infected.

17   Q.   Yes.

18   A.   Well, if you were so unlucky, one, to have a gunshot

19   wound; two, if it got infected; and three, you might have

20   consequences from that infection.

21   Q.   Okay.  So, my question is:  Are you saying that the

22   trauma of the gunshot wound did not lead to me getting sepsis?

23   A.   Yes.  And the reason is - and it's very interesting -

24   gunshot wounds are usually clean.

25   Q.   Okay.  So, if I had my leg bit off by a shark --

1        A.   By a what?

2                  MR. COFFEY:   Judge, we have gone from open heart

3        surgery to being bitten by a shark.  I object.

4                  THE COURT:   I understand the point she's trying

5        to make.  The objection is overruled.

6        Q.   If a shark bit off my leg and then it got infected

7   and then I got sepsis.

8        A.   Yes.  Well, we would want to know what kind of shark

9   and what kind of flora was in the shark's mouth that led to

10  infection, because they could have special bugs, and I have no

11  experience in sharks.

12       Q.   Okay.  Well, Doctor, are you saying that the trauma

13  of me being bitten by a shark did not lead to me getting

14  sepsis?

15       A.   Well, if we take the assumptions that you are

16  providing - that, number one, you got bitten by a shark; number

17  two, that the shark bite got infected and that that infection

18  could spread and cause sepsis - that would be true.

19       Q.   So, the trauma of the shark bite did lead to sepsis?

20       A.   No.  The trauma -- the way you presented it.  The

21  trauma of the shark bite, and then you said it became infected,

22  and that infection then could go into the bloodstream.

23       Q.   Okay.  But the infection --

24       A.   And you would die.

25       Q.   But the infection became because of the shark bite

1    which was the trauma; correct?

2          A.   Well, the shark bite is traumatic, yes.

3          Q.   Okay.

4          A.   Any other rounds?

5          Q.   I think I'm done.  Thank you.  Isn't sepsis still

6    responsible for a large amount of illness and death in

7    hospitalized patients who first suffered a trauma?

8          A.   I'm sorry.  Would you say that again?

9          Q.   Yes.  Isn't sepsis still responsible for a large

10   amount of illnesses and deaths in hospitalized patients who

11   have first suffered a trauma?

12         A.   Well, it depends on the extent of the trauma and on

13   the resuscitation efforts that are required.  So, let's say

14   that you had a trauma that led to respiratory arrest and you

15   had to be intubated.  Intubation is accompanied by infections

16   that might lead to sepsis.

17         Q.   Okay.  So, that would be a person who first suffered

18   from a trauma and then it led to sepsis?

19         A.   Yeah, but it wasn't the trauma.  It was the

20   resuscitative efforts that led to the introduction of the

21   organisms.

22         Q.   That's a pretty myopic view of it; isn't it, Doctor?

23         A.   Myopic?

24         Q.   Aren't you looking at it pretty small?

25         A.   I think I'm looking at it pretty large.

1          Q.   Okay.  Now, I want to talk to you about pneumonia for

2     a minute.  If a person is unconscious, they could potentially

3     develop pneumonia; couldn't they?

4          A.   That would be by means of aspiration.

5          Q.   Okay.  Now, talking about aspiration, what you have

6     stated, it sounds like it's your belief that for a person to

7     aspirate, it must be on something, such as a piece of food or

8     something like that.

9          A.   It's a foreign body, yes.

10         Q.   Okay.  So, do you disagree or -- you don't like

11    double negatives.  Let me rephrase it.  Can someone aspirate on

12    their own saliva?

13         A.   No.

14         Q.   So, it's your opinion that someone cannot aspirate on

15    their own saliva?

16         A.   Correct.

17         Q.   What about on their own spit-up?

18         A.   No.

19         Q.   Cannot aspirate on their own spit-up?

20         A.   Well, I assume spit-up and saliva are the same thing.

21         Q.   Okay.  So, if someone swallows secretions in their

22    mouth and it gets down into their lungs, that's not aspirating?

23         A.   Correct.  Well, it's a normal phenomena.  We are

24    all -- you may, say, choke on -- even swallowing a drink,

25    sometimes there will be coughing.  That's easily resolved by

1    the defense mechanisms in the lung.

2         Q.   Okay.  What about when I'm just standing here and I

3    swallow wrong and I go into a coughing spell.  What did I just

4    do?

5         A.   You will be okay.

6         Q.   Okay.  But what did I just do?

7         A.   Well, I would assume that there was something that

8    stimulated you to cough, but it's not going to lead to any

9    consequences.  You will still be here.

10        Q.   So, are you saying that I can't swallow saliva down

11   into my lungs?

12        A.   I'm saying it has no consequences for you.

13        Q.   Okay.  So, it's not physically impossible to swallow

14   saliva down into my lung?

15        A.   Well, it's not -- we are probably all doing it all

16   the time and there are no consequences.

17        Q.   Okay.  If I swallow it and I start coughing really

18   hard --

19        A.   Yes.

20        Q.   And say there was bacteria in my mouth, what then?

21        A.   Well, there are bacteria in your mouth.

22        Q.   Okay.

23        A.   So, it's a natural phenomena and it's easily cleared.

24   We have cilia that bring up that kind of material.  Otherwise,

25   we would all be dead.

*(Klein - Defendant - Cross)*

1    Q.   Well, what if there was strep pneumo in my mouth and

2    I swallowed?

3    A.   Same thing.  We all have had or have even now strep

4    pneumo.

5    Q.   So, you are saying – it's your testimony – that it's

6    impossible to get strep pneumo by swallowing your own

7    secretions down into your lungs?

8    A.   Well, there's an element of truth, but not much, in

9    what you are saying.  So, the way that we get pneumonia is the

10   organisms gain access to the lungs.  It gains access to the

11   sinuses and to the ears by this thread from the organism to the

12   respiratory tract.  I won't call that aspiration.  I would call

13   that a normal mechanism of pneumococcus getting into the lung.

14   It's not aspiration.

15   Q.   So, you agree it can just get in there naturally?

16   A.   Yes.

17   Q.   All right.  And the strep pneumo that ███████ had,

18   that's the kind that's commonly found in our airways, anyway;

19   correct?

20   A.   Well, it's commonly found in infants and

21   particularly, as we discussed before, infants in day-care

22   centers.

23   Q.   Okay.  And that's not the kind that's found on our

24   skin, though, a staph virus; correct?

25   A.   No.  Staph is a different organism.

*(Klein - Defendant - Cross)*

1  Q.   Okay.  The one that ███████ had is the one that's

2  commonly already found within your respiratory tract; correct?

3  A.   Respiratory tract, yes.

4  Q.   Okay.  Do you agree that subdural hematomas in the

5  absence of major trauma, such as a car accident or a long fall,

6  are usually the result of abuse?

7  A.   I have no opinions about those events.

8  Q.   Do you agree that ███████'s retinal hemorrhages could

9  be the result of abuse?

10  A.   Um, I'm not an abuse expert, so I can't answer that.

11  Q.   Well, do you agree that there's a large correlation

12  between subdural hematomas and retinal hemorrhages?

13  A.   I can't answer that.

14  Q.   Okay.  Do you agree that there's a large correlation

15  between head trauma and retinal hemorrhages?

16  A.   The same.

17  Q.   Do you agree that a low temperature could be a result

18  of a head trauma?

19  A.   The vital signs, which include temperature and

20  respiratory rate, are governed by events in the brain.  So,

21  anything that's disturbing in the brain could affect those

22  vital signs.

23  Q.   So yes, you agree with me?

24  A.   I do.

25  Q.   Do you agree that low blood pressure could be the

1  result of a head trauma?

2      A.   Well, only if it has a significant event in the

3  brain.

4      Q.   Okay.  So, if it has a significant result in the

5  brain, such as large bilateral subdural hematomas, that could

6  be the result of a head trauma?

7      A.   Well, I wouldn't opine about specifics, but vital

8  signs are governed by centers of the brain.

9      Q.   Do you agree that a low platelet count could be the

10  result of a head trauma?

11      A.   No.

12      Q.   Okay.  Do you agree that an impaired gag reflex could

13  be the result of a head trauma?

14      A.   If you are unconscious, of course, you would have a

15  depressed gag reflex.

16      Q.   And in fact, DIC, which you testified about, that's

17  associated with head trauma; isn't it?

18      A.   CI what?

19      Q.   DIC that you testified about, DIC?

20      A.   Oh, DIC?

21      Q.   Yes.  That's associated with head trauma; isn't it?

22      A.   Not that I'm familiar with.

23      Q.   Isn't there a lot of publications on that?

24      A.   Well, I know of one, which was inadequate.

25      Q.   You know of one publication?

*(Klein - Defendant - Cross)*

1    A.   Well, I have been given Dr. Jenny's 1997 publication

2    which was retrospective.  She presents a hypothesis.

3         MS. BOOK:  May I get this marked?

4    (Medical Literature marked People's Exhibit 25 for

5    identification.)

6    Q.   Doctor, I'm going to hand you People's 25 for

7    identification.  Let me show you another.  Does that article

8    appear to be about DIC and head trauma?

9    A.   Well, it's a 2008 article, and I would have to read

10   it to know whether it's an adequate scientific research.

11   Q.   Okay.  But does it appear to be about DIC and head

12   trauma?

13   A.   That's the article, "Coagulation disorders after

14   traumatic brain injury."

15   Q.   So, there's at least two papers published on it now;

16   correct?

17        MR. COFFEY:  I object to this.  It's not in

18        evidence.

19   A.   Well --

20        MR. COFFEY:  Doctor, please.  I object to him

21        referring to it.  It's not in evidence.

22        MS. BOOK:  Your Honor, I'm not reading from it.

23        MR. COFFEY:  Well, it has the same effect.  He's

24        talking about the specifics of the article, Judge.

25        THE COURT:  The objection is sustained.  The

*(Klein - Defendant - Cross)*                                          970

1          point has been made.

2          Q.   Thank you.  So, Doctor, as part of your practice, you

3     study DIC; correct?

4          A.   I do.

5          Q.   Okay.  And it's your testimony here today that you

6     are not familiar with DIC being associated with head trauma?

7          A.   The only article that I'm familiar with is the 1997

8     article by Dr. Jenny in which she raises a hypothesis, so a

9     possibility, and her conclusion is that it needs more work.

10    Now, whether this represents more work, I don't know.

11         Q.   Well, are you aware that an injury to the brain can

12    release chemicals in the blood that affect its clotting

13    properties?

14         A.   No.

15         Q.   You don't agree with that?

16         A.   I don't know that.

17         Q.   Okay.  Well, do you agree with that?

18         A.   I'm not familiar with what you are referring to, so I

19    don't know.

20         Q.   Okay.  Well, do the cells that respond naturally to

21    the areas of head trauma, do they produce substances that

22    attract other inflammatory cells?

23         A.   No.

24         Q.   How do cells communicate with each other?

25         A.   You know, that's an interesting scientific question,

1    where viruses can communicate; bacteria can communicate; people

2    can communicate.  I'm not sure exactly where you are going with

3    this.

4         Q.   Okay.  Well, would cells recruit other cells to come

5    to sites of injury?

6         A.   Yes.

7         Q.   Okay.  Now, DIC --

8         A.   CID?

9         Q.   DIC.

10        A.   DIC, right.

11        Q.   I'm not familiar with CID.  DIC, are certain organs

12   more susceptible to DIC?

13        A.   I'm sorry?

14        Q.   Are certain organs more susceptible to DIC?

15        A.   Um, well, in particular, we worry about the adrenal

16   glands; and often, in overwhelming sepsis, the adrenal glands

17   are particularly susceptible and develop hemorrhage.

18        Q.   And what about hollow organs?  They are also

19   particularly susceptible; aren't they?

20        A.   I don't know that.

21        Q.   So, you studied --

22        A.   You mean like the intestine?

23        Q.   Like the kidney?

24        A.   I'm not aware of that.

25        Q.   So, you study DIC and you are not aware of whether or

1    not a kidney is more or less susceptible to it?

2         A.   Correct.

3         Q.   Okay.  Well, if DIC was taking over someone's body,

4    would you expect it to affect their kidney?

5         A.   As one of many organs.

6         Q.   And would you expect it to affect their liver?

7         A.   The same.

8              MS. BOOK:  May I approach, Your Honor?

9              THE COURT:  What do you have in your hand?

10             MS. BOOK:  People's Exhibit 24 in evidence.

11             THE COURT:  May I see that for one moment again,

12        please?

13             MS. BOOK:  Yes, sir.

14             THE COURT:  You may continue.

15             MS. BOOK:  Thank you, Your Honor.

16        Q.   Doctor, I'm going to hand you what's in evidence as

17   People's Exhibit 24.  These are the transplant and donor

18   records of ▮▮▮▮▮▮▮.  And specifically, I'm going to ask

19   you to look at the liver data and the renal data at the time of

20   transplant.

21        A.   Okay.

22        Q.   And those records indicate that there were no

23   problems with those organs?

24        A.   They were accepted for transplant.

25        Q.   Okay.  Is it okay if I stand up here with you?

*(Klein - Defendant - Cross)*

1          A.   Sure.

2          Q.   So we can both look at this.  Okay.  First referring

3     to the liver data, it says, "anatomic abnormality, no."

4     Correct?

5          A.   Yes.

6          Q.   "Surgical damage, no."  Correct?

7          A.   Yes.

8          Q.   "Capsular torn, no."  Correct?

9          A.   Yes.

10         Q.   "Hematoma, no."  Correct?

11         A.   Yes.

12         Q.   And it was accepted for transplant?

13         A.   It was.

14         Q.   Now, with respect to ████████'s kidney, it says --

15    with both the right and the left, we have some data.

16    "Infarcted areas on the right, no; on the left, no."  Is that

17    correct?

18         A.   It is.

19         Q.   "Capsular tear on the right, no; on the left, no."

20    Is that correct?

21         A.   It is.

22         Q.   "Subcapsular hematoma on the right, no; on the left,

23    no."  Correct?

24         A.   It is.

25         Q.   "Cyst discoloration on the right, no; on the left,

*(Klein - Defendant - Cross)*                                    974

1     no."  Correct?

2         A.   It is.

3         Q.   And that was also accepted for donation; correct?

4         A.   I assume so.

5         Q.   Okay.  In your experience, is it common for someone

6     who has overwhelming septic shock to have their organs

7     harvested for donation?

8         A.   If they are thought to be in as good health as these

9     organs are and the bacterial infection disease is easily taken

10    care of for transplant with antibiotics that destroy the

11    bacteria.

12        Q.   Is it common?

13        A.   I'm not in the transplant business.  So, I can't tell

14    you that.

15        Q.   Did you previously testify that it was not common?

16        A.   If I did, it would still be that I'm not familiar

17    with transplants.

18        Q.   Okay.  Doctor, do you remember being asked this

19    question and giving this answer:

20             "Question:"  --

21             MR. COFFEY:  What page?  Excuse me.

22             MS. BOOK:  I'm sorry.  2023.

23             MR. COFFEY:  Okay.  I have it.  I'm sorry.  I

24    apologize.  I'm ready.

25        Q.   "Question:  And would it be common for someone with

*(Klein - Defendant - Cross)*

1    overwhelming septic shock to have their organs harvested for

2    donation?

3              "Answer:  No."

4         A.    Right.  They would have to be treated to be

5    acceptable for the organ.  So, the way your question was asked

6    six years ago or five years ago, it didn't include the fact

7    that the patient had been treated adequately so that the organs

8    were acceptable.

9         Q.    So, you didn't know that fact back then?

10        A.    That's not a part of your question.

11        Q.    Were you aware of the fact that the patient had been

12   treated?

13        A.    Well, by the time the patient had died, he had been

14   treated for several days.

15        Q.    And were you aware of that five years ago?

16        A.    That the patient had been treated?

17        Q.    Yes.

18        A.    Of course.

19        Q.    And are you aware that there was a successful kidney

20   transplant here?

21        A.    No.

22        Q.    Are you aware that there was a successful liver

23   transplant here?

24        A.    No.

25        Q.    In your experience, is that consistent with a body

1    that's being ravaged and bleeding all over that died a death of

2    overwhelming septic shock complicated by DIC?

3         A.   Number one, I don't go into organs that are

4    transplanted.  That's not an area that they would consult me

5    on.  Number two, if the organ would be examined, as these were,

6    and if they were acceptable, then they would be available to

7    help somebody else.

8         Q.   Well, Dr. Klein, you are an infectious disease

9    doctor; correct?

10        A.   Correct.

11        Q.   I'm assuming that infectious diseases can affect the

12   kidney; right?

13        A.   They can.

14        Q.   They can affect the liver; right?

15        A.   Of course.

16        Q.   And you are aware that Dr. Sikirica, the medical

17   examiner, did a full autopsy here; correct?

18        A.   Yes.

19        Q.   And you didn't find any deficiencies in his report;

20   correct?

21        A.   Oh, I did, because his report didn't give sufficient

22   emphasis to the overwhelming pneumococcal sepsis.

23        Q.   Okay.  So now you found deficiencies in his report?

24        A.   I'm sorry?

25        Q.   Now you did find deficiencies in his report?

*(Klein - Defendant - Cross)*

1      A.    Yes.

2      Q.    Okay.  Do you agree that, when you testified in the

3    previous proceeding, you did not find any deficiencies in his

4    report?

5      A.    My prior testimony was the same as my testimony

6    today.

7      Q.    I'm at Page --

8      A.    That the baby died of overwhelming sepsis.  Dr.

9    Sikirica did not have that on his list initially at the top of

10   it, and he's testified this morning that trauma was the cause

11   of the baby's death; and he's wrong, in my opinion.

12     Q.    Okay.  I'm at Page 2021.

13          "Question:  Okay.  In fact, there was a medical

14   examiner in this case who did a full autopsy.  You reviewed

15   that report; correct?

16          "Answer:  I did.

17          "Question:  Find any deficiencies there?

18          "Answer:  No.  I took the report at face value."

19          Do you remember being asked those questions and

20   giving those answers?

21     A.    No.

22     Q.    And although Dr. Sikirica's report doesn't mention

23   the word sepsis, he doesn't disagree that sepsis is there; does

24   he?

25     A.    Well, listening to his testimony this morning, he

*(Klein - Defendant - Cross)*                                978

1    considers it, what I understood, to be a contributing factor.

2        Q.   Okay.  And five years ago, you knew he considered it

3    to be a contributing factor; correct?

4        A.   I don't recall that testimony.

5        Q.   Okay.  Well, do you -- I'm on the same page.  Do you

6    recall being asked this question and giving this answer:

7             "Question:  And although it doesn't mention the word

8    sepsis, the medical examiner doesn't disagree that sepsis is

9    there?

10            "Answer:  No.  And he identifies the positive blood

11   culture."

12            Do you remember being asked that question and giving

13   that answer?

14       A.   Well, I would give the same answer today.  He does

15   mention the positive blood culture.

16       Q.   Okay.  So, he did mention that sepsis is there and

17   the -- without using that word, and then mentions the positive

18   blood culture; correct?

19       A.   If you recall -- you got it.  It's number eight.  I

20   put it number one.

21       Q.   Okay.  But Dr. Sikirica was aware of this information

22   when he made his findings; correct?

23       A.   He seems to be giving it limited importance.

24            MS. BOOK:  May I approach, Your Honor?

25            THE COURT:  You may.

*(Klein - Defendant - Cross)* 979

1   Q.   Now, I want to show you People's 18 in evidence.   Do

2   you recognize this?

3   A.   I remember seeing the picture.

4   Q.   Okay.  And are you able to tell us what's depicted on

5   that photograph?

6   A.   It's a picture of the brain with the skin pulled

7   back.  So, it reveals what appears to be the covering of the

8   brain or dura, and there seems to be blood spots.

9   Q.   Okay.  And five years ago when you were shown that

10  picture, do you recall that you couldn't identify anything

11  about that picture?

12  A.   You mean like zero?

13  Q.   Well, do you recall that you were not able to

14  recognize it as a subgaleal hemorrhage?

15  A.   Well, I probably would not identify it specifically

16  now, either.

17  Q.   Okay.

18  A.   And as you pointed out, I'm not a pathologist.

19  Q.   Okay.  Well, do you agree that five years ago, you

20  could not recognize anything on there as a subgaleal

21  hemorrhage?

22  A.   I only see a couple of blood spots.  I couldn't tell

23  you where they were.

24  Q.   Okay.  So, could you identify the subgaleal

25  hemorrhages for us or could you not?

1        A.   I would not.

2        Q.   If I showed you the CAT scan images of ██████ 's

3   head, could you point out the subdural hematomas and the bleeds

4   for us?

5        A.   No.

6        Q.   So, you are not qualified to look at pictures of the

7   CAT scans or the brain and make a diagnosis for us?

8        A.   I have no expertise beyond the general pediatrician.

9        Q.   So, then, Doctor, you cannot state, to a reasonable

10  degree of medical certainty, that ██████ did not suffer from

11  inflicted trauma; can you?

12       A.   Well, as we discussed, I am not offering an opinion

13  on trauma or the pathology of the brain.

14       Q.   When you make a diagnosis on someone, is it important

15  to rule out other causes of disease or injury?

16       A.   It depends.  If you have overwhelming evidence of

17  sepsis, as in this child, and overwhelming information about

18  the result of death caused by sepsis, then that's your

19  identifiable entity in terms of the cause of death and the

20  organism that caused the death.

21       Q.   Okay.  But you make that opinion as not a

22  pathologist; correct?

23       A.   As an infectious disease person.

24       Q.   Okay.  And as someone who cannot recognize the

25  subgaleal hemorrhage, even to the brain, in that picture?

1              MS. BOOK:  Well, I have more five more important

2       ones.  If he's here for a period of time, then I think I

3       might have a few more.

4              MR. COFFEY:  Let me just interrupt that and

5       stop.  No, it's not my position.  I may be another hour of

6       redirect.

7              THE COURT:  Well, Dr. Klein is present.  So, I'm

8       not going to restrict the examinations.  You can proceed

9       as normal.  Dr. Klein, may I have you retake the witness

10      stand?  Thank you.  Bring the jury in, please.

11             COURT OFFICER:  All rise.  Jury entering.

12             THE COURT:  Please be seated.  Members of the

13      jury, good morning.  Welcome back.  We are going to resume

14      with the trial testimony at this time.  I will remind you

15      that the sworn witness remains Jerome Klein.

16             Doctor, I will remind you that you are still

17      under oath.  Ms. Book, you may continue your

18      cross-examination.

19             MS. BOOK:  Thank you, Your Honor.

20      **CROSS-EXAMINATION**

21      **BY MS. BOOK:   (Continuing)**

22      Q.  Good morning, Dr. Klein.

23      A.  Good morning.

24      Q.  I think that we left off looking at the photographs

25      of the subgaleal hemorrhage, if I'm correct.  Does that seem to

*(Klein - Defendant - Cross)*                                    998

1    be your memory?

2         A.   Well, it seems that that was much earlier.

3         Q.   It does?

4         A.   I think so.

5         Q.   What is your recollection about where we left off?

6              MR. COFFEY:  Object as irrelevant.

7              THE COURT:  Sustained.

8              MS. BOOK:  Judge, could we turn this T.V. off?

9    It's a little bit distracting.

10             THE COURT:  Sure.

11        Q.   All right.  Doctor, can you say, to a reasonable

12   degree of medical certainty, that ███████ did not suffer from

13   inflicted head trauma?

14             MR. COFFEY:  I object to this.  It's been asked

15        and answered repeatedly yesterday.

16             THE COURT:  Didn't you cover this, Ms. Book?

17   The objection is sustained.

18        Q.   Okay.  Doctor, you don't know when ███████ got the

19   subdural hematomas; do you?

20             MR. COFFEY:  Objection.  He never testified he

21        had a subdural hematoma.

22             THE COURT:  The objection is overruled.

23        A.   It's not in my area of expertise.

24        Q.   So, you would agree that you don't know when ███████

25   got the subdural hematoma?

*(Klein - Defendant - Cross)*                     999

1          MR. COFFEY:  Objection.

2     A.   I would not.

3          THE COURT:  Overruled.

4     Q.   So, you would have to agree with me, then, that it's

5     possible that the subdurals came before he even had a problem

6     clotting his blood; correct?

7          MR. COFFEY:  Object to the facts stated in that

8          question.  It assumes that this doctor agrees that there

9          was a subdural.  I object to this.

10         THE COURT:  Overruled.

11    A.   I have no opinion, based on the absence of expertise,

12    in subjects of intracranial events.

13    Q.   So --

14    A.   Other than infection.

15    Q.   Okay.  So, therefore, you don't know whether or not

16    the subdurals came first or the problem clotting his blood came

17    first.  Is that correct?

18    A.   I only know the infectious disease elements.

19    Q.   Okay.  So, you would agree with me, then, that you

20    don't know whether or not the subdurals came first or the blood

21    clotting problem came first?

22         MR. COFFEY:  Objection.  Once again, it assumes

23         facts that this doctor does not accept.

24         THE COURT:  Overruled.

25    A.   It's not in my area of expertise.

*(Klein - Defendant - Cross)*                    1000

1      Q.   So, you would agree with me?

2      A.   I would stand by my statement.  I'm not sure whether

3   that agrees or not.

4      Q.   Okay.  So, you don't know whether or not the subdural

5   hematoma came first or the problem clotting his blood came

6   first?

7                MR. COFFEY:  Object to this as repetitious.

8           This is the fourth time this question was asked.

9                THE COURT:  Sustained.

10     Q.   Now, when ███████ went to Samaritan Hospital, he had

11  a platelet count of 115,000.  Isn't that correct?

12     A.   That is.

13     Q.   Now, while low, that's sufficient to clot blood;

14  isn't it?

15     A.   It is.

16     Q.   Okay.  Now, are you aware of what his next clotting

17  level was or his next - I'm sorry - platelet count was at

18  Albany Medical Center?

19     A.   It went down in several steps, so that within a day,

20  it was 25,000.

21     Q.   Okay.  But it didn't go right from 115 to 25; did it?

22     A.   Well, there was a cessation of platelets being formed

23  so that they kept dropping.

24     Q.   Okay.

25     A.   And I think it was at 70,000 when they measured it;

*(Klein - Defendant - Cross)*                    1001

1    and finally, it was 25,000.  So, that's low.

2         Q.   Okay.  So, when he went to Samaritan at about 9:30 or

3    so in the morning, or whenever it was that they drew his blood

4    at Samaritan -- we know he was only there for two hours.  So,

5    somewhere between about 9:20 and 11:20, he had a platelet count

6    of 115,000; correct?

7         A.   He did.

8         Q.   Now, the next platelet count you remember to be about

9    70,000?

10        A.   I have a sheet that gives you all those factors.

11        Q.   Oh, okay.

12        A.   His platelet counts went down.  There were three

13   measurements.  His platelet count at Samaritan was 115,000.

14   The next measurement at Albany was 44,000.  So, it, again, was

15   falling precipitously, and then 29,000.

16        Q.   Okay.  And even at 44,000, that's still sufficient to

17   clot blood; isn't it?

18        A.   Yes.  I think the important thing is not whether at

19   that point it's sufficient to clot, but the fact that it's just

20   dropping precipitously.

21        Q.   Okay.  Well, my question, though, is at 44,000, you

22   are still clotting blood; aren't you?

23        A.   You can.

24        Q.   Okay.  So, at 115,000, while low, you are clotting

25   blood; correct?

*(Klein - Defendant - Cross)* 1002

1    A.   Yes.

2    Q.   And even at 44,000, while even lower - certainly not

3    a good count - you are still clotting blood; correct?

4    A.   But there are several elements in the clotting

5    mechanism, and those are also dropping.  So, there's various

6    factors in the coagulation process.  Platelets are only one.

7    So, there are other tests; platelet thrombin, that are

8    variously being measured by the physicians, and they are all

9    dropping.

10    Q.   Okay.  Now, do you know what time it was that the

11    measurement of 44,000 came?

12    A.   I didn't put that down in my notes, but it's in the

13    sequence, the first tests that are made at Albany.

14    Q.   Okay.  If I showed you the medical records, could you

15    tell me what time that was taken?

16    A.   If you have the lab sheet, then we can determine

17    that.

18              MS. BOOK:  May I approach, Your Honor?

19              THE COURT:  You may.

20    Q.   I hand you what's in evidence as Defendant's D.

21    These are the records from Albany Medical Center.  If you could

22    take a look through those and tell me when the platelet count

23    occurred.

24    A.   You want me to find the laboratory sheet within this

25    pile of records?

*(Klein - Defendant - Cross)*                    1003

 1          Q.   Are you familiar with looking through medical

 2    records, Doctor?

 3          A.   Well, it will still take me ten minutes.

 4          Q.   Okay.  You have reviewed these records before; right,

 5    Doctor?

 6          A.   I have, but you haven't provided me with a sticky

 7    that would indicate where the laboratory values are.

 8          Q.   Doctor, while you are doing that, may I take a look

 9    at your notes that you are referring to?

10          A.   Yes.  You have a copy of this.  Okay.  So, here we

11    have various blood counts.  9/22 at 1930, the platelet count is

12    eight.

13          Q.   Okay.  Now, on 9/21, do you have what the platelet

14    counts are?

15          A.   9/21, the platelet count is 109 at 2135.

16          Q.   2135.  Now, that's military time; correct?

17          A.   It is.

18          Q.   What time does that come out to be?

19          A.   That's 9:35.

20          Q.   9:35 a.m.?

21          A.   p.m.

22          Q.   p.m.  Okay.  So, at 9:35 p.m. on September 21st,

23    ███████ had a platelet count of --

24          A.   Let me just, if I could --

25          Q.   Sure.

1       A.   Advise them.  On the 21st, earlier, 1725, which is

2   5:25, he had a platelet count of 29,000.  At that point, they

3   gave him platelets.

4       Q.   Okay.

5       A.   So that now you have a factor that would increase the

6   platelets, and it doesn't give you the dynamic of how it had

7   been progressively decreasing.

8       Q.   Okay.  Now, what about the platelet count before

9   5:25?

10      A.   9:21 -- let's see what the values are.  It looks like

11  the earliest value is that 5:25 count, and that's 29,000.

12      Q.   Okay.  There wasn't any earlier count taken at Albany

13  Medical Center?

14      A.   I don't see it.

15      Q.   Where did you get the 40,000 number from that you

16  testified to?

17      A.   That's 9/22.

18      Q.   That's 9/22?

19      A.   Is that what you are referring to?

20      Q.   You said that the first one was 115,000 and then the

21  next one was 40,000?

22      A.   Let's start over, and I will give you the sequence as

23  we've got it here.  There are a lot of platelet counts.

24      Q.   Okay.

25      A.   Should we go through them all?

*(Klein - Defendant - Cross)*                    1005

1    Q.   Yes.  If we are going to do that, let me also give

2    you Samaritan Hospital's labs.  Is this the paper that you

3    need?

4    A.   Pardon me?

5    Q.   Is this the paper that you would need from Samaritan

6    Hospital?

7    A.   Yes, his platelets.

8    Q.   Okay.  Let me put these down, so we don't mix them

9    up.  Let me just give you --

10   A.   That page will be sufficient.

11   Q.   Okay.  There's a few behind it.  Let's just keep

12   these this way, so we don't mix up the records.  So, starting

13   at Samaritan Hospital, then, that pile, can you tell me what

14   his platelet counts were and what times?

15   A.   Platelet count at 9:45 in the morning was 115,000.

16   Q.   Okay.  And that was at Samaritan?

17   A.   Correct.

18   Q.   All right.

19   A.   Now, at Albany, it looks like the first counts that

20   are available to us on 9/21 are at 5:25 in the evening.

21   Q.   Okay.  So, the next one was not taken until almost

22   eight hours later, at 5:25 p.m.?

23   A.   Yes.

24   Q.   And what was that count?

25   A.   29,000.

*(Klein - Defendant - Cross)*                               1006

1      Q.   Okay.

2      A.   So, here you have from 115,000 to 29,000, which is

3   indicative of how the platelets are being used up by the

4   infectious process.

5      Q.   Okay.  I'm glad you brought that up.  So, when you

6   have a platelet count at 9:45 a.m. of 115,000 and then, seven

7   hours and 40 minutes later, you have a platelet count of

8   29,000, those platelets are going somewhere; right?

9      A.   They are being used up.

10      Q.   They are being used up to clot; right?

11      A.   Well, they are lining -- they are part of a process.

12   It's not platelet count alone.  It's all the other factors in

13   the clotting.  What's happening simultaneously is that the

14   small arteries are being lined now with these various

15   processes, including platelets, and that's leading to clotting

16   within the vessels, obstruction; and behind the obstruction,

17   since the blood is constantly pushing against this now closed

18   area, they are either going to rupture or the blood is going to

19   back up and it will be thrombosed, so there will be a clot

20   there.

21      Q.   Okay.  When you still have 115,000, that's sufficient

22   to clot blood; correct?

23      A.   It is.

24      Q.   Okay.  So, at 9:45 in the morning when ████ had a

25   115,000 platelet count, he had sufficient amount of platelets

*(Klein - Defendant - Cross)*                                    1007

1      to clot his blood; correct?

2            A.   Well, it was part of this process, where now they are

3      not only clotting the blood but the arteries are being clogged.

4            Q.   Okay, but if you could stay with my question.  At

5      115,000, he had sufficient clotting ability; correct?

6            A.   There's a number of factors that go into clotting.

7      If you look at the platelets alone at that point, asking the

8      question as you did, platelets alone would be sufficient.

9            Q.   Okay.  And we know that ▮▮▮▮▮ had his CAT scan of

10     his head, where the large subdural hematoma was found and the

11     posterior subdural hematoma was found.  That CAT scan was at

12     12:40 p.m.  Are you aware of that?

13           A.   I am now.

14           Q.   Okay.  So, at 9:40 in the morning, he still had

15     115,000 platelets.  These platelets were going to clot blood.

16     And at 5:20, I think you said - if I have the time right -

17     5:25, he had 29,000.  So, fair to say that ▮▮▮▮▮ was clotting

18     his blood?  Those platelets were going to clot blood during

19     that day?

20           A.   I think you are oversimplifying.  Platelets are not

21     the only factor in the coagulation process; and at this time,

22     there's damage to the vessels and the platelets are being

23     consumed by lining those vessels.  So, if there is a clot

24     that's within the arteries, that is going to lead to bleeding.

25           Q.   Doctor, that number didn't go down from 115,000 to

*(Klein - Defendant - Cross)*                                    1008

1    29,000 in ten minutes?

2        A.   It wasn't ten minutes, as you pointed out.  It was

3    several hours.

4        Q.   Right.  That's because they go down gradually;

5    correct?

6        A.   I'm not sure that I can tell you by hour whether it's

7    a gradual process or, all of a sudden, it's a precipitous

8    process.

9        Q.   Okay.  The reason that they are going down is because

10   they are being used up to clot blood; correct?

11       A.   No.  They are being used up because they are in the

12   vessels where the inflammation is taking place, and they are

13   being taken out of the blood and lining those vessels leading

14   to the potential for bleeding.

15       Q.   Okay.  Well, fair to say that he had enough platelets

16   that he's not bleeding out at this point at 9:20 in the

17   morning; correct?

18       A.   No.  I don't think I could say that.

19       Q.   Oh, you can't say that?

20       A.   No, because you are taking one of many factors in

21   coagulation and that, scientifically, is inappropriate.

22       Q.   Okay.  Well, taking the rest of the factors, can you

23   say?

24       A.   Well, there are a number of studies that are done at

25   Albany that have to do with coagulation, but they had not been

*(Klein - Defendant - Cross)*                                    1009

1     done previously.

2          Q.   Well, I want to talk about at 12:40 that day.

3          A.   I'm sorry.  12:40?

4          Q.   Yes.  I want to talk about whether or not ▮▮▮▮▮ was

5     bleeding out at 12:40 p.m.

6          A.   Could he have been bleeding?  Yes.

7          Q.   Could he have been bleeding out, knowing that he had

8     a platelet count of 115,000 at 9:20 in the morning?

9          A.   What do you mean by bleeding out?

10         Q.   Could he have been bleeding everywhere, or did he

11    have enough platelets to be clotting his blood?

12         A.   Well, platelets are not the only factor in clotting.

13         Q.   That's why I'm asking you about the other factors,

14    Doctor.

15         A.   Unfortunately, this is done much later.

16         Q.   So, your answer is you don't know?

17         A.   No.  As an example --

18         Q.   I'm talking about 12:40.

19              MR. COFFEY:  I believe he should answer this.

20              THE COURT:  Overruled.

21         A.   The platelets are being used as surrogate for

22    clotting, but that would be oversimplifying it.  So, as an

23    example, when he gets to Albany, they do look at a bunch of

24    other factors involved in clotting; platelet thrombin time,

25    different scientific terms, APTT fibrinogen, FTP.  And if those

*(Klein - Defendant - Cross)*                          1010

1    tests had been done earlier, they would have amplified our

2    ability to look at the clotting mechanism.  Platelets are not

3    the only factor.  To think of it as a marker is reasonable.

4    So, we know it went from 115 to 29 in eight hours, but there

5    are, perhaps, 20 factors that are involved in the coagulation

6    process.  They have different names, complement fibrinogen.

7    They are not -- so, platelets are easy tests to run, but it

8    would be oversimplifying to look at platelets alone as to

9    whether the child was bleeding or not.

10       Q.   Okay.  So, the bottom line is you can't tell me, at

11   12:40, what was going on in ████████'s body?

12       A.   I can.

13       Q.   You can tell me?

14       A.   Yes.

15       Q.   Didn't you just tell me that you don't have the

16   information available to you at 12:40?

17       A.   No.  Your question is a general one, do I know what's

18   happening.  And I know that when he arrives at Samaritan, his

19   white count is very overwhelming, low number of a thousand.

20   So, we know that he's being overwhelmed, and his platelets are

21   lagging a little behind, if you took that as the sole criteria,

22   from 115 and there following by going down.  So, eight hours

23   later, it's measured as 29.  So, he's suffering an overwhelming

24   infection.

25       Q.   And he's also suffering from head trauma; correct?

*(Klein - Defendant - Cross)*                    1011

1      A.   No.  I don't know that.

2      Q.   You don't know that?

3           MR. COFFEY:  This is at least a half dozen times

4      that she's asked this question and she's got this answer.

5      I object.  It's repetitious.

6           THE COURT:  The objection is sustained.

7      Q.   Doctor, do you recall the Leary litigation in the

8      early 1990's?

9      A.   The only time I have known about that is when it was

10     brought up at the last trial, and I had never heard of it

11     before but, apparently, it was noted by prosecution that some

12     lawyer had made some identification of issues.

13     Q.   Okay.  Well, do you know that there's -- do you

14     recall testifying in the Leary litigation?

15     A.   No.

16     Q.   All right.  Well, let me see if I can refresh your

17     memory about it.  That litigation was about the DPT shot.  Do

18     you know what that is?

19     A.   I do.

20     Q.   What is it?

21     A.   These were baby shots, up until about 1990, that

22     included -- D for diphtheria; P for pertussis or whooping cough

23     and T for tetanus.  And they were rough vaccines, particularly

24     because the pertussis was a whole cell vaccine.  So, all the

25     stuff in the pertussis organism led to some adverse events,

*(Klein - Defendant - Cross)*                    1012

1    including seizures in one of 1800 children.  Fortunately, now,

2    we have a much finer pertussis vaccine and those adverse events

3    have been eliminated.

4         Q.   Okay.  Well, in that litigation, do you recall that

5    you testified on behalf of the Department of Health and Human

6    Services?

7         A.   I -- well, I don't remember that case.

8         Q.   Okay.

9         A.   But that has been my role.

10        Q.   Okay.  And in that case, a child, two days after he

11   got the third shot of the DPT vaccine, he, unfortunately,

12   passed away?

13             MR. COFFEY:  I would like to approach the bench,

14        if I might.

15             THE COURT:  Attorneys approach.

16             (Sidebar discussion held on the record as

17        follows:)

18             THE COURT:  Go ahead, Mr. Coffey.

19             MR. COFFEY:  Judge, pretrial, there was a ruling

20        by this Court that witnesses were not to be examined about

21        prior testimony.  Specific cases and specific events would

22        not be testified to, and I agreed to that.  So, he

23        wouldn't be able to be asked this question:  "Isn't it

24        right you testified in a case in which Mary Smith beat her

25        children bad and the jury found her guilty?"  This is

*(Klein - Defendant - Cross)*

1    exactly what they are doing now.  They are going to get

2    into this, "The child died and you testified."  I object

3    to this.  I don't mind -- I am not objecting to his

4    testimony.  I do object to the specifics of the child

5    dying.  That is absolutely contrary to what we agreed

6    upon.

7         MS. BOOK:  I think what we agreed upon was about

8    sentences.

9         THE COURT:  No.  That's not it at all.  We also

10   agreed we were not going to go into people being wrongly

11   convicted or serving time because of it.

12        MS. BOOK:  Right.

13        THE COURT:  The question that you just asked is

14   outside the Court's ruling.  It's exactly the type of

15   information that you made a motion to preclude on the

16   defense side and you are now inquiring about.  The

17   objection is sustained.  I'm going to tell the jury that

18   the question -- the objection is sustained and the

19   question is stricken from the record, and I'm going to

20   direct that you move on from that topic.

21        I will also note that, while I'm not restricting

22   your cross-examination, the defense direct examination was

23   about 40 minutes long.  Your cross-examination is now

24   approaching two hours.  You have been going today for

25   almost 40 minutes, and that's after you told me yesterday

*(Klein - Defendant - Cross)*                    1014

1   you had five questions left.

2               MS. BOOK:  Well, I will note for the record that

3   I was going to ask five more in an attempt to wrap it up

4   because I knew the defense had time constraints.

5               THE COURT:  No.  That's not it.  That's not it

6   at all.  You told me, after the jury went home, you told

7   me you only had five left.  You didn't say you had five

8   left to wrap things up.  You told me you only had five

9   questions left, as if to suggest that you could have been

10  done fairly quickly.  I'm not cutting your

11  cross-examination off, but I'm just pointing out the fact

12  that you have been going almost two hours, including 40

13  some minutes today after you told me yesterday you had

14  five questions left.  I am just making a record of that.

15  I'm not restricting your cross-examination, other than to

16  say that I'm sustaining this objection and directing that

17  you move on from this topic.  Attorneys may return to

18  their seats.

19               (Proceedings continue in open court as follows:)

20               THE COURT:  Members of the jury, the last

21  objection was sustained.  As I advised you during my

22  preliminary instructions, a question alone is never

23  evidence.  It is, of course, the question along with the

24  answer; and even though no answer was given to the last

25  question, I am striking the last question.  You are to

1    disregard it.  Ms. Book, you may continue.

2        Q.   Doctor, when you are making a diagnosis, would you

3    agree that it's important to rule out other causes of disease

4    or injury?

5        A.   Well, obviously, you don't -- are able to rule out

6    everything.  So, if you have a child who has a high fever, you

7    are not talking about cancer.

8        Q.   Okay.  But when you are going to opine on a cause of

9    someone's death, is it important to rule out other causes of

10   disease or injury?

11       A.   No.  When you are looking at that circumstance, you

12   put together all the clues, all the information from the

13   history, from the physical examination, from the laboratory

14   tests and, finally, from the autopsy and you come to a

15   conclusion that it probably is A as the likely event; and

16   others are not necessarily excluded, but A is so overwhelmingly

17   evident that that's the diagnosis.

18       Q.   And you are coming to your diagnosis here today,

19   admittedly, without any ability to say anything about ███████'s

20   head trauma; correct?

21       A.   I'm not saying anything about that, that there is

22   head trauma, because I lack the expertise.

23            MS. BOOK:  Thank you.  Nothing further.

24   **REDIRECT EXAMINATION**

25   **BY MR. COFFEY:**

*(Klein - Defendant - Redirect)*                    1016

1      Q.   Doctor, just one or two questions, if I might.

2  Doctor, regardless of the severity of the head injury, does a

3  closed head injury -- do you have an opinion, assuming there's

4  no break in the skin or fracture, if I were to whack my head,

5  can that cause sepsis?

6      A.   No.  Sepsis is caused by, in this case, a bacterial

7  organism.  There's no way the trauma caused this.

8           MS. BOOK:  Your Honor, I'm going to object to

9      ·this.  The Doctor has already testified that he's not

10     qualified to talk about head injury.

11          THE COURT:  Mr. Coffey?

12          MR. COFFEY:  He's not talking about head injury.

13     He's talking about sepsis.

14          THE COURT:  The objection is overruled.

15     Q.   You may continue.

16     A.   Well, the cause of this event was an infection, and

17 it was a tragic circumstance of a child who suffered an

18 overwhelming infection that was evident by the laboratory

19 values when he appeared at Samaritan with a low white count,

20 which meant that the bone marrow was being wiped out and all

21 the other factors that followed, including all the discussion

22 we have had about the decrease in platelets and that he

23 essentially was already gone when he appeared at Samaritan, and

24 ·despite the efforts at Samaritan, at Albany, he could not be

25 revived.

1       Q.   Thank you, Doctor.

2       A.   And this happens.

3                MR. COFFEY:   That's all I have.   Thank you.

4                THE COURT:   Recross?

5                MS. BOOK:   No, Your Honor.

6                THE COURT:   Thank you, Doctor.   You may step

7       down.   Thank you.

8                (Discussion off the record.)

9                THE COURT:   Members of the jury, we are going to

10      take a ten-minute break at this time.   During the break,

11      please don't discuss the case.   Don't form any judgments

12      or opinions.   Don't read, listen or view any media

13      accounts.   Don't conduct any research about this case.   We

14      will take a short break at this time.   Thank you.

15               (Jury excused.)

16               (Brief recess taken.)

17               THE COURT:   Okay.   We are outside the presence

18      of the jury.   Mr. Coffey, do you want to put something on

19      the record?

20               MR. COFFEY:   Thank you.   I have some *Rosario*

21      material from Dr. Barnes that I am providing to Ms. Book.

22      I haven't date stamped pages, but this is *Rosario* material

23      we received from Dr. Barnes, some of which I didn't

24      receive until last night, actually, but nonetheless -- so,

25      I want the record to reflect that I have submitted that.