EXHIBIT "V"

1    forward.  I know it's probably hard when you are kind of

2    kept in the dark and not exactly sure where we are in the

3    progression of this trial, but we are making progress,

4    despite what it may seem like at times, and that's where

5    we are.  So, I wanted to tell you that and thank you very

6    much again for your patience and understanding.

7                 The defense may call its next witness.

8                 MR. COFFEY:  Thank you, Judge.  Dr. Leestma,

9    please.

10   **JAN EDWARD LEESTMA**, after first having been duly sworn by the

11   Clerk of the Court, was examined and testified as follows:

12                 THE CLERK:  The sworn witness is Jan Edward

13   Leestma, L-E-E-S-T-M-A.

14   **DIRECT EXAMINATION**

15   **BY MR. COFFEY:**

16        Q.   Good morning, Doctor.

17        A.   Good morning.

18        Q.   Doctor, would you be kind enough to tell the jury

19   your name and occupation, please.

20        A.   Sure.  My name is Jan Edward Leestma, L-E-E-S-T-M-A,

21   and I'm a physician, a pathologist.

22        Q.   I'm sorry.  You are a what?

23        A.   I'm a pathologist, neuropathologist.

24        Q.   Doctor, where do you presently practice or where is

25   your office?

1    A.   I live and practice in Chicago, Illinois.

2    Q.   And we have done this with every doctor, so I suppose

3    you should be no different.  Tell us a little bit about your

4    educational background.

5    A.   Sure.  I attended Hope College in Holland, Michigan,

6    from 1956 to 1960, and received a Bachelor of Arts degree in

7    chemistry and biology, went then to the University of Michigan

8    School of Medicine in Ann Arbor from '60 to '64 and graduated

9    with an M.D. degree.

10   Q.   Okay.

11   A.   And then went onto postgraduate training in pathology

12   at the University of Colorado School of Medicine in Denver.

13   First two years were spent performing anatomic pathology or

14   general pathology, and then the last year that I was in Denver,

15   I began my neuropathology training in disease, and I completed

16   that at the Albert Einstein College of Medicine in the Bronx,

17   New York, in 1968; so, four years of postgraduate training, and

18   I completed my postgraduate training at that time.

19   Q.   Okay.  Now, Doctor, we are going to go back to that a

20   little bit, but I would like to ask you this:  You indicated

21   that you are a neuropathologist?

22   A.   Yes, sir.

23   Q.   And we have heard this from every doctor here, as

24   well.  Are you board certified?

25   A.   Yes, I am.

1  Q.   And when were you board certified?

2  A.   I believe it was 1970, I was board certified in

3  anatomic pathology and neuropathology, two separate boards.

4  Q.   Okay.  Now, are there different kinds of pathologies?

5  A.   Yes.

6  Q.   You said anatomic.  Just tell us what anatomic is.

7  A.   Anatomic pathology, basically, is hospital pathology

8  relating to autopsies, surgical pathology, things of that sort,

9  the main tools of the microscope, and I had received training

10  and board certification in that, diseases of all organs of the

11  body.

12  Q.   Okay.  And to be a pathologist doesn't necessarily

13  mean you examine people who have died, correct; I mean tissues?

14  A.   No.  That's part of it.  If someone should die in the

15  hospital, the pathologist, if there's a permit for it, would be

16  the one who does the autopsy and determines what was going on.

17  But a considerable part of the other experience is dealing with

18  material that comes from the operating room, perform frozen

19  sections, interoperative diagnosis on a breast lump, for

20  example, brain tumor or whatever, and tell the surgeon what it

21  is.  So, these days, that's become a huge part of what anatomic

22  pathology is.  Another part of it would be reading pap smears

23  and things like that.

24  Q.   Okay.  And Doctor, over the course of your

25  experience, have you been present at autopsies?

1    A.   Yes.

2    Q.   And let me ask you - not just autopsies - in terms of

3    if you had occasion, in your experience, to examine brains?

4    A.   Sure.  That's part of the regular experience in an

5    autopsy, is one of the organs that is taken out and is

6    examined.  The general pathologist or anatomic pathologist

7    qualified to do that in medical centers, teaching institutions,

8    they usually have somebody like me who is a neuropathologist

9    and then would perform that part of the examination and add to

10   the information that would make up the final report.

11   Q.   What is a neuropathologist?

12   A.   Well, it's somebody who has basic training in

13   pathology, anatomic pathology and then has focused, usually two

14   years or so, in training on the diseases of the nervous system,

15   what they look like under the microscope, how the disease

16   process plays itself out, how it works, and that's basically

17   what the neuropathologist does.

18   Q.   Well, is there a difference between a forensic

19   pathologist and a neuropathologist?

20   A.   Yes.

21   Q.   And what is that difference?

22   A.   Forensic pathology is a recognized discipline and

23   there are boards for that.  And basically, it's pathology as it

24   touches the legal system; that is, the cause of death.  But

25   then the forensic pathologist usually is targeted with the

*(Leestma - Defendant - Direct)*                    1042

1    responsibility of determining the manner of death, which is

2    five things; homicide, suicide, accidental, natural or

3    undetermined.  And they are usually the one -- if they have to

4    do the autopsy, they will generate a death certificate to

5    satisfy the legal requirements for that job.

6        Q.   In terms of examining brains and organs, is there any

7    difference between a forensic pathologist and a

8    neuropathologist?

9        A.   Some are.  Some have training in multiple areas,

10   including neuropathology, and that's increasingly more common

11   these days.

12       Q.   Well, in terms of examining a brain, does it make a

13   difference whether the brain is being examined -- the brain

14   doesn't know whether it's being examined by a neuropathologist

15   or a forensic pathologist; correct?

16       A.   Well, it depends.  Sometimes forensic pathologists do

17   have training in neuropath, and that would be good.  Generally,

18   the experience, when you focus on one thing and learn the huge

19   breadth of information that's required to understand brain

20   disease, they are probably going further down the curve than

21   somebody who maybe doesn't spend that much time doing it.

22   There's a lot of nuances there.  So, generally, a

23   neuropathologist examining a brain will give you a more

24   thorough, complete examination and, hopefully, conclusion than

25   someone else.

1    Q.   Now, Doctor, I may have asked you this.  If I did, I

2  apologize.  How many brains, for example, do you believe you

3  have examined in the past?

4    A.   My estimate, in the years I have been at it, 45 years

5  or something like that, about 20,000 brain specimens.

6    Q.   And what were the reasons -- I'm sure there were

7  various reasons.  But what were the reasons why you examined

8  these 20,000 brain specimens?

9    A.   Well, the usual situation -- or it started out that

10  way, that I was head of neuropathology at the Northwestern

11  University Center in Chicago.  And so at that time, in 1971

12  when I was there, that medical center and the affiliated

13  hospitals probably performed -- my guess would be about 1500

14  autopsies a year.  And unless they are restricted, most of them

15  would have a brain specimen, and it would be my job and the

16  people that work with me and for me to do those examinations.

17  So, it started out with hospital autopsies, and when that

18  declined, then I moved over to the Cook County Medical

19  Examiner's Office, where I probably -- I don't know how many I

20  examined in a year, but they all add up.  And there were times

21  when I was probably examining a thousand brains plus a year,

22  and then it diminished somewhat; but over the years, my

23  calculation is about 20,000.

24    Q.   Okay.  Now, Doctor, we have heard a lot of testimony.

25  Were you here during the testimony of Dr. Sikirica?

1        A.   Yes.

2        Q.   And he is a medical examiner in Rensselaer County.

3   Are you aware of that?

4        A.   That's right.

5        Q.   Doctor, did there come a point in time in the past

6   when you were retained in 2008 or 2009 to examine the autopsy

7   and the slides of a young infant named ███████████████?

8        A.   That's correct.

9        Q.   Okay.  And you testified in a previous proceeding in

10   this regard; correct?

11        A.   I have, yes.

12        Q.   Doctor, before trial, have you and I met?

13        A.   Yes.

14        Q.   You remember that?

15        A.   I sure do.

16        Q.   And where did we first meet?

17        A.   You and your associate, Mr. Frost, came to Chicago in

18   my office, and we spent a few hours there talking; and then I

19   have had subsequent contact by phone and in person since I have

20   been here in Troy.

21        Q.   Now, Doctor, you are being paid for your time;

22   correct?

23        A.   That's my understanding.

24        Q.   Now, I want to ask you some other questions if I can.

25   In order for you to testify here today, have you examined

1    certain records?

2        A.    That's usually part of it.  There's different things

3    that I need to see.  There's background information, which

4    would include hospital reports, medical reports, the autopsy

5    report, if there is one; you know, things of that sort that

6    sort of put the context of where a case is.  Most importantly

7    is the objective evidence, which is the things that nobody can

8    mess with.  In other words, it is what it is and it doesn't

9    matter who looks at it - the factual material is there - and

10   that would be autopsy photographs.

11       Q.    Have you reviewed those?

12       A.    Yes.

13       Q.    All right.

14       A.    Autopsy photographs, radiographic imaging studies, if

15   they exist.

16       Q.    Okay.

17       A.    Microscopic tissue slides that have been prepared of

18   the autopsy tissues, and to a lesser degree, laboratory reports

19   and things like that, because these are things that are

20   objective and basically don't involve -- I mean, they may be an

21   opinion, but I can look at it unvarnished by that and make up

22   my own mind with what's there.  So, it's a synthesis of all of

23   these things that comes down to what results in an opinion.

24       Q.    Let's talk about the slides, the tissues, the

25   photographs and so forth.  Were they provided to you back in

1    2008 or 2009?

2         A.   Yes.

3         Q.   And did you rely upon those in forming an opinion;

4    and at a prior proceeding, did you utilize and testify with

5    regard to those?

6         A.   Correct.

7         Q.   Now, Doctor, have you also made photographs of the --

8    what was sent to you?

9         A.   Yes.  As a part of the examination, we now have nice

10   digital cameras that can hook up to the microscope.  So, if

11   there's something that I think would be important to

12   communicate or illustrate, I can take a picture of it and use

13   it in one way or another to present a PowerPoint presentation

14   or a blow-up or whatever it is to whomever is having to make

15   decisions about the case.

16        Q.   All right.  And Doctor, do you have photographs with

17   you today?

18        A.   I have done that.

19        Q.   Do you have them with you?

20        A.   I have some disks and so forth that I have provided

21   to you.  Let me get my copies out of my file.  Yes.  I have

22   found copies of what would be on those disks.

23   (Documents marked Defendant's Exhibit H for identification.)

24   (CD marked Defendant's Exhibit I for identification.)

25        Q.   Doctor, I'm going to show you what's been identified

P021681

*(Leestma - Defendant - Direct)*

1    as Defendant's Exhibit I.  Can you tell us what this is?

2        A.   Yes.  What I was doing after I took these pictures --

3    they are on a hard drive on my computer.  I burned a CD or a

4    disc of the PowerPoint presentation that selected the pictures

5    I took and something called a handout, which is a proof sheet,

6    basically; put it on a disc, made two copies and gave it to

7    you.

8        Q.   Now, that disc represents, which is I, represents

9    what?

10       A.   These represent, as I indicated, certain elements of

11   the materials that I examined.

12       Q.   Well, tell us what those are, specifically.

13       A.   Pardon me?

14       Q.   Would you tell us what those are?

15       A.   Sure.  I can't recall all of them, but there were

16   photographs of the -- one part of the imaging study, the CT

17   scan that was done on admission of this child to the hospital.

18   There was some photographs of the face of the individual and

19   then some photographs taken through a microscope of various

20   tissues of the brain, the heart, the subdural hematoma, the

21   scalp lesion and so forth, and there's an anatomic diagram in

22   there taken from an analysis of anatomy to illustrate what we

23   are talking about in terms of the nasal cavity, the orbit, the

24   sinuses and so forth.

25            MR. COFFEY:  All right.  I'm going to offer

P021682

*(Leestma - Defendant - Direct)*                    1048

1    this, Judge.

2              THE COURT:  Ms. Book?  For the record, that's

3    Defendant's what?

4              MR. COFFEY:  I, as in Ivan.

5              MS. BOOK:  May I voir dire briefly?

6              THE COURT:  Sure.

7    **VOIR DIRE EXAMINATION**

8    **BY MS. BOOK:**

9         Q.   These samples that you have slides of, where did they

10   come from?

11        A.   The slides?

12        Q.   Uh-huh.

13        A.   They were conveyed to me so I would have a sample and

14   an opportunity to examine them five years ago or whatever.  I

15   returned them to counsel and they were returned to me - I don't

16   know - six weeks or so ago by FedEx to my office, and I

17   examined them again there and then conveyed them back through a

18   couple of people to counsel.  They appear to be there on the

19   table.

20        Q.   But the original slides, where did they come from?

21        A.   I guess the medical examiner.  They were provided to

22   me from them.

23        Q.   So, Dr. Sikirica, he made the original slides?

24        A.   He had to because he had the material.  I don't know

25   if he sent them to me or they came through counsel.  I don't

*(Leestma - Defendant - Direct)*                    1049

```
 1    remember now.

 2                    MS. BOOK:  Thank you.  No objection.

 3                    THE COURT:  Defendant's I will be received in

 4         the record at this time without objection.

 5    (Defendant's Exhibit I marked for identification received in

 6    evidence and marked Defendant's Exhibit I in evidence.)

 7                    MR. COFFEY:  Judge, if I might, I would like to

 8         set up the T.V. so I can have Dr. Leestma testify to them,

 9         if that's okay.

10                    THE COURT:  That's okay.

11                    MS. BOOK:  May I reposition, Your Honor?

12                    THE COURT:  Of course.

13         Q.   Doctor, we are going to try to work this so everybody

14    can see and you can operate it.  For the record, we have a

15    screen, which Christa was kind enough to work for us.  You are

16    sitting in the witness chair.  Are you going to be able to

17    testify - I know you have a computer in front of you - to

18    what's on that screen?  Can you do that?

19         A.   Sure, if I can stand up and look at it.

20         Q.   However is most comfortable.  By the way, before you

21    do that, have you ever taught before?

22         A.   Yes.

23         Q.   And who have you taught?

24         A.   Well, that was part of -- it's what I have done

25    pretty much my whole life as an academic pathologist,
```

(*Leestma - Defendant - Direct*)

1    neuropathologist.  I was teaching medical students, dental

2    students, nursing students, residents in neurology,

3    neurosurgery, psychiatry, pathology, running clinical

4    conferences to my colleagues in the various specialties.  So,

5    teaching has been, you know, integral to what I have been doing

6    pretty much my whole career.

7        Q.   Have you taught pathology to medical students?

8        A.   Yes.

9        Q.   Is pathology, by the way, a required course in

10   medical school?

11       A.   Yes.  It's probably one of the big two courses that

12   happens in the second year usually.  Pathology and then

13   pharmacology are the two biggies that occupy that year, and the

14   amount of material varies from school to school, but that's a

15   major course in the second year.

16       Q.   And why is that?  Forget pharmacology for the moment.

17   Let's talk about pathology.  Why is pathology such a vital

18   course?

19       A.   It tells you about disease.  That's why you are a

20   doctor.  All the other stuff is preparation, basically, the

21   background.  Pathology is the first course that really says,

22   "Here are the diseases.  You learn them."  And this is how we

23   teach.

24       Q.   Okay.  Now, I would like you to teach the jury a

25   little bit.  Would you feel better stepping down?

1        A.   Yes, so I can see the screen.

2        Q.   Doctor, may I --

3             THE COURT:  Of course, Doctor, if I could just

4        ask you to keep your voice up nice and loud.

5        Q.   Doctor, I'm going to step over here, and I know there

6   are images on the right which are kind of small.  I don't know

7   if you can expand those or not.

8        A.   We will bring them up.

9        Q.   Okay.  First of all, Doctor, these are images

10  pertaining to             ; correct?

11       A.   Yes.

12       Q.   And before we start, I want to ask you:  Based

13  upon -- I'm not going to ask you yet what it is.  But based

14  upon your review of all the slides, did you develop an opinion,

15  based upon a reasonable degree of medical certainty, as to the

16  cause of death of             ?

17       A.   Yes.

18            MS. BOOK:  Your Honor, prior to the doctor

19       testifying about his opinion, may I voir dire?

20            THE COURT:  For what purpose?

21            MS. BOOK:  If he's going to render an opinion, I

22       would like to voir dire him on his qualifications to give

23       his opinion.

24            THE COURT:  Any objection, Mr. Coffey?

25            MR. COFFEY:  No.  I don't object to that now,

*(Leestma - Defendant - Direct)*

1        but if, later, we go back through this again, then -- I

2        have no objection one way or another, really.

3                    THE COURT:  Go ahead, Ms. Book.

4                    MS. BOOK:  Thank you, Your Honor.

5    **VOIR DIRE EXAMINATION**

6    **BY MS. BOOK:**

7        Q.   I guess it's afternoon now.  Good afternoon.

8        A.   Hello.

9        Q.   I'm Christa Book.  Now, Doctor, you are not a board

10   certified forensic pathologist; correct?

11       A.   No, I'm not.

12       Q.   Okay.  And you are also not board certified in

13   clinical pathology?

14       A.   Nope.

15       Q.   And you are not a board certified ophthalmologist?

16       A.   Certainly not.

17       Q.   So, you don't have the qualifications to look into

18   someone's eyes and diagnose them; correct?

19       A.   Probably not.  If I had a slide of the eye - that is,

20   a microscopic tissue slide of the tissue - I would be qualified

21   to make a diagnosis there, but clinically -- I'm not a clinical

22   practitioner.  I don't see patients.

23       Q.   And you are not a board certified radiologist;

24   correct?

25       A.   No.

*(Leestma - Defendant - Voir Dire)*

1    Q.   You are not a neurosurgeon; correct?

2    A.   No.

3    Q.   And you are not a certified pediatrician; correct?

4    A.   Certainly not.

5    Q.   You have never been declared an expert in the area of

6    pediatrics; have you?

7    A.   No.

8    Q.   And you have not sat for the new board certification

9    in the area of child abuse pediatrics?

10   A.   I'm not a pediatrician and I have not sat for that

11   examination, no.

12   Q.   Okay.  And you don't specialize specifically in

13   infant neuropathology; correct?

14   A.   There was one time that that's basically all I did

15   when I was at the Children's Hospital in Northwestern, but I

16   don't consider that to be my -- you know, the only thing I do.

17   Q.   Okay.  You have never worked with a live child

18   patient; correct?

19   A.   Of course, I have, medical school.

20   Q.   And when was that?

21   A.   1960 to '64.

22   Q.   Okay.  So, would it be fair to say that the last time

23   you have worked with a live child patient would have been 50

24   years ago?

25   A.   In a clinical setting, yes.  I took splinters out of

1    my kids and grandkids' feet and stuff like that, but that's not

2    medical practice.

3        Q.   Okay.  So, aside from your own children and

4    grandchildren, the last time you have treated a live child

5    patient would have been 50 years ago?

6        A.   Could be that, yes, medical school.

7        Q.   And you have never worked on a trauma unit where

8    children came in after being in car accidents with head

9    injuries; have you?

10       A.   They didn't have such a thing when I was in med

11    school.  There was a general pediatric ward, and we did get

12    trauma patients there, along with everything else; but as such,

13    a specific trauma unit, no.

14       Q.   Okay.  And again, that would have been 50 years ago?

15       A.   Yes.

16       Q.   You have never admitted a child into a hospital?

17       A.   No.

18       Q.   And it's not your job to treat children, then, with

19    existing subdural hematomas; is it?

20       A.   Certainly not.  That's a clinician's job, and I'm not

21    one of those.

22       Q.   You consult on autopsies; correct?

23       A.   Oh, I do them.  I consult on them.  I have done both

24    sides.

25       Q.   Okay.  Well, now, you don't really do entire

*(Leestma - Defendant - Voir Dire)*

1    autopsies anymore; do you?

2        A.   Not very often.  I'm pretty much retired from

3    hospital practice and institutional practice.  So, it's been a

4    few years since I have done an autopsy.

5        Q.   When was the last time you did an entire head-to-toe

6    autopsy?

7        A.   I don't know how many years ago.  It must be about

8    five years ago, six years ago now.  I was on vacation in New

9    Zealand with a pathologist who was on call, and he got called

10   to do an autopsy and I helped him.

11       Q.   Okay.  So, the last time you did one, you assisted a

12   pathologist in doing one?

13       A.   Right.  We both gowned up and gloved up and did the

14   case.

15       Q.   Okay.  But you are not a board certified forensic

16   pathologist who has to do the entire autopsy and determine the

17   cause of death; correct?

18       A.   In conjunction with, you know, whatever that means --

19   I am not a forensic pathologist and I don't do that.  I do a

20   piece of it with neuropathology but not the whole thing.

21       Q.   Okay.  So, it's not your job to determine someone's

22   cause of death; correct?

23       A.   Generally not.  I could do that.  I am a licensed

24   physician and I can do those things if asked to do so, but

25   generally, I do not.

1     Q.    You don't generally sign death certificates?

2     A.    Generally not, no.

3     Q.    Could you probably count on your hands the number of

4     death certificates you have signed?

5     A.    That's true.

6     Q.    How many full - I mean head-to-toe - autopsies have

7     you performed during the course of your career?

8     A.    A few hundred or so.  I don't know exactly.

9     Q.    Where you had the primary responsibility of

10    performing the head-to-toe autopsy and determining the cause of

11    death?

12    A.    Yes.

13    Q.    And it was to you to determine the cause of death?

14    A.    Sure.  That's what the pathologist's job is.

15    Q.    Okay.  And where was it that you did that?

16    A.    It began at the University of Colorado during my

17    residency program and continued in every place I have been.

18    When I took on staff duties at Northwestern, I supervised the

19    residents who were doing autopsies, occasionally would do one

20    myself, mostly supervisory.  That's what staff people do.  And

21    occasionally, it would happen that I would do a full autopsy,

22    for one reason or another.  When I was in practice with a large

23    group of neurosurgeons, part of my job was, if one of our

24    patients died and we had a permit, I would do the autopsy.  So,

25    that would involve a few a year; and occasionally, someone

*(Leestma - Defendant - Voir Dire)*                    1057

1     would request a proper autopsy or exhumation or something like

2     that.  In that case, I would do that.

3          Q.   Okay.  So, only a few a year would you do the entire

4     autopsy, not just the brain autopsy?

5          A.   In recent years, yes, true.

6                    MS. BOOK:  Okay.  I don't have anything further

7               right now.  Thank you.

8                    THE COURT:  You may continue.

9     **DIRECT EXAMINATION**

10    **BY MR. COFFEY:   (Continuing)**

11         Q.   Do any pathologists generally admit patients to

12    hospitals?

13.        A.   Ask me again.

14         Q.   Yes.  Do pathologists of any sort generally admit

15    patients to hospitals?

16         A.   Well, it would depend on the hospital.  They might

17    have privileges to do something, but generally not.

18         Q.   Usually the pathologists are signing him out; right?

19         A.   Yeah.  I suppose so, right.

20         Q.   Now, with regard to what we are talking about here,

21    the brain in ████████████, is this within your area of

22    expertise?

23         A.   Sure.

24         Q.   And you have -- I said before I am not going to ask

25    your opinion.  But I want to ask you this:  Did you, in looking

*(Leestma - Defendant - Direct)*                                    1058

1    at these slides and so forth that you have testified to, did

2    you do that with a view as to determining, based upon your

3    expertise, the cause of death of ████████████?

4         A.   Yes.

5         Q.   Okay.  Are you familiar with the term sepsis?

6         A.   I am.

7         Q.   Are you familiar with the term subdural hematomas?

8         A.   Yes.

9         Q.   Subgaleal hemorrhages?

10        A.   Yes.

11        Q.   And a term called disseminated intravascular

12   coagulopathy?

13        A.   I am.

14        Q.   And I ask you that because these terms have been used

15   by us the past week.  Are these terms generally used and

16   understood by pathologists and other physicians?

17        A.   Yes, they are.

18        Q.   Now, you have indicated that you have examined in the

19   course of your experience about 20,000 brains; correct?

20        A.   Yes.

21        Q.   Have you had occasion - I'm sure you have - in the

22   past to examine children's brains, infants' brains?

23        A.   Sure.  That would be the spectrum.  That wouldn't be

24   the largest group in there, but I'm sure there would be several

25   thousand.  I have never actually kept track or calculated them,

*(Leestma - Defendant - Direct)*                    1059

1    but children's brains would be a part of that.

2        Q.   Now, I want to ask you something else, if I can, in

3    terms of your expertise.  Do pathologists such as yourself

4    publish articles?

5        A.   Yes.

6        Q.   I notice you have a book there.  You have a book

7    right in front of you?

8        A.   Yes.

9        Q.   What is the name of that book?

10       A.   It's called *Forensic Neuropathology, the Second*

11   *Edition.*  It's a book that I authored.

12       Q.   Okay.  And is that utilized, as far as you know, by

13   other pathologists in the country, in the world?

14       A.   It's a well-known one.  There are a number of other

15   textbooks.  Twenty some years ago, mine was the only one in

16   print.  That was the first edition, and now there are probably

17   four, five or six competing ones in different ways.

18       Q.   And articles -- have you written articles over the

19   years?

20       A.   Right.

21       Q.   What's your best estimate as to how many?

22       A.   I guess, if you add the books and so forth, I think

23   it's 104 or five or six now publications.

24       Q.   Now, these articles, just so we can understand, these

25   are articles written for people, say, like me, general public,

*(Leestma - Defendant - Direct)*                    1060

1   or are they written for people in your field?  I know I could

2   get a hold of it.  But who are they written for?

3        A.   The general public isn't the target for these.  These

4   would be the medical journals, professional journals, like

5   *Journal of the American Medical Association* or *Neuropathology*

6   *Journal* or whatever, and it is targeted to the professionals in

7   my area.

8        Q.   Do you ever have to lecture on your articles?

9        A.   Did I ever what?

10        Q.   Lecture with regard to these articles and your

11   findings?

12        A.   I'm sorry.  I still missed the first part.

13        Q.   Have you ever lectured?

14        A.   Yes, sure.

15        Q.   So, at a lecture, of course, someone could stand up

16   and say, "Dr. Leestma, you are crazy.  I think your article is

17   nutty."  Right?

18        A.   Yes, they can.

19        Q.   Those articles are widely available to the medical

20   profession?

21        A.   They are.

22        Q.   Okay.  Come on down, if you would again.

23             THE COURT:  That's fine, Doctor.

24        A.   This is a screen that is unfamiliar to me, but okay.

25        Q.   Now, Doctor, before we do anything, I want to ask you

*(Leestma - Defendant - Direct)*                      1061

1    if you are aware of the fact that ███████████ - and I want

2    you to assume - was born in May of 2008?

3         A.   Yes.  That is my recollection.

4         Q.   Are you aware of any risk factors that his mother

5    had?

6         A.   Yes.

7         Q.   And what were you --

8         A.   The mother was very heavy and there were twins, and

9    there was some difficulties with the deliveries with the twins.

10   I don't recall what all of them were, but it necessitated some

11   hospitalization after birth.  I think there was premature

12   separation of the membrane, breaking of the water, and some

13   questions about pre-toxemia.  So, there were a bunch of factors

14   that were going around the birth of these two boys.

15        Q.   Doctor, I want you to assume that ██████ and his

16   twin were born at 33 weeks gestation.

17        A.   Yes, and that's early.  That's -- 40 weeks is normal,

18   so that's quite a bit early.

19        Q.   Okay.  Now, having said that, would you tell me if

20   the -- ███████ -- not ██████  I'm not interested in ████████

21   for these purposes.  Whether ██████ would be at any risk in

22   terms of his brain having been born -- with those factors and

23   premature?

24        A.   Yes.

25        Q.   And what would those be?

1    A.    You can't assign that absolutely to children that are

2    born like that.  But the kinds of things that they are

3    vulnerable to and err to involve bleeding in the brain.

4    There's a much higher incidence of subdural hematoma and

5    bleeding in the brain associated with births like that.  There

6    can be infections that occur because of the premature rupture

7    of the membranes.  The immaturity of the babies always makes

8    them vulnerable to not getting enough oxygen and blood supply

9    to their brain, so they could have brain injuries from that.

10   There's a whole legacy of things that can be there.  Many of

11   these children end up with what's known as cerebral palsy,

12   brain damage that renders them, obviously, not normal and may

13   kill them.  So, there's a bunch of risk factors there that

14   ████████ was exposed to.

15   Q.    Is that generally understood in the medical

16   community?

17   A.    Say again.

18   Q.    I'm sorry.  Is that generally understood in the

19   medical community?

20   A.    Sure.  There are many, many articles, studies written

21   about these kinds of things; that these are well-known risk

22   factors.

23   Q.    Have you examined brains?  I don't mean to raise my

24   voice.  I guess I trail off a little bit.  Have you examined

25   brains of newborns or children who are premature with regard to

*(Leestma - Defendant - Direct)*                    1063

1    subdural bleeding?

2        A.   Yes.

3        Q.   And the dura is what?

4        A.   These are often children that did not survive or

5    became ill later and died, and the aging and dating of these

6    processes put it back to the time of birth, and there are

7    imaging studies that clearly demonstrate that.  This is not an

8    uncommon problem.

9        Q.   Okay.  What is a dura?

10       A.   A dura -- let's start from the outside, go from the

11   scalp, where the hair is.  If I cut through that, the next

12   thing I'm going to hit is the skull.  If I go through that, the

13   next thing I'm going to see is the dura, which is a

14   parchment-like membrane that embraces the side of the skull and

15   goes down the spinal canal.

16       Q.   Okay.  Doctor, we know that ███████ was admitted to

17   Seton Health, I think, 10 to 13 days after his birth, and there

18   was an ultrasound apparently taken at that time.  And then,

19   Doctor, subsequently, we know that ███████ died; correct?

20       A.   Correct.

21       Q.   Now, in looking at the tissues of his autopsy and so

22   forth that you have indicated, are you able to come to a

23   determination whether ███████ at any time had subdural bleeds

24   in his brain?

25       A.   Yes.

1    Q.   Okay.  And can you date -- first of all, are you able

2  to date any of them?

3    A.   Yes.  It is possible to make some estimates of the

4  aging and dating of subdurals.

5    Q.   Can you show us?

6    A.   If we proceed on, it would be after this

7  particular --

8    Q.   Go right ahead.  Doctor, so tell us what we are

9  looking at.

10    A.   Okay.  What we are looking at is the admitting CT

11  scan.

12    Q.   All right.  Admitting of what?

13    A.   When the child was admitted to the hospital.  This is

14  an x-ray, computerized x-ray image of this child's head and

15  brain.

16    Q.   At Samaritan Hospital or --

17    A.   I don't remember which hospital it would be; I think

18  the first hospital the child was at.

19    Q.   Go ahead, Doctor.

20    A.   What we have here is what are essentially -- this

21  would be like taking a bandsaw and making -- or a salami

22  slicer, whatever, and making slices from the top of the head

23  down.  And what we see here is this outer rim of white.  That's

24  the skull.  Underneath that, here's the brain with my pointer

25  on it, and these images are reversed from left to right.  The

*(Leestma - Defendant - Direct)*

1    radiologists do that.  I don't know why, but the left side is

2    the right side of the head; the right side is the left side.

3    What we see is the brain, but over this brain, between the

4    skull and the brain itself, is a gray space.  That should not

5    be there.  Some of it should be there.  And what this is is

6    fluid.  And it's not completely black like the images, the next

7    image here, which would be cerebrospinal fluid, which is

8    watery.  This means there has to be a little bit of blood

9    pigment, residual fluid, blood in this fluid and in some

10   places -- you will notice on this right side over here, it's a

11   little grayer than it is on this other side, which means that

12   this is probably more watery, would probably look like

13   straw-colored fluid or urine.  On the other side, there's

14   probably some blood mixed in with it, but there's not a lot of

15   acute blood there.

16       Q.   What does acute blood mean?

17       A.   That is bleeding right now.  You know, if this were

18   all blood, then it would look like foam.  It would be white,

19   and it isn't.  So, what we have here is fluid collections over

20   this brain, some of which has probably some blood elements in

21   it, and this is really quite abnormal.

22            Now, one of the things we see here -- see these gaps

23   in the white skull back there?  Those are the sutures where the

24   skull bones come together.  They are obviously split, and that

25   would correlate with the head circumference that this child had

1    on admission, which was way off the paper in terms of average,

2    46 centimeters.  The normal should be 41.  So, this is reality.

3              Then the next cut would be down a bit lower, and we

4    see the ventricles of the brain, which is where the

5    cerebrospinal fluid is produced.  We have a membrane between

6    the two hemispheres called the falx, F-A-L-X, and it has some

7    blood density on it as white; and back here at the back of the

8    brain on the right side is some blood density.  So, there may

9    be some blood there; not much, but some.  So, what we see is a

10   chronic fluid collection.

11       Q.   What does chronic mean?

12       A.   It means that maybe, at one time, this was blood, but

13   the blood is gone now.  It's replaced by fluid, and fluid comes

14   from what's left after the blood elements are gone or just

15   fluid leaking from the brain itself or the surface of the dura.

16   So, it's liquid.  It's watery.  It's not blood.

17       Q.   Okay.

18       A.   And this is abnormal.  It means that this child had

19   had this for some time, probably months, weeks.

20       Q.   Had what for some time?

21       A.   These fluid collections over the brain.

22       Q.   And has had them for how long?

23       A.   Many weeks, probably.  It could be back to birth.  I

24   can't accurately age and date these using this particular

25   study.  When I get to the autopsy, now we have better tissue

1    and I can look at and give some ages and date of that.

2         Q.   Go ahead, then.

3         A.   Let me see if I can advance this way.  Taking it from

4    the inside out now -- this is an autopsy photograph of the top

5    of ████████'s head.  The scalp has been peeled forward, and

6    there clearly is some bloody material in the soft tissues of

7    the scalp that are reflected, and all of that is reflected on

8    the skull.  I think more importantly, though, we can look and

9    see that the tissues are yellow.  That has the meaning that,

10   probably, there was blood there; just like a bruise, it turns

11   yellow eventually after a week or two, which means there was

12   bleeding there some time ago, and there may be some more recent

13   bleeding attached to that, so that there's some bleeding in the

14   scalp before.  The residue of that is this yellow material,

15   blood pigment.  And then there's something that's probably more

16   recent, but in terms of trying to age and date that with your

17   naked eye, we are not very accurate about that.

18        Q.   Okay.  Go ahead.

19        A.   Okay.

20        Q.   Everybody knows what this is.

21        A.   Of course.  This is a piece of tissue that was taken

22   from somewhere in this frontal area underneath the scalp, and

23   it represents the soft tissues of some of this discolored

24   material that's there.  Right down here in the lower right-hand

25   corner is a blood vessel with some red blood cells in it,

1    normal.  Actually, the vessel is bigger and so forth than

2    normally you would see, but all of these blue dots and

3    everything, these are inflammatory cells of different kinds;

4    chronic ones that take a week or more to get there, and some

5    that get there and begin doing something within a day or so.

6    But this is well-developed and --

7         Q.   What does that mean, well-developed?

8         A.   Meaning that this isn't the beginning of a process.

9    It's well along; I would guess four, five days, maybe more.

10        Q.   What does that mean?

11        A.   It means that something is going on here, and the

12   normal subgaleal hemorrhage doesn't have these inflammatory --

13   they have some, but not like this.  This immediately suggests

14   infection, and bacterial infection at that.

15        Q.   Why?

16        A.   Bacteria emits sort of chemicals and toxins when they

17   get into the tissues and that draws the cells there to gobble

18   them up and get rid of them.

19        Q.   Called microphages?

20        A.   There will be microphages and scavenger cells, as

21   well as several other kinds of chronic and acute inflammatory

22   cells there.

23        Q.   Okay.

24        A.   So, it tells us we have something going on besides

25   simply the hemorrhage in the soft tissue.  It's infected, most

1   likely.  The next thing we see is a photograph taken in the

2   hospital while the child still had all of the tubes and pipes

3   and so forth in.  The thing that I want to point out is, number

4   one, there is really no obvious bruise or external injury in

5   the skin, and these eyes are very, very puffy.  The meaning of

6   this potentially, and I think will become clear as we move

7   on --

8           Q.   All right.

9           A.   This suggests, perhaps, there had been clotting; so,

10  the venous drainage from the eyes and the eye area, so that

11  they puff out, and also - that will become clearer in a

12  moment - there well may be an infection in those tissues around

13  the eye, which is, in fact, the case.

14           Just to put things in some sort of anatomic

15  perspective, if I were to take a slice, sort of, before my ears

16  and basically take my face off and look into the structures

17  there, these holes here would be the orifice.  That's where the

18  eyes are, the eyeballs are, and the holes in the back are where

19  the optic nerve would go back into the brain.  The brain would

20  be sitting up here in the frontal fossa.  All these other holes

21  here, like this one, the maxillary sinus -- that's the sinus

22  underneath your eye and over your upper jaw.  There's the

23  others, ethmoid sinuses and so forth; the point being here is

24  the paranasal sinuses are a membrane away from the orbital

25  contact, very thin bone between them.  The importance of that

1    is if one has an infection, if you have an infection in here,

2    it's not uncommon for this tiny barrier to be reached and for

3    infection to spread out away from the sinuses.  That's one of

4    the dangers of sinus infection.

5         Q.   And where does it go?

6         A.   Into the orbit.

7         Q.   Orbit, meaning the eye?

8         A.   Into the orbital tissues, the soft tissue around the

9    eyeball.  It could also go into the brain cavity itself and

10   lead to meningitis.  And, so, these are the cards you don't

11   want to turn over if you have a sinus infection and hope that

12   you can get on it before it goes that way.

13        So, this shows you that the sinus is not way off here

14   someplace away from the eyeball.  It's a membrane away.  These

15   are tissue slides taken from the contents of one of the

16   orbits - I don't remember which - of the eye and optic nerve in

17   that.  Anyway, what we see here is a pocket of necrotic dead

18   tissue, and these bluish smudges are probably bacterial

19   colonies, clumps of blood.  Surrounding that is all kinds of

20   inflammatory reaction and cells, kind of like what I was

21   showing you before in the subgaleal region.

22        Q.   Doctor, hold on a second, please.

23             TRIAL JUROR:  It's hard to see.  Could we try to

24        maximize the image, please?

25             MR. COFFEY:  It's hard to see.  Let me see if I

*(Leestma - Defendant - Direct)*                     1071

1    can do this.

2        Q.   Doctor, maybe you can stand over here.

3        A.   I'm trying to get the picture back to where I want

4    it.

5        Q.   Let me ask you if I can -- can everybody see it now?

6    Okay.  We are in better shape.  Okay, Doctor.

7        A.   Okay.  This arrow which I put on there, all of this

8    kind of indistinct stuff that looks like strings and some pink

9    and all of that, this is death tissue.  Whatever was there has

10   died, been killed by bacteria, and these bluish marks and so

11   forth, as I indicated, are colonies of bacteria; and around the

12   edge of it, all of these cells and dilated blood vessels

13   represent the reaction to this infection.

14        Now, what's the infection?  It's not a virus.  Virus

15   doesn't do that.  What we did was -- let me get over here.

16   What we did here is performed at the request -- I didn't do it.

17   I requested it, and the lab did it; so-called Gram stains,

18   G-R-A-M, on this tissue.  This is a chemical reaction using a

19   variety of dyes that stains bacteria.  There are Gram-positive

20   and Gram-negative.  These are Gram-positive, and all these

21   little dots here -- well, the arrow doesn't really highlight

22   it; but all these little dots are bacteria, and many of them

23   seem to be two peas in a pod, and that's a characteristic for

24   so-called streptococcus pneumoniae or strep bacilli, which is a

25   very common cause of pneumonia and upper respiratory infection.

1    Q.   Have you seen streptococcus pneumoniae in the past in

2    your 20,000 brains you have examined?

3    A.   Yup.   It's not uncommon.   It's a very common cause of

4    upper respiratory infections, pneumonia, meningitis in children

5    and adults, too.   So, the idea that this is an infection, yup.

6    What's causing it?   Gram-positive bacteria streptococcus.   Now,

7    that's a nice observation.   But what other observations do we

8    have that nail that down?   The child had positive blood

9    culture.   There was bacteria in his blood.   I don't know what

10   more you need, really, to nail down the concept of blood

11   poisoning or sepsis.   That's what this particular blood is.

12   This child has what we call orbital cellulitis, which is a

13   life-threatening, serious, very serious problem and there it

14   is.

15   Q.   Okay.

16   A.   Okay.   This got me back unwillingly to the scalp

17   slide.   But you can clearly see, there's all kinds of different

18   cells.   Some have pigment and material in them, and that's what

19   they do; they gobble up -- there was a Gram stain on this.   I

20   just didn't photograph it, and there's the same bugs in there.

21   Q.   Tell us about that, Doctor.

22   A.   This is a slide taken of a portion of the subdural

23   hematoma.   Now, in the autopsy, it was described as a liquid

24   portion that was in there, basically, fallen down into the back

25   of the open skull because of gravity, and then there was some

*(Leestma - Defendant - Direct)*                    1073

1    thickened areas that were sampled by Dr. Sikirica.  And what we

2    have here is -- this reminds me of one of those cakes, a black

3    forest cake or whatever it is, where there's layer, upon layer,

4    upon layer of reaction there.  The topmost layer, if we

5    magnified that, that would be dead blood cells, dead pus,

6    bacterial colonies and things like that in there, but beyond

7    that -- I don't know how many layers we got here; five, six,

8    seven.  It indicates that there must have been multiple kinds

9    of bleeding in this child's dura, because the way it works,

10   blood doesn't -- when it gets to the so-called subdural space,

11   the body does a strange reaction.  It goes no place else.  That

12   occurs no place else in the body, and the blood gets walled off

13   and, hopefully, turns into kind of a pancake that then can be

14   processed and the blood gotten rid of.

15          And then if there's rebleeding -- which comes from

16   these little tiny capillaries that are very delicate there in

17   response to nothing.  It isn't trauma.  It could be

18   coagulopathy.  It could be just the natural history of the

19   subdural.  So, it starts all over again.  So, you end up with a

20   new layer and that's partially healed and then some more

21   bleeding occurred, and that's how subdurals increase in size

22   over the years.  This has been known for a hundred years.

23          Q.   And can you tell us -- can you date the subdural, say

24   the first one?  I know there's six or seven.  But can you date

25   the time periods of these?

*(Leestma - Defendant - Direct)*                                 1074

1      A.   Well, if you pick one layer -- there is a scheme that

2    was developed - published in 1936 - subdurals whose age was

3    known.  And then they said, well, what's in them under the

4    microscope, and then they created a kind of algorithm, I guess,

5    for saying, "If these things are present, this is how old it

6    is."  Well, to age something like this, you have, obviously,

7    the process starting over and over and over again.  The best

8    estimate I have is -- this child is only four and a half, five

9    months old.  It could very well go back to birth.

10      Q.   Are these consistent with trauma?

11      A.   Who knows what starts these things?  First, if they

12    are birth related, that's trauma.  A birth is traumatic.  A lot

13    of children, especially those with the risk factors we talked

14    about, have a greater likelihood of subdural bleeding; but

15    then, over time, may evolve into something like this.  This is

16    about the most spectacular layer of subdural that I think I

17    have seen.

18      Q.   Okay.  Doctor, if a child starts to bleed at birth or

19    right after birth from a traumatic event, are they now more

20    susceptible to rebleed?

21      A.   Of course.

22      Q.   Have you seen that in your experience?

23      A.   Absolutely.  That's the mechanism -- there was a lot

24    of argument argument; why, if you have a chronic subdural that

25    you know is months old or maybe even older, how come there is

1  recent blood?  And the theory is, that has been pretty well

2  proven now, that these little capillaries are weak and they may

3  just be spontaneously kind of starting the whole process over

4  and over again.

5      Q.   Now, can a baby who has this kind of bleed and

6  rebleed act normally and seem okay?

7      A.   Yes.  It's part of the natural history of subdural

8  and chronic subdurals to rebleed, and mostly a little,

9  sometimes a lot; but I think importantly on this particular

10  child who has got all of this, but on the surface here, is

11  infected, too.  So, this gives you infection in the scalp,

12  infection in the orbit, infection in the subdural hematoma and

13  who knows where else.

14      Q.   Can infection cause a bleed?

15      A.   Sure.

16      Q.   Why?

17      A.   The toxins in the bacteria will attack some of these

18  small blood vessels causing them to clot and then maybe burst.

19  So, bleeding can be part of that.  And another part of it is

20  coagulopathy; that is, if somebody is septic, then your

21  coagulation can be all screwed up.

22      Q.   Now, in this case, ███████, when he presented to

23  Samaritan Hospital and then Albany Medical Center, do you have

24  an opinion -- and all of these opinions are based upon a

25  reasonable degree of medical certainty.

*(Leestma - Defendant - Direct)*                                    1076

1    A.   I understand that.

2    Q.   Whether he was septic at that time?

3    A.   He probably was.

4    Q.   Was he septic in the hospital, Albany Medical Center?

5    A.   Yes.

6    Q.   And can sepsis cause a disseminated intravascular

7  coagulopathy?

8    A.   Yes.

9    Q.   And did he have a DIC?

10   A.   I believe he did.

11   Q.   Doctor, do you have another slide you need to look

12 at?

13   A.   So, here we have something that tells us this is not

14 a brand-new process.  In fact, the amount of acute bleeding in

15 here, we saw from the scan, is very little.  So, this has been

16 around for a while.

17        Some other slides showing surface of the cerebral

18 cortex and brain.  These are veins, small veins.  They are all

19 very dilated.  And some of them, if you look at them -- I know

20 you can't get this.  But there was a vein here somewhere, and

21 it's full of blood flow.  So, there has been DIC.  There has

22 been clotting in the cerebral veins, which is a scary thing

23 because blood can get into a part of the brain but it can't get

24 out.  So, it may burst out and produce cerebral edema and a

25 whole bunch of other --

1    Q.   Cerebral edema is what?

2    A.   Brain swelling from water that is migrating out.

3    Q.   And this baby had cerebral edema?

4    A.   Yes.

5    Q.   Are there any slides that -- we don't need to see the

6    same.  Is there anything different in any of these slides?  Do

7    you have any slides that will show anything different in terms

8    of your opinion here?

9    A.   No.  This is a very, very sick kid with a septic

10   problem, all of the problems that associate with that, and

11   there you are.

12   Q.   Have you completed your slides?

13   A.   Let me go ahead and see where we are next.  Here's

14   just another vessel.  This is -- let me get my pointer back.

15   Here we are.  This pink stuff up here is what brain looks like.

16   It's not very exciting.  The pink, these bubbles and holes, are

17   cerebral edema, water.  This is a small vein or capillary, and

18   it contains a clot that's been there for a few days.  So, the

19   clotting dysfunction has been going on since this child was in

20   the hospital and just represents kind of the hidden story of it

21   all.

22          Let me see if there's something else.  Yes.  This is

23   the slide of the lung.

24   Q.   Okay.

25   A.   So, you might say, where is all the air?  The lungs

*(Leestma - Defendant - Direct)*                    1078

1    collapsed, either because of difficulty with ventilation or

2    machine or whatever it is.  All of these clear spaces should be

3    big things.  This should look like a sponge.  Air should be in

4    there and it's not.  So, this poor kid is having trouble in his

5    airways and, more importantly, yes, there are some inflammatory

6    cells scattered through here, but this is not rip-roaring

7    pneumonia.  It's not a raging pneumonia.  It's not a lung

8    abscess.

9          So, this lung is representing kind of what a dying

10   lung or dying patient's lungs look like.  And the importance

11   being here, wherever the septic process was -- I don't doubt

12   that we could get recovered bacteria from there if we wanted

13   to, but that isn't the main focus of where the problem is.

14         There's a principle in pathology that you might say,

15   "Where did this tumor begin?"  Well, you go where the tumor is

16   the biggest.  That's probably where it began.

17         Q.   Where is it biggest?

18         A.   And where is it biggest in this kid?  The orbit, the

19   deep cranial tissues.  That's where the main infectious process

20   is.

21         Q.   How did it get to the orbit?

22         A.   From probably a sinus infection, upper respiratory

23   infection.

24         Q.   And how did it get to the sinus?

25         A.   The sinuses communicate directly to the nasal cavity

1    through little tubes and pipes; and when there's bugs there, it

2    will get into the sinuses.

3        Q.   Meaning breathing in?

4        A.   Breathing in or just part of the normal thing.

5    Sometimes you get a cold and then you get a sinus infection

6    after that.

7        Q.   Okay.  Doctor, anything else on the slides?

8        A.   Yes.  Another point I want to make about this.

9    There's a question about aspiration in this case.  Aspiration

10   affects the lung in a --

11       Q.   What is aspiration?

12       A.   Inhaling of things into your lungs and bronchi that

13   shouldn't be there.  It could be food.  It could be vomitus.

14   It could be something else.  If you inhale vomitus, that has

15   got hydrochloric acid in it from your stomach.  When that hits

16   the lung, it turns the lung to liquid.  It makes it bloody and

17   turns it into something that looks look hamburger almost, and

18   I'm not able to see that here.

19            So, did aspiration occur?  Could have, in a minor

20   way.  But in terms of classic aspiration pneumonia, this child

21   does not have that.

22       Q.   Okay.

23       A.   Then we came to the heart, which was a little bit of

24   a surprise.  These areas around the edge here are heart muscle.

25   This thing in the center is a scar.  Something killed some

*(Leestma - Defendant - Direct)* 1080

1    areas of this child's heart, and it could have been an episode

2    of DIC at some time in the past, a clot or something.  Who

3    knows what it is?  But that's taken some weeks to get there.

4    So, something was going on with this child before that.

5         And the last slide -- I think it's the last slide.

6    This is heart muscle itself, red blood cells.  You can see

7    those.  There's some nuclei from the muscle cell, but some of

8    these, you can see that they are pulled apart.  The muscle

9    fibers are torn apart.  So, this child had some failure of

10   blood flow and oxygen going through his heart in the last day

11   or so of his life.  This probably wasn't present when the child

12   was admitted to the hospital.  This is part of the dying

13   process.  So, that is what I've got.

14        MR. COFFEY:  Judge, if I might.  I think I may

15        only have about 10 minutes left, if you want to take a

16        lunch break.  I know we have a time factor here.

17        THE COURT:  We are supposed to stop by one

18        o'clock for lunch.  Do you think you can be done within

19        the next ten minutes or so?

20        MR. COFFEY:  That's my guess.  I mean, it might

21        be helpful if I have a lunch break.  I may be able to

22        coordinate.  Mr. Frost can tell me what I should ask, and

23        then I can cut it down.  I may be able to trim it if I

24        can.

25        THE COURT:  We will take a lunch break now.

1   Members of the jury, it is five of one.  So, we will break

2   for lunch at this time.  We will break until two o'clock.

3   During the course of this break, please do not discuss the

4   case among yourselves or with anyone else.  Do not read,

5   view or listen to any media accounts of this case.  Do not

6   visit or view any premises mentioned during this trial.

7   Do not conduct any research about this case.  Do not

8   request or accept any payment in return for supplying any

9   information.  Do not form any judgments or opinions about

10  this case.  And if anyone attempts to improperly influence

11  you, please report that directly to me.  Hope you all

12  enjoy your lunch.  We will see you back here at two

13  o'clock.

14              (Jury excused.)

15              THE COURT:  Doctor, because you are still giving

16  sworn testimony in this case, I'm going to ask that,

17  during the course of this break, please do not discuss

18  this case or your testimony with anybody, and that

19  includes the attorneys involved in this case.  Okay?

20              THE WITNESS:  Okay.

21              THE COURT:  See you back here at two o'clock.

22  Thank you.

23              (Whereupon, a luncheon recess was taken.)

24              THE COURT:  Please be seated.  Dr. Leestma, can

25  you retake the witness stand, please?  Bring the jury back

1     in, please.

2               COURT OFFICER:  All rise.  Jury entering.

3               THE COURT:  Please be seated.  The sworn witness

4     remains Jan Leestma.  Doctor, I will remind you that you

5     are still under oath.  Mr. Coffey, you may proceed.

6               MR. COFFEY:  Thank you, Judge.

7     Q.   Doctor --

8     A.   Yes.

9     Q.   I want to ask you -- and I'm not going to go back to

10    the slides.  You have done that, and we appreciate that.  Tell

11    me:  Do you have an opinion, based upon a reasonable degree of

12    medical certainty - I'm not going to repeat that phrase in

13    every sentence but - as to this baby's cause of death?

14    A.   Yes.

15    Q.   And what is that opinion?

16    A.   The baby died from the effects of bacterial sepsis

17    from shock.

18    Q.   Dr. Sikirica, who was in the courtroom, indicated

19    that, in his opinion,  ▮▮▮▮▮▮  died from a subdural or from

20    trauma.  Do you agree with that?

21    A.    A contributing cause.  There clearly was a subdural

22    fluid collection which imposed some stress on the brain.  And I

23    guess when we are listing something in a death certificate or a

24    report, we would put bacterial sepsis and so forth first, and

25    contributing cause would be intracranial pressure due to the

1    subdural fluid collection.

2         Q.   Well, Dr. Sikirica opined that to have trauma you

3    then have aspiration.  Did you find any evidence of aspiration

4    in this case?

5         A.   There's photographs of some mucoid material in the

6    upper airway.  In terms of the slides of the lung, I was

7    unconvinced that the classic pictures were there, no.

8         Q.   Classic pictures were there or were not there?

9         A.   Were not.

10        Q.   Okay.  Now, Doctor, what about the subgaleal

11   hemorrhage?  What does that indicate to you?

12        A.   That raises, perhaps, more questions than is

13   answered.  The appearance in the gross indicates that there may

14   have been bleeding in that area before because of the yellow

15   discoloration in the soft tissues of the deep scalp.  The

16   visual inspection doesn't help you very much, because

17   estimating age and dating by the naked eye is probably not very

18   accurate.  The microscopic, however, clearly shows that this

19   lesion has been there for some time, four or five days maybe,

20   as evidenced by the chronic inflammation and healing reactions

21   that are going on there.  And then, of course, we have the

22   bacterial infection that is affecting that subgaleal

23   hemorrhage.  So, this raises all sorts of issues of how can I

24   tell how that got there, what is the mechanism of it and so

25   forth, and that becomes very difficult to sort out.

*(Leestma - Defendant - Direct)*                    1084

1    Q.   Well, do you have an opinion or -- do you have an

2    opinion that no one can have that opinion as to how it got

3    there?

4    A.   Not a firm one.  I mean, the issue is there was an

5    apparent fall some days before admission.  That certainly could

6    explain why there would be a bruise in that area.  Beyond that,

7    certainly, some impact would be a candidate for --

8    Q.   A candidate.  But is that the only candidate?  That's

9    my question.

10   A.   No, it's not.

11   Q.   What are the other candidates?

12   A.   That there was a prior injury there and that the

13   subsequent medical condition, sepsis and so forth,

14   coagulopathy, contributed to the hemorrhage that's there.  In

15   terms of sorting out precisely what the cause is, I can't do

16   it.

17   Q.   Now, Doctor, do you have an opinion as to whether --

18   if, in fact, ██████ fell on the floor at 17 inches --

19   A.   Yes.

20   Q.   -- would that cause that kind of damage?

21   A.   Yes.

22   Q.   Now, Doctor, would that cause the massive bleeding

23   that you saw?

24   A.   I'm not sure if there was massive bleeding there.

25   There is a case report, an interesting one, one witness, a

*(Leestma - Defendant - Direct)*                         1085

1    young child that fell backward - maybe an eight-month-old - I

2    think trying to pull himself up on a couch or to walk and fell

3    backwards, and the child had known fluid collections over the

4    brain, very similar to what ███████ had, and the kid fell back

5    18 inches maybe to the back of the head, caused bleeding in

6    that fluid collection, fluid -- the increased intracranial

7    pressure and retinal hemorrhages.  The child survived, but it

8    shows you the sort of relatively minor circumstances or events

9    in somebody who's already has problems; you know, can magnify

10   them.

11        Q.   Well, could this subgaleal hemorrhage be caused by a

12   very minor impact if the child -- for example, theoretically

13   hitting his head on the crib or whatever?

14        A.   Yes.

15        Q.   Do you have an opinion?

16        A.   Yes.  We know for sure, I think, beyond reason that a

17   young child that has fluid collections like this, the injury

18   threshold for something later is lesser.  Precisely how much, I

19   don't think we know; but this one case report certainly

20   illustrates what can happen sometimes and that may be in play

21   here.

22        Q.   It may.  What does that mean, it may?

23        A.   Maybe.

24        Q.   Can anyone testify, in your opinion, with a

25   reasonable degree of medical certainty whether it did?

1      A.   If we know of that event and can, you know, nail it

2  down that it really happened, then I think it's more likely

3  than not that that was contributory; but in terms of absolutely

4  certain, there's no way I can know that.

5      Q.   But in terms of contributory, my question to you is

6  this:  The cause of death of this baby, was it trauma or was it

7  sepsis?

8      A.   Sepsis.

9      Q.   Okay.  Is there any question in your mind?

10      A.   No.

11      Q.   And DIC -- we have heard Dr. Sikirica say there was

12  60 milliliters of blood taken out of this baby's brain.

13      A.   I heard that testimony.  I'm aware of that in the

14  report, too.  I have to question 60 milliliters of blood.  The

15  last pictures we had of this child's brain and head was in the

16  CT scan, and there was essentially no blood there.  There was

17  fluid with some blood-tinged material in it.  If there was 60

18  milliliters of blood in this child's head at autopsy, it came

19  during the hospitalization, not before.  So, I suspect that

20  this is probably fluid, watery fluid mixed with some blood that

21  spilled during the autopsy procedure and/or occurred while the

22  child was hospitalized, and DIC would be a good explanation for

23  why.

24      Q.   And Doctor, you told us what meningitis is.  In your

25  .opinion, did this baby suffer from meningitis?

1      A.    Yes.

2      Q.    And what problems can that cause?

3      A.    This is part of the whole picture.  Meningitis can

4  lead to blood coagulation problems, thrombosis or clotting of

5  vessels inside the head, cerebral edema, seizures, all kinds of

6  things, increased intracranial pressure.  It is not a benign

7  condition.

8           MR. COFFEY:  Okay.  One minute, if I might.

9      Q.    What are the effects of heparin, Doctor?

10     A.    What is what?

11     Q.    What are the effects of heparin?

12     A.    Heparin is, first of all, a drug that is given to, in

13 a sense, thin the blood, and it disrupts the clotting

14 mechanism.  I don't remember exactly what part of the cascade

15 it intersects, but it does thin the blood.

16     Q.    Which means what?

17     A.    Meaning it can be used for a variety of reasons.  If

18 you have clotting inside the vessels, heparin could be used for

19 that.  If you are preparing, essentially, a body for organ

20 donation, heparin is often used to prevent clotting and damage

21 to the organs that you want to transplant.  So, it thins the

22 blood and can cause bleeding.

23     Q.    Doctor, do you have an opinion, based upon a

24 reasonable degree of medical certainty - or do you agree with

25 Dr. Sikirica or any other people called by the District

*(Leestma - Defendant - Direct)*                    1088

1   Attorney's Office - whether trauma was the cause of this baby's

2   death?  Do you have an opinion?

3          A.   I would say --

4                 MS. BOOK:  Objection.  This has been asked and

5          answered, Your Honor.

6                 THE COURT:  Overruled.

7          Q.   Do you have an opinion?

8          A.   Did trauma cause the death of this baby?  I would say

9   no.

10                MR. COFFEY:  Thank you.  That's all I have.

11                THE COURT:  Ms. Book?

12                MS. BOOK:  Thank you, Your Honor.

13  **CROSS-EXAMINATION**

14  **BY MS. BOOK:**

15         Q.   Hello again.

16         A.   Hi.

17         Q.   Doctor, do you agree with the statement "Trauma does

18  not cause sepsis"?

19         A.   I would not necessarily agree with that.  I would say

20  that it probably does not in the majority of cases.  It can,

21  but not usually.

22         Q.   And how can trauma cause sepsis?

23         A.   Well, we have to be a little more specific on what

24  kind of trauma.  If someone takes an impact blow, kick to the

25  abdomen and ruptures an internal organ, the gut or something,

*(Leestma - Defendant - Cross)*                                    1089

1    sure, you can get sepsis from that.  Deep skeletal injury or

2    muscular injury, sepsis may occur as a secondary or tertiary

3    complication of that.  Head injury, generally not, unless you

4    have a fracture through a sinus or something and then you spill

5    contaminated material into the intracranial compartment.  There

6    are certainly some conditions in which trauma can produce

7    sepsis but, generally, that would be regarded as down the road

8    apiece because of something else.

9         Q.   Okay.  But as a general statement, you do agree that

10   trauma can cause sepsis?

11        A.   Yes.

12        Q.   Okay.  And if Dr. Klein, who testified, said that

13   trauma cannot, in any circumstances, lead to sepsis, do you

14   disagree with that statement?

15        A.   If that is what was said, I do.

16        Q.   Okay.  Now, for a moment, let's talk about you

17   testifying as an expert witness.  Okay?

18        A.   Okay.

19        Q.   How much of your income comes from case review and

20   possibly ultimately testifying?

21        A.   Probably these days - I don't know - 10 percent, 20

22   percent maybe.

23        Q.   Okay.  Taking aside your -- taking your retirement

24   and such out of the equation, just your active income from

25   practicing medicine these days.  How much of that income comes

1   from reviewing cases and testifying as an expert?

2       A.   Virtually all of my earned income -- there were a few

3   little other consulting things, matters such as this and so

4   forth.  It depends from year to year.  It might end up to be 10

5   percent, 20 percent of my total income.  Last year, I lost

6   money.  I made no money.  So, it depends on many things.

7       Q.   Okay.  I'm saying if you take out of the equation

8   your retirements and investment and things like that and we are

9   just simply talking about how you earn new money.  How much of

10  that comes from testifying?

11      A.   Virtually -- not testifying, but consulting on

12  cases - it may culminate in testimony - that's the -- that

13  would be the source of my earned income.

14      Q.   So, that's the entirety of your earned income these

15  days?

16      A.   Sure.

17      Q.   How many trials have you testified so far in this

18  year?

19      A.   Let's see.  I could be wrong; maybe four, five.

20      Q.   Okay.  And how many of those were for the

21  prosecution?

22      A.   Um, one of them was.  The others were for defense --

23  let me see.  I think one was a civil case and then two or three

24  criminal cases.  Those were for the defense.

25      Q.   Okay.  So, in the civil case, you mean you testified

1    for the plaintiff?

2         A.   I'm trying to remember what it was.  I frankly don't

3    remember.  I don't know.  It breaks about 50/50 in the civil

4    cases, plaintiff versus defense.  I just don't remember now.

5         Q.   Okay.  I'm talking about in the criminal cases.

6         A.   Right.

7         Q.   How many times this year have you testified for, say,

8    the People of the State of New York?

9         A.   Okay.  Let's say of the three or four criminal cases

10   that I have been involved with this year, one of them was for

11   prosecution.  The rest would have been for defense.

12        Q.   In a criminal case, you testified for the

13   prosecution?

14        A.   Yes.

15        Q.   And how many times did you testify for the

16   prosecution in 2013?

17        A.   Let's see.  I had a couple of cases.  I don't think I

18   testified, actually.  I think they were settled or pled out or

19   did something, but I was retained by the prosecutor on two

20   cases.

21        Q.   Okay.  And back in 2009, it was no times for the

22   prosecution; right?

23        A.   That's probably true, yes.

24        Q.   And in 2008, it was no times for the prosecution;

25   correct?

1    A.  I think that's right, too.

2    Q.  2007, it was no times for the prosecution; correct?

3    A.  Now we get to where my memory fades a little bit.

4    Somewhere in there, I had a prosecution trial and testimony.

5    Q.  Okay.

6    A.  One.

7    Q.  Somewhere in those years, you had one time that you

8    testified for the prosecution?

9    A.  Yeah, I think so.  I'm not sure if it was '07.  I

10   testified in San Diego.

11   Q.  Okay.  Well, if I told you that you previously

12   testified that you testified for the prosecution no times in

13   2007, would you believe --

14   A.  You may be right.  I don't have my list in front of

15   me.

16   Q.  Okay.  Not only do you principally testify for

17   defendants -- would you agree with that?

18   A.  In criminal matters, yes, that's true.

19   Q.  But you testify assisting criminal defendants or

20   children -- or people whose children might be taken because of

21   allegations of child abuse; correct?

22   A.  That's true.

23   Q.  Now, how much do you charge an hour to prepare for a

24   trial?

25   A.  That totally depends.  It usually works out to about

1   350 an hour or less, depending on who is hiring me.  They may

2   have limits, government stipulated limits, or there are others

3   that don't.  So, it will vary anywhere from four, $500 an hour

4   to 250 or nothing.  It depends.

5        Q.   And how much an hour for testimony?

6        A.   In recent years, it's been the same; whatever prep

7   work, it turns out to be about the same or the same for

8   testimony.  If I quote a rate, I usually charge $100 or more

9   for the sworn testimony, but I rarely get that.

10       Q.   Now, as you sit here today, how much money have you

11  made on this case so far?

12       A.   None.  I have not received any payment.

13       Q.   Okay.  How much are you going to charge on this case

14  so far?

15       A.   It's not what I'm going to charge.  It's what the

16  county or the state will give me.  I think we have made an

17  agreement that my pay would be a fixed amount.  I think it's

18  5,000; but because of delays and everything, they may add

19  something to that.

20       Q.   Okay.  Now, you spoke with Mr. Coffey and Mr. Frost

21  prior to coming here today; correct?

22       A.   Yes.

23       Q.   And how many times have you spoken with them?

24       A.   I can't count.  They came -- I think I testified

25  before that they came to Chicago and we met for a couple of

*(Leestma - Defendant - Cross)*

1    hours, two, three hours, and then we have spoken on the

2    telephone and by Internet a few times; and then, of course,

3    since I have come here to Troy to prep for the trial.  So, it

4    might be three, four times, something like that.

5          Q.   Okay.  Now, in medical school, are you trained to

6    write reports?

7          A.   Well, I don't know.  You are certainly trained to

8    write notes in the chart.  There are certain formats for that.

9    In terms of writing reports, no, I don't think there's any

10   formal instruction on that.

11         Q.   Okay.  If you were going to review an autopsy, do you

12   normally write a report of that?

13         A.   I might.  It depends on what my task is.

14         Q.   Did you write a report in this case?

15         A.   No.

16         Q.   Why not?

17         A.   I asked do you want a report and I was told no.

18         Q.   So, the defense told you that they didn't want a

19   report?

20         A.   At a prior legal proceeding, that's where that arose;

21   and on this particular occasion, no report was requested.

22         Q.   Okay.  And if you wrote a report, do you know, would

23   it have had to have been turned over?

24         A.   I don't know.  It depends on what the jurisdiction of

25   the local rules are.  I would assume so.

1        Q.   So, by not writing a report, you don't have to turn

2    over anything in advance?

3        A.   I don't have to turn over anything.  It would be the

4    counsellors.  That's their responsibility, and I don't know

5    what would happen in this place.

6        Q.   Okay.  Now, you were in the courtroom yesterday for

7    Dr. Sikirica's testimony; correct?

8        A.   For part of it, yes.

9        Q.   And have you spoken to the attorneys about what other

10   witnesses have said?

11       A.   I think we discussed the part about Dr. Sikirica's

12   testimony that I heard.  I didn't hear the cross.  I heard the

13   direct examination, and we did talk briefly about that.

14       Q.   Have you read any testimony from any other witnesses?

15       A.   In this particular proceeding?

16       Q.   Yes.

17       A.   I don't think so.  I don't think I have been provided

18   any transcripts or anything like that, no.

19       Q.   Okay.  Have you read Dr. Jenny's testimony from a

20   prior proceeding?

21       A.   I have read her -- the testimony in the prior

22   exercise, and I'm trying to think whether I have read anything

23   on this one.  I don't think so.

24       Q.   Have you read Dr. Sikirica's testimony from a prior

25   proceeding?

1   A.   Yes.  I believe there was a transcript of that.

2   Q.   Okay.  And what about Dr. Waldman?

3   A.   Good question.  I don't remember.

4   Q.   Okay.  And do you know who he is?

5   A.   I couldn't tell you right now.

6   Q.   Okay.  If I told you he was the pediatric

7   neuropathologist or the neurosurgeon -- I'm sorry.  The

8   pediatric neurosurgeon, does that sound familiar?

9   A.   No.

10  Q.   Okay.  Now, if you had a chance to assess ▉▉▉ in

11  person, wouldn't that be the preferred way to conduct an

12  autopsy?

13  A.   That is, perform the autopsy myself?

14  Q.   Yes.

15  A.   Sure.  That would be great.  I couldn't do that,

16  obviously.

17  Q.   Okay.  So, then, you would agree with me that Dr.

18  Sikirica, he had a bit of an advantage over you; correct?

19  A.   Well, I'm dependent upon what evidence was collected,

20  photographs, samples, and that would, of course, be the other

21  doctor's responsibility.  In terms of what he thinks and what

22  he sees, then I would have to see for myself based on the

23  objective evidence I have.

24  Q.   Okay.  But the doctor that actually got a chance to

25  look at, to feel, to cut into the body, to take the slides,

1    that doctor has a bit of an advantage over you; doesn't he?

2        A.   He does have some advantages, but if proper evidence

3    has been preserved, it's not a major deficit in my opinion, no.

4        Q.   Now, I want to talk to you about your testimony

5    regarding preexisting head traumas.

6        A.   Okay.

7        Q.   It's common that you testify regarding preexisting

8    head trauma; isn't it?

9        A.   It is a fact in many cases that I'm involved in, yes.

10       Q.   In fact, in a large percentage of cases that you have

11   testified in the last five, ten years that involved a subdural

12   hematoma, you found a preexisting one.  Is that correct?

13       A.   I don't know what the percentage is.  It could be

14   three-quarters, 75 percent, 80 percent, for some reason seem to

15   have older chronic lesions.

16       Q.   Okay.  Well, as you sit here today, can you tell me a

17   case that involved a subdural hematoma where you did not find a

18   preexisting one?

19       A.   Yes.  That happens from time to time; as I say, maybe

20   20 percent of the time.

21       Q.   Can you tell me a case?

22       A.   I'm trying to think.  I don't tabulate them that way,

23   but it happens that some infants do have no evidence of chronic

24   subdurals.  It's all acute.  I can't recall a case right now,

25   but it wouldn't be that uncommon.

*(Leestma - Defendant - Cross)* 1098

1   Q.   Okay.  Now, I want to talk to you about a case that

2   you testified in previously.

3   A.   Okay.

4   Q.   You testified in a case where a woman was on trial

5   for the death of a child in her care, Louise Woodward.  Does

6   that ring a bell?

7   A.   I remember the case very well.

8   Q.   Okay.  And in that case, you found a preexisting head

9   injury.  Is that correct?

10  A.   Yes.

11  Q.   And when that case was concluded, you turned over

12  slides that you had received from the attorneys over to a

13  member of the media.  Is that correct?

14  A.   With the okay and blessing of the attorneys involved.

15  Q.   Okay.  You didn't have the blessing of the parents

16  involved; did you?

17          MR. COFFEY:  Object to this.

18          THE COURT:  Overruled.

19  A.   I didn't have any contact with the parents at all.

20  Q.   Okay.  So, essentially, a slide is a part of the

21  baby's body.  Is that not correct?

22  A.   Yes.  I agree.

23  Q.   So, you turned over a part of that dead baby's body

24  to the media.  Is that correct?

25  A.   By that definition, yes.

1    Q.   And then you got a lot more interviews in the media

2    after that; didn't you?

3    A.   There were some in connection with a civil trial that

4    resulted after the criminal trial was concluded, and there were

5    some interviews, yes.

6    Q.   Okay.  And are you aware of the fact that you were

7    criticized by medical ethicists for doing this?

8    A.   I'm not sure what you mean.  I know there were a

9    number of people who did not like what I had to say and took

10   deference to my -- you know, exceptions to my opinions and

11   criticized me in one form or another.

12   Q.   Do you know if the medical ethicists criticized you

13   turning over parts of that little boy to the media?

14               MR. COFFEY:  Objection, objection.

15               THE COURT:  Sustained.

16   A.   I don't know who --

17               THE COURT:  Sustained.

18   Q.   And were you compensated between 60 and $70,000 for

19   that trial?

20   A.   Oh, goodness, no.  I don't know what the total

21   compensation for the criminal trial was, lots of trips to

22   Boston.  I don't know.  It could have been 25, 30, $40,000.  I

23   doubt it was 70.

24   Q.   Would it surprise you if I told you that you

25   previously testified that you were compensated between 60 and

*(Leestma - Defendant - Cross)*                              1100

1      $70,000 for that trial?

2           A.   I didn't recall but, if you have that, so be it.

3           Q.   And are you aware that after the Louise Woodward

4      trial, 50 physicians signed a letter stating the following --

5                     MR. COFFEY:  I object to this as hearsay.

6                     THE COURT:  Sustained.

7           Q.   Are you aware that after the Louise Woodward trial,

8      50 physicians signed a letter --

9                     MR. COFFEY:  Objection.

10          Q.   -- disagreeing with your opinion?

11                    MR. COFFEY:  This is the same question I

12          objected to.  She continues.

13                    THE COURT:  The objection is sustained.  It's

14          not relevant what other doctors may have felt about this

15          witness' testimony in another case.  That's the basis for

16          which I'm sustaining the objection.

17          Q.   Doctor, is it fair to say that -- I'm sorry.  Let me

18     ask you about one more case before we move on.  Do you remember

19     a case of John - I'm not sure how you say it; P-O-Z-E-F-S-K-Y -

20     in Cuyahoga County, Ohio?

21          A.   Podolski maybe?

22          Q.   Maybe.

23          A.   Yeah, vaguely.

24          Q.   Do you recall that case?

25          A.   Not much, but I remember the name, yes.

1        Q.   Okay.  And that individual was on trial, and in that

2    case, it was the prosecution and the medical examiner's

3    contention that in that case, the infant died from blunt force

4    trauma.  Do you recall that it was your contention in that case

5    that the infant died from a birth complication, not blunt force

6    trauma?

7        A.   I know I had a conclusion that was different from

8    that of the ME and the prosecution's theory of the case and,

9    frankly, I don't remember the details of that to be able to

10   give you much more.

11       Q.   Is it fair to say that your specialty is in the area

12   of disease and the central nervous system?

13       A.   Yes.

14       Q.   The majority of your work is looking at areas such as

15   tumors, viruses, epilepsy, the nervous system?

16       A.   Yeah, anything to do with the nervous system,

17   including those things, yes.

18       Q.   You don't operate on people?

19       A.   Certainly not.

20       Q.   You have not written many articles dealing with the

21   treatment of children who are the victims of abuse?

22       A.   I'm not a treating physician.  That's not an area of

23   my expertise, so I haven't written about that.

24       Q.   Okay.  And you haven't written about recognizing and

25   treating children who have head injuries; correct?

1     A.   No.   That's not my expertise at all.   I'm not a

2   clinician.

3     Q.   When you come to work day in and day out, you are not

4   looking at CT scans of a child; right?

5     A.   Well, day in and day out, I don't do that but,

6   certainly, that's part of the exam that I do and then it's

7   important for me to see that information if it exists.   So, I'm

8   certainly very familiar with CT scans of children and anybody

9   else.

10    Q.   But you are not, as you stated before, a board

11   certified radiologist; correct?

12    A.   No, I'm not, no.

13    Q.   Okay.   And you don't have special training in

14   radiology that a person who is board certified in radiology

15   would have; correct?

16    A.   In the broad sense, certainly not.   I have gone

17   through the residency.   I must say that the neuroradiologists

18   in hospitals and I both learned to read CT scans at the same

19   time, because they would come to look at the brain, look at the

20   scans and correlate them.   So, in a sense, we evolved together.

21   Obviously, their training is much more encyclopedic than mine.

22    Q.   You don't need to use CT scans often in the course of

23   being a pathologist, being that you can cut right into the

24   brain and look at it; correct?

25    A.   Well, these days, not.   When I was involved with my

1    group of neurosurgeons for 13 years, the first thing I did

2    every day going into the operating room was look at the scans

3    on the wall of the operating room.  I looked at CT and MRI

4    scans every day.  I don't do that much any more, but I did at

5    one time.

6        Q.   Okay.  So, you really don't look at CT scans much any

7    more; correct?

8        A.   When they are available in a case, of course, I do,

9    which is easily half the time.

10       Q.   Okay.  And when they are available in a case, that's

11   a case that you have been retained on as an expert witness

12   primarily for the defense; correct?

13       A.   True.

14       Q.   When was the last time you performed lifesaving

15   efforts on a child?

16       A.   Lifesaving efforts?  Never.

17       Q.   Now, it's fair to say you never met ███████████;

18   correct?

19       A.   Correct.

20       Q.   You never treated him?

21       A.   Never treated him, never met him.

22       Q.   You didn't make any of the cuttings on the slides

23   that you presented?

24       A.   That was done by somebody else, Dr. Sikirica or his

25   staff.

1    Q.   Okay.  And would you agree with me that you have

2    previously written the following:  "It is sometimes an issue at

3    trial, often exploited by defense attorneys, that apparent lack

4    of external injury in connection with a massive intracranial

5    trauma somehow correlates better with accidental injury, rather

6    than a willful one.  This interpretation is fallacious and

7    should not be conceded"?

8    A.   I probably wrote that in the first edition of my

9    book, yes.  I believed that at one time.

10   Q.   So, you have previously written that, Doctor?

11   A.   That wouldn't surprise me, no.

12   Q.   And what is the book you brought with you today?

13   A.   This is my second edition of my *Forensic*

14   *Neuropathology* book.

15   Q.   May I look at that for a moment?

16   A.   Certainly.

17   Q.   And is this still a textbook you use?

18   A.   Well, yeah.  I refer to it once in a while myself.  I

19   hope other people do, too.

20   Q.   When did this come out?

21   A.   Some of these have a 2009 date on them.  Some of them

22   have 2010.  I don't know about that one.

23   Q.   And that statement that I just read to you, does it

24   appear in this book?

25   A.   I don't know.  Somehow I doubt it, but it could have.

1    Q.   Okay.  If I told you that you previously testified

2  that it appears in that book --

3    A.   Okay.  Well, I don't remember.

4    Q.   So, the book that you just told me that you still

5  use, that statement I just read to you, it does appear in that

6  book?

7    A.   I couldn't say.  I don't recall.

8    Q.   Okay.  But would you agree with me that it is

9  something you have written?

10   A.   If you say so.  I cannot recall where I might have

11  specifically written that.  It would probably be in this book

12  or the prior edition.  I just don't remember.

13   Q.   Do you disagree with me that you wrote that?

14   A.   No.  I have no basis to do that.

15   Q.   Okay.  Now, this picture of ███████ --

16        MS. BOOK:  May I approach?

17        THE COURT:  Yes, you may.

18   Q.   People's 17 in evidence.  I believe that was the same

19  picture on your slide show earlier?

20   A.   I believe it is, yes.

21   Q.   If I could just show the jury, so they know what we

22  are referencing.  Thank you.  Now, you mentioned that ██████

23  had puffy eyes in that picture?

24   A.   Yes, I did.

25   Q.   Doctor, isn't it true that his eyes could be puffy

1    due to volume replacement?

2         A.   Yes.

3         Q.   And what does that mean?

4         A.   It means, in terms of the intravenous fluid this

5    child is receiving, they overshot and produced -- you know, put

6    more water, essentially, into the system than he could handle,

7    and it could very well produce edema and swelling like that.

8         Q.   Okay.  And couldn't it also come from congestion in

9    the soft tissue due to the cerebral edema?

10        A.   No.  The cerebral edema wouldn't do that.  You have

11   to look at volume replacement issues, which is certainly fair.

12   You have to look at other things, disruption of venous drainage

13   from the eye cavity, infection there, which we have talked

14   about.  There may be some other issues that could produce that.

15        Q.   Okay.  But you do agree with me that the puffiness to

16   ████████'s eyes could certainly have been the result of volume

17   replacement?

18        A.   It could be a contributing -- a component of it.  I

19   know he has other things going on, but I could not say volume

20   replacement doesn't play a role here.  It could.

21        Q.   Okay.  Now, I want to talk to you about the retinal

22   hemorrhages in this case for a moment.

23        A.   Okay.

24        Q.   You have never been declared an expert in dealing

25   with issues of the eyes; correct?

1        A.   Exclusively, no; but as part of my purview of

2   neuropathology, the eye is part of the brain, and I have

3   certainly offered testimony regarding various pathologies in

4   the eye before.

5        Q.   You have never treated a patient for an eye disorder;

6   have you?

7        A.   As a medical student, but not since, no.

8        Q.   Okay.  So, about 50 years ago?

9        A.   Yes.

10        Q.   Now, are retinal hemorrhages indicative of child

11   abuse?

12        A.   No.

13        Q.   Have you previously testified that they are highly

14   correlative of child abuse?

15        A.   They correlate -- in cases of alleged child abuse, a

16   high percentage of such victims have retinal hemorrhages.

17   Whether it's probative of that condition or causative, I have

18   serious issues with that.

19        Q.   Okay.  Well, have you previously testified that:

20   "There was a strong correlation in abusive head injury in

21   children.  A large percentage of these babies will have retinal

22   hemorrhages"?

23        A.   Of alleged child abuse by somebody's definition,

24   that's true.

25        Q.   Okay.  So, there is a strong correlation between

*(Leestma - Defendant - Cross)*                    1108

1    abusive head injury in children and retinal hemorrhages?

2         A.   In alleged child abuse victims.  The criteria that

3    are used are sometimes not very reliable, but that statement is

4    widely publicized; and with that understanding, I agree.

5         Q.   Okay.  So, if there is abuse -- let's just say there

6    is abuse.

7         A.   Uh-huh.

8         Q.   If there's an abusive head injury in a child, there's

9    going to be strong correlation between that and retinal

10   hemorrhage; correct?

11        A.   Such a child will likely have retinal hemorrhages.

12        Q.   And have you previously testified that:  "So, in

13   fact, when you have a child abuse case, you are much more

14   likely to find retinal hemorrhage than when you don't have a

15   child abuse case"?

16        A.   I think that's probably true, yes.

17        Q.   And wouldn't it be fair to say in this case we have

18   extreme retinal hemorrhage?

19        A.   There were retinal hemorrhages.  In terms of their

20   extent, I haven't seen photographs, I don't think, of the

21   retina, but retinal hemorrhages were not a controversial issue,

22   though they were there.

23        Q.   In both eyes; correct?

24        A.   Correct.

25        Q.   Now, let me talk to you for a moment about aging

1    subdurals.  Okay?  You age subdural hematomas based on the

2    studies of adult brains.  Is that correct?

3         A.    That's what the 1936 study used, correct.

4         Q.    And the majority of articles you have written, they

5    deal with conditions in adult brains.  Is that correct?

6         A.    There are a number of differences, and I'm not sure

7    what -- how that affects the issues but, of course, there are

8    differences between adult and children's brains.

9         Q.    Okay.  Such as a child's brain is much more fragile

10   than an adult's brain.  Is that correct?

11        A.    It depends.  The child's brain is not any more

12   compressible than an adult's.  It's liquid.  It's water.  Water

13   is incompressible.  So, it makes no difference what the

14   percentage of water is in a child's brain versus an adult's

15   brain.  The things that are different is the brain case or the

16   skull is different.  The brain may be deformed more easily with

17   a child on impact than with an adult.  That's an important

18   thing.  How this all affects what happens to the child's brain

19   that is subjected to forces is still pretty controversial.

20        Q.    Okay.  Well, there's no hard scientific data to

21   suggest that a baby's brain is going to heal at the same rate

22   as an adult's brain; correct?

23        A.    It is certainly capable of undergoing certain healing

24   reactions, probably better than an adult.  There may still be

25   some capacity to regenerate nerve cells, regrow nerve fibers,

1    than an adult might have; and it may have some capacity that's

2    different in terms of what cells do what in the healing

3    reaction.  So, that may be so.

4         Q.  Okay.  And, so, in terms of dating a baby's subdural

5    hematoma, you are working on an assumption, then; correct?

6         A.  Yes.  It is based upon what the inflammatory reaction

7    is, the healing reaction and so forth.  And true, the study

8    that most people use to help age and date subdurals was based

9    on adults.  Over the 40 years or so, I have asked myself the

10   same question.  How accurate is it?  And whenever we get the

11   rare case, and it is rather rare, where you know precisely when

12   that subdural began and now you've got the slides and you can

13   look at it, it fits pretty well with the so-called Munro,

14   M-U-N-R-O, and Merritt, M-E-R-R-I-T-T, paper, the one that I'm

15   referring to from 1936.

16            I haven't found a great deal of discordance.  It

17   might be a day off, maybe two days or something, from the

18   formula that's there.  I have never found any great departure.

19        Q.  Okay.  Now, in this edition of your book, the one

20   that you brought with you today, you say that neonatal subdural

21   hematoma is said to be uncommon to rare with only nine cases

22   reported as of 1978.  Would you agree with that?

23        A.  Neonatal?

24        Q.  Yes.

25        A.  If that's so, that would be incorrect, because the

1    subsequent papers have come out that show that up to 25

2    percent, maybe even more, of normal births, the children have

3    subdural hematomas.

4         Q.   Okay.

5         A.   That's a lot.  And it may be up to '78, nobody had

6    the technology to look or they were wrong.  It appears to be

7    much more than that.

8         Q.   Okay.  And Dr. Jenny talked to us a little bit about

9    that in this courtroom; that there's been subsequent studies

10   where, through MRI images, babies that they wouldn't have

11   otherwise thought had any indication of hematomas were scanned

12   through the MRI'S and were found to have, actually have

13   bleeding.  Are you familiar with that study?

14        A.   There are several now.  I'm not sure which one she

15   quoted, but I don't disagree with that.

16        Q.   Okay.  Well, in the study that she referred to, all

17   of these babies were asymptomatic.  Are you familiar with that?

18        A.   Yeah.  The majority of them are, and that's the

19   surprise.  First of all, you don't scan normal babies, but

20   somebody did and used ultrasound and other things and said,

21   "Whoa, we have a greater incidence here than we thought."

22        Q.   Okay.  And when I say asymptomatic, what do I mean?

23        A.   To anybody's naked eye or clinical exam, they're

24   fine.

25        Q.   Okay.  And are you aware that all of these babies

1    were rescanned at a month old and there was no more finding of

2    it?

3        A.    In at least one study, that's so.  It appears that

4    the majority of these birth related subdurals do resolve

5    themselves.  Precisely what percent don't, we don't know.

6        Q.    Okay.  So, the majority of these resolved themselves

7    by one month with absolutely no signs of having had it;

8    correct?

9        A.    Apparently so, apparently so.

10       Q.    Now, from your testimony, it sounds as if

11    ████    was a very, very sick baby?

12       A.    I think he was.

13       Q.    It sounds like he was a very sick baby pretty much

14    from birth from your testimony?

15       A.    Yeah.  I don't know how -- in terms of the outward

16    appearance of how this kid was.  He had some significant

17    pathologies going on that magnified and culminated, I think, in

18    his death; but how he was, you know, to look at the baby and

19    all of that as a baby, I don't know.

20       Q.    Well, would you be surprised to know that his

21    treating pediatrician who saw him in the hospital at only five

22    days of birth, the one that saw him for all of his regular

23    checkups after that, said he was quite healthy?

24       A.    No.  It wouldn't surprise me.

25       Q.    But you said he was a very, very sick baby?

1  A.   He sure was.  He died; in the last month or so of his

2  life or in the last period of his life, desperately ill.

3  Q.   Oh, I don't argue with you that ████████ was a

4  very, very sick baby from September 21st, perhaps a little

5  before that.  But it sounds to me like you are saying from May

6  4th, when ████████ was born, up to the date he died, that

7  he was an extremely sick baby?

8  A.   I didn't know that.  I don't know that.

9  Q.   Well, didn't you say earlier that, what you saw of

10  the heart, it appeared that he suffered a heart attack about a

11  month before his death?

12  A.   At least, yes.

13  Q.   Okay.  Now, do you know -- are you familiar with the

14  fact that his mother took him to Samaritan Hospital on

15  September 13th because he had a rash from a chemical wipe on

16  his face?

17  A.   There was some skin problem.  I'm not sure what it

18  was, but he was examined at that time.

19  Q.   And do you know that his mother had called the

20  pediatrician when he hadn't made a bowel movement in a few

21  days?

22  A.   I didn't recall that but --

23  Q.   Okay.  Well, if it's in the records, would you

24  disagree with me?

25  A.   I don't remember.

1    Q.   So, are you telling me that a mother that's calling

2    the doctor because her son hadn't made a bowel movement in a

3    few days, a mother who takes her son to the hospital because he

4    has a little bit of a rash on his face due to a chemical wipe,

5    that her son is going to suffer a heart attack and no one is

6    going to take him anywhere?

7    A.   The kid did suffer, quote, a heart attack.  That is

8    there.  Whether this was symptomatic, recognized by anybody, it

9    appears not.

10   Q.   Doctor, you are telling me that ███████████, a

11   month before his death, suffered a heart attack and no one has

12   any idea; they all go about their business?

13   A.   Yes.

14   Q.   Doctor, isn't it much more true that ███████████

15   suffered this as an agonal event?

16   A.   No.  You don't get collagen and scarring on the heart

17   in three days.  This is a longer lasting lesion than that, and

18   it doesn't have to be clinically evident.

19   Q.   How many hearts have you looked at under the

20   microscope?

21   A.   Thousands.

22   Q.   Thousands?

23   A.   Many thousands.

24   Q.   And how many autopsies have you done where you have

25   had to actually look at the heart and determine someone's cause

1    of death?

2        A.    Every time I did an autopsy; and virtually every time

3    I examined an autopsy case, whether I did it or not, I'm very

4    interested in what the heart pathology shows.  So, I'm probably

5    looking -- in virtually every case that I am selected on,

6    there's slides of the heart there.  I look at them all.

7        Q.    Okay.  Well, didn't you tell me earlier that you

8    could count probably on your hands how many death certificates

9    you have signed?

10       A.    That's right.

11       Q.    Because your primary duty is to look at brains on

12   autopsies.  You do brain autopsies; correct?

13       A.    That's my focus, but I'm a pathologist and I look at

14   all the organs.

15       Q.    Okay.  But you look at them to no end.  You don't

16   have to sign a death certificate and determine the cause and

17   manner of someone's death; correct?

18       A.    Not my job.

19       Q.    Okay.  Do you agree that it's a fact that the vast

20   majority of seriously head injured infants and children, where

21   automobile and other major accidental trauma can be ruled out,

22   acquired their injuries as a result of abuse?

23       A.    That's a common assertion.  And in some age groups,

24   that would be true.  As a blanket statement, that's overly

25   broad.

1          Q.   Okay.  Is that something that you testified to

2     before?

3          A.   It's conceivable.

4          Q.   Okay.  So, to now sit here and say that it's overly

5     broad, do you agree with me that you testified to that

6     statement before?

7          A.   It depends.  I have been testifying in court for 40

8     years.  So, I don't recall.

9          Q.   Okay.  Do you agree with me that you testified to

10    that in a prior proceeding in this case?

11         A.   I don't know.

12         Q.   Well, do you recall being asked this question and

13    giving this answer:

14              "Question:" --

15              MR. COFFEY:  May I have a page, please?

16              MS. BOOK:  Yes - I'm sorry - 2198.

17              MR. COFFEY:  Okay, 2198.  I'm all set.

18         Q.   "Question:  Do you agree that it is a fact that the

19    vast majority of seriously head injured infants and children,

20    when automobile and other major accidental trauma can be ruled

21    out, acquired their injuries as a result of abuse?

22              "Answer:  I wrote that in the earlier edition of my

23    book, and similar statements have been revised to take a

24    broader view of those things.

25              "Question:  Well, you have said that in the past;

1    haven't you?

2                "Answer:  Pardon me?

3                "Question:  You have said that in the past, though;

4    haven't you, Doctor?

5                "Answer:  I have, sure.

6                "Question:  The vast majority of those children were

7    abused?

8                "Answer:  That is what I said.  I would not write

9    that today and I haven't written that today."

10        A.    Fair enough.  That's my position.

11        Q.    Would you agree that, as a general rule, most

12   children do not die from intracranial bleeding associated with

13   vaginal birth?

14        A.    Yes.  That's true.

15        Q.    And most children who do experience intracranial

16   bleeding are asymptomatic; correct?

17        A.    It would appear so, yes.

18        Q.    And the children that experience this bleeding, they

19   clear up on their own without medical intervention, the studies

20   have shown; correct?

21        A.    Well, some certainly will, and then it's discovered

22   and treated, hopefully, but there's a lot of silent hemorrhage

23   that goes on that nobody knows about.

24        Q.    Okay.  That was going to be my next question to you.

25   So, if they rebleed, often, they are not clinically

*(Leestma - Defendant - Cross)*

1   significant; right?

2       A.   Well, maybe clinically significant but not

3   recognized.  It may come down the road apiece, where something

4   happens and then the full story emerges; but many times, it's

5   unknown and unappreciated.

6       Q.   Okay.  Most of the time, it's not going to impact the

7   child at all; correct?

8       A.   It may not.

9       Q.   And do you say that it can rebleed with minor trauma

10  or no trauma?

11      A.   Subdurals can, sure, and do.

12      Q.   Okay.  When an infant is first born, they have a very

13  wide anterior fontanelle; correct?

14      A.   Yes.

15      Q.   Show me where your anterior fontanelle is.

16      A.   Right up here at the top of the head.

17      Q.   Okay.  And is it open when an infant is first born?

18      A.   It is not ossified.  That's the soft spot in the

19  baby's head, and I think everybody knows where that is.

20      Q.   Okay.  So, when you say it's not ossified, the bone

21  hasn't closed in that area?

22      A.   The skull hasn't closed over it, no.

23      Q.   Okay.  So, it's easy to see the top part of the brain

24  on ultrasound; correct?

25      A.   Yeah.  Ultrasound should reveal that, yes.

*(Leestma - Defendant - Cross)*

1    Q.    Okay.  And in your experience, are you aware that

2    it's common for premature babies to get an ultrasound done of

3    their head?

4    A.    It's seemingly more common nowadays than it was.  I

5    have no idea what percentage, but it's frequently done.

6    Q.    Well, you know that ▊▊▊▊ had an ultrasound done;

7    correct?

8    A.    I'm told, yes.

9    Q.    Okay.  And he had it done when he was ten days old;

10   correct?

11   A.    I don't remember the date, but he was young.

12   Q.    Okay.  Have you seen that study?

13   A.    No.

14            MS. BOOK:  May I approach, Your Honor?

15            THE COURT:  Yes, you may.

16   Q.    I'm going to hand you what's in evidence as People's

17   Exhibit 9 and ask you to just look this over.

18   A.    It's a report.  I have seen that report.  I haven't

19   seen the study itself; or if I did, I don't remember.

20   Q.    Okay.  So, do you agree with me that ▊▊▊▊ had an

21   ultrasound done when he was ten days old?

22   A.    Well, let's see what the date is.  Date of birth, May

23   4th, and exam date, May 14th.  So, that's ten days.

24   Q.    Okay.  And the results of that were normal; correct?

25   A.    That's what they said; no abnormal fluid collections

1   or problems.  So, normal study.

2        Q.   So, no bleeds?

3        A.   Maybe, maybe not.  This report says they didn't see

4   anything, and that does not necessarily mean that there wasn't

5   a bleed there.  It could be the level -- below the level of

6   detection or the technology that was involved maybe missed it.

7   I don't know.  All I know is that they said it was negative.

8        Q.   Okay.  Well, you agree with me that this is a nice

9   wide open area to view; correct?

10        A.   Yes.

11        Q.   And the large subdural hematoma that ███████ had upon

12   autopsy, that would have been at a place that was easily viewed

13   through that area; correct?

14        A.   If he had it at that time, sure.  It would have been

15   very evident.

16        Q.   Okay.  Well, isn't it your opinion that it dates back

17   to birth?

18        A.   The process began at birth probably.  The evolution

19   of this fluid collection wasn't immediate.  It took four and a

20   half months or thereabouts to get to that place.

21        Q.   Okay.  So, it was your opinion that it came at the

22   time of birth; correct?

23        A.   He probably had bleeding over the brain at the time

24   of birth that evolved into what we saw.

25        Q.   So, it's your testimony that, even though he got this

*(Leestma - Defendant - Cross)*

1    ultrasound - that this is a good place to view; that the bones

2    are nice and wide open so you can look in - that he must have

3    been bleeding but it was missed?

4    A.    That's my opinion.  I think the study, for whatever

5    reason - I'm not an ultrasound expert - it has a sensitivity

6    and an insensitivity and it's not always accurate.

7    Q.    Okay.  Now, Doctor, would you agree -- I will take

8    this back.  Actually, I'm going to leave this up here.  I'm

9    going to ask you another question about it in a minute.

10   A.    Okay.

11   Q.    Okay.  Now, would you agree with me that children who

12   are suffering from bleeds in their brain are going to have

13   abnormal head growth?

14   A.    They often do; not always, but they often do.

15   Q.    Okay.  Well, would you agree with me that ██████'s

16   head grew normally?

17   A.    For the first three examinations, apparently so.

18   He's hovering underneath the 25th percentile and starts

19   approaching it at the age of under three months according to

20   this chart.

21   Q.    Okay.  What about the first one?  Where is he

22   actually?

23   A.    He's below the fifth percentile, meaning most kids

24   are going to have -- 95 percent of them are going to have

25   bigger heads.

1    Q.   Okay.  So, it's your testimony that he has a bleed in

2    his brain, but 95 percent of kids have a bigger head than him;

3    correct?

4         A.   At birth, yes.

5         Q.   Okay.  And when was the next one taken?

6         A.   The next one seems to be at one month of age.

7         Q.   Okay.  And what was his -- what did his head

8    circumference put him; in what percentile at that point?

9         A.   He's moved up to the 25th percentile or thereabouts.

10        Q.   Okay.  And in your opinion, would the birth bleed

11   have rebled by this point in time?

12        A.   It may have.  I don't know.  His head is growing,

13   which kids do; and what component of that might be due to a

14   bleeding problem or the complications of it, I don't know.  I

15   have no way of knowing.

16        Q.   Okay.  So, it's your opinion he has a bleed in his

17   brain.  It could have possibly rebled.  But 75 percent of kids

18   still have a larger head than him?

19        A.   Yes.

20        Q.   Okay.  And then at two -- actually over two months,

21   because his two-month visit, because of how he was discharged

22   from the hospital, didn't actually occur until July 23rd;

23   correct?  So, he was actually more than two and a half months

24   old; right?

25        A.   About two and a half according to this.  He's

1    approaching the 50th percentile.  I don't know.  The chart

2    isn't that precise, but he's slightly under the 50th

3    percentile.

4         Q.    Slightly under the 50th percentile at that time?

5         A.    Right.

6         Q.    And, so -- even though, at this time, he's certainly

7    having rebleeds by now; right?

8         A.    Yeah.  He must have had something going on in there.

9         Q.    Okay.  To get that massive layering effect you told

10   us about?

11        A.    He didn't have all those layers at that time, but he

12   must have had some of them.

13        Q.    He only has two more months left to live.  So, by the

14   time you see this layering effect, he only has two more months

15   to get these layers.  So, at this time, he certainly has had to

16   have rebled; correct?

17        A.    I think so.

18        Q.    And at this point in time, 50 percent of kids still

19   have a bigger head than him?

20        A.    That's what it says.

21        Q.    Even though he has all this bleeding going on in his

22   brain?

23        A.    I don't know how much all this bleeding is.  He

24   probably had some.  The microscopic certainly indicates that

25   this process must have been going on at that time.  It just

*(Leestma - Defendant - Cross)*

1    hadn't declared itself yet.

2        Q.   And haven't you previously testified that, when a

3    child has a subdural hematoma in their head, that their head is

4    going to be at the 95th percentile?

5        A.   There's no way I would know that.  Some of them are;

6    some of them aren't.  I mean, there's no direct link.  They may

7    have a head that's much bigger than that.  There's nothing that

8    says a chronic subdural has to be at 95th percentile.  That

9    wouldn't be true.

10       Q.   Okay.  Doctor, do you recall, at 2203 and 2204, being

11   previously asked this question and giving this answer:

12           "Well, would you expect to see an increased growth

13   rate if there was, in fact, a growing subdural hematoma inside

14   the infant's brain?

15           "Answer:  I would expect to see that.  Some children

16   somehow -- either the brain is shrunken and somehow head

17   enlargement is not needed to compensate.  I don't have a good

18   explanation.  But when you see children with CT scans that look

19   like that, usually their heads are in the 95th percentile of

20   circumference."

21       A.   Okay.

22       Q.   Do you recall being asked that question and giving

23   that answer?

24       A.   I don't recall, but it's there.  You read it to me.

25       Q.   And in fact, if you take a look at that growth chart

*(Leestma - Defendant - Cross)*                    1125

1       again, ███ was only in the 25th percentile at the end of

2       July; right?

3           A.   I don't know about the end of July.  That would be

4       when he was one month old?

5           Q.   When he was almost three months old.

6           A.   Two and a half puts him at -- somewhere between the

7       25th and 50th percentile.  I don't know.  It's not precise

8       enough to pull off in terms of head circumference.

9           Q.   Okay.  And when you were previously asked if you

10      would have expected that he would have had a bigger head in

11      July, you testified that you would have expected that.  Do you

12      recall that?

13          A.   Sure.  That would be reasonable.

14          Q.   So, you would have expected that he would have had a

15      bigger head in July?

16          A.   Yeah.

17          Q.   But, in fact, he didn't?

18          A.   Okay.

19          Q.   Now, you said that this could be the result of

20      multiple, like five or six, individual impacts.  Is that

21      correct?

22          A.   No.  I am talking about the subdural hematoma now.

23      Interval bleeds, yes; impacts, I have no idea.  There could be,

24      maybe not.

25          Q.   Okay.  So, you don't know if this is five or six or

1    seven different episodes; right?

2         A.   Well, certainly bleeding episodes.  That's evident

3    from the slides.  In terms of what attended them or caused

4    them, I have no idea.

5         Q.   And you don't know if it could have been two

6    different impacts that rebled two or three different times?

7         A.   No way to know.

8         Q.   Or three that rebled once?

9         A.   No way to know.

10        Q.   And the difference between a fresh bleed and a

11   rebleed, can you tell that under the microscope?

12        A.   Yes.

13        Q.   How can you tell that?

14        A.   A fresh bleed -- well, a fresh bleed, you can see

15   intact red blood cells and some early healing reactions.

16   Whether that is due to an impact or some injury or something

17   else or simply a spontaneous rebleed, there's no way to know.

18        Q.   If someone did have an existing subdural hematoma,

19   would a greater intensity of trauma lead to a higher chance of

20   rebleeding?

21        A.   Yes, probably.  I think prior subdural would lower

22   the injury threshold.  I think we know that.  How much, I don't

23   know.

24        Q.   And is it common that people with significant head

25   trauma are going to develop complications?

1      A.    I think that's fair to say.

2      Q.    Such as pneumonia?

3      A.    Pneumonia could be there, depends on what their

4   condition is.

5      Q.    Now, have you seen people with head trauma develop

6   pneumonia?

7      A.    Would I what?

8      Q.    Have you seen people with head trauma develop

9   pneumonia?

10     A.    Yes, certainly.  If they are on a respirator, they

11  are most certainly going to get a pneumonia of some sort.

12     Q.    Okay.  You talked a little bit on your direct about

13  aspiration.  What's the difference between aspiration of a

14  normal secretion and a chemical aspiration?

15     A.    Probably different.  Your normal secretions, they

16  obviously contain bacteria and, so, that may lead to whatever

17  infection or reaction would come from that.  If it's a chemical

18  aspiration, namely food or gastric contents, that's a horse of

19  a different color.  That would propel into the respiratory

20  tract and potentially into the lung, corrosive material that

21  would destroy the lung.  So, the picture would be somewhat

22  different.

23     Q.    So, do you agree that someone could aspirate on their

24  normal secretions?

25     A.    Yes.

*(Leestma - Defendant - Cross)*                              1128

1    Q.   Such as saliva?

2    A.   Yes.

3    Q.   And microscopically, it's not going to look the same

4    as someone who aspirated vomit; correct?

5    A.   Probably not.  It may be limited to the

6    tracheobronchial tree and may never reach the periphery of the

7    lung.

8    Q.   Okay.  So, microscopically, it's not going to have

9    that chemical burn effect; correct?

10    A.   No.

11    Q.   So, someone could aspirate without having a chemical

12    burn effect; correct?

13    A.   Correct.

14    Q.   And would you agree with me that there's a risk of

15    aspiration with head trauma?

16    A.   Of course, there is.

17    Q.   Because if you can't cough and protect your airway,

18    you are at a higher risk; right?

19    A.   That's part of the problem, and there may be, again,

20    intubation and failure to clear secretions.  There's a whole

21    bunch of things that go along with that, but what you say is

22    okay.

23    Q.   Okay.  And you are going to be vulnerable to

24    pneumonia; correct?

25    A.   Yes.

*(Leestma - Defendant - Cross)*                                      1129

1  Q. And if you do lose a period of consciousness and you

2 become more vulnerable, isn't it possible that you could

3 aspirate?

4  A. Yes.

5    MR. COFFEY: Objection. There's no evidence

6   that this child was unconscious at any time from any blow

7   to the head. There's no evidence of that.

8    THE COURT: The objection is overruled.

9  Q. So, if you lose a period of consciousness and you

10 become more vulnerable, isn't it possible that you could

11 aspirate?

12  A. Yes. That's true.

13  Q. And if you aspirate, it's possible that you are not

14 going to be able to clear your airways; correct?

15  A. That's part of it, yes.

16  Q. Okay. And you might be more susceptible to bacterial

17 disease or anything else; right?

18  A. Of course, yes.

19  Q. And do you agree with me that someone who is on a

20 ventilator for two days is going to pretty much develop

21 pneumonia?

22  A. It's hard to predict. There's quite often an element

23 of pneumonia that develops, but the spectrum is quite wide. I

24 can't necessarily predict what they will have, but it wouldn't

25 surprise me that some element, after two days on a respirator,

*(Leestma - Defendant - Cross)*                    1130

1     would occur.

2          Q.    Okay.  Now, it's medically possible to have both a

3     fresh bleed and a rebleed at the same time; isn't it?

4          A.    Well, I think fresh bleed/rebleed sort of means the

5     same thing.  I'm not sure what you mean there.

6          Q.    Well, could I have a new bleed and a rebleed at the

7     same time?

8          A.    A new bleed and a rebleed, you are using words that

9     mean the same to me.

10         Q.    Okay.  Could I have a rebleed and a bleed to a

11    different area at the same time?

12         A.    Yes.

13         Q.    That's medically possible?

14         A.    Sure.

15         Q.    So, if I had older subdural hematomas to my posterior

16    fossa, they could possibly rebleed while I got a new, fresh

17    bleed that wasn't there before?

18         A.    That's true.  That could happen.

19         Q.    You stated that ▮▮▮▮▮▮ was probably septic upon

20    arrival at Samaritan Hospital?

21         A.    I think that's likely, yes.

22         Q.    Okay.  It may not have set in all the way yet at that

23    point in time?

24         A.    Well, clearly, this isn't an on and off situation.

25    He was a sick baby.  He had evidence of, probably, an infection

*(Leestma - Defendant - Cross)*                                    1131

1    going on.  And when you look at the microscopic slides, to

2    backdate it is more than 36 hours old.  So, it's inconceivable

3    to me that he wasn't infected and probably septic by the time

4    he got to the hospital.

5        Q.    More than 36 hours old from the time they were taken

6    on September 25th?

7        A.    From the time of death.  I think he was in the

8    hospital about 36 hours.

9        Q.    Okay.  So, from the time of death on September 23rd?

10       A.    Yes.

11       Q.    Okay.  Now, Doctor, would you agree with me that head

12   trauma can cause DIC?

13       A.    Yes, it can.  How that exactly works -- head injured

14   people frequently do have coagulopathy problems and the

15   mechanism is rather complicated.

16                THE COURT:  Okay, if I could interrupt here.  We

17        are going to take a break at this point in time.  Members

18        of the jury, we will break for 15 minutes.  During the

19        course of this break, please don't discuss the case.

20        Don't form any judgments or opinions.  Don't read or

21        listen to any media accounts.  We will take a short break

22        at this time.

23                MR. COFFEY:  Can we approach?

24                THE COURT:  Yes.

25                (Jury excused.)

*(Leestma - Defendant - Cross)*                           1132

1          THE COURT:  Doctor, again, during this break, I

2     will ask that you please not discuss your testimony or

3     this case with anyone during the adjournment.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Thank you, Doctor.

6          (Brief recess taken.)

7          THE COURT:  Please be seated.  Bring the jury

8     in, please.

9          COURT OFFICER:  Jury entering.

10          THE COURT:  Please be seated.  The sworn witness

11     remains Jan Leestma.  Doctor, I remind you that you are

12     still under oath.  Ms. Book, you may continue.

13          MS. BOOK:  Thank you, Your Honor.

14    **BY MS. BOOK:   (Continuing)**

15     Q.  Now, Doctor, you had mentioned -- we were just

16    talking about DIC, and you had mentioned that head trauma can

17    cause DIC.

18     A.  Yes, it can.

19     Q.  Now, are you aware of what █████████'s platelet count

20    was at the time he went to Samaritan Hospital?

21     A.  Oh, boy, it was around 100,000 as I recall.  I don't

22    remember the exact number.

23     Q.  Okay.  If I told you it was 115,000, does that sound

24    right?

25     A.  It's possible, yes.

*(Leestma - Defendant - Cross)*

1    Q.    Okay. Now, would you agree with me that at 115,000,

2    that's a sufficient platelet count to clot blood?

3    A.    There are other factors involved.  You know, it isn't

4    simply the platelets.  It's other things.  So, I don't know how

5    to answer that.  And I'm not an expert on blood coagulation, so

6    I don't know.

7    Q.    Okay.  So, you are not an expert on blood

8    coagulation?

9    A.    On the specifics of those things.  I certainly know

10   what it is and have some insight there, but I can't go very

11   far.

12   Q.    Okay.  So, you are not really giving an expert

13   opinion here today on DIC then?

14   A.    Well, I think he had it.  I think he's got pathologic

15   evidence for multiple clotting in different places, but it

16   depends how far you want me to go there.

17   Q.    Okay.  Well, would you agree with me that hollow

18   organs are more susceptible to DIC?

19   A.    Hollow organs?  By that, you mean the gut, lung,

20   things like that?  That is right.

21   Q.    Or the kidney?

22   A.    Well, I don't know if the kidney is a hollow organ,

23   but I have to answer I don't know.

24   Q.    Okay.  Well, even going with the gut, there wasn't

25   bleeding in ███████'s gut; correct?

*(Leestma - Defendant - Cross)*                          1134

1    A.   As far as I know, no.

2    Q.   Okay.  And as you just stated, hollow organs are more

3    susceptible to DIC, yet ██████ was not bleeding into his gut;

4    correct?

5    A.   I don't know how far I can go with that.  I don't

6    think he had any bleeding in his gut, as far as I know, and I

7    can't go much farther with that.

8    Q.   Didn't you say you did a whole thorough review of the

9    autopsy?

10   A.   Yes.  I looked at the autopsy, read all the slides,

11   read the report.

12   Q.   Okay.  And he didn't have bleeding in his lungs;

13   correct?

14   A.   Apparently not.

15   Q.   So, two of the organs that you stated as being more

16   susceptible to DIC did not have bleeding?

17   A.   I did not say that they were more susceptible.  I

18   said I didn't know.

19   Q.   Okay.  So, you really are not in a position to give

20   an opinion about DIC then?

21   A.   At that level of detail, probably not.

22   Q.   Okay.  Thank you.  Now, talking about how you went

23   over the entire autopsy, you said that you really couldn't talk

24   about the extent of the retinal hemorrhaging to ██████'s eyes?

25   A.   Uh-huh.

*(Leestma - Defendant - Cross)*

1       Q.   Were you not provided slides of the eyes?

2       A.   Yes, I was, but that's one slice that's 360 degrees.

3  I don't have the rest of it.  I have some slices, but he

4  certainly had them.

5       Q.   Okay.  And you went over the autopsy report in detail

6  that detailed them out?

7       A.   Yes.

8       Q.   Okay.

9  (Photograph marked People's Exhibit 26 for identification.)

10      Q.   Doctor, I'm going to hand you what's been marked for

11  identification as People's 26.  Do you recognize that

12  photograph?

13      A.   Okay.  Let's see.  What have we got here?  This looks

14  to be the heart.

15      Q.   Okay.  And do you recognize it to be ███████████ '

16  heart?

17      A.   Oh, I think I have seen it before, and there's some

18  subendocardial hemorrhage there.

19      Q.   What does that mean?

20      A.   There's hemorrhage under the inner lining of the

21  heart, the inner layer of it, little streaks of hemorrhage

22  there.

23      Q.   And that would be fresh hemorrhage; correct?

24      A.   It looks -- it's identifiable as at least recent

25  blood.  I don't know how old it is.  It is still recognizable

*(Leestma - Defendant - Cross)*                    1136

1    as blood, not brown stuff or orange.

2         Q.   Okay.  So, there is fresh blood to ██████ 's heart?

3         A.   Sure.

4         Q.   Okay.  Thank you.

5              MS. BOOK:  At this time, I would offer People's

6         26 for identification into evidence.

7              MR. COFFEY:  No objection.

8              THE COURT:  People's 26 will be received without

9         objection at this time.

10   (People's Exhibit 26 marked for identification received in

11   evidence and marked People's Exhibit 26 in evidence.)

12             THE COURT:  Ms. Book, may I see that photo,

13        please?

14             MS. BOOK:  Yes, Your Honor.  I'm sorry.

15             THE COURT:  Thank you.  All right.  Members of

16        the jury, People's 26 which was just received in evidence

17        is a photo.  Again, I would remind you at this time that

18        the photo is not being introduced to arouse any sympathy,

19        passion or prejudice.  The photo is somewhat graphic in

20        nature, and I would remind you at this time that you are

21        not to consider factors such as sympathy, prejudice or

22        passion at any time during this case, including during

23        your deliberations.

24             MS. BOOK:  I'm not going to seek to publish this

25        at this time.

*(Leestma - Defendant - Cross)*                                      1137

```
 1                    THE COURT:  I understand.  It is evidence and,

 2          therefore, presumably will be made available to the jury,

 3          so I wanted to give that instruction.

 4          Q.   Doctor, can you name a single study showing that a

 5    child's chronic subdural hematoma can rebleed from a trivial

 6    injury and cause brain injuries?

 7          A.   Yes.

 8          Q.   And what is that?

 9          A.   The study by Piatt, P-I-A-T-T, published in

10    Neurosurgical Focus, which is an on-line journal - I'm not sure

11    which neurosurgical association - some years ago.  It was

12    relating to this child that I talked about that was trying to

13    pull himself up on a piece of furniture and known to have fluid

14    collections, fell backward and achieved bleeding.  There were

15    retinal hemorrhages and nearly died but did survive.

16          Q.   Okay.  And this was a child that fell backwards?

17          A.   Yes.

18          Q.   What type of flooring did it fall on to?

19          A.   What came before?

20          Q.   No.  What type of flooring was it?

21          A.   The standard carpeted floor over wood or concrete.

22          Q.   Okay.  Do you know that to be the case?

23          A.   I don't recall the exact things from the case report,

24    but it's detailed in there; a hard surface, in any case.

25          Q.   Okay.  Now, Doctor, if I told you that there was
```

1    testimony elicited in this case that Mr. Thomas, the man

2    sitting on the end over there -- his baby was crying.  He had

3    just gotten into a fight with his wife and he was upset.  So,

4    he was bouncing the baby onto a bed, and the baby wouldn't stop

5    crying.  So, he bounced the baby harder, and the baby fell off

6    of the bed and fell onto the floor, and this bed was 17 inches

7    off of the ground.  There was no bed frame or anything to make

8    it higher.  Do you have an opinion about whether or not this

9    would have been sufficient to cause the injury to ████████ 's

10   head?

11       A.   What injury?  I have to know that.

12       Q.   His subdural hematomas?

13       A.   The child had a chronic subdural hematoma.  That

14   incident certainly didn't cause that.  It may have caused some

15   bleeding in it, but it didn't cause the subdural, which clearly

16   was chronic.

17       Q.   Okay.  So, it could have caused it to rebleed?

18       A.   Yes.

19       Q.   And can a rebleed put a child over the edge?

20       A.   It can.

21       Q.   And cause the child's death?

22       A.   It can in time, yes.

23            MS. BOOK:  Nothing further.  Thank you.

24            THE COURT:  Mr. Coffey?

25            MR. COFFEY:  Thank you.

1    **REDIRECT EXAMINATION**

2    **BY MR. COFFEY:**

3        Q.   Doctor, whether it can cause a rebleed or whether it

4    did is speculation; correct?

5        A.   Is it a medical issue or --

6        Q.   I'm sorry.  Whether that mechanism you just heard can

7    cause a rebleed --

8        A.   Yes.

9        Q.   -- and whether that rebleed in this case could have

10   caused possibly death is speculation; correct?

11       A.   Well, it's a theory.  It could happen that way.

12       Q.   A lot of things could happen; right?

13       A.   Sure.

14       Q.   Doctor, would you agree you could hit the lottery

15   today?

16       A.   There is a logic behind how that could evolve into

17   something more serious, yes.

18       Q.   Let's talk about what we know.  Based upon the

19   evidence, the objective evidence that you know as a

20   pathologist, what is your opinion of the cause of this baby's

21   death?

22       A.   Primarily the subdural fluid collection, as we know

23   there wasn't very much, if any, recent bleeding in them.  My

24   opinion, as I have stated it before, was bacterial sepsis and

25   infection and shock related to that.

*(Leestma - Defendant - Redirect)*                    1140

1      Q.   All right.  Now, Dr. Klein has testified -- and tell

2    me something.  With regard to the DIC, would that be an area

3    that would be more appropriate for an infectious disease

4    expert?

5      A.   Yeah, it sure would.  He would be very experienced

6    and familiar with that.

7      Q.   And in terms of aspiration and pneumonia and

8    streptococcal pneumoniae and how that affects the bloodstream,

9    would that doctor be more skilled or more proficient in that?

10     A.   From a clinical aspect, a clinician.  An internist or

11   pharmacologist or whoever would certainly know more about that

12   in terms of pathology and what it means, how it works.  I'm

13   certainly qualified to know about that.

14     Q.   If Dr. Klein opined that -- we all have saliva,

15   obviously; correct?

16     A.   Sure.

17     Q.   And sometimes when you swallow saliva, it can get

18   into, possibly, our lungs; correct?

19     A.   Yes.

20     Q.   And what are cilia?

21     A.   What are what?

22     Q.   Cilia, C-I-L-I-A?

23     A.   The cilia, they are little cells with hair on the

24   surface of them that are beating that helps to clear our

25   airway, and that is there.

1    Q.   And Doctor, if I were to tell you that Dr. Klein,

2   when asked a question, whether you can swallow saliva and

3   whether it would kill you, and he were to say it's unlikely -

4   in fact, I think he said to Ms. Book, "You will be okay if you

5   do that" - would you disagree with that?

6    A.   Yes.   You would not.   We have things that go down,

7   quote, the wrong throat all the time, and we cough it out and

8   that's that.

9    Q.   It doesn't cause bacteremia; does it?

10    A.   It has bacteria in it.

11    Q.   My point is, Doctor, does the process that we are

12   talking about -- it doesn't happen to everybody every day,

13   obviously, or we would all be dead; correct?

14                MS. BOOK:   Objection, leading.

15                THE COURT:   Sustained.

16    Q.   Doctor, the process that you have described,

17   streptococcal bacteremia and septic shock, is not something

18   that happens very often; does it?

19    A.   Not if you are walking around.   I am sure if you are

20   going to any hospital or any ward anywhere, there's going to be

21   somebody there suffering from sepsis.   It's medically a common

22   problem.   You know, nobody here is doing that, I hope.

23    Q.   Okay.   Now, Doctor, do you have any evidence

24   whatsoever in the record or based upon what you have heard that

25   this baby ever aspirated anything of a food nature or vomit or

*(Leestma - Defendant - Redirect)*                    1142

1   anything that went into his lungs?  Do you have any evidence

2   from any medical professional?

3       A.   In looking at the lung slides and so forth, we can

4   usually recognize what food is, vegetable matter, milk.  I saw

5   nothing like that.  I indicated that the gastric contents are

6   acids.  I sure know what aspiration pneumonia due to vomitus

7   looks like.  It's very different from what these lungs look

8   like.  So, could there have been some aspiration?  Yeah.  But I

9   can't show it to you.

10       Q.   Let me ask you this:  With a reasonable degree of

11   medical certainty -- I'm not asking about what could be,

12   Doctor.  The sun could rise in the west, theoretically, I

13   suppose; right?

14       A.   Right.

15           MS. BOOK:  Objection, leading.

16       Q.   Let me withdraw that.  Based upon the medical

17   evidence that you viewed as a competent neuroradiologist -

18   pathologist, I apologize - do you have an opinion whether

19   aspiration played any part in this case based upon the medical

20   evidence that you have seen?

21       A.   My answer would be no.  I have seen no evidence of

22   that.

23       Q.   Okay.  And Doctor, do you find any evidence in the

24   record at all, up to the morning of the Sunday that this poor

25   baby, ███████, was taken to the hospital, that this child was

*(Leestma - Defendant - Recross)*                                    1143

1     ever unconscious at all, ever, by anyone?

2          A.   No.

3          Q.   So, of course, it's theoretically possible, is it

4     not, that this child could have been unconscious at some point,

5     theoretically; correct?

6                    MS. BOOK:  Objection, leading.

7                    THE COURT:  Sustained.

8          Q.   Well, is there any evidence that you found in the

9     record of this child ever being unconscious?

10         A.   Had been unconscious, no.

11                   MR. COFFEY:  That's all I have, Judge.  Thank

12         you.

13                   THE COURT:  Ms. Book, anything else?

14    **RECROSS-EXAMINATION**

15    **BY MS. BOOK:**

16         Q.   Doctor, can you lose consciousness due to a head

17    trauma?

18         A.   Say that again.

19         Q.   Can you lose a period of consciousness due to a head

20    trauma?

21         A.   Sure.  Loss of consciousness is a common

22    accompaniment to head trauma.

23         Q.   And if you are unconscious and you swallowed saliva

24    or something into your lung, would you be able to cough it out?

25         A.   You might or might not.  It depends on how deeply

P021778

1    unconscious you are.  Those kinds of reflexes are preserved for

2    a while.  If you are deeply comatose, then you don't have those

3    guarding reflexes any more.  So, it's hard to predict.  An

4    unconscious person certainly can respond to something coming

5    down the back of the throat and can cough it out but sometimes

6    not.

7         Q.   And when ███████████ arrived at Samaritan

8    Hospital, he did have mucoid in his throat; didn't he?

9         A.   He did have what?

10        Q.   Mucoid, green substance?

11        A.   Mucous stuff?

12        Q.   In his throat?

13        A.   I don't know.  At autopsy, he seemed to have some

14   mucoid material in the upper airway; but at admission, I don't

15   know.

16        Q.   And he wasn't able to maintain his airway when he was

17   admitted to Samaritan Hospital?

18        A.   Of course.  That's one of the first things they do,

19   is put a tube in and guarantee air transfer.

20        Q.   And that was because he wasn't able to maintain his

21   own airway; correct?

22        A.   Apparently so.  He was comatose, and I don't know the

23   status of breathing, whether he had any output or not, but

24   that's what you do.

25             MS. BOOK:  Thank you.  Nothing further.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

P021779

1          MR. COFFEY:  Thank you, Doctor.  You are free to

2    leave.

3          THE COURT:  Doctor, you may step down.  Thank

4    you.

5          MR. COFFEY:  Thank you, Doctor.

6          THE COURT:  All right.  Members of the jury, as

7    we talked about a little earlier, we are going to stop at

8    this point in time.  It's my understanding, from having

9    spoken to the defense, that they have one more witness

10   left.  That witness will be available to testify first

11   thing Tuesday morning.  So, I'm going to ask that you

12   report back here Tuesday morning at nine o'clock.  Okay?

13   You will have, obviously, Monday off, but we will resume

14   Tuesday morning right at nine o'clock.

15         During the course of this three-day break,

16   please do not discuss the case among yourselves or with

17   anyone else.  Do not read or listen or view any media

18   accounts reported in this case.  Do not visit any premises

19   mentioned during this trial.  Do not conduct any research

20   about this case.  Do not request or accept any payment in

21   return for supplying any information about this case.  Do

22   not form any judgments or opinions about this case.  And

23   if anyone attempts to improperly influence you, please

24   report that directly to me.

25         Again, over the course of this break, this