EXHIBIT "W"

Page 1

Thomas v City of Troy et al - 7-30-2020 - Walter Edge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

Plaintiff,

           v    17-CV-626

CITY OF TROY, ADAM R. MASON,
RONALD FOUNTAIN, TIM COLANERI,
COUNTY OF RENSSELAER &
MICHAEL SIKIRICA,

Defendants.

_____/

              NON-PARTY
              DEPOSITION OF:     WALTER EDGE, M.D.

              DATE:            July 30, 2020

              TIME:            10:07 a.m. to 4:05 p.m.

              LOCATION:       Webex

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 2

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2   APPEARANCES:

 3       FOR THE PLAINTIFF:
         KLEIN CIVIL RIGHTS
 4       BY:   BRETT KLEIN
         305 Broadway, #600
 5       NEW YORK, NEW YORK 10007

 6       FOR THE CITY OF TROY AND POLICE OFFICERS:
         PATTISON, SAMPSON, GINSBERG & GRIFFIN:
 7       BY:  MICHAEL E. GINSBERG
              RHIANNON SPENCER
 8
         22 First Street
         Troy, New YORK 12180
 9

10       FOR THE STATE OF NEW YORK
         OFFICE OF THE NY STATE ATTORNEY GENERAL
11       BY:  CHRISTINE CALABRESE
         The Capitol
12       Albany, New York  12224-0341

13       FOR THE WITNESS:
         MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP
14       BY:  LEAH MITCHELL
         6 Tower Plaza
15
         Albany, New York 12203
16
         FOR MICHAEL SIKIRICA, M.D.:
         BAILEY JOHNSON & PECK, P.C.
17
         BY:  CRYSTAL PECK
18       Five Pine West Plaza, Suite 507
         Albany, New York 12205
19

20

21

22

23

24

25
```

Page 3

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2                         STIPULATIONS

 3        It is HEREBY STIPULATED by and among the attorneys

 4   for the respective parties, in accordance with the Federal

 5   Rules of Civil Procedure, that this deposition may be

 6   taken by the Defendant at this time, pursuant to subpoena;

 7        FURTHER STIPULATED, that all objections except as to

 8   the form of the questions and responsiveness of the

 9   answers, be reserved until trial;

10        FURTHER STIPULATED, that the witness may read and

11   sign the deposition and make any corrections to same

12   before any Notary Public;

13        AND FURTHER STIPULATED, that if the original

14   deposition has not been duly signed by the witness and

15   returned to the attorney taking the deposition by the time

16   of trial or any hearing in this cause, a certified copy of

17   the deposition may be used as though it were the original

18

19

20

21

22

23

24

25
```

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 4

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2              I N D E X   O F   P R O C E E D I N G S

3                      WALTER EDGE; Sworn

4    Direct Examination by Mr. Ginsberg                    6
     Cross Examination by Mr. Klein                       68
5    Cross Examination by Ms. Peck                        163
     Cross Examination by Ms. Calabrese                   169
6    Redirect Examination by M. Ginsberg                  203
     Recross Examination by Mr. Klein                     206
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

800.523.7887                                    Associated Reporters Int'l., Inc.

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                   E X H I B I T    I N D E X
 3   Marked as
 4   Description
 5   A                                                    17
 6   86 pages of medical records
 7   B                                                    67
 8   Deposition of a witness
 9   Plaintiff
10   One
11   Entire medical record
12   Two
13   Troy police department  investigation report
14   Three
15   Video 1
16   Four
17                            Video 2
18
19
20
21
22
23
24
25
```

Page 6

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        (On the record; 10:07 a.m.)
 3                        MR. GINSBERG:  If you would swear the
 4          witness.
 5                        THE REPORTER:  Okay.  We're on the
 6          record.  Doctor, if you could please raise your right
 7          hand.  Do you swear or affirm the testimony you're
 8          going to give is the truth, the whole truth, and
 9          nothing but the truth?
10                        THE WITNESS:  Yes.
11                        THE REPORTER:  Could you please state
12          and spell your name for the record please?
13                        THE WITNESS:  Walter Edge, W-A-L-T-E-R
14          E-D-G-E.
15                        THE REPORTER:  Okay.  The witness has
16          been sworn.  I'm all set.
17                        MR. GINSBERG:  Right, thank you.
18                        DIRECT EXAMINATION
19                        BY MR. GINSBERG:
20                        Q.   Doctor, before we get started,
21          have you received a package of materials for today's
22          deposition which includes a chart from -- with regard
23          to the treatment of █████████████?
24                        A.   Yes, I reviewed the chart and at
25          least part of it that was relevant.  I also received
```

Page 7

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      a copy of a deposition, earlier deposition and also
 3      the transcript of the earlier trial.
 4                  Q.    Perfect.  So, do you have a copy
 5      of the chart there with you if we need to refer to
 6      it?
 7                  A.    Yes.
 8                  Q.    Okay.  Wonderful.  Doctor, my
 9      name is Michael Ginsberg.  I'm the attorney for the
10      City of Troy and the Troy police officers, defendants
11      in the Thomas versus City of Troy et al matter.  And
12      I'm going to ask you a series of questions that
13      require a verbal response so that we can keep the
14      record clear.  Okay.
15                  A.    Yes.
16                  Q.    And could you tell us, again,
17      your full name?
18                  A.    Walter Edge.
19                  Q.    And Dr. Edge, can you describe
20      for us briefly your educational background, the
21      beginning of college?
22                  A.    I graduated from SUNY Albany in
23      1980, no '76.  I went to med school in '76 to '80 at
24      Albany Med.  I went to -- I was in residency at
25      Albany Med from '80 to '84.  I practiced out of
```

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2      Albany Med and elsewhere until '89 at which point I

 3      went to Toronto, Ontario to do a fellowship in

 4      pediatric I.C.U. for six months.  And then I returned

 5      to Albany Med and have been there ever since.

 6                     Q.   And, doctor, are you currently

 7      employed at Albany Med?

 8                     A.   I am.

 9                     Q.   And do you hold a title?

10                     A.   I am a full professor in

11      pediatric and attending physician.

12                     Q.   And do you work with any

13      particular specialty within the field of medicine?

14                     A.   I work in pediatric intensive

15      care.

16                     Q.   And what does pediatric intensive

17      care entail?

18                     A.   Taking care of children in an

19      I.C.U. setting.

20                     Q.   And are these extremely ailing

21      children?

22                     A.   Yeah.

23                     Q.   Intensive Care Unit, correct?

24                     A.   I work in a pediatric intensive

25      care unit, yes.
```

```
 1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                          Q.   And is there a short name for the
 3      pediatric intensive care unit, is it sometimes
 4      referred to as the PIC-U?
 5                          A.   Yes, P-I-C-U.
 6                          Q.   And, doctor, have you been
 7      involved in or authored any publications over the
 8      course of your history?
 9                          A.   Yes.
10                          Q.   Could you briefly describe them?
11                          A.   Not really.  There's about
12      twenty.
13                          Q.   And in what fields -- in what
14      fields were they?
15                          A.   There's a far range.  Pediatrics,
16      I have a paper -- three papers I think and four
17      publications, perhaps on transport between hospitals
18      of critically ill children and the list goes on.
19                          Q.   Okay.  And are you a current
20      member of any professional organization?
21                          A.   Yes, the Society of Critical Care
22      Medicine and the American Academy of Pediatrics.
23                          Q.   And do you currently hold any
24      board certification?
25                          A.   Yes, I am board certified in
```

Page 10

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        pediatric critical care.  I'm also board certified in

3        internal medicine.

4                    Q.   And, doctor, if I draw your

5        attention to September 21st of 2008, were you

6        employed at that time period -- at that time?

7                    A.   Yes.

8                    Q.   And where were you employed?

9                    A.   At Albany Med.

10                   Q.   And did you hold a title at that

11       time?

12                   A.   The same - well, I'm not sure if

13       it was the same title, but, I was an attending

14       physician in the PIC-U.  I'm not sure -- I think -- I

15       think, I was full professor at that point.  I'm not

16       positive.

17                   Q.   At that time period, were you

18       effectively in charge of the Pediatric Intensive Care

19       Unit?

20                   MS. MITCHELL:  Object to form.

21                   BY MR. GINSBERG:  (Cont'g.)

22                   Q.   You can answer that.

23                   A.   Okay.  I -- I don't understand

24       your question.  What does in charge mean?

25                   Q.   What I mean, were you -- were you

Page 11

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       the physician in charge of that unit in September of
 3       2008?
 4                      A.    I still -- in charge could mean a
 5       lot of things.  It could mean administratively in
 6       charge.  It could mean that I was on call.  It could
 7       mean any number of things.  I don't know what in
 8       charge actually means.
 9                      Q.    Did the other doctors and staff
10       assigned to the Pediatric Intensive Care Unit report
11       to you at that time?
12                      A.    At least for part of the day, I
13       can't tell you for the twenty-four hours, but I was
14       in -- yeah.  I was there --.
15                      Q.    Who is the highest ranking
16       physician within Pediatric Intensive Care Unit in
17       September of 2008?
18                      A.    On duty or in general?
19                      Q.    In general.
20                      A.    Well, we had the -- I was the
21       chief of the Division of Pediatric Critical Care
22       Medicine and then Dr. Sanchez was the Director of the
23       Pediatric I.C.U.  So we share chieftain, we were both
24       in charge.  I -- I was more the academic because
25       we're part of Albany Medical College.  I was the
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      academic chief, Division chief and Dr. Sanchez was

3      the Administrative Director of the Intensive Care

4      Unit, the nursing unit.

5                      Q.   In September of 2008, were your

6      duties with regard to the PICU different than they

7      are currently?

8                      A.   I mean, there's -- there's

9      schedule differences, but I'm generally doing the

10     same job I was doing then.

11                     Q.   And what does that entail?  What

12     were your daily responsibilities in September of 2008

13     in the PICU?

14                     A.   Well, we had multiple

15     responsibilities.  Besides, we have -- we cover the

16     PICU.  We usually split it up between days and

17     nights.  So there is different people there,

18     different times of day.  In addition, we have an

19     active service doing sedations.

20                     Q.   Doctor, what were your specific

21     responsibilities in September of 2008?

22                     A.   I did all -- we also attended at

23     different -- at a nursing home that takes care of

24     chronically ventilated patients.  So I had

25     responsibilities in all of those things.  So I, you

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      know, I can give you much greater detail.  If you

3      wanted to focus in on the day in particular, I'd be

4      glad to tell you what I was doing that day.

5                   Q.   We'll get to that afterward.

6      Doctor, drawing your attention to September 21st,

7      2008.  Did there come a time when you first came into

8      contact with a patient named ███████████?

9                   A.   Yes.

10                  Q.   And do you recall approximately

11     what time that was?

12                  A.   No.

13                  Q.   Would it help you if you referred

14     to the chart?

15                  A.   Yes.

16                  Q.   Would you do that?

17             MR. GINSBERG:  And while he is doing

18     that, do we have this chart marked?  How are we going

19     to do that remotely?

20             MS. MITCHELL:  It has to be marked in

21     order for him to refresh his memory and use it.

22             MR. GINSBERG:  I'm working on it,

23     Christina.

24             THE REPORTER:  I do have the exhibits.

25     Is it the chart, it's like eighty pages, I believe.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. MITCHELL:  Are we off the record?
 3                    MR. GINSBERG:  Yeah, let's go off the
 4        record for a moment.
 5                    THE REPORTER:  Off the record.
 6                    (Off the record)
 7                    (On the record)
 8                    BY MR. GINSBERG:  (Cont'g.)
 9                    Q.   Are you ready, Doctor?
10                    A.   Yes.
11                    Q.   Okay.  I believe that the
12        question was, do you recall what time approximately
13        you first came into contact with ███████████ on
14        September 21st, 2008?
15                    A.   A physical contact occurred at
16        12:06.  However, I had contact by telephone with
17        Samaritan Hospital before that and had arranged for
18        the transport team to go from Albany Med to Samaritan
19        to pick up the child on my recommendation that they
20        should do that.  And I do not have the exact time
21        that the Samaritan contact was made.  I -- I do have
22        the time that the transport team departed.  Okay.
23        Here's the initial time of the call.  I'm sorry, I do
24        have the initial time of the call from Samaritan was
25        -- it's hard to read 9:52 a.m.
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    Q.   Would that have been a.m.?
 3                    A.   Yes.
 4                    Q.   Okay.  And you --
 5                    A.    With the team, leaving at 10:18
 6        and arriving at Samaritan at 10:53, leaving Samaritan
 7        11:55 and arriving at 12:06 and I saw the child as
 8        soon as the child arrived.
 9                    Q.   That would have been shortly
10        after noon, correct?
11                    A.    Correct.
12                    Q.   And, Doctor, what was the sum and
13        substance of the discussion if any that you had with
14        the folks at Samaritan Hospital before the patient
15        arrived at Albany Med?
16                    A.    I don't remember exactly.  But,
17        in summary, I knew that there was a four-month old
18        child who was unresponsive, neurologically showing
19        limited neural -- neurologic activity, who was having
20        trouble breathing, who was therefore intubated and
21        put on a ventilator and we discussed the history
22        which was of some vomiting apparently, and diarrhea
23        and increasing lethargy which had occasioned the
24        parents to call EMS and bring the child to Samaritan.
25                    Q.   And Doctor --
```

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                      A.   In addition, the child had very
3        low blood pressure and was requiring pressure
4        medication to keep the blood pressure to an
5        acceptable level.
6                      Q.   And Doctor, is the chart and the
7        records that have been marked as
8                      City of Troy A for today's deposition,
9        were they made and kept in the ordinary course of
10       business of Albany Medical Center Hospital?
11                     A.   I don't understand your question.
12                     MS. MITCHELL:  I'm going to object
13       just because I --I don't know what has been marked as
14       A, if - is -- are you able to pull that up on the
15       screen for us?  I mean, he can --
16                     MR. GINSBERG:  It's on the screen now.
17                     MS. MITCHELL:  Okay.
18                     THE WITNESS:  That's a consultation to
19       ophthalmology.  Is that what you want to talk about?
20                     MR. GINSBERG:  No, we're just -- we're
21       just talking about the records.  Doctor, we'll sort -
22       we'll sort this out.
23                     BY MR. GINSBERG:  (Cont'g.)
24                     Q.   Is it the business of Albany
25       Medical Center Hospital to make and keep medical
```

Page  17

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      records?
 3                      A.   Yes.
 4                      Q.   And were these medical records
 5      that are in front of you and that have been marked as
 6      C.O.T. Exhibit A for today's date made and kept in
 7      the ordinary course of business on Albany Medical
 8      Center Hospital?
 9                      MS. MITCHELL:  I object.  I -- he
10      can't answer that because what hasn't been marked.
11                      BY MR. GINSBERG:  (Cont'g.)
12                      Q.   You can answer, Doctor.
13                      MS. MITCHELL:  No, I'm going to direct
14      him not to answer, he can't --.
15                      MR. GINSBERG:  You cannot direct him
16      not to answer.  Those are --
17                      MS. MITCHELL:  He can -- he --.
18                      MR. GINSBERG:  -- standing objections,
19      you are not permitted at a deposition.
20                      MS. MITCHELL:  Will you stop --.
21                      MR. GINSBERG:  Take it up in court.
22                      MS. MITCHELL:  Excuse me.
23                      MR. GINSBERG:  All of those will be
24      sorted out later at trial.
25                      MS. MITCHELL:  Sir.
```

Page 18

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        MR. GINSBERG:  Save it for the court.

3        Why don't we just move ahead with the deposition?

4                        MS. MITCHELL:  Okay.

5                        MR. GINSBERG:  Is the foundation

6        directly for the record.

7                        MS. MITCHELL:  I am objecting and

8        directing him not to answer.  You can't ask him to

9        confirm the authenticity of a document, he doesn't

10       have in front of him.  If it was marked and up on the

11       screen, that would be one thing.

12                       MR. GINSBERG:  We can sort it out

13       later.

14                       MS. MITCHELL:  So I certainly direct

15       him not to answer.  We can't sort it out later

16       because you're asking him to attest to it now.

17                       MR. GINSBERG:  Okay.  It's a

18       foundation question for the record.  The records are

19       going to be certified in it anyway.  I don't know --

20       I don't know why you are objecting.

21                       MS. MITCHELL:  So, then you don't need

22       him to answer it.

23                       MR. GINSBERG:  Are you going to make

24       the doctor come back and testify again, after a

25       motion?

Associated Reporters Int'l., Inc.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. MITCHELL:  Look, just because you
 3        did not do your job in getting all the exhibits
 4        marked and to us doesn't mean I'm going to allow the
 5        doctor to answer a question that he is not capable of
 6        answering.  So maybe we can try to work this out so
 7        that you can get what you need, but the doctor is not
 8        put in an unfair position.  Do you want to go through
 9        certain pages?
10                    MR. GINSBERG:  Who is speaking please?
11                    MS. MITCHELL:  Leah Mitchell, the
12        attorney representing Dr. Edge.
13                    BY MR. GINSBERG:  (Cont'g.)
14                    Q.   Okay.  You can go ahead and
15        answer, Doctor.  She cannot advise you not to answer
16        the question.
17                    A.   I don't understand your question.
18                    Q.   All right.  We'll save that for
19        --.
20                    A.   Can you rephrase it?.
21                    Q.   We'll save that for the next
22        deposition.
23                    MS. MITCHELL:  I am not going to--  if
24        you want to make a motion to bring him back, fine,
25        but I will not agree to him coming back and I
```

Associated Reporters Int'l., Inc.

```
1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2     certainly can direct him not to answer a question
3     that is completely improper.
4                     MR. GINSBERG:  What is the purpose of
5     your --?
6                     MS. MITCHELL:  If you want dig in your
7     heels and waste more time, that's your choice.  But
8     --
9                     MR. GINSBERG:  Why don't -- why don't
10    you state --
11                    MS. MITCHELL:  It hasn't --
12                    MR. GINSBERG:  -- why don't you state
13    for the record --.
14                    MS. MITCHELL:  -- on the record.  You
15    have been given --.
16                    MR. GINSBERG:  Why don't you state for
17    the record the basis of your objection and let's see
18    if it's privileged.
19                    MS. CALABRESE:  Can I speak for one
20    moment?
21                    MS. MITCHELL:  Yeah.
22                    MS. CALABRESE:  I think the exhibit is
23    on the screen.  And I thought the stenographer just
24    marked it as -- as number one.  Or Ginsberg Number
25    One, is that correct, Adriana (phonetic spelling)?
```

800.523.7887                              Associated Reporters Int'l., Inc.

                                                      Page 21

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                      THE REPORTER:  Yes.

3                      MS. CALABRESE:  Adriana.  Is that

4        correct, Annette?

5                      THE REPORTER:  Yes, it is, and I can

6        scroll down if you need me to.

7                      MS. CALABRESE:  Okay.

8                      MS. MITCHELL:  Okay.

9                      MS. CALABRESE:  Okay, sir can you see

10       this?

11                     MS. MITCHELL:  And how many pages is

12       this?

13                     MS. CALABRESE:  Is that the whole

14       chart?

15                     MS. MITCHELL:  Annette, how many pages

16       is this?

17                     THE REPORTER:  I believe it's eighty

18       something.

19                     MR. GINSBERG:  Eighty something.

20                     MS. CALABRESE:  Okay.  So --.

21                     THE REPORTER:  Eighty-six.

22                     MS. CALABRESE:  So I forget the name

23       of Dr. Edge's attorney.  What is your name again,

24       ma'am?

25                     MS. MITCHELL:  Leah Mitchell.  And I

Associated Reporters Int'l., Inc.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        think this is an incomplete chart.  I'm not sure but
 3        it's not --
 4                    MR. GINSBERG:  Because of my error.
 5                    MS. MITCHELL:  -- the complete --
 6                    MS. CALABRESE:  Okay.  Hold on, hold
 7        on, hold on.  Hold on, guys, I'm still talking.  But
 8        Ms. Mitchell, would you like a moment to scroll
 9        through Ginsberg One to see if that would appease you
10        as far as allowing Dr. Edge to answer this question?
11        I think that maybe is the best way to get over this.
12                    MS. MITCHELL:  Well, can I just get
13        clarification?  Is that the complete chart that was
14        submitted?
15                    MS. CALABRESE:  This is the
16        supplemental.
17                    MR. GINSBERG:  It doesn't matter.
18                    MS. CALABRESE:  Hold on, Michael.
19        Hold on.  This is the chart that we -- we received
20        from Albany Med.  That's my -- that's my
21        understanding of what Ginsberg One is.  I can tell
22        you, to be perfectly honest, that the four of us
23        attorneys received -- I mean, I have ten banker boxes
24        full of documents.  Many of them are medical records.
25        So I can't with a hundred percent certainty affirm
```

Page 23

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      that this is everything.  But it's my understanding
3      that Ginsberg One is the chart that we received from
4      Albany Med.  So why don't you just take a look at it.
5      See if you know this -- you know, this would satisfy
6      you and then just, you know, when you're finished,
7      come back on.  And we'll just go off the record and
8      take a minute -- a moment break.
9                      THE WITNESS:  Are you asking me -- us
10     to see if it satisfies --?
11                     MS. CALABRESE:  I'm asking your
12     attorney to take a little bit with you.  And you may
13     want to just mute yourself.  So we don't hear your
14     conversation.
15                     THE WITNESS:  What is that?  What am I
16     looking at?  I don't understand.
17                     MS. CALABRESE:  She can explain it to
18     you, Doctor.
19                     THE WITNESS:  This is all -- that --
20     that this is all --.
21                     MS. CALABRESE:  If you refer to the
22     screen, Ms. Mitchell, you'll be able to scroll on the
23     actual exhibit that was marked.
24                     MS. MITCHELL:  Okay.
25                     MS. CALABRESE:  Go ahead and look at
```

800.523.7887                          Associated Reporters Int'l., Inc.

Page 24

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        the one.
3                      MS. MITCHELL:  I know the chart is
4        more than eighty-six pages.
5                      MR. GINSBERG:  It doesn't matter.
6                      MS. CALABRESE:  Hold on, Michael.
7                      MR. GINSBERG:  It's doesn't matter.
8                      MS. CALABRESE:  I don't know.  Hold
9        on.  I don't know.
10                     MR. GINSBERG:  No, no, no.
11                     MS. CALABRESE:  Okay.  Hold on one
12       second, Michael.  I don't know what you have, Ms.
13       Mitchell.  What you have on paper, all I -- all I can
14       see is what's up on the screen.  So if you can --
15                     MS. MITCHELL:  Yeah.
16                     MS. CALABRESE:  -- look at that
17       exhibit, just so we know we're looking at the same
18       thing.  So just take a quick look at that.  And then
19       you'll want to mute it so that we don't hear your
20       conversations with Dr. Edge and then just come back
21       to us.
22                     THE REPORTER:  Do you want me to go
23       off the record?
24                     MS. CALABRESE:  Off the record for a
25       moment until she's done.

ARII@courtsteno.com                          www.courtsteno.com

Page 25

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          (Off the record)

3                          (On the record)

4                          THE REPORTER:  We're back on the

5          record.

6                          MR. GINSBERG:  Thank you.

7                          BY MR. GINSBERG:  (Cont'g.)

8                          Q.   Doctor, you recognize City of

9          Troy Exhibit A of today's date as Albany Medical

10         Center Hospital records?

11                         A.   Yes.

12                         Q.   And were those records made and

13         kept in the ordinary course of Albany Medical Center

14         Hospital business?

15                         MS. MITCHELL:  I'm going to object to

16         form.

17                         A.   I don't understand -- I don't

18         understand the question.  Can you restate it?

19                         BY MR. GINSBERG:  (Cont'g.)

20                         Q.   Okay.  Were they made during the

21         course of business of the hospital?

22                         A.   Yes.  Yes.

23                         Q.   Thank you.  Doctor, drawing your

24         attention to September 24th, 2008 and when you first

25         saw the patient, ██████████, can you describe to

1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      us how he presented?
3                    A.    Yes, he was minimally reactive.
4      He was --.
5                    Q.    What exactly was minimally
6      reactive?
7                    A.    He was -- he was not opening his
8      eyes.  He was comatose.  He would only move his
9      extremities to deep -- to -- to painful stimuli, his
10     pupils were not reactive.  He was on a ventilator
11     with a breathing tube in place.  He had I.V.'s in
12     place, which were being used to administer
13     medication.  His -- the remainder of the exam, I
14     don't recall exactly.  And when I was looking for
15     that page in my admission note, it is not -- it's not
16     included.  I have the admission note, which is a
17     combined note that the resident and I do -- I have
18     the first page which is the title, position,
19     admission history and physical with reconciliation.
20     I have the first page that has the history on it.
21     The second page which has laboratories on it, a third
22     page which is a family social history and reviewed
23     systems.  I have another page which shows an R.N.
24     assessment, but the last pages which show my physical
25     exam and my assessment are missing from this

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      particular document.
 3                  Q.   Do you have another document
 4      there, Doctor, that would refresh your recollection
 5      with regard to what your initial impression was?
 6                  A.   Well, I've just told you my
 7      initial impression, which was -- which I would be
 8      glad to repeat, but I have nothing to add to that.
 9                  Q.   Okay.  And, Doctor, what did you
10      do at that time for ████████████ if anything?
11                  A.   We were working.  If I could use
12      the vernacular, a full court press to try to keep
13      ██████ alive.  His blood pressure was dangerously
14      low.  We had to titrate, adjust the dopamine
15      medication to try to keep his blood pressure and to
16      keep him from dying.  He was very, very close to --
17      to death from a cardiovascular point of view.  To say
18      nothing about the fact that he neurologically
19      appeared to be severely brain -- in several paths
20      because his brain was clearly not functioning and
21      making it impossible for him to breathe on his own
22      adequately.  So we were basically in constant
23      interaction with the patient to try to keep him from
24      -- from dying and needing C.P.R.
25                  Q.   And Doctor, do you recall whether
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        any family members were with ██████████ at the
 3        time that he arrived at the hospital that you saw
 4        him?
 5                    A.   I don't recall.  I -- I -- I know
 6        from reviewing the chart that they were there
 7        eventually, but at what time I do not know.
 8                    Q.   And over the course of your
 9        career, approximately how many pediatric patients
10        have you cared for in the Intensive Care Unit?
11                    A.   Pretty tough -- thousands.
12                    MS. MITCHELL:  You can give the
13        approximate estimate.
14                    THE WITNESS:  Three thousand, five
15        thousand.
16                    BY MR. GINSBERG:  (Cont'g.)
17                    Q.   Thank you.  Doctor, as -- well,
18        pursuant to the treatment of ██████████ on or
19        about September 21st, 2008, were consultations
20        requested?
21                    A.   Did I ever -- did I ever make a
22        consult?
23                    Q.   No, were consultations requested
24        of other physicians with regard to █████'s
25        treatment?
```

```
 1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                         A.    Yes.
 3                         Q.    All right.  And who requested
 4         those consultations?
 5                         A.    I did.
 6                         Q.    Can you tell us what a
 7         consultation is?
 8                         A.    That's asking an attending
 9         physician to give their opinion regarding a patient.
10                         Q.    And that would be a physician in
11         a different practice area or focus, correct?
12                         A.    Correct.
13                         Q.    Someone who had a different skill
14         set than you, correct?
15                         MS. MITCHELL:  Form.
16                         A.    I can't say they have a different
17         skill set -- necessarily that varies, but it's
18         definitely a different point of view, and a different
19         set of credentials.
20                         BY MR. GINSBERG:  (Cont'g.)
21                         Q.    Different specialties, correct?
22                         A.    Correct.
23                         Q.    And do you recall what would have
24         been the consultations you requested with regard to
25         ██████████?
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    A.   Ophthalmology, neurosurgery.  I

3      think those might be the only two.

4                    Q.   And why --?

5                    A.   And hematology.

6                    Q.   And Doctor, why did you call for

7      ophthalmology consult?

8                    A.   To look for the possibility of

9      there being a traumatic brain injury that would be

10     reflected in a retinal hemorrhage.

11                   Q.   And at that point in time, was

12     there any medical evidence which indicated to you

13     that there was a potential for traumatic brain

14     injury?

15                   A.   There was no physical trauma

16     except for a scratch that -- that was on the

17     transport record.  However, in my experience a four-

18     month-old who's unresponsive without clear

19     explanation, trauma, and particularly non-accidental

20     trauma needs to be in the differential.

21                   Q.   Now, when you say differential,

22     what are you referring to?

23                   A.   A physician when they evaluate

24     any patient creates a list of possible diagnoses and

25     that list of possible diagnoses is called a

Page 31

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        differential diagnosis.
3                    Q.   All right.  And Doctor, on
4        occasion we see in medical chart an entry R/O and
5        then there's a list of ailments, is that a
6        differential diagnosis?
7                    A.   It could be, you know, the R/O
8        means rule out.  So it may not be a complete
9        differential diagnosis, it might be only referring to
10       one particular diagnosis.
11                   Q.   But that -- that's the basic
12       structure where the physician is attempting to
13       determine what the cause of the ailment is by ruling
14       out certain conditions, correct?
15                   A.   Correct.
16                   Q.   And Doctor, you also indicated
17       that you had called for a neurosurgery consult.  Why
18       was that requested?
19                   A.   For the same reasons as the
20       ophthalmology, I was concerned that there may be
21       trauma.  There was also a C.T. scan that showed
22       subdural fluid --
23                   Q.   Well that --
24                   A.   -- collect -- a collection of
25       fluid in the -- in the subdural space in the brain

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      and that would be consistent with a traumatic brain
 3      injury.
 4                      Q.   And Doctor, you also indicated
 5      that you called for a hematology consult, what was
 6      the purpose of that?
 7                      A.   The patient had problems with
 8      bleeding, with elevated clotting times and that was
 9      -- that was the reason for that.
10                      Q.   And Doctor, if I could draw your
11      attention to COT Exhibit A of today's date and ask
12      you to review the ophthalmology consult report.  I'll
13      put that up next.
14                      A.   Yes.
15                      Q.   And, Doctor, drawing your
16      attention to the report.  This is the report from the
17      ophthalmologist?
18                      A.   Yes.
19                      Q.   And there's an entry -- it's all
20      handwritten, correct?
21                      A.   Yes.
22                      Q.   And there's an entry under C.P.
23      head, do you to see that?  It's in the middle of the
24      page.
25                      A.   Yes.
```

Page  33

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          Q.    And can you read that to us?

3                          A.    Large bilateral, extra axial,

4          fluid collections hyphen possibly subdural.

5                          Q.    And what did you understand that

6          to mean?

7                          A.    That there was fluid outside of

8          the brain, outside of the brain matter -- well,

9          actually extra axial would be in the parenchyma.  But

10         they say possibly subdural.  So they're describing

11         fluid between the brain and the dura, which is the

12         lining of the brain.

13                         Q.    And is the -- is the existence of

14         fluid in that portion of the skull consistent with

15         head trauma?

16                         A.    Yes, it could be.  It's not the

17         only thing it could be but sometimes -- it does not

18         say blood.  So, sometimes blood depending on the age,

19         as I understand it, is easier to -- it's -- it's

20         sometimes difficult on C.T. scans to differentiate

21         blood from old blood from a collection of spinal

22         fluid.

23                         Q.    And those are findings that are

24         made by either radiologists or neurosurgeons

25         reviewing CAT scans, correct?

Page 34

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        A.   Correct.  I -- I rely on the
 3          neurosurgeons and the radiologists to make those
 4          determinations.
 5                        Q.   And, Doctor, on the page of the
 6          document, the ophthalmologist consult report.  At the
 7          bottom of the page, there are pictures or sketches of
 8          eyes, correct?  They're up on the screen --
 9                        A.   At the back of the eye -- of the
10          retina.
11                        Q.   And the report indicates that in
12          one of the eyes there was macular hemorrhage, is that
13          correct?
14                        A.   Correct.
15                        Q.   Can you tell which eye that was?
16                        A.   I am not positive about how they
17          set this up, which is the right and which is the
18          left.  I'm sure they have a convention but I'm not
19          familiar with it.
20                        Q.   And with regard to the -- to the
21          other eye, can you read what the -- what the entries
22          are?
23                        A.   I'm not sure which is -- the left
24          hand image --
25                        Q.   Just the one farthest to the
```

Associated Reporters Int'l., Inc.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        right.  I just read the one on the left.

3                      A.   The one on the right reads "inter

4        retinal hemorrhage next to optic nerve" and then

5        under that it says, hypo pigmented mass, and I can't

6        read under that something rupture.

7                      Q.   And what if any significance did

8        that finding have?

9                      A.   May I -- may I add?

10                     Q.   Of course.

11                     A.   May I read as well their

12       conclusion under retinal hemorrhage?

13                     Q.   Yes.

14                     A.   There they say there is evidence

15       of extensive retinal hemorrhage, intraretinal and

16       possible subretinal and that would indicate --

17       hemorrhage as you know means bleeding.  That would be

18       -- to answer your next question which is what does

19       that signify, that is a finding that's significant

20       for violent -- for trauma to the brain.

21                     Q.   And, Doctor, the macular

22       hemorrhaging, the bleeding in the back of the eyes

23       and the collection of fluid on the brain.  Those are

24       both symptoms of Shaken Baby Syndrome, correct?

25                     A.   The -- I would suggest that that

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2    we would shy away from that term, and that my -- I
 3    don't use that term anymore.  I can only talk about
 4    it historically as you -- as you know probably better
 5    than I.  That particular term has been very
 6    controversial in the last ten years.  What I can say
 7    is that this is a significant finding, indicating, in
 8    almost all cases, that there's been trauma.
 9                     Q.  What --
10                     MS. CALABRESE:  Can I -- I'm sorry,
11    Michael, can I interrupt for a moment?  Can we use
12    the term abusive head trauma, so that we all know
13    what we're talking about?  Is that -- is that
14    satisfactory to you, Doctor?
15                     THE WITNESS:  No because I don't know
16    that there's abuse.  All I know is that there's
17    trauma.
18                     MS. CALABRESE:  Okay.  Thank you.
19                     THE WITNESS:  I don't know what caused
20    it.
21                     MS. CALABRESE:  Okay. Thank you.
22                     THE WITNESS:  You know, if this child
23    was in a, you know, high speed motor vehicle accident
24    that could have caused it, and I don't have those
25    details to determine if this is abusive, accidental,
```

Associated Reporters Int'l., Inc.

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     or non-accidental as we refer to it in -- in the
 3     medical field.
 4                     BY MR. GINSBERG:  (Cont'g.)
 5                     Q.   Doctor, what type of head trauma
 6     would cause these conditions?
 7                     A.   The -- these conditions would be
 8     caused --
 9                     MR. KLEIN:  I'm just going to object
10     to form.  You can answer.
11                     A.   -- by the standard teaching and
12     again, I point out that there's been controversy in
13     the last ten years, the standard teaching and
14     practice has been that this is caused by rapid --
15     what we call acceleration-deceleration injury,
16     whether it involves actually hitting something or
17     not, it's something that doctors are -- are
18     continuing to argue among themselves.  I -- the
19     preponderance of -- of data at this point though,
20     indicates that in order to cause this kind of
21     acceleration, deceleration, there has to be impact as
22     well.
23                     BY MR. GINSBERG:  (Cont'g.)
24                     Q.   Thank you, Doctor.  Doctor, was
25     there anything else of significance within the
```

800.523.7887                           Associated Reporters Int'l., Inc.

Page 38

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        ophthalmology consult report with regard to █████

3        █████ condition at that time, anything that you

4        consider important?

5                        A.   Well, I didn't -- some of the

6        details of the neuro exam are important.   That I

7        didn't mention that they're -- under E.O.M.s in the

8        middle of the page.   They say there's no doll's eyes,

9        that is a very abnormal finding, which we had noted

10       earlier.

11                       Q.   What if anything did that

12       indicate to you?

13                       A.   That would indicate that there is

14       severe injury to the brain stem.   And it's one of the

15       things that we evaluate when we're determining

16       whether the child is brain dead.   It was in our -- it

17       was our concern and apparently shared.   Well, I won't

18       go that far.   I misspoke.   I would be concerned about

19       brain death or impending brain death, that absence of

20       doll's eyes.

21                       Q.   And then if we could move to the

22       next page.   And Doctor, if we look at the next page

23       of COT Exhibit A of today's date, this is the

24       neurosurgery consult report, correct?

25                       A.   Correct.

ARII@courtsteno.com                           www.courtsteno.com

Page 39

1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          Q.   And could you tell us what the

3        report indicates, the reason for the request was?

4                          A.   It's very hard to read.

5                          Q.   It says bilateral subdural

6        hematoma, doesn't it?

7                          A.   C.T. head with I don't -- I don't

8        know that could be -- S.D.H. would be subdural

9        hematoma. Yes, I agree with you.  That's what that

10       says.

11                         Q.   Can you scroll down on the next

12       -- the next document.  There we go.

13                         MR. KLEIN:  The reason for the

14       referral.

15                         MS. CALABRESE:  Okay.

16                         BY MR. GINSBERG:  (Cont'g.)

17                         Q.   And then, where it says reason

18       for request?

19                         A.   Yes.

20                         Q.   At the top.  Is that bilateral

21       subdural hematoma acronym?

22                         A.   I think S.P. status post S.D.H.,

23       subdural hematoma.  But it could be the -- I don't

24       know B.L. or S.P.

25                         Q.   And then -- and then if we go

Page 40

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        down to the first portion of the report, is that the

3        history?

4                      A.    There's a brief history which I

5        just reviewed with you at the top.  Do you want me to

6        try to read it?

7                      Q.    Yes, please, if you can.

8                      A.    Four-month-old with -- I can't

9        read.  Six weeks transferred from O.S.H. outside

10       hospital with -- I can't read, diarrhea, vomiting and

11       intubated period.  I can't read, to A.M.C., I can't

12       read and then the third line C.T. head with, and I --

13       I guess that's D/L S.D.H. subdural hematoma.

14                     Q.    Okay.  And this -- and this

15       report was signed by the neurosurgeon, correct?

16                     A.    Yes.

17                     Q.    And do you know who that was?

18                     A.    Dr. Jermaine is --.

19                     Q.    Well, it's not what that looks

20       like in there.

21                     A.    Doctor -- it says -- it says that

22       the transact consult was to Dr. Jermaine they put the

23       -- and the resident's note say D/U Dr. Jermaine,

24       those bottom line on the left.  However, the actual

25       attending signature is difficult to read.

Page 41

1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         Q.    Thank you, Doctor.  And if we go

3    now to -- to the resident progress note E720 up in

4    the top right-hand corner?

5                         A.    Yes.

6                         Q.    If you would just scroll down.

7    Right there's fine.  Thank you.  And Doctor, drawing

8    your attention to the resident progress note for

9    █████████████, there's a section that says

10   assessment and plans, correct?

11                        A.    Yes.

12                        Q.    And could you read to us what

13   that states, just the typewriting portion?

14                        A.    Assessment and plan four-month

15   old male with bilateral subdural hematoma.

16                        Q.    Can you tell us what a subdural

17   hematoma is?

18                        A.    It's a collection of blood

19   between the brain and the dura which is the lining of

20   the brain.

21                        Q.    And is a subdural hematoma

22   consistent with a traumatic brain injury?

23                        A.    Yes.

24                        MR. KLEIN:  Stating an objection to

25   that question.

Page 42

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                    BY MR. GINSBERG:  (Cont'g.)
3                    Q.   And again if we can go to the
4        next page.
5                    A.   I probably don't need to
6        volunteer this.  Here that is not the only part.
7                    MS. CALABRESE:  Michael, can I just
8        --.
9                    MR. GINSBERG:  Yes?
10                   MS. CALABRESE:  Michael, can I just
11       ask for it -- for the basis of his objection?
12                   MR. GINSBERG:  Doesn't matter.
13                   MS. CALABRESE:  I'm sorry?
14                   MR. GINSBERG:  You can do anything you
15       like, but it doesn't matter.
16                   MR. KLEIN:  Yeah.  And --.
17                   MS. CALABRESE:  I know.
18                   MR. KLEIN:  For what it's worth.  It's
19       what -- it's what Dr. Edge's counsel suggested that
20       there are -- there are multiple things that is
21       consistent with not just that -- so it's an objection
22       to the form of the question.
23                   MS. CALABRESE:  Objection to the form.
24                   MR. KLEIN:  So I'm sorry.
25                   MS. CALABRESE:  Okay.
```

Page  43

```
1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                    MR. KLEIN:  Yeah.
3                    MS. CALABRESE:  Thank you.  I just
4         wanted to know what, so to the form, thank you.
5                    MR. KLEIN:  Yeah, all other objections
6         is reserved for trials, it's my understanding.
7                    MR. GINSBERG:  Yes, let's just go off
8         the record for a second but I wasn't trying to insult
9         you.
10                   (Off the record)
11                   THE REPORTER:  We're back on the
12        record.
13                   MR. GINSBERG:  All right.  Thank you.
14                   BY MR. GINSBERG:  (Cont'g.)
15                   Q.   And Doctor, we're now looking at
16        the PICU attending note for date of service,
17        9/22/2018, you see that?
18                   A.   Yes, I have -- I have that.
19                   Q.   And on that form, there's an
20        identified problem list, correct?
21                   A.   There's a what?
22                   Q.   An identified problem list.
23                   A.   Yes.
24                   Q.   And can you read to us item
25        number three on that list?
```

Page 44

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          A.   C.T. scan shows bilateral

3          subdural hematomas of varying age.

4                          Q.   And can you also read entry eight

5          in that list for us?

6                          A.   A skull fracture noted on C.T.

7          scan.

8                          Q.   And Doctor, looking down at the

9          neurologic under the assessment and plan, was it your

10         opinion at that time that ███████████ was brain

11         dead?

12                         A.   I wrote that he appears to be

13         brain dead.  We did apnea testing this morning which

14         showed no breathing despite a $CO_2$ of ninety, repeat

15         apnea testing tomorrow morning, but the patient

16         appears to be brain dead, so yes.

17                         Q.   Thank you.  Can we move on to the

18         next page in that, the patient progress sheet?

19                         MR. KLEIN:  I'm sorry, Michael, did

20         you -- if I -- if -- if you didn't, it's fine, I just

21         -- did you ask  for the doctor's skull fracture

22         finding or -- or you didn't?

23                         MR. GINSBERG:  I did not.

24                         MR. KLEIN:  Okay.

25                         MR. GINSBERG:  Only that one.

Page 45

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       MR. KLEIN:  Thank you.

3                       BY MR. GINSBERG:  (Cont'g.)

4                       Q.   And can we scroll down just a

5       little bit to the middle of the page in that?  Thank

6       you.  And Doctor, showing you the patient progress

7       sheet contained within COT Exhibit A of today's date,

8       do you have that in front of you?

9                       A.   I'm looking.

10                      MS. MITCHELL:  Yeah, his next pages,

11      PICU resident progress note, so we've got to search

12      for what you want.

13                      MR. GINSBERG:  Okay.

14                      BY MR. GINSBERG:  (Cont'g.)

15                      Q.   Look at -- it's a note from Dr.

16      Waldman?

17                      A.   Yeah, I can -- I see it there.  I

18      -- I don't see it here.  I can -- I can read off --.

19                      Q.   Okay.

20                      A.   Read off --.

21                      Q.   The screen  --read off the

22      screen?  All right.  Doctor, do you see the notes in

23      the 9/22/08?

24                      A.   Yes.

25                      Q.   And in the middle of the page,

```
1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2         there's an entry right there, A slash P, do you see
3         that right in the middle?
4                   A.   Yes.
5                   Q.   What did --
6                   A.   I -- I don't see who wrote it.
7                   Q.   What does A slash P stand for?
8                   A.   Assessment and Plan, but we need
9         to see who -- who wrote that.  We need to go the top
10        of that note or you don't care about that, who wrote
11        it.
12                  Q.   Let's scroll up for a second to
13        the doctor note.
14                  A.   Okay.  Neurosurgery.  Okay.
15                  Q.   Okay.  Is this a neurosurgery
16        note based on Doctor Waldman?
17                  A.   It looks like it's the
18        neurosurgery resident note, and the attending note is
19        the next one.
20                  Q.   Okay.  Looking at the Assessment
21        slash Plan A/P entry, can you read the -- the first
22        line, Doc?
23                  A.   Can you go up further so I can --
24        I can read more?  Up all the way please.  Thank you.
25        The Assess -- A slash P assessment plan four-month-
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        old male with bilateral subdural hematoma and

3        evidence of increased I.C.P.

4                        A.    What's I.C.P.?

5                        Q.    Intracranial Pressure.

6                        And what -- what is the significance

7        --?

8                        A.    You -- you don't want me to read

9        the rest of the note?

10                       Q.    Sure, go ahead.

11                       A.    Evaluate for possible brain death

12       today.  No neuroso -- no neuro -- neurosurgical at

13       this point -- it must be no neurosurgical

14       intervention at this point.

15                       Q.    Doctor, what if any significance

16       did the finding of intracranial pressure have?

17                       A.    It can be any number of -- of

18       things.  It could be blood collecting in the brain.

19       It could be swelling of the brain itself.  It could

20       be increase in the size of the ventricles from spinal

21       fluid.

22                       Q.    And could the intracranial

23       pressure have been caused by the subdural hematomas?

24                       A.    Yes.

25                       Q.    As fluid collects in that area

Page 48

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       --.
 3                       MR. KLEIN:  I'm just going to -- I'm
 4       sorry I'm just going to note an objection to form to
 5       that question, sorry I'm doing it after the question.
 6                       BY MR. GINSBERG:  (Cont'g.)
 7                       Q.   Doctor, as fluid collects in that
 8       area of the skull and near the brain, that puts
 9       additional pressure on the brain, correct?
10                       A.   Yes.
11                       Q.   All right.  And Doctor, if we
12       look at the next entry, can you scroll down a little
13       bit so we can see this whole entry at the bottom,
14       pause it, thank you.
15                       Can you see the 9/22/08 N.S. attending
16       note, Doctor?
17                       A.   Yes.
18                       Q.   And do you know who the -- strike
19       that, please.  And twelve thirty, in the left-hand
20       column would be the time that PICU would have been
21       entered into the chart, correct?
22                       A.   Yes.
23                       Q.   And can you read the first
24       sentence?
25                       A.   Four-month-old, maybe B --.
```

Page 49

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       Q.   Male?  Male symbol?

3                       A.   There's a male -- before the male

4        symbol, there's a B, I'm not -- I'm not sure, ad --

5        admitted and transferred from Samaritan Hospital in

6        deep coma, history (from chart) of several days,

7        watery diarrhea, worsening over two-day period, mom

8        noted unresponsiveness on day of admission and called

9        E.M.S.  Past medical history of NICU stay at A.M.C.H.

10       Secondary, something birth --.

11                      MS. MITCHELL:  Is that twin?

12                      THE WITNESS:  Oh, twin birth and

13       waking issues.  Exam, no bruises, scalp swelling seen

14       -- no bruising, scalp swelling seen, pupils mid

15       position and fixed, corneal, gag absent, no

16       spontaneous respirations, no movement to deep vein

17       stimulus.

18                      BY MR. GINSBERG:  (Cont'g.)

19                      Q.   Okay.  And thank you, Doctor.  In

20       that can you scroll down to the next page?  That's

21       it, thank you.  And Doctor, the note continues on and

22       indicates retinal hemorrhages, correct?

23                      A.   Yes.

24                      Q.   As you indicated they were

25       demonstrating on the -- the ophthalmic consult,

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2     correct?

 3                    A.   Yes.

 4                    Q.   And there is a C.T. entry,

 5     correct?

 6                    A.   Yes.

 7                    Q.   And what does that refer to?

 8                    A.   Bilateral --.

 9                    Q.   What does -- what does the C.T.

10     refer to?  CAT scan?

11                    A.   CAT scan.

12                    Q.   Okay.  And what -- what did the

13     entry say?

14                    A.   Bilateral -- I'm not sure

15     hemispheric S.T.H.s subdural hematoma.

16                    Q.   Well now, bilateral means it's on

17     both sides of the child's head, correct?

18                    A.   Yes.  Marked separation of

19     sutures, no fracture seen.

20                    Q.   What if any import does the

21     marked separation of suture indicate?

22                    A.   With increasing of -- of the

23     brain size, the places where the different bones in

24     the brain can -- can pull apart.

25                    Q.   And doctor, the next entry is
```

Associated Reporters Int'l., Inc.

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          impression, correct?

3                              A.   Yes.

4                              Q.   And can you read for us the

5          second entry in there in that entry beginning with,

6          looks like bilateral?

7                              A.   Bilateral subdural hematomas

8          without explanation.

9                              Q.   Is there any significance to the

10         reference to without explanation?

11                             A.   I -- I don't think I can comment

12         on that, that would be Dr. Waldman.

13                             Q.   But to you what, if any import

14         would a bilateral subdural hematoma without

15         explanation be?

16                             A.   My concern would be that of a

17         child abuse.

18                             Q.   And who signed this 9/22/08 note

19         entered at twelve thirty in patient progress sheet of

20         COT Exhibit A of today's date?

21                             A.   Who signed the note?

22                             Q.   Yes, who entered that?

23                             A.   I believe that's Dr. Waldman.

24                             Q.   And Dr. Waldman was at that time

25         a neurosurgeon, correct?

Page 52

1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        A.    Yes.

3                        Q.    And you previously told us that

4       neurosurgeons -- strike that.

5                        Doctor, if I can draw your attention

6       to the physician admission history and physical with

7       medication reconciliation document, it looks like

8       this in that.

9                        A.    I got it.

10                       Q.    Perhaps -- why don't we go off

11      the record for a second while we find that?

12                       (Off the record, 11:21 a.m. to 11:21

13      a.m.)

14                       THE REPORTER:   Okay.   We're on the

15      record.

16                       BY MR. GINSBERG:   (Cont'g.)

17                       Q.    Are you all set, Doctor?

18                       A.    Yes.

19                       Q.    Doctor, showing you this page of

20      the physician admission history and physical with

21      medication reconciliation with the 9/21/08 fourteen-

22      hundred-hour entry at the bottom of it.   You see

23      that?

24                       A.    Yes, I -- we don't have that

25      here, but I -- I can see it up there.

Page 53

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          Q.    See at the screen?

3                          A.    Yes.

4                          Q.    Can we scroll down a little bit

5        in that?  Thank you.  All right.  There is a neuro

6        entry here, correct?

7                          A.    Yes.

8                          Q.    Can you read that neuro entry?

9                          A.    Bilateral subdural hematoma on

10       head C.T. read by radiology just called in and --.

11                         Q.    Do you understand that to mean

12       that radiology called in with that report?

13                         A.    Yes.

14                         Q.    And who signed this note?

15                         A.    Well, there's two parts, the --

16       the left side is signed by the resident, Doctor -- it

17       looks like Dr. Valliani, and the right side is signed

18       by me.

19                         Q.    So it was Dr. Valliani who

20       received the call from neurologist?

21                         A.    I don't know.

22                         Q.    But it's his note, correct?

23                         A.    It's his note.

24                         Q.    Okay.

25                         A.    It's -- it's both of our notes.

Page 54

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                      Q.   Okay.
3                      A.   I'll -- my attestation on the
4       right means that I've read his note and -- and I'm
5       agreeing with what's in it.
6                      Q.   And can we go to this C.T. scan
7       report?  Six -- I thought it's the fifth page from a
8       doc -- oh, no, it's not it's the third page from a
9       doc.  Yeah, this one.  Doctor, drawing your attention
10      to the C.T. scan report.
11                     A.   No, it's the same.
12                     Q.   Looks like it is dated 9/21/08 at
13      twelve forty-eight, you see that?  It's on the screen
14      if you can't find it?
15                     A.   Yes, I have -- I have it.
16                     Q.   And under discharge planning, you
17      can scroll down a little in that.
18                     A.   I mean I -- I don't know.  I
19      thought -- I thought you're looking at the C.T. scan,
20      you're looking at discharge planning?
21                     Q.   It's a C.T. scan report, it's on
22      the screen.
23                     MR. GINSBERG:  Annette, can you scroll
24      up to the top so the doctor can see the document?
25                     MS. MITCHELL:  Yes, sorry, --
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                     BY MR. GINSBERG:  (Cont'g.)
 3                     Q.   Can you identify what the
 4        document is, Doctor?
 5                     A.   No, I -- I can't.  I do not know.
 6                     Q.   It's a laboratory -- it's a
 7        laboratory result.
 8                     A.   Actually that -- it -- the actual
 9        result -- C.T. scan results looks different than
10        that.  This looks like it's been -- has the actual
11        resort -- report lifted and placed and -- and perhaps
12        a social worker report, but the actual C.T. report
13        has a title on it and radiology.  I can hold it up if
14        you wanted to see it, but it --.
15                     Q.   No, no Doctor, drawing -- drawing
16        your attention to --.
17                     A.   It looks -- it looks like this.
18                     Q.   Drawing your attention to the
19        document that's on the screen, the upper right-hand
20        corner says, laboratory results report, correct?
21                     A.   Yes.
22                     Q.   Okay.
23                     MR. GINSBERG:  And Annette if you
24        would just scroll down to the bottom.
25                     Q.   (Cont'g.)  This one says page
```

1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2         twenty-two of twenty-three, correct?

3                         A.   It says that it's a -- a report

4         from case management.

5                         Q.   Okay.  Now down at the very

6         bottom, it says, page twenty-two of twenty-three,

7         correct?

8                         A.   Yes.

9                         Q.   Okay.  And under the discharge

10        planning entry, there's an interaction entry,

11        correct?

12                        A.   Yes.

13                        Q.   9/21/08 at fifteen zero four?

14                        A.   Yes.

15                        Q.   Could you read that for us?

16                        A.   Called to PICU by peds M.D.

17        Daniel Dunnett regarding this baby.  He was

18        apparently transferred from Samaritan Hospital, has

19        had C.T. here which showed a bleed, possible skull

20        fracture (awaiting confirmation of this).

21                        Q.   But that --.

22                        A.   This is assess --.

23                        Q.   Go ahead.

24                        A.   Per M.D., this is a suspect

25        injury, period.  Patient's mother -- (Wilhemina Hicks

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        accompanied patient then apparently fainted and was
3        sent to the E.D. for evaluation, limited info
4        available.  Per report there are six other children
5        in the home including this baby's twin.  C.P.S.
6        contacted and the case was taken by a worker, Zewdie
7        Tibebu).  Will have S.W. follow up in a.m.
8                       Q.   Doctor, were you the quote, M.D.
9        who indicated that this is a suspect injury?
10                      A.   Was I the doctor that indicated
11       what?
12                      Q.   That this was a suspect injury?
13                      A.   I -- I'm not -- I don't know if I
14       used that -- that language as -- as we just read in
15       my admission, I was concerned about non-accidental or
16       accidental trauma.
17                      Q.   And Doctor, at the time when you
18       were caring for ███████████, did you, yourself,
19       render a diagnosis that resulted in suspect injury?
20                      A.   I -- I gave my diagnosis which we
21       just read a few minutes ago, yes, in the admission.
22                      Q.   Okay.  Could you tell us again
23       what it was?
24                      A.   I would like to read it rather
25       than --
```

Page 58

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.   Sure.

3                    A.   -- try to remember exactly.

4                    Q.   Sure.

5                    A.   I don't have that sheet, so you'd

6        have to go back to that, the last one that you had

7        which was the history and physical and medical.  I do

8        have from the next day that -- that gave my

9        assessment.

10                   Q.   Okay.  We don't -- we don't need

11       to specifically respond to it in the document.  If

12       you could tell us what your impression was.

13                   A.   My impression was that that there

14       was subdural hematomas, perhaps of different ages in

15       -- indicative of rapid acceleration, deceleration

16       injury, perhaps hitting a object causing subdural --

17       cause of which could be either at an accident or

18       child abuse.

19                   Q.   And did you also consider the

20       retinal bleeding in formulating a diagnosis?

21                   A.   Yes, and -- and the state of the

22       patient's mental state.  But again, to say whether

23       this was accidental or non-accidental, I -- I -- I

24       wasn't able to do.  I am the physician.  I could only

25       say that I was suspicious of trauma because I don't

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        know.  But I do have the history that there was not
 3        any accident reported, that it was not in a motor
 4        vehicle accident.
 5                      So the preponderance of evidence would
 6        be that this was not an accidental, but again -- and
 7        that's -- that would be something that is not in my
 8        area of expertise, that would be the police.
 9                      Q.   Dr. Edge, prior to treating
10        ████████████████, had you ever treated a -- a child who
11        had been the victim of child abuse wherein the parent
12        or care -- or caregiver denied causing any injury to
13        the child?
14                      A.   Yes.
15                      Q.   I didn't hear what your response
16        was, I'm sorry.
17                      A.   Yes, I've cared for children with
18        child abuse where parents denied abuse.
19                      Q.   Now, Doctor, drawing your
20        attention in that if we could, discharge transmission
21        plan, it's about seventeen pages from the front in
22        that.  Perfect, thank you.  Okay.  And Doctor, I'd
23        like to ask you if you would read to yourself the
24        initial assessment slash comment portion.
25                      A.   Initial assessment comment
```

Page 60

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       portion, you want me to read that?

3                    Q.    Yes.

4                    A.    DeLameter, Adair, social worker,

5       9/21/08, twenty-three forty-four, more numbers S.W.

6       social worker was called by PICU staff to meet with

7       patient's mother to provide emotional support.

8       Patient is a four-month-old boy transferred to PICU

9       from Samaritan Hospital on full life support.

10                   His mother stated she found him limp

11      when she got up this a.m. and patient was taken to Sa

12      -- Samaritan with complaint of respiratory distress.

13      Patient has bilateral subdural hematomas and is in

14      extremely critical condition, a report to C.P.S. was

15      made ear -- earlier.

16                   Social worker met with patient's

17      mother and her brother and the on-duty chaplain

18      responded also.  Social worker stayed with patient's

19      mother when Dr. Edge met with her to explain that

20      patient's injuries are life threatening and he does

21      not believe patient will live.

22                   At the request of Dr. Edge, social

23      worker contacted the Troy Police and at twenty-one

24      ten Detective Ron Fountain responded to the PICU desk

25      phone numbers.  Social worker also spoke twice to on-

Page 61

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      call C.P.S. worker, Andrea Fandholt to explain

3      patient's grave condition and extremely poor

4      prognosis.

5                  She confirmed that patient's six sib

6      -- siblings, including his twin brother had been

7      removed from the home and explained that there was an

8      open C.P.S. case on patient.  She said the case

9      worker is Jasper Esposito, phone number.

10                  Social worker met with charge nurse

11      and peds resident.  There is to be no visitation

12      other than immediate family and that visitation must

13      be supervised.  Social worker explained to charge

14      nurse and nurse caring for patient that a report must

15      be made to New York State Child Abuse and Neglect

16      Hotline, phone number, if patient expires, the phone

17      and form were left on the front of patient's chart.

18      Adair DeLamater.

19                  Q.   Doctor, was -- well, C.P.S

20      referred to in that entry is Child Protective

21      Services, correct?

22                  A.   Yes.

23                  Q.   And did you direct that Albany

24      Medical Center Hospital personnel contact C.P.S. with

25      regard to this matter?

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   I don't remember if I made the
 3        original referral or if it was done earlier.
 4                    Q.   Okay.  Do you feel that it was
 5        appropriate to report this matter to C.P.S.?
 6                    A.   It's -- it's required, yes.
 7                    Q.   And Doctor, the -- the entry also
 8        indicates that at your request, Troy Police
 9        Department was contacted with regard to this matter,
10        correct?
11                    A.   Yes.
12                    Q.   And why was that, Doctor?
13                    A.   With the concern of child abuse,
14        that would be assault and that is a police matter.
15                    Q.   And Doctor, prior to formulating
16        the diagnosis, and directing that Troy Police being
17        contacted, did you have any discussion with regard to
18        ███████████'s condition with any member of the
19        Troy Police?
20                    A.   I don't remember.
21                    Q.   If you did, would it have been in
22        any note or record?
23                    MR. KLEIN:  Objection to form.  You
24        can answer.
25                    A.   I don't know.
```

Page 63

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                   BY MR. GINSBERG:  (Cont'g.)
3                   Q.   Doctor, did any discussion or
4      interaction you had with any member of the Troy
5      Police Department influence the diagnosis that you
6      rendered in any way?
7                   A.   I don't know the answer to that.
8                   Q.   Who would have known the answer
9      to that if you don't?
10                  A.   Who would know whether what I
11     said to the police influence them?
12                  Q.   That -- that wasn't my question.
13     Let -- let me ask the question again, Doctor.  The
14     question was prior to rendering your diagnosis with
15     regard to ████████████, did any member of the Troy
16     Police Department influence you in rendering that
17     finding?
18                  A.   Not that I can recall.  I -- I
19     don't recall any contact before the discussion
20     referred to on this discharge transition plan.
21                  Q.   So am I correct in my
22     understanding that you rendered your diagnosis and
23     findings and then after the Troy Police Department
24     will be contacted, is that correct?
25                  A.   Yes, and -- and -- that's what it

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     says, that I wouldn't -- I've asked them to contact
 3     the police that the police had -- had already been
 4     contacted.
 5                    MS. SPENCER:  Michael, how much longer
 6     do you have?  I just want to see if -- now would be a
 7     good time for a restroom break?
 8                    MR. GINSBERG:  Why don't just give me
 9     another five minutes or so and I think I'll be done.
10                    MS. SPENCER:  Okay.  Thank you.
11                    BY MR. GINSBERG:  (Cont'g.)
12                    Q.  All right.  Doctor, do you know
13     if the Troy Police Department was contacted by Child
14     Protective Services with regard to ███████████'s
15     condition?
16                    A.  I -- I don't know anything that's
17     not in that note.
18                    Q.  All right.  Did there come a time
19     when you advised the -- any member of the Troy Police
20     Department as to your diagnosis and findings with
21     regard to ███████████?
22                    A.  I met with the -- I met with
23     them, yes.
24                    Q.  And -- and what's the sum and
25     substance --?
```

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   And -- and not -- not today --
 3     what's that?
 4                    Q.   Do you recall the sum and
 5     substance of what was said?
 6                    A.   Not word for word.
 7                    Q.   Did you advise them of your
 8     findings?
 9                    A.   Yes.
10                    Q.   And at any time, did any member
11     of the Troy Police Department attempt to get you to
12     change your -- either your diagnosis or findings with
13     regard to ████████████?
14                    A.   No.
15                    Q.   And Doctor, did you ever have any
16     discussions with a Dr. Sikirica with regard to
17     ████████████'s condition?
18                    A.   I don't recall.
19                    Q.   Do you know who Dr. Sikirica is?
20                    A.   I believe he's a pathologist
21     working for the -- working for the Attorney --
22     Attorney General's Office, I'm not -- I don't know
23     for sure.  But I -- I -- I -- I know that he is a
24     pathologist.  I -- I have had interactions with him
25     in the past.
```

Page 66

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                         Q.   And Doctor, did you have any
 3     discussions with Dr. Waldman, with regard to the care
 4     and treatment of ███████████ when he was at Albany
 5     Medical Center Hospital?
 6                         A.   Yes.  I -- I don't recall the
 7     exact, but I -- I did talk to all of the consultants
 8     that I consult.
 9                         Q.   And can we just bring up last --
10     last couple questions, Doctor..  Can we bring up on
11     that the deposition of a witness slip of Dr. Edge?
12                         THE REPORTER:  Yes.
13                         MR. GINSBERG:  I believe the date at
14     the bottom is 9/22/08.
15                         THE REPORTER:  Is it -- yes, he --.
16                         MR. GINSBERG:  I don't -- they may be
17     a separate -- there we go, thank you.  Is it part of?
18                         THE REPORTER:  No, it's -- it's
19     different.
20                         MR. GINSBERG:  Okay.  Can we mark this
21     as COT Exhibit B for today's date?
22                         THE REPORTER:  Yes.
23                         BY MR. GINSBERG:  (Cont'g.)
24                         Q.   And Doctor, drawing your
25     attention to what's been marked as COT Exhibit B with
```

800.523.7887                              Associated Reporters Int'l., Inc.

Page  67

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        today's date.  I ask you if that's the deposition of

3        a witness that you signed on or about September 22nd,

4        2008?

5                         A.   Yes, I have it.

6                         Q.   And Doctor, is the information

7        that's contained in that deposition of a witness

8        accurate as far as you know?

9                         A.   Yes.

10                        Q.   I have no further questions,

11       thank you.

12                         MR. GINSBERG:  You want to take a

13       quick break?

14                         MS. SPENCER:  Can you just -- on that,

15       can you just allow us to view that entire exhibit,

16       please?  I don't know if you can make that screen

17       bigger, oh, that's fine, that's fine.  What number

18       did you put on it?

19                         MR. GINSBERG:  B.

20                         THE REPORTER:  It's B.

21                         MS. SPENCER:  You're calling it Troy

22       E?

23                         MR. GINSBERG:  C -- COT the Troy COT

24       Exhibit B of today's date.

25                         THE REPORTER:  B as in boy.

Page 68

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MS. SPENCER:  B as in boy, thank you.

3          Are we taking a short break?

4                    MR. GINSBERG:  Yeah, I think -- I

5          think Christina had wanted to take a quick break.

6                    MS. SPENCER:  Yes, please.  Just, you

7          know, ten minutes to use the restroom.  Who's up

8          next?

9                    MR. KLEIN:  You are.  Why don't we

10         come back at noon?  Does that make sense for

11         everybody?

12                    MS. SPENCER:  Yeah, you -- you -- you

13         can skip me.

14                    THE REPORTER:  Okay.  I'm going to go

15         off the record.  We're off the record.

16                    (Off the record, 11:46 a.m.)

17                    (On the record, 12:11 p.m.)

18                    THE REPORTER:  We're on the record.

19                    CROSS EXAMINATION

20                    BY MR. KLEIN:

21                    Q.   Good afternoon, Dr. Edge, and

22         counsel.  I'm Brett Klein and I represent Adrian

23         Thomas in both the Court of Claims and in the

24         District Court Action surrounding the prosecutions

25         that were brought against him.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        And I just want to -- we're going to

3        ask you some additional questions today.  Try not to

4        ask you what you've already been asked, at least too

5        much, about your involvement in this matter.

6                        You understand that you took an oath

7        to tell the truth today and as you would take in a

8        court of law.  Are you aware of that?

9                        A.   Yes.

10                       Q.   Is there any reason why you can't

11       testify fully and accurately today?

12                       A.   No.

13                       Q.   Okay.  Do you remember your

14       involvement in this incident?

15                       A.   Yes.

16                       Q.   And have you had an opportunity

17       to refresh your recollection of anything that you may

18       not have remembered by looking at the Albany Medical

19       Center chart among other things?

20                       A.   Yes.

21                       Q.   What else have you looked at to

22       refresh your recollection of -- of this incident?

23                       A.   The two documents.  One is the --

24       the deposition -- the transcript of the 2009 trial

25       and the other is that statement, that we just went

Page 70

1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2         over, which was a deposition, I believe.  The voice

3         and handwritten one.

4                         Q.   The supporting deposition that

5         you signed for the police.  Is that what you're

6         referring to?

7                         A.   I'm not sure.  The one that we

8         just went over last.  It doesn't say anything about

9         police.  It says that deposition of a witness, State

10        of New York, County of Rensselaer, City of Troy

11        Court.

12                        Q.   Did you see at the bottom it's --

13        indicates a police -- that it was signed for a police

14        officer?

15                        A.   Is that -- is that the sergeant?

16                        Q.   Yes.

17                        MR. GINSBERG:  Please note my

18        objection to the form of that last question.

19                        BY MR. KLEIN:  (Cont'g.)

20                        Q.   Let me -- do you have any doubt

21        that you -- you prepared this at the request of a --

22        of a Troy Police Officer?

23                        A.   I don't independently remember

24        and the -- and -- and it was actually written, it's

25        not my handwriting.  I signed it, which means I agree

Page 71

1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2       with it.
3                     It looks like the social worker or
4       that was -- in the office was -- was the one that
5       actually wrote that out and then I made corrections
6       and signed it.
7                     I can't tell you that I'm -- that --
8       that it was for the police.  But I take your word for
9       it.
10                    Q.   Okay.
11                    MS. CALABRESE:  Please have that
12      exhibit displayed for me.
13                    MR. KLEIN:  I'm not getting into it
14      right now.  I'm just reviewing the universe of
15      documents he's looked at and then at some point I'll
16      put it up and we'll ask questions about it.
17                    MS. CALABRESE:  Okay.
18                    BY MR. KLEIN:  (Cont'g.)
19                    Q.   Other than your -- with -- object
20      -- withdrawn, I'm sorry.
21                    You said that you reviewed your
22      testimony.  Would that be your testimony from the
23      trial of Adrian Thomas from 2009?
24                    A.   Yes.
25                    Q.   Other than that testimony and

Page 72

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        other than today, have you given any other testimony
3        related to this matter?
4                        A.   Not that I know of.  Not that I
5        can remember, I should say.
6                        Q.   And just for the avoidance of
7        doubt, are you aware that there was a retrial of
8        Adrian Thomas in 2014 or around that time?
9                        MR. GINSBERG:  Object to the form.
10                       A.   I -- I wasn't aware of that.
11                       BY MR. KLEIN:  (Cont'g.)
12                       Q.   Okay.  Did -- did you know that
13       he was retried after the 2009 trial, even if you
14       don't know when it was?
15                       A.   This one is 2009.  The one you
16       showed me.
17                       MS. MITCHELL:  Yes.  Your testimony.
18                       THE WITNESS:  I -- I was not aware of
19       that.
20                       BY MR. KLEIN:  (Cont'g.)
21                       Q.   So you didn't know that he had a
22       retrial and he was found not guilty of all charges.
23       You didn't know that until I --.
24                       MR. GINSBERG:  Object to the form.
25                       A.   No, I -- my counsel told me that
```

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2    he had been released.
 3                    BY MR. KLEIN:  (Cont'g.)
 4                    Q.   Okay.  Without divulging what
 5    you've discussed with counsel, until I posited it in
 6    -- in these questions, were you aware that there was
 7    a trial after the one you testified that -- that led
 8    to his release?
 9                    MR. GINSBERG:  Object to the form.
10                    A.   I had -- I-- I actually, I don't
11    know how that works exactly.  Would that -- would
12    require a trial or not?
13                    So I have to -- all I know is what
14    counsel told me leading up to this, that he had been
15    released.
16                    MS. MITCHELL:  Okay.  You don't have
17    to provide him information as to what we talked
18    about.
19                    BY MR. KLEIN:  (Cont'g.)
20                    Q.   What I'm trying to get at is,
21    were you ever called into the D.A.'s office or to any
22    -- or any other place to meet with attorneys to talk
23    about testifying at a second time, even if you didn't
24    testify?
25                    A.   I don't remember that.
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                     Q.    Okay.  So to your knowledge, the
 3        only time you were asked to give testimony and to
 4        testify in terms of any trials was 2009?
 5                     A.    Yes -- yeah.
 6                     Q.    Okay.  Other than the supporting
 7        deposition or deposition of a witness form that we
 8        discussed, the 2009 testimony and the Albany Medical
 9        Center chart, that's about two hundred and twelve
10        pages.  Have you reviewed anything else to refresh
11        your recollection for that?
12                     A.    No.
13                     MS. MITCHELL:  If I can jump in, we
14        did receive exhibits of police narratives that the
15        witness briefly reviewed in preparation for
16        testimony.
17                     MR. KLEIN:  Okay.
18                     BY MR. KLEIN:  (Cont'g.)
19                     Q.    Did you review the police
20        narratives, approximately two of them?
21                     A.    Yes.
22                     Q.    One of them was by an officer
23        named Sergeant Colaneri.
24                     A.    Yes.
25                     Q.    Do you agree with that?
```

Page 75

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        A.   Yes.
 3                        Q.   And another one was by an officer
 4          named Mason?
 5                        A.   Yes.
 6                        Q.   Okay.  Other than what we've
 7          discussed, have you look at or discussed this case
 8          with anyone else to prepare for today's deposition
 9          other than conversations with your attorney?
10                        A.   No.
11                        Q.   Okay.  Did you know Adrian
12          Thomas, Wilhemina Hicks, or anyone in this family
13          prior to the events of September 21st, 2008?
14                        A.   No, no.
15                        Q.   Have you had any involvement with
16          the family, in your capacity as a physician since
17          those -- the day or two starting on September 21st,
18          2008 other than testifying at the criminal trial and
19          testifying today?
20                        A.   No, no.
21                        Q.   There was a Sergeant Adam Mason
22          who was involved in this case.  Do you know who he is
23          sitting here today?
24                        A.   No, no.
25                        Q.   Okay.  Do you -- there's a
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        Detective Ronald Fountain, Former Detective Ronald
 3        Fountain, who was involved in this investigation.  Do
 4        you know who that is?
 5                      A.   No.
 6                      Q.   Okay.  Did you speak with police,
 7        at the time, you just don't recall who they are by
 8        name?
 9                      A.   Yes.
10                      Q.   Okay.  Have you ever testified in
11        any civil trial in your capacity as a physician from
12        Albany Medical Center?
13                      A.   A civil trial, meaning --?
14                      Q.   Yeah.  A trial, whether --
15        whether you were accused of some type of malpractice
16        with the hospital or in the course of some -- someone
17        else -- some other type of case like a personal
18        injury lawsuit or any other circumstance?
19                      A.   The -- no.
20                      Q.   Okay.  Have you ever been sued
21        for malpractice?
22                      A.   Not in a professional --.
23                      MS. CALABRESE:  Objection, objection.
24        Thank you.
25                      BY MR. KLEIN:  (Cont'g.)
```

```
 1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        Q.   Okay.  You can answer.
 3                        A.   No.
 4                        Q.   Okay.
 5                        A.   Not at this point.
 6                        Q.   Okay.  Has the hospital or any
 7      entity that you've worked for been sued for
 8      malpractice based on conduct attributed to you, even
 9      if you dispute it?
10                        MS. CALABRESE:  Objection.
11                        MS. MITCHELL:  Objection, same
12      objection.
13                        MS. CALABRESE:  Same objection.
14                        BY MR. KLEIN:  (Cont'g.)
15                        Q.   You can answer.
16                        A.   Can you repeat the question?
17                        Q.   Sure.  Has any hospital or entity
18      that you've worked for been sued for malpractice, for
19      conduct alleged to have committed -- been committed
20      by you, even if you dispute that conduct and even if
21      you weren't the named party in the case?
22                        A.   Yes, yes.
23                        MS. PECK:  Object to form.
24                        BY MR. KLEIN:  (Cont'g.)
25                        Q.   On how many occasions?
```

1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          MS. PECK:  Same objection.  Object to

3            form.

4                          MS. CALABRESE:  Same objection.

5                          A.   I -- I -- twice, I think.

6                          BY MR. KLEIN:  (Cont'g.)

7                          Q.   Okay.  Did those cases go to

8            trial, either of them?

9                          MS. CALABRESE:  I would ask the

10           stenographer to note a standing objection to this

11           line of questioning for the Defendant, the State of

12           New York.

13                          MS. PECK:  The same, please, for Dr.

14           Sikirica.

15                          MS. CALABRESE:  Agree.  Well, for the

16           Defendant.

17                          MS. MITCHELL:  Same for -- attorney

18           for the witness.

19                          BY MR. KLEIN:  (Cont'g.)

20                          Q.   You can answer.  Did any of those

21           cases go to trial?

22                          A.   I don't think -- no.

23                          Q.   Okay.  Were you deposed in either

24           or both of those cases?

25                          A.   Yes.

Page 79

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    Q.   Okay.  On how many of them?
 3                    A.   I remember only one.
 4                    Q.   Do you remember when it was?  In
 5         other words, was it within the last few years?  Was
 6         it two decades ago or something else that you could
 7         -- you could specify?
 8                    A.   Approximately -- approximately
 9         five years ago.
10                    Q.   Okay.  And can you briefly
11         describe the allegations in the case?  What I'm
12         trying to get at is, is there anything similar to the
13         -- the facts of this case in any way?
14                    MR. GINSBERG:  Object to the form.
15                    A.   There was nothing similar.  It
16         was about -- I should keep talking?
17                    BY MR. KLEIN:  (Cont'g.)
18                    Q.   Yes.
19                    A.   Yeah.  The -- it was regarding a
20         child who had a puncture in the stomach.
21                    Q.   And was there an alleged
22         misdiagnosis about that?
23                    A.   Delay.
24                    Q.   Okay.  And did the child -- did
25         the child die?
```

```
 1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                         A.   No.
 3                         Q.   Did that case -- is that case --
 4         do you know in what venue that case was pending?
 5                         A.   I don't.  I think the case is all
 6         settled.
 7                         Q.   You think it was settled?  Was --
 8         do you know if there was an actual --?
 9                         MS. MITCHELL:  Do you know if the
10         matter settled or how it was resolved?  Or you just
11         know it's done?
12                         A.   I know it's done.
13                         MS. MITCHELL:  Okay.
14                         BY MR. KLEIN:  (Cont'g.)
15                         Q.   Do you know if it was done by a
16         settlement or some other disposition?
17                         A.   No.
18                         Q.   Do you have a copy of your
19         deposition transcript from that case?
20                         A.   No.
21                         Q.   Do you have -- did you have an
22         attorney representing you in that case?
23                         A.   The hospital attorney.  I did not
24         have a personal attorney.
25                         Q.   Can you state --?
```

Page 81

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MR. GINSBERG:  Note my objection to
 3        the form of the last question.
 4                    BY MR. KLEIN:  (Cont'g.)
 5                    Q.   Can you state the name of the
 6        hospital attorney or attorneys that represented you?
 7                    A.   If I remember the name?
 8                    Q.   Yes.
 9                    A.   No.
10                    Q.   Okay.  Do you know if that case
11        was pending in State Court or a Federal Court?
12                    A.   No.
13                    Q.   Do you know the name of the claim
14        of the plaintiff or claimants in that case or the
15        patient?
16                    A.   I don't remember.
17                    Q.   Okay.  In the course of the
18        criminal trial, you were asked about a matter
19        involving, Blaine Bryce.
20                    Do you recall a series of questions
21        about a matter involving Blaine Bryce?
22                    A.   Yes.
23                    MR. GINSBERG:  Object to the form.
24                    BY MR. KLEIN:  (Cont'g.)
25                    Q.   And that's the case -- did you
```

Page 82

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      agree that in that case there were mistakes made by

3      the radiologist?

4                      MR. GINSBERG:  Object to the form.

5                      MS. CALABRESE:  Object.  Again, for

6      the --

7                      MS. PECK:  Object to form.

8                      MS. CALABRESE:  -- for the Defendant,

9      the State of New York, I just want to reaffirm our

10     standing objection to any line of questioning

11     relating to any malfeasance or any allegations of

12     malfeasance, malpractice or anything related to the

13     personnel or employment records of this witness.

14     Thank you.

15                     MR. KLEIN:  You could just -- you

16     could just state the objection.

17                     MR. GINSBERG:  Objection.

18                     MS. PECK:  Object to the form for Dr.

19     Sikirica.

20                     MR. KLEIN:  I think -- I think the

21     appropriate is just to state the word objection.

22     Christina, just -- just so you know, you're super

23     loud or at least on my end, so.

24                     MS. MITCHELL:  Okay.  I'm going to

25     object to form.  And are you asking him if there were

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 83

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       allegations that the radiologist had made some type
 3       of error or are you asking him to give his opinion
 4       about that?
 5                   MR. KLEIN:  I didn't get there yet.
 6       I'm just asking if he recalls that line of
 7       questioning and then I'm going to go from there.
 8                   MS. MITCHELL:  Okay.  Can you state
 9       the question again?
10                   BY MR. KLEIN:  (Cont'g.)
11                   Q.  Sure.  Was that -- can you
12       describe for me briefly about the Blaine Bryce
13       treatment and what mistakes were made?
14                   MS. PECK:  Object to form.
15                   A.   I -- I would have --
16                   MR. GINSBERG:  Object to the form.
17                   A.   -- I would have to review the
18       case.  I -- I remember a few questions from 2009 but
19       beyond that, I can't answer your question.  I don't
20       know.
21                   BY MR. KLEIN:  (Cont'g.)
22                   Q.  Okay.  Was that a case where you
23       -- where you and other doctors said there was a skull
24       fracture but after the -- the body of the deceased
25       patient was exhumed, it was determined, it was, in
```

ARII@courtsteno.com                              www.courtsteno.com

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        fact, no skull fracture in sum and substance.   Is

3        that what happened?

4                    A.   I -- I only know that from what I

5        learned yesterday.  I -- I have -- and I have some

6        vague recollection but I certainly can't tell you if

7        that's really what happened or not.

8                    Q.   Okay.  Do you have any documents

9        related to that incident in your personal -- strike

10       that.

11                   What -- did any lawsuit or other

12       litigation such as in the criminal litigation against

13       Mr. Bry -- against Bryce?

14                   Was there any litigation in that case

15       that you were called to testify in?

16                   A.   No, no.  I don't -- I don't think

17       so.

18                   Q.   Okay.  Do you know why you were

19       not asked to testify?  Withdrawn.

20                   Were you asked to testify in the

21       subsequent trial of Adrian Thomas by the District

22       Attorney's Office?

23                   Were you -- did you ever have a

24       discussion about testifying a second time in this

25       case?

800.523.7887                              Associated Reporters Int'l., Inc.

Page 85

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          A.   No, not that I can remember.

3                          Q.   Did you know that your -- some of

4       your colleagues like Dr. Waldman, did testify at a

5       second trial?

6                          A.   No, no.

7                          MS. CALABRESE:  I'm sorry.  I'm sorry,

8       Brett.  Can I ask the stenographer to please repeat

9       the last question and answer?

10                         MR. KLEIN:  Does he know if Dr.

11      Waldman testified at the second trial and he said,

12      no.

13                         MS. CALABRESE:  Thank you.

14                         BY MR. KLEIN:  (Cont'g.)

15                         Q.   Have you ever seen the autopsy of

16      ████████████████? 

17                         A.   No.

18                         Q.   Well, did you testify at the

19      criminal trial that you -- you -- did you have access

20      to it before that trial to review it?

21                         A.   I don't remember.

22                         Q.   Okay.  Directing your attention

23      to September 21st, 2008, when you became involved in

24      this incident.  When this matter came to your

25      attention, it was in the course of a request for

ARII@courtsteno.com                              www.courtsteno.com

Page 86

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        transfer from Samaritan, is that right?
 3                      A.    Yes, yeah.
 4                      Q.    And did you have a chance to look
 5        at the Samaritan paperwork in the two hundred and
 6        twelve page medical record that you reviewed for
 7        today?
 8                      A.    I did not review that.
 9                      Q.    Okay.  Do you recall the
10        differential diagnosis either -- either specifically
11        or in sum and substance?
12                      A.    In sum and/or substance, I
13        remember that Dr. Carlos was concerned about sepsis,
14        but that she could not rule out trauma.
15                      Q.    Right.  And she started treating
16        -- she took -- withdrawn.
17                      She -- she drew blood so that the
18        blood could be tested for bacterial -- bacteria,
19        correct?
20                      A.    Yes.
21                      Q.    And then started the -- and
22        started the patient on a course of antibiotics after
23        that, correct?
24                      A.    Yes.  And we continued that in my
25        office.
```

Page 87

1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          Q.    Okay.   Did you ever become aware

3      of the results of the blood -- of the blood cultures?

4                          A.    No.

5                          Q.    Okay.   Did you ever come to learn

6      from a review of your file or from any other source

7      that the child had a pervasive bacterial infection?

8                          A.    I did not.   I was questioned

9      about that in 2009 and I can't remember if that's in

10     my -- nor do I remember in a review whether they told

11     me that at that time.

12                         So I don't want to say I didn't know

13     if, in fact, I was told in 2009 but other than that,

14     I would not -- I did not know.

15                         Q.    Okay.

16                         A.    Other than the fact that it was

17     brought up in the 2009 trial.   Should I speak up?

18                         Q.    Yeah.   Do you want to change or

19     amend your answer?

20                         A.    Yeah, I need to make a correction

21     because I -- I now have my discharge summary which

22     does state on September 23rd, the patient's blood

23     culture came back negative and the second brain death

24     exam was performed.

25                         Q.    Okay.   Did you ever come to learn

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          that that was wrong, that the -- the culture came

3          back positive in fact?

4                         A.    No.

5                         Q.    So when this child presented from

6          doctor -- from Samaritan to your hospital, it's fair

7          to say that the concern was primarily sepsis at that

8          time, correct?

9                         MS. MITCHELL:  Object to form.

10                        A.    Sepsis was definitely a concern

11         but the fact that the -- the C.T. findings of a

12         subdural fluid -- and the degree of neurologic

13         deficit were not easily explained by sepsis alone.

14                        BY MR. KLEIN:  (Cont'g.)

15                        Q.    Okay.

16                        A.    You say nothing -- of what --

17         I'll stop there.

18                        Q.    Well, he presented with low blood

19         pressure, correct?

20                        A.    Yes, sir.

21                        Q.    Unresponsiveness?

22                        A.    Yes.

23                        Q.    Lethargy and other symptoms that

24         gave us a concern that he had a serious blood-borne

25         infection that was causing shock.  Is that -- would

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        you agree with that?

3                    MS. MITCHELL:  Are you reading from

4        something?

5                    MR. KLEIN:  No, I'm just asking.

6                    A.    Those things can all be part of

7        sepsis, yes.

8                    BY MR. KLEIN:  (Cont'g.)

9                    Q.    Okay.  And so he did present with

10       low blood pressure, which is a symptom of severe

11       sepsis, correct?

12                   A.    Yes.

13                   Q.    And -- go ahead.

14                   A.    Volunteering too much.  I -- it

15       would be extraordinarily unusual for a patient with

16       sepsis to present with pupils that are fixed and with

17       a neuro exam close to brain death.

18                   Q.    Okay.  But --

19                   MS. CALABRESE:  Doctor, I didn't hear

20       your answer.  Did you say unusual?

21                   A.    That would be very unusual for --

22                   MS. CALABRESE:  Unusual, thank you.

23                   A.    -- a child who was --

24                   MS. CALABRESE:  No, you don't have to

25       repeat it.

Page 90

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    THE WITNESS:  Okay.
 3                    MS. CALABRESE:  I just didn't hear the
 4          word unusual.  Thank you.
 5                    THE WITNESS:  The low blood pressure,
 6          yes.  Decreased mental status, yes.  But brain death
 7          or near brain death, no.
 8                    BY MR. KLEIN:  (Cont'g.)
 9               Q.   But severe sepsis can cause brain
10          death, correct?
11               A.   Yes.
12               Q.   And in fact, did the trial get
13          into that -- if I, correct me, if I'm wrong.  You
14          said you couldn't rule out sepsis as being part of
15          the contributing cause of the death here?
16               A.   Yes.
17               Q.   Okay.  So you don't know from
18          your limited involvement in this case whether trauma
19          or abuse or non -- or accidental trauma caused a
20          death or whether a bacterial infection that
21          overwhelmed this child's system had caused the death,
22          do you?
23                    MR. GINSBERG:  Objection to form.
24                    MS. PECK:  Object to form.
25               A.   Well, first of all.  I -- I -- I
```

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          don't know that I had a limited that, I guess, I

3          shouldn't quibble over that.

4                      I -- I was at this kid's bedside

5          saving his life from low blood pressure, put in

6          multiple lines, made adjusted pressures, worked very

7          hard to -- to make sure this kid did very well, as

8          well as possible.

9                      And I don't know the cause of death,

10         but I have a hard time explaining it all by sepsis.

11                     BY MR. KLEIN:  (Cont'g.)

12                     Q.   But you -- you -- you currently

13         are -- you're not an infectious disease specialist.

14         Would -- would you agree with that?

15                     A.   Yes.

16                     Q.   Okay.  And you would -- would you

17         -- you would agree that it's -- it's possible that it

18         could have been sepsis but you have -- you personally

19         have a hard time explaining it as that.  Is that your

20         testimony?

21                     MS. MITCHELL:  Wait, are you asking

22         him for his  --

23                     MR. GINSBERG:  Object to form.

24                     MS. CALABRESE:  Can you repeat it?

25                     MS. MITCHELL:  -- opinion as to

```
1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      whether sepsis was the cause of death?  I just don't
3      understand what you're asking him.
4                      BY MR. KLEIN:  (Cont'g.)
5                      Q.   I'll rephrase it.  Just because
6      you have a hard time explaining that it's -- it was
7      sepsis that would have caused the death, doesn't mean
8      that sepsis didn't cause the death.  You don't know
9      either way, do you?
10                     MS. MITCHELL:  Object to form.
11                     MR. GINSBERG:  Object.
12                     MS. CALABRESE:  Same objection.
13                     MS. PECK:  Same objection.
14                     A.   I --
15                     MR. GINSBERG:  Objection.
16                     A.   -- have evidence from my
17     colleagues in neurosurgery and radiology and -- that
18     point to a cause of death as I've previously
19     discussed, that is trauma.
20                     Whether there was sepsis as well, I --
21     I can't say.  That's certainly possible but I -- my
22     professional opinion and that of the other physicians
23     taking care of this child, was that there was trauma
24     involved.
25                     BY MR. KLEIN:  (Cont'g.)
```

1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         Q.   Well, you can't -- you can't say

3         whether it was accidental trauma or non-accidental

4         trauma, correct?

5                         A.   Correct.

6                         Q.   And when you say trauma, would

7         you -- was it your observation that the bilateral

8         fluid collections were aged?  In other words, the

9         trauma could have gone back some weeks or months.

10                        A.   I -- there was a reading of --

11        that the fluid was in different ages.  So it is

12        possible that the trauma was a combination of

13        something recent and something old.

14                        Or at least something of different

15        ages.  Exactly what ages those are, are beyond my

16        area of expertise.

17                        Q.   Okay.  Are you aware of there

18        being birth-related trauma that could result in

19        subdural fluid collections?

20                        A.   Yes.

21                        Q.   Okay.  And that could happen in

22        complicated deliveries.  Would you agree with it?

23                        A.   Yes.

24                        Q.   Okay.  And those birth related

25        traumatic subdural hematomas, that could be birth

Page 94

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        related, may not always reveal themselves for some

3        time, or unless something else happens to the child,

4        correct?

5                        A.    Yes.

6                        Q.    And those subdural hematomas that

7        could be birth related can have different layers of

8        bleeding, settling in, you know, drying up and then

9        we have re-bleeds.  Would you agree with that concept

10       generally?

11                       A.    I'm not familiar with that.

12                       Q.    Okay.  Have you ever heard of the

13       concept of re-bleeds of subdural hematomas?

14                       A.    Yes.

15                       Q.    Okay.  What is -- what does it

16       mean, could you -- can you explain what re-bleeding

17       in -- in -- in this context means?

18                       A.    I -- I really don't feel that I

19       know enough about it to comment.

20                       Q.    Okay.  So when you say there is

21       older blood, older -- did you say older blood or

22       older injury, what exactly did you say?

23                       A.    There was -- there was evidence

24       of -- of subdurals of varying age, which I think is

25       pretty much the exact words on the radiology report.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          Q.    Okay.   The radiology report -- go

3        ahead, I'm sorry.

4                          A.    So whenever I speak about, you

5        know, findings on a brain, I am relying on a

6        radiology report.

7                          Q.    Okay.   So I'm going to ask that

8        we put up that exhibit and we put up that radiology

9        report.   Well, let me ask you this.   Do you -- do --

10       you recently looked at the radiology report a little

11       earlier in this deposition today, correct?

12                         A.    Yes.

13                         Q.    Okay.   It doesn't say anything

14       about subdural hematoma, correct?

15                         MS. MITCHELL:   So he is talking about

16       the former report.

17                         MR. KLEIN:   Yes.   Why don't -- if --

18       can -- Annette, can you put up that exhibit that I

19       emailed to you?   There we go.   Okay.   And I'll tell

20       you where to scroll down to.

21                         THE WITNESS:   It says fluid

22       collection.   It does not say hematoma.

23                         MR. KLEIN:   Okay.   And why don't we

24       just pull up that page so we could just reference it

25       for the record and the exhibit that's on the screen?

Associated Reporters Int'l., Inc.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                            Is there like a -- I'm going to see if

3        I could find that in reference to page number of --

4        of the P.D.F. for everybody.

5                            THE WITNESS:  Is this Plaintiff's One?

6                            MR. KLEIN:  Sure.

7                            THE WITNESS:  Hang on.

8                            THE REPORTER:  Why do you -- do you

9        want this marked as C?  Oh, no.  You want it mark as

10       -- do you want it marked as One?

11                           MR. KLEIN:  What?  That's fine.

12                           THE REPORTER:  Okay.

13                           MR. GINSBERG:  Plaintiff's One.

14                           THE REPORTER:  Yes.

15                           MR. GINSBERG:  The entire record?

16                           MR. KLEIN:  Yes.

17                           MR. GINSBERG:  The entire medical

18       record?

19                           MR. KLEIN:  Yeah.

20                           MS. MITCHELL:  If-- if we could note,

21       I know there were pages the City of Troy had marked

22       earlier that we haven't been able to locate in -- in

23       the chart that's being marked now.

24                           MR. KLEIN:  Okay.  Can you describe

25       what they are?

Page 97

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MS. MITCHELL:  Well, you don't have to

3        pull them back up, but I believe there was a history

4        and physical -- there was a progress sheet that we

5        have not been able to find in the chart that we were

6        provided by counsel.  Is it Rhiannon Spencer?

7                    MR. KLEIN:  Yeah.  Okay.  So maybe

8        we'll put a pin in that and go back to that.  But for

9        now, I'm just going to try to find the radiology

10       report while we're on that topic and ask --.

11                   MS. MITCHELL:  Okay.  He has the C.T.

12       report.

13                   MR. KLEIN:  Yeah.  I'm just trying to

14       scroll through.  Do you -- can you tell us is that

15       where it is in the packet -- it's the middle or the

16       back?

17                   MS. MITCHELL:  You know, it's not page

18       numbered.  It's not quite halfway through.  That's

19       the best I can describe for now.

20                   THE WITNESS:  I can read it to you if

21       you'd like.

22                   MR. KLEIN:  Sure.

23                   THE WITNESS:  September 21st exam C.T.

24       had clinical history, findings are large bilateral

25       extra axial fluid collections slightly larger on the

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 98

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        right -- posteriorly on the right and over the upper

3        aspect of the right convexity, the fluid is

4        distinctly denser than on the left.

5                        Which probably indicates a large

6        subdural collection on the right; it's unclear

7        whether the fluid is subdural or merely subarachnoid.

8        The distinction can be made with M.R.I. -- M.R.I.

9                        The brain parenchyma in particular

10       system appeared normal.  The calvarium appears

11       intact.

12                       Impression: Large bilateral, extra

13       axial fluid collections, probably subdural on the

14       right and possibly the same on the left.  M.R.I. is

15       recommended to distinguish between subdural

16       collections and enlargement of subarachnoid spaces.

17       So as you heard, it does not mention blood.

18                       BY MR. KLEIN:  (Cont'g.)

19                       Q.   Okay.  Now, I'm going to ask you

20       in reviewing your trial testimony, do you recall

21       being asked questions and giving answers about there

22       being some other report about there being blood

23       and/or hematoma.  Do you recall that?

24                       A.   I don't recall.

25                       Q.   Okay.  Would -- did you give

ARII@courtsteno.com                             www.courtsteno.com

Page 99

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          testimony at the trial that there was some other

3          report that turned out you were mistaken or incorrect

4          about that?

5                         MR. GINSBERG:  Object to the form.

6                         BY MR. KLEIN:  (Cont'g.)

7                         Q.   Is this the only report, the only

8          C.T. of the head?

9                         A.   There is the skull fracture.

10                         MS. CALABRESE:  Object to form.

11                         MS. MITCHELL:  Are you talking about a

12          formal typewritten report or are you talking about if

13          there's any reports in the record or references to

14          finding?

15                         MR. KLEIN:  I'm talking about actual

16          findings on a radiology exam.

17                         BY MR. KLEIN:  (Cont'g.)

18                         Q.   Did you testify that there were

19          additional findings other than what you just read in

20          this C.T. of the head with regard to head injuries?

21                         A.   I don't remember that.

22                         Q.   Okay.

23                         A.   I mean I do know that they are --

24          neurosurgery consult used the word hematoma and

25          blood.

Page 100

```
1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                        Q.    Okay.  Do you know where they got
3         that from?
4                        A.    I don't.
5                        Q.    Okay.  Do you know how this went
6         from large bilateral, extra axial fluid collections
7         to -- or subdural hematoma, if you know?
8                        MR. GINSBERG:  Object to the form.
9                        BY MR. KLEIN:  (Cont'g.)
10                       Q.    Do you know how the -- the
11        findings of the actual report of the C.T. morphed
12        into a subdural hematoma being referenced in the
13        record?
14                       MR. GINSBERG:  Object to the form.
15                       MS. PECK:  Object to the form.
16                       MS. CALABRESE:  Objection to the form.
17                       A.     No, I don't.
18                       BY MR. KLEIN:  (Cont'g.)
19                       Q.    You don't.  Okay.  Would you
20        agree that there's no report that finds that or has
21        an impression of a subdural hematoma?
22                       MR. GINSBERG:  Object to the form.
23                       MS. CALABRESE:  Same objection.
24                       A.    I don't -- I have not seen a
25        radiology report.  I've seen multiple references in
```

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      neurosurgery note about hematoma.
 3                      BY MR. KLEIN:   (Cont'g.)
 4                      Q.    Okay.  But they -- what is your
 5      understanding of where neurosurgery got that
 6      information from other than the C.T., if that's a
 7      part of that?
 8                      A.    Neurosurgery often -- since it's
 9      what they do, often will have a interpretation of a
10      C.T. that's not identical to radiology, extremely
11      common, I'd say, difference.
12                      Q.    I'm sorry.
13                      A.    Can I answer my question -- the
14      question?
15                      Q.    Yeah.
16                      A.    The -- in addition, we get
17      reports on several levels that are verbal, as well as
18      the final written report.  So I think this was a
19      Sunday, but any time of day, a resident reads the
20      film first and then talks to us.
21                      And then a -- someone reviews that.
22      So there could be another phone conversation with the
23      attending after the review and then the written thing
24      is usually -- the written report doesn't happen until
25      sometime later.
```

Associated Reporters Int'l., Inc.

Page 102

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       So there are -- there are multiple,

3       you know, verbal interactions that happen.  In

4       addition, the neurosurgeon also has their own

5       interpretation, which can also be verbally added.

6                       So there are many occasionings for

7       that idea that a subdural lead was present, despite

8       the fact that the final report does not state that.

9                       Q.   Okay.  And is the final report,

10      ultimately, the controlling conclusions of -- of the

11      clinicians that reviewed the scans?

12                      A.   I don't know.

13                      Q.   In other words, like, I think in

14      the record shown to you earlier, it said initial

15      impression subject to final review.  Is the -- is the

16      final report controlling or are different opinions

17      not stated in the report also the -- the findings as

18      well?

19                      In other words, are there subdural

20      hematomas here or -- or subdural collections or

21      bilateral collections of fluid?  What is there to

22      base the finding of subdural hematoma if it's on the

23      report?

24                      MR. GINSBERG:  Object to form.

25                      MS. CALABRESE:  Objection to form.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. PECK:  Object to form.
 3                    MS. MITCHELL:  Yeah.  Object to form.
 4        There's -- there's a lot of substance in there.  Can
 5        you just narrow down the question?
 6                    BY MR. KLEIN:  (Cont'g.)
 7                    Q.   Yeah.  It's the -- is the
 8        definitive final opinion here what's contained in the
 9        C.T. report that you just read?
10                    MS. MITCHELL:  And you're talking
11        specifically about the radiologists that are
12        identified on the report?
13                    MR. KLEIN:  Yeah.
14                    MS. MITCHELL:  Their opinions?
15                    A.   That's the final opinion of the
16        radiologist.
17                    BY MR. KLEIN:  (Cont'g.)
18                    Q.   Did the neurologist have
19        different opinions or would their opinions be based
20        on the radiologist's findings?
21                    MR. GINSBERG:  Object to the form.
22                    A.   I can't answer that.
23                    BY MR. KLEIN:  (Cont'g.)
24                    Q.   Okay.  When -- when ██████████
25        presented at Albany Medical, he -- his white blood
```

Page 104

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          cell count was one -- was one, which is very low,

3          correct?

4                          A.    Yes.

5                          Q.    Okay.

6                          A.    Was that from Albany Medical or

7          was that from Samaritan?

8                          Q.    I don't know where it was.  But

9          is it your understanding, it was extremely low?

10                         A.    Yes.

11                         Q.    Okay.

12                         A.    Right.  You saw that.  Right.

13                         Q.    Okay.  And when it's below five

14         --

15                         A.    I also remember that from my

16         review of the case.

17                         Q.    Right.  And so when -- when the

18         white -- when the white blood cell count is below

19         five thousand, would you agree the concern is that

20         the immune system is not functioning -- functioning

21         properly or is at least suppressed?

22                         A.    Yes.

23                         Q.    And that could be from bone

24         marrow suppression.  That could be a cause of that,

25         correct?

800.523.7887                          Associated Reporters Int'l., Inc.

```
 1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                         A.    Yes.
 3                         Q.    Okay.  You learned that ███████
 4      was hypothermic, correct, from Dr. Carlos at
 5      Samaritan?
 6                         A.    I -- I think so, yes.
 7                         Q.    Okay.  And he was -- did you --
 8      do you recall learning that he was experiencing
 9      tachycardia?
10                         A.    Yes.
11                         Q.    And that he was -- leukopenia.
12                         A.    That's the same as low white
13      count.
14                         Q.    Right.  And also had low blood
15      pressure?
16                         A.    Yes.
17                         Q.    And those are all signs of a
18      pervasive bacterial infection or could be, would you
19      agree?
20                         A.    Could be -- it could be.
21                         Q.    Now, do you have an understanding
22      of whether a bacterial infection that goes into the
23      meninges can result in coagulopathy?
24                         A.    Well, it's not specifically
25      meningitis, any bacterial infection can affect
```

Page 106

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     clotting --
 3                     Q.   Okay.
 4                     A.   -- and cause of coagulopathy.
 5                     Q.   So --
 6                     A.   But I'm not aware of anything
 7     specific about meningitis.
 8                     Q.   So was that in your mind -- so --
 9     and ████████ presented with clotting or coagulopathy
10     issues, correct?
11                     A.   Yes.
12                     Q.   And so was that in your mind as
13     well?  So were you thinking about sep -- withdrawn.
14                     Did that -- did all of these factors
15     cause you to think about sepsis as well or did you
16     immediately turn to trauma, in terms of your working
17     diagnosis?
18                     MS. PECK:  Object to form.
19                     MS. MITCHELL:  Object to form.
20                     A.   I treated this patient as septic
21     from the beginning.  All courts -- in a full court
22     press, absolutely.
23                     No holds barred and antibiotics were
24     continued.  I put lines in this kid.  I -- I
25     manipulated blood pressure, all which are treatment
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        for sepsis.
 3                      BY MR. KLEIN:  (Cont'g.)
 4                      Q.   I get that.  But I guess what I'm
 5        asking you is the record really from -- from -- from
 6        Samaritan seemed to have a focus of sepsis.
 7                      When  ███████  got to Albany Medical,
 8        there's -- the focus really turns to like a trauma or
 9        head injury, you know, abuse.  Is that a term that
10        you focus on and -- and that you've made that
11        determination that this was more likely abuse than
12        sepsis?
13                      MR. GINSBERG:  object to the form.
14                      MS. PECK:  object to the form.
15                      A.   Absolutely not.  And I -- I -- I
16        treat this kid like a full blown sepsis and save --
17        and saved his life from the period of time because of
18        it and I'm mad and -- that's what I've told him, yes.
19                      MS. MITCHELL:  I'm going to object to
20        form and request a five-minute break.
21                      MR. KLEIN:  Sure.
22                      THE REPORTER:  Sure.  Can we take --
23        it's twelve fifty-three, can we go until one ten?
24                      MR. KLEIN:  Right.  How long are we
25        going to be?  Are we going to take a break for lunch?
```

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          MS. CALABRESE:  Hold on a second.

3          Well, I also -- I'm going to have a few follow-up

4          questions after Crystal in the event that she

5          doesn't.  So we may want to take a break for lunch

6          now.

7                          THE REPORTER:  Yeah.  How -- do you

8          guys expect to be going all day?

9                          MR. KLEIN:  I don't.  I don't have

10         that much but certainly at least another, I would say

11         forty-five minutes to an hour, I would think because

12         it's going slower than it does, I think in person.

13                         And so I don't want it down, you know,

14         I'm hoping it'll be quicker than that but I think if

15         -- if people need lunch, maybe now is a good time to

16         do it.

17                         I'm willing to work through it.  But

18         if everyone wants to take a break, that's fine with

19         me as well.

20                         MS. CALABRESE:  I don't need a lunch

21         but I wasn't sure about the witness and the

22         stenographer.

23                         THE REPORTER:  I'm fine.

24                         MS. CALABRESE:  I said, I don't need a

25         lunch break but I wasn't sure about the witness --

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       how Dr. Edge feels and how the stenographer feels.

3                      THE REPORTER:  I'm fine.

4                      MS. CALABRESE:  Okay.  Hold on.  Let

5       me check.

6                      THE REPORTER:  I'm going to go off the

7       record.

8                      (Off the record 12:54 p.m.)

9                      (On the record 1:18 p.m.)

10                     THE REPORTER:  We're on the record.

11                     BY MR. KLEIN:  (Cont'g.)

12                     Q.   Okay.  So we've just have taken a

13      break.  Now, we're going to continue. Is there

14      anything about your testimony so far you wish to

15      revise? If not, we'll move forward.

16                     A.   Only to say, which we're saying

17      at the very end that, you know, my responsibility was

18      to treat this, you know, child with sepsis, with no

19      holds barred in the best possible way possible,

20      holding nothing back and I am proud that we did that.

21                     I also am responsible to have a

22      question marked when trauma might exist and it's my

23      legal responsibility to bring up that question and --

24      and not to miss that.

25                     Q.   Okay.  Are you aware of

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        stipulations similar to this in your per -- personal
 3        experience or three years studies or as noting from
 4        college where young children under the age of two die
 5        from sepsis without -- in the absence of trauma?
 6                        MR. GINSBERG:  Object to the form.
 7                        A.   Okay.  Yes, it happens all the
 8        time but, you know, the professor in me wants to give
 9        you the collar -- corollary as well.
10                        BY MR. KLEIN:  (Cont'g.)
11                        Q.   Can you give it to us?
12                        A.   Can I give it?
13                        MS. MITCHELL:  Yes.  That was
14        acceptable.
15                        A.   (Cont'g.)  I teach, you know, I'm
16        a professor, I teach and one of the things I teach is
17        that if you have a three, four-month-old baby who
18        you're concerned about sepsis then you have to ask
19        the question is there trauma?
20                        Because this is the age that babies
21        start to cry and be hard to console and -- and so
22        that part of my training as an I.C.U. doctor is that,
23        you know, a three, four-month-old baby that comes to
24        you with sepsis, I ask the question, is there trauma?
25                        BY MR. KLEIN:  (Cont'g.)
```

Page 111

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                      Q.    And I don't think about -- I
 3        certainly don't take any issue with that and I'm
 4        grateful that you ask all the right questions.
 5                          In this case, was it also important to
 6        ask questions about the history of the -- to
 7        determine whether those types of things could have
 8        led to trauma that was, you know, not an accidental,
 9        that was accidental trauma or some other type of
10        trauma that could have led to the -- either a
11        subdural hematoma or other portion of a bacterial
12        infection, in fact?
13                      A.    Yes.
14                      Q.    And in this case --?
15                      A.    You know that -- you know -- I --
16        I -- I -- I know I'm going beyond the question again.
17        So I might -- I can feel my attorney, but the reason
18        we can't solve this hematology was in part say, you
19        know, is there an underlying, you know, bleeding
20        problem here that could explain this that's not
21        trauma.
22                          So in a sense that's doing what you
23        just suggested.
24                      Q.    Okay.  And wasn't there, in fact,
25        an underlying bleeding problem that could -- that was
```

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      not traumatic in explanation?
3                      A.   I don't know that.
4                      Q.   Okay.
5                      A.    The hematologist -- the
6      hematologist felt that this was consistent with --
7      with -- with -- with a trauma and that we're -- this
8      could be all from sepsis but it could -- it could
9      also be from a very severe brain injury.
10                     Q.   Okay.
11                     A.   And I'm not sure that that was
12     ever resolved.
13                     Q.   Right.  And that's what I want to
14     establish and I think you just did that.  When you
15     talk about the retinal hemorrhaging, that could be
16     from coagulopathy?
17                     A.   You're -- you sound like you're
18     underwater.
19                     Q.   Okay.  I have to switch
20     microphone so off the record.  I'm -- I'm going to
21     need to log back in again.
22                     MR. KLEIN:  I'm going to leave and
23     then come back in because I think my -- well, one
24     second.
25                     THE REPORTER:  I'll pause the record.

Page 113

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    (Off the record 1:22 p.m. to 1:23
 3        p.m.)
 4                    THE REPORTER:  We're back on.
 5                    BY MR. KLEIN:  (Cont'g.)
 6                    Q.   So -- so did I ask you the
 7        question whether -- whether the -- the orbital -- the
 8        -- no the -- the orbital -- the retinal hemorrhaging
 9        in this case could be from -- related to the
10        coagulopathy, correct, and not trauma?
11                    A.   It is extraordinarily rare for
12        the -- the most common cause of retinal hemorrhage is
13        trauma.
14                    Q.   But there are other causes,
15        correct?
16                    A.   Yes.  And although I'm not an
17        expert on -- on -- on that and some of that is still
18        quite controversial.
19                    Q.   If I told you that it was
20        determined that there were Gram stains done of the --
21        of the cultures in this case and that the cells and
22        the -- behind the -- of the eye were full of
23        bacteria.
24                    Would that influence your -- assuming
25        that was true, I'll represent to you that -- that was
```

Page 114

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       the finding of one of the experts and for purposes of

3       this question assuming that's a fact would that --

4       would that in your mind contribute to whether this

5       was -- sepsis contributed to the -- to the -- the --

6       the orbital -- the -- I'm sorry, the --

7                    MS. CALABRESE:  Cause of death?

8                    MR. KLEIN:  -- the retinal hemorrhage?

9                    MR. GINSBERG:  Object to the form.  He

10      is not -- this is not an expert witness.  He has not

11      been identified as an expert.  He can't be compelled

12      to give an opinion.

13                   MR. KLEIN:  Okay.  You know, you could

14      just say objection, Mike, as you said before.

15                   A.   Well, sepsis by definition means

16      that there's bacteria in -- in all the cells.  I --

17      I've treated many -- thousands of kids with sepsis

18      and -- and read many many scholarly articles and have

19      never heard of retinal hemorrhage being associated

20      with a fatal sepsis.  I'm sure there are cases but

21      --.

22                   BY MR. KLEIN:  (Cont'g.)

23                   Q.   And when this kid's father went

24      to trial, did you follow the testimony of the various

25      doctors on each side and did you hear that theory put

Page 115

```
1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     out there as a possibility in this case or were you

3     not aware of that?

4                    A.   I was not aware.

5                    MR. GINSBERG:  Object to the form.

6                    BY MR. KLEIN:  (Cont'g.)

7                    Q.   Now, were you aware that that on

8     autopsy there were blood and the other organs the --

9     the testes, I believe the heart or the lungs which

10    were signs of overwhelming sepsis.  Were you aware of

11    that?

12                   MS. CALABRESE:  Object -- Objection to

13    form.

14                   MS. PECK:  Objection.

15                   MS. CALABRESE:  This is Christina.

16    Object to the form.

17                   MS. MITCHELL:  Is -- is there going to

18    be a marked exhibit of the autopsy report?  Is that

19    something that we haven't gotten to see?

20                   MR. KLEIN:  I'm just asking if he was

21    aware of that.  I wasn't planning on marking it but,

22    you know, that would take longer but I don't have any

23    questions about that.

24                   A.   As I said, I'm not aware of that

25    if I -- if I -- if I had to swear, you know, whether
```

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     or not I saw it in '09, I -- I could not answer that.

3                    BY MR. KLEIN:   (Cont'g.)

4                    Q.   Okay.  So can we put the --

5     withdrawn.

6                    So if I can just sum up what I think

7     you said about two answers back.  You -- you didn't

8     know and don't know today whether this was -- whether

9     this child died from sepsis or from trauma or some

10    combination.

11                   You're just recalling what you saw at

12    that time, is that a fair characterization?

13                   A.   Yes.

14                   Q.   Okay.  Can we -- did you ever say

15    that this child was murdered?  Ever used that word

16    murdered to any police officers?

17                   A.   I don't recall saying that.  That

18    would have been very unusual.

19                   Q.   So that's -- that was my next

20    question.  How many years have you been an emergency

21    room physician?

22                   A.   Zero.  I'm an I.C.U. --.

23                   Q.   I.C. -- I'm so sorry, I.C.U.

24    physician, sorry.

25                   A.   Yeah.

Page 117

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.   How many years?

3                    A.   Actually, I did have a year.

4        Yeah, what was -- what's the question?  I -- I -- I

5        --.

6                    Q.   How many -- how many years -- how

7        many years have you been in this business?

8                    A.   Thirty.

9                    Q.   Okay.  In this type of scenario,

10       can you recall -- can you recall any situation where

11       you would have in this type of situation under these

12       facts said to the responding police, this is murder?

13       Words literally to that effect based on what you knew

14       in this case?

15                    MR. GINSBERG:  Object to the form.

16                    A.   I can't imagine saying that.

17                    MR. GINSBERG:  That -- that was the

18       entire question?

19                    MS. PECK:  Yes, just object to form.

20                    MR. GINSBERG:  Now, this a two-part

21       question.  Do you hear the entire question?

22                    THE WITNESS:  I was -- I was upset.

23                    MS. MITCHELL:  Okay.  Can we -- you

24       said it was a two-part question.  Can we hear the

25       question again?

Associated Reporters Int'l., Inc.

1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         MR. KLEIN:  Can you read -- can you

3           read it back, please?

4                         THE REPORTER:  Yeah, I can read back

5           the question.

6                         MR. KLEIN:  I think he -- I think he

7           answered it but it -- it started confusing with all

8           the objections.  I think the best thing to do is to

9           read it back.

10                        THE REPORTER:  Okay.  Just give me a

11          second.

12                        (Off the record 1:30 p.m.)

13                        MS. MITCHELL:  It might be easier if

14          you just -- if you just ask the question again.  The

15          doctor is ready to answer.

16                        THE REPORTER:  Okay.  We're back --.

17                        MS. MITCHELL:  If that's okay with

18          everyone.

19                        THE REPORTER:  We're back on.

20                        BY MR. KLEIN:  (Cont'g.)

21                        Q.   Doctor, do you recall saying to

22          the responding police officers in this case that this

23          was a murder or words to that effect?

24                        A.   I do not.

25                        Q.   In speaking to the responding

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      police officers, do you recall whether you said that
 3      this was possible abuse or possible sepsis or both or
 4      words to that effect?  Would you have told them
 5      everything?
 6                      MS. MITCHELL:  Object to form.
 7                      BY MR. KLEIN:  (Cont'g.)
 8                      Q.   Would you have explained all of
 9      it to them?
10                      MR. GINSBERG:  Object to the form.
11                      A.   Yes.
12                      BY MR. KLEIN:  (Cont'g.)
13                      Q.   Okay.  Yes, you would have
14      explained sepsis and -- and possible abuse as
15      potential causes of the injuries?
16                      A.   Yes.
17                      Q.   Okay.  Are you aware that the
18      Troy detectives said that you used the word murder in
19      saying this was a murder when they met with you at
20      Albany Medical Center on September 21st, 2008?
21                      MR. GINSBERG:  Object to the form.
22                      A.   Yes.
23                      BY MR. KLEIN:  (Cont'g.)
24                      Q.   Okay.  And do you -- do you
25      dispute that account by the police officer?
```

Page 120

```
 1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                      A.   Yes.
 3                      MR. GINSBERG:  Object to the form.
 4                      BY MR. KLEIN:  (Cont'g.)
 5                      Q.   Why don't we -- withdrawn.
 6                      What, if anything, did you tell the
 7           Troy police officers on September 21st, 2008?
 8                      A.   I don't remember the words.
 9                      Q.   How about in sum and substance?
10                      A.   That I was very concerned about
11           this being acceleration, deceleration injury, that
12           this fit a pattern consistent with that.
13                      And that in the absence of a motor
14           vehicle accident or other accident that child abuse
15           was the top of my list.
16                      Q.   Did you talk about the other
17           things on the list as well?
18                      A.   My job would be to give as broad
19           a picture as I can.
20                      Q.   Okay.  Did you ever confront any
21           of the police officers who attributed the word murder
22           to you as to why they said that in this case?
23                      MS. MITCHELL:  Object to form.
24                      A.   No.
25                      MR. GINSBERG:  Note my objection as
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        well.

3                     THE WITNESS: I saw that yesterday for

4        the first time.

5                     BY MR. KLEIN:  (Cont'g.)

6                     Q.   Well, in this case, the -- the

7        detectives went on to interrogate Mr. Thomas after

8        they spoke with you.

9                     MR. GINSBERG:  Object to form.

10                    BY MR. KLEIN:  (Cont'g.)

11                    Q.   And then they came back and spoke

12       with you again on the 22nd when you gave your

13       deposition.  I'm directing your attention to

14       September 22nd, 2008 when you gave your -- your

15       deposition.

16                    Do you recall being informed that they

17       were in the middle of interrogating him when they

18       spoke with you?

19                    A.   I don't remember.

20                    Q.   Since 2008, when this happens --

21       when this case presented -- was presented to you at

22       Albany Medical Center, have your views on the symptom

23       on the medicine here changed or evolved over the

24       years with developments in -- in -- in -- you know,

25       standards of looking at these cases?

Associated Reporters Int'l., Inc.

Page 122

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        Do you think this was more sepsis now

3        given all of the symptoms than abuse?  Do you not

4        know or something else?

5                        MS. PECK:  Object to form.

6                        MS. MITCHELL:  Object to form.

7                        A.   That's a really tough question.

8        I don't know what's the best answer.

9                        BY MR. KLEIN:  (Cont'g.)

10                       Q.   Okay.  I think you said things,

11       the medicine has changed or views in the field have

12       changed about shaken baby, have you asked that kind

13       of -- that term before.  What -- what did you mean by

14       that that -- that the --?

15                       A.   I -- I know that I -- I -- only

16       what I read in the newspaper.  What -- what I still

17       stick to and which is -- hasn't changed is that

18       acceleration, deceleration injury, hitting a child, a

19       baby against a soft object or sofa or bed, with

20       enough force can cause subdural hematoma.

21                       So to me that's -- and whatever is

22       changed in court, et cetera, et cetera, you know,

23       I've never used the -- used the term shaken baby,

24       partly because I thought -- I thought it was

25       confusing.

Associated Reporters Int'l., Inc.

Page 123

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    But the fact that, you know, that kind

3        of rapid movement hitting something and the brain

4        going back and forth in the skull can tear small

5        blood vessels and can cause subdural bleeding.

6                    Q.   The -- the intracranial --

7        withdrawn.  The -- the blood seen on the C.T. was

8        older than a few days though, correct?  You -- you

9        couldn't put an age on that.  Is that right?

10                   MS. MITCHELL:  Object to form.

11                   A.   I can't I --

12                   MS. CALABRESE:  Objection.

13                   A.   -- I am not an --

14                   MS. PECK:  Object.

15                   MR. KLEIN:  You can answer.

16                   A.   -- I'm not, I -- I -- I don't

17       know, I rely on neurosurgery and radiology for

18       information.

19                   MR. KLEIN:  Okay.

20                   BY MR. KLEIN:  (Cont'g.)

21                   Q.   So can we put the record back up

22       in that -- the two hundred and twelve page record?

23       Can you scroll down to -- I want you to do this.

24                   I want to refer you to the -- to the

25       PICU where that you signed, the PICU attending note,

Page 124

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        page sixty-one of the document.
3                        THE REPORTER:  Okay.
4                        BY MR. KLEIN:  (Cont'g.)
5                        Q.   Take a moment, Doctor, and review
6        that page if you could and let me know when you've
7        had a chance to look at it.
8                        MS. MITCHELL:  Okay.
9                        A.   I see it.
10                       BY MR. KLEIN:  (Cont'g.)
11                       Q.   Okay.  Is that your signature at
12       the bottom?
13                       A.   Yes.
14                       Q.   And was it some --?
15                       MS. CALABRESE:  I'm sorry.  I'm sorry.
16       Can we see the bottom?  I can't see the bottom.
17       Thank you.
18                       BY MR. KLEIN:  (Cont'g.)
19                       Q.   Next to the signature, it says
20       10/24.  Is that right?
21                       A.   Yes.
22                       Q.   And then -- and then below the
23       signature --
24                       A.   I don't see that.
25                       MS. MITCHELL:  Yeah, the -- the
```

Page 125

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          hardcopy we have, doesn't have --.

3                    THE WITNESS:  Is that a different

4          date?  What date is that?

5                    MR. KLEIN:  I've seen different copies

6          of it.  But in this record though --.

7                    MS. MITCHELL:  Let me see the date

8          above.  No, it's a different note.  Yeah, there you

9          go.

10                   THE WITNESS:  Yes.

11                   BY MR. KLEIN:  (Cont'g.)

12                   Q.   Okay.  So that's your signature,

13         correct?

14                   A.   Yes.

15                   Q.   Okay.  What is the significance

16         of 10/24 at the bottom?  Is that when you read it and

17         signed it?

18                   A.   Yes.

19                   Q.   So that was signed almost a month

20         after the September 21st, 2008 admission?

21                   A.   Yes.

22                   Q.   Okay.  And looking at the report

23         -- well, withdrawn.

24                   What -- what is a PICU attending note?

25         Can you just explain for the record what it is?

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                      A.   It's a report of my findings of

3       the day in combination with a resident note.

4                      Q.   And was it prepared on or close

5       to the date in question and it was just signed by you

6       at a later time or --?

7                      A.   Yes.

8                      Q.   Okay.

9                      A.   The top of the note said that the

10      time of dictation it was ten fifty-five on 9/23.

11                     Q.   So at number three, it says at

12      probable list, it says C.T. scan shows bilateral

13      subdural hematomas of varying age.  Do you see that?

14                     A.   Yes, yeah.

15                     Q.   That -- based on what -- how you

16      describe the C.T. report that is not what -- would

17      you agree that is not what it showed?

18                     MS. MITCHELL:  Object to form.

19                     MR. GINSBERG:  Object to the form.

20                     MS. CALABRESE:  Can you read that

21      back?

22                     MR. KLEIN:  It's very hard for her to

23      read back, Christina.  If you want, I could rephrase

24      -- I can ask it again.  But --

25                     THE REPORTER:  He said number?  He

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          read off what number three said.

3                        MR. KLEIN:  Yeah.

4                        MS. CALABRESE:  If you can read the

5          question, Brett, I just want to determine if I'm

6          objecting.

7                        MR. KLEIN:  Just say objection then

8          I'm sure and then all your objections are reserved

9          for trial so --.

10                       MS. CALABRESE:  No, I understand.

11                       MR. KLEIN:  My question is this.

12                       BY MR. KLEIN:  (Cont'g.)

13                       Q.   Number three says, C.T. scan

14         shows bilateral subdural hematomas at varying age,

15         correct?

16                       MS. CALABRESE:  You can answer.

17                       A.   Yes.

18                       BY MR. KLEIN:  (Cont'g.)

19                       Q.   Okay.  Is that -- isn't that

20         different than the C.T. report that you read earlier

21         into the record?

22                       A.   Yes.

23                       Q.   Okay.  Can you explain how you

24         arrived at number three given the -- the disparity

25         with the C.T. report?

Associated Reporters Int'l., Inc.

                                                        Page 128
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                         A.   Because my conclusions are
3        derived from multiple sources.  One being the
4        official reading of the C.T. scan.  One being
5        discussion with the neurosurgery attending.
6                         One being discussion -- personal
7        discussions -- well, this -- this was still the --
8        this was the 23rd.  So yeah, my discussions involve
9        -- my conclusions are based on more than the reading
10       of the X-ray, the CAT scan, but also on my discussion
11       with my consultant.
12                        Q.   But isn't it true that the CAT
13       scan did not show bilateral subdural hematomas?
14                        A.   It showed bilateral fluid
15       collections, that does not rule out hematoma.
16                        MS. MITCHELL:  Okay.  And I'm going to
17       object to the form because you keep mixing up what
18       the scan shows versus what the report documents.
19                        MR. KLEIN:  Well, the report shows --
20       is a document what the scan shows, correct,
21       typically?
22                        THE WITNESS:  As I mentioned earlier,
23       neurosurgery -- neurosurgeons will often not agree
24       with the report and there will be multiple
25       conclusions.

Associated Reporters Int'l., Inc.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    BY MR. KLEIN:  (Cont'g.)
 3                    Q.   Isn't it more fair to say that
 4        there would be initial impressions, but ultimately
 5        there will be a final report that is signed off on?
 6                    A.   Yes, that's right.  The
 7        neurosurgeon does not sign off on the neuro -- on the
 8        radiology report.  They are entitled to their own
 9        opinion.
10                    Q.   Okay.  So you're basing -- so am
11        I correct that you're basing this statement in number
12        three of the problem list based on the neurosurgeon,
13        but technically not on the plain language of the
14        report itself?
15                    MS. MITCHELL:  Object to form.
16                    A.   Again, as I understand it the
17        report saying that there is fluid collection does not
18        rule out hematoma.
19                    BY MR. KLEIN:  (Cont'g.)
20                    Q.   Do you recall that the report
21        also said an M.R.I. would be helpful?
22                    A.   Yes, yeah.
23                    Q.   Did you or anyone ever prescribe
24        an M.R.I.?
25                    A.   No.
```

Page 130

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        Q.   Why not?

3                        A.   I would not have changed the

4      treatment and the child was too sick to go to the

5      M.R.I. scanner, which requires time in the O.R. of

6      two and it could lead to death in an unstable

7      patient.

8                        Q.   Now --.

9                        A.   But most importantly -- most

10     importantly, it would not change treatment.

11                       Q.   It might change the diagnosis,

12     but not ultimately the treatment?

13                       A.   Yes, it would -- it would confirm

14     whether or not this was blood or not.

15                       Q.   And if it wasn't blood, what are

16     the other options, intraspinal fluid?

17                       A.   Intraspinal fluid, pus, old blood

18     that breaks down into plasma and red cells.

19                       Q.   Did you -- do know or do you --

20     did you ever come to learn that pus was evident on

21     the brain?

22                       A.   No.

23                       Q.   Looking at number eight, a skull

24     fracture noted on C.T. scan.  What was that based on?

25                       A.   I don't -- I don't remember who

Associated Reporters Int'l., Inc.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        -- who told me that.  I can only assure you that I

3        was -- had verbal communication that there was a

4        skull fracture that was later found not to be true

5        and it was on my problem list and, you know, again,

6        there is -- the patient was only there for a day.

7                        I was, you know, a day-and-a-half and

8        I would have deleted that in the -- my next

9        dictation, but these are dictated notes.

10                       Q.   How about when you signed off on

11       it.  Did you have the opportunity if you wanted to

12       strike it or delete it or make a, you know, a line

13       through with your signature -- with your initials?

14                       A.   I did have opportunity.

15                       Q.   Okay.  Can you state today why --

16       why you didn't do that in this case?

17                       A.   I missed -- I missed the -- I

18       missed it.  I didn't --

19                       Q.   Okay.

20                       A.   -- I didn't.

21                       Q.   So that -- so that problem listed

22       in number eight was we now know to be untrue,

23       correct?

24                       A.   Correct.

25                       Q.   Okay.  And how did it come to

Page 132

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        your attention that that was untrue or incorrect?

3                      A.   I -- I don't remember.  It may

4        have been the -- the C.T. report reported no skull

5        fracture.

6                      Q.   Who was it who -- if you could

7        narrow it down, who -- who -- I'd like to know the

8        universe of individuals who would have reported a

9        skull fracture.

10                     Would it be neurosurgery, radiology,

11       or some other individual or individuals that you

12       could think of?  Who would have told you that?

13                     A.   Radiology resident, my resident,

14       the covering attending, radiology attending.  The

15       final radiology attending, the neurosurgery resident,

16       the covering neurosurgery attending, the final

17       neurosurgery attending.

18                     Q.   So you're getting information

19       from a lot of different specialists or other

20       providers and colleagues that you work with and

21       you're putting them all together in your problem

22       list.  Is that fair to say?

23                     A.   Yes, yeah.

24                     Q.   And with regard to the skull

25       fracture, that initial impression or assessment

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       changed in the course of the treatment, correct?
 3                     A.   Yes.
 4                     Q.   Were there any other mistakes in
 5       the -- in the -- in the paperwork that you've seen,
 6       or any other assessments that changed that were not
 7       updated that you're aware of other than that?
 8                     MS. MITCHELL:  Object to form.
 9                     MS. CALABRESE:  Object to form.
10                     THE REPORTER:  Sorry.  Who is
11       objecting?
12                     MS. CALABRESE:  Christina.
13                     THE REPORTER:  Thank you.  I can't --
14       I can't see everyone with this up on the screen.
15                     MR. GINSBERG:  We're all on board with
16       the objection.
17                     MS. MITCHELL:  Do you mean when he --
18       he looked through the chart obviously, he didn't, you
19       know, quickly -- closely look at every single page.
20                     Do you mean when he reviewed the chart
21       if he noticed anything that was incorrect or you're
22       talking about something else?
23                     BY MR. KLEIN:  (Cont'g.)
24                     Q.   At any time, up until today, have
25       you become aware that anything else that you've
```

Page 134

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        written or that's otherwise in the chart written by
 3        someone else is incorrect?
 4                      A.   No.
 5                      Q.   Okay.  The -- the district
 6        attorney at the time, do you remember his name who
 7        handled the case?  Art, he went on record and said
 8        that this was a problem --.
 9                      MR. GINSBERG:  Object to form.
10                      BY MR. KLEIN:  (Cont'g.)
11                      Q.   I didn't finish the question.  Do
12        you recall the district attorney ever stating
13        publicly that this was problematic that your report
14        said that there was a skull fracture when there
15        wasn't a skull fracture?
16                      MR. GINSBERG:  Object to the form.
17                      MS. MITCHELL:  Object to form.
18                      MS. CALABRESE:  Christina, object to
19        form.
20                      A.   I don't remember him saying that.
21                      BY MR. KLEIN:  (Cont'g.)
22                      Q.   Okay.  Or anyone from the D.A.'s
23        office, do -- do you remember this being an issue
24        that that the report stated there was a skull
25        fracture, when in fact there was no skull fracture?
```

Page 135

1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          MR. GINSBERG:  Object to the form.

3                          A.   I don't remember that.

4                          BY MR. KLEIN:  (Cont'g.)

5                          Q.   In retrospect, should you have

6           corrected that report?

7                          MS. MITCHELL:  Object to form.

8                          A.   Yes.

9                          MR. KLEIN:  Okay.

10                         MS. MITCHELL:  Are we done with this

11          line of questioning especially since other records

12          show that it had been considered and ruled out, and

13          that was communicated.  Can we just move on now?

14                         MR. KLEIN:  I'm looking at my notes to

15          move on, but I don't think it's appropriate --

16                         MS. MITCHELL:  Okay.  Great.

17                         MR. KLEIN:  -- to really enter a

18          speaking objection on the record like that -- that --

19          .

20                         MS. MITCHELL:  Noted.

21                         MR. KLEIN:  I'm just trying to not go

22          over things that have already been covered, so maybe

23          it's taking longer to do that, but I'll try to get

24          through it.

25                         MS. MITCHELL:  Okay.

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    BY MR. KLEIN:  (Cont'g.)
 3                    Q.   Okay.  So one of the police
 4     officers stated that he had to follow you down the
 5     hall to get your attention when he initially spoke
 6     with you on September 21st, 2008.  Do you recall any
 7     such situation like that?
 8                    MR. GINSBERG:  Object to the form.
 9                    BY MR. KLEIN:  (Cont'g.)
10                    Q.   No?
11                    A.   No.
12                    Q.   Okay.  The police officer, one of
13     the investigating officers also said that you stated
14     that you had been up for days as of that time.  Do
15     you recall anything like that?
16                    MR. GINSBERG:  Object to the form.
17                    MS. MITCHELL:  Object to form.
18                    A.   No.
19                    BY MR. KLEIN:  (Cont'g.)
20                    Q.   Have you been up for days prior
21     to your interactions with ███████████?
22                    A.   I don't know.
23                    Q.   Is that something that did happen
24     during that time in -- in  -- given your work
25     schedule, would there be days where you worked for
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        days in a row?

3                    MS. MITCHELL:  Object to form.

4                    A.   Yes.

5                    MS. MITCHELL:  Well, do you mean days

6        in a row without a break?

7                    MR. KLEIN:  I'm asking him.

8                    MS. MITCHELL:  Let's be clear.

9                    MR. KLEIN:  There was a statement

10       made, I -- I can play it for you, but they -- I'm

11       telling you in sum and substance --.

12                   MS. MITCHELL:  But I'm just saying I'm

13       working days in a row.  I'm not on twenty-four/seven.

14       So I just want the record to be clear.

15                   THE WITNESS:  I was never on a shift

16       where I couldn't rest during the -- during the day.

17                   MR. KLEIN:  Okay.

18                   THE WITNESS:  There is always other

19       doctors and very competent nurses there to take care

20       of patients.  But even at best, the I.C.U. is --

21       pediatric I.C.U. is a stressful -- a stressful place.

22                   BY MR. KLEIN:  (Cont'g.)

23                   Q.   Okay.  I've just got to move on

24       here.  I think you said in response to earlier

25       questions that with regard to this whether this was a

Associated Reporters Int'l., Inc.

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      suspect injury, you wouldn't use that language you

3      were more concerned about non-accidental or

4      accidental trauma.  Do you recall that?

5                    A.   I -- I don't understand your

6      question.

7                    Q.   Is it fair, were -- were your

8      concerns about whether this was accidental or non-

9      accidental trauma, was that something you were

10     concerned with?

11                   A.   My medical findings can -- can

12     only diagnose problem.  It's not I -- I -- it's not

13     part of my job to decide or figure out if it's

14     accidental or non-accidental.

15                   Q.   Okay.  And you didn't do that in

16     this case, right?  You didn't determine that in this

17     case.

18                   A.   I -- I did not.

19                   Q.   Okay.  And did you ever

20     communicate to police -- to the police officers from

21     Troy Police Department who came to the hospital,

22     whether this was accidental or non-accidental?

23                   A.   I had him telling me that there

24     was no accident identified and that that would lead

25     me to not tell to them, but they would tell me that

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        there was no accident identified.  So again, it's --

3        it's a decision made by the investigating

4        professionals, not the medical professionals.

5                        Q.   Okay.  Can we put up the

6        deposition of a witness exhibit signed by Walter

7        Edge.

8                        Dr. Edge, can you just read us the

9        narrative where it says after the words depose and

10       say.

11                       A.   Can I just read from the whole

12       thing?  I don't -- I don't know what you mean.

13                       Q.   Yeah, I just want to -- just it's

14       hard for me to -- to understand, especially with the

15       cross outs.  So if you could just read through it and

16       indicate if there's a cross out if that's something

17       that you changed and what it says.

18                       A.   I examined ███████ and he had a

19       subdural hematoma on his head.  Based on the family

20       history, I was concerned that ███████ was a victim of

21       child abuse.

22                       The injury that ███████ suffered

23       typically is a high impact injury, or other

24       acceleration, deceleration.  This type of injury can

25       be caused by very violent shaking or shaking and

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        forced against a hard object.
 3                        ██████ also has brain swelling caused
 4        by severe trauma.  █████ is currently brain dead
 5        and another confirmation exam will be done tomorrow.
 6                        This type of injury could not have
 7        been caused by merely bumping █████ against a hard
 8        object.  This needs to be a severe acceleration prior
 9        to striking the object, the hard object.
10                        Q.   And then -- and then you signed
11        that at the bottom, correct?
12                        A.   Yes.
13                        Q.   Okay.  So is -- are these your
14        words that you discussed with them and then they
15        wrote it down?  Or did you dictate this to someone
16        else?
17                        In other words, let me rephrase it,
18        withdrawn.
19                        Can you explain the circumstances of
20        how the statement became written out?
21                        A.   I can't exactly.  It was written
22        by a social worker based on the history that we have
23        discussed in the past.
24                        Q.   How do you know it's written --
25        Sorry.
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        A.   Because --.
 3                        Q.   My question is how do you know
 4        it's written by a social worker as opposed to the
 5        investigating officer whose name is at the bottom?
 6                        A.   Maybe it's by him, yeah.  It
 7        looks like his handwriting, yes.
 8                        Q.   Okay.  So -- and -- and I'll show
 9        you another document where that sergeant says he took
10        a deposition from you.  So do you -- do you know now,
11        does that refresh your recollection?
12                        MR. GINSBERG:  Object to the form.
13                        BY MR. KLEIN:  (Cont'g.)
14                        Q.   Does this refresh your
15        recollection of who -- how this was written?  Did the
16        -- did the sergeant or police officer write it out?
17                        A.   I don't remember the details, no.
18                        MS. MITCHELL:  Let him finish his
19        question before you answer.  It just helps the
20        record.
21                        BY MR. KLEIN:  (Cont'g.)
22                        Q.   Does this -- does this deposition
23        -- withdrawn.  This deposition -- withdrawn.
24                        Going to the sentence where you have a
25        first edit.  It says the injury that ███████ suffered
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        and then you add something.  What does that say?  May

3        have -- may have been?

4                        A.    Typically.

5                        Q.    Typically.  Do -- do you remember

6        if the police were pushing you to say that this was a

7        high impact trauma, not accidental injury versus an

8        accidental injury or was this coming from you?

9                        A.    I don't remember.

10                       Q.    Okay.  As of -- as of the date

11       when you wrote this, which was on the 22nd of

12       September, did you know at that time whether this was

13       a traumatic death or some perhaps non-traumatic from

14       a set -- from septic shock?  Did you know either way?

15                       A.    Well, it wasn't a death at this

16       time, so you're asking me a question that --

17                       Q.    Did you examine -- you had said

18       -- you said he would be pronounced dead.  Do you --

19       you were just waiting for the second evaluation to

20       pronounce him dead, correct?

21                       But he was essentially brain dead at

22       that point, wasn't he?

23                       A.    Yes.

24                       Q.    Okay.  So my question is this,

25       you talk about he -- he also has brain swelling

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      caused by severe trauma.  Were the police officers

3      suggesting this trauma-centric deposition from you or

4      did you -- were these your own words?

5                     And in other words, did you -- would

6      you have mentioned sepsis as a possible cause of

7      death if you were writing this yourself, not them?

8                     MR. GINSBERG:  Object to the form.

9                     MS. CALABRESE:  Object to form.

10                     MS. PECK:  Object to form.

11                     MS. MITCHELL:  He wasn't dead.

12                     MR. KLEIN:  Okay.

13                     BY MR. KLEIN:  (Cont'g.)

14                     Q.   Would you have mentioned sepsis

15      as a contributing factor here at the time you wrote

16      the report, if -- if you were writing it rather than

17      them writing it for you?

18                     MR. GINSBERG:  Object to the form.

19                     MS. PECK:  Object to the form.

20                     MS. CALABRESE:  Christina, objection

21      to form.

22                     MR. KLEIN:  You can answer.

23                     A.   I really can't remember my state

24      of mind exactly and at that time of writing the

25      deposition, and exactly in what order my concerns

Page 144

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        were.

3                     MS. MITCHELL:  Yes, don't -- don't

4        guess, don't speculate.  It's only what you know now.

5                     MS. CALABRESE:  I'm going to ask that

6        you not coach the witness or make speaking

7        objections.  Thank you.

8                     MS. MITCHELL:  Okay.  Well, I'm going

9        to repeat that I told him not to guess or speculate,

10       which is appropriate because nobody wants a witness

11       doing that.

12                    So I'm not coaching him.  I'm

13       reminding him of the procedure.

14                    MR. GINSBERG:  Agreed.

15                    MS. CALABRESE:  But I would ask you to

16       not do that during the course of the deposition.

17       It's against the very concrete rules of trial

18       practice as outlined in the uniform court rules of

19       trial practice.

20                    So again, you know, this has been

21       going on the entire deposition.  I haven't said

22       anything up to this point.  But I think at this

23       point, it's important to make a record that you have

24       been making speaking objections at length.

25                    And you have been speaking for the

Page 145

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        witness prior to him asking questions during the

3        pendency of the answer.  So I'm just going to make a

4        record of that, ask you to not do that.

5                    If you continue to do that I will move

6        for sanctions based upon that behavior, which again,

7        is clearly against the uniform rules of trial

8        practice and procedure.  And if you need me to

9        provide you with a cite to that I certainly can.

10                    MS. MITCHELL:  Well, I'm going to note

11       that I -- I don't know what you're talking about that

12       this has been happening all along.

13                    This was the first time I reminded the

14       witness not to guess or speculate.  I don't see how

15       that would be sanctionable.  I've been trying to

16       assist the process because we don't have proper

17       exhibits to help him find things to move it along.

18                    If you want to email me the site,

19       that's fine.  But I'm going to do what's appropriate

20       for the witness and in my role as his attorney.

21                    BY MR. KLEIN:  (Cont'g.)

22                    Q.   Okay.  So looking at the

23       document, it says based on the family history, I was

24       concerned that ███████ was a victim of child abuse.

25                    Do you know who conveyed that family

800.523.7887                                Associated Reporters Int'l., Inc.

Page 146

1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       history to you?  In other words, did the detectives

3       provide history to you?

4                     A.   I don't remember.

5                     Q.   Okay.  Now, I'd like to show the

6       witness the exhibit entitled -- one second please.

7       Mason narrative.

8                     A.   Is this -- is this document one?

9                     Q.   I -- I believe so.

10                    THE REPORTER:  It is not marked yet.

11      Do you want to mark it as number two?

12                    MR. KLEIN:  Sure.

13                    MS. CALABRESE:  Is it a three-page

14      document?

15                    MR. KLEIN:  It is.  Bates number

16      thirteen ninety-eight, fourteen hundred and fourteen

17      zero one.

18                    MS. CALABRESE:  Okay.

19                    BY MR. KLEIN:  (Cont'g.)

20                    Q.   Just show him the first page

21      actually.

22                    A.   Yes.

23                    THE REPORTER:  Do you need me to go to

24      another page?

25                    A.   No.

Page 147

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                         BY MR. KLEIN:  (Cont'g.)
3                         Q.   Looking at the bottom of the
4       first page under the head section that says 9/21/08.
5       It says --.
6                         A.   It's not 9/21.  It says 9/26.
7                         Q.   Bates number thirteen ninety-
8       eight at the bottom.
9                         A.   Okay.
10                        Q.   Yeah.  Okay.
11                        MS. CALABRESE:  Can you scroll down,
12      take us the entire way so I can see what he's talking
13      about.  Okay, thank you.
14                        MR. GINSBERG:  Is it three pages or
15      six pages?
16                        MR. KLEIN:  Three pages.
17                        MS. CALABRESE:  Yeah, it does say page
18      one of six, page three of six, and page four of six.
19                        MR. KLEIN:  Right.  But this document
20      is three pages scanned, I guess that this is how it
21      was scanned.  I'm not sure why.
22                        BY MR. KLEIN:  (Cont'g.)
23                        Q.   In the last sentence it says,
24      Edge stated to detective Fountain, "This is a
25      murder." And that's -- I just wanted to show that to

Page 148

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        you that this was put in a report and just for the

3        record you dispute saying, "This is murder."  Is that

4        right?

5                        MR. GINSBERG:  Object -- object to the

6        form.  Please note the standing objection to any

7        questions with regard to this document.

8                        BY MR. KLEIN:  (Cont'g.)

9                        Q.   Okay.  And the answer was that's

10       correct.  Right, Doctor?

11                       A.   Yes.

12                       Q.   Okay.  Would you agree that it

13       was possible that the patient had an infection plus

14       some trauma?

15                       A.   Yes.

16                       Q.   And is that something that you

17       would necessarily have told the police?  In other

18       words, it's not that it was just trauma but that

19       there was an infection plus some trauma?

20                       A.   I can only speculate.

21                       Q.   Okay.  Well, in general -- just

22       speaking generally and if you want to refer to any of

23       the pages we can, but would you agree that your --

24       your -- your findings don't talk about sepsis?

25                       A.   Yes.

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. CALABRESE:  I'm sorry.  Did you
 3     say sexist?
 4                    MR. KLEIN:  Sepsis.
 5                    MS. CALABRESE:  I didn't hear that.
 6                    MR. KLEIN:  Sepsis.
 7                    MS. CALABRESE:  Sepsis, thank you.
 8                    BY MR. KLEIN:  (Cont'g.)
 9                    Q.   They don't mention, you're -- so
10     -- so if you --.
11                    MS. MITCHELL:  Can I just say -- just
12     to jump in, maybe get exposed to sanctions but when
13     you say findings, are you talking about what's
14     contained in the deposition or are you talking about
15     the findings in the medical report?
16                    MR. KLEIN:  In the medical report such
17     as the PICU attending note, such as the discharge
18     summary.  Anywhere in your record, you don't -- you
19     don't --.
20                    MS. MITCHELL:  Okay.
21                    BY MR. KLEIN:  (Cont'g.)
22                    Q.   You don't -- you don't -- is it
23     fair to say that you don't have any findings in your
24     -- in your -- in your records where you talk about
25     sepsis as being a possible contributing issue here.
```

Page 150

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    A.    That's not true.

3                    MS. CALABRESE:  So I'm sorry.  I have

4        to stop you, Brett right there.  This is an example

5        of the back and forth communication, the

6        inappropriate back and forth communication that

7        you've been having with your client.

8                    There was a question pending and you

9        were having a discussion with him.  It's not

10       appropriate.  You cannot speak to the witness while a

11       question is pending.

12                   And that's what I'm trying to, which

13       was happening throughout the -- I'm sorry, I'm still

14       talking.  That's what I'm referring to, which has

15       been happening throughout the course of this

16       deposition.

17                   Earlier, you said you didn't know what

18       I was talking about.  So I thought it was incumbent

19       upon me to illustrate for you what I meant earlier

20       and this is what I'm talking about.

21                   MS. MITCHELL:  I was asking for

22       clarification because he asked if there were any

23       findings of sepsis.

24                   MS. CALABRESE:  I'm not talking about

25       what you were talking to Brett about.  I'm talking

800.523.7887                          Associated Reporters Int'l., Inc.

Page 151

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        about what you were talking to your client about.
3                        You can't have a conversation with
4        your client when the question is pending because that
5        implies that you're coaching the response.
6                        So that is what I was referring to
7        earlier what you just suggested now.
8                        MS. MITCHELL:  I don't know what
9        communication you're talking about that I had with
10       the client.  Can you tell me what was said?
11                       MS. CALABRESE:  Are you --?
12                       MS. MITCHELL:  Because I'm trying to
13       help and look through the chart.
14                       MS. CALABRESE:  That's what you cannot
15       have a verbal communication with him while a question
16       is pending.
17                       MS. MITCHELL:  Okay.  What is the
18       verbal communication that you've heard that is at
19       issue?
20                       MS. CALABRESE:  I couldn't hear what
21       you were saying.  But I did observe you talking to
22       him.  Are you denying the fact that you did that?
23                       MS. MITCHELL:  I did not.  You're
24       saying that you did not hear anything, but you saw a
25       communication.  I am wearing a mask.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MS. CALABRESE:  I heard -- I heard you

3        -- I heard a mumble.  I heard a mumble.  Are you on

4        the record as an officer of the court saying that you

5        did not just say something to your client while the

6        question is pending?

7                    Because I -- just so you know, before

8        you answer, I'm going to ask the doctor under oath,

9        if you just spoke to him, so be careful how you

10       respond here.  Are you -- are you referring to your

11       client --.

12                   MS. MITCHELL:  Okay.  First of all, I

13       don't -- are you speaking to me at all?  You said you

14       were going to get a motion for sanctions because I

15       asked my client not to guess.  If you want to end --

16                   MR. GINSBERG:  Let's just settle back

17       --

18                   MS. MITCHELL:  -- this deposition now

19       --

20                   MR. GINSBERG:  -- for a second.

21                   MS. CALABRESE:  If you want to end it,

22       that's fine.  But we're not coming back.

23                   MR. GINSBERG:  The problem I have --

24       that the concerns are we have to come back for a

25       second.

Associated Reporters Int'l., Inc.

Page 153

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. MITCHELL:  Yeah, we're taking a
 3        break.
 4                    MR. KLEIN:  Christina, I think you
 5        made your point.  I think we should try to finish the
 6        deposition.
 7                    MS. CALABRESE:  I -- I don't think
 8        that -- I don't think there's any reason to stop.
 9        But I'm not going to allow somebody to imply that I
10        didn't see what I -- what I very distinctly saw.
11                    MR. GINSBERG:  Christina, it's not
12        wrong.
13                    MS. CALABRESE:  What's that, Michael?
14                    MR. GINSBERG:  I said you're not
15        wrong.
16                    MS. CALABRESE:  No, I know I'm not.
17        I'm trying to be judicious and -- and polite about
18        it, you know, but I'm getting a lot of pushback
19        rather than -- you know --.
20                    MR. GINSBERG:  She -- she appeared --
21        she appears to be a young attorney, let's -- you
22        know, let's try to cover a little snag on that.
23                    (Off the record 2:14 p.m.)
24                    (On the record, 2:25 p.m.)
25                    THE REPORTER:  We are on the record.
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        We can't hear you.

3                        MS. SPENCER:  Brett, you're muted.

4                        BY MR. KLEIN:  (Cont'g.)

5                        Q.   Dr. Edge, based on your training

6        and experience, is there evidence that you're aware

7        of or developments in medicine over the last twelve

8        years that suggests that subdural hematomas can incur

9        from birth?

10                       A.   I haven't reviewed that

11       literature recently.  Certainly, it is -- I think

12       pretty much any hematoma can cause it -- can cause it

13       by birth trauma.  I don't think that's new like the

14       last twelve years that's --.

15                       Q.   This case involves a forceps

16       delivery.  I don't know, did you know that?

17                       A.   No.

18                       Q.   There was toxemia, did you know

19       that?

20                       MR. GINSBERG:  Objection to form.

21       Please note my objection to the form of the last

22       question.

23                       BY MR. KLEIN:  (Cont'g.)

24                       Q.   Did you know that there was

25       toxemia at birth?

Page 155

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                      MR. GINSBERG:  Object to form.
 3                      BY MR. KLEIN:  (Cont'g.)
 4                      Q.   No?
 5                      A.   No.
 6                      Q.   Okay.  Did you know that there
 7        was -- the mother had, I believe, a bacterial
 8        infection?
 9                      MR. GINSBERG:  Object to the form.
10                      A.   No.
11                      BY MR. KLEIN:  (Cont'g.)
12                      Q.   There was -- I think the word is
13        merc -- meconium.  Did you hear anything about that
14        being present?
15                      A.   I -- I don't recall, to be
16        honest.  That -- that should be the answer to all of
17        the last three questions.
18                      Q.   So all the related birth
19        difficulties with ████, if you had had this case
20        today would that be something based on the -- where
21        medicine is on this today that you would have asked
22        to look into?
23                      MR. GINSBERG:  Object to the form.
24                      MS. PECK:  Object to form.
25                      BY MR. KLEIN:  (Cont'g.)
```

Page 156

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        Q.   Not saying -- not saying whether

3     or not you had anything to do with that.  I'm just

4     saying based on how the medicine has advanced on what

5     we know about bacterial infections.

6                        A.   I got three questions there.

7     You're asking whether birth history is an important

8     part of my history.  It's always been and always will

9     be and is part of -- part of the admission process

10    for any patient.  And second question was, has

11    anything changed in the last twelve years, no, not --

12    that's always been an important question.

13                       Q.   Okay.  I want to play a video.

14    Can I do a screen share from my computer, Annette?

15                       THE REPORTER:  Let me give you

16    permission.

17                       MR. KLEIN:  You got to see my old

18    desktop.  It's just --.

19                       THE REPORTER:  Brett, you should be

20    able to do it now.

21                       MR. KLEIN:  Okay.  So then do you guys

22    just see doctor -- a picture of Dr. Edge and that's

23    it?  Just want to make sure you don't see my old

24    computer.

25                       MS. CALABRESE:  I don't see anything.

Page 157

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MR. KLEIN:  Okay.  How do we present,
 3        how do we do that that?
 4                    THE REPORTER:  Go to share.
 5                    MS. CALABRESE:  If you go to that top
 6        and hit share.
 7                    MR. KLEIN:  Yeah.
 8                    MS. CALABRESE:  And then you see share
 9        content.
10                    MR. KLEIN:  I see.  There you go.  Got
11        it.  Perfect.
12                    BY MR. KLEIN:  (Cont'g.)
13                    Q.   Okay.  Doctor, I'm just going to
14        play you a short clip and let me -- I just want to
15        know your response to whether you -- your response to
16        the clip.  Have you ever seen --?
17                    MR. GINSBERG:  Object to the form.
18        Object to the presentation.  Object to the
19        foundation.
20                    BY MR. KLEIN:  (Cont'g.)
21                    Q.   Dr. Edge, have you ever seen the
22        documentary of the -- of Adrian Thomas' case?
23                    A.   No.
24                    Q.   Okay.  I'm going to play this --
25                    MS. CALABRESE:  Can we mark this?
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        MR. KLEIN:  Sure.  We can mark it

3        after.  I'll send it to the reporter.

4                        MS. CALABRESE:  Okay.  Thank you.

5                        BY MR. KLEIN:  (Cont'g.)

6                        Q.   This is part of the documentary

7        that just references you and I'm just going to ask

8        you some questions about it on the other side, okay?

9                        [Video being played]

10                       MS. CALABRESE:  That's better, but can

11       you restart it though because we couldn't hear it in

12       the beginning?

13                       MR. KLEIN:  I'm going to restart it.

14                       [Video being played]

15                       MR. KLEIN:  Okay.  Dr. Edge.

16                       MS. MITCHELL:  The audio was cutting

17       in and out a little just so you know.

18                       MR. KLEIN:  I hear you. Did you ever

19       --?

20                       BY MR. KLEIN:  (Cont'g.)

21                       Q.   Okay.  Have you ever seen that

22       before?

23                       A.   No.

24                       Q.   Okay.  If you need me to play it

25       back in snippets let me know, but can you tell us if

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        -- if that's accurate, if that's an accurate

3        portrayal or if in your view that's inaccurate?

4                    MS. MITCHELL:  Object to form.

5                    A.   Do I think it was accurate?  Was

6        I very concerned about this child having a massive

7        head trauma?  Yes.  And did I do my best to

8        communicate that to the police?  Yes.  Did I tell

9        them that I was busy or I couldn't talk to them more?

10       I really can't remember.

11                   BY MR. KLEIN:  (Cont'g.)

12                   Q.   Did you tell them that this was

13       -- about -- that this was a murder?

14                   A.   I don't remember using that word.

15       As I said to you a little while ago, I have no

16       recollection of saying that word nor would that be my

17       usual practice.

18                   Q.   Thank you.

19                   MR. GINSBERG:  Can you -- sorry Brett,

20       can you again share your screen?

21                   MR. KLEIN:  Yeah.  I'm going to play

22       one more.  Just one more and then I think I'm just

23       about done with my questions.  It's going to load it

24       up.

25                   [Video being played]

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 160

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MS. MITCHELL:  Just so it's clear, I'm

3        just asking my client -- his phone went off.  I'm

4        asking if he needs to take the call.

5                    THE WITNESS:  I need a break.  I have

6        to respond to a patient question.

7                    MR. KLEIN:  Sure.  Do you want to --

8        do you want us to mute you or you want to step out or

9        are you okay?

10                   THE WITNESS:  No, no, I can do it

11       right here.  I'm texting.

12                   MS. MITCHELL:  Christina, I just need

13       to ask, you're on mute.

14                   MS. CALABRESE:  I don't need to

15       explain, you know, make a record for my benefit when

16       you speak to Dr. Edge.  It -- just to be perfectly

17       frank, it's difficult during remote depositions to

18       make sure that everything is go -- you know,

19       everything is copacetic.  And so that's why, you

20       know, I said what I said.  I honestly didn't mean to

21       give you a hard time, so I don't want you to feel

22       like you need to cut your way to appease me.  All

23       right.

24                   MS. MITCHELL:  Well, you did threaten

25       to bring a motion for sanctions so --

ARII@courtsteno.com                              www.courtsteno.com

Associated Reporters Int'l., Inc.

Page 161

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        MS. CALABRESE:  I did.

3                        MS. MITCHELL:  -- of course I will

4        take, you know, this tone from now on and I certainly

5        don't want there to be any confusion.  I think it's

6        really unfortunate that we were not given marked

7        exhibits in advance because I think this remote

8        process has been hard enough for the doctor.

9                        And now, we're trying to work off of

10       stuff that's very confusing but again, when you throw

11       out a motion for sanctions I understand now you're

12       saying I shouldn't appease you, but I'm going to go

13       above and beyond because now you've attacked my

14       efforts.  But I'd like to just move on so the doctor

15       can wrap it up.

16                        THE WITNESS:  I'm all set.

17                        MR. KLEIN:  Okay.  Great.  I'm going

18       to show the next clip and I think I'm pretty much

19       done.  Just going to double-check that but here's the

20       other clip I want to play for you and talk to you

21       about it on the other side.  Hold on a sec.  That's

22       not what I wanted to share.  That didn't work right.

23       Hold on one second.

24                        [Video being played]

25                        MR. KLEIN:  Okay.  Thanks for bearing

Page 162

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      with me.
3                      BY MR. KLEIN:  (Cont'g.)
4                      Q.   Do you see the video?  No?
5                      A.   No.
6                      Q.   Okay.  I'm going to try it one
7      more time and if I don't get it, I'm going to give
8      up, sorry.
9                      [Video being played]
10                     BY MR. KLEIN:  (Cont'g.)
11                     Q.   Okay.  So Dr. Edge, have you ever
12     seen that clip or footage before?
13                     A.   No.
14                     Q.   Okay.  Let me just get back to my
15     screen here.  Do you recall that -- I'll represent to
16     you that the gentleman who said that this is
17     problematic was the District Attorney who tried the
18     case?  Do you recognize him now that you've seen him?
19                     A.   No.
20                     Q.   Okay.  Do you remember anyone
21     telling you that it was prob -- that your findings
22     were problematic?
23                     A.   I don't, no.
24                     Q.   Okay.  This idea that you were
25     telling the police, this is a murder, this is a

Page 163

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      murder.  Is that something that you think, based on

3      your experience and your recollections of this

4      incident, came from the police and not from you?

5                        MR. GINSBERG:  Object to the form.

6                        MS. MITCHELL:  Object to form.

7                        A.   It did not come from me.

8                        MR. KLEIN:  That's good.  Thanks so

9      much.  I think that's all I have.  I'm just going to

10     take one moment to look at my notes and I believe

11     that's about it.

12                        I believe that's all I have.  Subject

13     to any follow-up after Christine -- Christina or

14     anyone else.  Dr. Edge, thank you for your time

15     today.  We appreciate it and thanks for what you do,

16     stay safe.

17                        THE WITNESS:  Thank you.

18                        MS. PECK:  Christina, do you want me

19     to go next?

20                        CROSS EXAMINATION

21                        BY MS. PECK:

22                        Q.   Dr. Edge, my name is Crystal

23     Peck.  I'm with Bailey, Johnson & Peck.  We are

24     attorneys for Dr. Michael Sikirica, medical examiner

25     in this case.  I only have a few questions for you so

Page 164

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          I'm really hoping that we can keep this pretty short.

3          Most of them are going to be following up on some of

4          the questions that were asked of you by Mr. Klein.

5                        You were asked questions about

6          subdural hematomas being caused by birth.  When you

7          have a patient like ███████████, four months old,

8          is there a way to definitively say whether a subdural

9          hematoma that's found in a patient like him is caused

10         by birth or in subsequent trauma?  Is there a way to

11         definitively diagnose where and when -- where it came

12         from?

13                        A.   That's not my area of expertise.

14         I -- I believe that the radiologist can make an

15         estimate of how old blood is and I've seen them do

16         that before and the neurosurgeons.  Those are the

17         people who have expertise in that area.

18                        Q.   Okay.  And then --?

19                        A.   So my -- my job was to -- to --

20         to take what was reported to me.

21                        Q.   Okay.  You were asked questions

22         about the -- the C.T. report and the fact that it

23         said an M.R.I. would be helpful.  What exactly does

24         an M.R.I. show that the C.T. is not showing?

25                        A.   It gives you a better picture of

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        the density of different things and would help give

3        some definition of how old this blood was.  Also,

4        whether there was other injury to the brain.  The --

5        the CAT scan is good for showing, you know,

6        fractures, for showing that there is some fluid but

7        exactly what the fluid is, it's not very good at.

8                    Q.    Okay.  So if an M.R.I. would be

9        better than a CAT scan to be able to show what you

10       had just described, taking it a step further, which I

11       know you can't do when you're treating live patients.

12       But an autopsy being able to look actually in the

13       brain itself, would that really be the best evidence

14       of finding out what is going on with the patient or

15       what happened with the patient?

16                   A.    An M.R.I.?

17                   Q.    No, what I'm saying is that if an

18       -- if an M.R.I. was better than a CAT scan when you

19       have to -- when you have to do an autopsy, would that

20       be able to reveal to you better than, say, given an

21       M.R.I. or a CAT scan as to what was going on in the

22       brain about, if there was injury, if there was blood,

23       how much injury?

24                   A.    Yeah.  An autop -- an autopsy is

25       better than anything.

Page 166

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                    MR. KLEIN:  Objection.
3                    THE WITNESS:  It's actually by looking
4          at -- looking at the brain is better than, you know,
5          getting any picture of the brain.  There are changes
6          that happen after death however, that can make it
7          confusing and this is a question that a pathologist
8          would need to address.
9                    BY MS. PECK:  (Cont'g.)
10                   Q.   So a pathologist would be able to
11         say what kind of changes might have occurred after
12         death that might have changed whether -- affected how
13         they would be able to diagnose this?
14                   A.   Yes, I believe so, yes.
15                   Q.   Okay.  ████████████  had both a
16         subdural hematoma and retinal hemorrhage --
17         hemorrhages.  Was it your -- is it your opinion that
18         those are not necessarily consistent with sepsis when
19         you're seeing them together like this -- that they
20         would be consistent with trauma?
21                   MR. KLEIN:  Objection to form.
22                   A.   I -- I have never seen subdural
23         hematoma or retinal hemorrhages with severe sepsis in
24         the many thousands of cases, nor have I read about
25         that.  I'm sure the cases exist but I'm not -- that

Page 167

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        is a rarity.

3                        BY MS. PECK:   (Cont'g.)

4                        Q.    And sepsis can't cause subdural

5        hematomas, can it?

6                        A.    I -- I've never seen it.  As I

7        said before, I -- I'm not aware of that being, you

8        know, we -- I see a lot of subdural hematomas.  They

9        are, you know, ninety-nine point ninety-nine percent

10       of the time they're trauma.  I've had -- there's been

11       a few cases where there was an inborn birth issue

12       with -- with like a patient with, what's the word

13       called, hemophilia, that can get bleeding everywhere.

14       But other than that, I've not seen subdurals outside

15       of trauma.

16                       MS. PECK:  I'm going to ask you and I

17       will, again, I think I'll need to have this marked.

18       The 2009 trial testimony that was, I think, was

19       emailed over to you.

20                       THE REPORTER:  Yes.

21                       MS. PECK:  If you could just mark that

22       as a Sikirica One.

23                       THE REPORTER:  Okay.

24                       MS. PECK:  All right.  And I'll ask

25       you to go to page twenty-six, Ms. Annette.  Can you

Page 168

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     pull down towards the bottom, please?
 3                    THE REPORTER:  Sure.
 4                    BY MS. PECK:  (Cont'g.)
 5                    Q.   Doctor, I'd like to bring your
 6     attention to page twenty-four of this transcript.
 7     You were asked if you had an opinion as to what
 8     caused the death of ███████████.  And your
 9     response was that, I have the opinion, my opinion was
10     trauma and I can't rule out sepsis as being
11     contributing to that.  Does that remain your opinion
12     today, Doctor?
13                    A.   Yes.
14                    MS. PECK:  I have no further
15     questions.
16                    MS. CALABRESE:  I just need one
17     moment, please.
18                    MR. GINSBERG:  Crystal, what was that
19     -- what was that the transcript of?
20                    MS. PECK:  It was the 2009 trial
21     testimony.  I think Brett had emailed a link over to
22     Rhiannon with it.
23                    MR. GINSBERG:  Okay.  I'm just -- I'm
24     just keeping my -- my evidence list.
25                    MS. PECK:  Sure.
```

Page 169

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MR. GINSBERG:  So testimony of Dr.

3     Edge?

4                    MS. PECK:  Dr. Edge, yes.

5                    MR. GINSBERG:  Okay.  Thank you.

6                    MS. PECK:  It's page nine seventy-

7     five, I want to say of the transcript itself.

8                    MR. GINSBERG:  Okay.  Thank you.

9                    MS. CALABRESE:  Okay.  Thank you.  Are

10    we still on, Annette?

11                   THE REPORTER:  Okay.

12                   CROSS EXAMINATION

13                   BY MS. CALABRESE:

14                   Q.  Dr. Edge, my name is Christina

15    Calabrese.  I'm an attorney with the Office of the

16    New York State, Attorney General to represent the

17    State of New York in the action of Adrian Thomas

18    versus the State of New York.  In our claim, he's

19    alleging that he was wrongfully imprisoned over a

20    course of period of time.

21                   Throughout the course of the

22    investigation we've learned that the allegations

23    generally relate to actions of police conduct or

24    misconduct and investigation and determination made

25    in autopsy by Dr. Sikirica, okay.  So I'm just going

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      to follow-up with some questions that mostly Mr.

3      Klein asked you.  You used the term dolls' eye.  Can

4      you explain to me what that means?

5                      A.    Normally, when you have a patient

6      lying on their back and you move, their -- their

7      eyes, their -- the eyes go to the middle so they --

8      they move.  And a patient who's dead, they don't

9      move.  They just keep looking straight ahead.

10                     Q.    And did you say that ██████

11     ████ presented with dolls' eye or did not?

12                     A.    He had all the signs -- many

13     signs of brain death including an abnormal response

14     to moving the head with the eyes.

15                     Q.    Or dolls' eye?

16                     A.    Oculocephalic response is the --

17                     Q.    Okay.

18                     A.    -- medical term.

19                     Q.    Thank you.  And you were asked

20     several questions about conversations that you may

21     have had with the Troy Police Department.  Do you

22     remember those questions?

23                     A.    I remember something about that.

24                     Q.    And I'm not asking -- I'm not

25     asking if you remember the questions between you and

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2          the Troy Police.  I'm asking you to remember the
3          questions that the attorneys here asked you today.
4                    A.    Yeah.  I remember some of them.
5          I'm not sure I remember every one.
6                    Q.    Okay.  Is it fair to say that if
7          -- let me ask you this, withdrawn.  Would it be
8          appropriate for a doctor to -- would it be
9          appropriate and ethical for a doctor to tailor his or
10         her medical diagnosis and treatment plan to the whims
11         or wishes of a police agency?
12                   A.    Oh!  No, it would be unethical to
13         tailor your professional response to police or anyone
14         else.
15                   Q.    And so in response to questions
16         relating to conversations that you may have had with
17         the Troy Police Department, several of your responses
18         were, I don't remember.  As you sit here today, would
19         you remember if you tailored your diagnosis and
20         treatment of ██████████ to the wishes of the Troy
21         Police Department?
22                   A.    I --.
23                   MR. KLEIN:  Objection.
24                   A.    I can't really answer that
25         question directly.  I can answer directly --

Associated Reporters Int'l., Inc.

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          indirectly about how I've dealt with patients like

3          this in the past.

4                          BY MS. CALABRESE:  (Cont'g.)

5                          Q.   I guess -- I guess the broader

6          question Doctor is, do you alter or change what the

7          factual -- what the facts allowed you to come up with

8          a medical diagnosis and treatment -- treatment of

9          ████████.  Did you tailor that or alter it because of

10         what the police wanted you to do?

11                         A.   Absolutely not.

12                         Q.   And that would never be something

13         you would do?

14                         A.   I -- can I ask my attorney a

15         question --

16                         Q.   Absolutely.

17                         A.   -- off the record?

18                         Q.   Yes.  just make sure you hit

19         mute, so we don't hear you.

20                         MR. KLEIN:  Did I -- did I notice on

21         your wall, Mike, is that like a great granddad or

22         something?

23                         MR. GINSBERG:  That's my grandfather,

24         yes.

25                         MR. KLEIN:  All right.

Page 173

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         MR. GINSBERG:  In lieu of a wheel, but

3          -- yes, my father was even in that, so.

4                         MS. CALABRESE:  Hey, Brett, since

5          we're waiting, are you -- did you say you were going

6          to provide those two video exhibits to Ms. Steno and

7          have her mark them.

8                         MR. KLEIN:  I could, sure.

9                         MS. CALABRESE:  That'd be great.

10         Thank you.  So Annette, I would ask that you not

11         circulate the transcripts until you have those.

12                        THE WITNESS:  Okay.  I'm ready, go

13         ahead.

14                        BY MS. CALABRESE:  (Cont'g.)

15                        Q.   Okay.  Do you remember the

16         question?

17                        A.   I have said something in order to

18         -- with altering medical facts in order to

19         accommodate the police requests.

20                        Q.   Yes.  Essentially, my question

21         is, would you change your opinion as to diagnosis and

22         treatment of a patient to align it with what

23         perspective the police department determine --

24         determined they wanted you to have?

25                        A.   I -- absolutely not.  I would not

Page 174

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        alter -- my job is to try to get the most balanced
 3        complete picture.  I'm -- however, and when I -- when
 4        I talk to my attorney about there's something I want
 5        to add that I think is really important and that's --
 6        that I've actually found myself on the other side.
 7        Where I find officers, particularly from counties
 8        that are, you know, outside of the city areas, where
 9        when a child is -- a baby is assaulted, they actually
10        underplay and they get, oh, that's just shaken baby.
11                     I've heard that before and I've found
12        myself in the situation on multiple occasions needing
13        to make it very clear that it's not just shaken baby,
14        that this is  -- can be and I'm not talking about
15        Michael Thomas.  I'm saying in general that, you
16        know, that shaking -- shaking a baby is assault.  And
17        these kinds of injuries are results of assault so
18        that's the point I wanted to say.
19                     Q.   Thank you, Doctor.  Thank you.
20        And would you agree with -- with me when I say that
21        your main duty and priority is to the patients?
22                     A.   Absolutely.
23                     Q.   And you will -- would you agree
24        with me when I say you will and it's important --
25        strike that.  It's important for you to liaise with
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        police departments in this -- in these types of cases
 3        in order to gain background information so that you
 4        can, in some cases, thoroughly diagnose and treat a
 5        patient?
 6                      A.   Yes, I mean --
 7                      Q.   Sometimes?
 8                      A.   -- our taking a -- our taking a
 9        history is getting as much social history as possible
10        and --.
11                      Q.   Thank you.  That -- that was my
12        question.  Would that be considered history, a
13        history in the course of your initial medical exam of
14        a patient?
15                      A.   Yes.  In fact, I think I
16        mentioned in my original history that there was this
17        -- he has history.  That's not making a judgment
18        about what happened.  I'm just saying that's an
19        important part of the constellation of findings here
20        that helped me make a diagnosis.
21                      Q.   And would you agree with me when
22        I say whether or not a person is investigated or
23        prosecuted for child abuse is of no relevance to you?
24                      A.   I have -- that is not my job.  My
25        job is my patients.  And making sure my -- (a) that
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        I'm taking good care of that patient, the best care
 3        possible, best care they could get anywhere in the
 4        world.  Number two, my responsibility is to that
 5        family.  And three, if there is a concern about child
 6        abuse, I need to let C.P.S. know and make sure that
 7        other children are not at risk.
 8                        Q.   And that was my follow-up
 9        question, Doctor.  I would ask that, would you agree
10        with me that kind of an asterisk to the statement
11        that you just gave or an exception would be in the
12        event that you're protecting your patient from
13        potential either continued abuse or follow-up abuse
14        in certain circumstances.
15                        That would be something that you would
16        want to -- information that you would want to obtain
17        in taking the history to ensure that your patient
18        when leaving your hospital would -- is going into a
19        safe place or a safe location?
20                        A.   That's a very big part of what I
21        do and very important.
22                        Q.   Particularly because your --
23        excuse my terminology but your client base are
24        children and oftentimes children can't advocate for
25        themselves, particularly infants?
```

Page 177

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.    Yes.
 3                    Q.    Now, there was a lot of
 4       conversation that you had with some of the attorneys
 5       with regard to the -- that part of your record or
 6       your report that discusses the skull fracture.  Do
 7       you remember the -- the conversations that you had
 8       with the attorneys?
 9                    A.    Yes.
10                    Q.    Okay.  I'd like you to explain
11       for me because it was kind of choppy back and forth;
12       how you came to the conclusion of the skull fracture
13       and then why the report was not changed by you?
14                    A.    I don't remember the exact times
15       that I was told that there was a skull fracture or
16       who told that to me.  But I do know that I would not
17       write that there was a skull fracture unless I'd been
18       told that by either radiology or neurosurgery.  I
19       don't remember in this situation where I heard that.
20                    And the fact that -- that the second
21       day that that after we had ruled that out that I
22       didn't -- it was a month later -- sometimes I -- I
23       did not think to cross that out.  And it was -- it
24       was an error on my part not remembering what had --
25       what had happened exactly one month ago.
```

Page 178

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         Q.   And so it wouldn't be typical for

3          you to when -- well, first let me ask you this.

4          Strike that.

5                         Why -- what would explain you signing

6          that page a month after the event?

7                         A.   The -- the record particularly, a

8          patient that dies, the record is taken away very

9          quickly.  And the notes sometimes -- my notes are

10         transcribed, they don't make it back into the chart

11         for several hours after I dictated them.  So there's

12         an excellent chance that this child had already been

13         transferred to the morgue or wherever before the note

14         came back.

15                         So the note, therefore, went to

16         medical records and then I would have gotten the

17         notice a week or so down the road that there's an

18         unsigned note and then I need to go to medical --

19         medical records and take care of that.

20                         Q.   And is it fair to say that in

21         that circumstance that you're describing where you

22         get some type of communication from medical record

23         saying, hey, you forgot to sign this page.  Please

24         come here and do that.  You would not be going

25         through the report line for line to check for

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        accuracy and/or check that the recitation of the

3        facts as within the report was akin to what you

4        remember it, you wouldn't have been doing that,

5        correct?

6                        MR. KLEIN:  Objection.

7                        A.   I mean, I'm signing it so that I

8        am saying that I've gone through it and agree with

9        what's in it.  Am I always very good at reading every

10       line when I -- no, I -- I'm not.  All right.  There

11       have been times where I've missed things and signed

12       it a month later.

13                       BY MS. CALABRESE:  (Cont'g.)

14                       Q.   Okay.  And you were asked several

15       questions by the other attorneys about statements

16       that the Troy Police Department, claim you made with

17       regard to the term "murder."  Do you recall using

18       that term?

19                       A.   No.

20                       Q.   Would that be something you would

21       say?

22                       A.   As I testified here on several

23       occasions, I can't imagine saying that.  I can

24       imagine as I just said, saying, explaining to police

25       that this is a serious injury involving a lot of

Page 180

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     trauma.
 3                       Q.   And frankly, saying this --.
 4                       A.   I -- I would have -- I would have
 5     emphasized that because as I said to you a few
 6     minutes ago, I find it -- it's been necessary to
 7     emphasize that to believe that it takes a serious
 8     amount of -- of violence to cause a subdural
 9     hematoma.
10                       Q.   And frankly, you would be remiss
11     in your duty to the patients and your duties under
12     the Hippocratic Oath if you didn't flag a law
13     enforcement authority in the event that you believe
14     child abuse is prevalent in one of your cases?
15                       MR. KLEIN:  Objection.
16                       A. In fact, you know, it's -- again,
17     it's for reasons we just talked about protecting
18     other children as my duty to protect children in
19     general.  It's very important that I educate law
20     enforcement and anyone else as to the -- the amount
21     of violence it takes for there to be bleeding in the
22     brain.
23                       BY MS. CALABRESE:  (Cont'g.)
24                       Q.   And you were asked questions
25     about the prevalence of subdural hematoma -- subdural
```

Page 181

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          hematomas and retinal hem -- hemorrhages and sepsis.

3          You stated that it would be incredibly rare to find

4          retinal hemorrhages in cases of sepsis, is that

5          correct?

6                         A.   I think that in my -- in my

7          experience I'm sure that it has -- it has occurred

8          but I -- I have not seen that.

9                         Q.   And just to recap your

10         experience, Doctor, how long have you practiced

11         medicine in the area of pediatrics?

12                        A.   Thirty years.

13                        Q.   And during that time, you have

14         probably treated hundreds of thousands of pediatric

15         patients, is that fair to say?

16                        MR. KLEIN:  Objection.  Objection to

17         form.

18                        A.   I don't know about hundreds of

19         thousands but thousands for sure.

20                        MS. CALABRESE:  Thousands.

21                        BY MS. CALABRESE:  (Cont'g.)

22                        Q.   And in fact, you've developed an

23         expertise in the area which led to your supervisory

24         roles in Albany Medical Center?

25                        MR. KLEIN:  Standing objection to

Associated Reporters Int'l., Inc.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        leading questions rather than objecting to each one,

3        if you could just note that, Ms. Reporter, thanks.

4                    A.   I -- I -- I can't say that I have

5        particular expertise in -- in child abuse but I am a

6        professor and I've been lecturing and -- medical

7        students and residents for that whole thirty years of

8        all the aspects of pediatric intensive care including

9        child abuse.

10                   BY MS. CALABRESE:   (Cont'g.)

11                   Q.   Including authoring journal

12       entries or writings with regard to ped -- your

13       pediatric care of patients?

14                   A.   In -- yeah, intensive care, yes.

15                   Q.   You said, based upon your

16       experience in handling pediatric patients, retinal

17       hemorrhaging has been ninety-nine point nine nine

18       percent due to trauma, in your experience?

19                   A.   Yes.

20                   Q.   And you were asked questions, I

21       believe, by Mr. Klein about the term Shaken Baby

22       Syndrome.   Is it your understanding in reading the

23       literature that that term is passé and the preferred

24       term is abusive head trauma?

25                   A.   Yes.

Page 183

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                      Q.   And generally, is that due to the

3        fact that subdural hematomas and retinal hemorrhaging

4        can be caused by, as you've described, acceleration/

5        deceleration injuries rather than just shaking an

6        infant?

7                      A.   Correct.  That's my

8        understanding.  I -- I do not have that particular

9        expertise in the area.

10                     Q.   And you responded to a question

11       that you do, in fact, remember your involvement in --

12       in this case and as you know, you treated baby Thomas

13       many years ago.  Why is it that you particularly

14       remember this case?

15                     A.   Well, there's more than one that

16       I remember, but I -- I was aware that there's been

17       some national news involved, although as I testified

18       to Mr. Klein, I -- I have never seen those clips

19       before.  I -- I -- I -- I knew that there was

20       something out there.

21                     Q.   I don't mean to put you on any

22       other thoughts there.

23                     A.   I have a funny but -- I have a

24       funny story for why I remember it, but I don't know

25       that it's appropriate for -- for here but just

Page 184

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        briefly that somebody's telephone went off in the

3        audience and the -- the Judge made a stern

4        announcement that that could not happen and then

5        twenty seconds later my phone went off.  And -- but

6        he ignored it.

7                    Q.   Oh, good.  Very good.  So could

8        that be why you remember this case?

9                    A.   I know I told that story.  It

10       makes it even more particularly interesting now even

11       though Michael Jackson is -- it was a Michael Jackson

12       clip that my kids has put on as the phone ringtone.

13                   Q.   Okay.

14                   A.   It was sort of embarrassing.

15                   Q.   Okay.  Now, you mentioned the

16       term per -- strike that.  The term pervasive

17       bacterial infection was used, and I just can't recall

18       if you used it or one of the attorneys used it.  Is

19       that a term you used to describe the diagnosis of

20       baby Thomas?

21                   A.   Persuasive bacterial infection?

22                   Q.   Pervasive.

23                   A.   I -- I -- I didn't use that term.

24                   Q.   Okay.  Would you say that baby

25       Thomas had a pervasive bacterial infection?

Page 185

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        A.   I'm only gathering that now.  I

3        -- at the time I was treating him for pervasive

4        bacterial infection.  He was on the appropriate

5        antibiotic and I was giving the support both to his

6        clotting system and to his blood pressure that

7        pervasive bacterial infection would cause.  So I was

8        treating that with all the ways available to me.  But

9        I did not know at the time that that was indeed what

10       was indeed going on which I -- I understand from Mr.

11       Klein was -- was found later.

12                        Q.   Okay.  And you're assuming what

13       Mr. Klein said is an accurate recitation of the facts

14       in that response?

15                        A.   I don't know anything other than

16       what Mr. Klein told me.

17                        Q.   Okay.  Can you describe what you

18       mean by pervasive bacterial infection?

19                        A.   I didn't use that term.

20                        Q.   What would that mean in medical

21       lingo or speak, or does it not mean anything?

22                        A.   Bacteria everywhere.

23                        Q.   Okay.  Fair enough.

24                        A.   Bacteria all the way through the

25       body.

Page 186

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                         Q.    Fair enough.  And in talking
 3      about this issue of sepsis and subdural hematomas,
 4      you mentioned that you would not expect to find the
 5      level or the degree of neurological deficit that you
 6      found in baby Thomas if the diagnosis was by sepsis
 7      alone.  Do you remember saying that?
 8                         A.    Yes.
 9                         Q.    Can you explain what you meant by
10      that?
11                         A.    The fact that when -- when the
12      patient presented at Samaritan that the baby was
13      already showing many signs of brain, you know, near
14      brain death.  That would be an unusual way for, you
15      know, we see severely septic patients come in, you
16      know, many times a -- a month.
17                         But to have a severely septic baby
18      present with almost no brain activity is unusual and
19      would raise questions of whether there's been a delay
20      in treatment for that -- for there to be such a
21      problem with circulation which is what happens in
22      sepsis.
23                         There's not enough circulation, not
24      enough oxygen getting into the brain but that would
25      have had to have been going on for some time for the
```

Page 187

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     patient to -- to present with very little or no

3     neurologic function.

4                    And by the time the patient arrived at

5     Albany Med, no question about what we considered

6     brain death.  Initially, there was description of

7     withdrawal to pain, but the first neuro exam that I

8     can find after arriving from Samaritan to Albany Med

9     showed that there was no withdrawal to pain.

10                   So basically, the -- the first exams

11    at Albany Med showed no function at all.  So it takes

12    some -- some time with low blood pressure for there

13    to be enough brain damage that the brain is actually

14    to a point that it can't recover any function.

15                   Q.   And if you had to quantify some

16    time, Doctor, could you provide me with an estimate?

17                   For example, one, you know, one week

18    to two weeks, one to two days, what would a general

19    estimate be so we can have an understanding of what

20    you mean by the term some time?

21                   A.   Hours.

22                   Q.   Thank you.

23                   A.   Not days.  I mean, you wouldn't

24    survive days but if there were, you know, four, five,

25    six hours or more of profound low blood pressure then

Page 188

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          you might start to see more severe brain damage.

3                          Q.   And in one of your responses, you

4          stated that your colleagues in neurology and

5          radiology point to the cause of death as trauma.  And

6          therefore, that led to your professional opinion that

7          the primary diagnosis in this case was trauma

8          related.  Do you recall saying that?

9                          A.   Yeah.  So although it was

10         neurosurgery not neurology.

11                         Q.   Oh, I'm sorry.  Thank you.

12         Neurosurgery.  Is that appropriate in your field to

13         rely on doctors and other specialties in making your

14         primary diagnosis?

15                         A.   Well, the bottom line is -- is --

16         is mine.  I mean, I -- I use my consultants for help.

17         When we're talking about the diagnosis of subdural

18         hematoma and retinal hemorrhage then, you know,

19         obviously, I think those are very important consults

20         for me.  And but as I said to doctor -- to Mr. Klein

21         and I greatly iterated again and again here, I, in no

22         way, decreased my treatment for sepsis or the --

23                         Q.   Yes.

24                         A.   -- possibility of sepsis at any

25         time during the patient's stay in the hospital and my

Page 189

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       -- even if trauma had not been on the board at all,
 3       the patient would have received exactly the same
 4       level of treatment for possible sepsis.
 5                       Q.   And frankly, it appears that
 6       notwithstanding a -- a Glasgow Coma score of zero or
 7       one upon arrival and no brain activity, you still
 8       treated this patient --?
 9                       A.   The -- the -- the lowest score is
10       three by the way.
11                       Q.   I'm sorry, is it five?
12                       A.   Three is the lowest score you can
13       get.
14                       Q.   Sorry.  Three.  And
15       notwithstanding the fact that -- I'll repeat.  Strike
16       that.  I'll repeat the question.  Notwithstanding the
17       fact that baby Thomas arrived with a Glasgow Coma
18       score of three and no signs of brain activity.  You
19       treated him with regard to a potential diagnosis of
20       sepsis as if he had a chance to make a recovery?
21                       A.   Yes.
22                       Q.   And -- and talking about your
23       earlier opinion that you relied on the neurosurgeons
24       and radiology, do you recall as you sit here today
25       without looking at the chart what their opinions
```

Page 190

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        were, or what their -- and/or what their diagnosis

3        were?

4                        A.   Dr. Waldman and Dr. German from

5        neurosurgery and the neurosurgery resident all have

6        notes that state subdural hematoma.  The radiology

7        note in the chart as we discussed earlier does not

8        mention hematoma, only describes a fluid collection

9        and then there are -- not everything that was -- the

10       set is documented in the chart.

11                       Q.   And is it -- is it true that you

12       wouldn't expect the radiology report to diagnose a

13       subdural hematoma because -- as that imaging does not

14       have the ability to show what the fluid is?

15                       A.   Usually, they will make that

16       diagnosis on the CT scan, but we do, however, rely on

17       an MRI to better -- to better get an idea.  But those

18       are the better questions for radiology and for

19       neurosurgery.

20                       Q.   Okay.  Thank you.  And did you

21       have any reason to question the radiologist's and

22       neurosurgeon's reports of subdural hematomas?

23                       A.   Well, again, the -- the radiology

24       final report did not mention the word hematoma and I

25       did not have reason to question the neurosurgeon

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        saying it's hematoma.  I try to keep -- as open

3        minded as I can, and I -- one of my notes does talk

4        about subdural hematomas of varying ages.

5                      I -- it's in one of my notes which

6        would be indicative that I was entertaining the idea

7        that this is not in one event but that there had been

8        more than one episode of bleeding.

9                      Q.   And in one of your responses, you

10       stated that although you cannot opine to baby

11       Thomas's cause of death, you have a hard time

12       explaining that all of his injuries relate to sepsis.

13       Can you explain what you meant by that?

14                      A.   It's -- it's -- the hematomas as

15       we've talked about repeatedly here would be an

16       unusual finding in sepsis as are the retinal

17       hemorrhages.

18                      Q.   Okay.  And an increased -- would

19       an increased white blood cell count be expected in an

20       infant such as baby Thomas when he is presented with

21       a subdural hematoma?

22                      A.   Yes, we can see -- we can see

23       counts go down with a subdural hematoma.  It's

24       interesting if the white blood cell counts went up

25       afterwards though, before the patient died.

Page 192

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         Q.    What do you relate -- okay.   And

3      do you attribute that to the medication that you

4      provided?

5                         A.    No, I'm not sure why that was.

6                         Q.    And you were asked questions

7      earlier about an opinion that Samaritan Hospital

8      focused on a sepsis diagnosis and Albany Medical

9      Center focused on a diagnosis relating to trauma or

10     abuse.  Are you aware if Samaritan conducted all of

11     the imaging that Albany Medical Center conducted?

12                        A.    They did not.  I think the -- the

13     patient was too sick to do any imaging at Samaritan.

14                        Q.    You were asked questions about

15     whether or not the subdural hematomas that you were

16     made aware of, as being present in the brain of baby

17     Thomas, whether or not that could be related to birth

18     trauma.  Could that be related to trauma at birth

19     knowing that at the time of death Baby Thomas was

20     more than three months' old?

21                        A.    It would depend on how old the

22     subdural hematoma is if they're -- you should be able

23     to date, not me, but a radiologist or perhaps a

24     neurosurgeon would be able to or pathologists would

25     be able to date how old the blood is.  And -- and/or

Page 193

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2          whether there were multiple episodes of bleeding.
3          Was there just evidence of one bleed at birth or were
4          there episodes -- is there blood of different ages.
5          That would demonstrate a reoccurrence of breeding --
6          bleeding.
7                    Q.   In this case, it's been noted
8          that Baby Thomas had two subdural hematomas.  One on
9          each side or bilateral and one was older, and the
10         other was newer or fresher.  Do you remember that
11         from reviewing your chart in treating Baby Thomas?
12                   A.   Yes.
13                   Q.   Now, knowing that and knowing
14         what you know with regard to the subdurals, if you
15         are able to answer this question please do.  If
16         you're not just tell me.  Are you able to say whether
17         or not the newer subdural could be related to birth
18         -- both locations?
19                   A.   I -- I -- I can't answer that.
20                   Q.   Okay.  Thank you.  And I believe
21         that you said and I'm asking you this to confirm, the
22         radiologists in this case believed that the injuries
23         were consistent with trauma, is that right?
24                   A.   I -- I couldn't hear you.
25                   Q.   I'm sorry.  The -- is it --

Page 194

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2     withdrawn.
3                   In this case, the radio -- did the
4     radiologist say that the injuries were consistent
5     with trauma?
6                   A.   Oh, you have the same report I
7     have, I -- I -- I -- I don't believe so, no.
8                   Q.   You don't have to look for it,
9     Doctor.  The radiologist said that the injuries were
10    not consistent with trauma?
11                  A.   He did not address whether it was
12    or wasn't.
13                  Q.   And in this case -- withdrawn.
14    And you were asked questions about the results of
15    investigation of Gram stain cultures.  Did you have
16    an opportunity to review any work that was conducted
17    by another doctor with regard to Gram stain cultures
18    of the -- of the eyes?
19                  A.   I -- I -- I don't know anything
20    about that.
21                  Q.   And you had stated in response to
22    a question that severe sepsis can cause brain death,
23    but it appeared to me and again, this could be a
24    fallacy of the electronic deposition process.  It
25    appeared to me that you were going to elaborate on

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        your response, but another question was asked.  Can

3        severe sepsis cause brain death?

4                    A.   Well, that's what we were talking

5        about when you -- when we're -- you'd asked me to put

6        a time on it and I told you hours.

7                    Q.   Uh-huh.  Yes.

8                    A.   So severe sepsis causes low blood

9        pressure.  And if there's persistent low blood

10       pressure then the brains didn't get enough oxygen.

11       And over time that can cause global injury to the

12       brain and loss of function of the brain.  I -- I am

13       reluctant to try to put a time on that but I -- you

14       asked me to go ahead and put a ballpark and I would

15       -- and I said there would -- would have to be hours

16       of significant low blood pressure for there to be a

17       patient presenting in brain death.

18                   Q.   And would that include within

19       this ballpark of hours the brain either sending or

20       failing to send a signal to the body to cease or halt

21       respirations, meaning that the patient would stop

22       respirating?

23                   A.   A severe brain injury would

24       affect a patient's ability to breathe, yes.

25                   Q.   Okay.

Page 196

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          A.    That -- that's a good point.  We

3          have many septic patients, severely septic patients

4          who are breathing -- who breathe fine.  It takes time

5          with sepsis and low blood pressure for there to be

6          that kind of injury to the brain.

7                          Q.    And you had spoken and given your

8          opinion about the fact that there was an autopsy

9          conducted in this case.  Would you agree with the

10         statement that an autopsy would be the best method to

11         determine injury to a patient?

12                         A.    I -- I would defer that question

13         to a pathologist.

14                         Q.    Okay.  Would you agree with the

15         statement that an autopsy would be considered in your

16         field or in your profession a definitive exam to

17         determine injuries if they're present?

18                         A.    Yeah.

19                         MR. KLEIN:  Objection.

20                         THE WITNESS:  As I answered a few

21         minutes ago, you know, pictures of the brain are

22         always second best to actually looking at the brain.

23         So ideally, you would actually have a -- a live

24         brain.  The problem with a dead brain, as I said a

25         few minutes ago, is that changes can occur that may

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        confound your findings.  And again, I'd ask you to
 3        talk to an expert in this for that answer.
 4                      BY MS. CALABRESE:  (Cont'g.)
 5                      Q.   Okay.  Thank you.  In the absence
 6        of a motor vehicle crash or crash in a different
 7        vehicle and in your -- based upon your experience in
 8        the field of pediatrics, what would be another
 9        explanation for an acceleration deceleration injury
10        other than trauma?
11                      MS. MITCHELL:  Object to form.
12                      A.   There is always hematoma with
13        trauma.  The question is is it accidental or non-
14        accidental?
15                      MR. KLEIN:  Object to the form.
16                      BY MS. CALABRESE:  (Cont'g.)
17                      Q.   Other than -- other than non-
18        accidental trauma.  That was kind of a hinky
19        question.  Do you want me to rephrase it?
20                      A.   No, it depends on what you're
21        saying.  For this to be accidental trauma, it would
22        involve very high energy movement and then hitting an
23        object.  So, however, you can imagine that accident
24        happening, be it a fall, motor vehicle, pedestrian,
25        bicycle, it takes that -- that sudden violent
```

Page 198

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       movement of the brain within the skull -- the skull
 3       shearing little blood vessels and to allow bleeding.
 4                    Q.   And you had provided your opinion
 5       or given an answer with regard to the fact that
 6       hitting a baby against a soft object with enough
 7       force can cause a subdural hematoma.  That may be
 8       contrary to a layman's understanding of this -- the
 9       mechanics of this type of an injury.  Can you explain
10       why this would be true with regard to a soft object?
11                    MR. KLEIN:  Objection.
12                    A.   It doesn't -- using a hard
13       surface that you hit against there's -- there is
14       definitely a skull fracture.  So for there not to be
15       a skull fracture, that -- that -- that can happen and
16       in my experience has happened with a very high force.
17       Hitting up a baby's head against a soft object where
18       there's no obvious trauma, but that brain has moved
19       back and forth enough to shear those blood vessels
20       and cause subdural hematoma.
21                    BY MS. CALABRESE:  (Cont'g.)
22                    Q.   And isn't that what we're talking
23       about here the shearing of the blood vessel is
24       because the head is moving back and forth and the
25       concurrent -- concurrently or at the same time with
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        the brain moving back and forth?

3                        A.   Or --

4                        MR. KLEIN:  Objection.

5                        A.   -- because the brain is -- is

6        hitting something the -- the -- I mean, the skull is

7        hitting something and the brain does that and

8        recoils.  So it's that acceleration/deceleration that

9        causes the shearing of blood vessels.

10                       BY MS. CALABRESE:  (Cont'g.)

11                       Q.   And with regard to your opinion

12       that this is likely contacts between Baby Thomas and

13       a soft object, would that also explain why he did not

14       present with any bruising above his head?

15                       A.   Yes.

16                       Q.   And you had answered questions

17       with regard to working several days in a row.  Is it

18       common practice for doctors to work extended hours?

19                       A.   Well, for attending doctors it

20       is.  We're getting better at it and it's taken a long

21       time.

22                       Q.   And that's common knowledge

23       within your field that doctors unfortunately, for

24       various reasons tend to work very long shifts?

25                       A.   There were -- there weren't

Page 200

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        enough of us for a long, long time.  Finally -- it's
 3        finally changed.  I've fought my whole career to get
 4        more docs in there and now I'm ready to retire.  Go
 5        figure.
 6                    Q.   And not with -- are you there
 7        because you froze on my end?  There you are.  Okay.
 8        And notwithstanding this fact that doctors generally
 9        work very long hours, is it fair or -- and true to
10        state that you would never put yourself in a position
11        to be unable to render proper treatment to a patient
12        because of the fact that you worked long shifts?
13                    MR. KLEIN:   Objection.
14                    A.   Absolutely.  I -- I would do
15        everything to avoid not getting the best care
16        possible.  We always have backup doctors, several
17        levels of backup doctors so that if you're too tired
18        and you want to go -- or you need a break, or a nap
19        you have a way to do that.
20                    As I said, we're -- we're never on
21        call or on duty by ourselves.  There's always
22        resident doctors available.  So to give us breaks if
23        necessary, for -- for a nap or even more sleep.
24                    Q.   And you were asked questions
25        about the written statement that you provided to the
```

1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       Troy Police Department.  To clarify, did you write

3       that statement?

4                    A.    No, I made the corrections.

5                    Q.    Okay.  And did you read the

6       statement for accuracy prior to signing it?

7                    A.    Yes.  And made corrections.

8                    Q.    I believe -- And made

9       corrections.  And I believe the statement was if it

10      were to be divided into paragraphs, approximately two

11      paragraphs.  Would you agree with that?

12                   A.    I -- I don't know how many

13      paragraphs.

14                   Q.    It was one -- on one page.

15                   A.    It's -- it was one page, yeah.

16                   Q.    One page.  And the record, the

17      medical record is at least two hundred -- the medical

18      record of Baby Thomas is at least two-hundred pages.

19      Is that your understanding of the length of the

20      record?

21                   A.    I don't know how long it is.  I

22      heard a lot of numbers.

23                   Q.    Okay, was two hundred pages one

24      of the numbers that you heard?

25                   A.    I mostly heard eighty something

Page 202

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        and then I don't remember two hundred, no.
 3                    Q.   Okay.  And is it -- okay.  Is it
 4        fair to say that the one-page statement that you
 5        provided to the Troy Police Department is not
 6        inclusive of all of the diagnoses and treatments that
 7        you provided to baby Thomas?
 8                    A.   That's correct.
 9                    Q.   Thank you, Doctor, I appreciate
10        your time and attention today.  I recognize this day
11        was very long and this is a difficult process because
12        it's electronic.  But again, I do appreciate your
13        willingness to be here today, and your honesty in
14        going forward.  So thank you for that.  And I'm all
15        set.
16                    A.   Thank you.
17                    THE REPORTER:  We can't hear you.
18                    MS. CALABRESE:  Anybody have anything
19        else for doc?  You're muted, Brett.
20                    MR. KLEIN:  I do.  I'll let Michael go
21        first.
22                    MS. CALABRESE:  You're muted, Michael.
23        Michael, you're muted.
24                    MR. GINSBERG:  Not yet.  You said that
25        Klein said the first time and then.  Yes, if anybody
```

Page 203

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        wants to take a break for a minute, I think we should

3        just continue with the same progression and now since

4        we're back into the rebuttal questions.

5                        MR. KLEIN:  It won't be forever.

6                        THE WITNESS:  Keep going, keep going.

7                        MS. CALABRESE:  It won't be forever.

8        I'm sorry.  It won't be forever.

9                        MR. GINSBERG:  I only have a few more

10       questions.  Thank you.

11                       REDIRECT EXAMINATION

12                       BY MR. GINSBERG:  (Cont'g.)

13                       Q.   Doctor, there's been testimony

14       and questions with regard to a statement that was in

15       one of the police, the Troy police officers' records

16       where it indicated that you had stated this is a

17       murder.  And do you recall testifying upon

18       examination by Mr. Klein that you do not recall

19       making that statement?

20                       A.   I -- I mean, yes, I don't recall

21       making that statement.

22                       Q.   And you also testified that it

23       would not be within your normal pattern of behavior

24       to make such a statement, correct?

25                       A.   Correct.

Associated Reporters Int'l., Inc.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        Q.   But you, as you sit here, right

3        now, you can't definitively say that you, in fact,

4        did not make that statement either, correct?

5                        A.   I cannot.

6                        Q.   Doctor, drawing your attention

7        back to the deposition of a witness on C.O.T. Exhibit

8        B of today's date.  You had the opportunity to review

9        that record before you signed it, correct?

10                       A.   Before --.

11                       Q.   Why don't we wait for her to put

12       it up?  There we go.

13                       A.   Yes.  I reviewed that statement

14       and I made some changes.

15                       Q.   Right.  So you -- you had the

16       opportunity to review the statement, correct?

17                       A.   Yes.  I reviewed the statement

18       and made some changes.

19                       Q.   Okay.  And what was the reason

20       that you made the changes?

21                       A.   I was trying to improve the

22       accuracy of the statement.

23                       Q.   And the statement does not

24       mention sepsis, correct?

25                       A.   Yes.  It's not -- It's not meant

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        to be, it does not mention sepsis.  That's correct.

3                      Q.   And Doctor, you signed the

4        deposition, correct?

5                      A.   Yes.

6                      Q.   And could you read the last

7        sentence -- the last printed sentence above the

8        signature line?

9                      A.   There needs to be se -- severe

10       acceleration prior to hitting the hard object.

11                     Q.   Thank you.  I'm referring to the

12       one right above the signature line that begins with

13       false statements.

14                     I'm sorry, please scroll down Annette,

15       right there.

16                     MR. KLEIN:  Objection.  The sentence

17       speaks for itself.  The document says what it says,

18       but if you want him to read it.

19                     MS. MITCHELL:  Are you talking about

20       the typewritten portion?

21                     MR. GINSBERG:  Yes, the typewritten

22       portion that begins with false statement.

23                     BY MR. GINSBERG:  (Cont'g.)

24                     Q.   Could you read that portion,

25       Doctor?

```
 1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        A.    False statements made herein are
 3            punishable with Class A misdemeanors pursuant to
 4            Section 210.45 of the Penal Law, the State of New
 5            York.
 6                        Q.    And Doctor, to your knowledge,
 7            did you put any false statements into this signed
 8            deposition of a witness?
 9                        A.    No false statements, no.
10                        Q.    Thank you.  I have no further
11            questions.
12                        RECROSS EXAMINATION
13                        BY MR. KLEIN:   (Cont'g.)
14                        Q.    Doctor, going back to your
15            transcript from 2009.  I don't know that anyone's
16            asked you this, so I wanted to.  You've -- you did
17            review it in preparation for today's testimony,
18            correct?
19                        A.    Yes.
20                        Q.    So was your testimony -- was your
21            testimony in 2009 true and correct to the best of
22            your recollection?
23                        A.    I did not go through it
24            carefully, I can do that now if you want me to.
25                        Q.    Well, I want to know if you
```

Associated Reporters Int'l., Inc.

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          adopted or if there's anything about it that was --

3          do you wish to change or correct and so I was hoping

4          you would have gone through that.

5                    A.   I -- I read through it very

6          quickly.  I can read through it more slowly if you'd

7          like me to.

8                    MR. GINSBERG:  Objection to the form

9          of the question.

10                    MR. KLEIN:  Or maybe we could do it at

11          the -- at the end.  Then I'll finish the questions

12          now.

13                    BY MR. KLEIN:  (Cont'g.)

14                    Q.   So next question.  In terms of

15          Ms. Peck asked you about your -- your testimony that

16          this was trauma, but you couldn't rule out sepsis.

17          And then you asked -- answered questions from Ms.

18          Calabrese about what you knew in terms of the

19          culture, isn't that you -- you -- I didn't mean to

20          suggest strongly that you didn't do a lot.  You did a

21          lot in the two days but your role in this case was --

22          was just that it was over two days or so, correct?

23                    A.   Yes, I'm quite sure it was a full

24          two days, yes.

25                    Q.   Correct.  Correct.  So -- so what

Page 208

1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       I was getting at and what I want to confirm now is,

3       you don't know what the culture showed, correct?

4                        A.   No, in fact, I --

5                        Q.   Yeah.

6                        A.   -- stated that they were negative

7       although I -- I -- I'm not sure --there was never

8       negative culture.  Does anyone know?

9                        Q.   The autopsy I have in front of

10      me, says, blood culture positive for Streptococcus

11      pneumonia on initial presentation at the hospital

12      parenthesis nine twenty-one zero eight.  That's one

13      of the anatomic diagnosis.  I'll represent that

14      that's what Dr. Sikirica put in his report.

15                        MR. GINSBERG:  Object to the form.

16                        BY MR. KLEIN:  (Cont'g.)

17                        Q.   And -- and then Sub A, it says,

18      acute and chronic pneumonia with severe -- severe

19      microscopic --.

20                        A.   Uh-huh.

21                        Q.   So as -- for instance, you -- you

22      didn't know about those findings in the approximately

23      day or so that you were involved in the case,

24      correct?

25                        A.   I did not.

Page 209

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.   So when you give an -- an opinion

3     about trauma, you're just talking about what you knew

4     in your snippet of time in this case, notwithstanding

5     that you did a lot.

6                    A.   Absolutely.

7                    Q.   Okay.

8                    A.   Absolutely -- absolutely with the

9     caveat that I treated this as sepsis and did not

10    compromise that in any way because of the trauma

11    diagnosis --

12                    Q.   Correct.

13                    A.   -- or trauma concern.

14                    Q.   This is so -- so -- and the

15    reason why we're asking you all these questions is

16    this case is about whether or not the police acted,

17    violated Mr. Thomas's rights when they coerced a

18    false confession out of him, which was subsequently

19    thrown out by the Court of Appeals and not allowed

20    --.

21                    MR. GINSBERG:  Object to -- object to

22    the form.  Object to the prior charge.

23                    MR. KLEIN:  Let me finish the

24    question, right.  Let me finish first.

25                    BY MR. KLEIN:  (Cont'g.)

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    Q.   And so no one's questioning your,
 3        that you did what you could during that time.  But
 4        you also didn't know so -- so when you talk about
 5        whether you believe this was trauma or not, you're --
 6        you're -- you're limited to what you knew and what
 7        you know.  You don't know what those -- that this --
 8        you didn't know that ████████ was severely infected.
 9        You may have suspected it, but you didn't know,
10        correct?
11                    MR. GINSBERG:  Object to the form.
12                    MR. KLEIN:  Okay.
13                    BY MR. KLEIN:  (Cont'g.)
14                    Q.   Now, with pneumococcal disease in
15        children under two like ████████ that didn't have his
16        four-month vaccine.  Are you aware of cases where the
17        -- the pneumococcal disease can progress to death --
18        to death in a matter of forty-eight hours or so?
19                    A.   Yes, yeah.
20                    Q.   Okay, and that would be without
21        trauma, is your answer still a yes?
22                    A.   Yes, yes.
23                    Q.   Okay.  Now, with regard to the
24        questions about the subdural hematoma that was in the
25        records, not in the radiology report.  Is it your
```

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       understanding that this mention or finding in the

3       records of a -- of an S.D.H. is based on opinion but

4       not based on any objective radiograph?

5                       MS. MITCHELL:  Object to the form.

6                       A.   I don't think that I'm -- since

7       we're talking about the neurosurgical opinion, I -- I

8       don't think I can comment on that, you know, Dr.

9       Waldman, Dr. German are, you know, thorough good

10      physicians, and would never give an opinion without

11      looking at the CAT scan.  So -- so to say it's

12      something separate from their -- from the CAT scan, I

13      think it would be misleading.

14                      BY MR. KLEIN:  (Cont'g.)

15                      Q.   So -- so it would be fair to say

16      that you would think it's more likely than not that

17      they would have reviewed the CAT scan before opining

18      that there was an S.D.H., but you're not sure.

19                      MR. GINSBERG:  Object to the form.

20                      THE WITNESS:  Absolutely no, I have no

21      question that they would review the CAT scan before

22      writing an opinion in the chart.

23                      BY MR. KLEIN:  (Cont'g.)

24                      Q.   Okay.  You talked about some

25      patients you've seen with severe sepsis.  Have --

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       don't have difficulty breathing.  Do you recall that
 3       line of questioning?
 4                    A.   We have a lot of patients with
 5       sepsis and -- and initially, they -- they breathe
 6       very well on their own.  That depends on their age.
 7       We have patients that we get through sepsis without
 8       putting on a breathing machine.
 9                    BY MR. KLEIN:  (Cont'g.)
10                    Q.   Okay.  ██████  had -- had
11       pneumonia, acute and chronic pneumonia.  Those
12       patients have difficulty breathing, correct?
13                    A.   Yes.
14                    Q.   Okay.
15                    A.   By definition, yes.
16                    Q.   Now, you were asked questions
17       about your statement --?
18                    A.   Can I -- can I -- can I comment
19       on this?
20                    Q.   Sure.
21                    A.   I want to go back, but I -- but I
22       believe that the -- maybe one of you know this off
23       the top of your head that they described apnea as --
24       as one of the reasons for intubation.
25                    Q.   At Samaritan?
```

Page 213

1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         A.   Yeah.  Okay, I thought I saw that

3         something more, that it wasn't just respiratory

4         distress, but they also described apnea.  Maybe I'm

5         wrong on that.

6                         Q.   I thought it was lethargy but if

7         you want to take a look please do.

8                         A.   No, I just see the apnea test

9         that we did for -- for brain death.

10                        Q.   Okay.  Are you familiar with the

11        Neuropathologist Jan Leestma?

12                        A.   No.

13                        Q.   Okay.  Were you aware that a -- a

14        neuropathologist testified in this case that, and in

15        this, a death was due to the overwhelming bacterial

16        infection and not due to trauma?

17                        MS. CALABRESE:  This is Christina,

18        objection.

19                        THE WITNESS:  I -- I was not aware of

20        that particular pathologist relaying.

21                        BY MR. KLEIN:  (Cont'g.)

22                        Q.   Okay.  Now, you were asked a

23        bunch of questions that -- about whether you would

24        alter your opinion for the police.  And I would just

25        say from our perspective, that is not what we've

Page 214

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      suggested.
 3                    My question to you is whether you
 4      think, based on hearing these statements attributed
 5      to you by the police, that you think the police
 6      skewed or exaggerated what you told them to suit the
 7      direction of the law enforcement investigation.
 8                    MS. CALABRESE:  This is Christina,
 9      objection.
10                    MR. GINSBERG:  Object to the form.
11                    MS. PECK:  Objection.
12                    A.   I really, I can't answer that.  I
13      don't know why the police would have gotten --
14      exaggerated what I said to them, I really -- it's
15      hard to understand.  Excuse me, Mr. Klein?
16                    BY MR. KLEIN:  (Cont'g.)
17                    Q.   Yes.
18                    A.   I did find a note -- a note from
19      Samaritan.  I don't know how to identify it for you.
20                    Q.   Can you just tell us what it
21      says?
22                    A.   So the note -- a note from Dr.
23      Kardos as part of her transfer note.  And she says he
24      -- he had for a few days and she was -- he was -- had
25      some vomiting, temperature a hundred point four this
```

Page 215

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     a.m., was well and then had rapid decline with

3     increased respiratory effort and decreased

4     responsiveness.

5                    Per E.M.S. patient with agonal

6     respirations, four to five per minute.  So that would

7     be severe bradycardia and would be atypical of

8     respiratory distress from pneumonia and more typical

9     of -- of the respiratory distress based on a brain

10    injury.

11                   That's not to say that the problem

12    wasn't pulmonary pneumonia, but it would have had

13    like I spoke to -- said earlier, there would have

14    been enough ongoing decrease circulation to the brain

15    from sepsis, that the brain was starting to show

16    signs of brain damage.

17                   Q.   But you -- you're not saying

18    that, you know whether the brain injury was from

19    trauma, there could be an old S.D.H. that had re-

20    bleeds that got infected because of the meningitis

21    and other aspects of the sepsis, correct?

22                   A.   Well, that would be --.

23                   MS. CALABRESE:  Objection to form.

24                   THE WITNESS:  I -- I think --.

25                   MS. CALABRESE:  It's Christina,

Page 216

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        objection to form.
 3                      BY MR. KLEIN:  (Cont'g.)
 4              Q.    You can answer.
 5              A.    First -- first and second on the
 6        list would be, you know, that this was, you know,
 7        streptococcal -- streptococcal sepsis and meningitis,
 8        causing enough circulatory problems to the brain that
 9        there was global brain injury, would be one of the
10        top two and the other would be the trauma.  I think
11        number three would be old trauma and re-bleed.
12                    Q.    But the -- the -- in terms of the
13        -- the collections of blood being of indeterminate
14        age one newer, one older, I think it was determined
15        that the newer one was not consistent with trauma.
16        Do you -- do you recall that?  Any -- any anything to
17        that effect?
18                    A.    No.
19                    Q.    Okay.  So the older one -- the
20        older one.  Yeah.
21                    MS. MITCHELL:  I just need to put an
22        objection out there.  Would you -- would you like me
23        to have the witness step out so there's no charge of
24        coaching or can I just make a quick statement?
25                    MR. KLEIN:  I'm fine with it.
```

Page 217

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       Christina, are you okay with it?

3                      MS. CALABRESE:  Of course.

4                      MS. MITCHELL:  Okay, I -- just for a

5       standing objection.  I think the witness has been put

6       in a very difficult position because there are a lot

7       of facts that are being presented to him of diagnosis

8       and -- and conclusions after the fact, he wasn't

9       involved reading from things that he doesn't have.

10                     You know, so I just feel that that has

11      colored everything, and I'd just like to put that out

12      there.  It's very hard for him to respond when you

13      keep bringing up things that he has no personal

14      knowledge of.

15                     MR. KLEIN:  We -- we could pose

16      hypotheticals to the witness based on the facts.  And

17      I don't think any of us are disputing the -- the

18      facts, even if or -- or the presentation of disputed

19      facts in this case.

20                     MR. GINSBERG:  I'd like to -- I'd like

21      to go on record and -- and dispute that just the last

22      statement from Mr. Klein.  You are not permitted to

23      give hypotheticals to anyone unless they're an expert

24      witness.  So let's just go ahead with the question.

25                     MR. KLEIN:  Yeah, I don't think -- I

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        don't think that I will -- it's neither here nor
 3        there.  Okay.  Okay, that's all I have, Dr. -- Dr.
 4        Edge, thank you very much.
 5                        THE WITNESS:  Thank you.
 6                        MR. KLEIN:  Anyone else?
 7                        MS. CALABRESE:  None for the State of
 8        New York.  Thank you.
 9                        MS. PECK:  No questions.  Thank you.
10                        MR. GINSBERG:  I have no further
11        questions.  Doctor, thank you very much for your
12        time.  I know it's been a long haul today.
13                        THE WITNESS:  Thank you.
14                        MR. KLEIN:  Yeah.  Good luck, again,
15        sir.  Stay safe.
16                        THE WITNESS:  You too.
17                        MR. KLEIN:  Okay.  Thanks, everybody.
18        See you soon.
19                        MR. GINSBERG:  Okay.  Thank you.
20        Thank you, Annette.
21                        (Off the record, 3:39 p.m.)
22
23
24
25
```

800.523.7887                                Associated Reporters Int'l., Inc.

Page 219

```
 1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2

 3    STATE OF                )
      COUNTY OF               )
 4
              I, WALTER EDGE, M.D., have read the foregoing
 5    record of my testimony taken at the time and place noted
      in the heading hereof and do hereby acknowledge:
 6    (Please check one)
              ( ) That it is a true and correct transcript of
 7    same.
              ( ) With the exceptions noted in the attached
 8
      errata sheet, it is a true and correct transcript of same.
 9
                                X
10                               WALTER EDGE, M.D.

11    Sworn to before me this
      _____day of _____, 2020.
12    X_____
      NOTARY PUBLIC
13    My Commission Expires:
      _____
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 220

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2

3          I, ANNETTE LAINSON, do hereby certify that the

4     foregoing testimony of WALTER EDDGE was taken by me, in

5     the cause, at the time and place, and in the presence of

6     counsel, as stated in the caption hereto, at Page 1

7     hereof; that before giving testimony said witness(es) was

8     (were) duly sworn to testify the truth, the whole truth

9     and nothing but the truth; that the foregoing typewritten

10    transcription, consisting of pages number 1 to 218,

11    inclusive, is a true record prepared by me and completed

12    by Associated Reporters Int'l., Inc. from materials

13    provided by me.

14

15    ANNETTE LAINSON, Reporter

16

17

18

19

20

21

22

23

24

25

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 221

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2            ASSOCIATED REPORTERS INTERNATIONAL, INC.
                        (800) 523-7887
 3
        Date:
 4      Case Name:  Thomas v City of Troy
        Index Number:  17-CV-626
 5      Deponent:  Walter Edge, M.D.
        Deposition Date:  7-30-2020
 6      Examining Attorney:  Mr. Ginsberg

 7      Dear Dr. Edge:

 8
        Please read and make any changes and/or corrections in
        your testimony and sign the transcript in the presence of
 9
        a notary public.  Please do so within thirty (30) days.
10      If you fail to sign the transcript within thirty (30)
        days, it will be delivered to the appropriate parties
11      without signature.  Return the transcript with
        corrections, if any, to:
12           PATTISON, SAMPSON, GINSBERG & GRIFFIN:
             BY:  MICHAEL E. GINSBERG
13                RHIANNON SPENCER
             22 First Street
14           Troy, New YORK 12180
        CORRECTIONS:
15
        _____     Word or phrase:  _____
16
                     Corrected to:    _____
        _____     Word or phrase:  _____
17
                     Corrected to:    _____
18      _____     Word or phrase:  _____
                     Corrected to:    _____
19      _____     Word or phrase:  _____
                     Corrected to:    _____
20      _____     Word or phrase:  _____
                     Corrected to:    _____
21      _____     Word or phrase:  _____
                     Corrected to:    _____
22      _____     Word or phrase:  _____
                     Corrected to:    _____
23

        _____
        Date Signed                          _____
24
                                             WALTER EDGE
25
```

ARII@courtsteno.com                                    www.courtsteno.com

800.523.7887                          Associated Reporters Int'l., Inc.

Page 222

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Associated Reporters Int'l., Inc.

**A**

**a.m** 1:13 6:2 14:25 15:2 52:12
  52:13 57:7 60:11 68:16 215:2
**A.M.C** 40:11
**A.M.C.H** 49:9
**A/P** 46:21
**ability** 190:14 195:24
**able** 16:14 23:22 58:24 96:22
  97:5 156:20 165:9,12,20
  166:10,13 192:22,24,25 193:15
  193:16
**abnormal** 38:9 170:13
**absence** 38:19 110:5 120:13
  197:5
**absent** 49:15
**absolutely** 106:22 107:15 172:11
  172:16 173:25 174:22 200:14
  209:6,8,8 211:20
**abuse** 36:16 51:17 58:18 59:11
  59:18,18 61:15 62:13 90:19
  107:9,11 119:3,14 120:14
  122:3 139:21 145:24 175:23
  176:6,13,13 180:14 182:5,9
  192:10
**abusive** 36:12,25 182:24
**academic** 11:24 12:2
**Academy** 9:22
**acceleration** 37:21 58:15 120:11
  122:18 139:24 140:8 197:9
  205:10
**acceleration-deceleration** 37:15
**acceleration/** 183:4
**acceleration/deceleration** 199:8
**acceptable** 16:5 110:14
**access** 85:19
**accident** 36:23 58:17 59:3,4
  120:14,14 138:24 139:2 197:23
**accidental** 36:25 57:16 58:23
  59:6 90:19 93:3 111:8,9 138:4
  138:8,9,14,22 142:7,8 197:13
  197:14,18,21
**accommodate** 173:19
**accompanied** 57:2
**account** 119:25
**accuracy** 179:2 201:6 204:22
**accurate** 67:8 159:2,2,5 185:13
**accurately** 69:11
**accused** 76:15
**acknowledge** 219:5

**acronym** 39:21
**acted** 209:16
**action** 68:24 169:17
**actions** 169:23
**active** 12:19
**activity** 15:19 186:18 189:7,18
**actual** 23:23 40:24 55:8,10,12
  80:8 99:15 100:11
**acute** 208:18 212:11
**ad** 49:4
**Adair** 60:4 61:18
**Adam** 1:6 75:21
**add** 27:8 35:9 142:2 174:5
**added** 102:5
**addition** 12:18 16:2 101:16
  102:4
**additional** 48:9 69:3 99:19
**address** 166:8 194:11
**adequately** 27:22
**adjust** 27:14
**adjusted** 91:6
**administer** 26:12
**Administrative** 12:3
**administratively** 11:5
**admission** 26:15,16,19 49:8 52:6
  52:20 57:15,21 125:20 156:9
**admitted** 49:5
**adopted** 207:2
**Adrian** 1:3 68:22 71:23 72:8
  75:11 84:21 157:22 169:17
**Adriana** 20:25 21:3
**advance** 161:7
**advanced** 156:4
**advise** 19:15 65:7
**advised** 64:19
**advocate** 176:24
**affect** 105:25 195:24
**affirm** 6:7 22:25
**afternoon** 68:21
**afterward** 13:5
**age** 33:18 44:3 94:24 110:4,20
  123:9 126:13 127:14 212:6
  216:14
**aged** 93:8
**agency** 171:11
**ages** 58:14 93:11,15,15 191:4
  193:4
**ago** 57:21 79:6,9 159:15 177:25
  180:6 183:13 196:21,25

**agonal** 215:5
**agree** 19:25 39:9 70:25 74:25
  78:15 82:2 89:2 91:14,17
  93:22 94:9 100:20 104:19
  105:19 126:17 128:23 148:12
  148:23 174:20,23 175:21 176:9
  179:8 196:9,14 201:11
**Agreed** 144:14
**agreeing** 54:5
**ahead** 18:3 19:14 23:25 47:10
  56:23 89:13 95:3 170:9 173:13
  195:14 217:24
**ailing** 8:20
**ailment** 31:13
**ailments** 31:5
**akin** 179:3
**al** 1:1 2:1 3:1 4:1 5:1 6:1 7:1
  7:11 8:1 9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1
  102:1 103:1 104:1 105:1 106:1
  107:1 108:1 109:1 110:1 111:1
  112:1 113:1 114:1 115:1 116:1
  117:1 118:1 119:1 120:1 121:1
  122:1 123:1 124:1 125:1 126:1
  127:1 128:1 129:1 130:1 131:1
  132:1 133:1 134:1 135:1 136:1
  137:1 138:1 139:1 140:1 141:1
  142:1 143:1 144:1 145:1 146:1
  147:1 148:1 149:1 150:1 151:1
  152:1 153:1 154:1 155:1 156:1
  157:1 158:1 159:1 160:1 161:1
  162:1 163:1 164:1 165:1 166:1
  167:1 168:1 169:1 170:1 171:1
  172:1 173:1 174:1 175:1 176:1
  177:1 178:1 179:1 180:1 181:1
  182:1 183:1 184:1 185:1 186:1

187:1 188:1 189:1 190:1 191:1
  192:1 193:1 194:1 195:1 196:1
  197:1 198:1 199:1 200:1 201:1
  202:1 203:1 204:1 205:1 206:1
  207:1 208:1 209:1 210:1 211:1
  212:1 213:1 214:1 215:1 216:1
  217:1 218:1 219:1 220:1 221:1
  222:1
**Albany** 2:12,15,18 7:22,24,25
  8:2,5,7 10:9 11:25 14:18
  15:15 16:10,24 17:7 22:20
  23:4 25:9,13 61:23 66:4 69:18
  74:8 76:12 103:25 104:6 107:7
  119:20 121:22 181:24 187:5,8
  187:11 192:8,11
**align** 173:22
**alive** 27:13
**allegations** 79:11 82:11 83:2
  169:22
**alleged** 77:19 79:21
**alleging** 169:19
**allow** 19:4 67:15 153:9 198:3
**allowed** 172:7 209:19
**allowing** 22:10
**alter** 172:6,9 174:2 213:24
**altering** 173:18
**amend** 87:19
**American** 9:22
**amount** 180:8,20
**anatomic** 208:13
**and/or** 86:12 98:23 179:2 190:2
  192:25 221:8
**Andrea** 61:2
**Annette** 21:4,15 54:23 55:23
  95:18 156:14 167:25 169:10
  173:10 205:14 218:20 220:3,15
**announcement** 184:4
**answer** 10:22 17:10,12,14,16
  18:8,15,22 19:5,15,15 20:2
  22:10 35:18 37:10 62:24 63:7
  63:8 77:2,15 78:20 83:19 85:9
  87:19 89:20 101:13 103:22
  116:2 118:15 122:8 123:15
  127:16 141:19 143:22 145:3
  148:9 152:8 155:16 171:24,25
  193:15,19 197:3 198:5 210:21
  214:12 216:4
**answered** 118:7 196:20 199:16
  207:17

answering 19:6
answers 3:9 98:21 116:7
antibiotic 185:5
antibiotics 86:22 106:23
anybody 202:18,25
anymore 36:3
anyone's 206:15
anyway 18:19
apart 50:24
apnea 44:13,15 212:23 213:4,8
apparently 15:22 38:17 56:18
 57:2
Appeals 209:19
APPEARANCES 2:2
appeared 27:19 98:10 153:20
 194:23,25
appears 44:12,16 98:10 153:21
 189:5
appease 22:9 160:22 161:12
appreciate 163:15 202:9,12
appropriate 62:5 82:21 135:15
 144:10 145:19 150:10 171:8,9
 183:25 185:4 188:12 221:10
approximate 28:13
approximately 13:10 14:12 28:9
 74:20 79:8,8 201:10 208:22
area 29:11 47:25 48:8 59:8
 93:16 164:13,17 181:11,23
 183:9
areas 174:8
argue 37:18
arranged 14:17
arrival 189:7
arrived 15:8,15 28:3 127:24
 187:4 189:17
arriving 15:6,7 187:8
Art 134:7
articles 114:18
asked 64:2 69:4 74:3 81:18
 84:19,20 98:21 122:12 150:22
 152:15 155:21 164:4,5,21
 168:7 170:3,19 171:3 179:14
 180:24 182:20 192:6,14 194:14
 195:2,5,14 200:24 206:16
 207:15,17 212:16 213:22
asking 18:16 23:9,11 29:8 82:25
 83:3,6 89:5 91:21 92:3 107:5
 115:20 137:7 142:16 145:2
 150:21 156:7 160:3,4 170:24
 170:25 171:2 193:21 209:15

aspect 98:3
aspects 182:8 215:21
assault 62:14 174:16,17
assaulted 174:9
assess 46:25 56:22
assessment 26:24,25 41:10,14
 44:9 46:8,20,25 58:9 59:24,25
 132:25
assessments 133:6
assigned 11:10
assist 145:16
associated 114:19 220:12 221:2
assuming 113:24 114:3 185:12
assure 131:2
asterisk 176:10
attached 219:7
attacked 161:13
attempt 65:11
attempting 31:12
attended 12:22
attending 8:11 10:13 29:8 40:25
 43:16 46:18 48:15 101:23
 123:25 125:24 128:5 132:14,14
 132:15,16,17 149:17 199:19
attention 10:5 13:6 25:24 32:11
 32:16 41:8 52:5 54:9 55:16,18
 59:20 66:25 85:22,25 121:13
 132:2 136:5 168:6 202:10
 204:6
attest 18:16
attestation 54:3
attorney 2:10 3:15 7:9 19:12
 21:23 23:12 65:21,22 75:9
 78:17 80:22,23,24 81:6 111:17
 134:6,12 145:20 153:21 162:17
 169:15,16 172:14 174:4 221:6
Attorney's 84:22
attorneys 3:3 22:23 73:22 81:6
 163:24 171:3 177:4,8 179:15
 184:18
attribute 192:3
attributed 77:8 120:21 214:4
atypical 215:7
audience 184:3
audio 158:16
authenticity 18:9
authored 9:7
authoring 182:11
authority 180:13

800.523.7887                                              Associated Reporters Int'l., Inc.

**autop** 165:24
**autopsy** 85:15  115:8,18  165:12
  165:19,24  169:25  196:8,10,15
  208:9
**available** 57:4  185:8  200:22
**avoid** 200:15
**avoidance** 72:6
**awaiting** 56:20
**aware** 69:8  72:7,10,18  73:6  87:2
  93:17  106:6  109:25  115:3,4,7
  115:10,21,24  119:17  133:7,25
  154:6  167:7  183:16  192:10,16
  210:16  213:13,19
**axial** 33:3,9  97:25  98:13  100:6

                    **B**
**B** 5:2,7  48:25  49:4  66:21,25
  67:19,20,24,25  68:2  204:8
**B.L** 39:24
**babies** 110:20
**baby** 35:24  56:17  110:17,23
  122:12,19,23  174:9,10,13,16
  182:21  183:12  184:20,24  186:6
  186:12,17  189:17  191:10,20
  192:16,19  193:8,11  198:6
  199:12  201:18  202:7
**baby's** 57:5  198:17
**back** 18:24  19:24,25  23:7  24:20
  25:4  34:9  35:22  43:11  58:6
  68:10  87:23  88:3  93:9  97:3,8
  97:16  109:20  112:21,23  113:4
  116:7  118:3,4,9,16,19  121:11
  123:4,21  126:21,23  150:5,6
  152:16,22,24  158:25  162:14
  170:6  177:11  178:10,14  198:19
  198:24  199:2  203:4  204:7
  206:14  212:21
**background** 7:20  175:3
**backup** 200:16,17
**bacteria** 86:18  113:23  114:16
  185:22,24
**bacterial** 86:18  87:7  90:20
  105:18,22,25  111:11  155:7
  156:5  184:17,21,25  185:4,7,18
  213:15
**Bailey** 2:16  163:23
**balanced** 174:2
**ballpark** 195:14,19
**banker** 22:23
**barred** 106:23  109:19

**base** 102:22  176:23
**based** 46:16  77:8  103:19  117:13
  126:15  128:9  129:12  130:24
  139:19  140:22  145:6,23  154:5
  155:20  156:4  163:2  182:15
  197:7  211:3,4  214:4  215:9
  217:16
**basic** 31:11
**basically** 27:22  187:10
**basing** 129:10,11
**basis** 20:17  42:11
**Bates** 146:15  147:7
**bearing** 161:25
**bed** 122:19
**bedside** 91:4
**beginning** 7:21  51:5  106:21
  158:12
**begins** 205:12,22
**behavior** 145:6  203:23
**believe** 13:25  14:11  21:17  51:23
  60:21  65:20  66:13  70:2  97:3
  115:9  146:9  155:7  163:10,12
  164:14  166:14  180:7,13  182:21
  193:20  194:7  201:8,9  210:5
  212:22
**believed** 193:22
**benefit** 160:15
**best** 22:11  97:19  109:19  118:8
  122:8  137:20  159:7  165:13
  176:2,3  196:10,22  200:15
  206:21
**better** 36:4  158:10  164:25  165:9
  165:18,20,25  166:4  190:17,17
  190:18  199:20
**beyond** 83:19  93:15  111:16
  161:13
**bicycle** 197:25
**big** 176:20
**bigger** 67:17
**bilateral** 33:3  39:5,20  41:15
  44:2  47:2  50:8,14,16  51:6,7
  51:14  53:9  60:13  93:7  97:24
  98:12  100:6  102:21  126:12
  127:14  128:13,14  193:9
**birth** 49:10,12  93:24,25  94:7
  154:9,13,25  155:18  156:7
  164:6,10  167:11  192:17,18
  193:3,17
**birth-related** 93:18

**bit** 23:12 45:5 48:13 53:4
**Blaine** 81:19,21 83:12
**bleed** 56:19 193:3
**bleeding** 32:8 35:17,22 58:20
    94:8 111:19,25 123:5 167:13
    180:21 191:8 193:2,6 198:3
**bleeds** 215:20
**blood** 16:3,4 27:13,15 33:18,18
    33:21,21 41:18 47:18 86:17,18
    87:3,3,22 88:18 89:10 90:5
    91:5 94:21,21 98:17,22 99:25
    103:25 104:18 105:14 106:25
    115:8 123:5,7 130:14,15,17
    164:15 165:3,22 185:6 187:12
    187:25 191:19,24 192:25 193:4
    195:8,9,16 196:5 198:3,19,23
    199:9 208:10 216:13
**blood-borne** 88:24
**blown** 107:16
**board** 9:24,25 10:2 133:15 189:2
**body** 83:24 185:25 195:20
**bone** 104:23
**bones** 50:23
**bottom** 34:7 40:24 48:13 52:22
    55:24 56:6 66:14 70:12 124:12
    124:16,16 125:16 140:11 141:5
    147:3,8 168:2 188:15
**boxes** 22:23
**boy** 60:8 67:25 68:2
**bradycardia** 215:7
**brain** 27:19,20 30:9,13 31:25
    32:2 33:8,8,11,12 35:20,23
    38:14,16,19,19 41:19,20,22
    44:10,13,16 47:11,18,19 48:8
    48:9 50:23,24 87:23 89:17
    90:6,7,9 95:5 98:9 112:9
    123:3 130:21 140:3,4 142:21
    142:25 165:4,13,22 166:4,5
    170:13 180:22 186:13,14,18,24
    187:6,13,13 188:2 189:7,18
    192:16 194:22 195:3,12,12,17
    195:19,23 196:6,21,22,24,24
    198:2,18 199:2,5,7 213:9
    215:9,14,15,16,18 216:8,9
**brains** 195:10
**break** 23:8 64:7 67:13 68:3,5
    107:20,25 108:5,18,25 109:13
    137:6 153:3 160:5 200:18
    203:2

**breaks** 130:18 200:22
**breathe** 27:21 195:24 196:4
    212:5
**breathing** 15:20 26:11 44:14
    196:4 212:2,8,12
**breeding** 193:5
**Brett** 2:4 68:22 85:8 127:5
    150:4,25 154:3 156:19 159:19
    168:21 173:4 202:19
**brief** 40:4
**briefly** 7:20 9:10 74:15 79:10
    83:12 184:2
**bring** 15:24 19:24 66:9,10
    109:23 160:25 168:5
**bringing** 217:13
**broad** 120:18
**broader** 172:5
**Broadway** 2:4
**brother** 60:17 61:6
**brought** 68:25 87:17
**bruises** 49:13
**bruising** 49:14 199:14
**Bry** 84:13
**Bryce** 81:19,21 83:12 84:13
**bumping** 140:7
**bunch** 213:23
**business** 16:10,24 17:7 25:14,21
    117:7
**busy** 159:9

---
                        **C**

**C** 4:2 67:23 96:9
**C.O.T** 17:6 204:7
**C.P** 32:22
**C.P.R** 27:24
**C.P.S** 57:5 60:14 61:2,8,19,24
    62:5 176:6
**C.T** 31:21 33:20 39:7 40:12 44:2
    44:6 50:4,9 53:10 54:6,10,19
    54:21 55:9,12 56:19 88:11
    97:11,23 99:8,20 100:11 101:6
    101:10 103:9 123:7 126:12,16
    127:13,20,25 128:4 130:24
    132:4 164:22,24
**Calabrese** 2:11 4:5 20:19,22
    21:3,7,9,13,20,22 22:6,15,18
    23:11,17,21,25 24:6,8,11,16
    24:24 36:10,18,21 39:15 42:7
    42:10,13,17,23,25 43:3 71:11
    71:17 76:23 77:10,13 78:4,9

78:15 82:5,8 85:7,13 89:19,22
89:24 90:3 91:24 92:12 99:10
100:16,23 102:25 108:2,20,24
109:4 114:7 115:12,15 123:12
124:15 126:20 127:4,10,16
133:9,12 134:18 143:9,20
144:5,15 146:13,18 147:11,17
149:2,5,7 150:3,24 151:11,14
151:20 152:2,21 153:7,13,16
156:25 157:5,8,25 158:4,10
160:14 161:2 168:16 169:9,13
169:15 172:4 173:4,9,14
179:13 180:23 181:20,21
182:10 197:4,16 198:21 199:10
202:18,22 203:7 207:18 213:17
214:8 215:23,25 217:3 218:7
**call** 11:6 14:23,24 15:24 30:6
37:15 53:20 61:2 160:4 200:21
**called** 30:25 31:17 32:5 49:8
53:10,12 56:16 60:6 73:21
84:15 167:13
**calling** 67:21
**calvarium** 98:10
**capable** 19:5
**capacity** 75:16 76:11
**Capitol** 2:11
**caption** 220:6
**cardiovascular** 27:17
**care** 8:15,17,18,23,25 9:3,21
10:2,18 11:10,16,21 12:3,23
28:10 46:10 59:12 66:3 92:23
137:19 176:2,2,3 178:19 182:8
182:13,14 200:15
**cared** 28:10 59:17
**career** 28:9 200:3
**careful** 152:9
**carefully** 206:24
**caregiver** 59:12
**caring** 57:18 61:14
**Carlos** 86:13 105:4
**case** 56:4 57:6 61:8,8 75:7,22
76:17 77:21 79:11,13 80:3,3,4
80:5,19,22 81:10,14,25 82:2
83:18,22 84:14,25 90:18
104:16 111:5,14 113:9,21
115:2 117:14 118:22 120:22
121:6,21 131:16 134:7 138:16
138:17 154:15 155:19 157:22
162:18 163:25 183:12,14 184:8
188:7 193:7,22 194:3,13 196:9

207:21 208:23 209:4,16 213:14
217:19 221:4
**cases** 36:8 78:7,21,24 114:20
121:25 166:24,25 167:11 175:2
175:4 180:14 181:4 210:16
**CAT** 33:25 50:10,11 128:10,12
165:5,9,18,21 211:11,12,17,21
**CATALINOTTO** 2:13
**cause** 3:16 31:13 37:6,20 58:17
90:9,15 91:9 92:2,8,18 104:24
106:4,15 113:12 114:7 122:20
123:5 143:6 154:12,12 167:4
180:8 185:7 188:5 191:11
194:22 195:3,11 198:7,20
220:5
**caused** 36:19,24 37:8,14 47:23
90:19,21 92:7 139:25 140:3,7
143:2 164:6,9 168:8 183:4
**causes** 113:14 119:15 195:8
199:9
**causing** 58:16 59:12 88:25 216:8
**caveat** 209:9
**cease** 195:20
**cell** 104:2,18 191:19,24
**cells** 113:21 114:16 130:18
**Center** 16:10,25 17:8 25:10,13
61:24 66:5 69:19 74:9 76:12
119:20 121:22 181:24 192:9,11
**certain** 19:9 31:14 176:14
**certainly** 18:14 20:2 84:6 92:21
108:10 111:3 145:9 154:11
161:4
**certainty** 22:25
**certification** 9:24
**certified** 3:16 9:25 10:2 18:19
**certify** 220:3
**cetera** 122:22,22
**chance** 86:4 124:7 178:12 189:20
**change** 65:12 87:18 130:10,11
172:6 173:21 207:3
**changed** 121:23 122:11,12,17,22
130:3 133:2,6 139:17 156:11
166:12 177:13 200:3
**changes** 166:5,11 196:25 204:14
204:18,20 221:8
**chaplain** 60:17
**characterization** 116:12
**charge** 10:18,24 11:2,4,6,8,24
61:10,13 209:22 216:23

**charges** 72:22
**chart** 6:22,24  7:5  13:14,18,25
  16:6  21:14  22:2,13,19  23:3
  24:3  28:6  31:4  48:21  49:6
  61:17  69:19  74:9  96:23  97:5
  133:18,20  134:2  151:13  178:10
  189:25  190:7,10  193:11  211:22
**check** 109:5  178:25  179:2  219:6
**chief** 11:21  12:2,2
**chieftain** 11:23
**child** 14:19  15:7,8,18,24  16:2
  36:22  38:16  51:17  58:18  59:10
  59:11,13,18  61:15,20  62:13
  64:13  79:20,24,25  87:7  88:5
  89:23  92:23  94:3  109:18  116:9
  116:15  120:14  122:18  130:4
  139:21  145:24  159:6  174:9
  175:23  176:5  178:12  180:14
  182:5,9
**child's** 90:21
**child's** 50:17
**children** 8:18,21  9:18  57:4
  59:17  110:4  176:7,24,24
  180:18,18  210:15
**choice** 20:7
**choppy** 177:11
**Christina** 13:23  68:5  82:22
  115:15  126:23  133:12  134:18
  143:20  153:4,11  160:12  163:13
  163:18  169:14  213:17  214:8
  215:25  217:2
**Christine** 2:11  163:13
**chronic** 208:18  212:11
**chronically** 12:24
**circulate** 173:11
**circulation** 186:21,23  215:14
**circulatory** 216:8
**circumstance** 76:18  178:21
**circumstances** 140:19  176:14
**cite** 145:9
**city** 1:1,6  2:1,6  3:1  4:1  5:1
  6:1  7:1,10,11  8:1  9:1  10:1
  11:1  12:1  13:1  14:1  15:1  16:1
  16:8  17:1  18:1  19:1  20:1  21:1
  22:1  23:1  24:1  25:1,8  26:1
  27:1  28:1  29:1  30:1  31:1  32:1
  33:1  34:1  35:1  36:1  37:1  38:1
  39:1  40:1  41:1  42:1  43:1  44:1
  45:1  46:1  47:1  48:1  49:1  50:1
  51:1  52:1  53:1  54:1  55:1  56:1

57:1  58:1  59:1  60:1  61:1  62:1
63:1  64:1  65:1  66:1  67:1  68:1
69:1  70:1,10  71:1  72:1  73:1
74:1  75:1  76:1  77:1  78:1  79:1
80:1  81:1  82:1  83:1  84:1  85:1
86:1  87:1  88:1  89:1  90:1  91:1
92:1  93:1  94:1  95:1  96:1,21
97:1  98:1  99:1  100:1  101:1
102:1  103:1  104:1  105:1  106:1
107:1  108:1  109:1  110:1  111:1
112:1  113:1  114:1  115:1  116:1
117:1  118:1  119:1  120:1  121:1
122:1  123:1  124:1  125:1  126:1
127:1  128:1  129:1  130:1  131:1
132:1  133:1  134:1  135:1  136:1
137:1  138:1  139:1  140:1  141:1
142:1  143:1  144:1  145:1  146:1
147:1  148:1  149:1  150:1  151:1
152:1  153:1  154:1  155:1  156:1
157:1  158:1  159:1  160:1  161:1
162:1  163:1  164:1  165:1  166:1
167:1  168:1  169:1  170:1  171:1
172:1  173:1  174:1,8  175:1
176:1  177:1  178:1  179:1  180:1
181:1  182:1  183:1  184:1  185:1
186:1  187:1  188:1  189:1  190:1
191:1  192:1  193:1  194:1  195:1
196:1  197:1  198:1  199:1  200:1
201:1  202:1  203:1  204:1  205:1
206:1  207:1  208:1  209:1  210:1
211:1  212:1  213:1  214:1  215:1
216:1  217:1  218:1  219:1  220:1
221:1,4  222:1
**civil** 2:3  3:5  76:11,13
**claim** 81:13  169:18  179:16
**claimants** 81:14
**Claims** 68:23
**clarification** 22:13  150:22
**clarify** 201:2
**Class** 206:3
**clear** 7:14  30:18  137:8,14  160:2
  174:13
**clearly** 27:20  145:7
**client** 150:7  151:2,4,10  152:5
  152:11,15  160:3  176:23
**clinical** 97:24
**clinicians** 102:11
**clip** 157:14,16  161:18,20  162:12
  184:12

800.523.7887                                                    Associated Reporters Int'l., Inc.

Page 230

**clips** 183:18
**close** 27:16 89:17 126:4
**closely** 133:19
**clotting** 32:8 106:2,9 185:6
**CO2** 44:14
**coach** 144:6
**coaching** 144:12 151:5 216:24
**coagulopathy** 105:23 106:4,9
 112:16 113:10
**coerced** 209:17
**Colaneri** 1:6 74:23
**collar** 110:9
**colleagues** 85:4 92:17 132:20
 188:4
**collect** 31:24
**collecting** 47:18
**collection** 31:24 33:21 35:23
 41:18 95:22 98:6 129:17 190:8
**collections** 33:4 93:8,19 97:25
 98:13,16 100:6 102:20,21
 128:15 216:13
**collects** 47:25 48:7
**college** 7:21 11:25 110:4
**colored** 217:11
**column** 48:20
**coma** 49:6 189:6,17
**comatose** 26:8
**combination** 93:12 116:10 126:3
**combined** 26:17
**come** 13:7 18:24 23:7 24:20
 64:18 68:10 87:5,25 112:23
 130:20 131:25 152:24 163:7
 172:7 178:24 186:15
**comes** 110:23
**coming** 19:25 142:8 152:22
**comment** 51:11 59:24,25 94:19
 211:8 212:18
**Commission** 219:13
**committed** 77:19,19
**common** 101:11 113:12 199:18,22
**communicate** 138:20 159:8
**communicated** 135:13
**communication** 131:3 150:5,6
 151:9,15,18,25 178:22
**compelled** 114:11
**competent** 137:19
**complaint** 60:12
**complete** 22:5,13 31:8 174:3
**completed** 220:11

**completely** 20:3
**complicated** 93:22
**compromise** 209:10
**computer** 156:14,24
**concept** 94:9,13
**concern** 38:17 51:16 62:13 88:7
 88:10,24 104:19 176:5 209:13
**concerned** 31:20 38:18 57:15
 86:13 110:18 120:10 138:3,10
 139:20 145:24 159:6
**concerns** 138:8 143:25 152:24
**conclusion** 35:12 177:12
**conclusions** 102:10 128:2,9,25
 217:8
**concrete** 144:17
**concurrent** 198:25
**concurrently** 198:25
**condition** 38:3 60:14 61:3 62:18
 64:15 65:17
**conditions** 31:14 37:6,7
**conduct** 77:8,19,20 169:23
**conducted** 192:10,11 194:16
 196:9
**confession** 209:18
**confirm** 18:9 130:13 193:21
 208:2
**confirmation** 56:20 140:5
**confirmed** 61:5
**confound** 197:2
**confront** 120:20
**confusing** 118:7 122:25 161:10
 166:7
**confusion** 161:5
**consider** 38:4 58:19
**considered** 135:12 175:12 187:5
 196:15
**consistent** 32:2 33:14 41:22
 42:21 112:6 120:12 166:18,20
 193:23 194:4,10 216:15
**consisting** 220:10
**console** 110:21
**constant** 27:22
**constellation** 175:19
**consult** 28:22 30:7 31:17 32:5
 32:12 34:6 38:2,24 40:22
 49:25 66:8 99:24
**consultant** 128:11
**consultants** 66:7 188:16
**consultation** 16:18 29:7

consultations 28:19,23 29:4,24
consults 188:19
Cont'g 10:21 14:8 16:23 17:11
  19:13 25:7,19 28:16 29:20
  37:4,23 39:16 42:2 43:14 45:3
  45:14 48:6 49:18 52:16 55:2
  63:2 64:11 66:23 70:19 71:18
  72:11,20 73:3,19 74:18 76:25
  77:14,24 78:6,19 79:17 80:14
  81:4,24 83:10,21 85:14 88:14
  89:8 90:8 91:11 92:4,25 98:18
  99:6,17 100:9,18 101:3 103:6
  103:17,23 107:3 109:11 110:10
  110:25 113:5 114:22 115:6
  116:3 118:20 119:7,12,23
  120:4 121:5,10 122:9 123:20
  124:4,10,18 125:11 127:12,18
  129:2,19 133:23 134:10,21
  135:4 136:2,9,19 137:22
  141:13,21 143:13 145:21
  146:19 147:2,22 148:8 149:8
  149:21 154:4,23 155:3,11,25
  157:12,20 158:5,20 159:11
  162:3,10 166:9 167:3 168:4
  172:4 173:14 179:13 180:23
  181:21 182:10 197:4,16 198:21
  199:10 203:12 205:23 206:13
  207:13 208:16 209:25 210:13
  211:14,23 212:9 213:21 214:16
  216:3
Cont'g 55:25 110:15
contact 13:8 14:13,15,16,21
  61:24 63:19 64:2
contacted 57:6 60:23 62:9,17
  63:24 64:4,13
contacts 199:12
contained 45:7 67:7 103:8
  149:14
content 157:9
context 94:17
continue 109:13 145:5 203:3
continued 86:24 106:24 176:13
continues 49:21
continuing 37:18
contrary 198:8
contribute 114:4
contributed 114:5
contributing 90:15 143:15
  149:25 168:11

controlling 102:10,16
controversial 36:6 113:18
controversy 37:12
convention 34:18
conversation 23:14 101:22 151:3
  177:4
conversations 24:20 75:9 170:20
  171:16 177:7
convexity 98:3
conveyed 145:25
copacetic 160:19
copies 125:5
copy 3:16 7:2,4 80:18
corneal 49:15
corner 41:4 55:20
corollary 110:9
correct 8:23 15:10,11 20:25
  21:4 29:11,12,14,21,22 31:14
  31:15 32:20 33:25 34:2,8,13
  34:14 35:24 38:24,25 40:15
  41:10 43:20 48:9,21 49:22
  50:2,5,17 51:2,25 53:6,22
  55:20 56:2,7,11 61:21 62:10
  63:21,24 86:19,23 88:8,19
  89:11 90:10,13 93:4,5 94:4
  95:11,14 104:3,25 105:4
  106:10 113:10,15 123:8 125:13
  127:15 128:20 129:11 131:23
  131:24 133:2 140:11 142:20
  148:10 179:5 181:5 183:7
  202:8 203:24,25 204:4,9,16,24
  205:2,4 206:18,21 207:3,22,25
  207:25 208:3,24 209:12 210:10
  212:12 215:21 219:6,8
corrected 135:6 221:16,17,18,19
  221:20,21,22
correction 87:20
corrections 3:11 71:5 201:4,7,9
  221:8,11,14
COT 32:11 38:23 45:7 51:20
  66:21,25 67:23,23
counsel 42:19 68:22 72:25 73:5
  73:14 97:6 220:6
count 104:2,18 105:13 191:19
counties 174:7
counts 191:23,24
County 1:7 70:10 219:3
couple 66:10
course 9:8 16:9 17:7 25:13,21
  28:8 35:10 76:16 81:17 85:25

86:22 133:2 144:16 150:15
161:3 169:20,21 175:13 217:3
**court** 1:2 17:21 18:2 27:12
68:23,24 69:8 70:11 81:11,11
106:21 122:22 144:18 152:4
209:19
**courts** 106:21
**cover** 12:15 153:22
**covered** 135:22
**covering** 132:14,16
**crash** 197:6,6
**creates** 30:24
**credentials** 29:19
**criminal** 75:18 81:18 84:12
85:19
**critical** 9:21 10:2 11:21 60:14
**critically** 9:18
**cross** 4:4,5,5 68:19 139:15,16
163:20 169:12 177:23
**cry** 110:21
**Crystal** 2:17 108:4 163:22
168:18
**CT** 190:16
**culture** 87:23 88:2 207:19 208:3
208:8,10
**cultures** 87:3 113:21 194:15,17
**current** 9:19
**currently** 8:6 9:23 12:7 91:12
140:4
**cut** 160:22
**cutting** 158:16

**D**

**D** 4:2,2 5:2
**D.A.'s** 73:21 134:22
**D/L** 40:13
**D/U** 40:23
**daily** 12:12
**damage** 187:13 188:2 215:16
**dangerously** 27:13
**Daniel** 56:17
**data** 37:19
**date** 1:12 17:6 25:9 32:11 38:23
43:16 45:7 51:20 66:13,21
67:2,24 125:4,4,7 126:5
142:10 192:23,25 204:8 221:3
221:5,23
**dated** 54:12
**day** 11:12 12:18 13:3,4 49:8
58:8 75:17 101:19 108:8 126:3

131:6 137:16 177:21 202:10
208:23 219:11
**day-and-a-half** 131:7
**days** 12:16 49:6 123:8 136:14,20
136:25 137:2,5,13 187:18,23
187:24 199:17 207:21,22,24
214:24 221:9,10
**dead** 38:16 44:11,13,16 140:4
142:18,20,21 143:11 170:8
196:24
**dealt** 172:2
**Dear** 221:7
**death** 27:17 38:19,19 47:11
87:23 89:17 90:6,7,10,15,20
90:21 91:9 92:2,7,8,18 114:7
130:6 142:13,15 143:7 166:6
166:12 168:8 170:13 186:14
187:6 188:5 191:11 192:19
194:22 195:3,17 210:17,18
213:9,15
**decades** 79:6
**deceased** 83:24
**deceleration** 37:21 58:15 120:11
122:18 139:24 183:5 197:9
**decide** 138:13
**decision** 139:3
**decline** 215:2
**decrease** 215:14
**decreased** 90:6 188:22 215:3
**deep** 26:9 49:6,16
**Defendant** 3:6 78:11,16 82:8
**defendants** 1:8 7:10
**defer** 196:12
**deficit** 88:13 186:5
**definitely** 29:18 88:10 198:14
**definition** 114:15 165:3 212:15
**definitive** 103:8 196:16
**definitively** 164:8,11 204:3
**degree** 88:12 186:5
**DeLamater** 61:18
**DeLameter** 60:4
**delay** 79:23 186:19
**delete** 131:12
**deleted** 131:8
**delivered** 221:10
**deliveries** 93:22
**delivery** 154:16
**demonstrate** 193:5
**demonstrating** 49:25

**denied** 59:12,18
**denser** 98:4
**density** 165:2
**denying** 151:22
**departed** 14:22
**department** 5:13 62:9 63:5,16,23
  64:13,20 65:11 138:21 170:21
  171:17,21 173:23 179:16 201:2
  202:5
**departments** 175:2
**depend** 192:21
**depending** 33:18
**depends** 197:20 212:6
**Deponent** 221:5
**depose** 139:9
**deposed** 78:23
**deposition** 1:11 3:5,11,14,15,17
  5:8 6:22 7:2,2 16:8 17:19
  18:3 19:22 66:11 67:2,7 69:24
  70:2,4,9 74:7,7 75:8 80:19
  95:11 121:13,15 139:6 141:10
  141:22,23 143:3,25 144:16,21
  149:14 150:16 152:18 153:6
  194:24 204:7 205:4 206:8
  221:5
**depositions** 160:17
**derived** 128:3
**describe** 7:19 9:10 25:25 79:11
  83:12 96:24 97:19 126:16
  184:19 185:17
**described** 165:10 183:4 212:23
  213:4
**describes** 190:8
**describing** 33:10 178:21
**description** 5:4 187:6
**desk** 60:24
**desktop** 156:18
**despite** 44:14 102:7
**detail** 13:2
**details** 36:25 38:6 141:17
**detective** 60:24 76:2,2 147:24
**detectives** 119:18 121:7 146:2
**determination** 107:11 169:24
**determinations** 34:4
**determine** 31:13 36:25 111:7
  127:5 138:16 173:23 196:11,17
**determined** 83:25 113:20 173:24
  216:14
**determining** 38:15

**developed** 181:22
**developments** 121:24 154:7
**diagnose** 138:12 164:11 166:13
  175:4 190:12
**diagnoses** 30:24,25 202:6
**diagnosis** 31:2,6,9,10 57:19,20
  58:20 62:16 63:5,14,22 64:20
  65:12 86:10 106:17 130:11
  171:10,19 172:8 173:21 175:20
  184:19 186:6 188:7,14,17
  189:19 190:2,16 192:8,9
  208:13 209:11 217:7
**diarrhea** 15:22 40:10 49:7
**dictate** 140:15
**dictated** 131:9 178:11
**dictation** 126:10 131:9
**die** 79:25 110:4
**died** 116:9 191:25
**dies** 178:8
**difference** 101:11
**differences** 12:9
**different** 12:6,17,18,23 29:11
  29:13,16,18,18,21 50:23 55:9
  58:14 66:19 93:11,14 94:7
  102:16 103:19 125:3,5,8
  127:20 132:19 165:2 193:4
  197:6
**differential** 30:20,21 31:2,6,9
  86:10
**differentiate** 33:20
**difficult** 33:20 40:25 160:17
  202:11 217:6
**difficulties** 155:19
**difficulty** 212:2,12
**dig** 20:6
**direct** 4:4 6:18 17:13,15 18:14
  20:2 61:23
**directing** 18:8 62:16 85:22
  121:13
**direction** 214:7
**directly** 18:6 171:25,25
**Director** 11:22 12:3
**discharge** 54:16,20 56:9 59:20
  63:20 87:21 149:17
**discussed** 15:21 73:5 74:8 75:7
  75:7 92:19 140:14,23 190:7
**discusses** 177:6
**discussion** 15:13 62:17 63:3,19
  84:24 128:5,6,10 150:9

**discussions** 65:16 66:3 128:7,8
**disease** 91:13 210:14,17
**disparity** 127:24
**displayed** 71:12
**disposition** 80:16
**dispute** 77:9,20 119:25 148:3
  217:21
**disputed** 217:18
**disputing** 217:17
**distinction** 98:8
**distinctly** 98:4 153:10
**distinguish** 98:15
**distress** 60:12 213:4 215:8,9
**district** 1:2,2 68:24 84:21
  134:5,12 162:17
**divided** 201:10
**Division** 11:21 12:2
**divulging** 73:4
**doc** 46:22 54:8,9 202:19
**docs** 200:4
**doctor** 6:6,20 7:8 8:6 9:6 10:4
  12:20 13:6 14:9 15:12,25 16:6
  16:21 17:12 18:24 19:5,7,15
  23:18 25:8,23 27:4,9,25 28:17
  30:6 31:3,16 32:4,10,15 34:5
  35:21 36:14 37:5,24,24 38:22
  40:21 41:2,7 43:15 44:8 45:6
  45:22 46:13,16 47:15 48:7,11
  48:16 49:19,21 50:25 52:5,17
  52:19 53:16 54:9,24 55:4,15
  57:8,10,17 59:19,22 61:19
  62:7,12,15 63:3,13 64:12
  65:15 66:2,10,24 67:6 88:6
  89:19 110:22 118:15,21 124:5
  148:10 152:8 156:22 157:13
  161:8,14 168:5,12 171:8,9
  172:6 174:19 176:9 181:10
  187:16 188:20 194:9,17 202:9
  203:13 204:6 205:3,25 206:6
  206:14 218:11
**doctor's** 44:21
**doctors** 11:9 37:17 83:23 114:25
  137:19 188:13 199:18,19,23
  200:8,16,17,22
**document** 18:9 27:2,3 34:6 39:12
  52:7 54:24 55:4,19 58:11
  124:2 128:20 141:9 145:23
  146:8,14 147:19 148:7 205:17
**documentary** 157:22 158:6
**documented** 190:10
**documents** 22:24 69:23 71:15
  84:8 128:18
**doesn't** 22:17 24:5 39:6
**doing** 12:9,10,19 13:4,17 48:5
  111:22 144:11 179:4
**doll's** 38:8,20
**dolls** 170:3,11,15
**don't** 18:20,21 20:9,9,12 23:16
  24:8 25:17 42:5 124:24 130:25
**dopamine** 27:14
**double-check** 161:19
**doubt** 70:20 72:7
**Dr** 7:19 11:22 12:2 19:12 21:23
  22:10 24:20 40:18,22,23 42:19
  45:15 51:12,23,24 53:17,19
  59:9 60:19,22 65:16,19 66:3
  66:11 68:21 78:13 82:18 85:4
  85:10 86:13 105:4 109:2 139:8
  154:5 156:22 157:21 158:15
  160:16 162:11 163:14,22,24
  169:2,4,14,25 190:4,4 208:14
  211:8,9 214:22 218:3,3 221:7
**draw** 10:4 32:10 52:5
**drawing** 13:6 25:23 32:15 41:7
  54:9 55:15,15,18 59:19 66:24
  204:6
**drew** 86:17
**drying** 94:8
**due** 182:18 183:2 213:15,16
**duly** 3:14 220:8
**Dunnett** 56:17
**dura** 33:11 41:19
**duties** 12:6 180:11
**duty** 11:18 174:21 180:11,18
  200:21
**dying** 27:16,24

**E**
**E** 2:7 4:2,2,2 5:2,2 67:22
  221:12
**E-D-G-E** 6:14
**E.D** 57:3
**E.M.S** 49:9 215:5
**E.O.M.s** 38:7
**E720** 41:3
**ear** 60:15
**earlier** 7:2,3 38:10 60:15 62:3
  95:11 96:22 102:14 127:20
  128:22 137:24 150:17,19 151:7

Associated Reporters Int'l., Inc.

189:23 190:7 192:7 215:13
**easier** 33:19 118:13
**easily** 88:13
**EDDGE** 220:4
**Edge** 1:1,11 2:1 3:1 4:1,3 5:1
6:1,13 7:1,18,19 8:1 9:1 10:1
11:1 12:1 13:1 14:1 15:1 16:1
17:1 18:1 19:1,12 20:1 21:1
22:1,10 23:1 24:1,20 25:1
26:1 27:1 28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1,9 60:1,19
60:22 61:1 62:1 63:1 64:1
65:1 66:1,11 67:1 68:1,21
69:1 70:1 71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1 103:1
104:1 105:1 106:1 107:1 108:1
109:1,2 110:1 111:1 112:1
113:1 114:1 115:1 116:1 117:1
118:1 119:1 120:1 121:1 122:1
123:1 124:1 125:1 126:1 127:1
128:1 129:1 130:1 131:1 132:1
133:1 134:1 135:1 136:1 137:1
138:1 139:1,7,8 140:1 141:1
142:1 143:1 144:1 145:1 146:1
147:1,24 148:1 149:1 150:1
151:1 152:1 153:1 154:1,5
155:1 156:1,22 157:1,21 158:1
158:15 159:1 160:1,16 161:1
162:1,11 163:1,14,22 164:1
165:1 166:1 167:1 168:1 169:1
169:3,4,14 170:1 171:1 172:1
173:1 174:1 175:1 176:1 177:1
178:1 179:1 180:1 181:1 182:1
183:1 184:1 185:1 186:1 187:1
188:1 189:1 190:1 191:1 192:1
193:1 194:1 195:1 196:1 197:1
198:1 199:1 200:1 201:1 202:1
203:1 204:1 205:1 206:1 207:1
208:1 209:1 210:1 211:1 212:1
213:1 214:1 215:1 216:1 217:1
218:1,4 219:1,4,10 220:1
221:1,5,7,24 222:1

**Edge's** 21:23 42:19
**edit** 141:25
**educate** 180:19
**educational** 7:20
**effect** 117:13 118:23 119:4
216:17
**effectively** 10:18
**effort** 215:3
**efforts** 161:14
**eight** 44:4 130:23 131:22 147:8
208:12
**eighty** 13:25 21:17,19 201:25
**eighty-six** 21:21 24:4
**either** 33:24 58:17 65:12 78:8
78:23 86:10,10 92:9 111:10
142:14 176:13 177:18 195:19
204:4
**elaborate** 194:25
**electronic** 194:24 202:12
**elevated** 32:8
**email** 145:18
**emailed** 95:19 167:19 168:21
**embarrassing** 184:14
**emergency** 116:20
**emotional** 60:7
**emphasize** 180:7
**emphasized** 180:5
**employed** 8:7 10:6,8
**employment** 82:13
**EMS** 15:24
**energy** 197:22
**enforcement** 180:13,20 214:7
**enlargement** 98:16
**ensure** 176:17
**entail** 8:17 12:11
**enter** 135:17
**entered** 48:21 51:19,22
**entertaining** 191:6
**entire** 5:11 67:15 96:15,17
117:18,21 144:21 147:12
**entitled** 129:8 146:6
**entity** 77:7,17
**entries** 34:21 182:12
**entry** 31:4 32:19,22 44:4 46:2
46:21 48:12,13 50:4,13,25
51:5,5 52:22 53:6,8 56:10,10
61:20 62:7
**episode** 191:8
**episodes** 193:2,4

errata 219:8
error 22:4 83:3 177:24
especially 135:11 139:14
Esposito 61:9
essentially 142:21 173:20
establish 112:14
estimate 28:13 164:15 187:16,19
et 1:1 2:1 3:1 4:1 5:1 6:1 7:1
  7:11 8:1 9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1
  102:1 103:1 104:1 105:1 106:1
  107:1 108:1 109:1 110:1 111:1
  112:1 113:1 114:1 115:1 116:1
  117:1 118:1 119:1 120:1 121:1
  122:1,22,22 123:1 124:1 125:1
  126:1 127:1 128:1 129:1 130:1
  131:1 132:1 133:1 134:1 135:1
  136:1 137:1 138:1 139:1 140:1
  141:1 142:1 143:1 144:1 145:1
  146:1 147:1 148:1 149:1 150:1
  151:1 152:1 153:1 154:1 155:1
  156:1 157:1 158:1 159:1 160:1
  161:1 162:1 163:1 164:1 165:1
  166:1 167:1 168:1 169:1 170:1
  171:1 172:1 173:1 174:1 175:1
  176:1 177:1 178:1 179:1 180:1
  181:1 182:1 183:1 184:1 185:1
  186:1 187:1 188:1 189:1 190:1
  191:1 192:1 193:1 194:1 195:1
  196:1 197:1 198:1 199:1 200:1
  201:1 202:1 203:1 204:1 205:1
  206:1 207:1 208:1 209:1 210:1
  211:1 212:1 213:1 214:1 215:1
  216:1 217:1 218:1 219:1 220:1
  221:1 222:1

ethical 171:9
evaluate 30:23 38:15 47:11
evaluation 57:3 142:19
event 108:4 176:12 178:6 180:13
  191:7
events 75:13
eventually 28:7
everybody 68:11 96:4 218:17
evidence 30:12 35:14 47:3 59:5
  92:16 94:23 154:6 165:13
  168:24 193:3
evident 130:20
evolved 121:23
exact 14:20 66:7 94:25 177:14
exactly 15:16 26:5,14 58:3
  73:11 93:15 94:22 140:21
  143:24,25 164:23 165:7 177:25
  189:3
exaggerated 214:6,14
exam 26:13,25 38:6 49:13 87:24
  89:17 97:23 99:16 140:5
  175:13 187:7 196:16
examination 4:4,4,5,5,6,6 6:18
  68:19 163:20 169:12 203:11,18
  206:12
examine 142:17
examined 139:18
examiner 163:24
Examining 221:6
example 150:4 187:17
exams 187:10
excellent 178:12
exception 176:11
exceptions 219:7
excuse 17:22 176:23 214:15
exhibit 17:6 20:22 23:23 24:17
  25:9 32:11 38:23 45:7 51:20
  66:21,25 67:15,24 71:12 95:8
  95:18,25 115:18 139:6 146:6
  204:7
exhibits 13:24 19:3 74:14
  145:17 161:7 173:6
exhumed 83:25
exist 109:22 166:25
existence 33:13
expect 108:8 186:4 190:12
expected 191:19
experience 30:17 110:3 154:6
  163:3 181:7,10 182:16,18
  197:7 198:16

**experiencing** 105:8
**expert** 113:17  114:10,11  197:3
  217:23
**expertise** 59:8  93:16  164:13,17
  181:23  182:5  183:9
**experts** 114:2
**expires** 61:16  219:13
**explain** 23:17  60:19  61:2  94:16
  111:20  125:25  127:23  140:19
  160:15  170:4  177:10  178:5
  186:9  191:13  198:9  199:13
**explained** 61:7,13  88:13  119:8
  119:14
**explaining** 91:10,19  92:6  179:24
  191:12
**explanation** 30:19  51:8,10,15
  112:2  197:9
**exposed** 149:12
**extended** 199:18
**extensive** 35:15
**extra** 33:3,9  97:25  98:12  100:6
**extraordinarily** 89:15  113:11
**extremely** 8:20  60:14  61:3
  101:10  104:9
**extremities** 26:9
**eye** 34:9,15,21  113:22  170:3,11
  170:15
**eyes** 26:8  34:8,12  35:22  38:8,20
  170:7,7,14  194:18

### F

**F** 4:2
**fact** 27:18  84:2  87:13,16  88:3
  88:11  90:12  102:8  111:12,24
  114:3  123:2  134:25  151:22
  164:22  175:15  177:20  180:16
  181:22  183:3,11  186:11  189:15
  189:17  196:8  198:5  200:8,12
  204:3  208:4  217:8
**factor** 143:15
**factors** 106:14
**facts** 79:13  117:12  172:7  173:18
  179:3  185:13  217:7,16,18,19
**factual** 172:7
**fail** 221:10
**failing** 195:20
**fainted** 57:2
**fair** 88:6  116:12  129:3  132:22
  138:7  149:23  171:6  178:20
  181:15  185:23  186:2  200:9

  202:4  211:15
**fall** 197:24
**fallacy** 194:24
**false** 205:13,22  206:2,7,9
  209:18
**familiar** 34:19  94:11  213:10
**family** 26:22  28:2  61:12  75:12
  75:16  139:19  145:23,25  176:5
**Fandholt** 61:2
**far** 9:15  22:10  38:18  67:8
  109:14
**farthest** 34:25
**fatal** 114:20
**father** 114:23  173:3
**Federal** 3:4  81:11
**feel** 62:4  94:18  111:17  160:21
  217:10
**feels** 109:2,2
**fellowship** 8:3
**felt** 112:6
**field** 8:13  37:3  122:11  188:12
  196:16  197:8  199:23
**fields** 9:13,14
**fifteen** 56:13
**fifth** 54:7
**fifty-five** 126:10
**fifty-three** 107:23
**figure** 138:13  200:5
**file** 87:6
**film** 101:20
**final** 101:18  102:8,9,15,16
  103:8,15  129:5  132:15,16
  190:24
**finally** 200:2,3
**find** 52:11  54:14  96:3  97:5,9
  145:17  174:7  180:6  181:3
  186:4  187:8  214:18
**finding** 35:8,19  36:7  38:9  44:22
  47:16  63:17  99:14  102:22
  114:2  165:14  191:16  211:2
**findings** 33:23  63:23  64:20  65:8
  65:12  88:11  95:5  97:24  99:16
  99:19  100:11  102:17  103:20
  126:2  138:11  148:24  149:13,15
  149:23  150:23  162:21  175:19
  197:2  208:22
**finds** 100:20
**fine** 19:24  41:7  44:20  67:17,17
  96:11  108:18,23  109:3  145:19
  152:22  196:4  216:25

Associated Reporters Int'l., Inc.

Page 238

**finish** 134:11 141:18 153:5
  207:11 209:23,24
**finished** 23:6
**first** 2:8 13:7 14:13 25:24
  26:18,20 40:2 46:21 48:23
  90:25 101:20 121:4 141:25
  145:13 146:20 147:4 152:12
  178:3 187:7,10 202:21,25
  209:24 216:5,5 221:13
**fit** 120:12
**five** 2:18 28:14 64:9 79:9
  104:13,19 169:7 187:24 189:11
  215:6
**five-minute** 107:20
**fixed** 49:15 89:16
**flag** 180:12
**fluid** 31:22,25 33:4,7,11,14,22
  35:23 47:21,25 48:7 88:12
  93:8,11,19 95:21 97:25 98:3,7
  98:13 100:6 102:21 128:14
  129:17 130:16,17 165:6,7
  190:8,14
**focus** 13:3 29:11 107:6,8,10
**focused** 192:8,9
**folks** 15:14
**follow** 57:7 114:24 136:4
**follow-up** 108:3 163:13 170:2
  176:8,13
**following** 164:3
**footage** 162:12
**force** 122:20 198:7,16
**forced** 140:2
**forceps** 154:15
**foregoing** 219:4 220:4,9
**forever** 203:5,7,8
**forget** 21:22
**forgot** 178:23
**form** 3:8 10:20 25:16 29:15
  37:10 42:22,23 43:4,19 48:4
  61:17 62:23 70:18 72:9,24
  73:9 74:7 77:23 78:3 79:14
  81:3,23 82:4,7,18,25 83:14,16
  88:9 90:23,24 91:23 92:10
  99:5,10 100:8,14,15,16,22
  102:24,25 103:2,3,21 106:18
  106:19 107:13,14,20 110:6
  114:9 115:5,13,16 117:15,19
  119:6,10,21 120:3,23 121:9
  122:5,6 123:10 126:18,19
  128:17 129:15 133:8,9 134:9

  134:16,17,19 135:2,7 136:8,16
  136:17 137:3 141:12 143:8,9
  143:10,18,19,21 148:6 154:20
  154:21 155:2,9,23,24 157:17
  159:4 163:5,6 166:21 181:17
  197:11,15 207:8 208:15 209:22
  210:11 211:5,19 214:10 215:23
  216:2
**formal** 99:12
**former** 76:2 95:16
**formulating** 58:20 62:15
**forth** 123:4 150:5,6 177:11
  198:19,24 199:2
**forty-eight** 54:13 210:18
**forty-five** 108:11
**forty-four** 60:5
**forward** 109:15 202:14
**fought** 200:3
**found** 60:10 72:22 131:4 164:9
  174:6,11 185:11 186:6
**foundation** 18:5,18 157:19
**Fountain** 1:6 60:24 76:2,3
  147:24
**four** 5:16 9:16 22:22 56:13
  147:18 164:7 187:24 214:25
  215:6
**four-** 30:17
**four-month** 15:17 41:14 210:16
**four-month-** 46:25
**four-month-old** 40:8 48:25 60:8
  110:17,23
**fourteen** 146:16,16
**fourteen-** 52:21
**fracture** 44:6,21 50:19 56:20
  83:24 84:2 99:9 130:24 131:4
  132:5,9,25 134:14,15,25,25
  177:6,12,15,17 198:14,15
**fractures** 165:6
**frank** 160:17
**frankly** 180:3,10 189:5
**fresher** 193:10
**front** 17:5 18:10 45:8 59:21
  61:17 208:9
**froze** 200:7
**full** 7:17 8:10 10:15 22:24
  27:12 60:9 106:21 107:16
  113:22 207:23
**fully** 69:11
**function** 187:3,11,14 195:12

**functioning** 27:20 104:20,20
**funny** 183:23,24
**further** 3:7,10,13 46:23 67:10
  165:10 168:14 206:10 218:10

---

**G**

**G** 4:2
**gag** 49:15
**gain** 175:3
**gathering** 185:2
**general** 2:10 11:18,19 148:21
  169:16 174:15 180:19 187:18
**General's** 65:22
**generally** 12:9 94:10 148:22
  169:23 183:2 200:8
**gentleman** 162:16
**German** 190:4 211:9
**getting** 19:3 71:13 132:18
  153:18 166:5 175:9 186:24
  199:20 200:15 208:2
**Ginsberg** 2:6,7 4:4,6 6:3,17,19
  7:9 10:12 13:17,22 14:3,8
  16:16,20,23 17:11,15,18,21,23
  18:2,5,12,17,23 19:10,13 20:4
  20:9,12,16,24 21:19 22:4,9,17
  22:21 23:3 24:5,7,10 25:6,7
  25:19 28:16 29:20 37:4,23
  39:16 42:2,9,12,14 43:7,13,14
  44:23,25 45:3,13,14 48:6
  49:18 52:16 54:23 55:2,23
  63:2 64:8,11 66:13,16,20,23
  67:12,19,23 68:4 70:17 72:9
  72:24 73:9 79:14 81:2,23 82:4
  82:17 83:16 90:23 91:23 92:11
  92:15 96:13,15,17 99:5 100:8
  100:14,22 102:24 103:21
  107:13 110:6 114:9 115:5
  117:15,17,20 119:10,21 120:3
  120:25 121:9 126:19 133:15
  134:9,16 135:2 136:8,16
  141:12 143:8,18 144:14 147:14
  148:5 152:16,20,23 153:11,14
  153:20 154:20 155:2,9,23
  157:17 159:19 163:5 168:18,23
  169:2,5,8 172:23 173:2 202:24
  203:9,12 205:21,23 207:8
  208:15 209:21 210:11 211:19
  214:10 217:20 218:10,19 221:6
  221:12,12
**give** 6:8 13:2 28:12 29:9 64:8

74:3 83:3 98:25 110:8,11,12
  114:12 118:10 120:18 156:15
  160:21 162:7 165:2 200:22
  209:2 211:10 217:23
**given** 20:15 72:2 122:3 127:24
  136:24 161:6 165:20 196:7
  198:5
**gives** 164:25
**giving** 98:21 185:5 220:7
**glad** 13:4 27:8
**Glasgow** 189:6,17
**global** 195:11 216:9
**go** 14:3,18 19:8,14 23:7,25
  24:22 38:18 39:12,25 41:2
  42:3 43:7 46:9,23 47:10 52:10
  54:6 56:23 58:6 66:17 68:14
  78:7,21 83:7 89:13 95:2,19
  97:8 107:23 109:6 125:9 130:4
  135:21 146:23 157:4,5,10
  160:18 161:12 163:19 167:25
  170:7 173:12 178:18 191:23
  195:14 200:4,18 202:20 204:12
  206:23 212:21 217:21,24
**goes** 9:18 105:22
**going** 6:8 7:12 13:18 16:12
  17:13 18:19,23 19:4,23 25:15
  37:9 48:3,4 68:14 69:2 82:24
  83:7 95:7 96:2 97:9 98:19
  107:19,25,25 108:3,8,12 109:6
  109:13 111:16 112:20,22
  115:17 123:4 128:16 141:24
  144:5,8,21 145:3,10,19 152:8
  152:14 153:9 157:13,24 158:7
  158:13 159:21,23 161:12,17,19
  162:6,7 163:9 164:3 165:14,21
  167:16 169:25 173:5 176:18
  178:24 185:10 186:25 194:25
  202:14 203:6,6 206:14
**good** 64:7 68:21 108:15 163:8
  165:5,7 176:2 179:9 184:7,7
  196:2 211:9 218:14
**gotten** 115:19 178:16 214:13
**graduated** 7:22
**Gram** 113:20 194:15,17
**granddad** 172:21
**grandfather** 172:23
**grateful** 111:4
**grave** 61:3
**great** 135:16 161:17 172:21
  173:9

**greater** 13:2
**greatly** 188:21
**GRIFFIN** 2:6  221:12
**guess** 40:13  91:2  107:4  144:4,9
  145:14  147:20  152:15  172:5,5
**guilty** 72:22
**guys** 22:7  108:8  156:21

### H

**H** 5:2
**halfway** 97:18
**hall** 136:5
**halt** 195:20
**hand** 6:7  34:24
**handled** 134:7
**handling** 182:16
**handwriting** 70:25  141:7
**handwritten** 32:20  70:3
**Hang** 96:7
**happen** 93:21  101:24  102:3
  136:23  166:6  184:4  198:15
**happened** 84:3,7  165:15  175:18
  177:25  198:16
**happening** 145:12  150:13,15
  197:24
**happens** 94:3  110:7  121:20
  186:21
**hard** 14:25  39:4  91:7,10,19  92:6
  110:21  126:22  139:14  140:2,7
  140:9  160:21  161:8  191:11
  198:12  205:10  214:15  217:12
**hardcopy** 125:2
**hasn't** 20:11
**haul** 218:12
**head** 32:23  33:15  36:12  37:5
  39:7  40:12  50:17  53:10  99:8
  99:20,20  107:9  139:19  147:4
  159:7  170:14  182:24  198:17,24
  199:14  212:23
**heading** 219:5
**hear** 23:13  24:19  59:15  89:19
  90:3  114:25  117:21,24  149:5
  151:20,24  154:2  155:13  158:11
  158:18  172:19  193:24  202:17
**heard** 94:12  98:17  114:19  151:18
  152:2,2,3,3  174:11  177:19
  201:22,24,25
**hearing** 3:16  214:4
**heart** 115:9
**heels** 20:7

**help** 13:13  145:17  151:13  165:2
  188:16
**helped** 175:20
**helpful** 129:21  164:23
**helps** 141:19
**hem** 181:2
**hematologist** 112:5,6
**hematology** 30:5  32:5  111:18
**hematoma** 39:6,9,21,23  40:13
  41:15,17,21  47:2  50:15  51:14
  53:9  95:14,22  98:23  99:24
  100:7,12,21  101:2  102:22
  111:11  122:20  128:15  129:18
  139:19  154:12  164:9  166:16,23
  180:9,25  188:18  190:6,8,13,24
  191:2,21,23  192:22  197:12
  198:7,20  210:24
**hematomas** 44:3  47:23  51:7  58:14
  60:13  93:25  94:6,13  102:20
  126:13  127:14  128:13  154:8
  164:6  167:5,8  181:2  183:3
  186:3  190:22  191:4,14  192:15
  193:8
**hemispheric** 50:15
**hemophilia** 167:13
**hemorrhage** 30:10  34:12  35:4,12
  35:15,17  113:12  114:8,19
  166:16  188:18
**hemorrhages** 49:22  166:17,23
  181:2,4  191:17
**hemorrhaging** 35:22  112:15  113:8
  182:17  183:3
**hereof** 219:5  220:7
**hereto** 220:6
**hey** 173:4  178:23
**Hicks** 56:25  75:12
**high** 36:23  139:23  142:7  197:22
  198:16
**highest** 11:15
**hinky** 197:18
**Hippocratic** 180:12
**historically** 36:4
**history** 9:8  15:21  26:19,20,22
  40:3,4  49:6,9  52:6,20  58:7
  59:2  97:3,24  111:6  139:20
  140:22  145:23  146:2,3  156:7,8
  175:9,9,12,13,16,17  176:17
**hit** 157:6  172:18  198:13
**hitting** 37:16  58:16  122:18
  123:3  197:22  198:6,17  199:6,7

205:10
**hold** 8:9 9:23 10:10 22:6,6,7,7
   22:18,19 24:6,8,11 55:13
   108:2 109:4 161:21,23
**holding** 109:20
**holds** 106:23 109:19
**home** 12:23 57:5 61:7
**honest** 22:22 155:16
**honestly** 160:20
**honesty** 202:13
**hoping** 108:14 164:2 207:3
**hospital** 14:17 15:14 16:10,25
   17:8 25:10,14,21 28:3 40:10
   49:5 56:18 60:9 61:24 66:5
   76:16 77:6,17 80:23 81:6 88:6
   138:21 176:18 188:25 192:7
   208:11
**hospitals** 9:17
**Hotline** 61:16
**hour** 108:11
**hours** 11:13 178:11 187:21,25
   195:6,15,19 199:18 200:9
   210:18
**hundred** 22:25 74:9 86:5 123:22
   146:16 201:17,23 202:2 214:25
**hundred-hour** 52:22
**hundreds** 181:14,18
**hyphen** 33:4
**hypo** 35:5
**hypothermic** 105:4
**hypotheticals** 217:16,23

**I**

**I--** 73:10
**I.C** 116:23
**I.C.P** 47:3,4
**I.C.U** 8:4,19 11:23 110:22
   116:22,23 137:20,21
**I.V.'s** 26:11
**I'd** 217:11
**I'll** 32:12 113:25
**I'm** 7:12 13:22 37:9 42:24
   115:24 127:8
**idea** 102:7 162:24 190:17 191:6
**ideally** 196:23
**identical** 101:10
**identified** 43:20,22 103:12
   114:11 138:24 139:2
**identify** 55:3 214:19
**If--** 96:20

**ignored** 184:6
**ill** 9:18
**illustrate** 150:19
**image** 34:24
**imagine** 117:16 179:23,24 197:23
**imaging** 190:13 192:11,13
**immediate** 61:12
**immediately** 106:16
**immune** 104:20
**impact** 37:21 139:23 142:7
**impending** 38:19
**implies** 151:5
**imply** 153:9
**import** 50:20 51:13
**important** 38:4,6 111:5 144:23
   156:7,12 174:5,24,25 175:19
   176:21 180:19 188:19
**importantly** 130:9,10
**impossible** 27:21
**impression** 27:5,7 51:2 58:12,13
   98:12 100:21 102:15 132:25
**impressions** 129:4
**imprisoned** 169:19
**improper** 20:3
**improve** 204:21
**inaccurate** 159:3
**inappropriate** 150:6
**inborn** 167:11
**incident** 69:14,22 84:9 85:24
   163:4
**include** 195:18
**included** 26:16
**includes** 6:22
**including** 57:5 61:6 170:13
   182:8,11
**inclusive** 202:6 220:11
**incomplete** 22:2
**incorrect** 99:3 132:2 133:21
   134:3
**increase** 47:20
**increased** 47:3 191:18,19 215:3
**increasing** 15:23 50:22
**incredibly** 181:3
**incumbent** 150:18
**incur** 154:8
**independently** 70:23
**indeterminate** 216:13
**Index** 221:4
**indicate** 35:16 38:12,13 50:21
   139:16

**indicated** 30:12 31:16 32:4
  49:24 57:9,10 203:16
**indicates** 34:11 37:20 39:3
  49:22 62:8 70:13 98:5
**indicating** 36:7
**indicative** 58:15 191:6
**indirectly** 172:2
**individual** 132:11
**individuals** 132:8,11
**infant** 183:6 191:20
**infants** 176:25
**infected** 210:8 215:20
**infection** 87:7 88:25 90:20
  105:18,22,25 111:12 148:13,19
  155:8 184:17,21,25 185:4,7,18
  213:16
**infections** 156:5
**infectious** 91:13
**influence** 63:5,11,16 113:24
**info** 57:3
**information** 67:6 73:17 101:6
  123:18 132:18 175:3 176:16
**informed** 121:16
**initial** 14:23,24 27:5,7 59:24
  59:25 102:14 129:4 132:25
  175:13 208:11
**initially** 136:5 187:6 212:5
**initials** 131:13
**injuries** 60:20 99:20 119:15
  174:17 183:5 191:12 193:22
  194:4,9 196:17
**injury** 30:9,14 32:3 37:15 38:14
  41:22 56:25 57:9,12,19 58:16
  59:12 76:18 94:22 107:9 112:9
  120:11 122:18 138:2 139:22,23
  139:24 140:6 141:25 142:7,8
  165:4,22,23 179:25 195:11,23
  196:6,11 197:9 198:9 215:10
  215:18 216:9
**instance** 208:21
**insult** 43:8
**Int'l** 220:12
**intact** 98:11
**intensive** 8:14,16,23,24 9:3
  10:18 11:10,16 12:3 28:10
  182:8,14
**inter** 35:3
**interaction** 27:23 56:10 63:4
**interactions** 65:24 102:3 136:21

**interesting** 184:10 191:24
**internal** 10:3
**INTERNATIONAL** 221:2
**interpretation** 101:9 102:5
**interrogate** 121:7
**interrogating** 121:17
**interrupt** 36:11
**intervention** 47:14
**intracranial** 47:5,16,22 123:6
**intraretinal** 35:15
**intraspinal** 130:16,17
**intubated** 15:20 40:11
**intubation** 212:24
**investigated** 175:22
**investigating** 136:13 139:3
  141:5
**investigation** 5:13 76:3 169:22
  169:24 194:15 214:7
**involve** 128:8 197:22
**involved** 9:7 75:22 76:3 85:23
  92:24 183:17 208:23 217:9
**involvement** 69:5,14 75:15 90:18
  183:11
**involves** 37:16 154:15
**involving** 81:19,21 179:25
**issue** 111:3 134:23 149:25
  151:19 167:11 186:3
**issues** 49:13 106:10
**it'll** 108:14
**it's** 33:19 42:21 54:8 70:12
  98:6 211:11 218:2
**item** 43:24
**iterated** 188:21

---

**J**

---

**Jackson** 184:11,11
**Jan** 213:11
**Jasper** 61:9
**Jermaine** 40:18,22,23
**job** 12:10 19:3 120:18 138:13
  164:19 174:2 175:24,25
**Johnson** 2:16 163:23
**journal** 182:11
**Judge** 184:3
**judgment** 175:17
**judicious** 153:17
**July** 1:12
**jump** 74:13 149:12

---

**K**

---

**Kardos** 214:23
**keep** 7:13 16:4,25 27:12,15,16
 27:23 79:16 128:17 164:2
 170:9 191:2 203:6,6 217:13
**keeping** 168:24
**kept** 16:9 17:6 25:13
**kid** 91:7 106:24 107:16
**kid's** 91:4
**kid's** 114:23
**kids** 114:17 184:12
**kind** 37:20 122:12 123:2 166:11
 176:10 177:11 196:6 197:18
**kinds** 174:17
**Klein** 2:3,4 4:4,6 37:9 39:13
 41:24 42:16,18,24 43:2,5
 44:19,24 45:2 48:3 62:23 68:9
 68:20,22 70:19 71:13,18 72:11
 72:20 73:3,19 74:17,18 76:25
 77:14,24 78:6,19 79:17 80:14
 81:4,24 82:15,20 83:5,10,21
 85:10,14 88:14 89:5,8 90:8
 91:11 92:4,25 95:17,23 96:6
 96:11,16,19,24 97:7,13,22
 98:18 99:6,15,17 100:9,18
 101:3 103:6,13,17,23 107:3,21
 107:24 108:9 109:11 110:10,25
 112:22 113:5 114:8,13,22
 115:6,20 116:3 118:2,6,20
 119:7,12,23 120:4 121:5,10
 122:9 123:15,19,20 124:4,10
 124:18 125:5,11 126:22 127:3
 127:7,11,12,18 128:19 129:2
 129:19 133:23 134:10,21 135:4
 135:9,14,17,21 136:2,9,19
 137:7,9,17,22 141:13,21
 143:12,13,22 145:21 146:12,15
 146:19 147:2,16,19,22 148:8
 149:4,6,8,16,21 153:4 154:4
 154:23 155:3,11,25 156:17,21
 157:2,7,10,12,20 158:2,5,13
 158:15,18,20 159:11,21 160:7
 161:17,25 162:3,10 163:8
 164:4 166:2,21 170:3 171:23
 172:20,25 173:8 179:6 180:15
 181:16,25 182:21 183:18
 185:11,13,16 188:20 196:19
 197:15 198:11 199:4 200:13
 202:20,25 203:5,18 205:16
 206:13 207:10,13 208:16
 209:23,25 210:12,13 211:14,23
 212:9 213:21 214:15,16 216:3
 216:25 217:15,22,25 218:6,14
 218:17
**knew** 15:17 117:13 183:19 207:18
 209:3 210:6
**know** 11:7 13:2 16:13 18:19,20
 23:5,5,6 24:3,8,9,12,17 28:5
 28:7 31:7 35:17 36:4,12,15,16
 36:19,22,23 39:8,24 40:17
 42:17 43:4 48:18 53:21 54:18
 55:5 57:13 59:2 62:25 63:7,10
 64:12,16 65:19,22,23 67:8,16
 68:7 72:4,12,14,21,23 73:11
 73:13 75:11,22 76:4 80:4,8,9
 80:11,12,15 81:10,13 82:22
 83:20 84:4,18 85:3,10 87:12
 87:14 90:17 91:2,9 92:8 94:8
 94:19 95:5 96:21 97:17 99:23
 100:2,5,7,10 102:3,12 104:8
 107:9 108:13 109:17,18 110:8
 110:15,23 111:8,15,15,16,19
 111:19 112:3 114:13 115:22,25
 116:8,8 121:24 122:4,8,15,22
 123:2,17 124:6 130:19 131:5,7
 131:12,22 132:7 133:19 136:22
 139:12 140:24 141:3,10 142:12
 142:14 144:4,20 145:11,25
 150:17 151:8 152:7 153:16,18
 153:19,22 154:16,16,18,24
 155:6 156:5 157:15 158:17,25
 160:15,18,20 161:4 165:5,11
 166:4 167:8,9 174:8,16 176:6
 177:16 180:16 181:18 183:12
 183:24 184:9 185:9,15 186:13
 186:15,16 187:17,24 188:18
 193:14 194:19 196:21 201:12
 201:21 206:15,25 208:3,8,22
 210:4,7,7,8,9 211:8,9 212:22
 214:13,19 215:18 216:6,6
 217:10 218:12
**knowing** 192:19 193:13,13
**knowledge** 74:2 199:22 206:6
 217:14
**known** 63:8

**L**

**laboratories** 26:21
**laboratory** 55:6,7,20
**LAINSON** 220:3,15
**language** 57:14 129:13 138:2

```
large 33:3 97:24 98:5,12 100:6
larger 97:25
law 69:8 180:12,19 206:4 214:7
lawsuit 76:18 84:11
layers 94:7
layman's 198:8
lead 102:7 130:6 138:24
leading 73:14 182:2
Leah 2:14 19:11 21:25
learn 87:5,25 130:20
learned 84:5 105:3 169:22
learning 105:8
leave 112:22
leaving 15:5,6 176:18
lecturing 182:6
led 73:7 111:8,10 181:23 188:6
Leestma 213:11
left 34:18,23 35:2 40:24 53:16
  61:17 98:4,14
left-hand 48:19
legal 109:23
length 144:24 201:19
let's 14:3 20:17 43:7 46:12
  137:8 152:16 153:21,22 217:24
lethargy 15:23 88:23 213:6
leukopenia 105:11
level 16:5 186:5 189:4
levels 101:17 200:17
liaise 174:25
lieu 173:2
life 60:9,20 91:5 107:17
lifted 55:11
limited 15:19 57:3 90:18 91:2
  210:6
limp 60:10
line 40:12,24 46:22 78:11 82:10
  83:6 131:12 135:11 178:25,25
  179:10 188:15 205:8,12 212:3
lines 91:6 106:24
lingo 185:21
lining 33:12 41:19
link 168:21
list 9:18 30:24,25 31:5 43:20
  43:22,25 44:5 120:15,17
  126:12 129:12 131:5 132:22
  168:24 216:6
listed 131:21
literally 117:13
literature 154:11 182:23
```

```
litigation 84:12,12,14
little 23:12 45:5 48:12 53:4
  54:17 95:10 153:22 158:17
  159:15 187:2 198:3
live 60:21 165:11 196:23
LLP 2:13
load 159:23
locate 96:22
location 1:14 176:19
locations 193:18
log 112:21
long 107:24 181:10 199:20,24
  200:2,2,9,12 201:21 202:11
  218:12
longer 64:5 115:22 135:23
look 19:2 23:4,25 24:16,18 30:8
  38:22 45:15 48:12 75:7 86:4
  124:7 133:19 151:13 155:22
  163:10 165:12 194:8 213:7
looked 69:21 71:15 95:10 133:18
looking 23:16 24:17 26:14 43:15
  44:8 45:9 46:20 54:19,20
  69:18 121:25 125:22 130:23
  135:14 145:22 147:3 166:3,4
  170:9 189:25 196:22 211:11
looks 40:19 46:17 51:6 52:7
  53:17 54:12 55:9,10,17,17
  71:3 141:7
loss 195:12
lot 11:5 103:4 132:19 153:18
  167:8 177:3 179:25 201:22
  207:20,21 209:5 212:4 217:6
loud 82:23
low 16:3 27:14 88:18 89:10 90:5
  91:5 104:2,9 105:12,14 187:12
  187:25 195:8,9,16 196:5
lowest 189:9,12
luck 218:14
lunch 107:25 108:5,15,20,25
lungs 115:9
lying 170:6

                M
M 4:6
M.D 1:11 2:16 56:16,24 57:8
  219:4,10 221:5
M.R.I 98:8,8,14 129:21,24 130:5
  164:23,24 165:8,16,18,21
ma'am 21:24
machine 212:8
```

**macular** 34:12  35:21
**mad** 107:18
**main** 174:21
**making** 27:21  144:24  175:17,25
  188:13  203:19,21
**male** 41:15  47:2  49:2,2,3,3
**malfeasance** 82:11,12
**malpractice** 76:15,21  77:8,18
  82:12
**management** 56:4
**manipulated** 106:25
**mark** 66:20  96:9  146:11  157:25
  158:2  167:21  173:7
**marked** 5:3  13:18,20  16:7,13
  17:5,10  18:10  19:4  20:24
  23:23  50:18,21  66:25  96:9,10
  96:21,23  109:22  115:18  146:10
  161:6  167:17
**marking** 115:21
**marrow** 104:24
**mask** 151:25
**Mason** 1:6  75:4,21  146:7
**mass** 35:5
**massive** 159:6
**materials** 6:21  220:12
**matter** 7:11  22:17  24:5,7  33:8
  42:12,15  61:25  62:5,9,14  69:5
  72:3  80:10  81:18,21  85:24
  210:18
**█████** 6:23  13:8  14:13  25:25
  27:10,13  28:2,18  29:25  38:7
  41:9  44:10  57:10  59:10  62:18
  63:15  64:14,21  65:13,17  66:4
  85:16  103:24  105:3  106:9
  107:7  136:21  139:18,20,22
  140:3,4,7  141:25  145:24
  155:19  164:7  166:15  168:8
  170:10  171:20  172:9  210:8,15
  212:10
**█████'s** 28:24
**MAYNARD** 2:13
**mean** 10:24,25  11:4,5,6,7  12:8
  16:15  19:4  22:23  33:6  53:11
  54:18  92:7  94:16  99:23  122:13
  133:17,20  137:5  139:12  160:20
  175:6  179:7  183:21  185:18,20
  185:21  187:20,23  188:16  199:6
  203:20  207:19
**meaning** 76:13  195:21

**means** 11:8  31:8  35:17  50:16
  54:4  70:25  94:17  114:15  170:4
**meant** 150:19  186:9  191:13
  204:25
**mechanics** 198:9
**meconium** 155:13
**med** 7:23,24,25  8:2,5,7  10:9
  14:18  15:15  22:20  23:4  187:5
  187:8,11
**medical** 5:6,11  11:25  16:10,25
  16:25  17:4,7  22:24  25:9,13
  30:12  31:4  37:3  49:9  58:7
  61:24  66:5  69:18  74:8  76:12
  86:6  96:17  103:25  104:6  107:7
  119:20  121:22  138:11  139:4
  149:15,16  163:24  170:18
  171:10  172:8  173:18  175:13
  178:16,18,19,22  181:24  182:6
  185:20  192:8,11  201:17,17
**medication** 16:4  26:13  27:15
  52:7,21  192:3
**medicine** 8:13  9:22  10:3  11:22
  121:23  122:11  154:7  155:21
  156:4  181:11
**meet** 60:6  73:22
**member** 9:20  62:18  63:4,15  64:19
  65:10
**members** 28:2
**memory** 13:21
**meninges** 105:23
**meningitis** 105:25  106:7  215:20
  216:7
**mental** 58:22  90:6
**mention** 38:7  98:17  149:9  190:8
  190:24  204:24  205:2  211:2
**mentioned** 128:22  143:6,14
  175:16  184:15  186:4
**merc** 155:13
**merely** 98:7  140:7
**met** 60:16,19  61:10  64:22,22
  119:19
**method** 196:10
**Michael** 1:7  2:7,16  7:9  22:18
  24:6,12  36:11  42:7,10  44:19
  64:5  153:13  163:24  174:15
  184:11,11  202:20,22,23  221:12
**microphone** 112:20
**microscopic** 208:19
**mid** 49:14

**middle** 32:23 38:8 45:5,25 46:3
  97:15 121:17 170:7
**Mike** 114:14 172:21
**mind** 106:8,12 114:4 143:24
**minded** 191:3
**mine** 188:16
**minimally** 26:3,5
**minute** 23:8 203:2 215:6
**minutes** 57:21 64:9 68:7 108:11
  180:6 196:21,25
**misconduct** 169:24
**misdemeanors** 206:3
**misdiagnosis** 79:22
**misleading** 211:13
**missed** 131:17,17,18 179:11
**missing** 26:25
**misspoke** 38:18
**mistaken** 99:3
**mistakes** 82:2 83:13 133:4
**Mitchell** 2:14 10:20 13:20 14:2
  16:12,17 17:9,13,17,20,22,25
  18:4,7,14,21 19:2,11,11,23
  20:6,11,14,21 21:8,11,15,25
  21:25 22:5,8,12 23:22,24 24:3
  24:13,15 25:15 28:12 29:15
  45:10 49:11 54:25 72:17 73:16
  74:13 77:11 78:17 80:9,13
  82:24 83:8 88:9 89:3 91:21,25
  92:10 95:15 96:20 97:2,11,17
  99:11 103:3,10,14 106:19
  107:19 110:13 115:17 117:23
  118:13,17 119:6 120:23 122:6
  123:10 124:8,25 125:7 126:18
  128:16 129:15 133:8,17 134:17
  135:7,10,16,20,25 136:17
  137:3,5,8,12 141:18 143:11
  144:3,8 145:10 149:11,20
  150:21 151:8,12,17,23 152:12
  152:18 153:2 158:16 159:4
  160:2,12,24 161:3 163:6
  197:11 205:19 211:5 216:21
  217:4
**mixing** 128:17
**mom** 49:7
**moment** 14:4 20:20 22:8 23:8
  24:25 36:11 124:5 163:10
  168:17
**month** 125:19 177:22,25 178:6
  179:12 186:16

**month-old** 30:18
**months** 8:4 93:9 164:7
**months'** 192:20
**morgue** 178:13
**morning** 44:13,15
**morphed** 100:11
**mother** 56:25 60:7,10,17,19
  155:7
**motion** 18:25 19:24 152:14
  160:25 161:11
**motor** 36:23 59:3 120:13 197:6
  197:24
**move** 18:3 26:8 38:21 44:17
  109:15 135:13,15 137:23 145:5
  145:17 161:14 170:6,8,9
**moved** 198:18
**movement** 49:16 123:3 197:22
  198:2
**moving** 170:14 198:24 199:2
**MRI** 190:17
**multiple** 12:14 42:20 91:6
  100:25 102:2 128:3,24 174:12
  193:2
**mumble** 152:3,3
**murder** 117:12 118:23 119:18,19
  120:21 147:25 148:3 159:13
  162:25 163:2 179:17 203:17
**murdered** 116:15,16
**mute** 23:13 24:19 160:8,13
  172:19
**muted** 154:3 202:19,22,23

─────────────── **N** ───────────────
**N** 4:2,2 5:2
**N.S** 48:15
**name** 6:12 7:9,17 9:2 21:22,23
  76:8 81:5,7,13 134:6 141:5
  163:22 169:14 221:4
**named** 13:8 74:23 75:4 77:21
**nap** 200:18,23
**narrative** 139:9 146:7
**narratives** 74:14,20
**narrow** 103:5 132:7
**national** 183:17
**near** 48:8 90:7 186:13
**necessarily** 29:17 148:17 166:18
**necessary** 180:6 200:23
**need** 7:5 18:21 19:7 21:6 42:5
  46:8,9 58:10 87:20 108:15,20
  108:24 112:21 145:8 146:23

158:24 160:5,12,14,22 166:8
167:17 168:16 176:6 178:18
200:18 216:21
**needing** 27:24 174:12
**needs** 30:20 140:8 160:4 205:9
**negative** 87:23 208:6,8
**Neglect** 61:15
**neither** 218:2
**nerve** 35:4
**neural** 15:19
**neuro** 38:6 47:12 53:5,8 89:17
129:7 187:7
**neurologic** 15:19 44:9 88:12
187:3
**neurological** 186:5
**neurologically** 15:18 27:18
**neurologist** 53:20 103:18
**neurology** 188:4,10
**neuropathologist** 213:11,14
**neuroso** 47:12
**neurosurgeon** 40:15 51:25 102:4
129:7,12 190:25 192:24
**neurosurgeon's** 190:22
**neurosurgeons** 33:24 34:3 52:4
128:23 164:16 189:23
**neurosurgery** 30:2 31:17 38:24
46:14,15,18 92:17 99:24 101:2
101:5,8 123:17 128:5,23
132:10,15,16,17 177:18 188:10
188:12 190:5,5,19
**neurosurgical** 47:12,13 211:7
**never** 114:19 122:23 137:15
166:22 167:6 172:12 183:18
200:10,20 208:7 211:10
**new** 1:2 2:5,5,8,10,12,15,18
61:15 70:10 78:12 82:9 154:13
169:16,17,18 206:4 218:8
221:14
**newer** 193:10,17 216:14,15
**news** 183:17
**newspaper** 122:16
**NICU** 49:9
**nights** 12:17
**nine** 169:6 182:17,17 208:12
**ninety** 44:14
**ninety-** 147:7
**ninety-eight** 146:16
**ninety-nine** 167:9,9 182:17
**non** 90:19

**non-** 138:8 197:13,17
**non-accidental** 30:19 37:2 57:15
58:23 93:3 138:3,14,22
**NON-PARTY** 1:10
**non-traumatic** 142:13
**noon** 15:10 68:10
**normal** 98:10 203:23
**Normally** 170:5
**NORTHERN** 1:2
**notary** 3:12 219:12 221:9
**note** 26:15,16,17 40:23 41:3,8
43:16 45:11,15 46:10,13,16,18
46:18 47:9 48:4,16 49:21
51:18,21 53:14,22,23 54:4
62:22 64:17 70:17 78:10 81:2
96:20 101:2 120:25 123:25
125:8,24 126:3,9 145:10 148:6
149:17 154:21 178:13,15,18
182:3 190:7 214:18,18,22,22
214:23
**noted** 38:9 44:6 49:8 130:24
135:20 193:7 219:5,7
**notes** 45:22 53:25 131:9 135:14
163:10 178:9,9 190:6 191:3,5
**notice** 172:20 178:17
**noticed** 133:21
**noting** 110:3
**notwithstanding** 189:6,15,16
200:8 209:4
**number** 11:7 20:24,24 43:25
47:17 61:9,16 67:17 96:3
126:11,25 127:2,13,24 129:11
130:23 131:22 146:11,15 147:7
176:4 216:11 220:10 221:4
**numbered** 97:18
**numbers** 60:5,25 201:22,24
**nurse** 61:10,14,14
**nurses** 137:19
**nursing** 12:4,23
**NY** 2:10

---

### O

**O** 4:2,2
**O.R** 130:5
**O.S.H** 40:9
**O'CONNOR** 2:13
**oath** 69:6 152:8 180:12
**object** 10:20 16:12 17:9 25:15
37:9 58:16 71:19 72:9,24 73:9
77:23 78:2 79:14 81:23 82:4,5

82:7,18,25 83:14,16 88:9
90:24 91:23 92:10,11 99:5,10
100:8,14,15,22 102:24 103:2,3
103:21 106:18,19 107:13,14,19
110:6 114:9 115:5,12,16
117:15,19 119:6,10,21 120:3
120:23 121:9 122:5,6,19
123:10,14 126:18,19 128:17
129:15 133:8,9 134:9,16,17,18
135:2,7 136:8,16,17 137:3
140:2,8,9,9 141:12 143:8,9,10
143:18,19 148:5,5 155:2,9,23
155:24 157:17,18,18 159:4
163:5,6 197:11,15,23 198:6,10
198:17 199:13 205:10 208:15
209:21,21,22 210:11 211:5,19
214:10
**objecting** 18:7,20 127:6 133:11
182:2
**objection** 20:17 41:24 42:11,21
42:23 48:4 62:23 70:18 76:23
76:23 77:10,11,12,13 78:2,4
78:10 81:2 82:10,16,17,21
90:23 92:12,13,15 100:16,23
102:25 114:14 115:12,14
120:25 123:12 127:7 133:16
135:18 143:20 148:6 154:20,21
166:2,21 171:23 179:6 180:15
181:16,16,25 196:19 198:11
199:4 200:13 205:16 207:8
213:18 214:9,11 215:23 216:2
216:22 217:5
**objections** 3:7 17:18 43:5 118:8
127:8 144:7,24
**objective** 211:4
**observation** 93:7
**observe** 151:21
**obtain** 176:16
**obvious** 198:18
**obviously** 133:18 188:19
**occasion** 31:4
**occasioned** 15:23
**occasionings** 102:6
**occasions** 77:25 174:12 179:23
**occur** 196:25
**occurred** 14:15 166:11 181:7
**Oculocephalic** 170:16
**office** 2:10 65:22 71:4 73:21
84:22 86:25 134:23 169:15

**officer** 70:14,22 74:22 75:3
119:25 136:12 141:5,16 152:4
**officers** 2:6 7:10 116:16 118:22
119:2 120:7,21 136:4,13
138:20 143:2 174:7
**officers'** 203:15
**official** 128:4
**oftentimes** 176:24
**oh** 49:12 54:8 67:17 96:9 171:12
174:10 184:7 188:11 194:6
**okay** 6:5,15 7:8,14 9:19 10:23
14:11,22 15:4 16:17 18:4,17
19:14 21:7,8,9,20 22:6 23:24
24:11 25:20 27:9 36:18,21
39:15 40:14 42:25 44:24 45:13
45:19 46:14,14,15,20 49:19
50:12 52:14 53:24 54:2 55:22
56:5,9 57:22 58:10 59:22 62:4
64:10 66:20 68:14 69:13 71:10
71:17 72:12 73:4,16 74:2,6,17
75:6,11,25 76:6,10,20 77:2,4
77:6 78:7,23 79:2,10,24 80:13
81:10,17 82:24 83:8,22 84:8
84:18 85:22 86:9 87:2,5,15,25
88:15 89:9,18 90:2,17 91:16
93:17,21,24 94:12,15,20 95:2
95:7,13,19,23 96:12,24 97:7
97:11 98:19,25 99:22 100:2,5
100:19 101:4 102:9 103:24
104:5,11,13 105:3,7 106:3
109:4,12,25 110:7 111:24
112:4,10,19 114:13 116:4,14
117:9,23 118:10,16,17 119:13
119:17,24 120:20 122:10
123:19 124:3,8,11 125:12,15
125:22 126:8 127:19,23 128:16
129:10 131:15,19,25 134:5,22
135:9,16,25 136:3,12 137:17
137:23 138:15,19 139:5 140:13
141:8 142:10,24 143:12 144:8
145:22 146:5,18 147:9,10,13
148:9,12,21 149:20 151:17
152:12 155:6 156:13,21 157:2
157:13,24 158:4,8,15,21,24
160:9 161:17,25 162:6,11,14
162:20,24 164:18,21 165:8
166:15 167:23 168:23 169:5,8
169:9,11,25 170:17 171:6
173:12,15 177:10 179:14
184:13,15,24 185:12,17,23

190:20 191:18 192:2 193:20
195:25 196:14 197:5 200:7
201:5,23 202:3,3 204:19 209:7
210:12,20,23 211:24 212:10,14
213:2,10,13,22 216:19 217:2,4
218:3,3,17,19
**old** 15:17 33:21 41:15 47:2
93:13 130:17 156:17,23 164:7
164:15 165:3 192:20,21,25
215:19 216:11
**older** 94:21,21,21,22 123:8
193:9 216:14,19,20
**on-** 60:25
**on-duty** 60:17
**one-page** 202:4
**one's** 210:2
**ongoing** 215:14
**Ontario** 8:3
**open** 61:8 191:2
**opening** 26:7
**ophthalmic** 49:25
**ophthalmologist** 32:17 34:6
**ophthalmology** 16:19 30:2,7
31:20 32:12 38:2
**opine** 191:10
**opining** 211:17
**opinion** 29:9 44:10 83:3 91:25
92:22 103:8,15 114:12 129:9
166:17 168:7,9,9,11 173:21
188:6 189:23 192:7 196:8
198:4 199:11 209:2 211:3,7,10
211:22 213:24
**opinions** 102:16 103:14,19,19
189:25
**opportunity** 69:16 131:11,14
194:16 204:8,16
**opposed** 141:4
**optic** 35:4
**options** 130:16
**orbital** 113:7,8 114:6
**order** 13:21 37:20 143:25 173:17
173:18 175:3
**ordinary** 16:9 17:7 25:13
**organization** 9:20
**organs** 115:8
**original** 3:13,17 62:3 175:16
**outlined** 144:18
**outs** 139:15
**outside** 33:7,8 40:9 167:14
174:8

**overwhelmed** 90:21
**overwhelming** 115:10 213:15
**oxygen** 186:24 195:10

**P**

**P** 4:2 46:2,7,25
**P-I-C-U** 9:5
**P.C** 2:16
**P.D.F** 96:4
**p.m** 1:13 68:17 109:8,9 113:2,3
118:12 153:23,24 218:21
**package** 6:21
**packet** 97:15
**page** 26:15,18,20,21,22,23 32:24
34:5,7 38:8,22,22 42:4 44:18
45:5,25 49:20 52:19 54:7,8
55:25 56:6 86:6 95:24 96:3
97:17 123:22 124:2,6 133:19
146:20,24 147:4,17,18,18
167:25 168:6 169:6 178:6,23
201:14,15,16 220:6
**pages** 5:6 13:25 19:9 21:11,15
24:4 26:24 45:10 59:21 74:10
96:21 147:14,15,16,20 148:23
201:18,23 220:10
**pain** 187:7,9
**painful** 26:9
**paper** 9:16 24:13
**papers** 9:16
**paperwork** 86:5 133:5
**paragraphs** 201:10,11,13
**parenchyma** 33:9 98:9
**parent** 59:11
**parenthesis** 208:12
**parents** 15:24 59:18
**part** 6:25 11:12,25 42:6 66:17
89:6 90:14 101:7 110:22
111:18 138:13 156:8,9,9 158:6
175:19 176:20 177:5,24 214:23
**particular** 8:13 13:3 27:2 31:10
36:5 98:9 182:5 183:8 213:20
**particularly** 30:19 174:7 176:22
176:25 178:7 183:13 184:10
**parties** 3:4 221:10
**partly** 122:24
**parts** 53:15
**party** 77:21
**passé** 182:23
**pathologist** 65:20,24 166:7,10
196:13 213:20

**pathologists** 192:24
**paths** 27:19
**patient** 13:8  15:14  25:25  27:23
  29:9  30:24  32:7  44:15,18  45:6
  51:19  57:2  60:8,11,13,21  61:8
  61:14,16  81:15  83:25  86:22
  89:15  106:20  130:7  131:6
  148:13  156:10  160:6  164:7,9
  165:14,15  167:12  170:5,8
  173:22  175:5,14  176:2,12,17
  178:8  186:12  187:2,4  189:3,8
  191:25  192:13  195:17,21
  196:11  200:11  215:5
**patient's** 56:25  58:22  60:7,16
  60:18,20  61:3,5,17  87:22
  188:25  195:24
**patients** 12:24  28:9  137:20
  165:11  172:2  174:21  175:25
  180:11  181:15  182:13,16
  186:15  196:3,3  211:25  212:4,7
  212:12
**pattern** 120:12  203:23
**PATTISON** 2:6  221:12
**pause** 48:14  112:25
**Peck** 2:16,17  4:5  77:23  78:2,13
  82:7,18  83:14  90:24  92:13
  100:15  103:2  106:18  107:14
  115:14  117:19  122:5  123:14
  143:10,19  155:24  163:18,21,23
  163:23  166:9  167:3,16,21,24
  168:4,14,20,25  169:4,6  207:15
  214:11  218:9
**ped** 182:12
**pedestrian** 197:24
**pediatric** 8:4,11,14,16,24  9:3
  10:2,18  11:10,16,21,23  28:9
  137:21  181:14  182:8,13,16
**pediatrics** 9:15,22  181:11  197:8
**peds** 56:16  61:11
**Penal** 206:4
**pendency** 145:3
**pending** 80:4  81:11  150:8,11
  151:4,16  152:6
**people** 12:17  108:15  164:17
**percent** 22:25  167:9  182:18
**Perfect** 7:4  59:22  157:11
**perfectly** 22:22  160:16
**performed** 87:24
**period** 10:6,17  40:11  49:7  56:25
  107:17  169:20

**permission** 156:16
**permitted** 17:19  217:22
**persistent** 195:9
**person** 108:12  175:22
**personal** 76:17  80:24  84:9  110:2
  128:6  217:13
**personally** 91:18
**personnel** 61:24  82:13
**perspective** 173:23  213:25
**Persuasive** 184:21
**pervasive** 87:7  105:18  184:16,22
  184:25  185:3,7,18
**phone** 60:25  61:9,16,16  101:22
  160:3  184:5,12
**phonetic** 20:25
**phrase** 221:15,16,18,19,20,21,22
**physical** 14:15  26:19,24  30:15
  52:6,20  58:7  97:4
**physician** 8:11  10:14  11:2,16
  29:9,10  30:23  31:12  52:6,20
  58:24  75:16  76:11  116:21,24
**physicians** 28:24  92:22  211:10
**PIC-U** 9:4  10:14
**pick** 14:19
**picture** 120:19  156:22  164:25
  166:5  174:3
**pictures** 34:7  196:21
**PICU** 12:6,13,16  43:16  45:11
  48:20  56:16  60:6,8,24  123:25
  123:25  125:24  149:17
**pigmented** 35:5
**pin** 97:8
**Pine** 2:18
**place** 26:11,12  73:22  137:21
  176:19  219:5  220:5
**placed** 55:11
**places** 50:23
**plain** 129:13
**plaintiff** 1:4  2:3  5:9  81:14
**Plaintiff's** 96:5,13
**plan** 41:14  44:9  46:8,21,25
  59:21  63:20  171:10
**planning** 54:16,20  56:10  115:21
**plans** 41:10
**plasma** 130:18
**play** 137:10  156:13  157:14,24
  158:24  159:21  161:20
**played** 158:9,14  159:25  161:24
  162:9

**Plaza** 2:14,18
**please** 6:6,11,12 19:10 40:7
  46:24 48:19 67:16 68:6 70:17
  71:11 78:13 85:8 118:3 146:6
  148:6 154:21 168:2,17 178:23
  193:15 205:14 213:7 219:6
  221:8,9
**plus** 148:13,19
**pneumococcal** 210:14,17
**pneumonia** 208:11,18 212:11,11
  215:8,12
**point** 8:2 10:15 27:17 29:18
  30:11 37:12,19 47:13,14 71:15
  77:5 92:18 142:22 144:22,23
  153:5 167:9 174:18 182:17
  187:14 188:5 196:2 214:25
**police** 2:6 5:13 7:10 59:8 60:23
  62:8,14,16,19 63:5,11,16,23
  64:3,3,13,19 65:11 70:5,9,13
  70:13,22 71:8 74:14,19 76:6
  116:16 117:12 118:22 119:2,25
  120:7,21 136:3,12 138:20,20
  138:21 141:16 142:6 143:2
  148:17 159:8 162:25 163:4
  169:23 170:21 171:2,11,13,17
  171:21 172:10 173:19,23 175:2
  179:16,24 201:2 202:5 203:15
  203:15 209:16 213:24 214:5,5
  214:13
**polite** 153:17
**poor** 61:3
**portion** 33:14 40:2 41:13 59:24
  60:2 111:11 205:20,22,24
**portrayal** 159:3
**pose** 217:15
**posited** 73:5
**position** 19:8 26:18 49:15
  200:10 217:6
**positive** 10:16 34:16 88:3
  208:10
**possibility** 30:8 115:2 188:24
**possible** 30:24,25 35:16 47:11
  56:19 91:8,17 92:21 93:12
  109:19,19 119:3,3,14 143:6
  148:13 149:25 175:9 176:3
  189:4 200:16
**possibly** 33:4,10 98:14
**post** 39:22
**posteriorly** 98:2

**potential** 30:13 119:15 176:13
  189:19
**practice** 29:11 37:14 144:18,19
  145:8 159:17 199:18
**practiced** 7:25 181:10
**preferred** 182:23
**preparation** 74:15 206:17
**prepare** 75:8
**prepared** 70:21 126:4 220:11
**preponderance** 37:19 59:5
**prescribe** 129:23
**presence** 220:5 221:8
**present** 89:9,16 102:7 155:14
  157:2 186:18 187:2 192:16
  196:17 199:14
**presentation** 157:18 208:11
  217:18
**presented** 26:2 88:5,18 103:25
  106:9 121:21,21 170:11 186:12
  191:20 217:7
**presenting** 195:17
**press** 27:12 106:22
**pressure** 16:3,3,4 27:13,15 47:5
  47:16,23 48:9 88:19 89:10
  90:5 91:5 105:15 106:25 185:6
  187:12,25 195:9,10,16 196:5
**pressures** 91:6
**pretty** 28:11 94:25 154:12
  161:18 164:2
**prevalence** 180:25
**prevalent** 180:14
**previously** 52:3 92:18
**primarily** 88:7
**primary** 188:7,14
**printed** 205:7
**prior** 59:9 62:15 63:14 75:13
  136:20 140:8 145:2 201:6
  205:10 209:22
**priority** 174:21
**privileged** 20:18
**prob** 162:21
**probable** 126:12
**probably** 36:4 42:5 98:5,13
  181:14
**problem** 43:20,22 111:20,25
  129:12 131:5,21 132:21 134:8
  138:12 152:23 186:21 196:24
  215:11
**problematic** 134:13 162:17,22

**problems** 32:7  216:8
**procedure** 3:5  144:13  145:8
**process** 145:16  156:9  161:8
  194:24  202:11
**profession** 196:16
**professional** 9:20  76:22  92:22
  171:13  188:6
**professionals** 139:4,4
**professor** 8:10  10:15  110:8,16
  182:6
**profound** 187:25
**prognosis** 61:4
**progress** 41:3,8  44:18  45:6,11
  51:19  97:4  210:17
**progression** 203:3
**pronounce** 142:20
**pronounced** 142:18
**proper** 145:16  200:11
**properly** 104:21
**prosecuted** 175:23
**prosecutions** 68:24
**protect** 180:18
**protecting** 176:12  180:17
**Protective** 61:20  64:14
**proud** 109:20
**provide** 60:7  73:17  145:9  146:3
  173:6  187:16
**provided** 97:6  192:4  198:4
  200:25  202:5,7  220:13
**providers** 132:20
**public** 3:12  219:12  221:9
**publications** 9:7,17
**publicly** 134:13
**pull** 16:14  50:24  95:24  97:3
  168:2
**pulmonary** 215:12
**puncture** 79:20
**punishable** 206:3
**pupils** 26:10  49:14  89:16
**purpose** 20:4  32:6
**purposes** 114:2
**pursuant** 3:6  28:18  206:3
**pus** 130:17,20
**pushback** 153:18
**pushing** 142:6
**put** 15:21  19:8  32:13  40:22
  67:18  71:16  91:5  95:8,8,18
  97:8  106:24  114:25  116:4
  123:9,21  139:5  148:2  183:21
  184:12  195:5,13,14  200:10

  204:11  206:7  208:14  216:21
  217:5,11
**puts** 48:8
**putting** 132:21  212:8

## Q

**quantify** 187:15
**question** 10:24  14:12  16:11
  18:18  19:5,16,17  20:2  22:10
  25:18  35:18  41:25  42:22  48:5
  48:5  63:12,13,14  70:18  77:16
  81:3  83:9,19  85:9  101:13,14
  103:5  109:22,23  110:19,24
  111:16  113:7  114:3  116:20
  117:4,18,21,21,24,25  118:5,14
  122:7  126:5  127:5,11  134:11
  138:6  141:3,19  142:16,24
  150:8,11  151:4,15  152:6
  154:22  156:10,12  160:6  166:7
  171:25  172:6,15  173:16,20
  175:12  176:9  183:10  187:5
  189:16  190:21,25  193:15
  194:22  195:2  196:12  197:13,19
  207:9,14  209:24  211:21  214:3
  217:24
**questioned** 87:8
**questioning** 78:11  82:10  83:7
  135:11  210:2  212:3
**questions** 3:8  7:12  66:10  67:10
  69:3  71:16  73:6  81:20  83:18
  98:21  108:4  111:4,6  115:23
  137:25  145:2  148:7  155:17
  156:6  158:8  159:23  163:25
  164:4,5,21  168:15  170:2,20,22
  170:25  171:3,15  179:15  180:24
  182:2,20  186:19  190:18  192:6
  192:14  194:14  199:16  200:24
  203:4,10,14  206:11  207:11,17
  209:15  210:24  212:16  213:23
  218:9,11
**quibble** 91:3
**quick** 24:18  67:13  68:5  216:24
**quicker** 108:14
**quickly** 133:19  178:9  207:6
**quite** 97:18  113:18  207:23
**quote** 57:8

## R

**R** 1:6  4:2
**R.N** 26:23

**R/O** 31:4,7
**radio** 194:3
**radiograph** 211:4
**radiologist** 82:3 83:2 103:16
  164:14 192:23 194:4,9
**radiologist's** 103:20 190:21
**radiologists** 33:24 34:3 103:11
  193:22
**radiology** 53:10,12 55:13 92:17
  94:25 95:2,6,8,10 97:9 99:16
  100:25 101:10 123:17 129:8
  132:10,13,14,15 177:18 188:5
  189:24 190:6,12,18,23 210:25
**raise** 6:6 186:19
**range** 9:15
**ranking** 11:15
**rapid** 37:14 58:15 123:3 215:2
**rare** 113:11 181:3
**rarity** 167:2
**re-** 215:19
**re-bleed** 216:11
**re-bleeding** 94:16
**re-bleeds** 94:9,13
**reactive** 26:3,6,10
**read** 3:10 14:25 33:2 34:21 35:2
  35:6,11 39:4 40:6,9,10,11,12
  40:25 41:12 43:24 44:4 45:18
  45:20,21 46:21,24 47:8 48:23
  51:4 53:8,10 54:4 56:15 57:14
  57:21,24 59:23 60:2 97:20
  99:19 103:9 114:18 118:2,3,4
  118:9 122:16 125:16 126:20,23
  127:2,4,20 139:8,11,15 166:24
  201:5 205:6,18,24 207:5,6
  219:4 221:8
**reading** 89:3 93:10 128:4,9
  179:9 182:22 217:9
**reads** 35:3 101:19
**ready** 14:9 118:15 173:12 200:4
**reaffirm** 82:9
**really** 9:11 84:7 94:18 107:5,8
  122:7 135:17 143:23 159:10
  161:6 164:2 165:13 171:24
  174:5 214:12,14
**reason** 32:9 39:3,13,17 69:10
  111:17 153:8 190:21,25 204:19
  209:15
**reasons** 31:19 180:17 199:24
  212:24

**rebuttal** 203:4
**recall** 13:10 14:12 26:14 27:25
  28:5 29:23 63:18,19 65:4,18
  66:6 76:7 81:20 86:9 98:20,23
  98:24 105:8 116:17 117:10,10
  118:21 119:2 121:16 129:20
  134:12 136:6,15 138:4 155:15
  162:15 179:17 184:17 188:8
  189:24 203:17,18,20 212:2
  216:16
**recalling** 116:11
**recalls** 83:6
**recap** 181:9
**receive** 74:14
**received** 6:21,25 22:19,23 23:3
  53:20 189:3
**recitation** 179:2 185:13
**recognize** 25:8 162:18 202:10
**recoils** 199:8
**recollection** 27:4 69:17,22
  74:11 84:6 141:11,15 159:16
  206:22
**recollections** 163:3
**recommendation** 14:19
**recommended** 98:15
**reconciliation** 26:19 52:7,21
**record** 5:11 6:2,6,12 7:14 14:2
  14:4,5,6,7 18:6,18 20:13,14
  20:17 23:7 24:23,24 25:2,3,5
  30:17 43:8,10,12 52:11,12,15
  62:22 68:15,15,16,17,18 86:6
  95:25 96:15,18 99:13 100:13
  102:14 107:5 109:7,8,9,10
  112:20,25 113:2 118:12 123:21
  123:22 125:6,25 127:21 134:7
  135:18 137:14 141:20 144:23
  145:4 148:3 149:18 152:4
  153:23,24,25 160:15 172:17
  177:5 178:7,8,22 201:16,17,18
  201:20 204:9 217:21 218:21
  219:5 220:11
**records** 5:6 16:7,21 17:2,4
  18:18 22:24 25:10,12 82:13
  135:11 149:24 178:16,19
  203:15 210:25 211:3
**recover** 187:14
**recovery** 189:20
**Recross** 4:6 206:12
**red** 130:18

**Redirect** 4:6 203:11
**refer** 7:5 23:21 37:2 50:7,10
  123:24 148:22
**reference** 51:10 95:24 96:3
**referenced** 100:12
**references** 99:13 100:25 158:7
**referral** 39:14 62:3
**referred** 9:4 13:13 61:20 63:20
**referring** 30:22 31:9 70:6
  150:14 151:6 152:10 205:11
**reflected** 30:10
**refresh** 13:21 27:4 69:17,22
  74:10 141:11,14
**regard** 6:22 12:6 27:5 28:24
  29:24 34:20 38:2 61:25 62:9
  62:17 63:15 64:14,21 65:13,16
  66:3 99:20 132:24 137:25
  148:7 177:5 179:17 182:12
  189:19 193:14 194:17 198:5,10
  199:11,17 203:14 210:23
**regarding** 29:9 56:17 79:19
**relate** 169:23 191:12 192:2
**related** 72:3 82:12 84:9 93:24
  94:2,7 113:9 155:18 188:8
  192:17,18 193:17
**relating** 82:11 171:16 192:9
**relaying** 213:20
**release** 73:8
**released** 73:2,15
**relevance** 175:23
**relevant** 6:25
**relied** 189:23
**reluctant** 195:13
**rely** 34:2 123:17 188:13 190:16
**relying** 95:5
**remain** 168:11
**remainder** 26:13
**remember** 15:16 58:3 62:2,20
  69:13 70:23 72:5 73:25 79:3,4
  81:7,16 83:18 85:2,21 86:13
  87:9,10 99:21 104:15 120:8
  121:19 130:25 132:3 134:6,20
  134:23 135:3 141:17 142:5,9
  143:23 146:4 159:10,14 162:20
  170:22,23,25 171:2,4,5,18,19
  173:15 177:7,14,19 179:4
  183:11,14,16,24 184:8 186:7
  193:10 202:2
**remembered** 69:18

**remembering** 177:24
**reminded** 145:13
**reminding** 144:13
**remiss** 180:10
**remote** 160:17 161:7
**remotely** 13:19
**removed** 61:7
**render** 57:19 200:11
**rendered** 63:6,22
**rendering** 63:14,16
**Rensselaer** 1:7 70:10
**reoccurrence** 193:5
**repeat** 27:8 44:14 77:16 85:8
  89:25 91:24 144:9 189:15,16
**repeatedly** 191:15
**rephrase** 19:20 92:5 126:23
  140:17 197:19
**report** 5:13 11:10 32:12,16,16
  34:6,11 38:2,24 39:3 40:2,15
  53:12 54:7,10,21 55:11,12,12
  55:20 56:3 57:14 60:14 61:14
  62:5 94:25 95:2,6,9,10,16
  97:10,12 98:22 99:3,7,12
  100:11,20,25 101:18,24 102:8
  102:9,16,17,23 103:9,12
  115:18 125:22 126:2,16 127:20
  127:25 128:18,19,24 129:5,8
  129:14,17,20 132:4 134:13,24
  135:6 143:16 148:2 149:15,16
  164:22 177:6,13 178:25 179:3
  190:12,24 194:6 208:14 210:25
**reported** 59:3 132:4,8 164:20
**reporter** 6:5,11,15 13:24 14:5
  21:2,5,17,21 24:22 25:4 43:11
  52:14 66:1,15,18,22 67:20,25
  68:14,18 96:8,12,14 107:22
  108:7,23 109:3,6,10 112:25
  113:4 118:4,10,16,19 124:3
  126:25 133:10,13 146:10,23
  153:25 156:15,19 157:4 158:3
  167:20,23 168:3 169:11 182:3
  202:17 220:15
**Reporters** 220:12 221:2
**reports** 99:13 101:17 190:22
**represent** 68:22 113:25 162:15
  169:16 208:13
**represented** 81:6
**representing** 19:12 80:22
**request** 39:3,18 60:22 62:8
  70:21 85:25 107:20

**requested** 28:20,23 29:3,24
  31:18
**requests** 173:19
**require** 7:13 73:12
**required** 62:6
**requires** 130:5
**requiring** 16:3
**reserved** 3:9 43:6 127:8
**residency** 7:24
**resident** 26:17 41:3,8 45:11
  46:18 53:16 61:11 101:19
  126:3 132:13,13,15 190:5
  200:22
**resident's** 40:23
**residents** 182:7
**resolved** 80:10 112:12
**resort** 55:11
**respective** 3:4
**respirating** 195:22
**respirations** 49:16 195:21 215:6
**respiratory** 60:12 213:3 215:3,8
  215:9
**respond** 58:11 152:10 160:6
  217:12
**responded** 60:18,24 183:10
**responding** 117:12 118:22,25
**response** 7:13 59:15 137:24
  151:5 157:15,15 168:9 170:13
  170:16 171:13,15 185:14
  194:21 195:2
**responses** 171:17 188:3 191:9
**responsibilities** 12:12,15,21,25
**responsibility** 109:17,23 176:4
**responsible** 109:21
**responsiveness** 3:8 215:4
**rest** 47:9 137:16
**restart** 158:11,13
**restate** 25:18
**restroom** 64:7 68:7
**result** 55:7,9 93:18 105:23
**resulted** 57:19
**results** 55:9,20 87:3 174:17
  194:14
**retina** 34:10
**retinal** 30:10 35:4,12,15 49:22
  58:20 112:15 113:8,12 114:8
  114:19 166:16,23 181:2,4
  182:16 183:3 188:18 191:16
**retire** 200:4

**retrial** 72:7,22
**retried** 72:13
**retrospect** 135:5
**Return** 221:11
**returned** 3:15 8:4
**reveal** 94:2 165:20
**review** 32:12 74:19 83:17 85:20
  86:8 87:6,10 101:23 102:15
  104:16 124:5 194:16 204:8,16
  206:17 211:21
**reviewed** 6:24 26:22 40:5 71:21
  74:10,15 86:6 102:11 133:20
  154:10 204:13,17 211:17
**reviewing** 28:6 33:25 71:14
  98:20 193:11
**reviews** 101:21
**revise** 109:15
**Rhiannon** 2:7 97:6 168:22 221:13
**right** 6:6,17 19:18 29:3 31:3
  34:17 35:2,3 41:7 43:13 45:22
  46:2,3 48:11 53:5,17 54:4
  64:12,18 71:14 86:2,15 98:2,2
  98:3,6,14 104:12,12,17 105:14
  107:24 111:4 112:13 123:9
  124:20 129:6 138:16 147:19
  148:4,10 150:4 160:11,23
  161:22 167:24 172:25 179:10
  193:23 204:2,15 205:12,15
  209:24
**right-hand** 41:4 55:19
**rights** 2:3 209:17
**ringtone** 184:12
**risk** 176:7
**road** 178:17
**role** 145:20 207:21
**roles** 181:24
**Ron** 60:24
**Ronald** 1:6 76:2,2
**room** 116:21
**row** 137:2,6,13 199:17
**rule** 31:8 86:14 90:14 128:15
  129:18 168:10 207:16
**ruled** 135:12 177:21
**rules** 3:5 144:17,18 145:7
**ruling** 31:13
**rupture** 35:6

---

**S**

**S** 4:2
**S.D.H** 39:8,22 40:13 211:3,18

215:19
**S.P** 39:22,24
**S.T.H.s** 50:15
**S.W** 57:7 60:5
**Sa** 60:11
**safe** 163:16 176:19,19 218:15
**Samaritan** 14:17,18,21,24 15:6,6
  15:14,24 49:5 56:18 60:9,12
  86:2,5 88:6 104:7 105:5 107:6
  186:12 187:8 192:7,10,13
  212:25 214:19
**SAMPSON** 2:6 221:12
**Sanchez** 11:22 12:2
**sanctionable** 145:15
**sanctions** 145:6 149:12 152:14
  160:25 161:11
**satisfactory** 36:14
**satisfies** 23:10
**satisfy** 23:5
**save** 18:2 19:18,21 107:16
**saved** 107:17
**saving** 91:5
**saw** 15:7 25:25 28:3 104:12
  116:2,11 121:3 151:24 153:10
  213:2
**saying** 109:16 116:17 117:16
  118:21 119:19 129:17 134:20
  137:12 148:3 151:21,24 152:4
  156:2,2,4 159:16 161:12
  165:17 174:15 175:18 178:23
  179:8,23,24 180:3 186:7 188:8
  191:2 197:21 215:17
**says** 35:5 39:5,10,17 40:21,21
  41:9 55:20,25 56:3,6 64:2
  70:9 95:21 124:19 126:11,12
  127:13 139:9,17 141:9,25
  145:23 147:4,5,6,23 205:17,17
  208:10,17 214:21,23
**scalp** 49:13,14
**scan** 31:21 44:2,7 50:10,11 54:6
  54:10,19,21 55:9 126:12
  127:13 128:4,10,13,18,20
  130:24 165:5,9,18,21 190:16
  211:11,12,17,21
**scanned** 147:20,21
**scanner** 130:5
**scans** 33:20,25 102:11
**scenario** 117:9
**schedule** 12:9 136:25

**scholarly** 114:18
**school** 7:23
**score** 189:6,9,12,18
**scratch** 30:16
**screen** 16:15,16 18:11 20:23
  23:22 24:14 34:8 45:21,22
  53:2 54:13,22 55:19 67:16
  95:25 133:14 156:14 159:20
  162:15
**scroll** 21:6 22:8 23:22 39:11
  41:6 45:4 46:12 48:12 49:20
  53:4 54:17,23 55:24 95:20
  97:14 123:23 147:11 205:14
**se** 205:9
**search** 45:11
**sec** 161:21
**second** 24:12 26:21 43:8 46:12
  51:5 52:11 73:23 84:24 85:5
  85:11 87:23 108:2 112:24
  118:11 142:19 146:6 152:20,25
  156:10 161:23 177:20 196:22
  216:5
**Secondary** 49:10
**seconds** 184:5
**section** 41:9 147:4 206:4
**sedations** 12:19
**see** 20:17 21:9 22:9 23:5,10
  24:14 31:4 32:23 43:17 45:17
  45:18,22 46:2,6,9 48:13,15
  52:22,25 53:2 54:13,24 55:14
  64:6 70:12 96:2 115:19 124:9
  124:16,16,24 125:7 126:13
  133:14 145:14 147:12 153:10
  156:17,22,23,25 157:8,10
  162:4 167:8 186:15 188:2
  191:22,22 213:8 218:18
**seeing** 166:19
**seen** 49:13,14 50:19 85:15
  100:24,25 123:7 125:5 133:5
  157:16,21 158:21 162:12,18
  164:15 166:22 167:6,14 181:8
  183:18 211:25
**send** 158:3 195:20
**sending** 195:19
**sense** 68:10 111:22
**sent** 57:3
**sentence** 48:24 141:24 147:23
  205:7,7,16
**sep** 106:13

**separate** 66:17 211:12
**separation** 50:18,21
**sepsis** 86:13 88:7,10,13 89:7,11
  89:16 90:9,14 91:10,18 92:2,7
  92:8,20 106:15 107:2,6,12,16
  109:18 110:5,18,24 112:8
  114:5,15,17,20 115:10 116:9
  119:3,14 122:2 143:6,14
  148:24 149:4,6,7,25 150:23
  166:18,23 167:4 168:10 181:2
  181:4 186:3,6,22 188:22,24
  189:4,20 191:12,16 192:8
  194:22 195:3,8 196:5 204:24
  205:2 207:16 209:9 211:25
  212:5,7 215:15,21 216:7
**September** 10:5 11:2,17 12:5,12
  12:21 13:6 14:14 25:24 28:19
  67:3 75:13,17 85:23 87:22
  97:23 119:20 120:7 121:14
  125:20 136:6 142:12
**septic** 106:20 142:14 186:15,17
  196:3,3
**sergeant** 70:15 74:23 75:21
  141:9,16
**series** 7:12 81:20
**serious** 88:24 179:25 180:7
**service** 12:19 43:16
**Services** 61:21 64:14
**set** 6:16 29:14,17,19 34:17
  52:17 142:14 161:16 190:10
  202:15
**setting** 8:19
**settle** 152:16
**settled** 80:6,7,10
**settlement** 80:16
**settling** 94:8
**seventeen** 59:21
**seventy-** 169:6
**severe** 38:14 89:10 90:9 112:9
  140:4,8 143:2 166:23 188:2
  194:22 195:3,8,23 205:9
  208:18,18 211:25 215:7
**severely** 27:19 186:15,17 196:3
  210:8
**sexist** 149:3
**shaken** 35:24 122:12,23 174:10
  174:13 182:21
**shaking** 139:25,25 174:16,16
  183:5

**share** 11:23 156:14 157:4,6,8
  159:20 161:22
**shared** 38:17
**shear** 198:19
**shearing** 198:3,23 199:9
**sheet** 44:18 45:7 51:19 58:5
  97:4 219:8
**shift** 137:15
**shifts** 199:24 200:12
**shock** 88:25 142:14
**short** 9:2 68:3 157:14 164:2
**shortly** 15:9
**show** 26:24 128:13 135:12 141:8
  146:5,20 147:25 161:18 164:24
  165:9 190:14 215:15
**showed** 31:21 44:14 56:19 72:16
  126:17 128:14 187:9,11 208:3
**showing** 15:18 45:6 52:19 164:24
  165:5,6 186:13
**shown** 102:14
**shows** 26:23 44:2 126:12 127:14
  128:18,19,20
**shy** 36:2
**sib** 61:5
**siblings** 61:6
**sick** 130:4 192:13
**side** 53:16,17 114:25 158:8
  161:21 174:6 193:9
**sides** 50:17
**sign** 3:11 129:7 178:23 221:8,10
**signal** 195:20
**signature** 40:25 124:11,19,23
  125:12 131:13 205:8,12 221:11
**signed** 3:14 40:15 51:18,21
  53:14,16,17 67:3 70:5,13,25
  71:6 123:25 125:17,19 126:5
  129:5 131:10 139:6 140:10
  179:11 204:9 205:3 206:7
  221:23
**significance** 35:7 37:25 47:6,15
  51:9 125:15
**significant** 35:19 36:7 195:16
**signify** 35:19
**signing** 178:5 179:7 201:6
**signs** 105:17 115:10 170:12,13
  186:13 189:18 215:16
**Sikirica** 1:7 2:16 65:16,19
  78:14 82:19 163:24 167:22
  169:25 208:14

Associated Reporters Int'l., Inc.

**similar** 79:12,15 110:2
**single** 133:19
**sir** 17:25 21:9 88:20 218:15
**sit** 171:18 189:24 204:2
**site** 145:18
**sitting** 75:23
**situation** 117:10,11 136:7
  174:12 177:19
**six** 8:4 40:9 54:7 57:4 61:5
  147:15,18,18,18 187:25
**sixty-one** 124:2
**size** 47:20 50:23
**sketches** 34:7
**skewed** 214:6
**skill** 29:13,17
**skip** 68:13
**skull** 33:14 44:6,21 48:8 56:19
  83:23 84:2 99:9 123:4 130:23
  131:4 132:4,9,24 134:14,15,24
  134:25 177:6,12,15,17 198:2,2
  198:14,15 199:6
**slash** 46:2,7,21,25 59:24
**sleep** 200:23
**slightly** 97:25
**slip** 66:11
**slower** 108:12
**slowly** 207:6
**small** 123:4
**SMITH** 2:13
**snag** 153:22
**snippet** 209:4
**snippets** 158:25
**social** 26:22 55:12 60:4,6,16,18
  60:22,25 61:10,13 71:3 140:22
  141:4 175:9
**Society** 9:21
**sofa** 122:19
**soft** 122:19 198:6,10,17 199:13
**solve** 111:18
**somebody** 153:9
**somebody's** 184:2
**soon** 15:8 218:18
**sorry** 14:23 36:10 42:13,24
  44:19 48:4,5 54:25 59:16
  71:20 85:7,7 95:3 101:12
  114:6 116:23,24 124:15,15
  133:10 140:25 149:2 150:3,13
  159:19 162:8 188:11 189:11,14
  193:25 203:8 205:14

**sort** 16:21,22 18:12,15 184:14
**sorted** 17:24
**sound** 112:17
**source** 87:6
**sources** 128:3
**space** 31:25
**spaces** 98:16
**speak** 20:19 76:6 87:17 95:4
  150:10 160:16 185:21
**speaking** 19:10 118:25 135:18
  144:6,24,25 148:22 152:13
**speaks** 205:17
**specialist** 91:13
**specialists** 132:19
**specialties** 29:21 188:13
**specialty** 8:13
**specific** 12:20 106:7
**specifically** 58:11 86:10 103:11
  105:24
**specify** 79:7
**speculate** 144:4,9 145:14 148:20
**speed** 36:23
**spell** 6:12
**spelling** 20:25
**Spencer** 2:7 64:5,10 67:14,21
  68:2,6,12 97:6 154:3 221:13
**spinal** 33:21 47:20
**split** 12:16
**spoke** 60:25 121:8,11,18 136:5
  152:9 215:13
**spoken** 196:7
**spontaneous** 49:16
**staff** 11:9 60:6
**stain** 194:15,17
**stains** 113:20
**stand** 46:7
**standard** 37:11,13
**standards** 121:25
**standing** 17:18 78:10 82:10
  148:6 181:25 217:5
**start** 110:21 188:2
**started** 6:20 86:15,21,22 118:7
**starting** 75:17 215:15
**state** 2:10,10 6:11 20:10,12,16
  58:21,22 61:15 70:9 78:11
  80:25 81:5,11 82:9,16,21 83:8
  87:22 102:8 131:15 143:23
  169:16,17,18 190:6 200:10
  206:4 218:7 219:3

**stated** 60:10 102:17 134:24
  136:4,13 147:24 181:3 188:4
  191:10 194:21 203:16 208:6
  220:6
**statement** 69:25 129:11 137:9
  140:20 176:10 196:10,15
  200:25 201:3,6,9 202:4 203:14
  203:19,21,24 204:4,13,16,17
  204:22,23 205:22 212:17
  216:24 217:22
**statements** 179:15 205:13 206:2
  206:7,9 214:4
**states** 1:2 41:13
**stating** 41:24 134:12
**status** 39:22 90:6
**stay** 49:9 163:16 188:25 218:15
**stayed** 60:18
**stem** 38:14
**Steno** 173:6
**stenographer** 20:23 78:10 85:8
  108:22 109:2
**step** 160:8 165:10 216:23
**stern** 184:3
**stick** 122:17
**stimuli** 26:9
**stimulus** 49:17
**STIPULATED** 3:3,7,10,13
**stipulations** 3:2 110:2
**stomach** 79:20
**stop** 17:20 88:17 150:4 153:8
  195:21
**story** 183:24 184:9
**straight** 170:9
**Street** 2:8 221:13
**streptococcal** 216:7,7
**Streptococcus** 208:10
**stressful** 137:21,21
**strike** 48:18 52:4 84:9 131:12
  174:25 178:4 184:16 189:15
**striking** 140:9
**strongly** 207:20
**structure** 31:12
**students** 182:7
**studies** 110:3
**stuff** 161:10
**Sub** 208:17
**subarachnoid** 98:7,16
**subdural** 31:22,25 33:4,10 39:5
  39:8,21,23 40:13 41:15,16,21
  44:3 47:2,23 50:15 51:7,14

  53:9 58:14,16 60:13 88:12
  93:19,25 94:6,13 95:14 98:6,7
  98:13,15 100:7,12,21 102:7,19
  102:20,22 111:11 122:20 123:5
  126:13 127:14 128:13 139:19
  154:8 164:6,8 166:16,22 167:4
  167:8 180:8,25,25 183:3 186:3
  188:17 190:6,13,22 191:4,21
  191:23 192:15,22 193:8,17
  198:7,20 210:24
**subdurals** 94:24 167:14 193:14
**subject** 102:15 163:12
**submitted** 22:14
**subpoena** 3:6
**subretinal** 35:16
**subsequent** 84:21 164:10
**subsequently** 209:18
**substance** 15:13 64:25 65:5 84:2
  86:11,12 103:4 120:9 137:11
**sudden** 197:25
**sued** 76:20 77:7,18
**suffered** 139:22 141:25
**suggest** 35:25 207:20
**suggested** 42:19 111:23 151:7
  214:2
**suggesting** 143:3
**suggests** 154:8
**suit** 214:6
**Suite** 2:18
**sum** 15:12 64:24 65:4 84:2 86:11
  86:12 116:6 120:9 137:11
**summary** 15:17 87:21 149:18
**Sunday** 101:19
**SUNY** 7:22
**super** 82:22
**supervised** 61:13
**supervisory** 181:23
**supplemental** 22:16
**support** 60:7,9 185:5
**supporting** 70:4 74:6
**suppressed** 104:21
**suppression** 104:24
**sure** 10:12,14 22:2 34:18,23
  47:10 49:4 50:14 58:2,4 65:23
  70:7 77:17 83:11 91:7 96:6
  97:22 107:21,22 108:21,25
  112:11 114:20 127:8 146:12
  147:21 156:23 158:2 160:7,18
  166:25 168:3,25 171:5 172:18
  173:8 175:25 176:6 181:7,19

192:5 207:23 208:7 211:18
212:20
**surface** 198:13
**surrounding** 68:24
**survive** 187:24
**suspect** 56:24 57:9,12,19 138:2
**suspected** 210:9
**suspicious** 58:25
**suture** 50:21
**sutures** 50:19
**swear** 6:3,7 115:25
**swelling** 47:19 49:13,14 140:3
142:25
**switch** 112:19
**sworn** 4:3 6:16 219:11 220:8
**symbol** 49:2,4
**symptom** 89:10 121:22
**symptoms** 35:24 88:23 122:3
**Syndrome** 35:24 182:22
**system** 90:21 98:10 104:20 185:6
**systems** 26:23

---

**T**

**T** 5:2
**tachycardia** 105:9
**tailor** 171:9,13 172:9
**tailored** 171:19
**take** 17:21 23:4,8,12 24:18
67:12 68:5 69:7 71:8 107:22
107:25 108:5,18 111:3 115:22
124:5 137:19 147:12 160:4
161:4 163:10 164:20 178:19
203:2 213:7
**taken** 3:6 57:6 60:11 109:12
178:8 199:20 219:5 220:4
**takes** 12:23 180:7,21 187:11
196:4 197:25
**talk** 16:19 36:3 66:7 73:22
112:15 120:16 142:25 148:24
149:24 159:9 161:20 174:4
191:3 197:3 210:4
**talked** 73:17 180:17 191:15
211:24
**talking** 16:21 22:7 36:13 79:16
95:15 99:11,12,15 103:10
133:22 145:11 147:12 149:13
149:14 150:14,18,20,24,25,25
151:2,9,21 174:14 186:2
188:17 189:22 195:4 198:22
205:19 209:3 211:7

**talks** 101:20
**teach** 110:15,16,16
**teaching** 37:11,13
**team** 14:18,22 15:5
**tear** 123:4
**technically** 129:13
**telephone** 14:16 184:2
**tell** 7:16 11:13 13:4 22:21 29:6
34:15 39:2 41:16 57:22 58:12
69:7 71:7 84:6 95:19 97:14
120:6 138:25,25 151:10 158:25
159:8,12 193:16 214:20
**telling** 137:11 138:23 162:21,25
**temperature** 214:25
**ten** 22:23 36:6 37:13 60:24 68:7
107:23 126:10
**tend** 199:24
**term** 36:2,3,5,12 107:9 122:13
122:23 170:3,18 179:17,18
182:21,23,24 184:16,16,19,23
185:19 187:20
**terminology** 176:23
**terms** 74:4 106:16 207:14,18
216:12
**test** 213:8
**tested** 86:18
**testes** 115:9
**testified** 73:7 76:10 85:11
179:22 183:17 203:22 213:14
**testify** 18:24 69:11 73:24 74:4
84:15,19,20 85:4,18 99:18
220:8
**testifying** 73:23 75:18,19 84:24
203:17
**testimony** 6:7 71:22,22,25 72:2
72:17 74:3,8,16 91:20 98:20
99:2 109:14 114:24 167:18
168:21 169:2 203:13 206:17,20
206:21 207:15 219:5 220:4,7
221:8
**testing** 44:13,15
**texting** 160:11
**thank** 6:17 25:6,23 28:17 36:18
36:21 37:24 41:2,7 43:3,4,13
44:17 45:2,5 46:24 48:14
49:19,21 53:5 59:22 64:10
66:17 67:11 68:2 76:24 82:14
85:13 89:22 90:4 124:17
133:13 144:7 147:13 149:7
158:4 159:18 163:14,17 169:5

169:8,9 170:19 173:10 174:19
174:19 175:11 187:22 188:11
190:20 193:20 197:5 202:9,14
202:16 203:10 205:11 206:10
218:4,5,8,9,11,13,19,20
**thanks** 161:25 163:8,15 182:3
218:17
**That'd** 173:9
**That's** 97:18
**theory** 114:25
**they're** 217:23
**thing** 18:11 24:18 33:17 101:23
118:8 139:12
**things** 11:5,7 12:25 38:15 42:20
47:18 69:19 89:6 110:16 111:7
120:17 122:10 135:22 145:17
165:2 179:11 217:9,13
**think** 9:16 10:14,15 20:22 22:2
22:11 30:3 39:22 51:11 64:9
68:4,5 78:5,22 80:5,7 82:20
82:20 84:16 94:24 101:18
102:13 105:6 106:15 108:11,12
108:14 111:2 112:14,23 116:6
118:6,6,8 122:2,10 132:12
135:15 137:24 144:22 153:4,5
153:7,8 154:11,13 155:12
159:5,22 161:5,7,18 163:2,9
167:17,18 168:21 174:5 175:15
177:23 181:6 188:19 192:12
203:2 211:6,8,13,16 214:4,5
215:24 216:10,14 217:5,17,25
218:2
**thinking** 106:13
**third** 26:21 40:12 54:8
**thirteen** 146:16 147:7
**thirty** 48:19 51:19 117:8 181:12
182:7 221:9,10
**Thomas** 1:1,3 2:1 3:1 4:1 5:1
6:1,23 7:1,11 8:1 9:1 10:1
11:1 12:1 13:1,8 14:1,13 15:1
16:1 17:1 18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1,25 26:1
27:1,10 28:1,2,18 29:1,25
30:1 31:1 32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1 40:1 41:1
41:9 42:1 43:1 44:1,10 45:1
46:1 47:1 48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1 56:1 57:1
57:18 58:1 59:1,10 60:1 61:1
62:1 63:1,15 64:1,21 65:1,13

66:1,4 67:1 68:1,23 69:1 70:1
71:1,23 72:1,8 73:1 74:1 75:1
75:12 76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1 84:1,21
85:1,16 86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1 100:1
101:1 102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
121:1,7 122:1 123:1 124:1
125:1 126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1 134:1
135:1 136:1,21 137:1 138:1
139:1 140:1 141:1 142:1 143:1
144:1 145:1 146:1 147:1 148:1
149:1 150:1 151:1 152:1 153:1
154:1 155:1 156:1 157:1 158:1
159:1 160:1 161:1 162:1 163:1
164:1,7 165:1 166:1,15 167:1
168:1,8 169:1,17 170:1,11
171:1,20 172:1 173:1 174:1,15
175:1 176:1 177:1 178:1 179:1
180:1 181:1 182:1 183:1,12
184:1,20,25 185:1 186:1,6
187:1 188:1 189:1,17 190:1
191:1,20 192:1,17,19 193:1,8
193:11 194:1 195:1 196:1
197:1 198:1 199:1,12 200:1
201:1,18 202:1,7 203:1 204:1
205:1 206:1 207:1 208:1 209:1
210:1 211:1 212:1 213:1 214:1
215:1 216:1 217:1 218:1 219:1
220:1 221:1,4 222:1
**Thomas'** 157:22
**Thomas's** 38:3 64:14 65:17
191:11 209:17
**Thomas's** 62:18
**thorough** 211:9
**thoroughly** 175:4
**thought** 20:23 54:7,19,19 122:24
122:24 150:18 213:2,6
**thoughts** 183:22
**thousand** 28:14,15 104:19
**thousands** 28:11 114:17 166:24
181:14,19,19,20
**threaten** 160:24
**threatening** 60:20

**three** 5:14 9:16 28:14 43:25
  110:3,17,23 126:11 127:2,13
  127:24 129:12 147:14,16,18,20
  155:17 156:6 176:5 189:10,12
  189:14,18 192:20 216:11
**three-page** 146:13
**throw** 161:10
**thrown** 209:19
**Tibebu** 57:7
**TIM** 1:6
**time** 1:13 3:6,15 10:6,6,11,17
  11:11 13:7,11 14:12,20,22,23
  14:24 20:7 27:10 28:3,7 30:11
  38:3 44:10 48:20 51:24 57:17
  64:7,18 65:10 72:8 73:23 74:3
  76:7 84:24 87:11 88:8 91:10
  91:19 92:6 94:3 101:19 107:17
  108:15 110:8 116:12 121:4
  126:6,10 130:5 133:24 134:6
  136:14,24 142:12,16 143:15,24
  145:13 160:21 162:7 163:14
  167:10 169:20 181:13 185:3,9
  186:25 187:4,12,16,20 188:25
  191:11 192:19 195:6,11,13
  196:4 198:25 199:21 200:2
  202:10,25 209:4 210:3 218:12
  219:5 220:5
**times** 12:18 32:8 177:14 179:11
  186:16
**tired** 200:17
**title** 8:9 10:10,13 26:18 55:13
**titrate** 27:14
**to--** 19:23
**today** 47:12 65:2 69:3,7,11 72:2
  75:19,23 86:7 95:11 116:8
  131:15 133:24 155:20,21
  163:15 168:12 171:3,18 189:24
  202:10,13 218:12
**today's** 16:8 17:6 25:9 32:11
  38:23 45:7 51:20 66:21 67:2
  67:24 75:8 204:8 206:17
**today's** 6:21
**told** 27:6 52:3 72:25 73:14
  87:10,13 107:18 113:19 119:4
  131:2 132:12 144:9 148:17
  177:15,16,18 184:9 185:16
  195:6 214:6
**tomorrow** 44:15 140:5
**tone** 161:4

**top** 39:20 40:5 41:4 46:9 54:24
  120:15 126:9 157:5 212:23
  216:10
**topic** 97:10
**Toronto** 8:3
**tough** 28:11 122:7
**Tower** 2:14
**toxemia** 154:18,25
**training** 110:22 154:5
**transact** 40:22
**transcribed** 178:10
**transcript** 7:3 69:24 80:19
  168:6,19 169:7 206:15 219:6,8
  221:8,10,11
**transcription** 220:10
**transcripts** 173:11
**transfer** 86:2 214:23
**transferred** 40:9 49:5 56:18
  60:8 178:13
**transition** 63:20
**transmission** 59:20
**transport** 9:17 14:18,22 30:17
**trauma** 30:15,19,20 31:21 33:15
  35:20 36:8,12,17 37:5 57:16
  58:25 86:14 90:18,19 92:19,23
  93:3,4,6,9,12,18 106:16 107:8
  109:22 110:5,19,24 111:8,9,10
  111:21 112:7 113:10,13 116:9
  138:4,9 140:4 142:7 143:2
  148:14,18,19 154:13 159:7
  164:10 166:20 167:10,15
  168:10 180:2 182:18,24 188:5
  188:7 189:2 192:9,18,18
  193:23 194:5,10 197:10,13,18
  197:21 198:18 207:16 209:3,10
  209:13 210:5,21 213:16 215:19
  216:10,11,15
**trauma-centric** 143:3
**traumatic** 30:9,13 32:2 41:22
  93:25 112:2 142:13
**treat** 107:16 109:18 175:4
**treated** 59:10 106:20 114:17
  181:14 183:12 189:8,19 209:9
**treating** 59:9 86:15 165:11
  185:3,8 193:11
**treatment** 6:23 28:18,25 66:4
  83:13 106:25 130:4,10,12
  133:2 171:10,20 172:8,8
  173:22 186:20 188:22 189:4
  200:11

**treatments** 202:6
**trial** 3:9,16 7:3 17:24 69:24
  71:23 72:13 73:7,12 75:18
  76:11,13,14 78:8,21 81:18
  84:21 85:5,11,19,20 87:17
  90:12 98:20 99:2 114:24 127:9
  144:17,19 145:7 167:18 168:20
**trials** 43:6 74:4
**tried** 162:17
**trouble** 15:20
**Troy** 1:1,6 2:1,6,8 3:1 4:1 5:1
  5:13 6:1 7:1,10,10,11 8:1 9:1
  10:1 11:1 12:1 13:1 14:1 15:1
  16:1,8 17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1 25:1,9
  26:1 27:1 28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1 60:1,23
  61:1 62:1,8,16,19 63:1,4,15
  63:23 64:1,13,19 65:1,11 66:1
  67:1,21,23 68:1 69:1 70:1,10
  70:22 71:1 72:1 73:1 74:1
  75:1 76:1 77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1 85:1 86:1
  87:1 88:1 89:1 90:1 91:1 92:1
  93:1 94:1 95:1 96:1,21 97:1
  98:1 99:1 100:1 101:1 102:1
  103:1 104:1 105:1 106:1 107:1
  108:1 109:1 110:1 111:1 112:1
  113:1 114:1 115:1 116:1 117:1
  118:1 119:1,18 120:1,7 121:1
  122:1 123:1 124:1 125:1 126:1
  127:1 128:1 129:1 130:1 131:1
  132:1 133:1 134:1 135:1 136:1
  137:1 138:1,21 139:1 140:1
  141:1 142:1 143:1 144:1 145:1
  146:1 147:1 148:1 149:1 150:1
  151:1 152:1 153:1 154:1 155:1
  156:1 157:1 158:1 159:1 160:1
  161:1 162:1 163:1 164:1 165:1
  166:1 167:1 168:1 169:1 170:1
  170:21 171:1,2,17,20 172:1
  173:1 174:1 175:1 176:1 177:1
  178:1 179:1,16 180:1 181:1
  182:1 183:1 184:1 185:1 186:1
  187:1 188:1 189:1 190:1 191:1
  192:1 193:1 194:1 195:1 196:1
  197:1 198:1 199:1 200:1 201:1
  201:2 202:1,5 203:1,15 204:1
  205:1 206:1 207:1 208:1 209:1
  210:1 211:1 212:1 213:1 214:1
  215:1 216:1 217:1 218:1 219:1
  220:1 221:1,4,14 222:1
**true** 113:25 128:12 131:4 150:2
  190:11 198:10 200:9 206:21
  219:6,8 220:11
**truth** 6:8,8,9 69:7 220:8,8,9
**try** 19:6 27:12,15,23 40:6 58:3
  69:3 97:9 135:23 153:5,22
  162:6 174:2 191:2 195:13
**trying** 43:8 73:20 79:12 97:13
  135:21 145:15 150:12 151:12
  153:17 161:9 204:21
**tube** 26:11
**turn** 106:16
**turned** 99:3
**turns** 107:8
**twelve** 48:19 51:19 54:13 74:9
  86:6 107:23 123:22 154:7,14
  156:11
**twenty** 9:12 184:5
**twenty-four** 11:13 168:6
**twenty-four/seven** 137:13
**twenty-one** 60:23 208:12
**twenty-six** 167:25
**twenty-three** 56:2,6 60:5
**twenty-two** 56:2,6
**twice** 60:25 78:5
**twin** 49:11,12 57:5 61:6
**two** 5:12 30:3 53:15 69:23 74:9
  74:20 75:17 79:6 86:5 110:4
  116:7 123:22 130:6 146:11
  173:6 176:4 187:18,18 193:8
  201:10,17,23 202:2 207:21,22
  207:24 210:15 216:10
**two-day** 49:7
**two-hundred** 201:18
**two-part** 117:20,24
**type** 37:5 76:15,17 83:2 111:9
  117:9,11 139:24 140:6 178:22
  198:9
**types** 111:7 175:2
**typewriting** 41:13
**typewritten** 99:12 205:20,21
  220:9
**typical** 178:2 215:8

**typically** 128:21 139:23 142:4,5

---

**U**

**Uh-huh** 195:7 208:20
**ultimately** 102:10 129:4 130:12
**unable** 200:11
**unclear** 98:6
**underlying** 111:19,25
**underplay** 174:10
**understand** 10:23 16:11 19:17
  23:16 25:17,18 33:5,19 53:11
  69:6 92:3 127:10 129:16 138:5
  139:14 161:11 185:10 214:15
**understanding** 22:21 23:2 43:6
  63:22 101:5 104:9 105:21
  182:22 183:8 187:19 198:8
  201:19 211:2
**underwater** 112:18
**unethical** 171:12
**unfair** 19:8
**unfortunate** 161:6
**unfortunately** 199:23
**uniform** 144:18 145:7
**unit** 8:23,25 9:3 10:19 11:2,10
  11:16 12:4,4 28:10
**UNITED** 1:2
**universe** 71:14 132:8
**unresponsive** 15:18 30:18
**unresponsiveness** 49:8 88:21
**unsigned** 178:18
**unstable** 130:6
**untrue** 131:22 132:2
**unusual** 89:15,20,21,22 90:4
  116:18 186:14,18 191:16
**updated** 133:7
**upper** 55:19 98:2
**upset** 117:22
**use** 13:21 27:11 36:3,11 68:7
  138:2 184:23 185:19 188:16
**usual** 159:17
**usually** 12:16 101:24 190:15

---

**V**

**v** 1:1,5 2:1 3:1 4:1 5:1 6:1 7:1
  8:1 9:1 10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1 42:1 43:1

44:1 45:1 46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1 96:1 97:1
98:1 99:1 100:1 101:1 102:1
103:1 104:1 105:1 106:1 107:1
108:1 109:1 110:1 111:1 112:1
113:1 114:1 115:1 116:1 117:1
118:1 119:1 120:1 121:1 122:1
123:1 124:1 125:1 126:1 127:1
128:1 129:1 130:1 131:1 132:1
133:1 134:1 135:1 136:1 137:1
138:1 139:1 140:1 141:1 142:1
143:1 144:1 145:1 146:1 147:1
148:1 149:1 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1 162:1
163:1 164:1 165:1 166:1 167:1
168:1 169:1 170:1 171:1 172:1
173:1 174:1 175:1 176:1 177:1
178:1 179:1 180:1 181:1 182:1
183:1 184:1 185:1 186:1 187:1
188:1 189:1 190:1 191:1 192:1
193:1 194:1 195:1 196:1 197:1
198:1 199:1 200:1 201:1 202:1
203:1 204:1 205:1 206:1 207:1
208:1 209:1 210:1 211:1 212:1
213:1 214:1 215:1 216:1 217:1
218:1 219:1 220:1 221:1,4
222:1
**vaccine** 210:16
**vague** 84:6
**Valliani** 53:17,19
**varies** 29:17
**various** 114:24 199:24
**varying** 44:3 94:24 126:13
  127:14 191:4
**vehicle** 36:23 59:4 120:14 197:6
  197:7,24
**vein** 49:16
**ventilated** 12:24
**ventilator** 15:21 26:10
**ventricles** 47:20
**venue** 80:4

Associated Reporters Int'l., Inc.

**verbal** 7:13 101:17 102:3 131:3
  151:15,18
**verbally** 102:5
**vernacular** 27:12
**versus** 7:11 128:18 142:7 169:18
**vessel** 198:23
**vessels** 123:5 198:3,19 199:9
**victim** 59:11 139:20 145:24
**video** 5:15,17 156:13 158:9,14
  159:25 161:24 162:4,9 173:6
**view** 27:17 29:18 67:15 159:3
**views** 121:22 122:11
**violated** 209:17
**violence** 180:8,21
**violent** 35:20 139:25 197:25
**visitation** 61:11,12
**voice** 70:2
**volunteer** 42:6
**Volunteering** 89:14
**vomiting** 15:22 40:10 214:25

---

**W**

**W-A-L-T-E-R** 6:13
**wait** 91:21 204:11
**waiting** 142:19 173:5
**waking** 49:13
**Waldman** 45:16 46:16 51:12,23,24
  66:3 85:4,11 190:4 211:9
**wall** 172:21
**Walter** 1:1,11 2:1 3:1 4:1,3 5:1
  6:1,13 7:1,18 8:1 9:1 10:1
  11:1 12:1 13:1 14:1 15:1 16:1
  17:1 18:1 19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1 27:1 28:1
  29:1 30:1 31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1 51:1 52:1
  53:1 54:1 55:1 56:1 57:1 58:1
  59:1 60:1 61:1 62:1 63:1 64:1
  65:1 66:1 67:1 68:1 69:1 70:1
  71:1 72:1 73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1 81:1 82:1
  83:1 84:1 85:1 86:1 87:1 88:1
  89:1 90:1 91:1 92:1 93:1 94:1
  95:1 96:1 97:1 98:1 99:1
  100:1 101:1 102:1 103:1 104:1
  105:1 106:1 107:1 108:1 109:1
  110:1 111:1 112:1 113:1 114:1
  115:1 116:1 117:1 118:1 119:1

120:1 121:1 122:1 123:1 124:1
125:1 126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1 134:1
135:1 136:1 137:1 138:1 139:1
139:6 140:1 141:1 142:1 143:1
144:1 145:1 146:1 147:1 148:1
149:1 150:1 151:1 152:1 153:1
154:1 155:1 156:1 157:1 158:1
159:1 160:1 161:1 162:1 163:1
164:1 165:1 166:1 167:1 168:1
169:1 170:1 171:1 172:1 173:1
174:1 175:1 176:1 177:1 178:1
179:1 180:1 181:1 182:1 183:1
184:1 185:1 186:1 187:1 188:1
189:1 190:1 191:1 192:1 193:1
194:1 195:1 196:1 197:1 198:1
199:1 200:1 201:1 202:1 203:1
204:1 205:1 206:1 207:1 208:1
209:1 210:1 211:1 212:1 213:1
214:1 215:1 216:1 217:1 218:1
219:1,4,10 220:1,4 221:1,5,24
222:1
**want** 16:19 19:8,24 20:6 23:13
  24:19,22 40:5 45:12 47:8 60:2
  64:6 67:12 69:2 82:9 87:12,18
  96:9,9,10 108:5,13 112:13
  123:23,24 126:23 127:5 137:14
  139:13 145:18 146:11 148:22
  152:15,21 156:13,23 157:14
  160:7,8,8,21 161:5,20 163:18
  169:7 174:4 176:16,16 197:19
  200:18 205:18 206:24,25 208:2
  212:21 213:7
**wanted** 13:3 43:4 55:14 68:5
  131:11 147:25 161:22 172:10
  173:24 174:18 206:16
**wants** 108:18 110:8 144:10 203:2
**wasn't** 43:8 58:24 63:12 72:10
  108:25 111:24 115:21 130:15
  134:15 142:15,22 143:11
  194:12 213:3 215:12 217:8
**wasn't** 108:21
**waste** 20:7
**watery** 49:7
**way** 22:11 46:24 63:6 79:13 92:9
  109:19 142:14 147:12 160:22
  164:8,10 185:24 186:14 188:22
  189:10 200:19 209:10
**ways** 185:8

**we'll** 13:5 19:18 23:7 71:16
 97:8 109:15
**we're** 6:5 11:25 16:20,20 24:17
 25:4 36:13 38:15 43:11,15
 52:14 68:15,18 69:2 97:10
 109:10,13,16 112:7 113:4
 118:16,19 133:15 153:2 161:9
 173:5 188:17 195:5 198:22
 199:20 200:20,20 203:4 209:15
 211:7
**we've** 75:6 109:12 169:22 191:15
 213:25
**we'll** 16:21,22 19:21
**we're** 152:22
**we've** 45:11
**wearing** 151:25
**Webex** 1:14
**week** 178:17 187:17
**weeks** 40:9 93:9 187:18
**went** 7:23,24 8:3 69:25 70:8
 100:5 114:23 121:7 134:7
 160:3 178:15 184:2,5 191:24
**weren't** 77:21 199:25
**West** 2:18
**wheel** 173:2
**whims** 171:10
**white** 103:25 104:18,18 105:12
 191:19,24
**Wilhemina** 56:25 75:12
**willing** 108:17
**willingness** 202:13
**wish** 109:14 207:3
**wishes** 171:11,20
**withdrawal** 187:7,9
**withdrawn** 71:20 84:19 86:16
 106:13 116:5 120:5 123:7
 125:23 140:18 141:23,23 171:7
 194:2,13
**witness** 2:13 3:10,14 5:8 6:4,10
 6:13,15 16:18 23:9,15,19
 28:14 36:15,19,22 49:12 66:11
 67:3,7 70:9 72:18 74:7,15
 78:18 82:13 90:2,5 95:21 96:5
 96:7 97:20,23 108:21,25
 114:10 117:22 121:3 125:3,10
 128:22 137:15,18 139:6 144:6
 144:10 145:2,14,20 146:6
 150:10 160:5,10 161:16 163:17
 166:3 173:12 196:20 203:6
 204:7 206:8 211:20 213:19

 215:24 216:23 217:5,16,24
 218:5,13,16
**witness(es)** 220:7
**Wonderful** 7:8
**word** 65:6,6 71:8 82:21 90:4
 99:24 116:15 119:18 120:21
 155:12 159:14,16 167:12
 190:24 221:15,16,18,19,20,21
 221:22
**words** 79:5 93:8 94:25 102:13,19
 117:13 118:23 119:4 120:8
 139:9 140:14,17 143:4,5 146:2
 148:18
**work** 8:12,14,24 19:6 108:17
 132:20 136:24 161:9,22 194:16
 199:18,24 200:9
**worked** 77:7,18 91:6 136:25
 200:12
**worker** 55:12 57:6 60:4,6,16,18
 60:23,25 61:2,9,10,13 71:3
 140:22 141:4
**working** 13:22 27:11 65:21,21
 106:16 137:13 199:17
**works** 73:11
**world** 176:4
**worsening** 49:7
**worth** 42:18
**wouldn't** 64:2 138:2 178:2 179:4
 187:23 190:12
**wrap** 161:15
**write** 141:16 177:17 201:2
**writing** 143:7,16,17,24 211:22
**writings** 182:12
**written** 70:24 101:18,23,24
 134:2,2 140:20,21,24 141:4,15
 200:25
**wrong** 88:2 90:13 153:12,15
 213:5
**wrongfully** 169:19
**wrote** 44:12 46:6,9,10 71:5
 140:15 142:11 143:15

---

| X |
| --- |

**X** 4:2 5:2,2 219:9,12
**X-ray** 128:10

---

| Y |
| --- |

**yeah** 8:22 11:14 14:3 20:21
 24:15 42:16 43:2,5 45:10,17
 54:9 68:4,12 74:5 76:14 79:19

86:3 87:18,20 96:19 97:7,13
101:15 103:3,7,13 108:7
116:25 117:4 118:4 124:25
125:8 126:14 127:3 128:8
129:22 132:23 139:13 141:6
147:10,17 153:2 157:7 159:21
165:24 171:4 182:14 188:9
196:18 201:15 208:5 210:19
213:2 216:20 217:25 218:14
**year** 117:3
**years** 36:6 37:13 79:5,9 110:3
116:20 117:2,6,7 121:24 154:8
154:14 156:11 181:12 182:7
183:13
**yesterday** 84:5 121:3
**York** 1:2 2:5,5,8,10,12,15,18
61:15 70:10 78:12 82:9 169:16
169:17,18 206:5 218:8 221:14
**you'd** 195:5
**you've** 124:6
**young** 110:4 153:21

**Z**

**zero** 56:13 116:22 146:17 189:6
208:12
**Zewdie** 57:6

**0**

**09** 116:2

**1**

**1** 5:15 220:6,10
**1:18** 109:9
**1:22** 113:2
**1:23** 113:2
**1:30** 118:12
**10/24** 124:20 125:16
**10:07** 1:13 6:2
**10:18** 15:5
**10:53** 15:6
**10007** 2:5
**11:21** 52:12,12
**11:46** 68:16
**11:55** 15:7
**12:06** 14:16 15:7
**12:11** 68:17
**12:54** 109:8
**12180** 2:8 221:14
**12203** 2:15
**12205** 2:18

**12224-0341** 2:12
**163** 4:5
**169** 4:5
**17** 5:5
**17-CV-626** 1:5 221:4
**1980** 7:23

**2**

**2** 5:17
**2:14** 153:23
**2:25** 153:24
**2008** 10:5 11:3,17 12:5,12,21
13:7 14:14 25:24 28:19 67:4
75:13,18 85:23 119:20 120:7
121:14,20 125:20 136:6
**2009** 69:24 71:23 72:13,15 74:4
74:8 83:18 87:9,13,17 167:18
168:20 206:15,21
**2014** 72:8
**2020** 1:12 219:11
**203** 4:6
**206** 4:6
**210.45** 206:4
**218** 220:10
**21st** 10:5 13:6 14:14 28:19
75:13,17 85:23 97:23 119:20
120:7 125:20 136:6
**22** 2:8 221:13
**22nd** 67:3 121:12,14 142:11
**23rd** 87:22 128:8
**24th** 25:24

**3**

**3:39** 218:21
**30** 1:12 221:9,10
**305** 2:4

**4**

**4:05** 1:13

**5**

**507** 2:18
**523-7887** 221:2

**6**

**6** 2:14 4:4
**600** 2:4
**67** 5:7
**68** 4:4

| 7 | |
|---|---|
| **7-30-2020** | 1:1 2:1 3:1 4:1 5:1 |
| | 6:1 7:1 8:1 9:1 10:1 11:1 |
| | 12:1 13:1 14:1 15:1 16:1 17:1 |
| | 18:1 19:1 20:1 21:1 22:1 23:1 |
| | 24:1 25:1 26:1 27:1 28:1 29:1 |
| | 30:1 31:1 32:1 33:1 34:1 35:1 |
| | 36:1 37:1 38:1 39:1 40:1 41:1 |
| | 42:1 43:1 44:1 45:1 46:1 47:1 |
| | 48:1 49:1 50:1 51:1 52:1 53:1 |
| | 54:1 55:1 56:1 57:1 58:1 59:1 |
| | 60:1 61:1 62:1 63:1 64:1 65:1 |
| | 66:1 67:1 68:1 69:1 70:1 71:1 |
| | 72:1 73:1 74:1 75:1 76:1 77:1 |
| | 78:1 79:1 80:1 81:1 82:1 83:1 |
| | 84:1 85:1 86:1 87:1 88:1 89:1 |
| | 90:1 91:1 92:1 93:1 94:1 95:1 |
| | 96:1 97:1 98:1 99:1 100:1 |
| | 101:1 102:1 103:1 104:1 105:1 |
| | 106:1 107:1 108:1 109:1 110:1 |
| | 111:1 112:1 113:1 114:1 115:1 |
| | 116:1 117:1 118:1 119:1 120:1 |
| | 121:1 122:1 123:1 124:1 125:1 |
| | 126:1 127:1 128:1 129:1 130:1 |
| | 131:1 132:1 133:1 134:1 135:1 |
| | 136:1 137:1 138:1 139:1 140:1 |
| | 141:1 142:1 143:1 144:1 145:1 |
| | 146:1 147:1 148:1 149:1 150:1 |
| | 151:1 152:1 153:1 154:1 155:1 |
| | 156:1 157:1 158:1 159:1 160:1 |
| | 161:1 162:1 163:1 164:1 165:1 |
| | 166:1 167:1 168:1 169:1 170:1 |
| | 171:1 172:1 173:1 174:1 175:1 |
| | 176:1 177:1 178:1 179:1 180:1 |
| | 181:1 182:1 183:1 184:1 185:1 |
| | 186:1 187:1 188:1 189:1 190:1 |
| | 191:1 192:1 193:1 194:1 195:1 |
| | 196:1 197:1 198:1 199:1 200:1 |
| | 201:1 202:1 203:1 204:1 205:1 |
| | 206:1 207:1 208:1 209:1 210:1 |
| | 211:1 212:1 213:1 214:1 215:1 |
| | 216:1 217:1 218:1 219:1 220:1 |
| | 221:1,5 222:1 |
| **76** | 7:23,23 |

| 8 | |
|---|---|
| **80** | 7:23,25 |
| **800** | 221:2 |
| **84** | 7:25 |

| **86** | 5:6 |
|---|---|
| **89** | 8:2 |

| 9 | |
|---|---|
| **9/21** | 147:6 |
| **9/21/08** | 52:21 54:12 56:13 60:5 |
| | 147:4 |
| **9/22/08** | 45:23 48:15 51:18 66:14 |
| **9/22/2018** | 43:17 |
| **9/23** | 126:10 |
| **9/26** | 147:6 |
| **9:52** | 14:25 |