UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ADRIAN THOMAS,

                             Plaintiff,                      **DEFENDANT'S 7.1
                                                                          AMENDED RULE
      -against-                                                        STATEMENT**
                                                                          Civil Case No.: 17-cv-626
ADAM R. MASON, Individually, RONALD FOUNTAIN,   (GTS/DJS)
Individually, TIM COLANERI, Individually, and
MICHAEL SIKIRICA, Individually,

                             Defendants.
_____

       Defendant, Michael Sikirica, by and through their attorneys, Bailey, Johnson & Peck, P.C., pursuant to Rule 7.1(a)(3) of the Local Rules of practice for the United States District Court for the Northern District of New York, hereby state the following:

       1.      On September 21, 2008, Plaintiff Adrian Thomas (hereinafter "Plaintiff") had seven children. Plaintiff's youngest children were 4-month-old twin boys.

       2.      On the morning of September 21, 2008, a 911 call was made by Plaintiff stating that M.T. was unresponsive. (Ex[1]. "A")

       3.      The City of Troy Fire Department responded to the call and found M.T. to be alive but unresponsive. He was transported by ambulance to Samaritan Hospital. (Ex. "C")

       4.      Upon arrival at Samaritan Hospital, the triage assessment included a history that M.T. had been vomiting and had diarrhea for 2 to 3 days and was found unresponsive that morning. Among the initial procedures performed at Samaritan Hospital, M.T. was intubated, and a blood culture was drawn and sent for analysis. (Sikirica[2] Ex. 2[3] pp. S000272-273)

---

[1] Unless otherwise referenced all exhibits references herein are attached to the Declaration of Crystal R. Peck.
[2] References to "Sikirica" refer to the Affidavit of Dr. Sikirica and exhibits attached thereto which accompanies the instant Motion.
[3] References to Sikirica Exhibit 2-page numbers refer to bate stamp numbers on the document.

5.      Samaritan Hospital records note "copious amounts of green secretions" when M.T. was intubated. (Sikirica Ex. 2 p. S000273)

6.      Within one hour of M.T.'s arrival at Samaritan Hospital, Dr. Edge was contacted at Albany Medical Center (AMC) to transfer M.T. to AMC's Pediatric Intensive Care Unit. (Sikirica Ex. 2 p. 297).  Dr. Edge was advised of M.T.'s condition, that he was unresponsive, showing limited neurological activity, having trouble breathing, had been intubated and placed on a ventilator, and had very low blood pressure.  (Ex. "W" pp. 15-16).  Dr. Edge was provided a history that the child had some vomiting, diarrhea, and increased lethargy prior to the parents calling EMS.  (Ex. "W" pp. 15-16)

7.      Dr. Edge saw M.T. upon his arrival at AMC.  He observed that M.T. was minimally reactive such that he would only move to painful stimuli, was on a ventilator with a breathing tube in place, with I.V.'s in place to administer medication.  (Ex. "W" p. 26)

8.      Dr. Edge ordered an ophthalmology and neurosurgery consult for M.T. to look at the possibility of there being a traumatic brain injury.  (Ex. "W" p. 30; Ex. X p. 15; Sikirica 2 pp. S000068-69, S000072).  A hematology consult was also ordered because M.T. had problems with elevated clotting times.  (Ex. "W" p. 32).

9.      A CT scan was also performed on M.T. which showed large bilateral, extra axial, fluid collections – possibly subdural.  (Ex. "W" 33, Sikirica Ex. 2 p. S000103).

10.     Dr. Edge testified that the CT findings could be consistent with head trauma, and that he would rely on neurosurgeons and a radiologist to review the CT scan to differentiate between blood and a collection of spinal fluid.  (Ex. "W" pp. 33-34).

11. The ophthalmology consult indicated "inter-retinal hemorrhage next to optic nerve" and that there is "evidence of extensive retinal hemorrhage, intraretinal and possible subretinal". (Sikirica Ex. "2" p. S000068, Ex. "W" p. 35)

12. Dr. Edge testified that the ophthalmology finding is significant for trauma to the brain. (Ex. "W" p. 35).

13. The neurosurgery consultation indicated that at the time of examination M.T. was in a deep coma, at best, possibly brain dead and anterior fontanelle bulging was full intense. (Sikirica Ex. 2 pp. S000069, S000072; Ex. "X" pp. 20-21). Neurosurgeon, Dr. John Waldman gave deposition testimony that the examination findings were suggestive of the baby's brain being swollen and/or there is an additional mass like a subdural hematoma that has pushed the bones apart and caused the fontanelle to be tense and sutures to be spread apart abnormally. (Ex. "X" p. 21)

14. Dr. Waldman examined M.T. on September 22, 2008. Based on his examination, his impression was that M.T. was likely brain dead from bilateral subdural hematomas. (Ex. "X" p. 27). Dr. Waldman testified that since there was no history as to how the subdural hematomas occurred, they were considered to be possibly non-accidental trauma. (Ex. "X". p. 28).

15. Dr. Waldman's diagnosis was bilateral subdural hematomas without explanation based on his examination, review of the CAT scan, and understanding of the history from the chart. (Ex. "X" p. 28)

16. Dr. Edge's impression was that there were subdural hematomas, perhaps of different ages, indicative of rapid acceleration//deceleration injury, perhaps hitting an object causing subdural hematomas – cause of which could either be an accident or child abuse. (Ex. "W". p. 58).

17. Based on these findings, Dr. Edge had M.T.'s condition reported to Child Protective Services and the City of Troy Police Department for possible abuse.  (Ex. "W" pp. 60-62).

18. City of Troy Police Officers, Sgt. Mason and Detective Fountain were called to investigate the report of a baby (M.T.) at AMC with head injuries.  (Ex. "E" – 9/21/08 Narrative)

19. Sgt. Mason responded first to Samaritan Hospital Emergency Room and then to Plaintiff's home along with Child Protective Services.  (Ex. "E" – 9/21/08 Narrative)  Plaintiff's remaining 6 children were removed from the home by CPS and Officer Mason conducted an initial interview of Plaintiff at the home.  Id.

20. Sgt. Mason then reported to AMC and was told by the charge nurse that M.T. had suffered a bilateral subdural hematoma and was not likely to survive.  (Ex. "E" – 9/21/08 Narrative).  The hematomas appeared to be both old and new as blood on the victim's brain indicated an old injury as well as a new injury.  (Ex. "E" – 9/21/08 Narrative)

21. On that same day, Detective Fountain spoke with Dr. Edge and reported that Dr. Edge states that the observed injury is typically caused by a high-speed impact or by slamming very hard into a hard object.  Det. Fountain further reported that Dr. Edge stated, "this is murder".  ((Ex. "E" – 9/21/08 Narrative; Ex. "Z" p. 60).

22. After speaking with Plaintiff's wife at the hospital, Detective Fountain and Sgt. Mason returned to Plaintiff's residence and asked if he would come to the police station for questioning.  (Ex. "Z" p. 65).

23. Plaintiff agreed and was questioned for approximately 2 hours before threatening to jump off a bridge if M.T. died. (Ex. "Z" p. 67).  In response to Plaintiff's statement, Detective

4

Fountain and Sgt. Mason called Samaritan Hospital for a mental health evaluation and transported Plaintiff to Samaritan Mental Health.  (Ex. "Z" p. 67)(Ex. "Y" p. 99)

24. On September 22, 2008, Sgt. Mason reported again to AMC and spoke with neurosurgeon Dr. Waldman.  (Ex. "E" - 9/22/08 Mason Narrative).  Sgt. Mason reported that Dr. Waldman stated that M.T. had no brain activity and that the cause of the injury was consistent with what had been stated by Dr. Edge.  (Ex. "E" - 9/22/08 Mason Narrative).

25. On that same day, Detective Fountain monitored interviews of Plaintiff's children at the State Children's Center. (Ex. "E" - 9/22/08 Mason Narrative). During those interviews, M.T.'s sister, India Hicks reported that on the morning of the incident she observed Plaintiff throw M.T. into his crib, and that M.T.'s head banged off the side of the crib and he appeared to go limp. (Ex. "E" - 9/22/08 Mason Narrative).

26. At approximately 5 p.m., on September 22, 2008, Plaintiff was released from Samaritan Mental Health.  Plaintiff was met at the hospital by Detective Mason and asked to return to the police station for further questioning.  (Ex. "Z" p. 69).

27. Plaintiff was questioned again by Sgt. Mason on the evening of September 22, 2008 through the early morning hours of September 23, 2008.  (Ex. "Y" p. 106).  The interview was videotaped and lasted approximately 7 hours.  During that time, Plaintiff stated that he had slammed M.T. down on a mattress and crib on three separate occasions in the days leading up to September 21, 2008.  (Ex. "F")  At the conclusion of the interview, Plaintiff provided a ten-page statement summarizing what he had done to M.T.  (Ex. "F").

28. After providing the statement to the police, Plaintiff was placed under arrest.  (Ex. "Y" p. 116, Ex. "G").

29. M.T. Thomas was declared brain dead on September 23, 2008. (Sikirica Ex. 2 p. S000068)

30. Wilhelmina Hicks, M.T.'s mother, gave consent for M.T.'s organs to be donated. (Sikirica Ex. 4). A procedure to harvest M.T.'s kidneys and liver was conducted on September 24, 2008. (Sikirica Ex. 4).

31. On September 25, 2008, an autopsy of M.T. was performed by Dr. Sikirica. (Sikirica Ex. 3).

32. Dr. Sikirica is the Chief Medical Examiner for Rensselaer County. (Sikirica Aff. ¶ 1).

33. The position of Medical Examiner is independent from law enforcement and the district attorney's office. (Ex. "BB" 328-329 22:3)

34. As Chief Medical Examiner, Dr. Sikirica is charged with determining the cause and manner of a decedent's death, which he does by performing an autopsy. (Sikirica Aff. ¶ 8; NY County Law §674(3)(a)).

35. An autopsy is both the internal and external examination of the decedent that is analyzed taking into account additional information that is relevant to the manner and cause of death such as police reports, witness statements, photographs of the scene of death, medical records, and toxicology reports. (Sikirica ¶ 9).

36. Prior to performing the physical examination of M.T., Dr. Sikirica received and reviewed the Samaritan Hospital records and AMC records relative to M.T. (Sikirica ¶ 35) Dr. Sikirica also reviewed a copy of the Troy Police Incident Report and a 10-page handwritten statement by Adrian Thomas. (Sikirica Ex. 3)

37. Prior to an autopsy, Dr. Sikirica does not ordinarily speak with law enforcement. His office will receive a call of a death that falls within his jurisdiction and a Medicolegal Death Investigator employed by the County will obtain the preliminary information needed to schedule the autopsy.  (Sikirica ¶¶ 20, 22)

38. Dr. Sikirica did not participate in the questioning of Adrian Thomas by the City of Troy Police. (Sikirica Aff. ¶66)

39. Dr. Sikirica did not attend the questioning of Adrian Thomas that was conducted by the City of Troy Police. (Sikirica Aff. ¶66)

40. In attendance at the autopsy was District Attorney Richard McNally, Assistant District Attorney Christa Book, Police Sergeant Adam Mason, Evidence Technician David Farley of the Troy Police Department, and Rensselaer County Senior Medicolegal Death Investigator Jennifer Alibozek. (Sikirica Ex. 3 p. 5).

41. Prior to performing the autopsy of M.T., a Medicolegal Death Investigator with the Rensselaer County Department of Health notified the City of Troy Police Department of the time and place of the autopsy.  (Sikirica Aff. ¶ 22).  The District Attorney's Office was not notified by either Dr. Sikirica or his staff as to the date/time of the autopsy.  ((Sikirica Aff. ¶22).

42. Dr. Sikirica made the following observations during his physical examination of M.T.:

- Evidence of postmortem organ donation with no evidence of trauma to remaining organs;
- No fractures;
- A few cc of bloody fluid in the pleural and peritoneal cavities, no adhesions;
- Larynx and thyroid gland were unremarkable.  Slight amount of hemorrhage in the soft tissues of the lower right neck consistent with overlying right jugular line;
- Partial collapse of each lung in pleural cavity.  Slight greenish pink coloration to the pleural surface of each lung.  Diffuse bilateral congestions, small

> amount of mucoid slightly purulent material in the airways of each lung.  No aspirated material or thromboembolic found;
> - Circumstantial spotty hemorrhage in the myocardium throughout the left ventricle consistent with anoxia or ischemia;
> - Large zone of mottled predominately purple subgalea hemorrhage along the frontal and anterior left and right parietal scalp.  1 cm greenish ecchymosis along the lower right parietal and upper temporal region.  1.5 cm fairly well circumscribed pink ecchymosis lesion along the right parietal zone.  Extensive splitting of sutures of the skull.  Approximately 60 ml of subdural blood collected along the right middle cerebral fossa and extending along the right temporal and parietal lobes.  No evidence of epidural hemorrhage.  Diffuse subarachnoid hemorrhage along the basilar portion of the brain and along the superior hemisphere;
> - Small and large intestines and appendix have normal configuration; and
> - Liver, adrenal glands, kidneys, and spleen surgically absent.

(Sikirica Ex. 3; Sikirica Ex. 2. pp. S000256-259)

43. Dr. Sikirica further observed that M.T. had evidence of pneumonia and infection at the time death.  (Sikirica ¶ 36)

44. Based on the information available to Dr. Sikirica on September 25, 2008, Dr. Sikirica determined M.T.'s cause of death to be "severe closed head injuries with cerebral edema due to blunt force trauma" and the manner of death to be homicide.  (Ex. "H" p. 17).

45. While Dr. Sikirica reached a cause of death determination on September 25, 2008, his autopsy report was not completed until April 22, 2009.  (Sikirica Ex. 3).

46. On September 26, 2008, Dr. Sikirica testified before the Rensselaer County Grand Jury in *People v. Adrian Thomas*.  (Ex. "H").

47. Dr. Sikirica testified to the observations he made during his physical examination of M.T. the day before as well as to his cause of death determination.  (Ex. "H" pp. 7-24).

48. In the Grand Jury proceeding, Dr. Sikirica specifically testified that M.T. showed evidence of developing and worsening pneumonia. (Ex. "H" pp. 11, 13, 15, 17).

8

49. Dr. Sikirica further testified before the Grand Jury that it was the effect of the shearing injury, added on by the pneumonia, that caused the swelling of M.T.'s brain. (Ex. "H" p. 15).

50. Between September 26, 2008 and April 22, 2009, Dr. Sikirica received M.T.'s birth records, toxicology laboratory results, and performed the sectioning and examination of M.T.'s brain and eyes. (Sikirica ¶ 53)

51. Dr. Sikirica's review of the materials after his physical examination did not alter his determination as to the cause and manner of M.T.'s death. (Sikirica ¶ 53)

52. Dr. Sikirica prepared his formal Autopsy Report on April 22, 2009. (Sikirica Ex. 3) Therein, Dr. Sikirica listed the following under Anatomic Diagnosis:

"I. Severe closed head injuries with cerebral edema due to blunt force trauma
   a. Clinical history of subdural hematoma with severe cerebral edema
   b. Radiographic evidence of bilateral subdural hematomas
   c. Medical evidence of brain death
   d. Splitting of the sutures of the skull consistent with cerebral edema
   e. Extensive acute and resolving subarachnoid hemorrhage
   f. Extensive acute and resolving hemorrhage in the optic nerve sheaths and acute retinal hemorrhage, bilateral
   g. Fresher and older appearing areas of subgalea hemorrhage
   h. Reported history of decedent thrown forcibly downward on a mattress on several instances before eventually being found unresponsive.
II. Blood culture positive for streptococcus pneumonia on initial presentation to hospital (9/21/08)
   a. Acute and chronic pneumonia with severe atelectasis (microscopic)
III. Severe anoxic type changes of the heart (gross and microscopic)
IV. Status post donation of multiple internal organs"

(Sikirica Ex. 3 p. 12).

53. Plaintiff was criminal prosecuted for murder in September of 2009.

54. At Plaintiff's 2009 criminal trial, Dr. Kardos, Dr. Edge, Dr. Waldman, Dr. Jenny, Dr. Ojukwu, and Dr. Sikirica testified as witnesses for the prosecution. (Exs. "H" – "N")

9

55. Dr. Sikirica testified to his review of the records, his autopsy findings, and his cause and manner of death determination and the basis for same. (Ex. "N")

56. Dr. Sikirica further testified at the 2009 trial "according to the records that came over from Samaritan Hospital, he [M.T.] did have bacteria in his bloodstream. He had streptococcus pneumoniae bacteria in his bloodstream suggesting sepsis. (Ex. "N" p. 9 [A1360[4]])

57. Dr. Sikirica further testified that he found evidence of pneumonia microscopically and grossly, and evidence of acute subdural hematomas and older chronic subdural hematomas indicating multiple bouts of head trauma. (Ex. "N" p. 101 [A1452]).

58. The testimony of Dr. Kardos, the treating emergency room physician at Samaritan Hospital, included:

- A differential diagnosis including sepsis and possible head trauma. (Ex. "M" p. 8 [A717]);
- That she began a course of antibiotics for the possible infection and ordered a blood culture. (Ex. "M" p. 8-9 [A718]);
- A CT scan had not been ordered. (Ex. "M" p. 10 [A719]);
- Streptococcus pneumonia can cause bacteremia – bacteria in the blood. (Ex. "M" p. 25 [A734]);
- "Head injury can cause an alteration in your level of consciousness, and it can—it's possible that it can result in an inability to protect your airway, which can lead to aspiration, a cause of infection." (Ex. "M" p. 36-37 [A745-46]).

59. Dr. Edge's testimony included:

- The neurosurgical consult, ophthalmological consult and CT scan evidenced subdural hematomas and retinal hemorrhages that were consistent with trauma. (Ex. "J" p. 24-25 [A846-47]);
- It was possible that M.T. had both sepsis and trauma; (Ex. "J" p. 69 [A891]).
- In his opinion, trauma was the cause of death with sepsis not ruled out as contributing to that. (Ex. "J" p. 28 [A850]);
- "We were treating the patient for ceasing of brain activity, inability to breathe, inability to maintain blood pressure, which we thought could be from sepsis,

---

[4] References to numbers in [ ] refer to bate stamps numbers at the bottom of the transcripts. Both page numbers and bate stamp numbers are used as references.

        but we felt that the neurologic signs were out of proportion to it being sepsis alone. (Ex. "J" p. 73 [A895])";

- The subdural hematoma would not have been caused by sepsis. (Ex. "J" p. 73 [A895]).

60. Dr. Ojukwu's testimony included:

- He is Board certified in pediatrics and had been M.T.'s pediatrician at birth through Seton Health. (Ex. "I" pp. 5-6 [A1330-31]);
- A head sonogram of M.T. had been ordered after birth to rule out intracranial bleeds when he was born. (Ex. "I" p. 12 [A1337]);
- Since the fontanelle is open for 9 to 12 months following birth, an ultrasound can be used to diagnosis intracranial bleeds in newborn infants. (Ex. "I" p. 13 [A1338]);
- The ultrasound performed on M.T. did not show subdural bleeds. (Ex. "I" p. 13 [A1338]).

61. Dr. Jenny's testimony included:

- She is board certified in pediatric medicine and is a Professor of Pediatrics at Brown Medical School and the Director of the Child Protection Program at the Hasbro Children's Hospital in Providence. (Ex. L p. 3 [A1475]);
- She reviewed Wilhelmina Hick's pre-natal records, M.T.'s birth records, hospital records, and autopsy report. (Ex. L pp. 12-13 [A1484-85]);
- M.T.'s birth and pediatric records did not evidence that he had a subdural hematoma dating back to birth. (Ex. L p. 17-18 [A1490-91]);
- In her medical opinion, M.T.'s sepsis condition was a secondary complication of the fact that he had an ongoing head injury. (Ex. L p. 101 [A1573]).

62. Plaintiff offered testimony of his own medical witnesses in 2009 to provide opinions as to M.T.'s cause of death. (Exs. O, P)

63. Plaintiff's defense counsel and medical witnesses proffered two theories regarding M.T.'s cause of death: (1) that M.T. died of an overwhelming sepsis condition with indications of meningitis; and (2) that the subdural hematoma observed was chronic, possibly dating back to birth. (Exs. O, P)

64. These witnesses included infectious disease specialist Dr. Jerome Klein, and neuropathologist Dr. Jan Leetsma. (Exs. O, P)

65. Dr. Leetsma's testimony in 2009 included:

11

- He reviewed the medical records relating to M.T. as well as Dr. Sikirica's autopsy report and microscopic slides; (Ex. "P" p. 19 [A1951])
- "The child was shown to have streptococcus bacteria in his blood. That's a very serious finding"; (Ex. "P" p. 37 [A1969])
- He observed that M.T. did have a chronic subdural hematoma with fresh bleeding; (Ex. "P" p. 48, 51-52 [A1980, A1983-84])
- "[P]ediatric head injury is attended by a very high percentage of infants that have retinal hemorrhage"; (Ex. "P" p. 129 [A2061])
- "That's [growth chart] something I often look for, because children with problems like this [chronic subdural hematoma] often do have an increasing head circumference"; (Ex. "P" p. 142 [A2074])
- When someone experiences head injury, if their level of consciousness and functioning is impeded, they can develop pneumonia. (Ex. "P" p. 145 [A2077])

66. Dr. Klein's testimony included:

- He specializes in infectious disease;. (Ex. "O" p. 2 [A1825])
- In his opinion M.T.'s death was caused by overwhelming pneumococcal sepsis; (Ex. "O" p. 12 [A1835])
- He did not find any deficiencies in the autopsy report. Although the report doesn't mention the word sepsis, the medical examiner does not disagree sepsis is there and identified the positive blood culture; (Ex. "O" p. 69 [A1892])
- Dr. Klein observed subdural hematomas from the autopsy photographs; (Ex. "O" p. 73 [A1896])
- Dr. Klein deferred to experts in ophthalmology and neuroanatomy or neuropathology when asked if there could be other causes to in the brain; (Ex. "O" p. 95[A1918])
- Trauma can cause retinal hemorrhaging. (Ex. "O" p. 95[A1918])

67. Plaintiff's inculpatory statements were permitted into evidence and considered by the jury during his 2009 criminal trial. *People v. Thomas*, 22 N.Y.3d 629 (2014).

68. At the conclusion of his trial, Plaintiff was convicted of murder in 2009. *People v. Thomas*, 22 N.Y.3d 629 (2014).

69. Plaintiff thereafter appealed his conviction on the basis that his confession was coerced and should not have been permitted as evidence against him. *People v. Thomas*, 22 N.Y.3d 629 (2014).

12

70. On March 22, 2012, the Appellate Division, Third Department upheld Plaintiff's conviction finding that Plaintiff's statements to the police were voluntary and that the strategies and tactics employed by the officers were not of the character as to induce a false confession and were not so deceptive that they were fundamentally unfair and deprived him of due process. *People v. Thomas*, 93 A.D.3d 1019.

71. Plaintiff then appealed the Third Department's Decision to the New York State Court of Appeals. In an opinion issued by the Court on February 20, 2014, the Court of Appeals found that Plaintiff's inculpating statements were not demonstrably voluntary granting Plaintiff's motion to suppress the statements and directed a new trial. *People v. Thomas*, 22 N.Y.3d 629 (2014).

72. Plaintiff was retried in May 2014. (Exs. "Q"-"V")

73. Similar to the first trial, the prosecution witnesses included a number of medical professionals who testified as to M.T.'s medical condition and cause of death. These witnesses included Dr. Kardos, Dr. Ojukwu, Dr. Waldman, Dr. Jenny, and Dr. Sikirica. (Exs. "Q"-"V")

74. Dr. Kardos' testimony included:

- M.T. could not maintain his own airway upon arrival to Samaritan Hospital which increases the risk of aspiration; (Ex. "T" p. 14 [P20820])
- M.T.'s platelet level upon admission did not raise concern of coagulopathy. She did not observe signs of bleeding or bruising on M.T.'s body which are external signs of coagulopathy; (Ex. "T" pp. 25-26 [P20831-32])
- When she made her differential diagnosis of sepsis she did not have all of the information and did not have the benefit of a CT scan. (Ex. "T" pp. 22, 60 [P20828, 20866]).

75. Dr. Ojukwu testified consistent with his 2009 testimony. (Ex. "Q").

76. Dr. Waldman also testified consistent with his 2009 testimony. (Ex. "R"). Dr. Waldman's testimony included:

13

- He reviewed the CT scan of M.T. and opined that M.T. "has bilateral subdural hematomas with more acute blood or fresh blood on the right side."; (Ex. "X" pp. 24-26 [P21116-8])
- The subdural hematomas are caused by varying degrees of trauma; (Ex. "X" p. 28 [P21120])
- In his opinion M.T. sustained a blunt force trauma that caused subdural hematoma and they caused his death; (Ex. "X" p. 29 [P21121])
- "I have taken care of patients with head injuries and septic shock, and I have never seen subdural hematomas like this occur in septic shock personally." (Ex. "X" p. 75 [P21167]).

77.  Dr. Jenny's testimony in 2014 was also consistent with her 2009 testimony. (Ex. "S"). Her 2014 testimony included:

- The autopsy findings are "clearly related to trauma, multiple episodes of trauma, and the acute nature of his decompensating…going from---is also concerning for trauma, and his blood work, much of it is very consistent with trauma, and his low white count, his positive blood culture, are consistent with an infection."; (Ex. "S" p. 75 [P21276]).
- M.T. was not bleeding excessively when IV's were administered and that he lacked bruising to his body which indicated that, upon entry to the hospital, he was clotting reasonably; (Ex. "S" p. 45-46 [P21146-47]).
- "[S]evere retinal hemorrhaging is very common in inflicted trauma."; (Ex. "S" p. 53 [P21254]).
- "Given the dating of the subdural and the fact that the child had a normal head growth up until two months of age, I think they [the older subdural hematomas] occurred after two months of age."; (Ex. "S" p. 73 [P21174]).
- Her medical opinion was to what caused M.T.'s death is "it was abusive head trauma complicated by bacterial sepsis." (Ex. "S" p. 74 [P21175]).

78.  Likewise, Plaintiff again submitted medical testimony from Dr. Jerome Klein and Dr. Jan Leetsma. (Exs. "U" and "V")

79.  Dr. Klein testified in 2014 that he could not testify in any way about M.T.'s head trauma because "I lack expertise". (Ex. "U" p. 75 [P211651]).

80.  Dr. Leetsma again testified in 2014 that he observed the subdural hematomas documented during autopsy and continued to testify to the following:

- M.T.'s subdural or trauma was a contributory cause of his death. (Ex. "V" p. 46-47 [P21717-8]).

14

- Observations made include that the "the child had a positive blood culture. There was bacteria in his blood." (Ex. "V" p. 37 [P21707]).
- "The appearance in the gross indicates that there may have been bleeding in that area before because of the yellow discoloration in the soft tissues of the deep scalp.  The visual inspection doesn't help you very much, because estimating age and dating by the naked eye is probably not very accurate.  The microscopic, however clearly shows that this lesion has been there for some time, four or five days maybe, as evidence by the chronic inflation and healing reactions that are going on there.  And then, of course, we have the bacterial infection that is affected the subgalea hemorrhage.  So, this raises all sorts of issues of how can I tell how that got there, what is the mechanism of it and so forth, and that becomes very difficult to sort out…I mean, the issue is there was an apparent fall some days before admission.  That certainly could explain why there would be a bruise in that area."  (Ex. "V" pp. 47-48 [P21718-9]).
- The subgalea hemorrhage could be caused by a very minor impact if the child----for example, theoretically hitting his head on the crib. (Ex. "V" pp. 47 [P21718]).

81. Plaintiff's statements to the police were not permitted into evidence at the 2014 criminal trial and Plaintiff was acquitted of all charges.  *People v. Thomas*, 22 N.Y.3d 629 (2014).

82. At Plaintiff's deposition testimony, he testified that the basis for his conspiracy claim against the defendants is because Dr. Sikirica review his written statement to the police. (Ex. "DD" pp. 318-319)

83. Plaintiff further testified that the basis for his claim that Dr. Sikirica fabricated his autopsy report and conclusion is because Dr. Sikirica opined that M.T.'s cause of death was trauma.  (Ex. "DD" pp. 358-59)

84. Defendant Fountain did not have any conversations with Dr. Sikirica about the autopsy of M.T. Thomas.  (Ex. "Z" pp. 129, 136).

85. Defendant Colaneri did not have any conversations with Dr. Sikirica about the autopsy of M.T. (Ex. "AA" p. 28).

15

86. The only time Defendant Mason encountered Dr. Sikirica during his investigation was at the autopsy of M.T. Thomas. (Ex. "Y" p. 9).

87. Defendant Mason testified that there are typically not a lot of discussions at the autopsies he has attended.  (Ex. "Y" p. 144).

88. While Defendant Mason may have brought paperwork from the police file with him to the autopsy, he did not attend a "pre-autopsy" briefing or meeting with Dr. Sikirica about the M.T. investigation or autopsy.  (Ex. "Y". p. 144-45 22:6, p. 145 10:18).

89. Dr. Sikirica as a Medical Examiner is required to investigate causes of death that fall within his jurisdiction.  Sikirica ¶ 8-10, 13-15, 32, NY County Law § 674.  Investigations into causes of death include performing a physical examination of a decedent as well as reviewing documents such as death scene investigation materials, witness statements, and medical records.  Sikirica ¶ 8-10, 13-15, 32, NY County Law § 674.

90. In arriving at a determination that the manner of a death is a homicide, a medical examiner is not making a legal determination but instead determining that the death was caused by the direct action of another.  Sikirica Aff. ¶ 68.

91. In arriving at the cause and manner of death determination relative to M.T., Dr. Sikirica abided by all forensic pathology standards of practice.  Ex. "Baden-2[5]."

Dated:  June 14, 2021                                 Bailey, Johnson & Peck, P.C

By: *Crystal R. Peck*
      Crystal R. Peck
      Bar Roll No.: 514375
*Attorneys for Defendant, Michael Sikirica*
5 Pine West Plaza, Suite 507
Albany, New York 12207
Telephone: (518) 456-0082
CRPeck@BaileyJohnson.com

---

[5] Exhibits labeled "Baden" are attached to the Affirmation of Dr. Baden submitted with the instant Motion.