UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

ADRIAN THOMAS,

                                 Plaintiff,                17 CV 626 (DJS)

       -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                                 Defendants.

--------------------------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO THE TROY POLICE DEPARTMENT
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BRETT H. KLEIN, ESQ., PLLC
*Attorneys for the Plaintiff*
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT........................................................................................1

STATEMENT OF FACTS.................................................................................................2

     A.    Statement of Relevant Facts………………………………………………………2

     B.    Statement of Relevant Expert Witness Opinions…………………………………10

STANDARD OF REVIEW………………………………………………………………11

ARGUMENT……………………………………………………………………………...12

     I.    THE COURT OF APPEALS DECISION THAT THOMAS' CONFESSION WAS INVOLUNTARY SHOULD BE GIVEN PRECLUSIVE EFFECT ……………12

     II.    PLAINTIFF WAS MALICIOUSLY PROSECUTED ………..………...……...13

          A.    All TPD Defendants Initiated a Criminal Prosecution against Plaintiff….14

          B.    Probable Cause to Prosecute Plaintiff was Lacking………………………15

          C.    Defendants Acted with Malice…………………………………………...18

     III.    PLAINTIFF WAS DENIED HIS RIGHT TO FAIR TRIAL…………………………19

     IV.    PLAINTIFF HAS ESTABLISHED A SECTION 1983 CONSPIRACY CLAIM…...21

     V.    PLAINTIFF HAS ESTABLISHED CAUSATION…………………………………22

     VI.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY……………23

CONCLUSION..................................................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**

*Allen v. McCurry,* 449 U.S. 90 (1980) ........................................................................... 12

*Anderson v. City of New York*, 817 F.Supp.2d 77 (E.D.N.Y. 2011) .............................. 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 11

*Bailey v. City of New York*, 79 F. Supp. 3d 424 (E.D.N.Y. 2015) ........................... 17, 18

*Blake v. Race*, 487 F. Supp. 2d 187 (E.D.N.Y. 2007) ................................................... 16

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) ................................................. 18

*Buari v. City of New York*, No. 18 CV 12299 (MKV), 2021 WL 1198371 (S.D.N.Y. Mar. 30,

   2021) .......................................................................................................................... 18

*Crews v. County of Nassau*, 996 F. Supp. 2d 186 (E.D.N.Y. 2014) ............................... 18

*Days v. Eastchester Police Dep't*, No. 18-CV-11538 (NSR), 2020 WL 5504433 (S.D.N.Y. Sept.

   9, 2020) ..................................................................................................................... 15

*Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340 (2d Cir. 1998) ............................... 19

*Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443 (S.D.N.Y. 2012) .............................. 18, 21, 25

*Espada v. Schneider,* 522 F.Supp.2d 544 (S.D.N.Y. 2007) ............................................ 14

*Garnett v. City of New York*, 13 CV 7083 (GHW), 2014 WL 3950904 (S.D.N.Y. Aug. 13, 2014)

   ................................................................................................................................... 19

*Hamilton v. City of New York*, No. 15 CV 4574 (CBA)(SJB), 2019 WL 1452013 (E.D.N.Y. Mar.

   19, 2019) ............................................................................................................... 22, 23

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir.2007) ................................................ 19, 22, 23

*Hincapie v. City of New York*, 434 F. Supp. 3d 61 (S.D.N.Y. 2020) .............................. 19

*Hydro Inv'rs. Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000) ........................ 23

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) ............................................................ 23

*Kenney v. Clay*, 172 F. Supp. 3d 628 (N.D.N.Y. 2016)................................................................ 19

*Kogut v. Cty. of Nassau*, No. 06-CV-6695(JS)(WDW), 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009) ..................................................................................................................................... 12

*Lanning v. City of Glens Falls*, 908 F.3d 19 (2d Cir. 2018) ......................................................... 13

*Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209 (2d Cir.2002) ...................................... 22

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010)....................................... 14, 17, 18

*Matthews v. City of New York*, 889 F. Supp. 2d 418 (E.D.N.Y. 2012.................................... 23, 24

*McKinley v. City of Mansfield,* 404 F.3d 418 (6th Cir. 2005) ...................................................... 22

*Moroughan v. Cty. of Suffolk*, No. 12 CV 0512 (JFB)(AKT), 2021 WL 298714 (E.D.N.Y. Jan. 20, 2021) ............................................................................................................................. 14, 15

*Niemann v. Whalen*, 911 F. Supp. 656 (S.D.N.Y. 1996) ............................................................. 16

*Ortiz v. Wagstaff*, No. 16 CV 00321 (EAW), 2021 WL 752538 (W.D.N.Y. Feb. 26, 2021). 14, 16

*Owens v. Treder*, 873 F.2d 604 (2d Cir. 1989) ..................................................................... 12, 20

*Palka v. Servicemaster Mgmt. Servs. Corp.,* 83 N.Y.2d 579 (N.Y.1994) .................................... 22

*Pangburn v. Culbertson,* 200 F.3d 65 (2d Cir.1999) ................................................................... 21

*People v. Thomas*, 22 N.Y.3d 629 (N.Y. 2014)................................................................... passim

*Pizarro v. City of New York*, No. 14-CV-507 (KAM) (VVP), 2015 WL 5719678 (E.D.N.Y. Sept. 29, 2015) ............................................................................................................................ 16, 20

*Rentas v. Ruffin*, 816 F.3d 214 (2d Cir. 2016) ........................................................................... 18

*Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123 (2d Cir. 1997)............................... 14, 18, 19, 20

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995)...................................................... 11

*Sanders v. City of New York*, No. 12 CV 113 (PKC)(LB), 2015 WL 1469514 (E.D.N.Y. Jan. 7, 2015) ........................................................................................................... 15, 18

*Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003) ............................................................ 15

*Shabazz v. Kailer*, 201 F. Supp. 3d 386 (S.D.N.Y. 2016) ........................................................... 23

*Struthers v. City of New York*, No. 12 CV 0242 (JG), 2013 WL 2390721 (E.D.N.Y. May 31, 2013) ....................................................................................................................... 19

*Tankleff v. Cty. of Suffolk*, No. 09-CV-1207(JS)(AYS), 2017 WL 2729084 (E.D.N.Y. June 23, 2017) ....................................................................................................................... 24

*Wong v. Yoo*, 649 F. Supp. 2d 34 (E.D.N.Y. 2009) .................................................................... 14

*Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007) .................................................................... 23

**Other Authorities**

John Rafael Peña Perez, *Confronting the Forensic Confirmation Bias*, 33 Yale L. & Pol'y Rev. 457, 460 (2015) ........................................................................................................ 1, 17

Naomi Cahn, *Race, Poverty, History, Adoption, and Child Abuse: Connections*, 36 Law & Soc'y Rev. 461, 471 (2002) .......................................................................................... 21

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................................... 11

## PRELIMINARY STATEMENT

On September 21, 2008, Adrian Thomas' then wife, Wilhelmina Hicks, found their four month old infant son, M.T., unresponsive in his crib.  An ensuing erroneous medical assessment led to the wrongful labeling of M.T.'s death a murder by members of the Troy Police Department (hereinafter "TPD"), setting in motion a cascade effect, otherwise known as "forensic confirmation bias," resulting in a rigid focus on one suspect, here Adrian Thomas.  *See* John Rafael Peña Perez, *Confronting the Forensic Confirmation Bias*, 33 Yale L. & Pol'y Rev. 457, 460 (2015); Johnson Rpt. p. 11.  This rigid focus ultimately led to the coercion of a false confession from Mr. Thomas in which Mr. Thomas admitted to engaging in conduct consistent with abusive head trauma and his ultimate conviction of the murder of his son.

In a resounding rejection of the TPD defendants' misconduct, the New York State Court of Appeals (hereinafter "Court of Appeals") held that defendants Mason, Fountain, and Colaneri had engaged in pervasive coercive behavior to elicit a suggested confession from Mr. Thomas consistent with their theory of death, recognizing that "[e]very scenario of trauma induced head injury equal to explaining the infant's symptoms was suggested to defendant by his interrogators" and that there was "not a single inculpatory fact in defendant's confession that was not suggested to him."  *People v. Thomas*, 22 N.Y.3d 629, 646 (N.Y. 2014).  The Court of Appeals further recognized that the agreement of Thomas' inculpatory account with the theory of injury can "be readily understood as a congruence forged by the interrogation" and that "[t]he attainment of the interrogation's goal, therefore, cannot instill confidence in the reliability of its result."  *Thomas*, 22 N.Y.3d at 646.

Despite the lack of any evidence suggesting Mr. Thomas had murdered M.T., due to the cascade effect set in motion by defendants, Mr. Thomas was retried without the unlawfully

obtained confession, and ultimately acquitted after his second trial in 2014, ending the criminal phase of a six year ordeal.  This civil action seeking redress for the harms and losses caused by defendants ensued.

## STATEMENT OF FACTS

**A.    Statement of Relevant Facts[1]**

M.T., the four month old son of Adrian Thomas and Wilhelmina Hicks, was pronounced dead on September 23, 2008.  PCS ¶ 1.  Although M.T. died of natural causes, specifically, a streptococcus pneumoniae infection causing sepsis and meningitis, his death was erroneously labeled a crime, resulting in the wrongful prosecution and conviction of Mr. Thomas.  PCS ¶¶ 2-3.  This chain of events was first set in motion by the premature birth of M.T., a twin, born at 33 weeks on May 4, 2008, during a complicated birth which necessitated the use of forceps.  PCS ¶ 4.  During her pregnancy, Ms. Hicks had gestational diabetes, high blood pressure, and pre-eclampsia.  PCS ¶ 5.  Hicks was admitted to the hospital on May 1, 2008, where her water broke and showed evidence of meconium.  PCS ¶ 6.  The foregoing issues placed M.T. at risk for subdural bleeds.  PCS ¶ 7.  After birth, M.T. was admitted to the neonatal intensive care unit at Albany Medical Center (hereinafter "AMC") and then transferred to St. Mary's Hospital, where he remained hospitalized until May 22, 2008.  PCS ¶ 8.  As of September 2008, M.T. had only 1 of 4 pneumococcal vaccinations, and due to this and his premature birth, was more susceptible to infections, including bacterial pneumoniae.  PCS ¶ 9.  After M.T. came home from the hospital, M.T. was primarily cared for by Ms. Hicks.  PCS ¶ 10.

---

[1] For a complete statement of the facts which remain to be tried and which demonstrate that there are numerous genuine issues of material fact which preclude summary judgment in this matter, the Court is respectfully referred to plaintiff's Local Rule 56.1 Counter Statement (hereinafter referred to as "PCS").  A summary of said genuine issues of fact is set forth here.

On or about Friday, September 19, 2008, M.T. developed a fever with diarrhea, which lasted through Sunday. PCS ¶ 11. In the morning of September 21, 2008, Hicks discovered M.T. barely breathing in his crib. PCS ¶ 12. Prior to that morning, M.T. had not exhibited any problems with his breathing. PCS ¶ 13. Thomas called 911 and M.T. was transported to Samaritan hospital where he presented with symptoms of sepsis, and a blood culture was taken to confirm whether M.T. had a bacterial infection. PCS ¶ 14. M.T. was then transferred to the care of Dr. Walter Edge at AMC. PCS ¶ 15. Dr. Edge requested a neurology and ophthalmology consults to look for a possible traumatic brain injury. PCS ¶ 16. Dr. Edge was erroneously informed by the AMC neurosurgery consult that M.T.'s C.T. showed bilateral subdural hematomas and a skull fracture. PCS ¶ 17. It was later determined while M.T. was still at AMC that the diagnosis of a skull fracture was plainly incorrect, and the CT results in fact showed bilateral "fluid collections," not hematomas. PCS ¶ 18. Later, at autopsy, only a right sided hematoma was observed. PCS ¶ 18. Nonetheless, based on the flawed reported evidence of head trauma, both TPD and Child Protective Services (hereinafter "CPS") were notified out of a concern for possible child abuse. PCS ¶ 19.

Defendants Mason and Fountain were assigned the case and shared the role of lead investigator. PCS ¶ 20. Upon commencing their investigation, defendants Mason and Fountain first responded to Samaritan Hospital, where they were informed that the initial report at Samaritan was that M.T. was having respiratory problems and was unresponsive, and that M.T. had been transferred to AMC. PCS ¶ 21. Defendants Mason and Fountain thereafter escorted a CPS worker to Thomas' home for the purpose of removing Mr. Thomas and Ms. Hicks' other children from the home. PCS ¶ 22. While at the home, defendants Mason and Fountain learned from Mr. Thomas that M.T. had been sick with a fever and diarrhea for the past two days. PCS ¶ 23.

Detectives Mason and Fountain next went to AMC, where defendant Fountain spoke to Dr. Edge.  PCS ¶¶ 24-25.  The conversation lasted only three to four minutes, during which Dr. Edge conveyed that M.T.'s head injury was the type typically caused by a high speed impact or by slamming very hard into a hard object.  PCS ¶ 25.  During the first visit to AMC, defendants Fountain and Mason were further incorrectly informed that M.T. had a skull fracture.  PCS ¶ 26. Critically, defendant Fountain further falsely claimed that during this conversation, Dr. Edge also told him that M.T. had been murdered.  PCS ¶ 27.  Dr. Edge denied making any such statement regarding a murder, and confirmed that his role as a physician is to diagnose, not determine a cause, or whether an injury is accidental or non-accidental.  PCS ¶¶ 28-29.  Defendant Fountain and Mason also obtained a statement from Ms. Hicks, which corroborated Thomas' claim that M.T. had been sick for the past few days, and did not contain any statements alleging any abuse of M.T. by Mr. Thomas.  PCS ¶ 30.  Despite that both Thomas and Hicks confirmed M.T. had been sick, Mason never inquired with doctors about M.T.'s illness, or whether there could be a non-trauma related cause of death.  PCS ¶ 31.

Thereafter, defendants Fountain and Mason returned to Mr. Thomas' home and asked him to accompany them to TPD headquarters.  PCS ¶ 32.  Going into the questioning, defendant Fountain concedes he believed that Thomas had done something to M.T., despite that defendants had learned nothing up until this time to support such a conclusion, and that Ms. Hicks was the primary caretaker of M.T.  PCS ¶¶ 10, 21-33.  During the questioning, Mr. Thomas thought he could not leave, and repeatedly expressed that he felt like he was in jail.  PCS ¶ 34.  Mr. Thomas was initially questioned for about two hours.  PCS ¶ 35.  During the first video interrogation, defendant Fountain suggested to Mr. Thomas that he may have bumped M.T.'s head on the crib with the hope Thomas would adopt this suggestion.  PCS ¶ 37.  Also, during the interrogation, Mr.

4

Thomas stated, in sum and substance, that if his son died, he would jump off a bridge.  PCS ¶ 38. Defendants Mason and Fountain continued to question Mr. Thomas after he made this statement. PCS ¶ 39.  After repeated denials that he had done anything to M.T., in a state of duress and emotional turmoil, and in response to threats that his wife would be arrested, Mr. Thomas eventually adopted defendant Fountain's suggestion that he had bumped M.T.'s head on the crib, and agreed to sign a statement written by Fountain, which he in fact signed on September 22, 2008 at 1:41 a.m.  PCS ¶ 40.  Defendants concede that the first interview did not yield any statements or evidence that gave defendants Mason and Fountain probable cause to arrest Mr. Thomas for any crime, or which were consistent with the information Fountain had learned from Dr. Edge. PCS ¶ 41.  As a result of Mr. Thomas' statement regarding jumping off a bridge, Mason and Fountain brought him to Samaritan Hospital for a mental health evaluation.  PCS ¶ 42.  Thomas remained under observation for 15 hours.  PCS ¶ 42.  Mason requested that Samaritan notify him when Thomas was ready to be released.  PCS ¶ 43.

On September 22, 2008, while Thomas was in the hospital, Mason returned to AMC and spoke to Dr. Edge, obtaining a statement from Dr. Edge that M.T.'s injury would have required more than a bump on a crib.  PCS ¶ 44.  Defendant Mason also learned at this time that M.T. did not actually have a skull fracture.  PCS ¶ 45.  In the afternoon of September 22, 2008, Thomas, who was distraught and sleep deprived, was met and picked up from the hospital by defendant Mason.  PCS ¶ 46.  Defendant Mason brought Thomas back to the TPD headquarters for further questioning.  PCS ¶ 47.  On the way to the interview room, defendant Mason told Thomas that once in the interview room, if he were to get up and go towards the door, he would be charged with escape.  PCS ¶ 48.  As of this time, Thomas had not slept since he was awoken by his wife

on September 21, 2008 at approximately 8:00 a.m., and he did not feel he was free to leave during the ensuing interrogation.  PCS ¶¶ 50- 51.

Defendant Mason interrogated Thomas for approximately 7 ½ hours, while defendant Colaneri watched and otherwise monitored the interrogation from a separate room, actually entering the room on one occasion.  PCS ¶¶ 49, 52.  During the second interrogation, defendants Mason and Colaneri jointly introduced the concept of Matthew being slammed.  PCS ¶ 54.  Prior to defendant Colaneri entering the room, defendant Mason concedes that he did not have probable cause to arrest Mr. Thomas for any crime.  PCS ¶ 53.  Further, defendants concede that purported probable cause to arrest Mr. Thomas was not established until the moment Mr. Thomas adopted the TPD defendants' suggested and otherwise fabricated narrative that Mr. Thomas had slammed Matthew on the bed three times, a narrative which was false and involuntarily adopted by Mr. Thomas.  PCS ¶ 61.  Thomas involuntarily adopted the statements regarding bumping, throwing, or slamming M.T., all of which were suggested to him by defendants, because he was, without limitation, tired, afraid, wanted to see his children and particularly his son, M.T., was afraid if he did not make the statement he or his wife would be arrested, and based on the false promise by the defendants that he would be released if he made the statement.  PCS ¶¶ 55-56.

In the early hours of September 23, 2008, after Mr. Thomas signed a second coerced 10-page false statement, he was arrested by defendant Mason.  PCS ¶ 62.  Although Mr. Thomas told the TPD defendants many times that he didn't do anything, neither Mason nor Fountain documented such in the statements they wrote for Mr. Thomas to sign.  PCS ¶ 60.  The decision to arrest Mr. Thomas was made by defendants Mason and Colaneri jointly.  PCS ¶ 63.  Defendant Fountain participated in the first interrogation, and was personally involved in conduct which the Court of Appeals found to be coercive.  PCS ¶ 57.  Defendant Mason prepared a criminal court

information charging Mr. Thomas with attempted murder of his son, and attached only the second coerced false statement to it, leaving out the first coerced but inconsistent and non-incriminating statement.  PCS ¶ 64.  Thomas was arraigned based on the documents submitted by defendant Mason, and consequently imprisoned in the Rensselaer County Jail.  PCS ¶ 65.

On September 25, 2008, Dr. Sikirica performed the autopsy of M.T.  PCS ¶ 68.  Dr. Sikirica consulted with TPD Sergeant Mason, who was present during the autopsy, reviewed Thomas' coerced false statements that were provided to him by the TPD defendants, and was aware that Thomas had already been arraigned on attempted murder charges, and that his autopsy was being done in conjunction with a homicide investigation at the time he conducted the autopsy.  PCS ¶ 69.  During the autopsy, Sikirica neither took gram stains nor examined M.T.'s sinuses, evaluations which would have been relevant to determining the cause and extent of M.T.'s infection and actual cause of death.  PCS ¶ 70.  Further, on September 25, 2008, the lab results came back from the swabs taken at Samaritan Hospital, confirming that M.T. had a bacterial infection.  PCS ¶ 71.  Despite the positive lab test and other evidence of sepsis known at autopsy including, without limitation, that M.T. presented at the hospital with low white blood cell count, low platelet count, hypothermia, respiratory distress, low blood pressure, coagulopathy, hypoglycemia, tachycardia, and pancytopenia, Dr. Sikirica neither listed sepsis as a contributory cause of death on the death certificate nor as a finding in the later completed autopsy report.  PCS ¶ 73.  Instead, Sikirica issued a death certificate on September 25, 2008, which listed the immediate cause of death as only "severe closed head injuries with cerebral edema due to blunt force trauma."  PCS ¶ 72.  Further, consistent and otherwise congruent with the fabricated information learned from TPD, Dr. Sikirica stated the cause of injury to be: "assaulted by another (repeatedly)."  PCS ¶ 72.

On September 26, 2008, defendants Mason and Sikirica testified in the grand jury, and the 10-page coerced confession was also introduced into evidence at the grand jury PCS ¶¶ 74, 76. During his grand jury testimony, defendant Sikrica testified to only some evidence of developing pneumonia, despite later admitting that the same bacteria that was found in M.T.'s bloodstream causes pneumonia, and that the pneumonia had advanced to sepsis by the time of M.T.'s death. PCS ¶ 75. Thereafter, on April 22, 2009, Dr. Sikirica issued an autopsy in which he reported only that M.T.'s blood was positive for streptococcus pneumoniae. PCS ¶ 77. Sikirica admits that streptococcus pneumoniae can cause pneumonia, meningitis, and sepsis, and that sepsis is more serious than the mere presence of the bacteria—which is all he listed in his autopsy report—and that sepsis is an actual infection that leads to organ damage throughout the body, and that these conditions can cause death. PCS ¶¶ 78-79. Dr. Sikirica knew that his autopsy results would be relied on by police and prosecutors when he intentionally omitted any mention of sepsis from his report because he recognized that including the diagnosis would divert from what he assessed was the real cause of death. PCS ¶¶ 80-81. Sikirica now concedes that while he listed the cause of M.T.'s death to be only blunt force trauma, that sepsis was a contributory cause of death, and doctors could disagree as to his assessment as to the actual cause of death. PCS ¶ 82. This is of importance because other than Thomas' coerced false confession, and Dr. Sikrica's flawed finding that M.T. had died of blunt force trauma rather than sepsis, there was no other evidence that a crime had been committed or linking Thomas to any purported crime. PCS ¶ 83.

Thomas was tried by a jury in 2009, on charges of murder, and was convicted. PCS ¶ 85. Defendant Mason testified at the 2009 trial and evidence including Thomas' statement and portions of the second videotaped coerced confession were introduced into evidence. PCS ¶ 86. Defendant Sikirica testified during the first trial that based on his experience and participation in the autopsy

and microscopic examinations of M.T., that M.T.'s injuries were consistent with having been slammed down on a mattress at a great force, and that the subgaleal hematoma was consistent with being slammed into a wooden rail of a crib.  PCS ¶ 87.  Thomas was sentenced to 25 years to life in prison, and thereafter transferred to Downstate Correctional Facility, and then to Auburn Correctional Facility.  PCS ¶ 88.

Thomas filed post-conviction motions to suppress his confession and to set aside the verdict rendered against him, a remedy that was ultimately granted by the Court of Appeals on February 20, 2014.  *Thomas*, 22 N.Y.3d 629.  The Court of Appeals found that defendants Mason, Fountain, and Colaneri had engaged in coercive behavior, including *inter alia*, threatening that if Thomas continued to deny responsibility for M.T.'s injury his wife would be arrested and removed from his ailing child's bedside, repeating 21 times during the course of the interrogation "that his disclosure of the circumstance under which he injured his child was essential to assist the doctors attempting to save the child's life," and "the ubiquitous assurances offered by defendant's interrogators, that whatever had happened was an accident, that he could be helped if he disclosed all, and that, once he had done so, he would not be arrested, but would be permitted to return home" which included telling Thomas "67 times that what had been done to his son was an accident, 14 times that he would not be arrested, and eight times that he would be going home." *Id.* at 643-646.  The Court of Appeals further recognized that Thomas' "subsequent confession provided no independent confirmation that he had in fact caused the child's fatal injuries" and that "[e]very scenario of trauma induced head injury equal to explaining the infant's symptoms was suggested to defendant by his interrogators" that that "not a single inculpatory fact in defendant's confession that was not suggested to him." *Id.* at 646.

After the Court of Appeals remanded Thomas' case for retrial, Thomas was again imprisoned at Rensselaer County Jail.  PCS ¶ 92.  Thomas was retried in 2014.  PCS ¶ 93. Defendant Sikirica testified at Thomas' second trial.  PCS ¶ 94.  At the second trial, Sikirica testified that in his experience, the injuries could be consistent with a moderate amount of force, and that M.T.'s injuries were consistent with M.T. being bounced hard off of a bed and onto the ground.  PCS ¶ 95.  Defendant Sikirica continued to attribute M.T.s death to Mr. Thomas even after Thomas' confession had been suppressed, and despite the suppressed statement being the only link between Thomas and M.T.'s death.  PCS ¶ 96.  At the conclusion of Thomas' second trial, Thomas was acquitted, and the matter was dismissed and sealed.  PCS ¶ 97.

### B.      Statement of Relevant Expert Witness Opinions

Plaintiff retained Matthew B. Johnson, Ph.D., associate professor in the Department of Psychology at John Jay College of Criminal Justice-CUNY, as an expert witness to provide an informed opinion concerning the coerced confession and the emotional damages and sequalae flowing from the events at issue.  *See* Johnson Decl. ¶¶ 1-2.  After a review of relevant documentation, Johnson opined in relevant part that plaintiff's malicious prosecution resulted from a process commonly referred to as "a mis-information effect (also called an 'anchoring effect', or a process of 'forensic confirmation bias', or 'bias cascade'), where an initial erroneous assumption or report is accepted as factual and misguides the ensuing investigation."  *Id.* at ¶ 4; PCS ¶ 98. Johnson further opined that in the case of plaintiff, the initial mistaken assessment by AMC led the police to subject Thomas to a "prolonged, coercive, interrogation to confirm the erroneous medical assessment" and that "[t]he coerced false confession then influenced the medical examiner's autopsy report."  PCS ¶ 98.  Johnson also cited research recognizing that when an event is mislabeled a crime, "forward momentum often fueled by circular reasoning takes over" resulting

in individuals being convicted of crimes that never occurred in the first place, as was the case here. PCS ¶ 98.

Plaintiff retained forensic pathologist Katherine F. Maloney, M.D., currently the Deputy Chief Medical Examiner for the Erie County Medical Examiner's Office, to provide an expert opinion as to M.T.'s cause of death.  *See* Maloney Decl. ¶¶ 2-3.  After a review of the extensive record, Maloney concluded that M.T. died exclusively from streptococcus pneumoniae meningitis. *Id.* at ¶ 5; PCS ¶ 99.  She further found that the scalp and subgaleal hemorrhages, retinal hemorrhages, and subdural hemorrhage were neither due to violent trauma, nor were they fatal injuries, and they did not explain the cause of death.  PCS ¶ 99.  Rather, the retinal hemorrhages were due to increased intracranial pressure caused by the cerebral edema, and the subgaleal and subdural hemorrhages resulted from coagulopathy due to the streptococcus pneumoniae infection and from brain swelling due to the loss of oxygen to the brain caused by the infection, which led to an accumulation of fluid surrounding the brain.  PCS ¶ 99.

## **STANDARD OF REVIEW**

Summary judgment should be granted only if the Court determines that there is no genuine dispute as to any material fact concerning the non-movant's claims or defenses and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must examine the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all factual inferences in favor of the non-moving party.  *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995).  The burden is on the moving party to show that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### POINT I
### THE COURT OF APPEALS DECISION THAT THOMAS' CONFESSION WAS INVOLUNTARY SHOULD BE GIVEN PRECLUSIVE EFFECT

In deciding summary judgment, the Court of Appeals decision that Thomas' confession was involuntary should be given preclusive effect.  "Principles of collateral estoppel may bar relitigation in a subsequent civil rights action in federal court of an issue that was determined in a state court criminal proceeding." *Owens v. Treder*, 873 F.2d 604, 607 (2d Cir. 1989) (citing *Allen v. McCurry,* 449 U.S. 90, 103-05 (1980)).  In determining whether collateral estoppel applies, the federal court applies the rules of the state which rendered the judgment.  *Owens*, 873 F.2s at 607. "In New York a party is barred from relitigating an issue if the following requirements are met: (1) the issue as to which preclusion is sought is identical to the issue decided in the prior proceeding; (2) the issue was necessarily decided in the prior proceeding; and (3) the litigant now opposing preclusion had a full and fair opportunity to litigate the issue in the prior proceeding." *Id.*

Applying the above rules, the Second Circuit in *Owens* stated, "that if the ruling denying a motion to suppress is followed by an appellate decision expressly stating that the trial court had properly admitted the confession, then the combination of the suppression ruling and the appellate affirmance would bar relitigation of a coercion issue."  *Owens*, 873 F.2s at 609.  The Second Circuit's statement in *Owens* makes clear that an unambiguous appellate ruling regarding the suppression of evidence bars relitigation of the issue, and therefore the Court of Appeals ruling that Thomas' confession was coerced cannot be relitigated here.  *See Kogut v. Cty. of Nassau*, No. 06-CV-6695(JS)(WDW), 2009 WL 5033937, at *10 (E.D.N.Y. Dec. 11, 2009) (recognizing that

"*Owens* made clear that an unambiguous Appellate Division ruling that the trial court properly refused to admit a confession after a suppression hearing 'would have barred relitigation of the coercion issue in th[e] § 1983 action.'")  Here, there can be no doubt that the Court of Appeals, the highest court in New York, rendered an unambiguous ruling that Thomas' statement was coerced and based on *Owens*, this decision is entitled to preclusive effect in rendering decision as to defendants' motion for summary judgment.

<h2 style="text-align:center">POINT II</h2>

**PLAINTIFF                    WAS              MALICIOUSLY PROSECUTED**

Defendants argue that plaintiff's malicious prosecution claim fails for various reasons, all of which should be rejected.  *See* Defs.' Mem. of Law pp. 10-15.  To survive a summary judgment motion on a malicious prosecution claim under § 1983, a plaintiff must "show a seizure or other perversion of proper legal procedures implicating his personal liberty and privacy interests under the Fourth Amendment . . . that criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor."  *See Lanning v. City of Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018) (internal quotations omitted).  Under § 1983, a termination is considered favorable if it is indicative of innocence.  *Id.* at 27-28.  Defendants neither contest that plaintiff's prosecution was terminated in his favor, nor that Mason was personally involved in plaintiff's prosecution, but rather assert that plaintiff's claim fails as to defendants Fountain and Colaneri for lack of personal involvement, and as to all defendants because probable cause purportedly existed to arrest plaintiff and on the grounds plaintiff cannot establish malice.  Defendants' arguments should be rejected for the reasons that follow.

### A. All TPD Defendants Initiated a Criminal Prosecution against Plaintiff

There is ample evidence in the record from which a jury could conclude that all of the TPD defendants initiated a prosecution against plaintiff. "[C]ourts have found triable issues of fact as to the initiation element where a defendant police officer 'brought formal charges and had the person arraigned, filled out complaining and corroborating affidavits, swore to and signed a felony complaint, or created false information and forwarded it to prosecutors.'" *See Wong v. Yoo*, 649 F. Supp. 2d 34, 65 (E.D.N.Y. 2009) (citing *Espada v. Schneider,* 522 F.Supp.2d 544, 553 (S.D.N.Y. 2007); *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997)). Initiation can also be shown through the preparation of an alleged false confession, or by joint involvement in a "scheme to ensure that a plaintiff was detained on false charges" even where an officer does not personally prepare documents to initiate the prosecution." *Ricciuti*, 124 F.3d at 130; *Moroughan v. Cty. of Suffolk*, No. 12 CV 0512 (JFB)(AKT), 2021 WL 298714, at *26 (E.D.N.Y. Jan. 20, 2021). *See also, Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010); *Ortiz v. Wagstaff*, No. 16 CV 00321 (EAW), 2021 WL 752538, at *11 (W.D.N.Y. Feb. 26, 2021).

Viewing the facts in a light most favorable to plaintiff, defendants Fountain, Mason, and Colaneri were all involved in a chain of coercive actions which resulted in the elicitation of a confession which they knew to be false, insofar as the Court of Appeals correctly recognized, all of the incriminating statements made by plaintiff originated from and were suggested to him by the defendants. *See Moroughan*, 514 F. Supp. 3d at 526 (finding personal involvement established based on evidence that detective knowingly elicited and fabricated inculpatory statements); *Thomas*, 22 N.Y.3d at 646; PCS ¶¶ 32-43, 46-59. Defendants' efforts to differentiate this case from *Ricciuti* and *Manganiello* should be rejected because accepting plaintiff's allegations as true, defendants did create Thomas' false confession via their suggestion to Thomas of facts consistent

with the faulty information received from AMC, which they then coerced Thomas to adopt through unconstitutional means.  *Thomas*, 22 N.Y.3d at 643-46.  That defendants convinced Thomas to adopt the suggested narrative does not make the narrative any less false or reliable.  *See id.* at 646. Further, defendants' efforts to compartmentalize the two interrogation sessions and to minimize Colaneri and Fountain's involvement in the joint scheme to pressure Thomas into eventually signing the incriminating 10-page confession, should be rejected.  As the Court of Appeals recognized in a decision which has preclusive effect here, the entire 9 ½ hour interrogation, which all three defendants participated in, was unconstitutional.  *Id.* at 637-646, *Owens*, 873 F.2s at 609. Further, defendants Colaneri and Fountain themselves recognize that they jointly participated in the interrogations which resulted in Thomas' confession which, accepting plaintiff's allegations as true, was false, coerced, and forwarded to prosecutors.  PCS ¶¶ 37, 40, 57-59, 84.  Finally, even if, *arguendo,* it were to be found Colaneri was not directly involved, he could nonetheless still be found personally involved via his failure to intervene insofar as he watched the entire second interrogation via video monitor.  *See Moroughan*, 514 F. Supp. 3d at 526; *Days v. Eastchester Police Dep't*, No. 18-CV-11538 (NSR), 2020 WL 5504433, at *7 (S.D.N.Y. Sept. 9, 2020).

### B.  Probable Cause to Prosecute Plaintiff was Lacking

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  *Sanders v. City of New York*, No. 12 CV 113 (PKC)(LB), 2015 WL 1469514, at *14 (E.D.N.Y. Jan. 7, 2015) (citing *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . or may require a trial if the facts are in dispute."  *Blake v. Race*, 487 F. Supp. 2d 187, 207 (E.D.N.Y. 2007).  As an initial matter, defendants all conceded that they did not have probable cause to arrest

plaintiff before he adopted their suggested narrative at the end of his second interrogation.  PCS ¶¶ 41, 53, 55, 61.  Therefore, given that plaintiff's confession was coerced, as the Court of Appeals found, the issue of probable cause cannot be resolved on summary judgment.  *See Niemann v. Whalen*, 911 F. Supp. 656, 669 (S.D.N.Y. 1996).  Further, viewing the facts in a light most favorable to plaintiff, defendants not only coerced a confession from him, but defendants had reason to know said confession was false, because it contained statements which they alone had suggested, and which were tailored to developing information received from AMC.  *Thomas*, 22 N.Y.3d at 643-46; PCS ¶¶ 37, 44, 54-55.  This is sufficient to create a question of fact as to whether there was probable cause to prosecute plaintiff, and to rebut any presumption that the grand jury indictment might have ordinarily created.  *Ortiz*, 2021 WL 752538, at *10 ([A] police officer's fabrication and forwarding to prosecutors of known false evidence" is the sort of bad faith misconduct that can rebut the presumption of probable cause flowing from a grand jury indictment.); *See also*, *Pizarro v. City of New York*, No. 14-CV-507 (KAM) (VVP), 2015 WL 5719678, at *5 (E.D.N.Y. Sept. 29, 2015) (finding the plaintiff's claim that the defendants had coerced and falsified his confession sufficient to rebut the presumption of probable cause flowing from the grand jury indictment).

Defendants' arguments to avoid this result rest on disputed facts, and therefore cannot provide a basis for granting summary judgment.  *See Blake*, 487 F. Supp. 2d at 207.  In particular, defendants argue that plaintiff's purported confession to CPS on September 24, 2008, and Dr. Edge's claim that a murder had occurred, provide additional support beyond the coerced confession for probable cause.  Insofar as plaintiff disputes having ever confessed anything to CPS, and instead avers that CPS received the substance of any such confession from TPD, not plaintiff, and Dr. Edge disputes that he told the police a murder had occurred, probable cause cannot be

determined as a matter of law based thereon. *Id.*; PCS ¶¶ 27-29, 66-67. Finally, the Court of Appeals' determination to remand for a new trial does not foreclose a finding that probable cause was lacking to prosecute plaintiff, as its decision did not reach the question of whether probable cause existed absent the confession. *See Thomas*, 22 N.Y.3d 629. Moreover, given that defendants concede they did not have probable cause until the confession, without it, a question of fact exists as to whether probable cause existed to arrest Thomas in the first instance, which also calls into question whether probable cause could possibly exist to prosecute plaintiff. *See Bailey v. City of New York*, 79 F. Supp. 3d 424, 457 (E.D.N.Y. 2015); PCS ¶¶ 41, 53, 55, 61.

Further, questions of fact remain to be tried regarding whether the entire narrative that a murder had occurred in the first place was engineered by the TPD defendants, beginning with Fountain's false claim that Dr. Edge had told him that this was a murder, words Dr. Edge denied he would have ever uttered. PCS ¶¶ 27-29. This erroneous assumption that a murder had occurred was accepted as fact and misguided the ensuing investigation, coercion of a false confession from Thomas, and malicious prosecution of him. PCS ¶ 98. Had this cascading chain of events not been started by the TPD defendants who, based on the false assumption that M.T. had sustained trauma, engaged in a myopic focus on Thomas to the exclusion of all other suspects and potential reasons for M.T.'s death, and in furtherance thereof elicited a false confession consistent with their theory, then Thomas would never have been arrested or prosecuted. *See e.g.* PCS ¶ 98; *Confronting the Forensic Confirmation Bias*, 33 Yale L. & Pol'y Rev. 457, 460; *Manganiello*, 612 F.3d at 164. As the Court of Appeals recognized, any congruence between Thomas' confession and information the TPD defendants learned from doctors "can be readily understood as a congruence forged by the interrogation" and therefore "[t]he attainment of the interrogation's goal, [] cannot instill confidence in the reliability of its result." *See Thomas*, 22 N.Y.3d at 646. It was

17

defendants' misconduct that led to the cascade effect which resulted in Thomas' arrest, prosecution, and trials, without probable cause or any reasonable basis to believe that M.T. had been murdered, let alone by Mr. Thomas.  PCS ¶ 98.

### C.  Defendants Acted with Malice

Defendants further argue that plaintiff has not presented facts in support of his claim that defendants acted with malice.  *See* Defs.' Mem. of Law, pp. 12-14.  Because a lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment, defendants' argument fails in this regard.  *See e.g., Rentas v. Ruffin*, 816 F.3d 214, 221-22 (2d Cir. 2016); *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003) ("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well."). *See also*; *Ricciuti*, 124 F.3d at 130; *Sanders*, 2015 WL 1469514, at 16 (collecting cases); *Anderson v. City of New York*, 817 F.Supp.2d 77, 91 (E.D.N.Y. 2011).  Thus, because plaintiff has raised a question of fact regarding probable cause as argued at Points I(B), *supra*, plaintiff has consequently also raised a question of fact as to malice sufficient to withstand summary judgment.  S*ee Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 461 (S.D.N.Y. 2012)*; Boyd,* 336 F.3d at 78.  Moreover, a jury could also infer malice from defendants' coercion of a false confession from plaintiff.  *See Crews v. County of Nassau*, 996 F. Supp. 2d 186, 208 (E.D.N.Y. 2014); *see also*, *Buari v. City of New York*, No. 18 CV 12299 (MKV), 2021 WL 1198371, at *12 (S.D.N.Y. Mar. 30, 2021) (recognizing that "[f]alsifying evidence is sufficient to show malice.") (citing *Bailey*, 79 F. Supp. 3d at 451 (collecting cases)).  Malice can also be inferred from the officers' "apparently myopic focus" on Thomas to the exclusion of both all other explanations for M.T.'s death and all other suspects.  *See Manganiello*, 612 F.3d at 164.

18

<u>POINT III</u>

**PLAINTIFF WAS DENIED HIS RIGHT TO FAIR TRIAL**

"A plaintiff establishes a denial of the right to fair trial claim by showing that the defendant fabricated evidence that was likely to influence a jury, forwarded that information to prosecutors, and that the plaintiff suffered a deprivation of liberty as a result." *Garnett v. City of New York*, 13 CV 7083 (GHW), 2014 WL 3950904, *12 (S.D.N.Y. Aug. 13, 2014) (citing *Ricciuti,* 124 F.3d at 129-130); *see also, Struthers v. City of New York*, No. 12 CV 0242 (JG), 2013 WL 2390721, *13 (E.D.N.Y. May 31, 2013). The existence of probable cause is not a defense. *Ricciuti*, 124 F.3d at 130.

Here, accepting plaintiff's allegations as true, defendants violated his Fifth Amendment rights and his right to fair trial by forwarding a false confession to prosecutors. There can be no question that if these allegations are accepted, plaintiff's rights were violated under the Fifth Amendment as asserted in plaintiff's amended complaint. *See* ECF Doc. 31 ¶¶ 11, 97. "The Fifth Amendment's self-incrimination clause bars the government from using a compelled confession in any criminal case." *Higazy v. Templeton*, 505 F.3d 161, 170 (2d Cir.2007). A plaintiff may bring a § 1983 coercion claim "if coercion was applied to obtain a waiver of the plaintiff's rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in a criminal proceeding." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998); *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 76 (S.D.N.Y. 2020). "[T]he key inquiry for Fifth Amendment purposes is whether the statement introduced in a judicial proceeding was obtained, not by failure to read a defendant the Miranda warnings, but by coercion—an inquiry determined by the totality of the circumstances." *Kenney v. Clay*, 172 F. Supp. 3d 628, 636 (N.D.N.Y. 2016). Further, a coerced confession need not be

19

introduced at trial to violate a plaintiff's Fifth Amendment rights, rather the "use or derivative use of a compelled statement at any criminal proceeding against the declarant violates that person's Fifth Amendment rights." *Id.* at 637 (internal quotations omitted).  Here, a confession which the Court of Appeals unambiguously ruled was coerced, was used against Thomas during the grand jury and first trial proceedings, and this alone is sufficient to find that Thomas' Fifth Amendment rights were violated.  *See Owens*, 873 F.2s at 609.

Defendants have set forth no arguments to undermine plaintiff's claim of a Fifth Amendment violation or that the forwarding of his coerced false confession does not constitute a violation of plaintiff's right to fair trial, as it is clearly established such conduct constitutes a violation.  *See e.g., Ricciuti*, 124 F.3d at 130; *Pizarro*, 2015 WL 5719678, at *7.  Defendants' entire argument rests instead on their erroneous contention that defendants did not "create" a known fabricated and false confession and that, regardless, Fountain and Colaneri were not personally involved.  For the reasons argued, *supra*, these assertions are unavailing insofar as a jury could conclude that all defendants were jointly involved in the acts that led to Thomas' false confession, and that all defendants knew that the confession was false in that defendants concede, and as the Court of Appeals recognized, all of the inculpatory statements made by Thomas were suggested to Thomas by defendants based on the faulty information provided by AMC.  *See Thomas*, 22 N.Y.3d at 646.

## POINT IV
## PLAINTIFF HAS ESTABLISHED A SECTION
## 1983 CONSPIRACY CLAIM[2]

"A Section 1983 conspiracy claim requires '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Deskovic*, 894 F. Supp. 2d at 465 (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id*.

As an initial point, contrary to defendants' contention, and as argued *supra* at Points I-III, plaintiff has established a question of fact as to whether his constitutional rights were violated. Furthermore, accepting plaintiff's allegations as true, a jury could conclude that Dr. Sikirica rendered his medical opinion in conspiracy with, and to be consistent or "congruent" with, Thomas' false coerced confession. *See* PCS ¶¶ 68-69. Indeed, Dr. Sikrica admitted that he omitted any mention of sepsis, despite his recognition of the presence of sepsis, because including the diagnosis would divert from his (and the TPD defendants') position that that M.T. had died from trauma at the hands of Thomas. PCS ¶¶ 69-73, 77-81. Viewing the evidence in a light most favorable to plaintiff, a question of fact exists as to whether the TPD defendants and Dr. Sikirica conspired to ensure the autopsy confirmed the narrative established by the TPD defendants, to wit:

---

[2] While there is ample scholarly evidence that black children are "more likely to be labeled as abused than white children" and it can be inferred that such inequalities may have impacted AMC's assessment of M.T. and the investigation of M.T.'s death by the TPD defendants, at this juncture plaintiff agrees to voluntarily dismiss his Section 1985 conspiracy claim.  *See e.g.,* Naomi Cahn, *Race, Poverty, History, Adoption, and Child Abuse: Connections*, 36 Law & Soc'y Rev. 461, 471 (2002).

that M.T. had been "murdered" by Thomas, to the unreasonable exclusion of evidence that M.T. had died of natural causes.

### POINT V
**PLAINTIFF HAS ESTABLISHED CAUSATION**

Defendants next argue that the trial judge's decision to not suppress Thomas' statement insulates defendants from liability.  The Second Circuit has "explained that 'foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication.'"  *Higazy*, 505 F.3d at 175 (citing *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 216 (2d Cir.2002); *Palka v. Servicemaster Mgmt. Servs. Corp.,* 83 N.Y.2d 579 (N.Y.1994); *McKinley v. City of Mansfield,* 404 F.3d 418, 437-438 (6th Cir. 2005) ("It is hard to see how law enforcement officials could 'ultimately impair' the right against self-incrimination if not by compelling a suspect to make incriminating statements that are later used against him at trial.  It is equally hard to see how officials whose conduct ultimately impaired a citizen's Fifth Amendment rights could nonetheless escape civil liability merely because a different state official put the statements into evidence at trial.")).  The Second Circuit also suggested in *Higazy* that "[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."  *Hamilton v. City of New York*, No. 15 CV 4574 (CBA)(SJB), 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019) (quoting *Higazy*, 505 F.3d at 177).  "Moreover, a 'proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury.'"

*Hamilton*, 2019 WL 1452013, at *17 (quoting *Hydro Inv'rs. Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000)).

Defendants should not be permitted to escape liability for their misconduct in coercing a false confession from Thomas, because the inference that defendants' misconduct was a substantial, if not critical, factor in bringing about his conviction cannot be ruled out.  *See Hamilton*, 2019 WL 1452013, at *17.  Further, because a fact finder could conclude that defendants could reasonably have foreseen that a coerced false confession would be used against Thomas, and would lead to Thomas' arrest and conviction, "the chain of causation need not be considered broken." *Higazy*, 505 F.3d at 177; *see also*, *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 398 (S.D.N.Y. 2016).  Defendants need not be the sole liable party, but because a jury could conclude defendants' misconduct was a substantial factor in bringing about Thomas' injuries and that defendants could reasonably have foreseen that their misconduct would cause such injury, summary judgment is inappropriate here.

## POINT VI
## DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants next argue that they are entitled to qualified immunity.  *See* Defs.' Mem. of Law, p. 16.  "Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation marks omitted); *see also*, *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007).  It is clearly established "that a coerced confession could not constitutionally be

used against a defendant in a criminal case." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 441 (E.D.N.Y. 2012) (quoting *Higazy,* 505 F.3d at 173).

Here, the Court of Appeals ruled that plaintiff's confession was coerced and, as defendants concede, it was clearly established in 2008 that coercing a confession constituted a constitutional violation.  *See* Thomas, Defs.' Mem. of Law p. 21-22.  Defendants nonetheless argue that they are entitled to qualified immunity because defendants purportedly could not have known that their actions constituted coercion.  This argument should be rejected because in holding that defendants had coerced plaintiff's confession, the Court of Appeals applied established law which any reasonably competent officer should have been aware.  As the Court of Appeals held, it was established that while "not all forms of deception of a suspect is coercive, [] in extreme forms it may be" and "that interrogators may not threaten that the assertion of Fifth Amendment rights will result in harm to the interrogee's vital interests."  *Thomas*, 22 N.Y.3d at 642.  Defendants' actions in engaging in pervasive deception, coupled with assertions that if Thomas failed to confess his, his wife's, and his son's vital interests would be harmed, violated these clearly established rules, and violated plaintiff's clearly established right not to have a coerced confession used against him. *See Thomas*, 22 N.Y.3d at 642-43.  Defendants are not entitled to qualified immunity for their actions.  *See e.g.*, *Matthews*, 889 F. Supp. 2d at 441 (holding defendants were "not entitled to qualified immunity because no reasonable officer could believe that coercing a confession from an accused by withholding medical treatment from an injured family member and using the coerced confession to prosecute the accused is constitutional."); *Tankleff v. Cty. of Suffolk*, No. 09-CV-1207(JS)(AYS), 2017 WL 2729084, at *21 (E.D.N.Y. June 23, 2017) (If [] Plaintiff's statements were coerced and the prosecution was initiated based on a confession fabricated by

Defendants, the factfinder could conclude that no reasonable officer would believe that there was probable cause to prosecute.")

Moreover, drawing all permissible inferences favorable to plaintiff, including that defendant Fountain fabricated Dr. Edge's statement that M.T.'s death was a murder, and that all defendants knowingly participated in coercing Thomas' confession insofar as the confession was entirely suggested by them to Thomas, a reasonable jury could find that officers of reasonable competence would agree that there was not probable cause to prosecute Thomas, particularly given the lack of other evidence to prosecute Thomas aside from the confession.   Under these circumstances, defendants are not entitled to qualified immunity.  *See Deskovic*, 894 F. Supp. 2d at 462 (denying qualified immunity, where "drawing all permissible inferences favorable to Plaintiffs, including that [] officers fabricated the ejaculation statement and coerced [a] confession, a reasonable jury could find that officers of reasonable competence would agree that there was not probable cause to prosecute [], given the exculpatory DNA results and general lack of other evidence.")

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be denied, together with such other relief to plaintiff as the Court deems just and proper.

Dated: New York, New York
       September 20, 2021

BRETT H. KLEIN, ESQ., PLLC
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

By: _____
    BRETT H. KLEIN
    LISSA GREEN-STARK