UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X

ADRIAN THOMAS,

                                        Plaintiff,                    17 CV 626 (DJS)

            -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                                        Defendants.

-----------------------------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SIKIRICA'S
MOTION FOR SUMMARY JUDGMENT**


                                        BRETT H. KLEIN, ESQ., PLLC
                                        *Attorneys for the Plaintiff*
                                        305 Broadway, Suite 600
                                        New York, New York 10007
                                        (212) 335-0132

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT.........................................................................................1

STATEMENT OF FACTS.................................................................................................2

     A.     Statement of Relevant Facts……………………………………………………2

     B.     Statement of Relevant Expert Witness Opinions…………………………………9

STANDARD OF REVIEW………………………………………………………………10

ARGUMENT………………………………………………………………………...11

     I.     A JURY COULD CONCLUDE THAT SIKIRICA'S AUTOPSY REPORT WAS A SUBSTANTIAL FACTOR IN BRINGING ABOUT PLAINTIFF'S PROSECUTION AND DENIAL OF RIGHT TO FAIR TRIAL ………………11

     II.     A JURY COULD CONCLUDE THAT DEFENDANT SIKIRICA CONSPIRED WITH THE TPD DEFENDANTS……………………………………………13

     III.     DEFENDANT SIKIRICA IS NOT ENTITLED TO QUALIFIED IMMUNITY……………………………………………………………...14

CONCLUSION................................................................................................................16

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 11

*Anilao v. Spota*, 774 F.Supp.2d 457 (E.D.N.Y. 2011) .................................................................. 15

*Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443 (S.D.N.Y. 2012) ........................................... 13

*Fappiano v. City of New York*, 640 F. App'x 115 (2d Cir. 2016) .................................................. 11

*Ferris v. City of Cadillac*, 272 F.Supp.3d 1003 (W.D. M.I. 2017) ............................................... 15

*Hamilton v. City of New York*, No. 15 CV 4574 (CBA)(SJB), 2019 WL 1452013 (E.D.N.Y. Mar.
   19, 2019) .................................................................................................................................. 12

*Hydro Inv'rs. Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000) ....................................... 12

*Matthews v. City of New York*, 889 F.Supp.2d 418 (E.D.N.Y. 2012) .......................................... 15

*McCaffrey v. City of New York*, No. 11 CV 1636 (RJS), 2013 WL 494025 (S.D.N.Y. Feb. 7,
   2013) .................................................................................................................................. 11, 12

*Pangburn v. Culbertson,* 200 F.3d 65 (2d Cir.1999) .................................................................. 13

*People v. Thomas*, 22 N.Y.3d 629 (N.Y. 2014) .................................................................... 1, 8, 9

*Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123 (2d Cir. 1997) ................................................. 15

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995) ....................................................... 11

*Sanders v. City of New York*, No. 12 CV 113 (PKC)(LB), 2015 WL 1469514 (E.D.N.Y. Jan. 7,
   2015) ........................................................................................................................................ 11

*Thomas v. City of Troy*, 293 F. Supp. 3d 282 (N.D.N.Y. 2018), *on reconsideration sub nom*.
   *Thomas v. Mason*, No. 17 CV 626 (DJS), 2019 WL 6111572 (N.D.N.Y. Nov. 18, 2019) ...... 14

*Ying Li v. City of New York*, 246 F. Supp. 3d 578 (E.D.N.Y. 2017) ...................................... 11, 12

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) ........................................................................... 15

**Other Authorities**

John Rafael Peña Perez, *Confronting the Forensic Confirmation Bias*, 33 Yale L. & Pol'y Rev.

457 (2015) ................................................................................................................... 1

Naomi Cahn, *Race, Poverty, History, Adoption, and Child Abuse: Connections*, 36 Law & Soc'y

Rev. 461 (2002) ........................................................................................................... 13

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................... 10

## PRELIMINARY STATEMENT

On September 21, 2008, Adrian Thomas' then wife, Wilhelmina Hicks, found their four month old infant son, M.T., unresponsive in his crib.  An ensuing erroneous medical assessment led to the wrongful labeling of M.T.'s death a murder by members of the Troy Police Department (hereinafter "TPD"), setting in motion a cascade effect, otherwise known as "forensic confirmation bias," resulting in a rigid focus on one suspect, here Adrian Thomas.  *See* John Rafael Peña Perez, *Confronting the Forensic Confirmation Bias*, 33 Yale L. & Pol'y Rev. 457, 460 (2015); Johnson Decl., Ex. 2 Rpt. p. 11.  This rigid focus ultimately led to the coercion of a false confession from Mr. Thomas, which was provided to defendant Michael Sikirica, the Rensselaer County Medical Examiner, who conducted the autopsy of M.T., and in accordance with TPD's coerced statement and theory of the case, rendered a death certificate and autopsy report tailored to the police theory of the case.  Defendant Sikirica's actions aided in the malicious prosecution and ultimate wrongful conviction of Thomas for the murder of his son.

In a resounding rejection of the TPD defendants' misconduct, the New York State Court of Appeals ("Court of Appeals") held that defendants Mason, Fountain, and Colaneri had engaged in pervasive coercive behavior to elicit a suggested confession from Mr. Thomas consistent with their theory of death, recognizing that "[e]very scenario of trauma induced head injury equal to explaining the infant's symptoms was suggested to defendant by his interrogators" and that there was "not a single inculpatory fact in defendant's confession that was not suggested to him." *People v. Thomas*, 22 N.Y.3d 629, 646 (N.Y. 2014).  The Court of Appeals further recognized that the agreement of Thomas' inculpatory account with the theory of injury can "be readily understood as a congruence forged by the interrogation" and that "[t]he attainment of the interrogation's goal, therefore, cannot instill confidence in the reliability of its result." *Thomas*, 22 N.Y.3d at 646.

Despite the lack of any evidence to suggest Mr. Thomas had murdered his son, due to the cascade effect first set in motion by the TPD defendants, Mr. Thomas was retried without the unlawfully obtained confession.  Mr. Thomas was ultimately acquitted after his second trial in 2014, at which defendant Sikirica testified, ending the six year criminal ordeal first set in motion by the actions of the TPD defendants, and rubberstamped by Dr. Sikirica's erroneous findings and withholding of exculpatory medical evidence.  This civil action seeking redress for the harms caused by the TPD defendants and defendant Sikirica ensued.

## STATEMENT OF FACTS

### A.      Statement of Relevant Facts[1]

M.T., the four month old son of Adrian Thomas and Wilhelmina Hicks, was pronounced dead on September 23, 2008.  PCS ¶ 1.  Although M.T. died of natural causes, specifically a streptococcus pneumoniae infection causing sepsis and meningitis, his death was erroneously labeled a crime, resulting in the malicious prosecution and wrongful conviction of Mr. Thomas.  PCS ¶¶ 2-3.  This chain of events was first set in motion by the premature birth of M.T., a twin, born at 33 weeks on May 4, 2008, during a complicated birth which necessitated the use of forceps.  PCS ¶ 4.  During her pregnancy, Ms. Hicks had gestational diabetes, high blood pressure, and pre-eclampsia.  PCS ¶ 5.  Hicks was admitted to the hospital on May 1, 2008, where her water broke and showed evidence of meconium.  PCS ¶ 6.  The foregoing issues placed M.T. at risk for subdural bleeds.  PCS ¶ 7.  After birth, M.T. was admitted to the neonatal intensive care unit at Albany Medical Center (hereinafter "AMC") and then transferred to St. Mary's Hospital, where he

---

[1] For a complete statement of the facts which remain to be tried and which demonstrate that there are numerous genuine issues of material fact which preclude summary judgment in this matter, the Court is respectfully referred to plaintiff's Local Rule 56.1 Counter Statement (hereinafter referred to as "PCS").  A summary of said genuine issues of fact is set forth here.

remained hospitalized until May 22, 2008.  PCS ¶ 8.  As of September 2008, M.T. had only 1 of 4 pneumococcal vaccinations, and due to this and his premature birth, was more susceptible to infections, including bacterial pneumoniae.  PCS ¶ 9.  After M.T. came home from the hospital, M.T. was primarily cared for by Ms. Hicks.  PCS ¶ 10.

On or about Friday, September 19, 2008, M.T. developed a fever with diarrhea, which lasted through Sunday.  PCS ¶ 11.  In the morning of September 21, 2008, Hicks discovered M.T. barely breathing in his crib.  PCS ¶ 12.  Prior to that morning, M.T. had not exhibited any problems with his breathing.  PCS ¶ 13.  Thomas called 911 and M.T. was transported to Samaritan hospital where he presented with symptoms of sepsis, and a blood culture was taken to confirm whether M.T. had a bacterial infection.  PCS ¶ 14.  M.T. was then transferred to the care of Dr. Walter Edge at AMC.  PCS ¶ 15.  Dr. Edge requested neurology and ophthalmology consults to look for a possible traumatic brain injury.  PCS ¶ 16.  Dr. Edge was erroneously informed that M.T.'s C.T. showed bilateral subdural hematomas and a skull fracture.  PCS ¶ 17.  It was later determined that the diagnosis of a skull fracture was incorrect while M.T. was still at AMC, and the CT scan in fact showed bilateral fluid collections, not hematomas, and M.T.'s autopsy would later confirm the diagnosis of bilateral hematomas was incorrect, as there was only a right sided hematoma.  PCS ¶ 18.  Nonetheless, based on the reported evidence of head trauma, both the TPD and Child Protective Services (hereinafter "CPS") were notified out of a concern for possible child abuse. PCS ¶ 19.

Defendants Mason and Fountain were assigned the case and shared the role of lead investigator.  PCS ¶ 20.  Upon commencing their investigation, defendants Mason and Fountain first responded to Samaritan Hospital, where they were informed that the initial report at Samaritan was that M.T. was having respiratory problems and was unresponsive, and that M.T. had been

3

transferred to AMC.  PCS ¶ 21.  Defendants Mason and Fountain thereafter escorted a CPS worker to Thomas' home for the purpose of removing Mr. Thomas and Ms. Hicks' other children from the home.  PCS ¶ 22.  While at the home, defendants Mason and Fountain learned from Thomas that M.T. had been sick with a fever and diarrhea.  PCS ¶ 23.

Detectives Mason and Fountain next went to AMC, where defendant Fountain spoke to Dr. Edge.  PCS ¶¶ 24-25.  The conversation lasted only three to four minutes, during which Dr. Edge erroneously conveyed that M.T.s head injury was the type typically caused by a high speed impact or by slamming very hard into a hard object.  PCS ¶ 25.  During the first visit to AMC, Fountain and Mason were further incorrectly informed that M.T. had a skull fracture.  PCS ¶ 26.  Critically, defendant Fountain falsely claimed that during this conversation, Dr. Edge also told him that M.T. had been murdered.  PCS ¶ 27.  Dr. Edge denied making any such statement regarding a murder, and confirmed that his role as a physician is to diagnose, not to determine a cause or whether an injury is accidental or non-accidental.  PCS ¶¶ 28-29.  Defendants Fountain and Mason also obtained a statement from Ms. Hicks, which corroborated Thomas' claim that M.T. had been sick, and did not contain any statements alleging abuse by Thomas.  PCS ¶ 30.  Despite that both Mr. Thomas and Ms. Hicks confirmed M.T. had been sick, Mason never inquired with doctors about M.T.'s illness or whether there could be a non-trauma related cause of death.  PCS ¶ 31.

Thereafter, defendants Fountain and Mason returned to Mr. Thomas' home and asked him to accompany them to TPD headquarters.  PCS ¶ 32.  Going into the questioning, defendant Fountain concedes he believed that Thomas had done something to M.T., despite that defendants had learned nothing up until this time to support this, and that Ms. Hicks was the primary caretaker of M.T.  PCS ¶¶ 10, 21-33.  During the questioning, Mr. Thomas thought he could not leave, and repeatedly expressed that he felt like he was in jail.  PCS ¶ 34.  Thomas was initially questioned

4

for about two hours.  PCS ¶ 35.  During the first interrogation, defendant Fountain suggested to Mr. Thomas that he may have bumped M.T.'s head on the crib with the hope Mr. Thomas would adopt this suggestion.  PCS ¶ 37.  Also during the interrogation, Mr. Thomas stated, in sum and substance, that if his son died, he would jump off a bridge.  PCS ¶ 38.  Defendants Mason and Fountain continued to question Mr. Thomas after he made this statement.  PCS ¶ 39.  After repeated denials that he had done anything to M.T., in a state of duress and emotional turmoil, and in response to threats that Mr. Thomas' wife would be arrested, Mr. Thomas eventually adopted defendant Fountain's false suggestion that he had bumped M.T.'s head on the crib, and agreed to sign a statement written by Fountain, which he signed on September 22, 2008 at 1:41 a.m.  PCS ¶ 40.  The TPD defendants concede that the first interview did not yield any statements or evidence that gave defendants Mason and Fountain probable cause to arrest Thomas for any crime, or which were consistent with the information Fountain had learned from Dr. Edge.  PCS ¶ 41.

As a result of Mr. Thomas' statement regarding jumping off a bridge, Mason and Fountain brought Thomas to Samaritan Hospital for a mental health evaluation.  PCS ¶ 42.  Mason requested that Samaritan notify him when Thomas was ready to be released.  PCS ¶ 43.  On September 22, 2008, Mason returned to AMC and spoke to Dr. Edge, obtaining a statement from him that M.T.'s injury would have required more than a bump on a crib.  PCS ¶ 44.  Defendant Mason also learned at this time that M.T. did not actually have a skull fracture.  PCS ¶ 45.  In the afternoon of September 22, 2008, Thomas, who was distraught and sleep deprived, was met and picked up from the hospital by defendant Mason.  PCS ¶ 46.  Defendant Mason brought Thomas back to the Troy Police Department headquarters for further questioning.  PCS ¶ 47.  On the way to the interview room, defendant Mason told Thomas that once in the interview room, if he were to get up and go towards the door, he would be charged with escape.  PCS ¶ 48.

Defendant Mason interrogated Thomas for approximately 7 ½ hours, with the assistance of defendant Colaneri.  PCS ¶¶ 49, 52.  During the second interrogation, defendants Mason and Colaneri jointly introduced the concept of Matthew being slammed.  PCS ¶ 54.  As a result of the coercive interrogation, Thomas involuntarily adopted statements regarding bumping, throwing, or slamming M.T., all of which were suggested to him by the TPD defendants.  PCS ¶¶ 55-56, 90. In the early hours of September 23, 2008, after Mr. Thomas signed a second coerced 10-page false statement, he was arrested by defendant Mason.  PCS ¶ 62.  Defendant Mason prepared a criminal court information charging Mr. Thomas with attempted murder.  PCS ¶ 64.  Mr. Thomas was then arraigned based on the documents submitted by defendant Mason, and consequently imprisoned in the Rensselaer County Jail.  PCS ¶ 65.

On September 25, 2008, Dr. Sikirica performed the autopsy of M.T.  PCS ¶ 68.  Dr. Sikirica consulted with TPD Sergeant Mason, who was present during the autopsy, reviewed Mr. Thomas' coerced false statements that were provided to him by the TPD defendants, and was aware that Mr. Thomas had already been arraigned on attempted murder charges, and that his autopsy was being done in conjunction with a homicide investigation at the time he conducted the autopsy.  PCS ¶ 69.  During the autopsy, Sikirica neither took gram stains nor examined M.T.'s sinuses, evaluations which would have been relevant to determining the cause and extent of M.T.'s infection and cause of death.  PCS ¶ 70.  Further, on September 25, 2008, the lab results came back from the swabs taken at Samaritan Hospital, definitively confirming that M.T. had a bacterial infection.  PCS ¶ 71. Despite the positive lab test and other evidence of sepsis including, without limitation, that M.T. presented at the hospital with low white blood cell count, low platelet count, hypothermia, respiratory distress, low blood pressure, coagulopathy, hypoglycemia, tachycardia, and pancytopenia, Dr. Sikirica neither listed sepsis as a contributory cause of death on the death

6

certificate nor as a finding in the autopsy report, which was completed months later after receipt of the positive lab report. PCS ¶¶ 73, 77. Instead, Sikirica issued a death certificate on September 25, 2008, which listed the immediate cause of death as only "severe closed head injuries with cerebral edema due to blunt force trauma" and further in accordance with the information learned from TPD, stated the cause of injury to be: "assaulted by another (repeatedly)." PCS ¶ 72.

On September 26, 2008, defendants Mason and Sikirica testified in the grand jury, and the 10-page coerced confession was also introduced into evidence at the grand jury PCS ¶¶ 74, 76. During his grand jury testimony, defendant Sikirica testified to only some evidence of developing pneumonia, despite later admitting at Mr. Thomas' trial that the same bacteria that was found in M.T.'s bloodstream causes pneumonia, and that the pneumonia had advanced to sepsis by the time of M.T.'s death. PCS ¶ 75  The. PCS ¶ 76. Thereafter, on April 22, 2009, Dr. Sikirica issued an autopsy report in which he reported merely that M.T.'s blood was positive for streptococcus pneumoniae. PCS ¶ 77. Sikirica admits that streptococcus pneumoniae can cause pneumonia, meningitis, and sepsis, and that sepsis is more serious than the mere presence of the bacteria— which is all he listed in his autopsy report—and that sepsis is an actual infection that leads to organ damage throughout the body, and which can cause death. PCS ¶¶ 78-79. Dr. Sikirica knew that his autopsy results would be relied on by police and prosecutors when he intentionally omitted any mention of sepsis from his report because he recognized that including the diagnosis would divert from what he assessed was the real cause of death. PCS ¶¶ 80-81. Sikirica now concedes that while he listed the cause of M.T.'s death to be only blunt force trauma, sepsis was a contributory cause of death, and doctors could disagree as to his assessment as to the cause of death. PCS ¶ 82. This is of importance because other than Thomas' coerced false confession and Dr. Sikirica's

flawed finding that M.T. had died of blunt force trauma rather than sepsis, there was no other evidence that a crime had been committed or linking Thomas to any purported crime.  PCS ¶ 83.

Thomas was tried and convicted by a jury in 2009 for the murder of his son, M.T.  PCS ¶ 85.  Defendant Mason testified at the 2009 trial, and evidence including Mr. Thomas' statement and portions of the second videotaped coerced false confession were introduced into evidence. PCS ¶ 86.  Defendant Sikirica testified during the first trial that based on his experience and participation in the autopsy and microscopic examinations of M.T., that M.T.'s injuries were consistent with having been slammed down on a mattress at a *great force*, and that the subgaleal hematoma was consistent with being slammed into a wooden rail of a crib.  PCS ¶ 87.  Thomas was sentenced to 25 years to life in prison, and thereafter transferred to Downstate Correctional Facility, and then to Auburn Correctional Facility.  PCS ¶ 88.

Thomas filed post-conviction motions to suppress his confession and to set aside the verdict rendered against him, a remedy that was ultimately granted by the Court of Appeals of on February 20, 2014.  *Thomas*, 22 N.Y.3d 629.  The Court of Appeals found that defendants Mason, Fountain, and Colaneri had engaged in coercive behavior, including *inter alia*, threatening that if Thomas continued to deny responsibility for M.T.'s injury his wife would be arrested and removed from his ailing child's bedside, repeating 21 times during the course of the interrogation "that his disclosure of the circumstance under which he injured his child was essential to assist the doctors attempting to save the child's life," and "the ubiquitous assurances offered by defendant's interrogators, that whatever had happened was an accident, that he could be helped if he disclosed all, and that, once he had done so, he would not be arrested, but would be permitted to return home" which included telling Thomas "67 times that what had been done to his son was an accident, 14 times that he would not be arrested, and eight times that he would be going home."

*Id.* at 643-646.  The Court of Appeals further recognized that Thomas' "subsequent confession provided no independent confirmation that he had in fact caused the child's fatal injuries" and that "[e]very scenario of trauma induced head injury equal to explaining the infant's symptoms was suggested to defendant by his interrogators" that that "not a single inculpatory fact in defendant's confession that was not suggested to him."  *Id.* at 646.

After the Court of Appeals remanded Thomas' case for retrial, Thomas was again imprisoned at Rensselaer County Jail.  PCS ¶ 92.  Thomas was retried in 2014.  PCS ¶ 93. Defendant Sikirica testified at Thomas' second trial.  *Id.* at Ex. 26, Sikirica 2014 Trial.  PCS ¶ 94. At the second trial, Sikirica testified that in his experience, the injuries could be consistent with a *moderate amount of force*, and that M.T.'s injuries were consistent with M.T. being bounced hard off of a bed and onto the ground.  PCS ¶ 95.  Defendant Sikirica continued to attribute M.T.s death to Mr. Thomas, consistent or otherwise congruent with the TPD fabricated evidence, even after Mr. Thomas' confession had been suppressed and despite the suppressed statement being the only link between Mr. Thomas and M.T.'s death.  PCS ¶ 96.  At the conclusion of the second trial, Mr. Thomas was acquitted, and the matter was dismissed and sealed.  PCS ¶ 97.

>   **B.**     **Statement of Relevant Expert Witness Opinions**

Plaintiff retained Matthew B. Johnson, Ph.D., associate professor in the Department of Psychology at John Jay College of Criminal Justice-CUNY, as an expert witness to provide an opinion concerning the coerced confession and the emotional damages and sequalae flowing from the events at issue.  *See* Johnson Decl. ¶ 2.  After a review of the record, Johnson opined, in relevant part, that plaintiff's malicious prosecution resulted from a process commonly referred to as "a misinformation effect (also called an 'anchoring effect', or a process of 'forensic confirmation bias', or 'bias cascade'), where an initial erroneous assumption or report is accepted as factual and

misguides the ensuing investigation." *Id.* at ¶ 4; PCS ¶ 98.  Johnson further opined that in the case of plaintiff, the initial mistaken assessment by AMC led the police to subject Thomas to a "prolonged, coercive, interrogation to confirm the erroneous medical assessment" and that "[t]he coerced false confession then influenced the medical examiner's autopsy report."  PCS ¶ 98. Johnson also cited research recognizing that when an event is mislabeled a crime, "forward momentum often fueled by circular reasoning takes over" resulting in individuals being convicted of crimes that never occurred in the first place, as was the case here.  PCS ¶ 98.

Plaintiff retained forensic pathologist Katherine F. Maloney, M.D., currently the Deputy Chief Medical Examiner for the Erie County Medical Examiner's Office, to provide an expert opinion as to M.T.'s cause of death.  *See* Maloney Decl. ¶¶ 2-3.  After a review of the record, Maloney determined that M.T. died exclusively from streptococcus pneumoniae meningitis.  *Id.* at ¶ 5; PCS ¶ 99.  She further found that the scalp and subgaleal hemorrhages, retinal hemorrhages, and subdural hemorrhage were not due to violent trauma, were not fatal injuries, and did not explain the cause of death.  PCS ¶ 99.  Rather the retinal hemorrhages were due to increased intracranial pressure caused by the cerebral edema, and the subgaleal and subdural hemorrhages resulted from coagulopathy due to the streptococcus pneumoniae infection and from brain swelling due to the loss of oxygen to the brain caused by the infection, which led to an accumulation of fluid surrounding the brain.  PCS ¶ 99.

## STANDARD OF REVIEW

Summary judgment should be granted only if the Court determines that there is no genuine dispute as to any material fact concerning the non-movant's claims or defenses and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must examine the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all

factual inferences in favor of the non-moving party.  *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995).  The burden is on the moving party to show that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

<u>**ARGUMENT**</u>

<u>**POINT I**</u>
**A JURY COULD CONCLUDE THAT SIKIRICA'S AUTOPSY REPORT WAS A SUBSTANTIAL FACTOR IN BRINGING ABOUT PLAINTIFF'S PROSECUTION AND DENIAL OF RIGHT TO FAIR TRIAL**

A defendant can initiate a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor."  *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017).  Further, a right to fair trial claim can be based on evidence that exculpatory evidence was suppressed.  *See McCaffrey v. City of New York*, No. 11 CV 1636 (RJS), 2013 WL 494025, at *13 (S.D.N.Y. Feb. 7, 2013).  *See also, Ying Li*, 246 F. Supp. 3d at 626 ("defendant's right to a fair trial is violated when exculpatory evidence is withheld, *i.e.*, when a *Brady* violation occurs."); *Sanders v. City of New York*, No. 12 CV 113 (PKC)(LB), 2015 WL 1469514, at *17 (E.D.N.Y. Jan. 7, 2015).  *See also*, *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) ("A fair trial claim may also arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant").

Defendant Sikirica argues that plaintiff's malicious prosecution and right to fair trial claims fail based solely on the grounds that Sikirica's autopsy report was purportedly neither false nor fabricated.  In so arguing, defendant emphasizes that Sikirica included in his anatomic diagnosis that M.T.'s blood was positive for streptococcus pneumonia.  Sikirica's prior testimony, however,

11

confirms that sepsis is more significant than the mere presence of bacteria in the blood stream, and he now concedes that sepsis was a contributory cause of death in this case. PCS ¶¶ 78-79, 82. Yet, despite admitting that he saw clear evidence of the more serious sepsis condition at autopsy, and that his autopsy would be relied upon in prosecuting plaintiff, Sikirica conceded that he chose not to list sepsis in his autopsy report because this would admittedly divert from his finding that M.T. died of trauma, which was the narrative presented to him by the TPD defendants. PCS ¶¶ 69, 80-82. This explanation creates an inference that Sikirica knowingly tailored his report to the findings of police, and was intentionally downplaying other obvious and exculpatory explanations for M.T.s death. This inference is underscored by Sikirica's couching the evidence of sepsis in his grand jury testimony as only developing and worsening pneumonia, notwithstanding that he was aware the pneumonia had already advanced to sepsis. PCS ¶ 75.

Based on the foregoing, a reasonable jury could conclude that Sikirica's omission of the more serious diagnosis of sepsis from the death certificate and autopsy report which, in his own words, would have diverted from the finding that M.T. had died of trauma, constituted an intentional withholding of exculpatory evidence sufficient to establish plaintiff's claim that Sikirica participated in initiating the malicious prosecution and denying Thomas of his right to fair trial. *See e.g.*, *Ying Li*, 246 F. Supp. 3d at 605; *McCaffrey*, 2013 WL 494025, at *13. Moreover, Sikirica need not be solely responsible for these harms to be liable to plaintiff. *See Hamilton v. City of New York*, No. 15 CV 4574 (CBA)(SJB), 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019) (quoting *Hydro Inv'rs. Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) (recognizing that a finding of causation "does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury.") Thus, because a jury could find that Sikirica's actions in withholding exculpatory

evidence, to wit: that the confirmed streptococcus pneumoniae infection had advanced to sepsis, resulting in death, was a substantial factor in bringing about the malicious prosecution and denial of fair trial alleged by plaintiff, defendant's arguments to the contrary should be rejected.

**POINT II**
**A JURY COULD CONCLUDE THAT DEFENDANT SIKIRICA CONSPIRED WITH THE TPD DEFENDANTS[2]**

"A Section 1983 conspiracy claim requires '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 465 (S.D.N.Y. 2012) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id.*

Here, a jury could conclude that Dr. Sikirica rendered his medical opinion to be consistent with Thomas' coerced false confession, and intentionally minimized the exculpatory evidence of sepsis. Indeed, Dr. Sikirica admitted that he omitted the word sepsis from his reports, despite his concession that he recognized that sepsis was a contributory cause of death, because including the diagnosis would divert from the finding of trauma, which was itself based off of the TPD defendant's coerced false confession. PCS ¶¶ 69-73, 78-82. Further, Sikirica's unwavering adoption of the TPD defendants' narrative, despite and even subsequent to the Court of Appeals' ruling that Thomas' confession had been coerced, reveals that he was not a neutral witness, but

---

[2] While there is ample scholarly evidence that black children are "more likely to be labeled as abused than white children" and it can be inferred that such inequalities may have impacted Albany Medical Center's assessment of M.T. and the investigation of M.T.'s death by the TPD defendants, at this juncture plaintiff agrees to voluntarily dismiss his Section 1985 conspiracy claim. *See e.g.,* Naomi Cahn, *Race, Poverty, History, Adoption, and Child Abuse: Connections*, 36 Law & Soc'y Rev. 461, 471 (2002).

was rather working in concert with the TPD defendants.  PCS ¶ 96.  This is further evidenced by his willingness to adopt as his medical opinion whichever facts were necessary to aid in the conviction of Mr. Thomas, agreeing during the first trial that M.T.'s injuries were consistent with having been slammed down on a mattress at a great force, and that the subgaleal hematoma was consistent with being slammed into a wooden rail of a crib, and then at the second trial altering his testimony to be consistent with the new theory of the case, to wit: testifying that in his experience the injuries could be consistent with a *moderate* amount of force consistent with M.T. being bounced hard off of a bed and onto the ground.  PCS ¶¶ 87, 95.

Moreover, that in his role as a medical examiner, Sikirica would be expected to meet with law enforcement, and that he met only once with Mason during the autopsy, does mean a jury cannot reasonably conclude that defendant Sikirica and the TPD defendants conspired in the effort to maliciously prosecute Thomas for M.T.'s death where, as here, it can be inferred from Sikirica's actions in withholding key exculpatory medical findings and tailoring his testimony to the prosecution that he was not merely a neutral unbiased actor.  Viewing the evidence in a light most favorable to plaintiff, a question of fact exists as to whether the TPD defendants and Dr. Sikirica conspired to ensure the autopsy confirmed the narrative established by the TPD defendants that M.T. had been "murdered" by Thomas, to the unreasonable exclusion of evidence that M.T. had died of natural causes.

## POINT III
## DEFENDANT SIKIRICA IS NOT ENTITLED
## TO QUALIFIED IMMUNITY

At this Court has previously recognized "[p]laintiff's right to be free from fabricated evidence in the form of falsified autopsy report is clearly established.  *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 300 (N.D.N.Y. 2018), *on reconsideration sub nom*.  *Thomas v. Mason*, No. 17

14

CV 626 (DJS), 2019 WL 6111572 (N.D.N.Y. Nov. 18, 2019) (citing *Zahrey v. Coffey*, 221 F.3d 342, 355-56 (2d Cir. 2000); *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997); *Weaver v. Brenner,* 40 F.3d 527, 533-34 (2d Cir. 1994); *Matthews v. City of New York*, 889 F.Supp.2d 418, 441 (E.D.N.Y. 2012); *Anilao v. Spota*, 774 F.Supp.2d 457, 492 (E.D.N.Y. 2011)). While defendant Sikirica recognizes this, he argues he is nonetheless entitled to qualified immunity because he purportedly drew honest conclusions from medical data.

Accepting plaintiff's allegations as true, however, Sikirica did not honestly draw his conclusions, but rather intentionally omitted exculpatory evidence that M.T. was septic when he died.  Thus, this case is distinguishable from *Ferris v. City of Cadillac*, 272 F.Supp.3d 1003 (W.D. M.I. 2017), the case upon which defendant relies, because here, a jury could conclude that that Sikirica did not "articulate [his] opinions of what the evidence means honestly and in good faith" but rather intentionally withheld an exculpatory and admittedly contributory cause of death.  PCS ¶¶ 81-82.  Further, this omitted cause of death was, in the light most favorable to Mr. Thomas, in fact the sole cause of M.T.s death.  PCS ¶ 2.  Moreover, Sikirica's failure to inspect M.T.'s sinuses or to order gram staining, where sepsis was the obvious presenting cause of death, further undermines Sikirica's claim that his actions did not deviate from accepted professional standards or that he drew his conclusions honestly or neutrally.  Based on the foregoing, Sikirica should not be granted qualified immunity.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment should be denied,

together with such other relief to plaintiff as the Court deems just and proper.

Dated: New York, New York
       September 20, 2021

                           BRETT H. KLEIN, ESQ., PLLC
                           Attorneys for the Plaintiff
                           305 Broadway, Suite 600
                           New York, New York 10007
                           (212) 335-0132

By: _____
                           BRETT H. KLEIN
                           LISSA GREEN-STARK