[ATBK]

**Matthew B. Johnson, Ph.D. Psychologist - Consultation & Treatment Services**
*4 South Orange Avenue #203*
*South Orange, New Jersey 07079 Mailing & correspondence address*
*mjohnson@jjay.cuny.edu; phone: (862) 216 4235*

*349 East Northfield Road, Suite LL5*
*Livingston, New Jersey 07039 Consultation Office*

November 16, 2020

Brett H. Klein, Esq., PLLC
Klein Civil Rights
305 Broadway, Suite 600
New York, NY 10007

Re: *Adrian Thomas vs City of Troy, NY et al*

Dear Mr. Klein,

At your request, this report has been prepared in connection to the above noted civil matter. The report is based upon my review of the amended complaint, plaintiff's affidavit, various exhibits, as well as related police and medical records, and my interviews with plaintiff, Adrian Thomas (AT) and his mother (Annie Pearl Black) as detailed below. The report proceeds by presenting research literature related to interrogation, confession, and wrongful conviction. This is followed by review of documents, records, and the interview material. The findings are reported below and summarized on page 10.

As I understand, the referral question involves my informed opinions concerning the coerced false confession in this case, as well as the emotional damages and/or sequelae attributed to Adrian's ordeal, including the prolonged interrogation, false accusations, criminal prosecution, wrongful conviction, long term imprisonment, deprivation of contact with his children, and other r

elated adversity, loss and damage arising from the subject incidents.

**Record review:**

The following records and documents were among those reviewed:
USDC Amended Complaint (10/16/17)
Plaintiff's Claim (6/10/16)
Mason trial testimony (document not dated) and depositions
Fountain testimony (document not dated) and depositions
Frye Hearing testimony of Dr. Richard Ofshe & Professor Paul Cassell
Samaritan Hospital (Psychiatric) Records (9/22/08)
Troy Police Department (10 page) 'Voluntary Statement' (9/22/08) sic
AT deposition transcript dates (8/20/19 & 8/21/19)
Interrogation video tapes [9/21/08] 9/22/08 & 9/23/08
AT interviews 10/05/20 & 10/12/20
Annie Pearl Black interview 10/30/20
*People v. Thomas* (2014), New York Court of Appeals ruling
Jan E. Leetsma, MD Report 11/16/20
Michael Sikirica, MD Autopsy Report 4/20/09

**Relevant Research Literature:**

There is a lengthy and substantial history of 'false confession' scientific research. Early investigators (Munsterberg, 1908; Borchard, 1932), using the term 'untrue confessions', identified false confessions and suggested remedies. Two developments precipitated further research in the latter half of the 20th Century:

1) The US Supreme Court Miranda ruling (*Miranda v Arizona*, 1966) referred to "modern psychological interrogation" noting that coercion could be psychological as well as physical.

2) The emerging DNA exonerations beginning in the 1990s demonstrated conclusively a substantial number of innocent defendants had confessed to major crimes they did not commit.

By the end of the 20th Century a robust, generally accepted, body of scientific research, derived from social-experimental, clinical, and archival research (Kassin, Goldstein, & Savitsky, 2003; Gudjonsson, 2003; Leo & Drizin, 2004) was recognized as admissible in many states and in federal court (Fulero, 2004). The National Registry of Exonerations (NRE) lists 43 defendants who were wrongfully convicted of major crimes in New York State stemming from false confessions (National Registry of Exoneration, nd).

Psychological research has been instrumental in describing and elaborating processes that contribute to police-induced false confessions (Kassin, 2015; Kassin, Drizin, Grisso, Gudjonsson et al 2010; *[Kassin & Gudjonsson, 2004]*; Leo, 2008; Leo & Davis, 2010; Drizin & Leo, 2004). While instances of voluntary false confessions have been noted in the literature (Gudjonsson, 2003), a common pattern is where innocent suspects adopt a false confession narrative after their initial accounts have been vigorously rejected by interrogators. False confessions to serious criminal offenses have been documented, catalogued, and classified in decades of research (Gudjonsson, 2003; Gudjonsson, 1992; Leo & Ofshe, 1998; Kassin & Wrightsman, 1985). Researchers (Kassin et al 2010) have identified two broad categories of factors that increase the risk of false confessions:

1) Situational or contextual factors, that is how interrogations are conducted. Three primary situational/contextual factors have been identified, a) prolonged interrogation and isolation; b) the introduction of false incriminating evidence; and c) the use of minimization tactics ('themes').

2) Dispositional or personal factors, that is suspect vulnerabilities. The reaction to interrogative pressure is not uniform. Some suspects (whether innocent or guilty) can endure and tolerate interrogation; that is maintain and assert their innocence, better and/or longer than others. Research has established that certain characteristics (a. youth, b. intellectual disability, c. mental illness) are associated with increased vulnerability to false confession. Also, two personality traits (a. suggestibility & b. compliance) are also associated with false confession.

False confession research has produced hundreds of scientific papers and dozens of academic books which have been cited in major textbooks and in legal rulings. The primary researchers have collaborated in major publications (i.e. Kassin et al, 2010) indicating the generally accepted body of research derived from various research approaches.

Research indicates criminal interrogation is essentially a two-step process – 1) the suspect's confidence is attacked, undermined, and the suspect feels hopeless; 2) the suspect is then persuaded (via various inducements) to improve their desperate situation by providing some admission to the offense (Drizin & Leo, 2004; Leo & Ofshe, 1998).

Johnson & Hunt (2000) point out that while interrogative questioning seeks information, it also transmits information.  In the Johnson & Hunt case illustration, the interrogator asked the juvenile suspect, "Did you realize as you were shaking her that she had stopped breathing" (p. 29).  This hypothetical formulation of the case facts was presented to the suspect as though it were factual.  If the suspect accepts the premises within the question, the interrogation has been contaminated and the suspect's incriminating response (either 'yes' or 'no') is an admission of guilt.

Garrett (2010) examined the process of interrogation contamination and false confession.  Drawing from investigation and litigation records, Garrett describes how interrogators provide crime details to innocent suspects who then incorporate the details in incriminating 'confession' narratives.  The resulting 'confessions' purportedly include knowledge of the crime only the perpetrator would know ('specialized knowledge' or 'control information').  These 'confessions' become the heart of the prosecutor's appeal to the jury for conviction and are cited in appellate rulings that affirm the convictions.

Trainum (2014; also see Trainum & Havlin, 2009) (a former DC Metro homicide detective) describes factors that contribute to confession contamination, several of which are relevant to the instant case.  For instance, Trainum specifically notes:

1.  Leading questions that suggest, "…where the interrogator believes the story should go…" (p. 7)

2.  Feedback where, "Every time the innocent suspect gets an answer 'wrong' the investigator accuses them of lying…" (p. 8).

3.  The presentation of false evidence.

4.  Where the interrogators begin a statement with "Let me tell you what we know… (p. 10).

Also relevant is the literature on wrongful conviction in Shaken Baby Syndrome/Abusive Head Trauma (Johnson et al, 2020) which describes the role of false/mis-leading medical evidence in these child abuse prosecutions, as well as the unique vulnerability of innocent parents.  Equally relevant to the facts as presented in the prosecution of AT, is the research summarized by Henry (2020) regarding innocent defendants prosecuted for crimes that never occurred ('no crime cases').

**Case Summary:**

As presented in the Amended Complaint (and other sources), on the morning of 9/21/08 4-month-old ███████████ (MT) (son of AT and Wilhemina Hicks, WH) was ill with vomiting and diarrhea.  The parents called for emergency medical assistance when the child became limp and unresponsive.  MT was taken to the local Samaritan Hospital where his presentation was suggestive of a bacterial infection.  Diagnostic tests to confirm sepsis were ordered but the results were not immediately available.  In the interim the child was transferred to the regional Albany Medical Center, where a physician (W. Edge, MD) mistakenly assessed the child to have brain injury and a fractured skull resulting from inflicted trauma.  By the following day, more complete evaluation revealed there was no fracture to the skull nor any fractures in the body.  However, on 9/21/08 the mis-diagnosis was transmitted to Troy Police officers who took AT into custody and sought to obtain incriminating statements (a confession) from plaintiff AT that were consistent with the flawed medical assessment.  The plaintiff's other 6 children were also removed from the home by CPS.  Through the course of a 9 ½ hour custodial interrogation (broken into an initial 2-hour session and a subsequent 7 ½ hour session) the police officers used a variety of illegal (*People v. Thomas*, 2014) deceptive, suggestive, and coercive methods to elicit incriminating statements from AT to correspond to a faulty medical assessment.  AT [initially] cooperated with the interrogators and asserted he had no knowledge of an inflicted head injury to his son, MT.  However, in the course of

*References to the infance decedants' full name have been redacted, as well as information pertaining to damages that are not germane to defendants' summary judgment motion.

the lengthy interrogation, AT became clinically depressed and suicidal which led the interrogating officers to take AT to the Samaritan Hospital for psychiatric evaluation leading to confinement on the mental health unit for a period of about 16 hours. Upon his release from psychiatric care, AT was immediately returned to the police precinct for a 7 plus hour period of further custodial interrogation.

During the initial interrogation session AT was reassured, multiple times, he would not be arrested and MT's condition was the result of an accident rather than intentional infliction. Also, AT was informed that either he or his wife, as the two adults in the household, were responsible for the child's 'injuries'. The interrogation officers suggested verbally, as well as enacted physically, a number of injury scenarios that might correspond to the mistaken medical assessment of inflicted head trauma. At some point during the initial session, AT began to entertain some of these scenarios but he eventually became acutely depressed with suicidal ideation. As noted below, AT cites the officers' threat to take in his wife for questioning as the proximal precipitant. At this point AT stated he was not responsible for injuring the child, nor did he think his wife was, but he would 'take the fall' rather than have her arrested.

The medical records from Samaritan Hospital confirm AT's acute depression with suicidal ideation and plan which made him a danger to himself upon admission. The medical/psychiatric record also confirms that AT's son was, "believed to be a victim of shaken baby syndrome…" (Adrian Morris, MD) further affirming the interrogation was guided by the erroneous initial diagnosis. In addition, upon discharge, AT, though no longer suicidal, remained depressed and with anxiety.

During the ensuing, prolonged, 7+ hour interrogation, AT was coerced (through a combination of threats and assurances of leniency) to adopt several incriminating statements and formulations, all of which originated from the interrogators (*People v. Thomas*, 2014, that is none of which indicated he had independent knowledge of an offense). AT's compliance with the incriminating statements and enactments were a direct result of the coercive interrogation methods employed and AT's vulnerable and impaired mental state, as detailed below. The coerced incriminating statements, coupled with flawed medical testimony, resulted in a trial conviction. In 2009, AT was sentenced to 25 years to life. Also, a family court restraining order prohibited AT from contact with his children. In February of 2014, AT's conviction was reversed unanimously by New York State's highest court (*People v. Thomas*, 2014) and AT was acquitted at re-trial later that year.

**Interview data, 10/05/20:**





**Summary:**

In 2008, at age 25, AT (the father of 7 children) was interrogated in connection with 'injuries/symptoms' exhibited by his 4-month-old son, M███████. The officers, who conducted the interrogation, had been (mis-) informed the child suffered inflicted trauma with a head fracture ('murdered'). This mis-information guided the interrogation with the officers urging AT to adopt various scenarios of inflicted trauma to coincide with the faulty, initial medical assessment. AT was presented false incriminating evidence and multiple assurances of leniency (it was an "accident", he would not be arrested, and he would be going home - themes) through the course of a 2-hour interrogation, which was video recorded. The officers indicated that either AT, or his wife, were responsible for the (assumed) inflicted injuries to the child and stated/insinuated his failure to provide an incriminating statement would result in the detention and arrest of his wife. Toward the end of the 2-hour interrogation, AT (who had endured major life stressors earlier in the day) became clinically depressed and suicidal. He offered to 'take the fall' for

his wife though insisting he had not harmed the child and he did not believe his wife had. Due to the acute suicidal ideation, AT was confined to a psychiatric unit for a 16-hour period. Upon release, AT was taken to the precinct to resume custodial interrogation which continued for a 7-hour period. Even though the interrogating officer acknowledged the earlier medical report of a head fracture was mistaken, the officer continued to interrogate AT in an effort to elicit incriminating admissions consistent with the inflicted trauma theory. At points through the 7-hour interrogation AT adopted incriminating formulations (statements) and enactments consistent with the suggestions of the interrogators. However, all of the incriminating content originated with the interrogators (*People v. Thomas*, 2014).

In 2009, AT was convicted by jury and sentenced to 25 years to life. The state's case relied on the disputed confession evidence as well as disputed medical testimony. In addition, through family court action, AT was denied contact with his children. AT was incarcerated in New York State prison until 2014 when his conviction was reversed, in a unanimous ruling, by the state's highest court which noted the interrogation tactics used were coercive, deceptive, and illegal (*People v. Thomas*, 2014). AT was subsequently acquitted at re-trial. Thus, AT was stigmatized by prosecution for a horrendous 'crime', deprived of his liberty for a period of 6 years, and subjected to various associated suffering and residual adverse effects which continue. The proximate cause of the suffering and adversity was the illegal, coercive, interrogation that resulted in the false confessions. This unfortunate, wide ranging, and painful outcome was not inevitable, in fact it was highly preventable with proper law enforcement training**.

**Wrongful conviction**

In the past 3 decades, largely associated with the application of DNA science to criminal investigation, wrongful criminal conviction has emerged as an indisputable and unfortunate feature in the US. While there is dispute about the scope of wrongful conviction, few deny any longer that it is a recurring problem, that deprives citizens of their liberty, that creates public safety risks, and harms the integrity of the legal system. There are multiple contributing causes to wrongful conviction and, as noted above, there have been 43 confirmed wrongful convictions directly linked to false confession in New York State.

The risk of wrongful conviction in shaken baby syndrome/abusive head trauma (SBS/AHT) cases has produced considerable attention in medical specialties, legal commentary, and in psychology (Johnson et al, 2020). The National Registry of Exonerations lists more than 20 wrongful convictions of this type and there is little doubt there are innocents convicted who lack the resources to establish their innocence. The factors contributing to these wrongful convictions are presented in Johnson et al (2020) noting the leading contributor as false/misleading medical evidence. It is relevant to note 7 confirmed wrongful convictions in SBS/AHT involved false confessions.

The process of wrongful conviction commonly involves a mis-information effect (also called an 'anchoring effect', or a process of 'forensic confirmation bias', or 'bias cascade'), where an initial erroneous assumption or report is accepted as factual and misguides the ensuing investigation. In some cases, this will be an erroneous identification, faulty forensic evidence, a false confession, or false accusation. In SBS/AHT prosecutions, the initial erroneous report is typically a medical assessment. This misinformation is clearly apparent in the prosecution of AT where the mistaken initial assessment by the Albany Medical Center physician (W. Edge, MD) was conveyed to the police and CPS. The police subjected the vulnerable AT to prolonged, coercive, interrogation to confirm the erroneous medical assessment. And with the use of illegal tactics, the interrogators elicited such admissions. The coerced false confession then influenced the medical examiner's autopsy report. These multiple sources of evidence all emanated from the initial, faulty, medical assessment.

While most wrongful convictions involve the prosecution of an innocent person for crime committed by someone else, a significant proportion of wrongful convictions involve cases where there was no crime at all. This process has been described by Henry (2020, p. ix) who points out, "... more than nine hundred entirely innocent people have been arrested, prosecuted, convicted, often incarcerated, and eventually exonerated for crimes that were never committed." Further, Henry points out, "Once an event is mislabeled a crime, forward momentum often fueled by circular reasoning takes over. The initial erroneous designation of a crime sets in motion a process that almost inexorably leads to a wrongful conviction" (p. 7). And, "... in nearly one-third of all known exonerations, a person was convicted of a crime that never happened" (p. 9). This observation highlights that not only was AT innocent, but there was no crime to begin with.

**Interrogation and false confession**

As noted above, the proximal cause of AT's incriminating statements was the prolonged, coercive, for deceptive, and illegal interrogation which precipitated acute depression with suicidal ideation and associated cognitive impairment. Several defendants knew, or should have known, the elevated risk of false incriminating statements in such a situation, especially where all of the incriminating content originated with the officers (*People v. Thomas*, 2014).

As presented in the above literature review, Kassin et al (2010) noted three situational factors that were associated with false confessions. Each of the three are apparent in the interrogation of AT, 1) isolation and prolonged interrogation, where interrogations lasting longer than 4-6 hours increase the risk of false confession; 2) false incriminating evidence - in the form of the medical evidence of injury and the ruse medical staff were requesting information for treatment; 3) the use of minimization tactics, in this case in the form of the repetitious 'accident' narrative, and the multiple assurances AT would not be arrested, and he could go home.

There are two very basic questions that warrant attention. The first, why would an innocent person give such incriminating statements during custodial interrogation; and the second, why would a suspect, if innocent, subsequently sign an incriminating confession document such as the 10-page statement in evidence.

Why did AT give the incriminating statements during interrogation? How do we understand this process and phenomena? First, there is no need to look further than the original *Miranda v. Arizona* (1966) ruling which warns about psychological interrogation methods that, "put the defendant in such an emotional state as to impair his capacity for rational judgment". At least since the Miranda ruling, social scientists have been studying criminal interrogation and confession, and have advanced models to describe and explain the process. Ofshe has used the term 'extraordinary influence'. Kassin (2015) used the term, 'Milgrahamesque' to characterize the process of gradual compliance to authority that results in false confession. Drizin and Leo (2004) describe a two-step process toward confession with 3 levels of inducement applied in the second step. Davis & Leo (2012) refer to 'interrogation related regulatory decline' to describe impairment of cognitive functioning that paves the way to false confession. An early publication by Ofshe and Leo (1997) described the process as 'controlling the alternatives the suspect considers and also influencing how those alternatives are understood'.

In this case, the available record indicates, AT sought to tell the truth as he knew it. He insisted he had not injured the child and he was confident his wife had not either. Unfortunately, the truth he told was repeatedly rejected by the interrogators. It was rejected with the force of authority of law enforcement who AT believed were being honest. Further the law enforcement officers asserted, the medical

professionals, who were actually caring for the infant, indicated his explanation was incomplete and insufficient. This attack on the truth as he knew it, produced doubt in AT. In addition to the rejection of the truth (see Trainum, 2014), AT was offered a variety of plausible ways he might have inadvertently harmed the child. Trusting the law enforcement officers resulted in a degree of uncertainty in AT and he began to consider some of the scenarios of injury suggested. This was encouraged by the multiple offers and insinuations of leniency that were presented. However, at a certain point during the initial 2- hour interrogation, the threat to arrest his wife precipitated an emotional crisis for AT and he became acutely depressed with suicidal ideation. Depression is not only an emotional state, it has an adverse effect on attention, thinking, and problem solving (West et al, 2013). So, the combination of doubt, the uncertainty, the plausibility of the suggested scenarios, and the threat to arrest the wife, eventually eroded his sense of clarity and confidence in his own perceptions. There are several elements here that explain AT's false confessions. First, as noted above, AT was in a heightened state of anxiety and apprehension even prior to the beginning of the interrogation. This was due to the acute medical crisis (of unknown cause) that afflicted his son, M████. This was aggravated by the fact he could not contact his wife and his children had been forcibly removed. So, he was experiencing grief regarding his son and, as a parent, this was colored to some degree with guilt (as parents often blame themselves for adversity that visits their children even when the parents had no control over the situation or cause). As was stated, the truth he told the interrogators was repeatedly and summarily rejected and he naively entertained the false incriminating information he was provided by the officers.

The second question, why did AT persist and sign the 10-page incriminating 'voluntary' statement, also warrants attention. Before directly addressing the question, it is important to point out this is not an unheard-of occurrence. There are several confirmed cases where innocent suspects provided coerced false confessions and also gave subsequent statements and/or testimony consistent with the false confession. While there are specific considerations in each case, the phenomenon is attributable to some combination of cognitive confusion, internalization, and interrogative coercion/bribery. In the case of AT, the available record indicates he suffered cognitive deterioration and confusion as a result of the lengthy and traumatic interrogation, coupled with the preceding fears about the condition of M████, the false incriminating evidence, acute depression, and the isolation from his usual sources of support. So, his ability to respond, problem solve, and assert his perspective was diminished. Further his pronounced grief, depression, and self-deprecation made him especially vulnerable to self-blaming explanations of his predicament. Finally, AT had been assured repeatedly during the interrogation that his admissions would be used to get him help, counseling, and protect him from serious criminal prosecution. Therefore, to a degree, he believed it was in his interest to comply with the interrogators' narrative.

Probably the most well-known example of a false confession that was repeated by the innocent defendant occurred in the Central Park Five prosecution where Kevin Richardson was convinced by the interrogator that his coerced (fabricated) admissions would be used to prosecute an actual offender not Richardson himself. Therefore, Richardson believed he, "had to sell it" (Burns et al 2012), that is convincingly assert the false confession narrative. In another case, Christopher Ochoa from Austin, Texas was coerced to falsely confess to the murder of a co-worker. He also provided sworn in-court testimony, consistent with the false confession, that was used to prosecute a co-defendant. In this case his compliance was secured by death penalty threats in a state with frequent executions. Similarly, Joe Dick, Jr. (in Virginia), falsely confessed to the murder of a young woman and also provided sworn in-court testimony for the state against his co-defendants again to protect himself from a death sentence (though there is evidence Dick, Jr. actually internalized his false confession for a period of time). Another example is Marcellius Bradford (from Illinois) who falsely confessed to a murder and provided sworn in-court testimony for the

state, consistent with the false confessions, to aid in the prosecution of others.  In Bradford's case it was learned that his false confession was provided in exchange for reduced penalties.

**Injuries and damage**





The findings and opinions reported above are presented with a reasonable degree of professional certainty. Thank you for the opportunity to consult on this case. If there are further questions the examiner can be reached at the above phone or email address.

**References:**

Burns, S., McMahon, D., & Burns, K. (Directors) (2012) The Central Park Five. Florentine Films and WETA Television.

Davis, D. & Leo, R. A. (2012) Interrogation related regulatory decline: Ego Depletion, failures of self-regulation, and the decision to confess. *Psychology, Public Policy and the Law*, 18, 673-704.

Drizin, S. & Leo, R. (2004) The problem of false confessions in a post DNA world. *North Carolina Law Review*, 82, 891-1007.

Fulero, S.M. (2004). Expert psychological testimony on the psychology of interrogations and confessions. In G.D. Lassiter (Ed.), *Interrogations, Confessions, and Entrapment*. Norwell, MA: Plenum Publishing.

Garrett, B.L. (2010) The Substance of False Confessions. *Stanford Law Review*, 62, 1051-1119.

Grounds, A. (2004) Psychological Consequences of Wrongful Conviction and Imprisonment. *Canadian Journal of Criminology and Criminal Justice*, 46, 165-183.

Gudjonsson, G.H. (2003). *The Psychology of Interrogations and Confessions: A Handbook*. John Wiley & Sons: Chichester, England.

Gudjonsson, G.H. (1992) *The Psychology of Interrogations, Confessions, and Testimony*. John Wiley & Sons: Chichester, England.

Henry, J.S. (2020) *Smoke But No Fire: Convicting the Innocent of Crimes that Never Happened.* University of California Press: Oakland, California.

Inbau, F.E., Reid, J.E., Buckley, J.P., & Jayne, B.C. (2013) *Criminal Interrogations and Confessions, 5th Edition*. Jones & Bartlett: Burlington, Mass.

Johnson, M.B., Baker, C., Prempeh, B., & Lewis, S.R. (2020) Shaken Baby Syndrome/Abusive Head Trauma: Wrongful Conviction Risks, Mis-information Effects, and Psychological Consultation. *Journal of Forensic Psychology Research and Practice*, 20, 3, 290-304.

Johnson, M.B. & Hunt, R.C. (2000) The Psycho-Legal Interface in Juvenile Miranda Assessment. *American Journal of Forensic Psychology*, 18, 3, 17-35.

Kassin, S. M., Goldstein, C. J., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior*, 27, 187–203.

Kassin, S. M., & Wrightsman, L. S. (1985). Confession evidence. In S. Kassin & L. Wrightsman (Eds.), *The Psychology of Evidence and Trial Procedure* (pp. 67–94). Beverly Hills, CA: Sage.

Kassin, S.M., Drizin, S.A., Grisso, T., Gudjonsson, G., Leo, R.A., & Redlich, A.D. (2010) Police-Induced Confessions: Risk Factors and Recommendations. *Law and Human Behavior*, 34, 3-38.

Kassin, S.M. & Gudjonsson, G. (2004) The Psychology of Confessions: A Review of the Literature and Issues. *Psychological Science in the Public Interest*, 5, 2, 33-67.

Leo, R. A. (2008) *Police Interrogation and American Justice*. Harvard University Press: Cambridge, Mass.

Leo, R. A., & Davis, D. (2010). From false confession to wrongful conviction: Seven psychological processes. *The Journal of Psychiatry and Law*, 38, 9– 56.

Leo, R., & Ofshe, R.J. (1998). The consequences of false confessions: Deprivations of liberty in the age of psychological interrogation. *Journal of Criminal Law & Criminology*, 88, 429-497.

*Miranda v Arizona* (1966) 384 U.S. 436

Munsterberg, H. (1908). *On the Witness Stand*. Garden City, NY: Doubleday.

*People v. Thomas*. (2014). 22 N.Y.3d 629

National Registry of Exonerations (nd) https://www.law.umich.edu/special/exoneration/Pages/about.aspx

Ofshe, R.J. & Leo, R.A. (1997) The Decision to Confess Falsely: Rational Choice and Irrational Action. *Denver University Law Review*, 74, 4, 979.

Trainum, J.L. (2014) 'I Did It' – Confession Contamination and Evaluation. *The Police Chief*, 81, June 2014. Retrieved from http://www.policechiefmagazine.org/i-did-it-confession-contamination-and-evaluation/

Trainum, J.L. & Havlin, D. (2009) A False Confession to Murder in Washington, DC. In D. Kim Rossmo *Criminal Investigative Failures*. Boca Raton, Fla: CRC Press.

West, B.K., Johnson, M.B., Citron, K.L. (2013) Cognitive Impairment Associated with Clinical Depression: Research, Theory, and Criminal Case Illustrations. *American Journal of Forensic Psychology*, 31, 1, 21-35.

Wildeman, J. Costelloe, M., and Schehr, R. (2011) Experiencing Wrongful and Unlawful Conviction. *Journal of Offender Rehabilitation*, 50, 411-432.

Thank you for the opportunity to consult on this case. If there are further questions, I can be reached at the above email address or phone number,

Respectfully,

Matthew B. Johnson, Ph.D.
Licensed Psychologist, NJ #2143