**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ADRIAN THOMAS,

Plaintiff,

1:17-CV-626
(DJS)

v.

ADAM R. MASON, RONALD FOUNTAIN, TIM
COLANERI, and MICHAEL SIKIRICA,

Defendants.

**APPEARANCES:**                    **OF COUNSEL:**

OFFICE OF BRETT H. KLEIN, PLLC       BRETT H. KLEIN, ESQ.
Attorney for Plaintiff
305 Broadway
Suite 600
New York, New York 10007

PATTISON, SAMPSON, GINSBERG,         RHIANNON I. GIFFORD, ESQ.
& GRIFFIN                            JOSEPH T. PERKINS, ESQ.
Attorney for City of Troy Defendants
22 First Street
P.O. Box 208
Troy, New York 12181-0208

BAILEY, JOHNSON, & PECK, P.C.        CRYSTAL R. PECK, ESQ.
Attorney for Defendant Sikirica     JOHN W. BAILEY, ESQ.
5 Pine West Plaza
Suite 507
Albany, New York 12205

**DANIEL J. STEWART**
**United States Magistrate Judge**

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

This case presents troubling claims arising from a tragic death.  The Complaint in this action was filed on June 12, 2017.  Dkt. No. 1.  Plaintiff subsequently filed an Amended Complaint, which is the operative pleading.  Dkt. No. 31, Am. Compl. Defendants filed Motions to Dismiss the Amended Complaint which the District Court granted in part and denied in part.  Dkt. No. 61.  Following that motion practice, the following claims remain:

1) a malicious prosecution claim under 42 U.S.C. § 1983 against all Defendants;

2) a denial of the right to a fair trial claim under 42 U.S.C. § 1983 against all Defendants;[1] and

3) a conspiracy claim under 42 U.S.C. § 1983 against all Defendants.[2]

Presently pending are Motions for Summary Judgment on behalf of Defendants Colaneri, Fountain, and Mason ("City Defendants"), Dkt. No. 142, and Defendant Sikirica.  Dkt. No. 143.  Plaintiff opposes the Motions.  Dkt. Nos. 152-158.  Defendants filed replies.  Dkt. Nos. 163-164.  The Court held oral argument on these Motions on December 5, 2022.  Text Minute Entry for Dec. 5, 2022.  Following those arguments, Plaintiff and the City Defendants filed supplemental letter briefs.  Dkt. Nos. 168 & 171. For the reasons that follow, the Motions for Summary Judgment are granted.

---

[1] The District Court initially dismissed this claim based on the statute of limitations, but following reconsideration the claim was reinstated.  Dkt. No. 124.

[2] The Amended Complaint also included a section 1985 conspiracy claim which Plaintiff has now withdrawn.  *See* Dkt. No. 154 at p. 13 n.2.

1

## II. FACTUAL BACKGROUND

On September 21, 2008, between 8:30 and 9:00 a.m., Plaintiff's infant son "M.T." was found unresponsive in his crib.  Dkt. No. 142-6 at p. 3; Dkt. No. 156-4 at p. 5. Plaintiff dialed 911 and emergency services personnel responded to his residence in Troy, New York.  Dkt. No. 156-4 at p. 5; Dkt. No. 156-18.  M.T. was transported by ambulance to Samaritan Hospital in Troy where he underwent emergency evaluation.  Dkt. No. 156-9.  As a result of M.T.'s critical condition he was transferred to Albany Medical Center. *Id.* at pp. 3-4.  Upon arrival at Albany Medical Center, M.T. was initially treated by Dr. Walter Edge.  Dkt. No. 142-9.  At some point on September 21, staff at Albany Medical Center, concerned that the child had been the victim of abuse, contacted Child Protective Services ("CPS").  *Id.*  Troy Police were eventually contacted and Defendants Fountain and Mason went to Albany Medical Center at around 9:00 p.m.  Dkt. No. 142-7 at ¶ 11.

At the hospital, police spoke with Dr. Edge and Wilhelmina Hicks, M.T.'s mother. At one point during discussions with police, Dr. Edge reported that M.T.'s injuries were the result of "high impact," either from being shaken or having his head hit against a hard object.  Dkt. No. 156-21.  Detectives Mason and Fountain eventually went to Plaintiff's residence and asked Plaintiff to come to the police station for questioning.  Dkt. No. 142-2 at ¶ 21.  Mr. Thomas went with Defendants and was interviewed for approximately two hours.  *Id.* at ¶ 24.[3]  During that interview, Plaintiff expressed suicidal thoughts which led

---

[3] The entirety of Plaintiff's interrogation was recorded.  The recording is a part of the record on these Motions.  Dkt. No. 142-15.  The formatting of the video does not permit ready citation to timestamped portions of the video and so references to the recording of this video are cited simply by reference to the file name for the particular portion of the video being cited.

police to bring him to Samaritan Hospital where he remained hospitalized for psychiatric evaluation for the next fifteen hours.  *Id.* at ¶¶ 27-28; Dkt. No. 142-5.  Upon Plaintiff's release, he agreed to return to the police station for further questioning.  Dkt. No. 142-7 at ¶ 34.  That questioning, lasting over seven hours, concluded with Plaintiff signing a statement implicating himself in injuring M.T.  *Id.* at ¶¶ 36 & 41.  On September 23, Plaintiff was arrested and charged with the attempted murder of M.T.  Dkt. No. 142-7 at ¶¶ 45-46.  Later that day, M.T. was pronounced dead.  Dkt. No. 156-27.

On September 25, 2008, Dr. Sikirica performed an autopsy on M.T.  Dkt. No. 143-35 at ¶ 33.  He concluded that the cause of M.T.'s death was homicide resulting from blunt force trauma.  Dkt. Nos. 156-27 & 156-28.

On September 26, 2008, Plaintiff was indicted for murder in the second degree related to M.T.'s death.  Prior to trial, Plaintiff's criminal defense counsel sought to suppress Plaintiff's statements made to Troy police investigators during the second interview on the ground that they were not voluntarily given.  The trial court judge denied the motion.  Dkt. No. 163-3 at pp. 6-17.  Plaintiff then proceeded to trial.  As relevant to the pending Motions, the trial involved extensive, and often conflicting, medical testimony between doctors called by the prosecution and defense regarding M.T.'s cause of death.  *See*, *e.g.*, Dkt. Nos. 156-3, 156-9. 156-25, 156-26, 156-34, & 156-35.  At the conclusion of the trial, Plaintiff was convicted.

On appeal, Plaintiff's conviction was affirmed by the Appellate Division.  *People v. Thomas*, 93 A.D.3d 1019 (3d Dep't 2012).  That court concluded, as part of its decision, that Plaintiff's incriminating statements to police "were voluntary and admissible."  *Id.* at

1028.  Plaintiff sought leave to appeal to the New York Court of Appeals, which was granted.   19 N.Y.3d 1105 (2012).   The Court of Appeals ultimately reversed the conviction, finding that Plaintiff's confession had been coerced.  22 N.Y.3d 629 (2014). Plaintiff was retried and acquitted.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 323.  To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant.  FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc*., 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.  DISCUSSION

### A.  The City Defendants' Motion for Summary Judgment[4]

#### 1. Effect of the New York Court of Appeals Ruling

In opposing the City Defendants' Motion for Summary Judgment, Plaintiff first argues that this Court must give "preclusive effect" to the Court of Appeals' finding that Plaintiff's confession was involuntary.  Dkt. No. 152 at pp. 12-13.  This Court is not obligated to do so for several reasons.

First, the very nature of the claim here makes affording the state court's finding preclusive effect inappropriate.  While federal courts "normally give great deference to the factual findings of the state court. . . . the ultimate issue of voluntariness is a legal question requiring independent federal determination."  *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (internal quotations, citations, and alterations omitted).

---

[4] Plaintiff's section 1983 conspiracy claim which is asserted against each Defendant is considered in Part IV(C) of this Opinion.

Second, in a section 1983 action, the Court must give a state court judgment the same effect it would be given under New York law. *Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir. 1996). "Under New York law, the doctrine of collateral estoppel, or issue preclusion, 'bars a party from relitigating in a subsequent proceeding an issue clearly raised in a prior proceeding and decided against that party where the party to be precluded had a full and fair opportunity to contest the prior determination.'" *Id.* (quoting *Weiss v. Manfredi*, 83 N.Y.2d 974, 976 (1994)). Here, Plaintiff seeks to preclude the individual Defendants from relitigating the question whether Plaintiff's confession was voluntary. Those Defendants were not parties to Plaintiff's criminal trial and thus had no opportunity to litigate the voluntariness of Plaintiff's conviction in state court. *McLaurin v. New Rochelle Police Officers*, 439 F. App'x 38, 39 (2d Cir. 2011); *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007). *Owens v. Treder*, 873 F.2d 604 (2d Cir. 1989), on which Plaintiff relies, is not to the contrary. In *Owens*, the issue before the court was whether the plaintiff could relitigate an issue decided during his criminal trial. 873 F.2d at 606. The Second Circuit held only that the requirements for applying collateral estoppel had not been met. *Id.* at 611-12. The same is true here. Defendants were not parties to Plaintiff's criminal prosecution and thus could not litigate their individual roles. As a result, collateral estoppel does not bar them from arguing that they did not violate Plaintiff's rights. *Jenkins v. City of New York*, 478 F.3d at 85.

### 2. Malicious Prosecution

Plaintiff's first cause of action is one for malicious prosecution. Am. Compl. at ¶¶ 84-93. Plaintiff alleges that Defendants lacked probable cause to arrest him because his

confession was the product of unlawful coercion and, without it, Defendants knew they lacked probable cause. *Id.* at ¶ 50.

"To state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)). In New York, that substantive showing requires Plaintiff to prove "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). No party contests that Plaintiff, given his acquittal, satisfies the favorable termination element. *See McDonough v. Smith*, 139 S. Ct. 2149, 2160 n.10 (2019). Defendants do, however, maintain that summary judgment is appropriate as to the remaining elements.

### a. Initiation of the Criminal Prosecution

It is "well settled that in order for an individual to initiate a prosecution for these purposes, . . . it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (internal quotations and alterations omitted) (citing cases). An active role can be inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint. *See Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010); *Costello*

*v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014).  In this case, Mason filed the arrest report against Plaintiff.  Dkt. No. 142-12.  For purposes of the present Motion, that is sufficient to satisfy this element as to Mason.  *Taylor v. City of New York*, 2022 WL 744037, at *16 (S.D.N.Y. Mar. 11, 2022); *Eldridge v. Hofstetter*, 2018 WL 5961289, at *3 (N.D.N.Y. Nov. 14, 2018).

In addition, "a defendant could have initiated a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor."  *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017) (internal quotations omitted) (citing cases).  This may include "some showing that the defendant distorted the process by which plaintiff was brought to trial."  *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015).  Forwarding a confession obtained through coercion may support a finding that police officers initiated the prosecution.  *See Pizarro v. City of New York*, 2015 WL 5719678, at *4 (E.D.N.Y. Sept. 29, 2015).

Defendant Fountain argues that he is entitled to summary judgment because while he was present early in the interrogation, he played no role in the later portion during which Plaintiff offered his ultimately excluded confession.  Dkt. No. 142-16 at p. 12.  In concluding that the interrogation was unduly coercive, the Court of Appeals referred several times to "the totality of the circumstances."  *People v. Thomas*, 22 N.Y.3d at 642 & 645.  In doing so, it rejected the attempt by the prosecutors, similar to that made by

Defendant Fountain here, to compartmentalize different portions of the interrogation,[5] finding that what happened early in the questioning "was pivotal to the course of the ensuing interrogation and instrumental to [Plaintiff's] final self-inculpation." *Id.* at 643. The summary judgment record does not suggest a basis for concluding otherwise at this stage of the proceedings.   The recording of the portion of the interrogation for which Fountain was present demonstrates that he was an active participant.  *See*, *e.g.*, Dkt. No. 142-15, 1st Interview at VTS_01_0 & VTS-01_1.  Defendant Fountain contends that his sole relevant role was to testify at pretrial proceedings and Plaintiff's initial criminal trial and that under the rationale of *Costello v. Milano* this was insufficient to support initiation.  Dkt. No. 142-16 at p. 12.  *Costello*, however, specifically recognized that a police officer "can also initiate a prosecution by creating material, false information and forwarding that information to a prosecutor."  *Costello v. Milano*, 20 F. Supp. 3d at 415. Fountain took part in nearly two hours of interrogation and is alleged to have been a part of doing exactly that.  That is sufficient for purposes of this Motion.

Colaneri makes a similar argument, stating that he had only five minutes of interaction with Plaintiff during the hours-long interrogation and that this, coupled with the fact that he had no subsequent role during the criminal proceedings, means he cannot be said to have initiated the prosecution.  Dkt. No. 142-16 at pp. 12-13.  This argument fails for several reasons.  First, as with Fountain, the Court declines to parse out individual roles in a lengthy interrogation that the Court of Appeals found to be coercive.  Second,

---

[5] The Court of Appeals referenced "[t]he interrogation" which it found had been "broken into" two sessions. *People v. Thomas*, 22 N.Y.3d at 637.  Fountain concededly took part in the first two hour session. Dkt. No. 142-2 at ¶ 24.

the record belies the suggestion that Colaneri had no significant role in the decision to arrest Plaintiff.  Defendant Mason's deposition testimony indicates that Colaneri's role, though limited in time, was significant in bringing about statements leading to Plaintiff's arrest.  Dkt. No. 156-13 at pp. 113-115.  Moreover, Mason and Colaneri met after Plaintiff confessed and it was then that "it was determined that Mr. Thomas would be arrested and charged with attempted murder."  Dkt. No. 142-7 at ¶ 45.  Based upon these facts, a question of fact exists as to whether Colaneri assisted in the initiation of the prosecution.

"The record is replete with evidence that the detectives who interfaced with [Plaintiff] before, during, and after his interrogation were in coordination with one another." *Hincapie v. City of New York*, 2022 WL 2870411, at *10 (S.D.N.Y. July 21, 2022).  A reasonable jury could infer from this evidence that each of the three Defendants played a role in the initiation of the prosecution. *Hincapie v. City of New York*, 2022 WL 2870411, at *10.[6]

### b. Probable Cause

"Probable cause is a complete defense to a malicious prosecution claim." *Kanderskaya v. City of New York*, 11 F. Supp. 3d 431, 436 n.1 (S.D.N.Y. 2014), *aff'd*, 590 F. App'x 112 (2d Cir. 2015).  "[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police

---

[6] A jury might well conclude that the roles of Fountain and Colaneri in this investigation overall were so limited and distinct from the conduct during that part of the interrogation that ultimately resulted in Plaintiff's confession that they cannot be said to have initiated the prosecution.  The Court holds here only that a reasonable jury might also conclude otherwise.

conduct undertaken in bad faith.'" *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* at 73; *see also Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017); *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). Though that burden has been characterized as "heavy," *Cunny v. City of New York*, 2001 WL 863431, at *5 (S.D.N.Y. July 31, 2001) (citing *Simms v. Village of Albion*, 115 F.3d 1098, 1107 (2d Cir. 1997)), a plaintiff may do so by offering evidence "sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino v. City of New York*, 331 F.3d at 73.

Plaintiff contends that Defendants lacked probable cause to arrest him, Am. Compl. at ¶ 50, and that the presumption of probable cause is rebutted by the Court of Appeals finding that Defendants coerced Plaintiff's confession. Dkt. No. 152 at p. 16. The Court has little difficulty concluding that the ultimate suppression of those statements based on a finding of coercion gives rise, at least, to questions of fact about whether Plaintiff's prosecution was the result of police conduct undertaken in bad faith. The significance of Plaintiff's confession cannot be understated on these facts. Defendant Mason testified regarding Plaintiff's incriminating statements "that's when I knew probable cause had been established." Dkt. No. 156-13 at p. 113. Indeed, Mason testified that at least part way through the interrogation "I didn't think I was going to arrest [Plaintiff]." *Id.* at pp. 113-114. The statements given by Plaintiff during the interrogation, therefore, were a critical component in forming probable cause to arrest Plaintiff. Without

11

the confession, a reasonable juror may conclude that police lacked probable cause to arrest Plaintiff.   *Hincapie v. City of New York*, 2022 WL 2870411, at \*14; *Niemann v. Whalen*, 911 F. Supp. 656, 668 (S.D.N.Y. 1996) ("the issue of whether [defendants] coerced plaintiff's confession is material to resolving the issue of probable cause.").

The City Defendants, while citing the presumption, make no real argument to the contrary that the facts alleged could not be sufficient to overcome it.  Dkt. No. 142-16 at pp. 13-14.  Plaintiff's allegations of misconduct, in the context of this case, are sufficient to overcome the presumption created by the indictment.

In considering probable cause, a court can set aside the evidence obtained from an arguably coerced confession and assess whether there was, in any event, probable cause for an arrest.  *See Edwards v. Pretsch*, 180 F. Supp. 2d 499, 507 (S.D.N.Y. 2002).  Despite Mason's testimony about the significance of Plaintiff's statements while being interrogated, Defendants maintain that there was probable cause sufficient to justify Plaintiff's arrest without reliance on these statements.  First, the City Defendants rely on an alleged confession by Plaintiff to CPS workers after his arrest.  Second, they maintain that Dr. Edge told police that M.T.'s death was "a murder."  Finally, they maintain that the New York Court of Appeals decision to order a new trial, rather than dismissing the indictment outright, demonstrates that probable cause existed apart from Thomas's confession.  None of these arguments represents a basis for granting summary judgment.

With regard to the first two arguments, material questions of fact preclude summary judgment.  The City Defendants cite to evidence in the record that Plaintiff told CPS staff that he had harmed M.T.  This allegedly occurred at the Rensselaer County Jail,

sometime after being arrested.   Dkt. No. 142-7 at ¶ 47.   During his deposition Plaintiff, however, repeatedly denied having hurt M.T. in any way and making any statements about having done so to CPS staff. Dkt. No. 142-21 at pp. 173-180. Plaintiff's deposition testimony, in fact, alleged that CPS staff had fabricated the report of this interview with Plaintiff.  *Id.* at pp. 179-180.   Thus, a clear question of fact exists as to whether Plaintiff made these statements.

Defendants also maintain that statements from Dr. Edge provide probable cause for Plaintiff's arrest.   Defendant Fountain's Affidavit recites a conversation with Dr. Edge at the hospital during which Dr. Edge purportedly stated that "this is a murder."  Dkt. No. 142-2 at ¶ 15.  During his deposition Dr. Edge testified that he did not recall ever having used the word murder when speaking with police officials. Dkt. No. 156-10 at p. 9.  Later in his deposition, Dr. Edge testified that he was aware police officials had attributed that word to him, but specifically disputed that account by police.  *Id.* at pp. 10 & 11.  Whether Dr. Edge made that statement at all is, therefore, plainly in dispute and Defendants cannot rely on it to establish probable cause to arrest Plaintiff.   The record does contain a statement from Dr. Edge, given September 22, 2008 indicating that he believed M.T.'s injuries had been caused by "severe trauma."  Dkt. No. 142-9.  But that statement unsurprisingly did not directly connect Plaintiff to the trauma and Defendants do not dispute that probable cause to arrest Plaintiff did not exist at the time of this statement. Dkt. No. 155-1 at ¶ 53; Dkt. No. 164-9 at ¶ 53 (noting that probable cause did not exist yet even at the early stages of Plaintiff's second interrogation session).

As to the final argument, the Court declines to accept the City Defendants' invitation to surmise what the Court of Appeals intended to say about the sufficiency of probable cause when it reversed Plaintiff's conviction. "[I]n New York, a conviction ultimately upset is accorded only the force of prima facie evidence of probable cause; this evidence can be surmounted in a suit for malicious prosecution if the plaintiff can show that the judgment was obtained by fraudulent or otherwise undue means." *Charlotten v. Heid*, 2011 WL 3423826, at *5 (N.D.N.Y. Aug. 4, 2011) (quoting *McCray v. City of N.Y.*, 2007 WL 4352748, at *22 (S.D.N.Y. Dec. 11, 2007)).   Even assuming the Court of Appeals reversal suggests that probable cause to prosecute continued to exist, *see Pierre v. City of Rochester*, 2018 WL 10072453, at *12 (W.D.N.Y. Sept. 7, 2018), summary judgment would still not be appropriate on these facts.   For purposes of this malicious prosecution claim, the relevant inquiry is whether Defendants had probable cause at the time they initiated a prosecution against Plaintiff.   *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 354 (N.D.N.Y. 2008), *aff'd*, 331 F. App'x 894 (2d Cir. 2009).   Defendant Mason continued to investigate this case and consider evidence long after Plaintiff's arrest and indictment.   Dkt. No. 142-7 at ¶ 57.   Evidence sufficient to establish probable cause apart from the confession could, therefore, have been developed in the investigation following Plaintiff's arrest.   The record establishes that Plaintiff's confession was the principal evidence on which Defendants relied for moving forward with a prosecution of Plaintiff. Precluding that evidence raises at least a question of fact on the issue of whether probable cause existed at the time the prosecution was initiated against Plaintiff.

### c. Actual Malice

The City Defendants also seek summary judgment on the ground that Plaintiff cannot establish any personal animus towards him that would warrant a jury finding the presence of actual malice.  Dkt. No. 142-16 at pp. 14-15.  However, "actual malice can be inferred when a plaintiff is prosecuted without probable cause."  *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016).  Here, the presence of factual questions regarding the existence of probable cause is sufficient to deny summary judgment on this ground as well.  "Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well."  *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003).

### 3. Right to a Fair Trial

Plaintiff's claim regarding the denial of a fair trial relates to the alleged coercion of a confession by the City Defendants.  Am. Compl. at ¶¶ 94-97.  This claim relies on a theory that Defendants developed their version of the events leading to M.T.'s hospitalization and then coerced Plaintiff into adopting those facts as his own.  *Id.* at ¶¶ 35-50.

Criminal defendants have a constitutional right to a fair trial.  *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010).  It is a violation of that right "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  "To succeed on a fabricated-evidence claim, a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's

verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Jeanty v. Cerminaro*, 2023 WL 325012, at *5 (2d Cir. Jan. 20, 2023) (quoting *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021)).

Plaintiff alleges that the City Defendants fabricated his confession in violation of this fair trial right.  The only real question presented on this Motion is whether the coercion Plaintiff alleges could be considered the equivalent to fabrication.  There is no doubt that the confession was forwarded to prosecutors by investigating officials, that this confession would likely have influenced a jury's decision, and that Plaintiff suffered some deprivation as a result.

Coercion and fabrication are distinct.  "There is clearly a difference between 'coercing witnesses to testify and fabricating witness testimony.'" *McDonough v. Smith*, 2022 WL 3279348, at *24 (N.D.N.Y. Aug. 11, 2022) (quoting *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014)).  "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014).  "Fabricated testimony is testimony that is made up; it is invariably false." *Id.*  Plaintiff's fair trial claim requires him to prove fabrication, evidence of coercion is not enough.  The City Defendants maintain that unlike other cases where police officers wrote out a false statement which they then had a defendant adopt, *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, they did not "create" Plaintiff's statement. Dkt. No. 142-16 at p. 16.  As a result, they contend that summary judgment is appropriate.

16

The Court disagrees, however, that there are insufficient facts in the record from which a jury could conclude that Defendants did indeed fabricate Plaintiff's statement. While the evidence of fabrication is slight, the Court must view the summary judgment record in the light most favorable to Plaintiff, *Donohue v. Hochul*, 32 F.4th 200, 206 (2d Cir. 2022), and in doing so concludes that Plaintiff has alleged enough to survive summary judgment on the merits.

Throughout much of his interrogation, Plaintiff consistently denied harming M.T. Dkt. No. 142-2 at ¶ 25.  He maintained his innocence at two criminal trials and does so here. *See* Am. Compl. at ¶ 3.  The Amended Complaint alleges that Defendant Mason repeatedly put forth a version of events regarding how M.T.'s injuries may have occurred that, as a result of coercion, Plaintiff ultimately adopted as his own. *See* Am. Compl. at ¶¶ 44-49.  The parties agree that, as the Court of Appeals found, "[a]ll the statements made by Mr. Thomas regarding bumping, throwing, or slamming M.T. were first suggested to him by defendants."  Dkt. No. 155-1 at ¶ 55; Dkt. No. 163-7 at ¶ 55; *People v. Thomas*, 22 N.Y.3d at 646.  In Plaintiff's view, this was the equivalent of fabricating a story about M.T.'s death.  If true, a jury could conclude that the City Defendants fabricated those facts and coerced Plaintiff to adopt them. *See Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) ("Although there was certainly not overwhelming evidence of falsification, a reasonable jury would be entitled to credit [Plaintiff's] testimony"). This is particularly true given Plaintiff's view that M.T.'s death was the result of sepsis, not trauma, *see* Dkt. No. 155-1 at ¶ 2, which the jury could also credit. *See*, *e.g.*, Dkt. No. 158 (Plaintiff's expert report concluding cause of death to be sepsis).

Implied in Defendants' Motion is the suggestion that the facts in Plaintiff's confession were not fabricated because, even if coerced, they were nonetheless true. *See* Dkt. No. 142-16 at pp. 16-17. Plaintiff's ultimate acquittal raises a question of fact on that point. In a case such as this where the alleged fabrication is the coercion of a confession and questions of fact exist as to whether the confession was coerced, those same questions of fact are relevant to the fabrication question. *Sedunova v. City of New York*, 652 F. App'x 29, 31 (2d Cir. 2016).

Upon hearing the facts regarding the interrogation, together with the other evidence known to Defendants at the time, a jury *could* conclude that Defendants' actions had the effect of creating a false confession from Plaintiff. Summary judgment, therefore, is not appropriate on the merits.

### 4. Qualified Immunity

42 U.S.C. § 1983 was designed to enforce the provisions of the Fourteenth Amendment and to provide a remedy for those whose constitutional rights have been violated by state actors. The "shall be liable" language of the statute is both succinct and direct and does not specifically provide for exceptions. Nevertheless, subsequent interpretation of the statute by the courts, in particular with respect to the doctrine of qualified immunity, has developed such that the straightforward remedial command of the statute is no longer so direct.

The doctrine of qualified immunity provides an immunity from suit, and thus liability, for public officials acting reasonably under the circumstances presented. "Qualified immunity attaches when an official's conduct does not violate clearly

18

established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation and citation omitted); *see also Behrens v. Pelletier*, 516 U.S. 299, 305 (1996). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotations and citations omitted). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

### a. The Coercion Claim

Plaintiff's malicious prosecution claim against the City Defendants is premised on their alleged coercion of a confession from him. This is because clearly had Plaintiff's confession not been suppressed it would have provided probable cause to arrest Plaintiff. *White v. City of New York*, 2018 WL 1545676, at *5 (E.D.N.Y. Mar. 29, 2018) ("A confession can be used to establish probable cause"). On the contrary, "[a] known false confession does not provide probable cause to believe a criminal prosecution would be successful." *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 365 (W.D.N.Y. 2021).

It was clearly established well before Plaintiff's interrogation that "police could not lawfully coerce incriminating statements from an in-custody criminal suspect." *Weaver v. Brenner*, 40 F.3d 527, 534 (2d Cir. 1994). That the right was clearly established

at this basic level, however, does not answer the question of Defendants' entitlement to qualified immunity.  "The more complex question is whether a reasonable officer would understand the conduct to be a violation of Plaintiff's rights." *Tankleff v. Cnty. of Suffolk*, 2017 WL 2729084, at *17 (E.D.N.Y. June 23, 2017).  Lower courts have consistently been reminded, if not reprimanded, that for purposes of qualified immunity, they should not consider the right at issue at too broad a level of generality.  "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also White v. Pauly*, 580 U.S. at 79 ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality.") (internal quotations and citations omitted).

For purposes of qualified immunity, Plaintiff's malicious prosecution claim "turn[s] on whether the defendant officers' probable cause determination was objectively reasonable - that is, whether there was 'arguable' probable cause to arrest." *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014).  "Arguable probable cause exists 'if officers of reasonable competence could disagree on whether the probable cause test was met.'" *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013)).  "In short, if at least some reasonable officers in the defendant's position could have believed that the challenged conduct was within the bounds of appropriate police responses, the defendant officer is entitled to

qualified immunity." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019) (internal quotation and citation omitted).

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "It is difficult to determine whether a confession is voluntary; case law 'yield[s] no talismanic definition' for the term." *United States v. Taylor*, 745 F.3d 15, 24 (2d Cir. 2014) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)). "Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing cases). Consideration of these facts leads to the conclusion that reasonable police officers could have believed that Plaintiff's interrogation was not unconstitutionally coercive. Or, at least, that they could reasonably disagree on the question. Accordingly, these Defendants are entitled to qualified immunity.

With regard to his personal characteristics, Plaintiff had no criminal record when he was questioned by police and was, therefore, likely unfamiliar with police interrogations. At the time of his interrogation, his son was in critical condition in the hospital. Moreover, Plaintiff's interrogation was interrupted by a period of psychiatric evaluation. These facts could certainly have made Plaintiff more susceptible to coercive tactics. Despite these personal characteristics, however, no facts suggest that the basic

circumstances of the interrogation itself was unduly coercive.  Plaintiff was advised of his rights several times.  He was not shackled or otherwise restrained at any time.  At times the door to the interrogation room remained open.  He never asked to leave or to speak with counsel.  He was offered food and drink and provided cigarettes.  No measure of physical intimidation or abuse is alleged or evident from the record.  These facts all suggest a lack of coercion.

Plaintiff places much of his emphasis on the conduct of investigators themselves, and relies heavily on the New York Court of Appeals finding of coercion.  *See* Dkt. No. 152 at pp. 23-25.  This is entirely appropriate since this is often the most critical component of the inquiry.  *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988).  The Court of Appels decision identified a number of actions taken by Defendants that it concluded were problematic, which are discussed in more detail below.  Before turning to the specifics of the conduct, however, it is important to make note of the scope of this Court's review.  The Court of Appeals wrote a comprehensive and compelling decision.  It is binding on police officers within the State of New York, and its powerful reasoning should be persuasive for federal courts.  At no point is this Court stating its conclusion was in error.  Rather, this Court is being called upon to make a vastly different determination; to view the conduct of the police officers at the time prior to the Court of Appeals decision, in light of then clearly established federal law, and consider whether any reasonable police officer could have concluded that the interrogation techniques used did not violate that law.

First, the Court of Appeals took exception to Defendants' tactic "to threaten that if defendant continued to deny responsibility for his child's injury, his wife would be arrested and removed from his ailing child's bedside." *People v. Thomas*, 22 N.Y.3d at 643. The Court of Appeals noted that "[t]he premise of the interrogation was that an adult within the Thomas-Hicks household must have inflicted traumatic head injuries on the infant." *People v. Thomas*, 22 N.Y.3d at 638. Given what the investigators knew about M.T.'s condition at the time, including that Plaintiff and his wife were the only adults in the household, it is hard to say that that premise was itself unreasonable. A number of district courts have held that absent probable cause to arrest a family member, such a threat may be unduly coercive. *See, e.g.*, *United States v. Melendez*, 2015 WL 3767178, at *5 (S.D.N.Y. June 17, 2015) (citing cases). In a related context, however, the Second Circuit has also recognized that "[p]leas in exchange for a promise by the government not to prosecute a third party are valid." *United States v. Shapiro*, 29 F. App'x 33, 35 (2d Cir. 2002). Defendants have not suggested that there was ever probable cause to charge M.T.'s mother regarding his injuries, but their decision at the time to highlight for Plaintiff that given their exclusive control over their children, one or the other of them was most likely responsible was not unreasonable. For purposes of a qualified immunity discussion, however, what is most critical is that "neither the Second Circuit nor the Supreme Court has 'squarely addressed whether threats to charge third-parties amount to coercion.'" *United States v. Zimmerman*, 480 F. Supp. 3d 446, 456 (E.D.N.Y. 2020) (quoting *Lewis v. Graham*, 2018 WL 3819557, at *4 (W.D.N.Y. Aug. 10, 2018) (citing

cases)).  The district court opinions expressing this view do not clearly establish the law for qualified immunity purposes.  *Hawkins v. Steingut*, 829 F.2d 317, 321 (2d Cir. 1987).

Next, exception was taken to Defendants' repeated statements to Plaintiff that fully disclosing what happened to M.T. was necessary to assist in his treatment.  *People v. Thomas*, 22 N.Y.3d at 643.  The Court of Appeals found this tactic particularly problematic because the statements were not true; nothing Plaintiff said about causation would have helped M.T.  *People v. Thomas*, 22 N.Y.3d at 643.  This Court agrees with the Court of Appeals that such statements potentially played on the familial heartstrings in a way which could have been coercive.  *Id.*  But the mere fact that the police lie to a suspect to elicit his confession does not necessarily render it coerced.  *Santiago Ortiz v. Kelly*, 687 F. Supp. 64, 65 (E.D.N.Y. 1988).  The use of trickery, deception, or some form of ruse is a common practice, and does not automatically render a confession involuntary.  *United States v. Anderson*, 929 F.2d at 99; *Whitlatch v. Senkowski*, 344 F. Supp. 2d 898, 903 (W.D.N.Y. 2004) (citing cases); *see also Illinois v. Perkins*, 496 U.S. 292, 296 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns.").  District courts have denied qualified immunity to police officers accused of coercing a confession by "withholding medical treatment from an injured family member."  *Matthews v. City of New York*, 889 F. Supp. 2d 418, 441 (E.D.N.Y. 2012).  However, this Court has found no controlling case issued prior to September 2008, holding that it was unlawfully coercive to tell a suspect undergoing interrogation that providing truthful information could assist in providing necessary medical treatment to a victim.

Significantly, Plaintiff also points to no such case either.  *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) ("to show a violation of clearly established law, [plaintiff] must identify a case that put [defendant] on notice that his specific conduct was unlawful.")  Pointing to the general proposition that one cannot coerce a confession, *see* Dkt. No. 152 at pp. 23-24, is not enough.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

Finally, Plaintiff refers to the countless times investigators told Plaintiff that they knew what had happened and that they were not going to arrest him as examples of inappropriate police conduct.  Promises of leniency, which this conduct most closely resembles, however, are not per se coercive.  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987).  What the recording of the interrogation makes clear is that Defendants made numerous statements to the effect that police did not want to arrest Plaintiff and if he told them what happened he would be able to go home.  "A court will not, however, readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers."  *United States v. Shores*, 2019 WL 2428774, at *7 (D. Vt. June 11, 2019) (citation omitted).  Significantly, as Plaintiff began to make incriminating statements, the tone of police comments changed and Defendant Mason made it clear to Plaintiff that he could not promise him that he would not be prosecuted.

The Court has little doubt that the police tactics may have felt coercive to Plaintiff, but the voluntariness inquiry is a purely objective one.  *United States v. Dzionara-Norsen*, 2020 WL 1897179, at *7 (W.D.N.Y. Apr. 17, 2020), *report and recommendation adopted*, 2020 WL 3401267 (W.D.N.Y. June 18, 2020); *United States v. Ortiz*, 943 F.

Supp. 2d 447, 456 (S.D.N.Y. 2013).  "[T]he single issue before the court is whether the statements were voluntary, *i.e.*, the 'product of an essentially free and unconstrained choice by [their] maker.'"  *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. at 225).  Despite the tactics used and the emotional context of this interrogation, the Court concludes that some police officers could very reasonably believe that Defendants conduct did not have the effect of overbearing Plaintiff's will.  Because reasonable police officers could disagree on the point, qualified immunity is appropriate.

The Court ends this analysis by recognizing that the state court judge presiding at Plaintiff's trial found that Plaintiff's inculpatory "statements were voluntarily made." Dkt. No. 163-3 at p. 18.  A unanimous panel of the state's Appellate Division agreed, finding that the prosecution "satisfied their burden of demonstrating beyond a reasonable doubt that his statements were voluntary" and that "[t]he circumstances and atmosphere of the interviews fail to demonstrate involuntariness."  *People v. Thomas*, 93 A.D.3d at 1026.  "We cannot realistically expect that reasonable police officers know more than reasonable judges about the law."  *Barts v. Joyner*, 865 F.2d 1187, 1193 (11th Cir. 1989). "To say the least, when a state court judge upholds the constitutionality of police actions, that alerts us to be particularly careful in concluding that the law was truly clearly established before we permit the officers to be held civilly liable."  *Id.* at 1194.  "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."  *Wilson v. Layne*, 526 U.S. 603, 618 (1999).  "There is, as case law teaches, a line separating tolerable deception from

unconstitutional coercion." *United States v. Shehadeh*, 940 F. Supp. 2d 66, 74 (E.D.N.Y. 2012), *aff'd*, 586 F. App'x 47 (2d Cir. 2014). The state court judges who considered Defendants' actions were split almost equally as to what side of that line the conduct fell. That six state jurists, in the calm of their chambers with time to review the record and hear arguments of attorneys, concluded that Defendants' actions were not coercive is exceptionally strong evidence, in this Court's view, that Defendants themselves could have reasonably believed in the moment that their actions were not transgressing Plaintiff's clearly established rights.

Apart from the above analysis, the Court concludes that an additional factor relevant to Colaneri independently entitles him to qualified immunity.

Colaneri participated in the interrogation for less than five minutes. *See* Dkt. No. 142-15, 2ⁿᵈ Interview-Part 2 at VTS_01_4. The video of the interrogation shows that he took a more forceful approach with Plaintiff than Defendant Mason took during much of the interview; the admitted "bad cop" to Mason's "good cop." *Id*; Dkt. No. 142-1 at ¶ 14. During this portion of the interview, Colaneri told Plaintiff that he had served in a medical role in the military during Operation Desert Storm and had significant experience with head injuries and that he believed Plaintiff was lying about his role in causing M.T.'s injuries.[7] "This evidence supports a conclusion that [Colaneri was] confrontational, but it does not support a conclusion that [he was] coercive." *United States v. Artis*, 2010 WL 3767723, at \*10 (D. Vt. Sept. 16, 2010). Defendant Mason concedes the importance of

---

[7] Colaneri admits that this was untrue, but was done to bolster his credibility on the subject to Plaintiff. Dkt. No. 142-1 at ¶ 16.

Colaneri's tactic in ultimately obtaining a confession, but the success of the tactic alone does not make it coercive.  Nor would a reasonable police officer believe that such an exceedingly brief interaction of the nature Colaneri had with Plaintiff could possibly have been viewed as "the type of coercion that, without more, would overbear a normal person's will and cause him to confess involuntarily." *Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir. 1996).

### b. The Fabrication Claim

The heart of Plaintiff's fair trial claim is that the individual police Defendants in this case developed their own "theory of death" to explain M.T.'s death and justify the prosecution of Adrian Thomas.  *See* Dkt. No. 152 at p. 1.  As a result, Plaintiff alleges that they "created false evidence" in the form of Plaintiff's confession.  Am. Compl. at ¶ 95.  While the Court agrees with Plaintiff that a reasonable juror might conclude that Defendants did so, it is also clear that given the evidence available to Defendants at the time of the investigation, a reasonable police officer could have believed that the working theory of the investigation was accurate and not a fabrication.  As a result, qualified immunity is appropriate as to this claim.

That police officials may not, within the bounds of the Constitution, fabricate evidence was well-established at the time of Plaintiff's prosecution.  *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000).  As noted, however, that does not end the inquiry.  "The relevant question in this case .  . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [Defendants' conduct] to be lawful, in light of clearly established law and the information the . . . officers possessed" at the time of their

investigation. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In other words, summary judgment for the defendant is required where "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the [defendants'] conduct under the circumstances." *Cugini v. City of New York*, 941 F.3d 604, 615 (2d Cir. 2019).

M.T. was originally taken to Samaritan Hospital in Troy before being transferred for more acute care to Albany Medical Center. Dr. Edge was the treating doctor at Albany Med. Dr. Edge expressed a concern that M.T. might be the victim of child abuse. Dkt. No. 156-21. As a result, Child Protective Services and Troy Police were notified. It was after this notification that Defendants became involved in the case. Defendants spoke with Dr. Edge who told them that M.T.'s injury was the result of trauma, the likely result of a violent shaking or an "acceleration, deceleration injury." Dkt. No. 156-21; Dkt. No. 156-10 at p. 11. While Plaintiff was at Samaritan Hospital, Defendant Fountain observed the questioning of another one of Plaintiff's children. During that questioning, the child indicated that she had witnessed Plaintiff throw M.T. down on a bed. Dkt. No. 156-33 at p. 2; Dkt. No. 142-7 at ¶ 32. M.T.'s mother had also told Detectives that a few weeks prior she had witnessed Plaintiff "beating my daughter . . . with a belt." Dkt. No. 142-3.

As a result, Defendant Mason, who was primarily responsible for the interrogation had this information to work with: 1) medical providers treating M.T. believed his injuries were the result of trauma, perhaps shaking or hitting his head hard against an object; those providers did not believe M.T.'s injuries could be caused by "merely bumping" his head; 2) there was testimony from someone who told authorities that she had seen Plaintiff

throw M.T. onto a bed; 3) statements that Plaintiff had a few weeks earlier been seen "beating" a nine year old with a belt; and 4) reports that Plaintiff had what his own wife termed "anger issues when dealing with the kids."  Given these facts, a police officer could, at that time, very reasonably have suspected that Plaintiff had, whether out of frustration or malice, injured M.T.  Pursuing an interrogation strategy based on that theory was not unreasonable.  And, whatever one makes of the tactics used during the interrogation, it cannot be said that reasonable police officers would have known that they were fabricating the version of events to which Plaintiff eventually admitted.  Remember that the hallmark of fabricated evidence is that "it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it."  *Fields v. Wharrie*, 740 F.3d at 1110.

Plaintiff makes an impassioned plea in this case that his prosecution was a tragic error.  That M.T. was not murdered, but instead died as a result of sepsis.  The Court cannot, and need not, resolve that issue on these Motions.  Much of the evidence on which Plaintiff now relies in support of that theory, however, developed after Plaintiff's interrogation and Plaintiff has offered no evidence in opposition to the police officers' Motion to establish that they were aware of it earlier.  The availability of qualified immunity turns on "the facts known to police at the time" of the conduct in question. *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016); *see also Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir. 2003) ("qualified immunity is analyzed from the perspective of the defendant at the time of the challenged conduct.").  "A court must evaluate the objective reasonableness of the [Defendants'] conduct in light of the information the officers

possessed." *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (internal citations, alterations, and quotations omitted).   In so doing, the Supreme Court has "cautioned against" evaluating qualified immunity with the "20/20 vision of hindsight in favor of deference to the judgment of reasonable officers on the scene." *Saucier v. Katz*, 533 U.S. at 205 (internal quotation omitted).  Defendants had been told by medical personnel that M.T. was a trauma victim; that his injuries were the result of him having been shaken or hit with some velocity.  There was an eyewitness report that M.T. had been thrown on a bed by Plaintiff days before being hospitalized.  It simply cannot be said that reasonable police officers would have believed that Mason and the other Defendants were fabricating a story about M.T. having been thrown down by Plaintiff.

The Amended Complaint itself calls Dr. Edge's initial view of M.T.'s condition a "misdiagnosis," Am. Compl. at ¶ 4, but Plaintiff never disputes what Dr. Edge told officers about the likely cause of M.T.'s injuries and offers no reason for finding that they should have known of Dr. Edge's alleged error.  None of the police officers sued here are medical professionals and they were most certainly entitled to rely on what they were being told by those who were.  Given the information available to Defendants at the time of Plaintiff's interrogation, reasonable law enforcement officials would not have thought that the version of events pursued during that interrogation was a pure fabrication by Defendants.  Accordingly, Defendants are entitled to qualified immunity with respect to Plaintiff's fair trial claim.

## B. Defendant Sikirica's Motion for Summary Judgment

The Amended Complaint alleges that Sikirica acted intentionally to render a "false medical opinion" regarding M.T.'s cause of death.   Am. Compl. at ¶ 55.   Defendant Sikirica seeks summary judgment on the ground that his autopsy report was not false or fabricated and, therefore, he cannot be liable for either malicious prosecution or denial of a fair trial.   Dkt. No. 143-1 at pp. 8-12.   In opposing summary judgment, Plaintiff identifies two slightly different arguments: 1) Sikirica specifically chose to downplay exculpatory explanations for M.T.'s death to aid the prosecution of Plaintiff, Dkt. No. 154 at pp. 11-12, and 2) his failure to identify sepsis as a cause of death "constituted an intentional withholding of exculpatory evidence."   *Id.* at p. 12.   Based on this record, these arguments are not a basis for denying summary judgment.

### 1. Fabrication of Evidence

"[A] coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983."   *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002); *see also Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th Cir. 2018).   Defendant Sikirica does not dispute this general principal but argues that the record is devoid of evidence from which a reasonable juror could conclude that he fabricated the autopsy report for M.T.   Dkt. No. 143-1 at pp. 8-12.   The Court agrees.

Plaintiff has long maintained that M.T.'s death was the result of sepsis.   Sepsis is variously defined in the record, but generally stated is the presence of a virus or bacteria in the bloodstream.   Dkt. No. 143-14 at p. 14 (Sepsis is "[a] blood infection with

bacteria"); Dkt. No. 143-24 at p. 54 ("Sepsis is a probable or documented infection in the body that produces a systemic response.").  Plaintiff maintains that Dr. Sikirica's failure to identify sepsis as a cause of death in his autopsy report renders the report false or fabricated.  Though Sikirica did not use that specific term in his autopsy report, in the Anatomic Diagnoses section of the report Sikirica noted there was a "Blood culture positive for streptococcus pneumonia." Dkt. No. 156-28 at p. 12.  There does not appear to be any dispute that this references a blood infection.  Sikirica himself has acknowledged that M.T. was septic. Dkt. No. 143-35 at ¶ 57.  He testified to it as well during Plaintiff's criminal trial on both direct and cross examination.  Dkt. No. 143-18 at pp. 39, 76, & 93.  Dr. Klein, an expert witness for Plaintiff at his first criminal trial, testified that although the autopsy report did not specifically use the word sepsis, Dr. Sikirica recognized the presence of sepsis.  Dkt. No. 143-19 at p. 69 ("Q. And although [the autopsy report] doesn't mention the word sepsis, the medical examiner doesn't disagree that sepsis is there?  A. No, and he identifies the positive blood culture").  Dr. Jan Leestma, another expert for Plaintiff, also testified that the positive blood culture identified in the autopsy report was an indication of sepsis.  Dkt. No. 143-26 at p. 36.  Plaintiff offers no authority from which the Court can conclude that the fact that the word "sepsis" does not appear in the report itself is of constitutional significance.

What is left of Plaintiff's argument is that it was, in fact, sepsis, not trauma that caused M.T.'s death and so Sikirica's autopsy report must be false.  Dr. Sikirica concluded that M.T. died as the result of "[s]evere closed head injuries with cerebral edema due to blunt force trauma" and determined the manner of death to be homicide.

Dkt. No. 156-28 at p. 1.  The autopsy report noted subgaleal and subdural hemorrhages. *Id.* at pp. 7-11.  Dr. Michael Baden, retained as expert witness by Dr. Sikirica, agreed. Dkt. No. 143-3.  In fact, Plaintiff's own expert recognized the presence of "scalp and subgaleal hemorrhages, retinal hemorrhages, and subdural hemorrhage," but determined only that they were not the result of trauma.  Dkt. No. 158-2 at p. 4.

Multiple doctors testified at Plaintiff's criminal trials that the cause of death was trauma.  Dr. Edge testified that it was his opinion that the cause of death was trauma.  Dkt. 143-14 at p. 28.[8]  Dr. Carole Jenny, an expert retained by the prosecution, testified that M.T.'s death was the result of trauma.  Dkt. No. 143-16 at p. 101; *see also id.* at pp. 51-52 (Dr. Jenny's testimony that she agreed with the finding of Dr. Sikirica that M.T. died of head trauma).  Dr. Waldman testified that the cause of M.T.'s death was "subdural hematomas." Dkt. No. 143-15 at p. 34.  Even Dr. Jan Leestma, Defendant's expert in his criminal retrial, though testifying that M.T. died of sepsis, recognized that M.T. had also suffered from head trauma which he identified as "[a] contributing cause" of his death. Dkt. No. 143-26 at pp. 46 & 50.

A medical examiner's conclusion about the medical cause of death is a medical judgment.  *See Manocchio v. Moran*, 919 F.2d 770, 779 (1st Cir. 1990).  The record establishes, at best, a difference of opinion as to the medical judgment Sikirica rendered about the cause of M.T.'s death.  It falls short of establishing any question of fact that he fabricated his conclusion.  Several other doctors, who either directly treated M.T. or have

---

[8] He did note that sepsis may have contributed to the death as well.

acted as expert witnesses reached the same conclusion as Dr. Sikirica.  *See* Dkt. No. 143-3 at p. 39 (Dr. Baden concluding that M.T.'s "death was caused by multiple homicidal blunt force impacts to his head that caused subdural hemorrhages and cerebral edema, and direct brain damage");  Dkt. No. 143-15 at 34 & 46 (Dr. Waldman testified at Plaintiff's 2009 criminal trial that the cause of M.T.'s death was "subdural hematomas" not sepsis); Dkt. No. 143-16 at pp. 51-52 (Dr. Jenny testified at the 2009 trial that M.T. died as a result of head trauma).  Neither Waldman nor Jenny denied that M.T. was septic, but neither attributed the primary cause of death to sepsis.  Dkt. No. 143-15 at p. 34; Dkt. No. 143-16 at p. 127.

Plaintiff has produced an expert report in this case from Dr. Katherine Maloney. That report clearly disputes Dr. Sikirica's findings regarding the cause of death.  Dkt. No. 158.  But that does not make them fabricated.  In fact, Dr. Maloney confirms the medical finding of hemorrhages, but concluded in her medical judgment that they were "not due to violent trauma" and were not fatal.  Dkt. No. 158-2 at p. 4.  "The question for this court is not whether a self-interested litigant can find an expert to say the defendant[] got it wrong, but whether the evidence - including any expert opinions - creates a genuine issue of material fact that Defendant[] fabricated that evidence."  *Ferris v. City of Cadillac, Mich.*, 726 F. App'x at 480-81.  Here, the answer to that question is no.  Dr. Maloney's opinion does not allege any fabrication on a part of Dr. Sikirica.  *See* Dkt. No. 158-2. "Testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."  *Rodriguez v. Derienzo*, 2020 WL 615052, at *3 (S.D.N.Y. Feb. 7, 2020).  As a result, even accepting that there may be a question of

fact about the cause of M.T.'s death, there remains no evidence, beyond what are essentially conclusory allegations, that Dr. Sikirica fabricated his report to bolster the case being made by the police.  To accept Plaintiff's theory that Dr. Sikirica's conclusion was fabricated would essentially also require the Court to conclude that multiple other medical professionals who reached a similar conclusion were also fabricating their findings. There is simply no basis on which any reasonable juror could reach that conclusion.

It is critical to recognize in considering this Motion that Plaintiff himself does not appear to allege that Dr. Sikirica falsified any actual medical finding.  Instead, much of Plaintiff's claim relies on the allegation that Sikirica's conclusions were tailored to match the supposedly false narrative built from the City Defendants' interrogation of Plaintiff. This argument, however, appears to be entirely conclusory.  The record establishes that Fountain, Colaneri, and Sikirica never discussed M.T.'s autopsy.  Dkt. No. 145 at ¶¶ 84-85; Dkt. No. 155 at ¶¶ 84-85.  Mason and Sikirica did briefly discuss the matter.  *Id.* at ¶ 86.   No allegation is made by Plaintiff that Dr. Sikirica contacted other testifying witnesses to have them coordinate their medical conclusions with his.

Finally, Plaintiff's reliance on Dr. Sikirica's alleged failure to follow what he contends were best practices regarding the conduct of the autopsy also does not provide a basis for denying summary judgment.  Dkt. No. 154 at p. 15.  Plaintiff offers no evidence to support that Sikirica deviated from accepted practice.  Dr. Baden stated that "Dr. Sikirica's conclusions and procedures abided by all forensic pathology standards of practice." Dkt. No. 143-3 at p. 35.  Dr. Maloney, Plaintiff's expert, does not specifically dispute this, saying only that she considers the matter "irrelevant."  Dkt. No. 158 at ¶ 7.

36

Even if Sikirica had not complied with acceptable practices, "such allegations would rise at most to the level of negligence or malpractice, but neither is actionable as a § 1983 claim." *Freire v. Zamot*, 2016 WL 6330405, at *5 (E.D.N.Y. Oct. 27, 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 and n.14 (1976)).

Medical judgments regarding cause of death will often involve some degree of uncertainty. *See Consolidation Coal Co. v. Necessary*, 272 F. App'x 273, 276 (4th Cir. 2008). Plaintiff has not come forward with any evidence on this Motion to demonstrate any question of fact from which a jury could conclude that fabrication, rather than an error in medical judgment, resulted in the allegedly false findings of Dr. Sikirica. Summary judgment for Dr. Sikirica is, therefore, warranted.

## 2. *Brady* Claim

Insofar as Plaintiff seeks to pursue a claim under *Brady v. Maryland* regarding Dr. Sikirica's alleged withholding of exculpatory evidence, that claim must also be dismissed. First, the Court notes that the Amended Complaint makes no reference to *Brady* or exculpatory evidence. *See generally* Am. Compl. Nor does the summary judgment record suggest that Plaintiff has ever before pursued any type of *Brady* claim.

Even if it were properly a part of this litigation, this claim is easily denied on the merits. "A classic *Brady* violation contains three elements: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 627

(E.D.N.Y. 2017) (quoting *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016)) (internal quotation omitted).  These elements are plainly not satisfied here.[9]

As Defendant Sikirica points out, there was extensive testimony about M.T.'s septic condition during Plaintiff's criminal proceedings.  Multiple medical professionals acknowledged that the autopsy report provides evidence regarding sepsis.  Plaintiff's own expert testified at the initial criminal trial that Dr. Sikirica had identified the presence of sepsis.  That trial testimony alone defeats any claim that Sikirica withheld evidence.  The prosecution questioned Sikirica about the presence of sepsis during the first trial.  Dkt. No. 143-18 at pp. 9 & 39.  He was also cross-examined about sepsis, *id.* at pp. 64-65, and the role it may have played in M.T.'s death.  *Id.* at p. 94.  So there appears to be no basis upon which to suggest that information in this regard was withheld from Plaintiff.  Given the trial record in the state court, Plaintiff has no colorable claim that Sikirica withheld M.T.'s septic condition.

Nor has Plaintiff articulated a basis for finding prejudice.  There is a "reasonable probability" of prejudice when the suppression of evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  Plaintiff was ultimately acquitted.  "[T]o show prejudice the claimant 'must demonstrate a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have

---

[9] Defendant Sikirica does not challenge the assertion that he had some obligation independent of prosecutors under *Brady* to disclose exculpatory evidence, so the Court presumes solely for purposes of this Motion that he did.  *But see D'Ambrosio v. Marino*, 2012 WL 4504523, at *4 (N.D. Ohio Oct. 1, 2012) ("the Court concludes that the duty of prosecutors to disclose exculpatory or impeachment evidence to criminal defendants does not extend to coroners.").

been different.'"  *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) (quoting *United States v. Ulbricht*, 858 F.3d 71, 112 (2d Cir. 2017)).  "Thus, a § 1983 plaintiff proceeding on a *Brady* theory can succeed on his claim if he can demonstrate that, had the withheld information been disclosed prior to trial, he would have been acquitted based on reasonable doubt or convicted on a lesser charge."  *Jeanty v. Cerminaro*, 2023 WL 325012, at *4.  "When a criminal defendant is acquitted notwithstanding an alleged *Brady* violation, the criminal defendant has not suffered prejudice and *Brady* has not been implicated."  *Cannistraci v. Kirsopp*, 2012 WL 1801733, at *17 (N.D.N.Y. May 16, 2012).  Plaintiff's acquittal, therefore, is fatal to his purported *Brady* claim.

### 3. Qualified Immunity

Even were the record such that questions of fact precluded summary judgment on the merits of Plaintiff's claim against Sikirica, he is nonetheless entitled to qualified immunity.  As discussed above, that doctrine shields state actors from liability when a reasonable person in their position could not have known that their actions were unconstitutional.

It is not enough that Plaintiff identifies a question of fact regarding M.T.'s cause of death.  In the qualified immunity context, the Court must consider whether a reasonable individual in Dr. Sikirica's position could have known that he was violating Plaintiff's rights.  Several of the medical professionals who either treated M.T. or reviewed this tragic case reached the same conclusions about his death as did Dr. Sikirica.  Others did not.  The facts establish only that each did so based upon their own independent, reasoned medical judgment.  In light of that evidence, Dr. Sikirica is clearly entitled to qualified

immunity.  To hold otherwise, based on a purely conclusory claim of misconduct, would "open the floodgates for civil rights claims against coroners by acquitted criminal defendants who believe a coroner made a mistake in performing an autopsy or in reaching a conclusion about the cause or causes of death of a victim." *Storey v. Chelan Cnty.*, 2011 WL 1575506, at *9 (E.D. Wash. Apr. 26, 2011).  Given that multiple other doctors reached the same conclusion as Dr. Sikirica, that trauma, not sepsis, caused M.T.'s death, no reasonable medical professional would conclude that Dr. Sikirica's conclusion was the result of fabrication.   "Defendant made a reasonable medical judgment, that even if mistaken, does not deprive him of qualified immunity." *Laurent v. Edwin*, 528 F. Supp. 3d 69, 92 (E.D.N.Y. 2021).

### C. Plaintiff's Section 1983 Conspiracy Claim

Finally, the Court addresses Plaintiff's claim alleging that the four individual Defendants "conspired to undermine Adrian Thomas' rights to be free from malicious prosecution and fabrication of evidence and/or deprivation of his right to a fair trial." Am. Compl. at ¶ 105.[10]  All Defendants seek summary judgment on this claim. Dkt. No. 142-16 at pp. 17-18; Dkt. No. 143-1 at pp. 12-14.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Rasheen v. Adner*, 356 F. Supp. 3d

---

[10] Following the Motion to Dismiss Decision, this claim relates only to the malicious prosecution claim.

222, 235 (N.D.N.Y. 2019).  "Conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct evidence.  Importantly, though, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 85 (N.D.N.Y. 2020) (internal quotations, citations, and alterations omitted).  "[S]trictly conclusory" allegations of a conspiracy are insufficient to state a claim.  *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *see also Pangburn v. Culbertson*, 200 F.3d at 72.

"A conspiracy requires an agreement or meeting of the minds to violate federally protected rights."  *Bhatia v. Yale Univ.*, 2007 WL 2904205, at *1 (D. Conn. Sept. 30, 2007), *aff'd sub nom. Bhatia v. Yale Sch. of Med.*, 347 F. App'x 663 (2d Cir. 2009).  In opposing these Motions, Plaintiff argues that "a jury could conclude that Dr. Sikirica rendered his medical opinion in conspiracy with, and to be consistent or 'congruent' with, Thomas' false coerced confession."  Dkt. No. 152 at p. 21; *see also* Dkt. No. 154 at p. 13 ("Dr. Sikirica rendered his medical opinion to be consistent with Thomas' coerced false confession").  Plaintiff's opposition to the Motions speaks exclusively of conduct Sikirica is alleged to have taken.  Dkt. No. 152 at pp. 21-22; Dkt. No. 154 at pp. 13-14.  Plaintiff identifies no actions taken by any member of the Troy Police Department that he suggests were acts in furtherance of a conspiracy with Dr. Sikirica.  Allegations of this sort on the part of Dr. Sikirica, even accepting them as true for purposes of the Motion, suggest, at most, a motive on his part to modify his own conduct to match that of others, not "a 'meeting of the minds' whose *conscious objective* was to deprive plaintiff[] of [his]

41

constitutional rights." *Farag v. United States*, 587 F. Supp. 2d 436, 470-71 (E.D.N.Y. 2008). Such a meeting of the minds is a requirement of a conspiracy claim under section 1983. That is an exceptionally thin read on which to base a claim, especially in light of the absence of any questions of fact suggesting Dr. Sikirica falsified his report.

Defendants Colaneri and Fountain expressly deny ever discussing M.T.'s case with Dr. Sikirica. Dkt. No. 142-1 at ¶ 24; Dkt. No. 142-2 at ¶ 35. Nothing in the record suggests to the contrary and the Court does not understand Plaintiff to maintain otherwise. As noted earlier, Plaintiff concedes that Fountain and Colaneri never spoke with Dr. Sikirica specifically about his autopsy of M.T. Dkt. No. 145 at ¶¶ 84-85; Dkt. No. 155 at ¶¶ 84-85. A conspiracy complaint "must contain 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Plaintiff also concedes that Sikirica and Mason met only once about this case, at the autopsy. Dkt. No. 145 at ¶ 86; Dkt. No. 155 at ¶ 86. Mason admittedly was present at M.T.'s autopsy and spoke with Sikirica at that time. Dkt. No. 156-6 at pp. 166-167. The record establishes that the presence of officials from the Police Department was not unusual at the autopsy of a child. That fact alone, therefore, falls far short of establishing a conspiracy. *See*, *e.g.*, *Gutierrez v. New York*, 2021 WL 681238, at *19 (E.D.N.Y. Feb. 22, 2021) (conclusory allegation that defendants met to conspire against plaintiff insufficient). Plaintiff relies largely on his assumption that Sikirica's conduct was designed to assist the police officers in making a case against Plaintiff, but there simply

is little evidence to support that.  His conclusory claim that as a result of this meeting Defendants "disregarded potentially exculpatory evidence, and shared information gained during their investigation" with the intent to conspire against Plaintiff "fall[s] short of the necessary facts sufficient to establish a meeting of the minds and an express or implied agreement to act in concert." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (citing cases).

Taken together, Plaintiff offers nothing more than the sort of broad, conclusory allegations of a conspiracy that are clearly insufficient to survive summary judgment. "'Unsubstantiated speculation' will not defeat summary judgment as to a § 1983 conspiracy claim." *Faulk v. New York City Dep't of Corr.*, 2014 WL 239708, at *5 (S.D.N.Y. Jan. 21, 2014) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Defendants' Motions for Summary Judgment are granted as to the section 1983 claims.

## V.  CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED**, that City Defendants' Motion for Summary Judgment (Dkt. No. 142) is **GRANTED**; and it is further

**ORDERED**, that Defendant Sikirica's Motion for Summary Judgment (Dkt. No. 143) is **GRANTED**; and it is further

**ORDERED**, that the Clerk is directed to enter judgment for Defendants, and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order

upon the parties to this action.

Dated:   March 30, 2023
          Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge