UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

****************************************************

ADRIAN THOMAS,

                                    Plaintiff,

                         -v-    17-cv-626

ADAM R. MASON, ET AL.,

                                    Defendants.

****************************************************


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DANIEL J. STEWART
                     December 5, 2022
                445 Broadway, Albany, New York


FOR THE PLAINTIFF:

BRETT H. KLEIN, ESQ.
305 Broadway, Suite 600
New York, New York 10007


FOR DEFENDANTS MASON, FOUNTAIN & COLANERI

PATTISON SAMPSON GINSBERG & GRIFFIN PLLC.
By:  Michael Ginsberg, Esq.
      Rhiannon Gifford, Esq.
P.O. Box 208
Troy, New York 12180

FOR DEFENDANT RENSSELAER COUNTY

BAILEY, JOHNSON & PECK, P.C.
By:  William Firth, Esq.
5 Pine West Plaza, Suite 507
Albany, New York 12205

THOMAS v MASON, ET AL. - 17-cv-626

```
 1            COURT CLERK:  Monday, December 5th, 2022,
 2   11:02 a.m.  The case -- you want to do one case?
 3            THE COURT:  Do Thomas.
 4            COURT CLERK:  The case is Adrian Thomas versus
 5   Adam R. Mason and others, case number 17-cv-626.
 6            Appearances for the record, please.
 7            MR. KLEIN:  Brett Klein, for the plaintiff.
 8   Good morning, Judge.
 9            THE COURT:  Good morning, Mr. Klein.
10            MR. FIRTH:  Good morning, your Honor.  William
11   Firth, on behalf of Dr. Sikirica.
12            THE COURT:  Good morning to you.
13            MR. GINSBERG:  Michael Ginsberg for Pattison,
14   Sampson, Ginsberg and Griffin, for the City of Troy and
15   the police officer defendants.
16            MS. GIFFORD:  Rhiannon Gifford, Pattison,
17   Sampson, Ginsberg and Griffin, on behalf of Adam R.
18   Mason, Ronald Fountain and Tim Colaneri.
19            THE COURT:  All right.  Thank you.  Rhiannon,
20   if I call your Rhiannon Spencer, I apologize in advance.
21            MS. GIFFORD:  I understand.  I still call
22   myself the wrong name.
23            THE COURT:  So what we are going to do -- I
24   want to have oral argument on both of these cases; we
25   will do Thomas first.  After we're done with Thomas, I'm
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1   going to take a little break and talk with my chambers,

2   and we will come back out and we will do the second

3   case.

4           So, with regard to Adrian Thomas, we have got

5   two motions for summary judgment, one on behalf of the

6   City defendants and one on behalf of Dr. Sikirica.

7           So, why don't I have the City defendants go

8   first if they wish.

9           MR. GINSBERG:  Thank you, your Honor.  If it's

10  acceptable to the Court, I would just like to make a

11  quick comment or statement about this matter, and then

12  Ms. Gifford -- I had to make a note in my notes as well

13  not to refer to her as Spencer -- then Miss Gifford will

14  address the matters in detail if that's acceptable to

15  the Court.

16          THE COURT:  I have no objection to that.

17          MR. GINSBERG:  Your Honor, in this matter, the

18  Thomas matter, the plaintiff has failed to demonstrate

19  the existence of genuine issue of material facts so as

20  to avoid summary judgment.  I think it's important to

21  point out to the Court that with regard to violation of

22  the right to a fair trial or with regard to any other

23  right on the basis of the involuntary confession as

24  determined by the Court of Appeals, we can't ignore the

25  applicable standard.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

```
 1              The standard is whether a reasonable police
 2     officer in the same position would have understood that
 3     their conduct was in violation of law.  We can't hold
 4     the officers to a higher standard than the standard that
 5     we hold the learned judges of the appellate division or
 6     the trial judge to.  Those judges ruled that the
 7     techniques used by the officer defendants in obtaining a
 8     confession were not in violation of law.
 9              How could the officers understand more than
10     the judges?
11              THE COURT:  Well, it was clearly established
12     at the time, however, that the police could not rely
13     upon the coerced confession in order to make a probable
14     cause determination.  Correct?
15              MR. GINSBERG:  Not at the time that it was
16     taken and certainly not --
17              THE COURT:  That was the state of the law,
18     right?  Back in -- trying to remember.  I'm sure I have
19     it.  So 2008 -- September of 2008 the state of the law
20     was the police couldn't rely on a coerced confession in
21     order to establish probable cause for a prosecution.
22              MR. GINSBERG:  On a coerced confession, yes,
23     your Honor.  But what constituted a coerced confession
24     is what was at issue, and neither the officers at that
25     time nor the trial judge nor the five members of the
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    panel at the appellate division considered the conduct

2    of the officers and techniques used to be a violation of

3    law to be coercive.

4            It wasn't until the Court of Appeals addressed

5    that issue and essentially rendered new law on that

6    matter in regard to the totality of the circumstances

7    and the techniques that were used.  So at the time that

8    those techniques were used, it was not settled law that

9    that constituted coercion.

10           THE COURT:  Well, are you conceding, then, for

11   purpose of the motion, that the confession was coerced?

12           MR. GINSBERG:  Not at the time that it was

13   taken.

14           THE COURT:  I mean as we sit here today, are

15   you conceding that this was a coerced confession?

16           MR. GINSBERG:  We concede that the Court of

17   Appeals determined that the techniques used in totality

18   constituted coercive behavior but only because it was

19   addressed at that time by the Court of Appeals and the

20   law then changed.

21           THE COURT:  Well, I mean, they relied upon

22   cases, Supreme Court cases that predated this event in

23   coming to their conclusion.  But what I'm trying to

24   figure out, because the plaintiff's counsel has made an

25   argument that the -- that you're collaterally estopped

THOMAS v MASON, ET AL. - 17-cv-626

1    from arguing that the confession was not coerced.  And I

2    understand what you're saying is the Court of Appeals

3    made the determination that they -- they made it also on

4    the basis of state law as well.

5                So, for purposes of -- if we have a trial in

6    this case, is one of the issues is going to be presented

7    at the trial as to whether this -- this confession was

8    coerced, are you conceding that it was coerced?

9                MR. GINSBERG:  Your Honor, we don't believe

10   that that's the inquiry that should be made here.  The

11   inquiry that should be made is whether or not the

12   officers at the time knew that the techniques and

13   behavior that they engaged in was in violation of law.

14               There was no way that they could have known

15   that because the judges who addressed the issues didn't

16   know it.  We can't hold the officers to a higher

17   standard.  So, yes, while perhaps ultimately the courts

18   determined that it was coercive, the officers did not

19   know and had no reason to believe that it was coercive

20   conduct at the time that they engaged in it and

21   therefore it cannot constitute a constitutional

22   violation.

23               THE COURT:  Wasn't there a Second Circuit

24   precedent about withholding medical cases of two

25   brothers with withholding medical treatment for the one

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    brother in order to get the other brother to confess to

2    the possession of the gun, they ruled that was

3    unconstitutional?  Isn't that a similar-type case?

4            MR. GINSBERG:  I don't believe so because no

5    medical attention was withheld here.

6            THE COURT:  Well, yeah, but the theory here is

7    that they're going to -- you know, Mr. Thomas, in

8    telling him you have to do this or else your child is

9    going to die and, therefore, that's why it's

10   involuntary.

11           MR. GINSBERG:  I believe what Mr. Thomas was

12   told by the officers was if you tell us what happened,

13   then the medical personnel will be in a better position

14   to help your son.

15           THE COURT:  Right.

16           MR. GINSBERG:  Not that they wouldn't provide

17   any medical attention to him unless he rendered a

18   confession.  I think that those are completely separate

19   issues.

20           THE COURT:  Okay.

21           MR. GINSBERG:  And Miss Gifford will address

22   the -- the particulars in more detail, your Honor.

23           THE COURT:  All right.

24           MS. GIFFORD:  I think the crux of the analysis

25   for the qualified immunity issue is really at what level

THOMAS v MASON, ET AL. - 17-cv-626

1    of generality does the Court define the relevant legal

2    right here.  And as you state, it is generally known

3    that a coerced confession cannot be used against a

4    defendant in a criminal trial.

5                THE COURT:  Let me start there, then.  Okay?

6    Assume for the moment that we extract the confession

7    from the probable cause analysis.  Was there probable

8    cause to arrest Mr. Thomas or prosecute Mr. Thomas in

9    the absence of that confession?

10               MS. GIFFORD:  Yes, I do believe there was.

11   There was significant evidence prior to the police even

12   being involved where the doctors at Albany Medical

13   Center stated that it was suspicious causes to the

14   injuries, that they are injuries that are typically only

15   found in acceleration and deceleration matters, shaking

16   of a child.  That raises a question as to what occurred

17   in questioning of the parents and individuals who had

18   access to the child is incredibly relevant.

19               And at that point, the children who were also

20   residing at the Thomas household were brought into this

21   CPS interview rooms and questioned.  During those

22   questioning, I believe one of the older children, India

23   Thomas, stated that she personally saw Mr. Thomas get

24   angry with the child and shake him and put him down in

25   the bed and his head hit the crib and his head hit the

THOMAS v MASON, ET AL. - 17-cv-626

1    mattress.

2            There were reports that Mr. Thomas utilized

3    a stick to prop open a window to hit the top of the

4    children's head.  There was the subsequent confession

5    prior to the grand jury indictment where Mr. Thomas

6    admitted to throwing the children to the bed to -- onto

7    the bed to the CPS workers.

8            THE COURT:  How long after -- when did

9    that confession occur vis-a-vis the confession which the

10   Court of Appeals found was coerced?

11           MS. GIFFORD:  The confession to the CPS

12   workers was two days before the grand jury presentation,

13   and that was on the 26th.  So it was on or about the --

14   September 24th, 2008, which was the day after the

15   confession with the police officers.

16           THE COURT:  So it's your position that

17   whatever obtained was caused by that improper

18   questioning, that that's somehow dissipated in that

19   period of time?

20           MS. GIFFORD:  Yes.  That is the position, and

21   that he -- the statements made are properly considered

22   as far as the probable cause analysis at the time.  At

23   the time, there was no indication that the confession

24   was indeed coerced, and the additional statements made

25   by Mr. Thomas to the CPS workers who did not have

THOMAS v MASON, ET AL. - 17-cv-626

1   knowledge -- who stated they did not have knowledge of

2   any prior confession to the police and that they were

3   just doing their due diligence pursuant to CPS

4   investigations when Mr. Thomas made those incriminating

5   statements for a second time to them.

6           He made incriminating statements that almost

7   kind of were a little different than what he had said to

8   the police but still corroborated the statements of

9   throwing the child onto the bed, the same kind of

10  actions that Dr. Edge and Dr. Waldman had said at the

11  hospital were indicative of acceleration, deceleration

12  injuries and that Dr. Edge said that this was a homicide

13  in his opinion.  While not necessarily accurate maybe,

14  but that was his opinion at the time he was assessing

15  the children before the police.

16          THE COURT:  He denies ever making that

17  statement, correct?

18          MS. GIFFORD:  He did deny saying that.

19  Correct.  All of the police records and notes taken

20  contemporaneously during the investigation contained

21  notes of that nature.  Dr. Edge was deposed in 2015,

22  many years after the incident.  I think the

23  contemporaneously made notes are indicative of --

24          THE COURT:  That becomes a question of fact.

25          MS. GIFFORD:  Potentially.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1          THE COURT:  Okay.  All right.

2          MS. GIFFORD:  Turning to the -- continuing

3     with qualified immunity analysis, though, the rights

4     needs to be clearly established.  The contours of the

5     rights needs to be clearly established based upon the

6     existence of current law.  Here, as the innocence that

7     were repeatedly stated throughout their briefs,

8     the Court of Appeals were in a unique position to

9     finally address and create bright-line rules with regard

10    to the techniques used by police officers

11    in interrogating and interviewing and that's so because

12    at that time, when the police were interviewing

13    Mr. Thomas in 2008, there were no bright-line rules.

14    There was no out-of-contour define and there was no

15    ability to the police to be able to reject what they had

16    been taught.

17          The innocence network had even acknowledged

18    that this was a proper time to address what the police

19    are taught and what they have been learning at police

20    academies across the state.  These were the common

21    practices and the techniques used in 2008, and they

22    weren't rejected or questioned until it was brought up

23    on this case in 2015, many years after the techniques

24    were utilized.

25          And even if we were to, you know, say that the

THOMAS v MASON, ET AL. - 17-cv-626

1    rule was clearly established and the contours of the

2    rule were defined, there's still the alternative basis

3    for qualified immunity, which was that it was

4    objectively reasonable to believe the techniques were

5    permissible under settled principles.

6            You mentioned when you were speaking with

7    Mr. Ginsberg that the Court of Appeals relied upon

8    Supreme Court cases in New York State to render their

9    determination, but those Supreme Court cases were not on

10   point with what the Court was analyzing in the Thomas

11   decision.  Those Supreme Court cases -- I believe it was

12   Abonds (phonetic) and Garrity, they related to an

13   individual's right to seek jobs and to apply for

14   government positions.

15           And in one of the cases, the Court held that

16   it was improper to force the employee to testify at the

17   grand jury because he could lose his right to bid on

18   contracts later on in the process.

19           THE COURT:  Right.

20           MS. GIFFORD:  That's not any of the scenarios

21   here.  That's --

22           THE COURT:  It goes to the issue of

23   voluntariness.  In other words, the Garrity warnings

24   generally in employment cases go to the issue of whether

25   or not the statements are voluntary.  But you've relied

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    and Mr. Ginsberg pointed out, you know, the decisions of

2    the Appellate Division as a basis for qualified immunity

3    and generally, you know, we look to what's clearly

4    established federal law.  We don't necessarily look to

5    what a state court has determined or not determined.

6              So, wasn't it clearly established by the

7    Second Circuit that at least on a basic level that the

8    police could not falsify evidence and use that to

9    prosecute an individual, correct?

10             MS. GIFFORD:  Yes.  That level of generality

11   was defined at that time.  I believe that we're not

12   dealing with a falsified confession here.

13             THE COURT:  That's what the plaintiff is

14   maintaining.  In other words, I understand there's a

15   difference between something that's coerced and

16   something that's falsified.  So theoretically you could

17   have a coerced confession that's not falsified and also

18   the possibility exists it could be a coerced confession

19   that is falsified.

20             MS. GIFFORD:  Correct.  And in this case, we

21   do not have a identified coerced confession that was

22   falsified.  The cases where they have identified a

23   falsified confession were instances where the criminal

24   defendants stated I never made those statements.  I was

25   not -- I didn't say that I had no gun on me, I didn't

THOMAS v MASON, ET AL. - 17-cv-626

1    have drugs on me, they made that up.

2            THE COURT:  Right.  I absolutely agree with

3    you.  That's one possibility, where the police basically

4    write the whole statement, forge the person's signature

5    and says this is his confession.  Obviously that's

6    unconstitutional.

7            MS. GIFFORD:  Yes.

8            THE COURT:  But what -- you know, what if they

9    go in and basically hold a gun to the person's head and

10   basically say we need you to confess to owning the drugs

11   and the person says okay, I'll write this down?  He

12   wrote it down.  It's not the police manufactured it but

13   they manufactured in a sense that they coerced it.

14           MS. GIFFORD:  I would disagree and say that I

15   think the police did manufacture the confession in that

16   scenario that you presented because they are forcing the

17   individual by a threat of violence to adopt and make

18   statements that he never made or agreed to make.

19           Here, they -- the officers were sitting with

20   Mr. Thomas and having a conversation and then he agreed

21   to -- and made the statements himself and never stated

22   that there was conduct that was performed by the police

23   officers outside the confines of the recorded interview.

24           Each of the tactics and techniques that were

25   utilized by the police in this scenario were available

THOMAS v MASON, ET AL. - 17-cv-626

1    for review by the trial court judge and the Third

2    Department when they determined that the techniques used

3    were not so coercive or inappropriate to vitiate the

4    voluntariness of the confession.

5              In a scenario where the officers are holding a

6    gun to the individual's head, we obviously know that his

7    statements are not being made voluntarily because maybe

8    here the police determined -- or the Court of Appeals

9    determined that the totality amounted to a kind of

10   coercive technique but doesn't necessarily mean for --

11   and I submit that means it does not mean that at all,

12   that the police knew that those statements made by

13   Mr. Thomas and adopted by Mr. Thomas were in fact false.

14             When a cop is holding a gun to an individual,

15   it's pretty apparent, I think, that those statements

16   cannot be reliable at all.

17             THE COURT:  Isn't that kind of what the Court

18   of Appeals was saying?  In other words, each of the

19   statements that was elicited were statements that were

20   fed to Mr. Thomas and that, coupled with his mental

21   health status, coupled with the threat to his wife to

22   prosecute her, the threat with, you know, the -- the

23   threat with regard to the fact that the child wasn't

24   going to get proper medical attention unless he's -- you

25   know, his memory was -- got better, whatever the phrase

THOMAS v MASON, ET AL. - 17-cv-626

1    is that they used -- I know it's not a gun to the head

2    but isn't it along the same lines you're basically

3    feeding that information to the person, trying to coerce

4    them to agree with it so they can close the case?

5             MS. GIFFORD:  At that time, the police

6    officers were not aware -- there was no settled case law

7    that those techniques were inherently coercive to

8    overcome his voluntariness of the statement -- of the

9    statements.

10            Here, you know, ultimately the Court of

11   Appeals took a broader look and had the opportunity and

12   benefit of time to see that, you know, actually the

13   techniques that have been in use and permissible all the

14   way up until 2015 when they made the decision actually

15   maybe aren't as voluntary as we had always been holding

16   or acknowledging.

17            THE COURT:  Well, you're relying on the state

18   court case.  So, there may be federal -- I mean -- my

19   responsibility is to determine what the state of law

20   federally was at the time, not necessarily what the

21   appellate definition concluded at the time.

22            I'm just wondering whether or not a more

23   prudent thing would be to have a jury make a

24   determination as to whether it was coerced, whether --

25   how it was coerced, and then make a determination as to

THOMAS v MASON, ET AL. - 17-cv-626

1    qualified immunity at that point in time once you have

2    that specific information because obviously plaintiff's

3    counsel is taking a different view with regard to the

4    level of misconduct of the pleas, and I'm wondering if

5    it creates a question of fact.

6        MS. GIFFORD:  I submit it does not create a

7    question of fact.  There is no federal court precedent

8    at least that I'm aware of or that I believe the

9    plaintiff argued or pointed to that did set forth the

10   bright-line or have a sufficient contour of the rule to

11   make it so that our officers at the time in 2018 were

12   aware that their techniques were in fact coercive and

13   potentially violation of Mr. Thomas's constitutional

14   rights.

15       I think the analysis is important to consider

16   the Third Department in the Huntley hearing and

17   what cases the Court of Appeals relied upon in the state

18   cases because those were relevant to how the police

19   understood what techniques were permissible.  From my

20   knowledge and at least I haven't seen or recall any

21   arguments to the contrary from the plaintiff's side

22   relying upon federal cases to overcome that.

23       THE COURT:  Okay.  As far as the Huntley

24   hearing goes, obviously your position is once the judge

25   makes a determination to admit the statement, that's an

THOMAS v MASON, ET AL. - 17-cv-626

1    intervening superseding cause which cuts off all

2    liability, correct?

3            MS. GIFFORD:  Correct.  That's the argument as

4    far as the causation element, and I think that the

5    prosecutor's decision to do -- to rely upon and admit

6    the confession and the portions of the reporting I

7    believe at the trial also overcomes and eliminates the

8    causation in this matter because they all made

9    independent judgment to admit and rely upon this

10   confession.

11           THE COURT:  Well, really comes down under

12   Townes, it comes down to what the judge makes an

13   independent determination.  So you -- I don't have it in

14   front of me but do you know at what point in time that

15   the Huntley hearing was made to allow it to come in?

16           MS. GIFFORD:  I did not write the date.  I

17   apologize.

18           THE COURT:  That's all right.  Obviously it's

19   sometime between September 2008 when the -- when the

20   matter went to trial in -- it was indicted

21   September 26th.  So October of 2009 was the trial.

22   Okay.  So you're looking at a year and a month.

23           MS. GIFFORD:  I'm sorry?

24           THE COURT:  I just said you're looking at a

25   year and a month.  In other words, under that scenario,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   assuming that there was a constitutional violation, the

2   state defendants would be responsible for his

3   incarceration for a year and a month up until the time

4   that the -- it was admitted into evidence at which point

5   in time that's basically on the judge for allowing it to

6   come in.

7           MS. GIFFORD:  I would dispute that in that

8   other probable cause existed to prosecute absent the

9   confession.

10          THE COURT:  Okay.

11          MS. GIFFORD:  So that confinement was still

12  legal and justified based upon the additional probable

13  cause.

14          THE COURT:  Okay.

15          MS. GIFFORD:  That was available.

16          THE COURT:  All right.  Let me just check and

17  see if I had any other questions for you.  I think

18  that's it.

19          MS. GIFFORD:  Okay.  Thank you, your Honor.

20          THE COURT:  All right.  Let me hear from the

21  county defendants at this point in time.

22          MR. FIRTH:  Your Honor, good morning.

23          THE COURT:  Good morning.

24          MR. FIRTH:  I have the pleasure of being

25  before you on both cases today due to -- Crystal

THOMAS v MASON, ET AL. - 17-cv-626

1    unfortunately had a family member pass away.

2              THE COURT:  Okay.

3              MR. FIRTH:  So I am here in her place instead.

4              THE COURT:  All right.

5              MR. FIRTH:  If I'm -- go ahead, your Honor.

6              THE COURT:  You can go ahead.  I understand

7    your situation.

8              MR. FIRTH:  To that point, I was going to say

9    if I'm not able to field some of your more difficult

10   questions, then that's kind of my "get out of jail free"

11   card.

12             THE COURT:  Okay.  Well, tell me what your

13   position is with regard to the county defendants and, in

14   particular, Dr. Sikirica.

15             MR. FIRTH:  Yes, Judge, so I think the -- the

16   primary thing to keep in mind here from our perspective

17   is that we're dealing with a grand jury indictment.

18   Okay?  So we have a presumption of probable cause.

19             Plaintiff is required in that situation then

20   to come up with some evidence on the part of

21   Dr. Sikirica showing that he engaged in perjury or

22   suppression of evidence or fraud and were some type of

23   other bad faith conduct on his part and that just has

24   not been done.

25             Crystal articulated it best in her memorandum

THOMAS v MASON, ET AL. - 17-cv-626

1    of law in this case.  This comes down to a disagreement

2    of eight medical experts, doctors, in terms of the

3    interpretation of the objective findings on autopsy.

4    All agree essentially that M.T. suffered from subdural

5    hematoma and hemorrhaging as a result of trauma.

6            And to draw a parallel here, whether it's

7    appropriate or not, plaintiff argued just as he does in

8    the Davis case that the omission of the particular word

9    or a very collateral issue constitutes the suppression

10   of evidence; in this case, it's the condition of sepsis.

11   Even plaintiff's experts, the criminal -- the criminal

12   defendants' experts agree that the autopsy report very

13   sufficiently identified the condition of sepsis.

14           If anything, Dr. Sikirica would be guilty of

15   being overly verbose in his report, describing the

16   condition itself instead of just stating the work.  So,

17   you know -- and, regardless, the prosecution was aware

18   that M.T. had sepsis.  The criminal defendants' team was

19   well aware of the septic condition.  Everyone was well

20   aware.  It was heavily discussed, heavily litigated in

21   both trials And during the grand jury proceeding

22   Dr. Sikirica tested [sic] consistently.

23           There's just no question that sepsis was

24   present as a condition.  So, really, a nonissue for

25   purposes of this motion.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1          You know, and plaintiff also talks about

2    Dr. Sikirica's consideration, I believe he does, of

3    the inculpatory statement of Mr. Thomas, but

4    Dr. Sikirica is neither law enforcement or an officer of

5    the court.  He's entitled to consider all facts

6    surrounding the manner of death and, in fact, he's

7    charged to do that under county law.  That's exactly

8    what he did in this case.

9          THE COURT:  Any problem with the police

10   sitting in on the autopsy?

11          MR. FIRTH:  No, Judge.  Plaintiff's only

12   doctors testified that's appropriate.

13          THE COURT:  Any constitutional violation for

14   disclosing the statements or confession as we referred

15   it to here of the plaintiff to Dr. Sikirica?

16          MR. FIRTH:  On the part of the -- of the city

17   defendants?

18          THE COURT:  Right.

19          MR. FIRTH:  I don't think so, Judge.

20          THE COURT:  Okay.  Well, let me ask you.

21          MR. FIRTH:  I mean --

22          THE COURT:  You know, if you have a

23   pathologist who altered their findings in order to

24   comport with the police investigation where the outcome --

25   where the police wanted to and intentionally did that,

THOMAS v MASON, ET AL. - 17-cv-626

1   that would be a constitution violation, correct?

2          MR. FIRTH:  I would agree that it's

3   intentionally --

4          THE COURT:  And that would get over

5   the presumption of normalcy or whatever the grand jury

6   indictment gets over because you could say it's

7   fraudulent or false.

8          MR. FIRTH:  Tend to agree with you, Judge.

9   Certainly that's not what happened in this case.

10         THE COURT:  That's your position, is that this

11  is a dispute with regard to their analysis and what --

12  initial cause of death that he listed was what?  I mean,

13  he mentioned sepsis but the cause of death was

14  blunt-force trauma, correct?

15         MR. FIRTH:  Yes, Judge.  That is correct.

16         THE COURT:  All right.  So Dr. Waldron, Jenny

17  and Dr. Baden agree with that, right?

18         MR. FIRTH:  That is correct.

19         THE COURT:  Dr. Klein doesn't know,

20  Dr. Maloney disagrees and Dr. Seema (phonetic)?

21         MR. FIRTH:  Leestma.

22         THE COURT:  Okay.  Leestma indicates it was

23  trauma but really it was sepsis.

24         MR. FIRTH:  She agrees it was trauma, just

25  secondary to sepsis.  Right.


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

```
 1              THE COURT:  Okay.
 2              MR. FIRTH:  Your Honor, yes.  Again, it's --
 3   it's really just a case of, you know, Dr. Sikirica's
 4   medical opinion through his extensive education and
 5   experience conducting over 10,000 autopsies, this was
 6   his opinion.  And some doctors agree with him.  At the
 7   very least this is qualified immunity.
 8              THE COURT:  All right.  Thank you.
 9              MR. FIRTH:  Thank you, your Honor.
10              THE COURT:  All right.  Mr. Klein.
11              MR. KLEIN:  Thank you, Judge.  Thank you,
12   Counsel.
13              Your Honor, I guess I'm not going to go
14   through the whole brief, which we rely on and reiterate.
15   But to touch on a few things.  Adrian Thomas -- this
16   case does not involve any crime; I think that's what
17   makes this significant.
18              Looking at the case at this stage of the
19   proceeding, I think that the defendants kind of gloss
20   over the fact that is not a case where there was a crime
21   and it's just a -- a disputed -- as to who committed a
22   crime.  This is a case where in the light most favorable
23   to Mr. Thomas, there was no crime.
24              This is a child who died of natural causes,
25   who was septic, fever, vomiting, et cetera, for two days
```

THOMAS v MASON, ET AL. - 17-cv-626

1    before he was found unresponsive, and other than

2    Dr. Sikirica and the defendants, there was no evidence

3    linking Adrian Thomas to any purported time, which is a

4    disputed fact.  So I think --

5            THE COURT:  There was -- you know, as you

6    pointed out, I mean, all these cases have a particular

7    narrative but here it seems like -- based upon what I

8    have read here, that there was an inquiry and the

9    concern by Dr. Edge with regard to what happened here,

10   he alerted the authorities with regard to that.  He may

11   have been incorrect with regard to his assessment but

12   that's what started the ball rolling, it seems to me.

13           MR. KLEIN:  Right.  And they -- these are all

14   going to be credibility issues as to what we allege

15   through our -- what we intend to prove at trial through

16   our expert in coerced false confessions, whose testimony

17   in evidence before Your Honor and through our

18   pathologist, that this incorrect information is very

19   frequently how a -- what's referred to as a bias cascade

20   starts with law enforcement going down a road that

21   results in law enforcement doing what they did in this

22   case and what the Court of Appeals found was a -- a

23   clear -- a flagrant violation of due process to get the

24   result that they want.  And this is a phenomenon that

25   occurs unfortunately in other cases and it occurred

1   here.

2            So even with that flawed information, there

3   was no evidence linking Mr. Thomas to an acceleration or

4   deceleration injury.  It was the police who then made a

5   conscious choice to interrogate Mr. Thomas for two

6   hours, getting nothing but denials and credible and

7   consistent unawareness of any information that would

8   have led -- would have explained how the child died.

9            Giving a coerced statement that the Court of

10  Appeals found at the first two-hour session was part of

11  this larger coerced confession.

12            And the -- the officers conceding that the

13  information he gave didn't give them probable cause.  It

14  wasn't consistent with the flawed information from

15  Dr. Edge who, by the way, had been up for two days,

16  spoke with these officers for two minutes, disputes what

17  they attribute to him.

18            THE COURT:  He disputes the word murdered but

19  he doesn't dispute that he had a concern.  He relayed

20  the concern to the authorities.  What do you expect the

21  police to do?  They have to investigate.

22            MR. KLEIN:  They do but they don't have to --

23            THE COURT:  They didn't make this up out of

24  whole cloth.

25            MR. KLEIN:  Well, the part with Mr. Thomas

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    I -- we will show at trial, Judge, if the Court will
2    allow, what the Court of Appeals laid out as -- and we
3    think should be the law of the case.
4            THE COURT:  Let's talk about that for a
5    moment.  I mean, that's not the rule of the Second
6    Circuit law.  You know, it's not how is it the
7    collateral estoppel?
8            MR. KLEIN:  Judge, we think that the -- the
9    issues was squarely litigated.
10            THE COURT:  Was -- by whom?
11            MR. KLEIN:  By Mr. Thomas and by the -- you
12    know, the District Attorney on behalf of the --
13    defending the conduct of the police.
14            THE COURT:  Well, the police weren't
15    represented at that hearing.
16            MR. KLEIN:  Well, the -- their conduct -- they
17    were, in essence, represented by the prosecutors.
18            THE COURT:  But that's not what the Second
19    Circuit says.  Right?  Just read *Jenkins versus City of*
20    *New York*.  Detectives Maxshine, Shulman and Hunter and
21    Parrino were witnesses in but not parties to Jenkins'
22    criminal proceeding.  The detectives are no more in
23    privity with the state than the city was in Brown;
24    therefore, it was error for the district court to
25    preclude the defendants from asserting that they had

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    probable cause to arrest Jenkins.

2            So, clearly if Mr. Thomas had lost the issue,

3    that would be res judicata against him because he was

4    there, he litigated it, he had the opportunity, but not

5    against the police officers who were not parties to the

6    proceeding.

7            So it's a defense abuse of collateral

8    estoppel.  You can't use it in an offensive manner in

9    this circumstance I don't believe once unless you can

10   find --

11           MR. KLEIN:  We cite the Owens versus Treder

12   case, Second Circuit 1989.

13           THE COURT:  Yes, and that case involves the

14   determination against the plaintiff who is a party to

15   the proceeding.  It's not against the -- it's not

16   against the -- the police officers.

17           MR. KLEIN:  Well, I think that there is

18   privity in the District Attorney.  I -- you know, the

19   police were represented, in essence, by the state in

20   that case.  They were defending their conduct and

21   litigated the constitutionality of it.

22           THE COURT:  If I made that ruling, it would

23   take a split second for the Second Circuit to reverse

24   me, which they do like to do.

25           MR. KLEIN:  Which I don't want them to do.


                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1           THE COURT:  No.

2           MR. KLEIN:  None of us do.

3           THE COURT:  It may not be a huge issue but --

4    and that's why I asked Rhiannon with regard to it.  They

5    are not taking the position that they concede that this

6    was coercive in nature.  Obviously the Court of Appeals

7    made the decision but I don't think it's binding upon --

8    on the individual detectives who were not party to that

9    proceeding.

10          MR. KLEIN:  Well, Judge, even if you find that

11   it's not, which we hope that you do in a way that won't

12   be reversed on appeal, the -- the -- there clearly are

13   questions of fact here.  The plaintiff denies that he

14   engaged in any crime for all the reasons set forth in

15   that decision.  The dozens of times that -- in other

16   words, he was there for -- not just the first two hours

17   after being hospitalized for -- after expressing an

18   intent to kill himself because he was so distraught, he

19   was hospitalized for 12, 14 hours, I believe.

20          He's then picked up by one of the defendants

21   and taken back right to this interrogation room, with

22   his child still in the hospital and what condition he

23   didn't know at that point, cut off from his family, and

24   even more distraught, sleep deprived and all of that.

25   And also there was circumstances that Your Honor pointed

THOMAS v MASON, ET AL. - 17-cv-626

1    out about his mental state, his ability to comprehend
2    that I think the jury would have to evaluate, and he --
3    he -- and even there, the defendants concede for the
4    next several hours until I believe Defendant Colanari
5    comes in the room, up until that point he maintained
6    that he didn't do anything wrong, and they didn't have
7    probable cause.  It was only when there was
8    this additional threat for, you know, I'll call it, that
9    he was so distraught, so ready to -- to, you know, told
10   so many times you'll leave, we will let you go, you're
11   not in trouble.  You know, we need you to --
12           Making all these threats to his vital
13   interests, which were set forth in the Court of Appeals
14   decision -- his wife, his family, his overall
15   well-being, his kid's survival -- did he give them what
16   they suggested to him dozens and dozens of times and
17   they concede in their testimony that after the Court of
18   Appeals decision in this case, that everything that the
19   Court of Appeals found with regard to their -- their --
20   their conduct was accurate.
21           Yes, we -- we -- he did not say any of these
22   facts before we fed them to him and so these questions
23   of fact are profound.  There may be questions about
24   whether they should -- I don't think -- well, let's say
25   this.  I don't know that anyone would disagree that if

1    Dr. Edge rightly or wrongly expresses a concern that

2    there was some acceleration or deceleration of injury,

3    which is disputed that they would have a right to look

4    into it.

5            The question is whether they coerced a false

6    confession creating fabricated evidence as well as

7    maliciously prosecuting the plaintiff.  Those are

8    questions of fact that can't be resolved on summary

9    judgment as well as qualified immunity.

10           THE COURT:  How do we deal with the fact that

11   we have five judges in the appellate division who looked

12   at this and they're experienced judges -- Malone,

13   Spain -- all these judges I know looked at this and said

14   this is not impermissible.

15           MR. KLEIN:  Well, I don't know them as well as

16   you do, Judge, but I think, you know, there is -- these

17   are invalidated decisions.  So I'm not sure that we need

18   to concern ourselves with that here and that they are --

19   they are not binding decisions.  I think as you pointed

20   out, I'm not aware of -- of the standard of giving the

21   defendants a free pass on immunity because state court

22   decided, you know, and ultimately improperly in their

23   favor.  Courts make mistakes, respectfully, all the time

24   and -- and --

25           THE COURT:  If you are going to say -- I guess

THOMAS v MASON, ET AL. - 17-cv-626

1   this is another area, the qualified immunity is supposed

2   to protect all, plainly.  You've got five judges with

3   law degrees who felt that what they did was appropriate.

4           How can you say that the police officers

5   then -- that they knowingly violated the law?  That a

6   reasonable police officer would have known that they

7   were -- knowingly violated the law when judges on the

8   appellate division felt that they didn't?

9           MR. KLEIN:  Well, because I think that the

10  police officers' conduct was misleading, and I think the --

11  thank God the Court of Appeals got it right.  But I

12  think --

13          THE COURT:  It's not -- it's not misleading in

14  the sense that -- I mean, it was videotaped.  So they

15  knew what it was.  They're not -- they didn't lie about

16  it.  They didn't go in and say we never asked him any

17  leading questions.  He just blurted it out in the first

18  five minutes.  It wasn't -- that's not what you're

19  saying, right?

20          MR. KLEIN:  No, but the fact that it was --

21  what they did, Judge, was -- I think there was

22  discussion about briefs in the Court of Appeals about

23  how these are tried and true techniques.

24          The testimony in this case is not that there

25  were any tried and true techniques used.  The evidence

THOMAS v MASON, ET AL. - 17-cv-626

1  at trial will show, Judge, and I think before the Court

2  in this motion, that Detective Fountain, the lead here,

3  was a juvenile officer and that this was his first, I

4  believe, murder case and that he jumped in after going

5  to one -- a couple of hour training session on

6  interrogations, and he didn't remember the details of

7  that at that time and basically went on instinct and

8  intuition and that his colleagues went along with it.

9          And that they basically went to such lengths

10  that -- threatening interests, threatening in such a way

11  that were clearly established to reasonable police

12  officers that -- and --

13          THE COURT:  Clearly established by what

14  federal case as of 2006?  In other words, if I were to

15  ask you give me your four best cases that would put a

16  police officer on notice, which cases would you rely

17  upon?

18          MR. KLEIN:  I'm probably going to have to ask

19  you to let me send you a letter or follow up because we

20  have thousands of pages of materials we are using and

21  just don't have it off the top of my head to quote for

22  you.

23          THE COURT:  Okay.

24          MR. KLEIN:  But I think it's obvious that --

25  and the -- for the reasons in the Court of Appeals

THOMAS v MASON, ET AL. - 17-cv-626

1   decision that the threats made in this case, the

2   information created --

3            THE COURT:  The Court of Appeals decision was

4   after the fact.  So we are talking about what a

5   reasonable officer would have known at the time that

6   they did it.  They didn't have the benefit of the judges

7   of the Court of Appeals years later.

8            MR. KLEIN:  Right.  The police officers had

9   notice -- this is the -- I can think of a case that I

10  had in the Eastern District where Judge Chen denied

11  summary judgment on a case where the police were looking

12  for individuals who shot at them, and they obtained a

13  statement from a -- a purported witness that was alleged

14  to have been coerced and they said this was what the

15  witness told us and we relied on it, and the Court found

16  that that created a -- that -- that coercion created a

17  question of fact whether they created fabricated

18  evidence that was used to commit -- a prosecutor can

19  deprive a defendant of his liberty.

20           THE COURT:  I will give you time to submit, a

21  week or two weeks.  I want to make sure I get this right

22  but I have to concentrate on what was clearly settled

23  law at the time and how much of an on-force case do I

24  need?  Obviously that's a -- a shifting sands, depending

25  upon the Court of Appeals decision I read with you.

THOMAS v MASON, ET AL. - 17-cv-626

```
 1              MR. KLEIN:  Right.  Because there's --
 2    there's, you know -- there's a lot of cases where it
 3    doesn't have to be specifically that holding for the
 4    Court to find that there's -- as long as they are on
 5    notice.  But, Judge, I would say this in this case, the
 6    evidence was that Adrian Thomas was involved was in fact
 7    created by the officers.  They had no evidence.
 8              THE COURT:  He was the custodial parent who
 9    had -- with the child when -- when the child became
10    sick.
11              MR. KLEIN:  The mother was as well but they
12    zoomed in on him and -- and immediately removed him from
13    the home to headquarters and started with their tell us
14    what happened, tell us -- we know you did this.  The
15    doctor told us this baby was hit with a force of a bus.
16    You know, if you want to save his life, you've got to
17    tell -- if you want to see your wife, if you want to go
18    home, you know, you're not in trouble.  Just tell us.
19    And they wore this man down.
20              And so I think that -- that the creation of
21    this false, fabricated evidence, which is at this stage
22    the Court should has to credit as in the light most
23    favorable to the plaintiff, this was a coerced false
24    confession with evidence created by these officers who
25    concede.
```

THOMAS v MASON, ET AL. - 17-cv-626

1            THE COURT:  You're using the word coerced and
2     false interchangeably.  You can have a coerced
3     confession and it could be true.
4            MR. KLEIN:   Correct.  This is a coerced and
5     false confession.  He -- it was coerced.  We think for
6     the reasons set forth in the Court of Appeals decision
7     that we have -- the officers concede that they suggested
8     all of the incriminating facts to plaintiff before he
9     ever said them independently.
10            And, two, that these facts were false.  The
11     plaintiff denies them, his expert validates that this
12     is exactly what happened here, and we think will -- you
13     know, can -- can convince a jury that more likely than
14     not that this was a coerced false confession and at
15     least are questions of fact.
16            THE COURT:  Do you concede that the point when
17     the judge allows a confession in that that breaks the
18     causal chain?
19            MR. KLEIN:  I don't.  I think we are talking
20     about Townes -- my understanding of Townes is it's a --
21     it's a case where someone was seeking damages for
22     malicious prosecution based on a bad stop and so, if I
23     recall correctly, the person was in the back of the cab
24     and had a gun.
25            THE COURT:  Yes.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1          MR. KLEIN:  And so it was probable cause to --
2    grounds to -- or to arrest that person even --
3          THE COURT:  No grounds to stop.
4          MR. KLEIN:  To stop.  And so the individual
5    sought to benefit from the fruit of the poisonous tree
6    in seeking damages for a bad stop, and the Court said no
7    once that gun is recovered, we have grounds to prosecute
8    you.
9          THE COURT:  But the Court also said -- and I
10   agree with what you said there.  The Court also said
11   separately and independently that once -- when the judge
12   makes a determination to allow it in, that's a
13   superseding intervening cause and that cuts the causal
14   chain.  So that would end any type of damages at that
15   point.
16         MR. KLEIN:  I think -- that's, I think, a
17   different scenario where someone is seeking damages.
18   Yeah, I -- I -- my understanding is that the -- the --
19   the defendants' conduct reasonably and foreseeably
20   resulted in plaintiff being, you know, a -- a court
21   adopting this coerced false statement.  And so I don't
22   see how that can insulate them from the reasonable and
23   foreseeable consequences of their misconduct.
24         THE COURT:  Well, because -- as long as they
25   don't lie to the judge.  In other words, if they

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    don't -- you know, say we brought him in and he

2    voluntarily wrote this down in three minutes and we

3    never asked him a single question.  All right?

4              MR. KLEIN:  Never threatened him and the

5    threats are on tape or --

6              THE COURT:  As long as a judge is making an

7    independent decision.  If he makes a decision to allow

8    that into evidence and he's wrong about that, he should

9    have suppressed it but he did not, that is a superseding

10   and intervening cause by definition.  But let me --

11             MR. KLEIN:  If I could just make one final

12   point.

13             THE COURT:  Yes.

14             MR. KLEIN:  I think that what's different here

15   is this bias cascade that continues even after the

16   confession is suppressed, is thrown out by the Court of

17   Appeals.

18             THE COURT:  Let me ask you this question:  Why

19   didn't the Court of Appeals, if they suppressed a

20   confession, there's no probable cause for the

21   prosecution, why didn't they dismiss the case at that

22   point in time rather than set it down to be retried?

23             MR. KLEIN:  I don't know that they went to the

24   question of probable cause.  I think the motion was just

25   on the -- on the suppression.  So I'm not sure of the

THOMAS v MASON, ET AL. - 17-cv-626

1    logistics of that, whether the Court had that authority

2    or whether the Court weighed that or not.  But my

3    understanding is that the Court did not make any

4    determination of probable cause.  It just made a

5    determination that the -- the motion to suppress should

6    have been granted and -- and sent it back to the trial

7    court for further proceeding.

8              We don't think he should have been

9    re-prosecuted in the absence of any evidence linking him

10   to it, but that was part of the bias cascade in this

11   case.

12             Dr. Sikirica stuck to his theory, even in the

13   absence of the information that was given to him with --

14   within hours of the -- of the coerced false confession

15   being created, and he writes blunt-force trauma on the

16   death certificate, doesn't issue his autopsy for months

17   and months and months later and goes to a grand jury and

18   reports that to this theory that only came about via the

19   suggestions and coerced statements made by the

20   defendants.

21             THE COURT:  What's the proof of that?  It

22   seems that Dr. Sikirica did an autopsy and made his

23   conclusion, which some other doctors agree with and some

24   others disagree.

25             MR. KLEIN:  Others agree I think who are not

THOMAS v MASON, ET AL. - 17-cv-626

1    experts in the case.  After the fact maybe the -- the
2    neurologist was asked in a deposition what do you think
3    about this?  People -- I think there's a credibility
4    issues about --
5              THE COURT:  Do you have an expert opinion to
6    say that the doctor committed malpractice in that
7    determination?
8              MR. KLEIN:  In -- in essence, I don't think
9    the question of malpractice was asked of Dr. Maloney.
10   The deputy county medical examiner for Erie County,
11   New York, is our expert in this case, and she says
12   flat-out that this -- there's no evidence of trauma,
13   that this was sepsis leading to meningitis that resulted
14   in the -- the swelling and bleeding and -- and evidence
15   of subdural collection in the brain and that
16   Dr. Sikirica was flatly wrong.
17             There are post hoc questions or expert reports
18   from the defense but at this stage, yes, the plaintiff
19   does submit that that was flatly wrong, and combined
20   with the testimony of Doctor -- of plaintiff's
21   confession expert squares -- supports the inference that
22   can only be decided by a jury that this was a cascade, a
23   bias cascade.  Started with this premise that there
24   was a homicide, and whether that was right or wrong, the
25   defendants then endeavored to get plaintiff to, you

1   know, sign a coerced false confession that was then

2   shared with Dr. Sikirica, who then issues a cause of

3   death determination that's at odds with what our expert

4   says the evidence shows.

5               So we do think there are credibility issues

6   that can only be resolved at trial.

7               THE COURT:  Okay.  All right.  Why don't --

8   I'm going to take a break for a couple of minutes just

9   to talk with my staff, and we will come out and finish

10  this one and move on to the next one.  If you want to

11  take a break and get a drink of water or something, feel

12  free.

13              MR. KLEIN:  Thank you.

14              (Pause in proceeding, 11:58 a.m.)

15              (Following recess, 12:10 p.m.)

16              THE COURT:  Before I get the decision over to

17  Davis-Guider, any further arguments that anyone wants to

18  make that I haven't heard from?  Pretty extensive brief.

19  This one goes along.  All right.  Not hearing anything.

20              So -- and obviously for purposes of this oral

21  argument, I have heard -- we talked about general

22  principles of the law that are generally applicable to

23  coroners and police officers, so we probably don't need

24  to repeat that except as to the specifics.  But why

25  don't I -- I'm going to turn to the City and just have

THOMAS v MASON, ET AL. - 17-cv-626

1    them summarize what your argument is in this case.

2           MS. GIFFORD:  Thank you, your Honor.  The

3    City's position in this case --

4           THE COURT:  Before you do, I'll just call a

5    different case.  So, with regard to this matter, we

6    talked a little bit about giving plaintiff's counsel and

7    defense counsel a short period of time if you want to

8    submit to me.  What I'm looking for particular cases

9    that deal with what was clearly established at the time

10   of this interrogation from a federal point of view that

11   you want to rely upon.

12          I'm not looking for hundreds of them but you

13   have three or four that are your best cases at the time,

14   Mr. Klein, can you do that within a week or so?

15          MR. KLEIN:  Yes.

16          THE COURT:  All right.  So seven days.  And

17   how about defense counsel?  Can I get those within a

18   week -- unless you want to rely upon what's in your

19   brief.

20          MR. GINSBERG:  To the extent that those cases

21   don't appear in the plaintiff's brief, we would like an

22   opportunity to at least see them and then respond to

23   them before the defense would have to submit.

24          THE COURT:  You made the motion for qualified

25   immunity.  So it's your obligation to tell me what the

                  Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    clearly established law was at the time.  So we will

2    just ask for whatever you give me.

3              MR. GINSBERG:  Certainly, your Honor.

4              THE COURT:  Okay.  Same for the --

5    Dr. Sikirica.

6              MR. FIRTH:  Yes.

7              THE COURT:  It may not be an issue with regard

8    to this whole issue of -- the confession is separate

9    from what your issue is?

10             MR. FIRTH:  That's correct, your Honor.

11             THE COURT:  All right.  So, feel free.  I just

12   want to give you an opportunity with regard to that.  So

13   that marks the end of the oral argument in the first

14   case and then going to transition over to the Michael

15   Davis-Guider case.

16             (Proceeding concluded.)

17             *  *  *  *  *  *  *  *  *

18

19

20

21

22

23

24

25

                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

# C E R T I F I C A T I O N

I, Lisa L. Tennyson, RMR, CSR, CRR, Federal
Official Realtime Court Reporter, in and for the United
States District Court for the Northern District of New
York, do hereby certify that pursuant to Section 753,
Title 28, United States Code, that the foregoing is a
true and correct transcript of the stenographically
reported proceedings held in the above-entitled matter
and that the transcript page format is in conformance
with the regulations of the Judicial Conference of the
United States.

                    /s/ Lisa L. Tennyson

            Lisa L. Tennyson, RMR, RPR, FCRR

                Lisa L. Tennyson, CSR, RMR, FCRR
            UNITED STATES DISTRICT COURT - NDNY